# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DENBURY RESOURCES INC., *et al.*,[1] | ) | Case No. 20-33801 (DRJ) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

## DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE PAYMENT OF SPECIFIED LIENHOLDER AND OTHER TRADE CLAIMS, (II) CONFIRMING ADMINISTRATIVE EXPENSE PRIORITY OF OUTSTANDING ORDERS, AND (III) GRANTING RELATED RELIEF

**EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON JULY 31, 2020, AT 7:30 A.M. (CENTRAL TIME) IN COURTROOM 400, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TEXAS 77002. IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**RELIEF IS REQUESTED NOT LATER THAN JULY 31, 2020.**

**PLEASE NOTE THAT ON MARCH 24, 2020, THROUGH THE ENTRY OF GENERAL ORDER 2020-10, THE COURT INVOKED THE PROTOCOL FOR EMERGENCY PUBLIC HEALTH OR SAFETY CONDITIONS.**

**IT IS ANTICIPATED THAT ALL PERSONS WILL APPEAR TELEPHONICALLY AND ALSO MAY APPEAR VIA VIDEO AT THIS HEARING.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S REGULAR DIAL-IN NUMBER. THE DIAL-IN NUMBER IS +1(832) 917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES. YOU WILL BE ASKED TO KEY IN THE CONFERENCE ROOM NUMBER. JUDGE JONES'S CONFERENCE ROOM NUMBER IS 205691.**

**PARTIES MAY PARTICIPATE IN ELECTRONIC HEARINGS BY USE OF AN INTERNET CONNECTION. THE INTERNET SITE IS WWW.JOIN.ME. PERSONS CONNECTING BY**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Denbury Resources Inc. (7835); Denbury Air, LLC (7621); Denbury Brookhaven Pipeline Partnership, LP (6322); Denbury Brookhaven Pipeline, LLC (6471); Denbury Gathering & Marketing, Inc. (6150); Denbury Green Pipeline-Montana, LLC (6443); Denbury Green Pipeline-North Dakota, LLC (7725); Denbury Green Pipeline-Riley Ridge, LLC (2859); Denbury Green Pipeline-Texas, LLC (2301); Denbury Gulf Coast Pipelines, LLC (0892); Denbury Holdings, Inc. (1216); Denbury Onshore, LLC (7798); Denbury Operating Company (7620); Denbury Pipeline Holdings, LLC (0190); Denbury Thompson Pipeline, LLC (0976); Encore Partners GP Holdings, LLC (N/A); Greencore Pipeline Company, LLC (9605); Plain Energy Holdings, LLC (0543). The location of Debtor Denbury Resources Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 5320 Legacy Drive, Plano, Texas 75024.

**MOBILE DEVICE WILL NEED TO DOWNLOAD THE FREE JOIN.ME APPLICATION.**

**ONCE CONNECTED TO WWW.JOIN.ME, A PARTICIPANT MUST SELECT "JOIN A MEETING".  THE CODE FOR JOINING THIS HEARING BEFORE JUDGE JONES IS "JUDGEJONES".  THE NEXT SCREEN WILL HAVE A PLACE FOR THE PARTICIPANT'S NAME IN THE LOWER LEFT CORNER.  PLEASE COMPLETE THE NAME AND CLICK "NOTIFY".**

**HEARING APPEARANCES SHOULD BE MADE ELECTRONICALLY AND IN ADVANCE OF THE HEARING.  YOU MAY MAKE YOUR ELECTRONIC APPEARANCE BY:**

**1) GOING TO THE SOUTHERN DISTRICT OF TEXAS WEBSITE;**

**2) SELECTING "BANKRUPTCY COURT" FROM THE TOP MENU;**

**3) SELECTING "JUDGES' PROCEDURES AND SCHEDULES";**

**4) SELECTING "VIEW HOME PAGE" FOR JUDGE JONES;**

**5) UNDER "ELECTRONIC APPEARANCE" SELECT "CLICK HERE TO SUBMIT ELECTRONIC APPEARANCE;"**

**6) SELECT "DENBURY RESOURCES INC., ET AL." FROM THE LIST OF ELECTRONIC APPEARANCE LINKS; AND**

**7) AFTER SELECTING DENBURY RESOURCES INC., ET AL. FROM THE LIST, COMPLETE THE REQUIRED FIELDS AND HIT THE "SUBMIT" BUTTON AT THE BOTTOM OF THE PAGE.**

**SUBMITTING YOUR APPEARANCE ELECTRONICALLY IN ADVANCE OF THE HEARING WILL NEGATE THE NEED TO MAKE AN APPEARANCE ON THE RECORD AT THE HEARING.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state the following in support of this motion (this "Motion"):

**Relief Requested**

1.      The Debtors seek entry of an interim order (the "Interim Order") and a final order (the "Final Order"), substantially in the forms attached hereto:  (a) authorizing the Debtors to pay certain lienholder and other trade claims in the ordinary course of business on a postpetition basis, subject to the terms of this Motion; (b) confirming the administrative expense priority status and allowed administrative treatment of the Debtors' outstanding orders and undisputed obligations

for the postpetition delivery and performance of goods and services and authorizing payment of such obligations in the ordinary course of business; and (c) granting related relief.

2.      In addition, the Debtors request that the Court (as defined herein) schedule a final hearing within approximately 35 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

### Jurisdiction and Venue

3.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The bases for the relief requested herein are sections 105(a), 363, 503(b), and 507(a) of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, and rule 9013-1(i) of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

6.      On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Christian S. Kendall, Chief Executive Officer of Denbury Resources Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with this Motion and incorporated by reference herein.

7.      The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with

the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

### The Specified Trade Claims

8.    The following table summarizes the types of claimants that the Debtors request authority to pay pursuant to this Motion and includes estimates prepetition amounts outstanding:

| Category | Description of Services Provided | Estimated Amount Outstanding as of Petition Date (Final Order) | Estimated Amount Due Within 35 Days (Interim Order) |
|---|---|---|---|
| Oil and Gas Operating Expense Claimants | Suppliers of goods or services utilized by the Debtors for all operating expenses on account of their working interests in oil and gas leases and relating to their $CO_2$ enhanced oil recovery operations. | $40,000,000[2] | $37,900,000 |
| Marketing Arrangement Counterparties | Suppliers of services necessary or desirable to get the oil and natural gas production to market in a condition ready for sale. | $8,000,000 | $8,000,000 |
| Shippers and Warehousemen | Suppliers of services necessary to transport or deliver goods, materials, or other property. | $720,000 | $700,000 |
| Miscellaneous Claimants | Providers of general operating, technology, and human resource services, including labor relations and training, as well as other services associated with running day-to-day operations. | $1,870,000 | $1,820,000 |
| HSE and Other Suppliers | Suppliers of goods or services that may be reasonably necessary to ensure the health, safety, regulatory, and environmental compliance and integrity of the Debtors' operations, but which are not Oil and Gas Operating Expenses, Marketing Expenses, Shipping and Warehousing Claims, Miscellaneous Expenses, or 503(b)(9) Claims. | $250,000 | $230,000 |
| **Total Amount of Estimated Claims** | | **$50,840,000** | **$48,650,000** |
| **Total as Percentage of Total Funded Debt** | | **2.1%** | **2.0%** |

---

[2]    The approximately $40 million of outstanding Oil and Gas Operating Expenses includes approximately $7.8 million of 503(b)(9) Claims (as defined herein).

I.        **Oil and Gas Operating Expenses.**

9.        The Debtors are operators of nearly all of their significant properties, in which the Debtors also own most of the interests, although typically less than a 100% working interest, and a lesser net royalty interest due to royalties and other burdens.  As operators, the Debtors are responsible for paying all of the lease operating expenses (the "Oil and Gas Operating Expenses") on account of their working interests in the oil and gas leases and on behalf of the non-operating working interest owners.  The Debtors then seek reimbursement from non-operating interest owners for their *pro rata* share of the Oil and Gas Operating Expenses.

10.       Oil and Gas Operating Expenses commonly include payments to third parties (the "Oil and Gas Operating Expense Claimants") that perform labor or furnish or transport materials, equipment, or supplies used in the drilling, operating, or maintenance of an oil and gas property.  Oil and Gas Operating Expenses can also include payments made to third parties who own property interests that are critical to the drilling, operating, or maintenance of an oil and gas property.  Such payments can take the form of lump sum payments, rentals, extensions, minimum payments, or damage payments made to surface or mineral interest owners.

11.       The Debtors increase the value of their properties through a combination of exploitation, drilling, and proven engineering extraction practices, with the most significant emphasis relating to $CO_2$ enhanced oil recovery ("EOR") operations.  $CO_2$ used in EOR is one of the most efficient tertiary recovery mechanisms for producing crude oil.  When injected under pressure into underground, oil-bearing rock formations, $CO_2$ acts somewhat like a solvent as it travels through the reservoir rock, mixing with and modifying the characteristics of the oil so it can be produced and sold.  The Debtors' asset base consists almost entirely of, or otherwise relates to, oil fields that the Debtors are currently flooding with $CO_2$ or plan to flood with $CO_2$ in the future and assets that produce $CO_2$.

12.     Tertiary projects may be more expensive to operate than traditional industry operations because of the cost of injecting and recycling the $CO_2$—primarily due to the cost of the $CO_2$ and the significant energy requirements to re-compress the $CO_2$ back into a near-liquid state for re-injection purposes.  The costs of the Debtors' $CO_2$ and the electricity required to recycle and inject the $CO_2$ comprise nearly half of the Debtors' typical tertiary operating expenses. Because these costs vary along with commodity and commercial electricity prices, they are highly variable and will increase in a high-commodity-price environment and decrease in a low-price environment.  The cost of purchasing and/or producing $CO_2$ for use in tertiary floods is allocated to the Debtors' tertiary oil fields and recorded as lease operating expenses (following the commencement of tertiary oil production) at the time the $CO_2$ is injected.  These costs have historically represented approximately 20% to 25% of the Debtors' total operating costs for their tertiary operations.  Because the Debtors expense all of the operating costs to produce and inject their $CO_2$ (following the commencement of tertiary oil production), operating costs per barrel for a new flood will be higher at the inception of $CO_2$ injection projects because of minimal related oil production at that time.

13.     The Debtors' $CO_2$-enhanced production infrastructure contributes to their competitive position in the market.  Expenses related to the production of $CO_2$ are allocated on a monthly basis between volumes sold to third parties and volumes consumed internally that are directly related to the Debtors' tertiary production, which are included as Oil and Gas Operating Expenses.

14.     Regardless of when an operator is reimbursed by non-operating working interest owners, the operator must continue to pay operating expenses (such as the Oil and Gas Operating Expenses) in a timely fashion.  Failure to pay Oil and Gas Operating Expenses when due could result in, among other remedies, the Debtors' removal as operator under certain joint operating

agreements.  Additionally, the failure to pay certain Oil and Gas Operating Expense Claimants

could result in the perfection and enforcement of liens on the Debtors' assets by such claimants,[3]

likely including those claimants holding claims on account of certain $CO_2$ expenses.[4]

15.     As is typical in the industry, the Oil and Gas Operating Expenses are not uniform

and are not entirely predictable on a month-to-month basis.   In 2019, the Debtors paid

approximately $660 million in Oil and Gas Operating Expenses, approximately $182 million of

which was reimbursed to the Debtors by non-operating working interest owners.

16.     The Debtors seek only to pay undisputed, prepetition Oil and Gas Operating

Expenses owed by the Debtors in the ordinary course of business.   As of the Petition Date,

the Debtors estimate that they have approximately $40 million of Oil and Gas Operating Expenses

outstanding, approximately $37.9 million of which will come due and owing within the first

35 days of these chapter 11 cases.   With respect to the total amount of Oil and Gas Operating

Expenses outstanding as of the Petition Date, the Debtors expect that they ultimately will be

reimbursed approximately $10.5 million by owners of non-operating working interests.

The Debtors request authority to pay prepetition Oil and Gas Operating Expenses as they become

---

[3]     For example, chapter 56 of the Texas Property Code grants a "mineral contractor" or "mineral subcontractor" a lien to secure payment for labor or services related to "mineral activities."  Tex. Prop. Code Ann. § 56.002; *see also In re Reichmann Petroleum Corp.*, 373 Fed. Appx. 497, 500 (5th Cir. 2010) (finding that creditors' mineral liens under Texas Law attached to the entire leasehold interest where creditors provided goods and services in the drilling, completion, and operation of wells).   "Mineral contractor" and "mineral subcontractor" are broadly defined to include, *inter alia*, persons performing labor or furnishing or hauling material, machinery, or supplies used in mineral activities.  *Id.* at § 56.001(2), (4).   "Mineral activities" is similarly broad and includes digging, drilling, torpedoing, operating, completing, maintaining, or repairing an oil, gas, or water well, an oil or gas pipeline, or a mine or quarry.  *Id.* at § 56.001(1).

[4]     *See, e.g.*, *Exxon Corp. v. Lujan*, 970 F.2d 757, 763 (10th Cir. 1992) (finding that Bureau of Land Management reasonably concluded that "natural gas" included carbon dioxide, within meaning of Mineral Leasing Act); *Aulston v. U.S.*, 915 F.2d 584, 599 (10th Cir. 1990) (finding that the Department of the Interior reasonably concluded that "gas" included carbon dioxide, within meaning of Agricultural Entry Act of 1914; *Amoco Prod. Co. v. State*, 751 P.2d 379, 382–83 (Wyo. 1988) (finding "natural gas" includes carbon dioxide within meaning of state tax statute).

due and payable and to continue paying Oil and Gas Operating Expenses in the ordinary course of business on a postpetition basis.

## II.     Marketing Expenses.

17.     To effectively market or sell production from oil and gas properties operated by the Debtors, the Debtors enter into contractual arrangements (the "Marketing Arrangements") pursuant to which third parties (the "Marketing Arrangement Counterparties") charge the Debtors, as operator, for transportation, marketing, processing, gathering, treating, dehydration, compression, fractionation, and other similar services necessary or desirable to ensure that such properties' production is in a condition ready for sale (such charges, collectively, the "Marketing Expenses").  In addition, the Debtors incur Marketing Expenses where they elect to take their production "in-kind" rather than requesting that the third-party operator market the production associated with the Debtors' non-operating working interests on the Debtors' behalf.

18.     The Debtors' compliance with the Marketing Arrangements and timely payment of the Marketing Expenses is critical to the Debtors' ability to receive revenue from production that they market both on behalf of themselves and third parties (the "Marketed Production").  Failure to receive such revenue would directly threaten the Debtors' ability to timely make payments to third parties holding an interest in production, such as working interest owners and royalty interest owners.[5]

19.     The Marketing Arrangement Counterparties typically have possession and, at times, title to the Marketed Production.  Accordingly, failure to pay Marketing Expenses when due could result in such Marketing Arrangement Counterparties refusing to release Marketed

---

[5]   For additional detail regarding payments to royalty interest owners and working interest owners, *see* the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Mineral Payments, Working Interest Disbursements, and Non-Operating Working Interest Expenses and (II) Granting Related Relief*, filed contemporaneously herewith.

Production or revenues associated with the Marketed Production in their possession or refusing to accept delivery of additional Marketed Production.

20.      In instances where delivery of Marketed Production is refused, the Debtors may be forced to shut-in a well.  Shutting in a well may have economic consequences to the Debtors beyond temporary cessation of production and revenue therefrom.  For instance, once a well is shut-in, it may not be possible to re-establish production from the well in the future.  The act of shutting in a well can trigger obligations to other interest owners in that well, including payment obligations or potential forfeiture of the Debtors' interest under the terms of an oil and gas lease. Without seamless compliance with their Marketing Arrangements and the ability to make the Debtors' production marketable for sale, the Debtors' revenue stream and ability to operate their business potentially would be severely impaired.

21.      In 2019, the Debtors paid approximately $42 million in Marketing Expenses.  As of the Petition Date, the Debtors estimate that they have approximately $8 million of prepetition Marketing Expenses outstanding, all of which will come due and owing in the first 35 days of these chapter 11 cases.  To preserve and protect their relationships with the applicable Marketing Arrangement Counterparties, the Debtors request authority to pay prepetition Marketing Expenses as they become due and payable and to continue paying Marketing Expenses in the ordinary course of business on a postpetition basis.

**III.    Shipping and Warehousing Claims.**

22.      In the ordinary course of business, the Debtors engage certain vendors (the "Shippers") to transport or deliver goods, materials, or other property, including drilling pipe, casing, wellheads, tanks, separators, and other necessary oil and gas equipment (the "Materials") from a manufacturer to a storage yard, between a storage yard and an oil and gas property, between oil and gas properties, or between storage yards.  The Shippers regularly possess Materials

belonging to the Debtors and to the owners of non-operating working interests in an oil and gas property of which the Debtors are the operator.  The Materials are integral to the exploration and production process.  The Debtors require timely, and sometimes immediate, access to the Materials while drilling or operating a well.

23.     Additionally, while the Debtors own multiple storage yards, they rely on certain additional vendors (collectively, the "Warehousemen") in the ordinary course of business to store Materials when not being used.  If the Debtors were to default on any obligation to the Warehousemen, the Warehousemen may assert a lien, attempt to take possession of the Debtors' property, or bar the Debtors' access to Materials stored at the Warehousemen's yards. In addition, under most state laws, a Shipper or a Warehouseman may have a lien on the goods in its possession,[6] which lien secures the charges or expenses incurred in connection with the transportation or storage of such goods.[7]  As a result, certain Shippers and Warehousemen may refuse to deliver or release Materials or other property in their possession or control, as applicable, before the prepetition amounts owed to them by the Debtors (collectively, the "Shipping and Warehousing Claims") have been satisfied and their liens redeemed.

24.     In 2019, the Debtors paid approximately $5 million in Shipping and Warehousing Claims.  As of the Petition Date, the Debtors estimate that they have approximately $720,000 of prepetition Shipping and Warehousing Claims outstanding, approximately $700,000 of which will become due and owing in the first 35 days of these chapter 11 cases.  To continue using the

---

[6]     *See* U.C.C. § 7-209(a) ("A *warehouse* has a lien against the bailor on the *goods* covered by a warehouse receipt or storage agreement or on the proceeds thereof in its possession for charges for storage or transportation, including demurrage and terminal charges, insurance, labor, or other charges, present or future, in relation to the goods, and for expenses necessary for preservation of the goods or reasonably incurred in their sale pursuant to law.") (emphasis added).

[7]     By this Motion, the Debtors do not concede that any liens (contractual, common law, statutory, or otherwise) described in this Motion are valid, and the Debtors expressly reserve the right to contest the extent, validity, and perfection of any and all such liens, and to seek avoidance thereof.

Shippers' and Warehousemen's transportation and storage services and have access to the Materials held or controlled thereby, the Debtors request authority to pay prepetition Shipping and Warehousing Claims as they become due and payable and to continue paying Shipping and Warehousing Claims in the ordinary course of business on a postpetition basis.

**IV.     503(b)(9) Claims.**

25.     The Debtors may have received certain goods from various vendors, such as tooling, valve equipment, and chemicals, within the 20 days prior to the Petition Date (collectively, the "503(b)(9) Claimants").  Certain of the Debtors' relationships with the 503(b)(9) Claimants are not governed by enforceable long-term contracts.  Rather, the Debtors often obtain supplies on an order-by-order basis.  As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its prepetition claims.

26.     The Debtors also believe certain 503(b)(9) Claimants could reduce the Debtors' existing trade credit—or demand payment in cash on delivery.  The Debtors believe that as of the Petition Date, they owe approximately $7.8 million[8] on account of goods delivered within the 20 days prior to the Petition Date, $7.6 million of which will become due and owing in the first 35 days of these chapter 11 cases, and the value of which may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.[9]

27.     Accordingly, the Debtors request authority, but not direction, to pay those undisputed claims arising from the goods received by the Debtors within the 20 days prior to

---

[8]     The approximately $7.8 million owed on account of goods delivered within the 20 days prior to the Petition Date is included in the approximately $40 million of Oil and Gas Operating Expenses outstanding described in paragraph 16 of this Motion.

[9]     The Debtors do not concede that any claims described in this Motion are conclusively entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code, and the Debtors expressly reserve the right to contest the allowance, priority, or validity of all such claims.

the Petition Date in the ordinary course of business (each, a "503(b)(9) Claim").  The Debtors do not seek to accelerate or modify existing payment terms with respect to the 503(b)(9) Claims. Rather, the Debtors will pay the 503(b)(9) Claims as they become due in the ordinary course of business, in accordance with the Court's orders.

**V.      Miscellaneous Expenses.**

28.      In the ordinary course of business, the Debtors incur obligations to providers (collectively, the "Miscellaneous Claimants") of general operating, technology, and human resource services, including labor relations and training, as well as other services associated with running the day-to-day operations of an oil and gas company (collectively, the "Miscellaneous Expenses").  Miscellaneous Expenses are not uniform and are not entirely predictable on a month-to-month basis.

29.      In 2019, the Debtors paid approximately $84 million in Miscellaneous Expenses. As of the Petition Date, the Debtors estimate that they have approximately $1.87 million of prepetition Miscellaneous Expenses outstanding, approximately $1.82 million of which will become due and owing in the first 35 days of these chapter 11 cases.  To continue using the services of the Miscellaneous Claimants, the Debtors request authority to pay prepetition Miscellaneous Expenses as they become due and payable and to continue paying Miscellaneous Expenses in the ordinary course of business on a postpetition basis.

**VI.     HSE and Other Suppliers.**

30.      In the ordinary course of business, the Debtors incur obligations to suppliers (collectively, the "HSE and Other Suppliers" and, together with the 503(b)(9) Claimants, Oil and Gas Operating Expense Claimants, Marketing Arrangement Counterparties, Shippers and Warehousemen, and Miscellaneous Claimants, the "Specified Trade Claimants") of goods and services utilized in the Debtors' operations, payment of which may be reasonably necessary to

12

ensure the health, safety, environmental, and regulatory compliance and integrity of the Debtors' operations, but which are not 503(b)(9) Claims, Oil and Gas Operating Expenses, Marketing Expenses, Shipping and Warehousing Claims, or Miscellaneous Expenses (collectively, the "HSE and Other Claims" and, together with the 503(b)(9) Claims, Oil and Gas Operating Expenses, Marketing Expenses, Shipping and Warehousing Claims, and Miscellaneous Expenses, the "Specified Trade Claims").

31. The HSE and Other Suppliers provide goods and services such as safety uniforms for the Debtors' workforce for unpredictable conditions, fire suppression and other safety supplies, safety training for well drilling and EOR operations, and certain goods that the Debtors are not able to obtain from any other vendor, but are necessary to the Debtors' operations.

32. The HSE and Other Suppliers may also include IT and other operational vendors who provide goods and services key to maintaining the integrity of the Debtors' drilling and EOR operations. Examples of such operationally essential goods and services provided by the HSE and Other Suppliers include: surveying, consulting, and seismic engineering services; automation solutions; machining and fabrication services; information and monitoring systems; and certain materials, equipment, and supplies. Such goods and services are key to maintaining business continuity. The Debtors need to satisfy the HSE and Other Claims in the ordinary course of business to ensure the continual health, safety, environmental, and regulatory compliance and integrity of their operations.

33. In 2019, the Debtors' average monthly payment to the HSE and Other Suppliers was approximately $1.5 million. As of the Petition Date, the Debtors estimate that approximately $250,000 in HSE and Other Claims are outstanding, of which approximately $230,000 will become due and owing during the first 35 days following the Petition Date.

34.     Any attempt by the HSE and Other Suppliers to refuse delivery of goods or services on account of nonpayment of prepetition HSE and Other Claims could severely disrupt the Debtors' operations at great expense to the Debtors' estates.  Accordingly, the Debtors request authority to pay HSE and Other Claims as they become due and payable and to continue paying HSE and Other Claims in the ordinary course of business on a postpetition basis.

**VII.    Outstanding Orders.**

35.     Prior to the Petition Date and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date (the "Outstanding Orders").   To avoid becoming general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition.   To prevent any disruption to the Debtors' business operations, and given that goods delivered after the Petition Date are afforded administrative expense priority under section 503(b) of the Bankruptcy Code, the Debtors seek an order: (a) granting administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations of the Debtors arising from the acceptance of goods subject to Outstanding Orders; and (b) authorizing the Debtors to satisfy such obligations in the ordinary course of business.

**VIII.   Proposed Conditions to Payment of Specified Trade Claims.**

36.     Out of an abundance of caution, and to successfully implement the relief requested herein and to further their restructuring efforts, the Debtors also request that the Interim Order and the Final Order authorize the Debtors to require that:  (a) each Specified Trade Claimant maintain or apply, as applicable, terms during the pendency of these chapter 11 cases that are at least as favorable as those terms existing as of the Petition Date, or on terms satisfactory to the Debtors in

their sole discretion; (b) each Specified Trade Claimant agrees that each such Specified Trade Claimant shall not be permitted to cancel on less than 90 days' notice any contract or agreement pursuant to which it provides services to the Debtors (collectively, the "Customary Terms"), as a condition to receiving any payment under the Interim Order or the Final Order; and (c) if a Specified Trade Claimant, after receiving a payment under the Interim Order or the Final Order, ceases to provide Customary Terms, then the Debtors may, in their sole discretion, deem such payment to apply instead to any postpetition amount that may be owing to such Specified Trade Claimant or treat such payment as an avoidable postpetition transfer of property. The Debtors also seek authority to require more favorable trade terms from any Specified Trade Claimant as a condition to payment of any prepetition claim.

37.     If any Specified Trade Claimant accepts payment for a prepetition obligation of the Debtors premised on compliance with the above conditions and thereafter fails to comply with the Customary Terms (or such other terms agreed to by the Debtors), the Debtors request that such payment be deemed an avoidable postpetition transfer under section 549 of the Bankruptcy Code, and that such Specified Trade Claimant be required to immediately repay the Debtors any payment made to such Specified Trade Claimant on account of its asserted claim to the extent the aggregate amount of such payments exceeds the postpetition obligations then outstanding, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or otherwise.

### **Basis for Relief**

I.     **The Debtors Should Be Authorized to Pay the Specified Trade Claims.**

    A.     **Failure To Timely Make Payment of the Specified Trade Claims Would Threaten the Debtors' Ability to Operate and Subject the Debtors' Assets to The Perfection of Liens.**

38.     The relief requested by this Motion is critical to protect the Debtors' business operations. Specifically, failure to pay the Specified Trade Claims would subject nearly every part

of the Debtors' business operations to the possibility that creditors would assert liens on the Debtors' assets.  State law in the jurisdictions in which the Debtors operate may protect the rights of mineral contractors by granting them statutory liens to secure payment for their services.  *See, e.g.*, Tex. Prop. Code Ann. § 56.002.   Moreover, pursuant to section 362(b)(3) of the Bankruptcy Code, the act of perfecting statutory liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the protections afforded by the automatic stay.  11 U.S.C. § 362(b)(3).  As a result, the Specified Trade Claimants may be able to perfect liens against the Debtors' assets notwithstanding the automatic stay under section 362 of the Bankruptcy Code.

39.     If the Specified Trade Claimants were able to assert liens against the Debtors' assets, the results would be detrimental to the Debtors and all parties in interest.  It is possible that the Specified Trade Claimants could place liens on, among other things, the Debtors' wells, the production and proceeds therefrom, the Debtors' working interests (which are real property rights), and fixtures and equipment associated with the oil and gas properties.  *See, e.g.*, Tex. Prop. Code Ann. § 56.002.  As such, the Debtors' revenues and their relationships with non-operating working interest owners could be placed in jeopardy absent the relief requested herein.  Accordingly, the Debtors submit that the payment of the Specified Trade Claims is necessary to protect the Debtors' business and ensure that the Debtors are able to maximize the value of their estates during these chapter 11 cases.[10]

40.     Courts in this district and other jurisdictions have routinely authorized payments to lien claimants under similar circumstances.

---

[10]   To the extent any Operating Expense Claimant holds a valid secured claim, the Debtors may be required to pay Operating Expense Lien Claimants in full as a condition to confirm a plan of reorganization.  *See* 11 U.S.C. § 1129.

**B.      Payment of the Specified Trade Claims Is a Sound Exercise of the Debtors'
Business Judgment Pursuant to Sections 105(a) and 363(b) of the Bankruptcy
Code.**

41.      Courts in the Fifth Circuit and elsewhere have recognized that it is appropriate to

authorize the payment of prepetition obligations where necessary to protect and preserve the estate,

including an operating business's going-concern value.  *See In re CoServ, L.L.C.*, 273 B.R. 487,

497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to

"doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369–70 (Bankr. S.D. Tex.

2000) (business transactions critical to the survival of the business of the debtor are exceptions to

the general rule of nonpayment of prepetition claims prior to plan confirmation); *In re Ionosphere*

*Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to

authorize the payment of pre-petition debt when such payment is needed to facilitate the

rehabilitation of the debtor is not a novel concept.").  In doing so, these courts acknowledge that

several legal theories rooted in sections 105(a), 363(b), and 1107(a) of the Bankruptcy Code

support the payment of prepetition claims as provided herein.

42.      Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval,

to pay prepetition obligations where a sound business purpose exists for doing so.  *See Ionosphere*

*Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor

to honor prepetition claims where supported by an appropriate business justification).  In addition,

under section 1107(a) of the Bankruptcy Code, a debtor in possession has, among other things, the

"implied duty . . . to 'protect and preserve the estate, including an operating business'

going-concern value."  *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting

*CoServ*, 273 B.R. at 497).

43.      Under section 105(a) of the Bankruptcy Code, "the [C]ourt may issue any order,

process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy

Code]." 11 U.S.C. § 105(a); *see CEI Roofing*, 315 B.R. at 59–60 (finding that "[b]ecause Congress has specifically provided that prepetition wage claims up to a certain amount per claim be elevated to priority status under § 503(1)(3)" the court's job is easier when it considers approval of such prepetition claims); *In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex. 2003) (noting that non-payment of prepetition claims may seriously damage a debtor's business); *CoServ*, 273 B.R. at 497 (finding that sections 105 and 1107 of the Bankruptcy Code provide the authority for a debtor in possession to pay prepetition claims).

44.     The above-referenced sections of the Bankruptcy Code therefore authorize the postpetition payment of prepetition claims when the payments are critical to preserving the going-concern value of the debtor's estate, as is the case here. *See, e.g.*, *CoServ*, 273 B.R. at 497 ("[I]t is only logical that the bankruptcy court be able to use [s]ection 105(a) of the [Bankruptcy] Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate.").

45.     As described more fully above, the failure to honor the Specified Trade Claims could have dire consequences on the Debtors' business operations.  Absent the relief requested herein, the Specified Trade Claimants could assert liens that could severely disrupt the Debtors' ordinary course operations.  Based on these potentially value-destroying consequences, the relief requested herein represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, maximizes the value of their estates, and is therefore justified under sections 105(a) and 363(b) of the Bankruptcy Code.  Indeed, similar relief has been granted in this district and other jurisdictions.

II.     **The Court Should Authorize the Payment of Claims Entitled to Priority Pursuant to Section 503(b)(9) of the Bankruptcy Code.**

46.     Section 503(b)(9) of the Bankruptcy Code provides administrative priority for the "value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which goods have been sold to the debtor in the ordinary course of such debtor's business."  11 U.S.C. § 503(b)(9).  These claims must be paid in full for the Debtors to confirm a chapter 11 plan.  *See* 11 U.S.C. § 1129(a)(9)(A).  Consequently, payment of such claims now provides such parties with only what they would be entitled to receive under a chapter 11 plan.  Additionally, all creditors will benefit from the seamless transition of the Debtors' operations into bankruptcy.

47.     Moreover, the Bankruptcy Code does not prohibit a debtor from paying such claims prior to confirmation.  As administrative claims incurred in the ordinary course of business, the Debtors believe they may pay such claims in accordance with their business judgment pursuant to section 363(c)(1) of the Bankruptcy Code.  *See, e.g.*, *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. Oct. 31, 2006) Hr'g Tr. 49:21–23 ("I think arguably the debtor could pay its 503(b)(9) claimants without court approval.").  The timing of such payments also lies squarely within the Court's discretion.  *See In re ATP Oil & Gas Corp.*, No. 12-36187, 2014 WL 1047818, at *10 (Bankr. S.D. Tex. Mar. 18, 2014) (stating that the "timing of payment of administrative expenses is within the Court's discretion").

48.     The Debtors' ongoing ability to obtain goods as provided herein is key to their survival and necessary to preserve the value of their estates.  Absent payment of the 503(b)(9) Claims at the outset of these chapter 11 cases—which merely accelerates the timing of payment and not the ultimate treatment of such claims—the Debtors could be denied access to the equipment and goods necessary to maintain the Debtors' business operations.  Failure to honor

these claims in the ordinary course of business may also cause the Debtors' vendor base to withhold support for the Debtors during this chapter 11 process. Such vendors could accelerate or eliminate favorable trade terms. Such costs and distractions could impair the Debtors' ability to stabilize their operations at this critical juncture to the detriment of all stakeholders.

**III.   The Court Should Confirm that Outstanding Orders Are Administrative Expense Priority Claims and that Payment of Such Claims Is Authorized.**

49.     Pursuant to section 503(b)(1) of the Bankruptcy Code, obligations that arise in connection with the postpetition delivery of goods and services, including goods ordered prepetition, are in fact administrative expense priority claims because they benefit the estate postpetition. *See* 11 U.S.C. § 503(b)(1)(A) (providing that the "actual [and] necessary costs and expenses of preserving the estate" are administrative expenses). Thus, the granting of the relief sought herein with respect to the Outstanding Orders will not afford such claimants any greater priority than they otherwise would have if the relief requested herein were not granted, and will not prejudice any other party in interest.

50.     Absent such relief, however, the Debtors may be required to expend substantial time and effort reissuing the Outstanding Orders to provide certain suppliers with assurance of such administrative priority. The attendant disruption to the continuous and timely flow of critical raw materials and other goods to the Debtors would force the Debtors to potentially halt operations and production, disrupt the Debtors' business, and lead to a loss of revenue, all to the detriment of the Debtors and their creditors. Accordingly, the Court should confirm the administrative expense priority status of the Outstanding Orders and should authorize the Debtors to pay the Outstanding Orders in the ordinary course of business.

**Emergency Consideration**

51.     Pursuant to Bankruptcy Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  The Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  The failure to receive the requested relief during the first 21 days of these chapter 11 cases could disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring.  The Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested herein on an emergency basis.

**Processing of Checks and Electronic Fund Transfers Should Be Authorized**

52.     The Debtors have sufficient funds to pay the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral.  Under the Debtors' existing cash management system, the Debtors have made arrangements to readily identify checks or wire transfer requests relating to the Specified Trade Claims, as applicable.  Accordingly, the Debtors believe that checks or wire transfer requests that are not related to authorized payments will not be honored inadvertently. The Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested herein.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

53.      To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Reservation of Rights

54.      Nothing contained herein or any actions taken by the Debtors pursuant to any order granting the relief requested by this Motion is intended or should be construed as:  (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined herein or any order granting the relief requested by this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party in interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid and the Debtors and all other parties in interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## Notice

55.      Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as

the Bankruptcy Local Rules, and is sufficient under the circumstances.  Without limiting the foregoing, due notice will be afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties in interest, including:  (a) the U.S. Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) JPMorgan Chase Bank, N.A., as administrative agent under the Debtors' revolving credit facility; (d) Vinson & Elkins LLP, as counsel to the administrative agent under the Debtors' revolving credit facility (e) Wilmington Trust, N.A., as indenture trustee under the Debtors' (i) 9.00% second lien secured notes due 2021, (ii) 9.250% second lien secured notes due 2022, (iii) 7.50% second lien secured notes due 2024, (iv) 7.750% second lien secured notes due 2024, and (v) 6.375% convertible notes due 2024; (f) Wilmington Trust, N.A., as successor  indenture trustee under the Debtors' (i) 6.375% subordinated notes due 2021, (ii) 4.625% subordinated notes due 2023, and (iii) 5.50% subordinated notes due 2022; (g) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to the ad hoc committee of second lien bondholders; (h) Akin Gump Strauss Hauer & Feld LLP, as counsel to the ad hoc group of convertible bondholders; (i) the United States Attorney's Office for the Southern District of Texas; (j) the Internal Revenue Service; (k) the United States Securities and Exchange Commission; (l) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (m) the state attorneys general for states in which the Debtors conduct business; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter interim and final orders, substantially in the forms attached hereto, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Houston, Texas
July 30, 2020

/s/ *Matthew D. Cavenaugh*

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Vienna F. Anaya (TX Bar No. 24091225)
Victoria Argeroplos (TX Bar No. 24105799)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:    (713) 752-4200
Facsimile:     (713) 752-4221
Email:          mcavenaugh@jw.com
                    vanaya@jw.com
                    vargeroplos@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Christopher J. Marcus, P.C. (*pro hac vice* admission pending)
Rebecca Blake Chaikin (*pro hac vice* admission pending)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:     (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                    christopher.marcus@kirkland.com
                    rebecca.chaikin@kirkland.com

-and-

David L. Eaton (*pro hac vice* admission pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:     (312) 862-2200
Email:          david.eaton@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

## **Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Local Rule 9013-1(i).

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

## **Certificate of Service**

I certify that on July 30, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh