# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| DENBURY RESOURCES INC., *et al.*,[1] | ) | Case No. 20-33801 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) | (Emergency Hearing Requested) |

## DEBTORS' EMERGENCY MOTION
## FOR ENTRY OF AN ORDER (I) AUTHORIZING THE
## DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER
## COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE
## EMPLOYEE BENEFITS PROGRAMS AND (II) GRANTING RELATED RELIEF

**EMERGENCY RELIEF HAS BEEN REQUESTED.  A HEARING WILL BE CONDUCTED ON THIS MATTER ON JULY 31, 2020, AT 7:30 A.M. (CENTRAL TIME) IN COURTROOM 400, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TEXAS 77002.  IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING.  OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**RELIEF IS REQUESTED NOT LATER THAN JULY 31, 2020.**

**PLEASE NOTE THAT ON MARCH 24, 2020, THROUGH THE ENTRY OF GENERAL ORDER 2020-10, THE COURT INVOKED THE PROTOCOL FOR EMERGENCY PUBLIC HEALTH OR SAFETY CONDITIONS.**

**IT IS ANTICIPATED THAT ALL PERSONS WILL APPEAR TELEPHONICALLY AND ALSO MAY APPEAR VIA VIDEO AT THIS HEARING.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S REGULAR DIAL-IN NUMBER. THE DIAL-IN NUMBER IS +1(832) 917-1510.  YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES.  YOU WILL BE ASKED TO KEY IN THE CONFERENCE ROOM NUMBER.  JUDGE JONES'S CONFERENCE ROOM NUMBER IS 205691.**

**PARTIES MAY PARTICIPATE IN ELECTRONIC HEARINGS BY USE OF AN INTERNET CONNECTION.   THE INTERNET SITE IS WWW.JOIN.ME.   PERSONS CONNECTING BY**

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Denbury Resources Inc. (7835); Denbury Air, LLC (7621); Denbury Brookhaven Pipeline Partnership, LP (6322); Denbury Brookhaven Pipeline, LLC (6471); Denbury Gathering & Marketing, Inc. (6150); Denbury Green Pipeline-Montana, LLC (6443); Denbury Green Pipeline-North Dakota, LLC (7725); Denbury Green Pipeline-Riley Ridge, LLC (2859); Denbury Green Pipeline-Texas, LLC (2301); Denbury Gulf Coast Pipelines, LLC (0892); Denbury Holdings, Inc. (1216); Denbury Onshore, LLC (7798); Denbury Operating Company (7620); Denbury Pipeline Holdings, LLC (0190); Denbury Thompson Pipeline, LLC (0976); Encore Partners GP Holdings, LLC (N/A); Greencore Pipeline Company, LLC (9605); Plain Energy Holdings, LLC (0543).  The location of Debtor Denbury Resources Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 5320 Legacy Drive, Plano, Texas 75024.

**MOBILE DEVICE WILL NEED TO DOWNLOAD THE FREE JOIN.ME APPLICATION.**

**ONCE CONNECTED TO WWW.JOIN.ME, A PARTICIPANT MUST SELECT "JOIN A MEETING".  THE CODE FOR JOINING THIS HEARING BEFORE JUDGE JONES IS "JUDGEJONES".  THE NEXT SCREEN WILL HAVE A PLACE FOR THE PARTICIPANT'S NAME IN THE LOWER LEFT CORNER.  PLEASE COMPLETE THE NAME AND CLICK "NOTIFY".**

**HEARING APPEARANCES SHOULD BE MADE ELECTRONICALLY AND IN ADVANCE OF THE HEARING.  YOU MAY MAKE YOUR ELECTRONIC APPEARANCE BY:**

**1) GOING TO THE SOUTHERN DISTRICT OF TEXAS WEBSITE;**

**2) SELECTING "BANKRUPTCY COURT" FROM THE TOP MENU;**

**3) SELECTING "JUDGES' PROCEDURES AND SCHEDULES";**

**4) SELECTING "VIEW HOME PAGE" FOR JUDGE JONES;**

**5) UNDER "ELECTRONIC APPEARANCE" SELECT "CLICK HERE TO SUBMIT ELECTRONIC APPEARANCE;"**

**6) SELECT "DENBURY RESOURCES INC., ET AL." FROM THE LIST OF ELECTRONIC APPEARANCE LINKS; AND**

**7) AFTER SELECTING DENBURY RESOURCES INC., ET AL. FROM THE LIST, COMPLETE THE REQUIRED FIELDS AND HIT THE "SUBMIT" BUTTON AT THE BOTTOM OF THE PAGE.**

**SUBMITTING YOUR APPEARANCE ELECTRONICALLY IN ADVANCE OF THE HEARING WILL NEGATE THE NEED TO MAKE AN APPEARANCE ON THE RECORD AT THE HEARING.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state the following in support of this motion (this "Motion"):

### Relief Requested

1.    The Debtors seek entry of an order (the "Order"), substantially in the form attached hereto:  (a) authorizing the Debtors to pay prepetition wages, salaries, other compensation, and reimbursable expenses and continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto (collectively, the "Employee Obligations"); and (b) granting related relief.

### Jurisdiction and Venue

2.    The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core

proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 105(a), 362(d), 363(b), 507(a), and 541(b)(1) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, and rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

5.      On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Christian S. Kendall, Chief Executive Officer of Denbury Resources Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with this Motion and incorporated by reference herein.

6.      The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

### The Debtors' Workforce

7.      As of the Petition Date, the Debtors employ approximately 664 individuals in the aggregate, including approximately 662 full-time employees and approximately 2 part-time employees (collectively, the "Employees").  The Debtors pay approximately 393 Employees a

salary and approximately 271 Employees on an hourly basis.  The Debtors' Employees, including their executive officers, are employed at-will and do not have employment agreements.  No Employee is represented by a union or collective bargaining unit.

8.      In addition to the Employees, the Debtors also periodically retain (a) specialized individuals as independent contractors to complete discrete projects (the "Independent Contractors"), either directly or through certain vendors (collectively, the "Contractor Vendors"), and (b) temporary workers to fulfill certain duties on a short-term basis (the "Temporary Staff") from several staffing agencies (the "Staffing Agencies").  As of the Petition Date, the Debtors retain approximately 170 Independent Contractors and Temporary Workers in the aggregate.  The Independent Contractors and Temporary Staff are a critical supplement to the efforts of the Debtors' Employees.  The Debtors regularly evaluate the appropriate size and function of their workforce, and as a result, when appropriate, locate, recruit, and maintain Employees, Independent Contractors, and/or Temporary Staff and incur amounts related thereto.

9.      The Debtors' Employees, Independent Contractors, and Temporary Staff perform a wide variety of functions critical to the Debtors' operations, the administration of these chapter 11 cases, and the Debtors' successful restructuring.  Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency.  Additionally, the Debtors' Employees and Independent Contractors often include highly trained personnel who are not easily replaced.  Without the continued, uninterrupted services of the Employees, Independent Contractors, and Temporary Workers, the Debtors' reorganization efforts likely will be jeopardized.  Consequently, the relief requested herein is necessary and appropriate.

## Employee Compensation and Benefits

10.     The Debtors provide wages and health and welfare benefits programs for their Employees.  The Debtors' compensation obligations and benefits programs are comprised of wages, salaries, health and welfare benefits, and certain supplemental benefits (collectively, the "Employee Compensation and Benefits").  The majority of the Debtors' Employees rely exclusively on the Employee Compensation and Benefits to pay their daily living expenses and support themselves and their families.  Thus, the Employees will be exposed to significant financial constraints if the Debtors are not permitted to continue paying their compensation and providing benefits.

11.     Subject to the Court's approval of the relief requested herein, the Debtors intend to continue their prepetition Employee Compensation and Benefits programs in the ordinary course of business on a postpetition basis.  Out of an abundance of caution, the Debtors request authority to modify, change, and/or discontinue any of their Employee Compensation and Benefits and, subject to applicable non-bankruptcy law, to implement new programs, policies, and/or benefits, in the ordinary course of business during these chapter 11 cases and without the need for further Court approval.

### I.     Compensation and Withholding Obligations.

#### A.     Wages.

12.     In the ordinary course, the Debtors pay wages, salaries, and other compensation to hourly Employees on a bi-weekly basis, one week in arrears, and salaried Employees on a semi-monthly, current basis (collectively, the "Wages").  Payroll amounts often vary depending upon the season, taxes, overtime, and other factors.  Over the past three pay cycles, the Debtors have paid on average $810,000 on a bi-weekly basis on account of hourly Employees' Wages and approximately $2.2 million on a semi-monthly basis on account of salaried Employees' Wages.

13.     Because Wages may be paid in arrears, certain Employees may be owed accrued but unpaid Wages.  Wages also may be due and owing on account of, among other things, potential discrepancies between the amounts paid and the amounts that Employees believe should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees.  As of the Petition Date, the Debtors believe that there are approximately $810,000 in accrued but unpaid Wages outstanding (excluding Expense Reimbursements, Paid Leave, and amounts related to the 401(k) Plan (each as defined herein)) (collectively, the "Unpaid Wages").

14.     As of the Petition Date, the Debtors do not believe that they owe Unpaid Wages to any Employee in excess of the statutory cap of $13,650 set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

15.     The Debtors seek authority to pay any Unpaid Wages and to continue paying Wages to their Employees in the ordinary course of business on a postpetition basis and consistent with past practice.

### B.     Contractor and Temporary Worker Obligations.

16.     The Debtors rely on Independent Contractors and Temporary Workers in the ordinary course of their business to perform a wide range of services critical to the Debtors' operations, including, among other things, providing drilling, engineering, and other operational services, information technology services, and various other administrative functions. The Debtors rely on the support of Independent Contractors and Temporary Workers to complete discrete projects in furtherance of the Debtors' business and to fill short-term positions that are not economically feasible to employ on a full- or part-time basis.  The Debtors believe the authority to continue paying the Independent Contractors and Temporary Workers, either directly or through the Contractor Vendors and Staffing Agencies, is critical to minimizing disruption of the Debtors'

continued business operations.  On average, the Debtors spend approximately $2.9 million on Independent Contractors and Temporary Workers on a monthly basis.

17.     As of the Petition Date, the Debtors estimate they owe approximately $5.0 million on account of services rendered by the Independent Contractors and Temporary Workers prior to the Petition Date, including any fees paid to the Contractor Vendors and Staffing Agencies (the "Unpaid Contractor and Staffing Obligations").  The Debtors seek authority to pay any Unpaid Contractor and Staffing Obligations and to continue paying amounts owed to the Independent Contractors and Temporary Workers, including any fees owed to the Contractor Vendors or Staffing Agencies, in the ordinary course of business on a postpetition basis and consistent with past practice.

### C.     Withholding Obligations.

18.     During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks for, among other things, garnishments, 401(k) contributions, levies, child support, and related fees, and pre-tax deductions payable pursuant to certain of the Health and Welfare Benefits (as defined herein) (collectively, the "Deductions").  Certain of the Deductions are forwarded to various third-party recipients.  In the aggregate, the Debtors deduct approximately $270,000 on a semi-monthly basis from salaried Employees' paychecks and approximately $140,000 on a bi-weekly basis from hourly Employees' paychecks on account of the Deductions.

19.     The Debtors also are required by law to withhold from the Employees' compensation amounts related to, among other things, federal, state, and local income taxes as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, and local taxing authorities.  The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based upon a percentage of

gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes," and together with the Employee Payroll Taxes, the "Payroll Taxes"). The Payroll Taxes generally are processed and forwarded to the appropriate federal, state, or local taxing authority at the same time Employees' payroll checks are disbursed.  In the aggregate, the Debtors remit approximately $530,000 on a semi-monthly basis and approximately $220,000 on a bi-weekly basis on account of the Payroll Taxes.

20.     The Debtors also employ Automatic Data Processing, Inc. ("ADP") to provide services related to the Payroll Taxes.  On a monthly basis, the Debtors advance funds to ADP on account of the Payroll Taxes.  ADP then remits appropriate amounts to the relevant taxing authorities on account of the Payroll Taxes.  The Debtors pay ADP approximately $1,100 per month on account of its services related to the Payroll Taxes (the "Payroll Fees").

21.     As of the Petition Date, the Debtors estimate that there are approximately $360,000 in accrued but unpaid Deductions and Payroll Taxes (together, the "Withholding Obligations") and approximately $2,500 in Payroll Fees.

**D.     Reimbursable Expenses.**[2]

22.     In the ordinary course of business, the Debtors reimburse Employees for certain reasonable and customary expenses that such Employees personally incur in the scope of their employment (collectively, the "Expense Reimbursements").  Expense Reimbursements typically include expenses associated with travel, lodging, ground transportation, safety gear needed for work, and other business-related expenses necessary for the discharge of an Employee's duties.

---

[2]     As detailed in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System and Maintain Existing Bank Accounts, (B) Continue to Perform Intercompany Transactions, and (C) Maintain Existing Business Forms and (II) Granting Related Relief*, filed contemporaneously herewith, the Debtors also maintain certain credit card programs for certain Employees.  The Debtors do not seek any additional relief with respect to the credit card programs in this Motion.

The Expense Reimbursements are incurred by Employees through the use of personal funds, and the applicable Employees may be held personally liable for any unpaid obligations despite the obligations having been incurred for the Debtors' benefit.  Thus, the Debtors' inability to reimburse the Expense Reimbursements likely would impose significant hardship on Employees.

23.     On average, the Debtors pay Expense Reimbursements of approximately $5,600 per month in the aggregate.  Although the Debtors ask that reimbursement requests be submitted promptly, sometimes submission delays occur.  Employees may submit reimbursement requests for prepetition expenses after the Petition Date.  Expense Reimbursements are incurred by Employees with the understanding that they will be reimbursed by the Debtors.  Without continued reimbursement of the Expense Reimbursements, Employees relying on these benefits would be saddled with additional costs, potentially causing personal financial hardship.

24.     As of the Petition Date, the Debtors estimate they owe approximately $14,000 in outstanding Expense Reimbursements.  The Debtors seek authority to satisfy any accrued but unpaid prepetition Expense Reimbursements and to continue to pay the Expense Reimbursements in the ordinary course of business on a postpetition basis and consistent with past practice.

## II.     Employee Benefit Programs.

### A.     Health and Welfare Benefits.

25.     The Debtors offer health and welfare benefits to eligible Employees for medical, prescription, dental, and vision care coverage and certain other welfare benefits, including life, accidental death & dismemberment insurance, and other insurance benefits (collectively, the "Health and Welfare Benefits").  Full-time regular Employees working at least 30 hours per week and their dependents are eligible to participate in the Debtors' Health and Welfare Benefits. Certain of the Debtors' Health and Welfare Benefits, including the Medical and Dental Plans and Pharmacy Benefits, are supported by a stop-loss insurance policy (the "Stop-Loss Policy") with

Companion Life Insurance Company, which provides for a specific deductible of $300,000 per Employee.  The Debtors pay approximately $580,000 annually under the Stop-Loss Policy.  As of the Petition Date, the Debtors estimate that approximately $120,000 is outstanding on account of premiums under the Stop-Loss Policy.

26.     The Debtors believe they are authorized to continue the Health and Welfare Benefits in the ordinary course; however, out of an abundance of caution the Debtors seek authority to continue the Health and Welfare Benefits on a postpetition basis in the ordinary course of business (including paying any prepetition amounts that may be outstanding) and consistent with their prepetition practices.

### 1.     Medical and Dental Plans and Pharmacy Benefits.

27.     The Debtors offer their Employees the opportunity to participate in three self-insured medical plan options administered by United Healthcare Services, Inc. ("UHC") including: (a) an exclusive provider organization plan (the "EPO Plan"); (b) a preferred provider option (the "PPO Plan"); and (c) a consumer driven health plan (the "CDHP Plan" and, together with the EPO Plan and PPO Plan, the "Medical and Dental Plans").  The EPO Plan provides in-network coverage to participating Employees and the PPO Plan and CDHP Plan provide participating Employees with the option to seek medical services inside and outside of the UHC network.  Thus, monthly health care premiums per Employee may vary depending on the specific coverage under the Medical and Dental Plan in which the Employee is enrolled and whether the Employee has dependents also covered by the applicable plan.

28.     The Dental Plans additionally provide the Debtors' Employees with dental insurance and an extensive network of dentists.  The Medical and Dental Plans also provide the Debtors' Employees with varying prescription drug benefits (the "Pharmacy Benefits"), administered by Express Scripts, Inc. ("Express Scripts").  In connection with the Medical and

Dental Plans, the Debtors contract with Teladoc Health, Inc. ("Teladoc") to provide participating Employees with 24/7 virtual access to medical support.

29.     The Debtors pay UHC, Express Scripts, and Teladoc aggregate monthly administrative fees of approximately $71,000 on account of their administration of the Medical and Dental Plans and Pharmacy Benefits.  In the aggregate, the Debtors pay approximately $1.5 million per month on account of the Medical and Dental Plans and Pharmacy Benefits.  As of the Petition Date, the Debtors estimate that there are approximately $1.8 million, including fees owed to UHC, Express Scripts, and Teladoc, in outstanding obligations on account of the Medical and Dental Plans and Pharmacy Benefits.

### 2.     Vision Plan.

30.     The Debtors also provide Employees the opportunity to purchase vision insurance (the "Vision Plan") administered through Superior Vision Services, Inc.  The Vision Plan covers, among other things, eye exams, eyeglasses, and contact lenses.  The Debtors pay approximately $15,000 per month on account of the Vision Plan.  As of the Petition Date, the Debtors estimate that there are approximately $34,000 in outstanding obligations on account of Vision Plan.

### 3.     HSA and FSA.

31.     The Debtors provide Employees participating in the CDHP Plan with the opportunity to maintain a health savings account (an "HSA") with Bank of America, N.A. ("BofA").  Participating Employees can opt to make pre-tax contributions to their individual HSA through payroll deductions up to the maximum amount permitted by the Internal Revenue Service.  Amounts in the individual HSAs may be used to help pay for insurance deductibles and qualified medical expenses, as well as dental and vision expenses.  The Debtors contribute to the HSAs on a quarterly basis, with the contribution amount determined by the applicable Employee's selected

coverage.[3]  Funds contributed to the individual HSAs roll over from year to year.  As of the Petition Date, approximately 30 Employees contribute to an HSA,

32.     All Employees also have the opportunity to contribute to one of three types of flexible spending accounts (each, an "FSA"), depending on the participating Employee's Medical and Dental Plan.  The FSAs are administered by Cosmal, Inc. (d/b/a TaxSaver Plan) and permit Employees to contribute pre-tax dollars for eligible out-of-pocket expenses.  Under all three types of FSAs, Employees may use the debit card associated with their FSA at the time of service or submit a claim form for out-of-pocket expenses for reimbursement.  The Debtors do not make contributions to the Employees' FSAs.  As of the Petition Date, approximately 260 Employees contribute to an FSA.

33.     The Debtors pay a monthly administrative fee of approximately $300 on account of the HSAs and a monthly administrative fee plus reimbursement of expenses of approximately $50,000 on account of the FSAs.  As of the Petition Date, the Debtors estimate that there is approximately $600 outstanding on account of administrative fees related to the HSAs and approximately $58,000 outstanding on account of administrative fees and reimbursement of expenses related to the FSAs.  In the aggregate, the Debtors deduct an average of approximately $55,000 from participating Employees' Wages on account of Employee contributions to HSAs and FSAs on a monthly basis.

---

[3]   If only the Employee is covered, the Debtors contribute $750 per year.  If the Employee and his or her spouse or the Employee and his or her family are covered, the Debtors contribute $1,500 per year.  The Debtors deposit contributions into the Employee's HSA account at the beginning of each quarter.  For new hires, the Debtors' annual contribution is pro-rated depending on the Employee's hire date.

### 4.      Insurance, Disability, and Workers' Compensation Programs.

#### a.      Life and AD&D Insurance Programs.

34.      The Debtors provide life and accidental death and dismemberment insurance coverage (the "Life and AD&D Insurance") to Employees through The Prudential Insurance Company of America ("Prudential"), which provides maximum coverage of up to 200 percent of the applicable Employee's annual earnings in the event of an Employee's death or injury, up to a maximum of $1.0 million.   All of the Debtors' active full-time Employees are automatically provided with Life and AD&D Insurance at no cost to the Employee.   Employees also have the option to enroll themselves, their spouses, and their dependents in supplemental Life and AD&D Insurance provided by Prudential, which provides up to 500 percent of the applicable Employee's annual earnings, up to $500,000, and other varying amounts for such Employee's spouse and/or dependents.   The Debtors make monthly payments of approximately $63,000 on account of premiums for the Life and AD&D Insurance.   As of the Petition Date, the Debtors estimate that they owe approximately $150,000 in outstanding obligations on account of the Life and AD&D Insurance.

#### b.      Disability Benefits.

35.      The Debtors provide disability benefits for both short-term disability and long-term disability, (respectively, the "Short-Term Disability Benefits and "Long-Term Disability Benefits" and, together, the "Disability Benefits").   The Disability Benefits are fully insured through Prudential.   The Short-Term Disability Benefits provide a maximum benefit period of 11 weeks, with a weekly benefit of eighty (80) percent of weekly base pay.   Employees may use Paid Leave (as defined below) to offset the remaining twenty (20) percent.   An Employee's Short-Term Disability Benefits begin (a) immediately if the Employee is hospitalized or begins maternity leave or (b) 14 calendar days after such Employee is absent from work due to illness or injury.

Employees are eligible for Long-Term Disability Benefits after 13 weeks of disability or if an Employee is unable to return to work after Short-Term Disability Benefits cease.  Long-Term Disability Benefits provide Employees with a monthly benefit of sixty (60) percent of monthly base pay, subject to a monthly cap of $20,000, until the applicable Employee reaches Social Security normal retirement age.  As of the Petition Date, the Debtors estimate that approximately 6 Employees are receiving Disability Benefits.

36.     The Debtors pay Prudential approximately $36,000 per month on account of premiums with respect to the Disability Benefits.  As of the Petition Date, the Debtors estimate that there is approximately $82,000 in outstanding obligations related to the Disability Benefits and associated premiums.

37.     The Debtors also offer certain Employees the opportunity to participate in supplemental long-term disability benefits (the "Supplemental Long-Term Disability Benefits") through Provident Life and Accident Insurance Company.  The Debtors pay approximately $700 per month on account of premiums related to the Supplemental Long-Term Disability Benefits.  As of the Petition Date, the Debtors estimate that there is approximately $1,700 in outstanding obligations on account of the Supplemental Long-Term Disability Benefits.

### c.     Workers' Compensation Program.

38.     The Debtors maintain workers' compensation insurance for Employees at the levels required by law in the states in which the Debtors operate (collectively, the "Workers' Compensation Program").  All Employees are entitled to participate in the Workers' Compensation Program.  The Debtors maintain the Workers' Compensation Program through Liberty Mutual Life Insurance.

39.     The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such

liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements during the pendency of these chapter 11 cases.[4]   To the extent any Employees assert claims arising under the Workers' Compensation Program, the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the Employees to proceed with their claims under the Workers' Compensation Program.  This required modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

40.     Because the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that potentially could disrupt the reorganization process.  The Debtors pay an annual policy premium of $320,000 in April of each year to maintain the Workers' Compensation Program.  As of the Petition Date, the Debtors estimate that they owe approximately $173,000 on account of approximately 2 open claims under the Workers' Compensation Program.  Out of an abundance of caution, the Debtors seek authority to pay any unpaid amounts on account of the Workers' Compensation Program, to continue the Workers' Compensation Program in the ordinary course of business on a postpetition basis, and to modify the automatic stay solely to allow Employees to assert claims under the Workers' Compensation Program to the extent applicable.

### 5.     COBRA Benefits.

41.     The Debtors also indirectly subsidize or continue to provide certain benefits to certain former Employees and their qualified dependents after their termination, retirement, or

---

[4]   The Debtors' Workers' Compensation Program may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder.  By this Motion, the Debtors request authority to continue the Workers' Compensation Program postpetition, including making any changes to current policy and practices that become necessary.

disability leave, including (without limitation) benefits provided under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA" and the benefits thereunder, the "COBRA Benefits"). To assist in the administration of the COBRA Benefits, the Debtors use the services of PayFlex Systems USA, Inc. ("PayFlex"). The Debtors pay PayFlex an administrative fee of approximately $800 per month on account of its administration of the COBRA Benefits.

42.     As of the Petition Date, the Debtors estimate that approximately 49 former Employees receive COBRA Benefits and that approximately $1,800 of administrative fees are currently accrued and outstanding on account of the COBRA Benefits.

**6.      Supplemental Benefits.**

43.     The Debtors provide Employees with the opportunity to participate in a number of supplemental benefits programs, including whole life, accident, and critical illness insurance, a benefit advocacy program, an employee assistance program, a wellness incentive program, an executive physicals program, a biometric screening program, a flu shot program, emergency travel assistance, a gift matching program, and a relocation program (collectively, the "Supplemental Benefits").

44.     The Debtors offer Employees the option to purchase whole life, accident, or critical illness insurance (the "Whole Life, Accident, and Illness Insurance") through Unum Life Insurance Company of America. On average, the Debtors deduct approximately $3,100 on a semi-monthly basis and approximately $2,500 on a bi-weekly basis on account of the Whole Life, Accident, and Illness Insurance. As of the Petition Date, the Debtors believe that there are approximately $2,100 of accrued and unpaid obligations related to the Whole Life, Accident, and Illness Insurance.

45.     The Debtors offer Employees the option to participate in benefit advocacy and employee assistance programs (the "Employee Assistance and Advocacy Programs") that allow Employees to, among other things, receive personalized alerts about medical tests and screenings,

check medical status in real time, access 24/7 support for assistance with healthcare and insurance issues, family challenges, stress, depression, and legal matters.  The Employee Assistance and Advocacy Programs are administered through West Health Advocate Solutions, Inc.  The Debtors pay approximately $2,000 per month related to the Employee Assistance and Advocacy Programs.  As of the Petition Date, the Debtors believe that there are approximately $4,500 of accrued and unpaid obligations related to the Employee Assistance and Advocacy Programs.

46.     The Debtors offer Employees the option to participate in a wellness incentive program (the "Wellness Incentive Program") that allows Employees to, among other things, log gym workouts, set and track wellness goals, and link to health apps or fitness devices. The Wellness Incentive Program is administered through The Vitality Group, LLC.  The Debtors pay approximately $7,900 per month related to the Wellness Incentive Program.  As of the Petition Date, the Debtors believe that there are approximately $19,000 of accrued and unpaid obligations related to the Wellness Incentive Program.

47.     The Debtors offer executive Employees the option to participate in a physical screening program (the "Executive Physical Program") administered through Cooper Clinic in Dallas, Texas.  The Debtors pay approximately $4,200 per month related to the Executive Physical Program.  As of the Petition Date, the Debtors believe that there are approximately $9,700 of accrued and unpaid obligations related to the Executive Physical Program.

48.     The Debtors offer Employees the option to obtain biometric screening (the "Biometric Screening Program") administered through Clinical Reference Laboratory, Inc. The Debtors pay approximately $1,300 per month related to the Biometric Screening Program.  As of the Petition Date, the Debtors believe that there are approximately $2,900 of accrued and unpaid obligations related to the Biometric Screening Program.

49.     The Debtors offer Employees the option to obtain flu shots (the "Flu Shot Program") administered through ScriptClaim Systems LLC.  The Debtors pay approximately $600 per month related to the Flu Shot Program.  As of the Petition Date, the Debtors believe that there are approximately $1,400 of accrued and unpaid obligations related to the Flu Shot Program.

50.     The Debtors offer Employees the option to participate in an adoption assistance program (the "Adoption Assistance Program"), which provides up to $5,000 of assistance per adopted child.  As of the Petition Date, the Debtors believe that no Employees participate in the Adoption Assistance Program.

51.     The Debtors offer Employees the option to participate in a political action committee (the "Political Action Committee").  The Political Action Committee is funded from Employee contributions or voluntary deductions from Employee payroll, which are then used to make contributions to certain political candidates who support the United States oil and gas industry along with a fair and sustainable business environment.  Funds related to the Political Action Committee are held in an account with JPMorgan Chase Bank, N.A. and are disbursed by the Debtors' governmental relations department.  On average, the Debtors deduct approximately $1,900 from salaried Employees on a semi-monthly basis and approximately $10 from hourly employees on a bi-weekly basis on account of the Political Action Committee.  As of the Petition Date, the Debtors believe that there are approximately 70 Employees participating in the Political Action Committee.

52.     The Debtors provide reimbursement for certain work related relocation expenses (the "Relocation Plan").  The Debtors contract with Altair Global to provide services related to the Relocation Plan.  Employees report various personal expenses pertaining to the Relocation Plan, and eligible expenses are reimbursed by the Debtors.  The average monthly cost of this program

is approximately $7,200.  As of the Petition Date, the Debtors believe that there are approximately $20,000 of accrued and unpaid obligations under the Relocation Plan.

53.     Accordingly, the Debtors seek authority to continue to honor the Supplemental Benefits in the ordinary course of business on a postpetition basis and consistent with past practice.

**B.     401(k) Plan.**

54.     The Debtors provide all eligible Employees who are over the age of 18 with the ability to participate in a 401(k) defined contribution program (the "401(k) Plan").  To be eligible, an Employee must, among other requirements, be an Employee of Denbury Resources Inc. or Denbury Onshore, LLC and not qualify as a leased or temporary employee under the 401(k) Plan. The 401(k) Plan currently is administered by BofA, and all administrative costs associated with the 401(k) Plan are deducted from the investment related revenue with any excess fees invoiced directly to the employer.  The 401(k) Plan allows Employees to make both pre-tax and Roth contributions in amounts up to the maximum amount allowed by the Internal Revenue Service, including contributions from the Non-Insider Employee Bonus Programs (as defined herein).  Each Employee's contributions under the 401(k) Plan are automatically deducted from each paycheck and transferred to a trust established under the 401(k) Plan (collectively, the "401(k) Deductions"). As of the Petition Date, the Debtors estimate that they are obligated to remit approximately $76,000 on account of the 401(k) Deductions.

55.     In addition, the Debtors match the Employees' annual 401(k) Plan contributions, including contributions from the Non-Insider Employee Bonus Programs, on a dollar-for-dollar basis up to six (6) percent (the "401(k) Contributions").  The Debtors pay the 401(k) Contributions on an ongoing basis with respect to each payroll period.  At the end of each calendar year, the Debtors conduct a true-up of their 401(k) Contributions.  The Debtors expect to contribute a total of approximately $6.3 million in 2020 on account of the 401(k) Contributions.  As of the Petition

Date, the Debtors estimate that there is approximately $42,000 in accrued and outstanding 401(k) Contributions.

56.     Many Employees' retirement savings solely consist of the 401(k) Plan, and many Employees choose to participate in the 401(k) Plan because of the 401(k) Contributions.  As such, the Debtors believe that continuing the 401(k) Plan and the 401(k) Contributions is essential to maintaining Employee morale and protecting Employee expectations.  In addition, the Debtors believe that the 401(k) Deductions generally are held in trust by the Debtors and are not property of their estates.  Accordingly, the Debtors seek authority to pay any 401(k) Contributions in the ordinary course of business and consistent with past practice, and to continue paying 401(k) Contributions in the ordinary course of business on a postpetition basis and consistent with past practice.

**C.     Paid Leave.**

57.     The Debtors maintain several paid leave benefit programs for Employees, which provide for paid leave for circumstances including annual sick leave, vacation time, and volunteer time (respectively, the "Volunteer Time," the "Sick Time," and the "Vacation Time," and, collectively, the "Paid Leave").  Active, regular Employees that work a minimum of 20 hours per week are eligible for Paid Leave.  Similar to other programs described in the Motion, Paid Leave is an integral benefit that the Debtors offer to the Employees, and will help maintain Employee morale and protect Employee expectations.

58.     The Debtors recognize their responsibility as good corporate citizens to help enrich surrounding communities of residence and work.  The Debtors encourage Employees to become involved in their communities, lending their voluntary support to programs that positively impact the quality of life within these communities.  As such, all full-time Employees are eligible to receive Volunteer Time for volunteer work that occurs during lunchtime, before work, after work,

or on the weekends.  Volunteer Time is paid at an Employee's normal pay rate and is not subject to overtime rates.  As with other nonworking Paid Leave, Volunteer Time does not count as hours worked for any purposes, including overtime calculations.  In addition, Employees may take one day per calendar year of paid time off to participate in their specific volunteer program.

59.    Eligible Employees are granted 120 hours of Sick Time at the beginning of each calendar year.  For the first year of employment, eligible Employees receive 80 hours of Sick Time, prorated for the period of time they are employed.  Sick Time may not be borrowed and must be accrued prior to use.  Employees may accumulate unused Sick Time until such Employee has accrued up to a total of 480 hours of Sick Time.  After an Employee reaches the maximum 480 hours of Sick Time, further accrual of Sick Time is suspended until such Employee has reduced the balance of Sick Time below 480 hours.  Accrued but unused Sick Time is not paid in lieu of use or upon termination of employment.

60.    Vacation Time is granted based on relevant industry or job experience and/or tenure of employment along the following schedule:  (a) Employees with less than 10 years' experience or tenure of employment receive 120 hours of Vacation Time per year; (b) Employees with 10 to 19 years' experience receive 160 hours of Vacation Time per year; and (c) Employees with 20 or more years' experience or 10 or more years of tenure of employment receive 200 hours of Vacation Time per year.  Employees are advanced their full annual allotment of Vacation Time at the beginning of each calendar year and Vacation Time accrues on a monthly basis.  Employees may rollover up to 40 hours of unused Vacation Time at the end of the calendar year.  Upon termination of employment, accrued but unused Vacation Time is paid out.  As of the Petition Date, the Debtors estimate that there is approximately $4.3 million in accrued and outstanding obligations on account

of Vacation Time.  This amount, however, is not a current cash payment obligation except in the event the Employees leave the Debtors' employment.

61.     The Debtors believe that the continuation of the Paid Leave policies in accordance with prior practice is essential to maintaining Employee morale during these chapter 11 cases. Further, the policies are broad-based programs upon which all Employees have come to depend. The Debtors anticipate that their Employees will utilize any accrued Paid Leave in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal payroll obligations.  Accordingly, the Debtors seek authority to pay their Employees any Paid Leave in the ordinary course of business and consistent with past practice, and to continue paying Paid Leave to their Employees in the ordinary course of business on a postpetition basis and consistent with past practice.

## III.     Non-Insider Employee Bonus Programs.

62.     The Debtors maintain bonus programs, including the Quarterly Bonus Plan (as defined below), to drive performance among their Employees (collectively, the "Non-Insider Employee Bonus Programs").[5]  Historically, the Debtors have offered bonus programs that provide eligible non-Insider Employees with an opportunity to receive meaningful awards for achieving certain performance goals based upon targets established by the Debtors' compensation committee.  For example, the Debtors have previously awarded bonuses to employees for achieving metrics related to production, lease operating expense, general and administrative spending, EBITDAX, safety, and individual performance.  The compensation committee also

---

[5]     The relief sought under this Motion with respect to the Non-Insider Employee Bonus Programs does not include the payment of any obligation to an "insider" (as that term is defined in section 101(31) of the Bankruptcy Code) (the "Insiders").  The Debtors will seek separate authority for any proposed bonus and severance programs with respect to such parties and reserve all rights with respect to the "insider" status of such parties.

determines the type or types of awards to be made under the Non-Insider Employee Bonus Programs, which may include cash and/or stock awards.  On June 3, 2020, the board of directors of the Debtors approved and adopted a quarterly bonus plan (the "<u>Quarterly Bonus Plan</u>"), pursuant to which certain non-Insider Employees are eligible to receive cash quarterly bonus payments through March 31, 2021 unless earlier terminated in accordance with the Quarterly Bonus Plan, payable on the first regularly scheduled pay date coincident with or next following the last day of the applicable quarter, subject to such non-Insider Employees continued employment with the Debtors through the end of the applicable quarter.  The Non-Insider Employee Bonus Programs are an integral part of the Employee Compensation and Benefits.

63.     The Debtors believe the Non-Insider Employee Bonus Programs improve Employee performance, preserve and maximize value for all parties in interest, and promote the overall efficiency and safety of the Debtors' operations.  Many Employees could receive competitive offers to participate in similar bonus programs from alternative employers.  The Debtors believe that continuing the Non-Insider Employee Bonus Programs is essential to maintaining Employee morale, protecting Employee expectations, and retaining key personnel. The Debtors request authority to honor obligations under the Non-Insider Employee Bonus Programs, including any prepetition obligations, in the ordinary course of business during the pendency of these chapter 11 cases.

64.     The Debtors do not believe they presently owe any prepetition amounts on account of the Non-Insider Employee Bonus Program and therefore do not seek to pay any prepetition amounts in connection with the Non-Insider Employee Bonus Programs.  Out of an abundance of caution, however, the Debtors seek authority to continue the Non-Insider Employee Bonus Program on a postpetition basis in the ordinary course of business and consistent with past

practices.  For the avoidance of doubt, the Debtors do not propose to make any payment on account of the Non-Insider Employee Bonus Program to Insiders.

**IV.      Discretionary Non-Insider Severance Benefits.**

65.      In the ordinary course of business, the Debtors, in their sole discretion, have historically provided severance benefits (the "Discretionary Non-Insider Severance Benefits") to non-Insider Employees in the event of an involuntary termination for any reason, including, but not limited to, downsizing or workforce reductions, corporate reorganization, job elimination or performance deficiencies.  The Debtors are not required, by any law or internal policy, to pay the Discretionary Non-Insider Severance Benefits, and the Debtors, in their sole discretion, may elect not to pay Discretionary Severance Benefits.  If the Debtors elect to pay any Discretionary Non-Insider Severance Benefits, the amounts and terms of such Discretionary Non-Insider Severance Benefits are entirely within the Debtors' sole discretion and, without limitation, may include benefits other than cash.  Historically, the Debtors have elected to pay released Employees two-weeks' pay for every year of service, with Employees entitled to a minimum of 12 weeks' pay and a maximum of 52 weeks' pay as part of the Discretionary Non-Insider Severance Benefits.

66.      The Debtors' ability to pay and provide Discretionary Non-Insider Severance Benefits has been critical to maintaining Employee morale and loyalty.  Increased instability in the Debtors' workforce will only undermine the Debtors' ability to strengthen their financial and operational foundation, to generate growth, and to be positioned for long-term success.  As a condition to receiving any Discretionary Non-Insider Severance Benefits, the Debtors may require that an Employee execute a release agreement, whereby the Employee releases any claims held against the Debtors.  The Debtors believe that the Discretionary Non-Insider Severance Benefits provide the Debtors' with the ability to reduce the time and expense that could arise in the absence of the Discretionary Non-Insider Severance Benefits to defend the assertion of claims by any

severed Employees. Accordingly, the Debtors request authority to elect to pay, or not pay, in their sole discretion, any Discretionary Non-Insider Severance Benefits in the ordinary course of business during the pendency of these chapter 11 cases.

67.    In late May 2020, the Debtors implemented changes in their workforce as part of their continued focus on cost reductions and to better align their workforce with the current and projected near-term needs of their business. Approximately 61 Employees were impacted by the workforce reduction, with approximately 38 of the impacted Employees furloughed (the "Furloughed Employees") and 23 of the impacted Employees released (the "Released Employees"). On July 24, 2020, 19 of the Furloughed Employees and two current Employees were released. The remaining 19 Furloughed Employees returned to work.

68.    Released Employees over the age of 40 have 45 days from the date of release plus an additional 7-day revocation period in which to return the release to receive their Discretionary Non-Insider Severance Benefits. Released Employees under the age of 40 have 21 days from the date of release to do the same. As of the Petition Date, the Debtors estimate that there is approximately $300,000 in accrued and outstanding obligations on account of Discretionary Non-Insider Severance Benefits for Released Employees under the age of 40. As of the Petition Date, the Debtors estimate that there is approximately $900,000 in accrued and outstanding obligations on account of Discretionary Non-Insider Severance Benefits for Released Employees over the age of 40.

## Basis for Relief

I.   **Sufficient Cause Exists to Authorize the Debtors to Honor the Employee Compensation and Benefits.**

   A.   **Certain Employee Compensation and Benefits Are Entitled to Priority Treatment.**

69.   Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Employee Compensation and Benefits owed to the Employees to priority treatment. As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(b) (requiring payment of certain allowed unsecured claims for: (a) wages, salaries, or commissions, including sick leave pay earned by an individual; and (b) contributions to an employee benefit plan). Thus, granting the relief sought herein should only affect the timing of certain payments to the Employees, and should not negatively affect recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties. *See In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 370 (Bankr. S.D. Tex. 2000) ("The need to pay [employee wage] claims in an ordinary course of business time frame is simple common sense. Employees are more likely to stay in place and to refrain from actions which could be detrimental to the case and/or the estate if their pay and benefits remain intact and uninterrupted.").

   B.   **Payment of Certain Employee Compensation and Benefits Is Required by Law.**

70.   The Debtors seek authority to pay the applicable Withholding Obligations to the appropriate third-party entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on

another party's behalf.  *See* 11 U.S.C. §§ 541(b)(1), (d); *see also In re Equalnet Commc'ns*, 258 B.R. at 370 (noting that, for tax obligations where funds are held by the debtor in trust, "the legal right to payment of such claims at any time appears irrefutable.") (citing *In re Al Copeland Enter., Inc.*, 991 F.2d 233 (5th Cir. 1993)).

71.     Federal and state laws require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority.  26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes).  Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Withholding Obligations on account of the Employees to the proper parties in the ordinary course of business.

72.     Similarly, state laws require the Debtors to maintain the Workers' Compensation Program.  If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states.  Payment of all Workers' Compensation Program amounts is therefore crucial to the Debtors' continued operations and the success of the Debtors' ongoing chapter 11 process.

## II.     Payment of the Employee Compensation and Benefits Is Proper Pursuant to Section 363(b) of the Bankruptcy Code.

73.     Courts in the Fifth Circuit have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value.  *See, e.g.*, *In re CoServ*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258 B.R. at 369–70 (business transactions critical

to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation); *see also In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."); *Armstrong World Indus., Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983).  In doing so, these courts acknowledge that several legal theories rooted in sections 105(a), 363(b), and 1107(a) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

74.     Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval, to pay prepetition obligations where a sound business purpose exists for doing so.  *See Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification).  In addition, under section 1107(a) of the Bankruptcy Code, a debtor in possession has, among other things, the "implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'"  *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ*, 273 B.R. at 497).  Moreover, under section 105(a) of the Bankruptcy Code, "the Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code."  11 U.S.C. § 105(a); *In re CoServ*, 273 B.R. at 497 (finding that sections 105 and 1107 of the Bankruptcy Code provide the authority for a debtor-in-possession to pay prepetition claims); *In re CEI Roofing, Inc.*, 315 B.R. at 60 (finding that "[b]ecause Congress has specifically provided that prepetition wage claims up to a certain amount per claim be elevated to priority status under § 503(1)(3)" the court's job is easier when it considers approval of such prepetition claims); *In re Mirant Corp.*, 296 B.R. 427, 429

(Bankr. N.D. Tex. 2003) (noting that non-payment of prepetition claims may seriously damage a debtor's business).  The above-referenced sections of the Bankruptcy Code therefore authorize the postpetition payment of prepetition claims when the payments are critical to preserving the going-concern value of the debtor's estate, as is the case here.  *See, e.g.*, *In re CoServ*, 273 B.R. at 497 ("[I]t is only logical that the bankruptcy court be able to use [s]ection 105(a) of the [Bankruptcy] Code to authorize satisfaction of the pre-petition claim in aid of preservation or enhancement of the estate.").

75.     Payment of Employee Compensation and Benefits is warranted under this authority and the facts of these chapter 11 cases.  The majority of the Employees and Independent Contractors exclusively rely on the Employee Compensation and Benefits to satisfy their daily living expenses.  Employees and Independent Contractors will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee Compensation and Benefits.  Continuing ordinary course benefits will help maintain Employee morale and minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' ongoing business operations.

76.     Moreover, Employees provide the Debtors with services necessary to conduct the Debtors' business, and the Debtors believe that absent the payment of the Employee Compensation and Benefits owed to the Employees and Independent Contractors, the Debtors may experience workforce turnover and instability at this critical time in these chapter 11 cases.  The oil and gas industry is a highly specialized business that requires unique technical expertise.  The Debtors believe that without these payments, their workforce may become demoralized and unproductive because of the potential significant financial strain and other hardships these Employees and Independent Contractors may face.  Such individuals may then elect to seek alternative

employment opportunities.  A significant portion of the value of the Debtors' business is tied to

their workforce, which cannot be replaced without significant efforts—which efforts may not be

successful given the overhang of these chapter 11 cases.  Enterprise value may be materially

impaired to the detriment of all stakeholders in such a scenario.  The Debtors therefore believe that

payment of the prepetition obligations with respect to the Employee Compensation and Benefits

is a necessary and critical element of the Debtors' efforts to preserve value and will give the

Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their

business in these chapter 11 cases.  The Debtors respectfully request that the Court authorize the

Debtors to pay and continue the Employee Compensation and Benefits in the ordinary course of

business and consistent with past practice on a final basis from the outset of these cases.

### III.    A Limited Waiver of the Automatic Stay for the Workers' Compensation Program Is Appropriate in this Case.

77.    Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of
> process, of a judicial, administrative, or other action or proceeding against the
> debtor that was or could have been commenced before the commencement of the
> case under this title, or to recover a claim against the debtor that arose before the
> commencement of the case under this title . . . .

Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to

request a modification or termination of the automatic stay for "cause."  11 U.S.C. § 362(d)(1).

78.    The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to

permit their Employees to proceed with their claims against the Workers' Compensation Program

in the appropriate judicial or administrative forum.  The Debtors believe that cause exists to modify

the automatic stay because staying the Employees' workers' compensation claims could have a

detrimental effect on the financial well-being and morale of the Employees and lead to the

departure of certain Employees who are critical at this juncture.  Such departures could cause a

severe disruption in the Debtors' business to the detriment of all stakeholders. In addition, as noted above, if the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Accordingly, the Debtors request a limited waiver of the automatic stay for purposes of allowing the Debtors' Workers' Compensation Program to proceed.

### Emergency Consideration

79.     Pursuant to Bankruptcy Local Rule 9013-1(i), the Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." As set forth in this Motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm. Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring. Accordingly, the Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and therefore request that the Court approve the relief requested in this Motion on an emergency basis.

### Processing of Checks and Electronic Fund Transfers Should Be Authorized

80.     The Debtors have sufficient funds to pay the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral. Under the Debtors' existing cash management system, the Debtors have made arrangements to readily identify checks or wire transfer requests relating to the Employee Obligations, as applicable. Accordingly, the Debtors believe that checks or wire transfer requests that are not related to authorized payments will not be honored inadvertently.

The Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested herein.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

81.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Reservation of Rights

82.     Nothing contained herein or any actions taken by the Debtors pursuant to any order granting the relief requested by this Motion is intended or should be construed as:  (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined herein or any order granting the relief requested by this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

## Notice

83.     Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Bankruptcy Local Rules, and is sufficient under the circumstances.   Without limiting the foregoing, due notice will be afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties-in-interest, including:  (a) the U.S. Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) JPMorgan Chase Bank, N.A., as administrative agent under the Debtors' revolving credit facility; (d)  Vinson & Elkins LLP, as counsel to the administrative agent under the Debtors' revolving credit facility; (e) Wilmington Trust, N.A., as indenture trustee under the Debtors' (i) 9.00% second lien secured notes due 2021, (ii) 9.250% second lien secured notes due 2022, (iii) 7.50% second lien secured notes due 2024, (iv) 7.750% second lien secured notes due 2024, and (v) 6.375% convertible notes due 2024; (f) Wilmington Trust, N.A., as successor indenture trustee under the Debtors' (i) 6.375% subordinated notes due 2021, (ii) 4.625% subordinated notes due 2023, and (iii) 5.50% subordinated notes due 2022; (g) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to the ad hoc committee of second lien bondholders; (h) Akin Gump Strauss Hauer & Feld LLP, as counsel to the ad hoc group of convertible bondholders; (i) the United States Attorney's Office for the Southern District of Texas; (j) the Internal Revenue Service; (k) the United States Securities and Exchange Commission; (l) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (m) the state attorneys general for states in which the Debtors conduct business; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Houston, Texas
July 30, 2020

/s/ *Matthew D. Cavenaugh*

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Vienna F. Anaya (TX Bar No. 24091225)
Victoria Argeroplos (TX Bar No. 24105799)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:    (713) 752-4200
Facsimile:    (713) 752-4221
Email:    mcavenaugh@jw.com
    vanaya@jw.com
    vargeroplos@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Christopher Marcus, P.C. (*pro hac vice* admission pending)
Rebecca Blake Chaikin (*pro hac vice* admission pending)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    joshua.sussberg@kirkland.com
    christopher.marcus@kirkland.com
    rebecca.chaikin@kirkland.com

-and-

David L. Eaton (*pro hac vice* admission pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    david.eaton@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Local Rule 9013-1(i).

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

**Certificate of Service**

I certify that on July 30, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh