## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| DENBURY RESOURCES INC., *et al.*,[1] | ) | Case No. 20-33801 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) | (Emergency Hearing Requested) |

## DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY
## OF INTERIM AND FINAL ORDERS (I) AUTHORIZING
## THE DEBTORS TO (A) CONTINUE TO OPERATE THEIR CASH
## MANAGEMENT SYSTEM AND MAINTAIN EXISTING BANK ACCOUNTS,
## (B) CONTINUE TO PERFORM INTERCOMPANY TRANSACTIONS, AND (C)
## MAINTAIN EXISTING BUSINESS FORMS AND (II) GRANTING RELATED RELIEF

> **EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON JULY 31, 2020, AT 7:30 A.M. (CENTRAL TIME) IN COURTROOM 400, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TEXAS 77002. IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**
>
> **RELIEF IS REQUESTED NOT LATER THAN JULY 31, 2020.**
>
> **PLEASE NOTE THAT ON MARCH 24, 2020, THROUGH THE ENTRY OF GENERAL ORDER 2020-10, THE COURT INVOKED THE PROTOCOL FOR EMERGENCY PUBLIC HEALTH OR SAFETY CONDITIONS.**
>
> **IT IS ANTICIPATED THAT ALL PERSONS WILL APPEAR TELEPHONICALLY AND ALSO MAY APPEAR VIA VIDEO AT THIS HEARING.**
>
> **AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S REGULAR DIAL-IN NUMBER. THE DIAL-IN NUMBER IS +1(832) 917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES. YOU WILL BE ASKED TO KEY IN THE CONFERENCE ROOM NUMBER. JUDGE JONES'S CONFERENCE ROOM NUMBER IS 205691.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Denbury Resources Inc. (7835); Denbury Air, LLC (7621); Denbury Brookhaven Pipeline Partnership, LP (6322); Denbury Brookhaven Pipeline, LLC (6471); Denbury Gathering & Marketing, Inc. (6150); Denbury Green Pipeline-Montana, LLC (6443); Denbury Green Pipeline-North Dakota, LLC (7725); Denbury Green Pipeline-Riley Ridge, LLC (2859); Denbury Green Pipeline-Texas, LLC (2301); Denbury Gulf Coast Pipelines, LLC (0892); Denbury Holdings, Inc. (1216); Denbury Onshore, LLC (7798); Denbury Operating Company (7620); Denbury Pipeline Holdings, LLC (0190); Denbury Thompson Pipeline, LLC (0976); Encore Partners GP Holdings, LLC (N/A); Greencore Pipeline Company, LLC (9605); Plain Energy Holdings, LLC (0543). The location of Debtor Denbury Resources Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 5320 Legacy Drive, Plano, Texas 75024.

> **PARTIES MAY PARTICIPATE IN ELECTRONIC HEARINGS BY USE OF AN INTERNET CONNECTION.   THE INTERNET SITE IS WWW.JOIN.ME.   PERSONS CONNECTING BY MOBILE DEVICE WILL NEED TO DOWNLOAD THE FREE JOIN.ME APPLICATION.**
>
> **ONCE CONNECTED TO WWW.JOIN.ME, A PARTICIPANT MUST SELECT "JOIN A MEETING".   THE CODE FOR JOINING THIS HEARING BEFORE JUDGE JONES IS "JUDGEJONES". THE NEXT SCREEN WILL HAVE A PLACE FOR THE PARTICIPANT'S NAME IN THE LOWER LEFT CORNER.  PLEASE COMPLETE THE NAME AND CLICK "NOTIFY".**
>
> **HEARING APPEARANCES SHOULD BE MADE ELECTRONICALLY AND IN ADVANCE OF THE HEARING.  YOU MAY MAKE YOUR ELECTRONIC APPEARANCE BY:**
>
> **1) GOING TO THE SOUTHERN DISTRICT OF TEXAS WEBSITE;**
>
> **2) SELECTING "BANKRUPTCY COURT" FROM THE TOP MENU;**
>
> **3) SELECTING "JUDGES' PROCEDURES AND SCHEDULES";**
>
> **4) SELECTING "VIEW HOME PAGE" FOR JUDGE JONES;**
>
> **5) UNDER "ELECTRONIC APPEARANCE" SELECT "CLICK HERE TO SUBMIT ELECTRONIC APPEARANCE;"**
>
> **6) SELECT "DENBURY RESOURCES INC., ET AL." FROM THE LIST OF ELECTRONIC APPEARANCE LINKS; AND**
>
> **7) AFTER SELECTING DENBURY RESOURCES INC., ET AL. FROM THE LIST, COMPLETE THE REQUIRED FIELDS AND HIT THE "SUBMIT" BUTTON AT THE BOTTOM OF THE PAGE.**
>
> **SUBMITTING YOUR APPEARANCE ELECTRONICALLY IN ADVANCE OF THE HEARING WILL NEGATE THE NEED TO MAKE AN APPEARANCE ON THE RECORD AT THE HEARING.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state the following in support of this motion (this "Motion"):

### Relief Requested

1.      The Debtors seek entry of an interim order and a final order (respectively, the "Interim Order" and "Final Order"), substantially in the forms attached hereto: (a) authorizing the Debtors to (i) continue to operate their cash management system, as described herein and as illustrated on Exhibit 1 to the Interim Order and Final Order, and maintain their existing bank accounts, including honoring certain prepetition obligations related thereto, (ii) continue to perform intercompany transactions and funding consistent with historical practice, subject to the terms described herein, and (iii) maintain existing business forms in the ordinary course of

business; and (b) granting related relief.  The Debtors also request the Court authorize the Cash
Management Banks (as defined below) to continue to charge Bank Fees (as defined below) and to
charge back returned items to the Bank Accounts, whether such items are dated before, on, or after
the commencement of these chapter 11 cases.

2.      In addition, the Debtors request that the Court schedule a final hearing within
approximately 35 days of the commencement of these chapter 11 cases to consider approval of
this Motion on a final basis.

### Jurisdiction and Venue

3.      The United States Bankruptcy Court for the Southern District of Texas
(the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core
proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent, pursuant to
rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of
a final order by the Court.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The bases for the relief requested herein are sections 105, 345, 363, and 503 of
chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 6003
and 6004, and rule 9013-1(b) of the Bankruptcy Local Rules for the Southern District of Texas
(the "Bankruptcy Local Rules").

6.      On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for
relief under chapter 11 of the Bankruptcy Code.  A detailed description of the facts and
circumstances of these chapter 11 cases is set forth in the *Declaration of Christian S. Kendall,
Chief Executive Officer of Denbury Resources Inc., in Support of Chapter 11 Petitions and First
Day Motions* (the "First Day Declaration"), filed contemporaneously with this Motion and
incorporated by reference herein.

7.     The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

**The Cash Management System**

**I.      Overview.**

8.     To facilitate the efficient operation of their business, the Debtors maintain an integrated, centralized cash management system (the "Cash Management System").  As part of the Cash Management System, the Debtors maintain 27 bank accounts and 2 lock box accounts (collectively,     the     "Bank Accounts"),     and     12     escrow     or     restricted     accounts (the "Restricted Accounts" and together with the Bank Accounts, the "Accounts") at 5 banks or financial institutions (collectively, the "Cash Management Banks").  The majority of the Accounts are held at JPMorgan Chase Bank, N.A. ("JPM").  The Cash Management System is comparable to the cash management systems used by similarly situated companies to manage the cash of operating units in a cost-effective, efficient manner.

9.     The Debtors use the Cash Management System in the ordinary course of their business to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.  The Debtors' treasury and corporate accounting department maintains oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds, including in connection with Intercompany Transactions (as defined herein).  The Debtors' treasury and corporate accounting

department reconciles the Debtors' books and records monthly to ensure that all transfers are accounted for properly.

10.     Given the economic and operational scale of the Debtors' business, any disruption to the Cash Management System would have an immediate adverse effect on the Debtors' operations to the detriment of their estates and stakeholders.   Accordingly, to minimize the disruption caused by these chapter 11 cases, and to maximize the value of the Debtors' estates, the Debtors request authority to continue to utilize their existing Cash Management System during the pendency of these chapter 11 cases, subject to the terms described herein.

**II.     Ordinary Cash Flows.**

11.     The Cash Management System is primarily divided into two integrated cash flow structures:

      a.     the "main" banking structure, consisting of 25 Bank Accounts, including one lockbox account, related primarily to the operations of the Debtors' business (the "Main Structure"); and

      b.     the "revenue" banking structure, consisting of three Bank Accounts, including one lockbox account, related primarily to the collection and disbursement of revenue and royalty payments (the "Revenue Structure").

**A.     The Main Structure.**

12.     The Main Structure is organized around a deposit account maintained by Debtor Denbury Onshore, LLC (the "Master Operating Account") at JPM, which serves as the centralized master account that funds other accounts in the Main Structure on an as-needed basis.  The Master Operating Account is used to manage daily cash inflows and outflows associated with operations. Within the Main Structure, the Debtors maintain a number of accounts used to fund amounts on account of accounts payable, certain land and lease check disbursements, payroll, field damages, and  pipeline rights-of-way, among other things.   The Debtors fund these accounts to pay operational expenses on an as-needed basis through account transfers from the Master Operating

Account.  Within the Main Structure, the Debtors also maintain accounts primarily used to fund or receive amounts related to 401(k) benefit payments, employees' withholdings related to stock-based compensation plans, voluntary contributions to political action committees funded from deductions from employee payroll and contributions, payments on account of the Corporate Card Programs (as defined herein), and certain state and local tax payments, amongst other expenditures.  The Debtors will also maintain a segregated account at JPM that the Debtors propose will hold the Adequate Assurance Deposit for the benefit of Utility Providers throughout the course of these chapter 11 cases (the "Adequate Assurance Account").[2]

### B.    Revenue Structure.

13.     Debtor Denbury Onshore, LLC maintains a concentration account held at JPM (the "Revenue Concentration Account") related to the Revenue Structure.   The Revenue Concentration Account is used primarily to manage revenues from operations.   The Revenue Concentration Account is funded from a linked lockbox account.  Within the Revenue Structure, funds from the Revenue Concentration Account are used to fund an account held by Debtor Denbury Onshore, LLC at JPM to pay mineral obligations to third parties through ACH or check payments (the "Revenue Checks Account").

### C.    Other Accounts.

14.     The Debtors also maintain an account held by Debtor Denbury Resources Inc. at JPM used to make interest payments and debt disbursements, settle hedges, and pay certain

---

[2]     Contemporaneously herewith, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief* (the "Utilities Motion").  As used herein, "Adequate Assurance Account" and "Utility Providers" shall have the meanings ascribed to the in the Utilities Motion.  The Adequate Assurance Account will be funded in accordance with the procedures described in the Utilities Motion and will be funded within five business days after entry of an order granting the relief requested in the Utilities Motion.

transaction expenses (the "Financing Account").  Additionally, the Debtors maintain 12 Restricted Accounts for use as collateral for certain operations as required for compliance with certain ongoing environmental, regulatory, or legal obligations that render the Restricted Accounts particularly difficult and time-consuming to alter or transfer.

15.       In addition, the Financing Account, the Revenue Concentration Account, and the Master Operating Account perform an overnight sweep to accrue additional interest on excess cash within the Cash Management System.  Such additional interest is used as an earnings' credit primarily to offset certain of the Debtors' Bank Fees (as defined below).

16.       As of the Petition Date, the Debtors have approximately $235,848,211 cash on hand within the Cash Management System, inclusive of $55,727,420 within the Restricted Accounts.

**III.    Accounts.**

17.       The Cash Management System is comprised of 41 Accounts in total, each of which is identified on Exhibit 2 attached to the Interim Order and the Final Order.  The Debtors hold the Accounts at the following Cash Management Banks:

- 30 Accounts reside at JPM;
- 8 Accounts reside at Wells Fargo, N.A. ("Wells Fargo");
- 1 Account resides at Bank of America, N.A. ("BofA");
- 1 Account resides at Merrill Lynch Pierce, Fenner & Smith Inc. ("ML"); and
- 1 Account resides at Arden Trust Company ("Arden Trust").

18.       The Accounts are described in more detail in the following table:

| Accounts | Descriptions of Accounts |
|---|---|
| **Main Structure** ||
| **Master Operating Account**<br><br>*JPM Account ending in 8626* | The Master Operating Account is the main operating account of the Debtors, which is used to manage the daily cash flows and outflows associated with operations.   The Master Operating Account makes payments, including checks, wires, and ACH, primarily on account of payroll, employee benefits, certain hedging payments, and general and administrative expenses. |
| **Accounts Payable Account**<br><br>*JPM Account ending in 1737* | The Debtors primarily use the Accounts Payable Account to disburse checks and ACH payments with respect to accounts payable and land checks. |
| **Payroll Account**<br><br>*JPM Account ending in 1729* | The Debtors primarily use the Payroll Account to disburse checks or ACH payments that the payroll department uses to pay the Debtors' employees and payroll taxes. |
| **Land Checks Account**<br><br>*JPM Account Ending in 8022* | The Debtors primarily use the Land Checks Account to make land ACH payments and disburse land checks and certain lease payments. |
| **Geographic Land Disbursement Accounts**<br><br>*7 JPM Accounts* | The Geographic Land Disbursement Accounts are used primarily to disburse checks or ACH payments to pay vendors in specific geographic locations where the Debtors operate. |
| **Local Disbursement Accounts**<br><br>*7 JPM Accounts* | The Local Disbursement Accounts are used to disburse manual checks related to minor non-recurring expenses in the ordinary course of the Debtors' operations. |
| **401K Benefits Account**<br><br>*JPM Account ending in 8642* | The 401K Benefits Account is used to hold voluntary employee contributions and employer match related to the employees' 401K and make disbursements with respect to 401K obligations to the 401K administrator |
| **Corporate Card Account**<br><br>*Wells Fargo Account ending in 4553* | The Corporate Card Account is used to fund payments on account of the SUA Program and the Credit Card Programs (each, as defined below). |
| **Denbury Operating Company Tax Account**<br><br>*JPM Account ending in 2275* | The Denbury Operating Company Tax Account is used to pay state and local tax obligations in certain states. |
| **Political Action Committee Account**<br><br>*JPM Account ending in 8460* | The Political Action Committee Account is funded from employee contributions or voluntary deductions from employee payroll, which are then used to make contributions to certain political action committees. |

| Accounts | Descriptions of Accounts |
|---|---|
| **Stock Compensation Account**<br><br>*ML Account ending in 2053* | The Stock Compensation Account is used to accumulate employee withholdings related to stock-based compensation granted to employees. |
| **Adequate Assurance Account**<br><br>*JPM Account ending in 8067* | The Adequate Assurance Account will hold the Adequate Assurance Deposit for the duration of these chapter 11 cases and at the conclusion of these cases, the funds in the Adequate Assurance Account may be applied to any postpetition defaults in payment to the Utility Providers. The Debtors intend to fund this account in accordance with the procedures described in the Utilities Motion. |
| **Lockbox Account**<br><br>*JPM Account ending in 2555* | This Lockbox Account is used to collect and process certain accounts receivable payments and remittance documents. |
| **Revenue Structure** | |
| **Main Revenue Account**<br><br>*JPM Account ending in 8634* | The Main Revenue Account is used to manage primarily daily cash inflows and outflows associated with revenue checks. The Main Revenue Account sweeps funds daily from the Revenue Checks Account and collects money from a linked lockbox. |
| **Revenue Checks Account**<br><br>*JPM Account ending in 1745* | The Revenue Checks Account is a zero-balance account used primarily to pay mineral obligations to third parties. |
| **Lockbox Account**<br><br>*JPM Account ending in 2621* | This Lockbox Account is used to collect and process certain accounts receivable payments related to mineral revenues and remittance documents. |
| **Other Accounts** | |
| **Financing Account**<br><br>*JPM Account ending in 7773* | The Financing Account is used to fund all of the Debtors' debt or interest payments on funded debt obligations, settle certain hedges, and pay transaction expenses primarily through ACH or wire. |
| **Restricted Accounts** | |
| **Grieve Plugging Fund Account**<br><br>*JPM Account ending in 0979* | The Grieve Plugging Fund Account is required by agreement in connection with operations at the Debtors' Grieve site. |
| **CCA Bond Collateral Account**<br><br>*BofA Account ending in 3092* | The Debtors are required by the State of Montana to post certain restricted amounts in connection with the Debtors' operations at the Cedar Creek Anticline ("CCA") site in Montana. |
| **Escrow Accounts**<br><br>*7 Wells Fargo Accounts*<br>*2 JPM Accounts*<br>*1 Arden Trust Account* | The Debtors maintain 10 escrow accounts as collateral for certain operations as required for compliance with certain ongoing environmental, regulatory, or legal obligations. |

**IV.** **Bank Fees.**

19.     The Debtors pay certain fees incurred in connection with the Accounts (the "Bank Fees") to the Cash Management Banks on a monthly basis.  The Debtors earn a credit based on the monthly average balance in the Master Operating Account, which is used to offset the Debtors' Bank Fees.  Monthly Bank Fees, prior to the Debtors' earnings credit, do not typically exceed $25,000.  The Debtors estimate that they owe the Cash Management Banks approximately $25,000 as of the Petition Date, all of which will become due and payable within the first 35 days of these chapter 11 cases.  Accordingly, the Debtors seek authority to continue paying the Bank Fees, including the Bank Fees that are owed as of the Petition Date, in the ordinary course on a postpetition basis, consistent with historic practice.  The Debtors also request that the Court authorize the Cash Management Banks continue to charge Bank Fees, and be permitted to charge back returned items to the Bank Accounts, whether such items are dated before, on, or after the Petition Date, in the ordinary course of business and consistent with historic practice.

**V.** **The Single Use Account Program.**

20.     In July 2017, the Debtors established a single use account program (the "SUA Program") with Wells Fargo to pay vendors that opt in to the SUA Program.  Payments made through the SUA Program are subject to internal controls requiring Debtors' approval.

21.     The SUA Program is an online service whereby the Debtors can make payments to business suppliers and vendors via single-use, virtual account numbers.  The Debtors' suppliers and vendors are able to sign up to receive payment through the SUA Program at their option and receive payment by this method rather than through a check or wire/ACH.  Although there is only one Wells Fargo credit card number associated with the SUA Program, the system generates a unique authorization token for each transaction the Debtors execute through the SUA Program.

10

The authorization token process essentially eliminates the risk of potential credit card fraud. To make payments through the SUA Program, the Debtors debit funds on a monthly basis from the Corporate Card Account via ACH transfers to pay amounts owed for the previous month. Based on current enrollment information, the Debtors estimate that approximately $2,300,000 in vendor payments will flow though the SUA Program on a monthly basis after the Petition Date. In addition, the Debtors pay a nominal service fee for the participation in the SUA Program.

22.     The SUA Program benefits vendors, allowing them to receive payment several days sooner than traditional check payments.  The Debtors also benefit from paying vendors through the SUA Program, as it reduces administrative burdens, results in more timely payments to vendors, and generates a rebate to the Debtors on average of approximately $25,000 per month. Accordingly, the Debtors seek authority to continue the SUA Program, subject to any terms and conditions thereof, in the ordinary course of business on a postpetition basis consistent with past practice, and to pay any prepetition amounts related to the SUA Program, including any prepetition fees related thereto.  For the avoidance of doubt, the Debtors will not seek to pay any outstanding amounts related to the SUA Program in advance of the date they come due.  As of the Petition Date, the Debtors believe approximately $1,000,000 is outstanding on account of the SUA Program.

**VI.     Credit Card Programs.**

23.     As part of the Cash Management System, the Debtors provide certain employees with Purchase Cards and Fuel Cards (each, as defined below) to cover legitimate business expenses in the ordinary course of business (and such programs, the "Credit Card Programs").  The Credit Card Programs are an integral part of the Debtors' Cash Management System.  Costs incurred through use of the Credit Card Programs are applied against the credit balance funded on an as-needed basis from the Master Operating Account to the Corporate Card Account, which in turn

is debited on the applicable payment date.  In addition, the Debtors pay certain nominal service fees for the use of the Purchase Cards and Fuel Cards issued under the Credit Card Programs.

### A.   Purchase Cards.

24.     Under the applicable Credit Card Program, the Debtors provide approximately 500 employees with credit cards for approved, legitimate, and documented business expenses and supplies incurred on behalf of the Debtors in the ordinary course of business (the "Purchase Cards") issued by Wells Fargo.  Employees' continued use of the Purchase Cards for procurement of qualifying business expenses is essential to the continued operation of the Debtors' businesses.  On average, the Debtors pay approximately $237,000 per month for amounts incurred on the Purchase Cards.  The Debtors, with the assistance of their advisors, have implemented internal mechanisms that will permit them to accurately track the balances and monitor the expenses incurred on the Purchase Cards.  As of the Petition Date, the Debtors believe they owe approximately $113,000 on account of authorized business expenses on the Purchase Cards.

### B.   Fuel Cards.

25.     Additionally, under the applicable Credit Card Program, the Debtors provide approximately 560 employees with fuel cards (the "Fuel Cards") issued by WEX Bank (the "Fuel Bank") to pay in-transit fuel costs incurred by the Debtors' employees in connection with travel between multiple work sites and field offices.  Expenses incurred on account of the Fuel Cards are billed directly to the Debtors and do not pass through the applicable Employee's personal financial accounts.  On average, the Debtors have historically spent approximately $95,000 per month on account of the Fuel Cards.  As of the Petition Date, the Debtors believe they owe approximately $95,000 on account of fuel purchases on the Fuel Cards.

26.    As of the Petition Date, the Debtors believe approximately $208,000 is outstanding on account of authorized business expenses under the Credit Card Programs.  If the Credit Card Programs are discontinued, the applicable card issuer could attempt to collect funds from the Debtors' employees, potentially resulting in injury to their personal credit and finances. Accordingly, the Debtors seek authority to continue the Credit Card Programs, subject to any terms and conditions thereof, in the ordinary course of business on a postpetition basis consistent with past practice, and to pay any prepetition amounts owed related to the Credit Card Programs, including any prepetition fees related thereto.  For the avoidance of doubt, the Debtors will not seek to pay any outstanding expenses or fees related to the Credit Card Programs in advance of the date they come due.

## VII.    Intercompany Transactions.

### A.    Overview.

27.    In the ordinary course of business, the Debtors maintain routine business relationships with other Debtor entities (the "Intercompany Transactions") that may result in intercompany receivables and payables owing from one Debtor entity to another Debtor entity (collectively, the "Intercompany Balances").  The Debtors settle Intercompany Transactions as journal entry receivables and payables, and from time to time, reimburse certain Debtors for various expenditures associated with their businesses and/or fund the Bank Accounts in anticipation of such expenditures.[3]  Such Intercompany Transactions include, among other things, funds flowing to and from the Master Operating Account to pay corporate and franchise taxes, expenses related to payroll and benefits, general administrative expenses, interest on corporate

---

[3]    The Intercompany Transactions discussed herein, and with respect to which the Debtors seek relief pursuant to this motion, encompass ordinary course transactions between Debtor entities.  The Intercompany Transactions do not encompass any loans made between Debtors to address liquidity concerns, and by this motion the Debtors are not seeking any relief in connection with any such loans.

funded debt, receipt of revenues and payment of expenses related to the operation of the Debtor's assets, and other transfers on behalf of Debtor entities to maintain the seamless operation of the Debtors' business.

28.     As discussed above, the Master Operating Account disburses funds, as necessary, throughout the Cash Management System to fund the operation of all Debtor entities.  In general, when other Debtor entities have excess cash on hand, those entities transfer funds to the Master Operating Account.  Each of the transfers discussed above is made on an as-needed basis in the Debtors' discretion or through certain zero-balance accounts, as applicable.  In connection with the daily operation of the Cash Management System, as funds are swept and disbursed throughout the Cash Management System and as business is transacted between the Debtors, there may be Intercompany Balances owing by one Debtor to another Debtor at any given time.   All Intercompany Balances are reflected as journal entry receivables and payables, as applicable, in the respective Debtors' accounting systems.[4]

### B.     Importance of the Intercompany Transactions.

29.     The Debtors' ability to engage in Intercompany Transactions is essential to the smooth and uninterrupted operation of the Debtors' business.  The Intercompany Transactions are crucial for the Debtors to process payroll, pay vendors for goods or services, track spending and performance by legal entity for financial and tax purposes, and to otherwise operate their business in the ordinary course.  The Debtors would be unduly burdened both financially and logistically if they were required to halt or otherwise modify the Intercompany Transactions at this time.  As a

---

[4]   This Motion provides an overview of the Debtors' typical Intercompany Transactions.  The relief requested herein is applicable with respect to all Intercompany Transactions and is not limited to those Intercompany Transactions described in this Motion.   To the extent that there are any outstanding prepetition obligations related to Intercompany Transactions not described herein, the Debtors, out of an abundance of caution, seek authority to honor such obligations.

practical matter, deintegration likely would require extensive effort at this critical juncture in these chapter 11 cases.  Third parties are also accustomed to using the existing Cash Management System, which funnels payments on account of all Debtors through the various Accounts and into the Master Operating Account from which such funds are swept.  Hasty changes to this established system likely would disrupt the Debtors' ability to timely and properly process receivables and payables and allocate them to the appropriate legal entity.

30.     Moreover, the Intercompany Transactions are comparable to those of other companies with similarly complex corporate structures and operate in a fashion typical of other oil and natural gas companies.  Importantly, all Intercompany Transactions can be, and will be, tracked on a postpetition basis, and subject to monthly reviews by the Debtors.  Any discrepancies can, and will be, addressed through a monthly intercompany true-up, consistent with past practice. If the Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' operations would be disrupted unnecessarily to the detriment of the Debtors, their creditors, and their other stakeholders.

## VIII.   Business Forms and Books and Records.

31.     In the ordinary course of their business, the Debtors utilize a variety of preprinted correspondence and business forms, such as letterhead and checks (collectively, the "Business Forms").  The Debtors also maintain books and records to document their financial results and a wide array of operating information (collectively, the "Books and Records").  The *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees* (the "U.S. Trustee Operating Guidelines") require that the Cash Management Banks print "Debtor in Possession" and the bankruptcy case number on checks issued after the Petition Date.  To minimize unnecessary additional expenses to the Debtors' estates and avoid disruption to their business operations and avoid confusion on the part of employees, customers, vendors, and

suppliers during the pendency of these chapter 11 cases, the Debtors request that the Court authorize their continued use of their Business Forms and Books and Records in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession.

**IX.     Compliance with Section 345 of the Bankruptcy Code.**

      **A.     The Cash Management System Complies with Section 345(a) of the Bankruptcy Code.**

32.     The Cash Management System complies with the deposit guidelines set forth in section 345 of the Bankruptcy Code.  Section 345(a) of the Bankruptcy Code authorizes deposit or investment of money of estates, such as cash, as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment."

33.     The Debtors utilize a conservative investment policy  (the "Investment Policy") for any Accounts in which cash is invested that sets prudent investment guidelines for safely and efficiently investing the Debtors' excess capital, with a primary goal of protecting principal and a secondary goal of increasing yield.  The Investment Policy requires investment in securities of the highest credit quality, focusing solely on government-backed treasury bonds or government money market funds.

34.     As of the Petition Date, and during the pendency of these chapter 11 cases, the Debtors seek authority to continue to utilize the Investment Policy for funds within the Cash Management System.  Because of the high-quality of investments required by the Investment Policy, such investments are generally capable of being liquidated immediately, allowing the Debtors to effectively treat any investments as cash equivalents.

35.     The Investment Policy is a disciplined and prudent strategy, permitting the Debtors to balance maximizing returns on excess cash while protecting principal and ensuring that such

cash is readily available for use in the Debtors' Cash Management System.  Accordingly, investing excess cash pursuant the Investment Policy satisfies the requirements of section 345(a) of the Bankruptcy Code.

### B.  Authorized Depositories.

36.     For deposits that are not "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code provides that the estate must require from the entity with which the money is deposited or invested a bond in favor of the United States secured by the undertaking of a corporate security, "unless the court for cause orders otherwise." Additionally, the U.S. Trustee Operating Guidelines generally require chapter 11 debtors to, among other things, deposit all estate funds into an account with an authorized depository that agrees to comply with the requirements of the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee").

37.     Here, JPM, BofA, and Wells Fargo, where the Debtors maintain 39 of their 41 Accounts are designated as authorized depositories by the U.S. Trustee, pursuant to the U.S. Trustee Operating Guidelines.  These Cash Management Banks are each party to a uniform depository agreement with the U.S. Trustee, and therefore those Accounts at these institutions will be collateralized in a manner consistent with the requirements of section 345 of the Bankruptcy Code.  Only Arden Trust and ML where the Debtors maintain (a) one Restricted Account—used as collateral for the Conroe Field Trust—and which is subject to certain restrictions on the Debtors' access to the funds held therein, and (b) one Bank Account used solely for withholdings based on the employee stock incentive compensation plan, respectively—are not authorized depositories.

38.     Arden Trust and ML are highly-rated financial institutions that are widely recognized as well-capitalized, financially stable, and will pose no cognizable risk to the Debtors'

estates.  Considering the specialized nature of these two Accounts, it would be difficult for the Debtors to move these Accounts without incurring considerable costs to the detriment of the Debtors' estates and creditors.  Additionally, funds in the Stock Compensation Account held at ML are insured by the FDIC.  The Debtors believe that these financial institutions are well-positioned to perform the cash management functions during the chapter 11 cases.  Failure to operate these Accounts would cause a significant, undue burden on the Debtors' estates.

39.    The Cash Management System is complex and critical to the ongoing stability of the Debtors' businesses and transition into chapter 11.  Requiring the Debtors to transfer any of the above-described Accounts would place a needless and excessive administrative burden on the Debtors and impose significant, value-destructive costs to the Debtors' estates.  Accordingly, cause exists to allow the Debtors to continue utilizing the existing Accounts consistent with historical practices, and therefore request that the Court waive the requirements of section 345(b) of the Bankruptcy Code and the U.S. Trustee Operating Guidelines, to the extent not already met, with respect to authorized depository requirements.  In any event, the Debtors will work in good faith with the U.S. Trustee to address any concerns regarding the continued use of these accounts on a postpetition basis.

## Basis for Relief

**I.    Maintaining the Existing Cash Management System Is Essential to the Debtors' Ongoing Operations and Restructuring Efforts.**

40.    The U.S. Trustee Operating Guidelines require debtors in possession to, among other things:  (a) close all existing bank accounts and open new debtor in possession bank accounts; (b) establish one debtor in possession account for all estate monies required for payment of taxes including payroll taxes; (c) physically set aside all monies required by law to be withheld from employees or collected from others for taxes; (d) open a new set of books and records as of the

commencement date of the case; (e) use new business forms indicating the debtor in possession status of the chapter 11 debtor; and (f) make all disbursements of estate funds by check with a notation representing the reason for the disbursement. *See Region 7 Guidelines for Debtors-in-Possession*. These requirements are intended to provide a clear line of demarcation between prepetition and postpetition transactions and operations and to prevent inadvertent payment of prepetition claims.

41.     Continuation of the Cash Management System, including the Credit Card Programs and the SUA Program (together, the "Corporate Card Programs"), should be permitted pursuant to section 363(c)(1) of the Bankruptcy Code, which authorizes the debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing." Bankruptcy courts routinely treat requests for authority to continue utilizing existing cash management systems as a relatively "simple matter." *In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987). In granting such relief, courts recognize that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in relevant part*, 997 F.2d 1039, 1061 (3d Cir. 1993). As a result, courts have concluded that the requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient." *Columbia Gas*, 997 F.2d at 1061; *see also In re Southmark Corp.*, 49 F.3d 1111, 1114 (5th Cir. 1995) (stating that a cash management system allows a debtor "to administer more efficiently and effectively its financial operations and assets").

42.     Here, requiring the Debtors to adopt a new, segmented cash management system during these chapter 11 cases would be expensive, burdensome, and unnecessarily disruptive to

the Debtors' operations.  Importantly, the Cash Management System provides the Debtors with the ability to quickly assess the location and amount of funds, which, in turn, allows management to track and control such funds, ensure cash availability within the Cash Management System, and reduce administrative costs through a centralized method of coordinating the collection and movement of funds.[5]  As a result, any disruption of the Cash Management System could have a severe and adverse effect on the Debtors' restructuring efforts.  Absent the relief requested herein, requiring the Debtors to adopt a new, segmented cash management system could cause the Debtors' operations to grind to a halt, needlessly destroying the value of the Debtors' business enterprise.  In contrast, maintaining the current Cash Management System (including the Corporate Card Programs) will facilitate the Debtors' transition into chapter 11 by, among other things, minimizing delays in paying postpetition debts and eliminating administrative inefficiencies.  Finally, maintaining the current Cash Management System will allow the Debtors' corporate accounting employees to focus on their daily responsibilities as opposed to the non-accretive task of constructing a new cash management system.

43.     Parties in interest will not be harmed by the Debtors' maintenance of the Cash Management System, including maintenance of all of the existing Accounts and performance of the Intercompany Transactions, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of prepetition obligations, except as authorized by the Court, thereby meeting the intentions of the U.S. Trustee Operating Guidelines.  Specifically, with the assistance of their advisors, the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior

---

[5]     Notwithstanding the Debtors' use of a consolidated cash management system, the Debtors intend to calculate quarterly fees under 28 U.S.C. § 1930(a)(6) based on the disbursements of each Debtor, regardless of which entity pays those disbursements.

approval of the Debtors' treasury and corporate accounting department. The Debtors will continue to work closely with the Cash Management Banks to ensure that appropriate procedures are in place to prevent checks that were issued prepetition from being honored without the Court's approval. In light of such protective measures, maintaining the Cash Management System is in the best interests of their estates and creditors.

44.     The Debtors further respectfully request that the Court authorize and direct the Cash Management Banks to receive, process, honor, and pay any and all checks, wire transfer, credit card, ACH payments and other instructions, and drafts payable through, or drawn or directed on, such Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto, irrespective of whether such checks, drafts, wires, credit card, or ACH payments are dated prior to or subsequent to the Petition Date. The Debtors also respectfully request that, to the extent a Cash Management Bank honors a prepetition check or other item drawn on any account that is the subject of this motion, either at the direction of the Debtors or in a good-faith belief that the Court has authorized such prepetition check or item to be honored, such Cash Management Bank will not be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item honored postpetition. Such relief is reasonable and appropriate because the Cash Management Banks are not in a position to independently verify or audit whether the Debtors may pay a particular item in accordance with a Court order or otherwise.

45.     Finally, the Debtors respectfully request that the Court authorize the Debtors to continue to pay the Bank Fees, including any prepetition Bank Fees, and further authorize the Cash Management Banks to chargeback returned items to the Accounts, whether such items are dated prior to, on, or subsequent to the Petition Date, in the ordinary course of business.

## II.     Authorizing the Debtors to Continue Using All Payment Methods is Warranted.

46.     The Debtors request that the Court further waive the U.S. Trustee Operating Guidelines to the extent they require the Debtors to make all disbursements by check.  In particular, the U.S. Trustee Operating Guidelines require that all receipts and all disbursements of estate funds must be made by check with a notation representing the reason for the disbursement.  In the ordinary course of business, the Debtors conduct transactions through ACH, wire, debit transfers or other similar methods.  In addition, a certain percentage of the Debtors' receipts are historically received through electronic funds transfer payments.  If the Debtors' ability to conduct transactions by debit, wire, ACH transfer, or other similar methods is impaired, the Debtors may be unable to perform under certain contracts, their business operations may be unnecessarily disrupted, and their estates will incur additional costs to the detriment of all of the Debtors' stakeholders.

## III.    The Court Should Authorize the Debtors to Continue the Corporate Card Programs and Pay Any Prepetition Amounts Related Thereto.

47.     As part of the Cash Management System, the Debtors request authority to continue the Corporate Card Programs in the ordinary course of business, as well as pay any prepetition amounts related thereto.  Historically, the Debtors have used the Corporate Card Programs to directly fund necessary business expenses.

48.     Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval, to pay prepetition obligations where a sound business purpose exists for doing so.  *See In re Ionosphere Clubs*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (noting that section 363(b) of the Bankruptcy Code provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification).  In addition, under section 1107(a) of the Bankruptcy Code, a debtor in possession has, among other things, the "implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business'

going-concern value.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)); *see also In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369 (Bankr. S.D. Tex. 2000) (noting that courts authorize debtors to pay, outside of a plan, prepetition claims from "business transactions which are at once individually minute but collectively immense and critical to the survival of the business of the debtor.").

49.     Moreover, under section 105(a) of the Bankruptcy Code, "the Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code."  11 U.S.C. § 105(a); *In re CoServ,* 273 B.R. at 497 (finding that sections 105 and 1107 of the Bankruptcy Code provide the authority for a debtor in possession to pay pre-petition claims); *see In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex. 2003) (noting that non-payment of prepetition claims may seriously damage a debtor's business).   The above-referenced sections of the Bankruptcy Code therefore authorize the postpetition payment of prepetition claims when the payments are critical to preserving the going-concern value of the debtor's estate, as is the case here.  *See, e.g*., *In re CoServ*, 273 B.R. at 497 ("[I]t is only logical that the bankruptcy court be able to use [s]ection 105(a) of the [Bankruptcy] Code to authorize satisfaction of the pre-petition claim in aid of preservation or enhancement of the estate.").

50.     Section 363(c)(1) of the Bankruptcy Code also authorizes the debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing."  The Debtors engage in the Corporate Card Programs on a regular basis, such that payment of the Corporate Cards are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and do not require court approval.  Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to continue the Corporate Card Programs, and pay any prepetition amounts related thereto, subject to the terms and condition thereof.

51.     The Credit Card Programs allow employees to purchase necessary materials, fuel, and supplies directly on behalf of the Debtors.  The SUA Program provides the Debtors with a streamlined system for funding necessary business expenses and contributes to the overall efficiency of the Debtors' business operations.  If the Corporate Card Programs were discontinued, the Debtors would no longer be able to directly fund the purchase of necessary business supplies, employees and certain non-employees would be burdened with carrying costs due to expenses incurred during operational emergencies, and the operation of the Debtors' business likely would suffer.  Therefore, the Debtors request that the Court authorize the Debtors to continue the Corporate Card Programs in the ordinary course of business, subject to the terms and conditions thereof.

**IV.     The Court Should Authorize the Debtors to Continue Using Their Existing Business Forms.**

52.     To avoid disruption of the Cash Management System and unnecessary expense, the Debtors request that they be authorized to continue to use their Business Forms, substantially in the form existing immediately before the Petition Date, without reference to their status as debtors in possession.  Given the limited nature of the Business Forms, parties in interest will not be prejudiced if the Debtors are authorized to continue to use their Business Forms substantially in the forms existing immediately before the Petition Date.  Parties doing business with the Debtors will either be aware of their status as debtors in possession or unaffected by these chapter 11 cases and, thus, changing forms such as letterhead would be an unnecessary additional expense and unduly burdensome.

**V.     The Court Should Authorize the Debtors to Continue Entering Into Intercompany Transactions in the Ordinary Course and Grant Administrative Expense Status to Postpetition Intercompany Balances Between Debtors.**

53.     The Debtors' funds move through the Cash Management System as described above and, at any given time, there may be Intercompany Balances owing by and between two Debtor entities.[6] Intercompany Transactions are made between and among Debtor affiliates in the ordinary course as part of the Cash Management System.  The Debtors track all fund transfers in their accounting system and can ascertain, trace, and account for all Intercompany Transactions previously described.  The Debtors will continue to maintain records of such Intercompany Transactions.

54.     Because these Intercompany Transactions represent extensions of intercompany credit made in the ordinary course of business that are an essential component of the Cash Management System, the Debtors respectfully request the authority to continue conducting the Intercompany Transactions in the ordinary course of business without need for further Court order. If the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted to the Debtors' and their estates' detriment.

55.     To ensure each individual Debtor will not, at the expense of its creditors, fund the operations of another entity, the Debtors respectfully request, pursuant to section 503(b)(1) of the Bankruptcy Code, that all postpetition payments between or among a Debtor and another Debtor on account of an Intercompany Transaction be accorded administrative expense status, subject to

---

[6]     Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises like that of the Debtors, the Debtors submit the Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and therefore do not require this Court's approval.  Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions on a postpetition basis.  Moreover, the continued performance of the ordinary course Intercompany Transactions is integral to ensure the Debtors' ability to operate their business as debtors in possession.

any administrative expense claims granted in any interim and/or final orders authorizing the debtor in possession financing facility and/or the use of cash collateral.  This relief will ensure that each entity receiving payments from a Debtor will continue to bear ultimate repayment responsibility for such ordinary course transactions, thereby reducing the risk that these transactions would jeopardize the recoveries available to each Debtor's respective creditors.

**VI.    Cause Exists for Waiving the U.S. Trustee Operating Guidelines Regarding Authorized Depositories and Investment Accounts on an Interim and Final Basis.**

56.    The Debtors further seek a waiver of the deposit and investment requirements set forth in section 345 of the Bankruptcy Code.  Section 345(a) of the Bankruptcy Code authorizes deposit or investment of money of estates, such as cash, as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment."  For deposits that are not "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code provides that the estate must require from the entity with which the money is deposited or invested a bond in favor of the United States secured by the undertaking of a corporate security, "unless the court for cause orders otherwise."  Additionally, under the U.S. Trustee Operating Guidelines, debtors in possession must, among other things, close prepetition bank accounts and open new "debtor in possession" operating, payroll, and tax accounts at one or more authorized depositories.

57.    Courts may waive compliance with the Bankruptcy Code section 345 and the U.S. Trustee Operating Guidelines for "cause."  In evaluating whether "cause" exists, courts have considered a number of factors such as:

> a.    the sophistication of the debtor's business;
>
> b.    the size of the debtor's business operations;

    c.      the amount of the investments involved;

    d.      the bank ratings (Moody's and Standard & Poor) of the financial institutions where the debtor in possession funds are held;

    e.      the complexity of the case;

    f.      the safeguards in place within the debtor's own business for ensuring the safety of the funds;

    g.      the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

    h.      the benefit to the debtor;

    i.      the harm, if any, to the debtor;

    j.      the harm, if any, to the estate; and

    k.      the reasonableness of the debtor's request for relief from section 345(b) requirements in light of the overall circumstances of the case.

*See In re Serv. Merch. Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

58.    The Debtors have determined in their business judgment that it is prudent and desirable to continue to utilize the Investment Policy in the ordinary course of business. The Debtors believe that "cause" exists to continue to allow the Debtors to invest using the Investment Policy. ***First***, the Investment Policy is structured with the primary objective to protect the Debtors' cash and secondary objective to increase yield. The Debtors' surplus cash is invested in high quality government treasury securities and government money market funds. ***Second***, the structure of the Investment Policy comports with the investment objectives of section 345(a) of the Bankruptcy Code: prudent investments that protect principal, while seeking a reasonable return.

59.    In addition, the vast majority of the Accounts comply with section 345(b) of the Bankruptcy Code, because such Accounts are held at Cash Management Banks that are authorized depositories under the U.S. Trustee Operating Guidelines. As described above, only two Accounts

are not held at an authorized depository under the U.S. Trustee Operating Guidelines, but these two Accounts are non-operating accounts held at well-capitalized institutions and specifically designed to protect the funds being held for the benefit of particular third-parties. Transferring these two Accounts to authorized depositories would not only be administratively burdensome, but likely in violation of certain contractual, legal, or regulatory obligations. Additionally, funds held in the Stock Compensation Account at ML are insured by the FDIC, and thus the Stock Compensation Account complies with section 345(b) of the Bankruptcy Code. Therefore, cause exists to waive the U.S. Trustee Operating Guidelines and section 345(b) of the Bankruptcy Code and allow the Debtors to continue to maintain the Accounts in the ordinary course of business.

60.     Accordingly, the Debtors request a waiver of the deposit and investment requirements of section 345 of the Bankruptcy Code to permit the Debtors, in the ordinary course of business, to continue to use their existing Accounts and invest excess cash pursuant to the Investment Policy.

### Processing of Checks and Electronic Fund Transfers Should Be Authorized

61.     The Debtors have sufficient funds to pay the amounts described in this motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral and debtor in possession financing. In addition, under the Debtors' existing Cash Management System, the Debtors can readily identify checks or electronic funds transfer requests as relating to an authorized payment in respect of the relief requested herein. Accordingly, the Debtors believe that checks or electronic funds transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or electronic transfer requests in respect of the relief requested in this motion.

## Emergency Consideration

62.     Pursuant to Bankruptcy Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  The Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  The failure to receive the requested relief during the first 21 days of these chapter 11 cases could disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring.  Accordingly, the Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, request that the Court approve the relief requested herein on an emergency basis.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

63.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Reservation of Rights

64.     Nothing contained herein or any actions taken by the Debtors pursuant to any order granting the relief requested by this Motion is intended or should be construed as:  (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined herein or any order granting the relief requested by this Motion; (e) a request

or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

### Notice

65.     Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Bankruptcy Local Rules, and is sufficient under the circumstances.   Without limiting the foregoing, due notice will be afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties-in-interest, including:  (a) the U.S. Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) JPMorgan Chase Bank, N.A., as administrative agent under the Debtors' revolving credit facility; (d) Vinson & Elkins LLP, as counsel to the administrative agent under the Debtors' revolving credit facility; (e) Wilmington Trust, N.A., as indenture trustee under the Debtors' (i) 9.00% second lien secured notes due 2021, (ii) 9.250% second lien secured notes due 2022, (iii) 7.50% second lien secured notes due 2024, (iv) 7.750% second lien secured notes due 2024, and (v) 6.375% convertible notes due 2024; (f) Wilmington Trust, N.A., as successor indentire trustee under the Debtors' (i) 6.375% subordinated notes due 2021, (ii) 4.625% subordinated notes due 2023, and (iii) 5.50% subordinated notes due 2022; (g) Paul, Weiss, Rifkind, Wharton &

Garrison LLP, as counsel to the ad hoc committee of second lien bondholders; (h) Akin Gump Strauss Hauer & Feld LLP, as counsel to the ad hoc group of convertible bondholders; (i) the United States Attorney's Office for the Southern District of Texas; (j) the Internal Revenue Service; (k) the United States Securities and Exchange Commission; (l) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (m) the state attorneys general for states in which the Debtors conduct business; (n) the Cash Management Banks; (o) Wells Fargo; (p) the Fuel Bank; and (q) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and

Final Order, substantially in the forms attached hereto, respectively, granting the relief requested

in this Motion and granting such other and further relief as is appropriate under the circumstances.

Houston, Texas
July 30, 2020

/s/ Joshua S. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Christopher Marcus, P.C. (*pro hac vice* admission pending)
Rebecca Blake Chaikin (*pro hac vice* admission pending)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                christopher.marcus@kirkland.com
                rebecca.chaikin@kirkland.com

-and-

David L. Eaton (*pro hac vice* admission pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          david.eaton@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Local Rule 9013-1(i).

*/s/ Joshua S. Sussberg, P.C.*
Joshua S. Sussberg, P.C.

**Certificate of Service**

I certify that on July 30, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh