# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| DENBURY RESOURCES INC., *et al.*,[1] | ) | Case No. 20-33801 (DRJ) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

## DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY
## OF AN ORDER (I) AUTHORIZING MINERAL PAYMENTS,
## WORKING INTEREST DISBURSEMENTS, AND NON-OPERATING
## WORKING INTEREST EXPENSES AND (II) GRANTING RELATED RELIEF

**EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON JULY 31, 2020, AT 7:30 A.M. (CENTRAL TIME) IN COURTROOM 400, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TEXAS 77002. IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**RELIEF IS REQUESTED NOT LATER THAN JULY 31, 2020.**

**PLEASE NOTE THAT ON MARCH 24, 2020, THROUGH THE ENTRY OF GENERAL ORDER 2020-10, THE COURT INVOKED THE PROTOCOL FOR EMERGENCY PUBLIC HEALTH OR SAFETY CONDITIONS.**

**IT IS ANTICIPATED THAT ALL PERSONS WILL APPEAR TELEPHONICALLY AND ALSO MAY APPEAR VIA VIDEO AT THIS HEARING.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S REGULAR DIAL-IN NUMBER. THE DIAL-IN NUMBER IS +1(832) 917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES. YOU WILL BE ASKED TO KEY IN THE CONFERENCE ROOM NUMBER. JUDGE JONES'S CONFERENCE ROOM NUMBER IS 205691.**

**PARTIES MAY PARTICIPATE IN ELECTRONIC HEARINGS BY USE OF AN INTERNET CONNECTION. THE INTERNET SITE IS WWW.JOIN.ME. PERSONS CONNECTING BY**

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Denbury Resources Inc. (7835); Denbury Air, LLC (7621); Denbury Brookhaven Pipeline Partnership, LP (6322); Denbury Brookhaven Pipeline, LLC (6471); Denbury Gathering & Marketing, Inc. (6150); Denbury Green Pipeline-Montana, LLC (6443); Denbury Green Pipeline-North Dakota, LLC (7725); Denbury Green Pipeline-Riley Ridge, LLC (2859); Denbury Green Pipeline-Texas, LLC (2301); Denbury Gulf Coast Pipelines, LLC (0892); Denbury Holdings, Inc. (1216); Denbury Onshore, LLC (7798); Denbury Operating Company (7620); Denbury Pipeline Holdings, LLC (0190); Denbury Thompson Pipeline, LLC (0976); Encore Partners GP Holdings, LLC (N/A); Greencore Pipeline Company, LLC (9605); Plain Energy Holdings, LLC (0543). The location of Debtor Denbury Resources Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 5320 Legacy Drive, Plano, Texas 75024.

**MOBILE DEVICE WILL NEED TO DOWNLOAD THE FREE JOIN.ME APPLICATION.**

**ONCE CONNECTED TO WWW.JOIN.ME, A PARTICIPANT MUST SELECT "JOIN A MEETING". THE CODE FOR JOINING THIS HEARING BEFORE JUDGE JONES IS "JUDGEJONES". THE NEXT SCREEN WILL HAVE A PLACE FOR THE PARTICIPANT'S NAME IN THE LOWER LEFT CORNER. PLEASE COMPLETE THE NAME AND CLICK "NOTIFY".**

**HEARING APPEARANCES SHOULD BE MADE ELECTRONICALLY AND IN ADVANCE OF THE HEARING. YOU MAY MAKE YOUR ELECTRONIC APPEARANCE BY:**

**1) GOING TO THE SOUTHERN DISTRICT OF TEXAS WEBSITE;**

**2) SELECTING "BANKRUPTCY COURT" FROM THE TOP MENU;**

**3) SELECTING "JUDGES' PROCEDURES AND SCHEDULES";**

**4) SELECTING "VIEW HOME PAGE" FOR JUDGE JONES;**

**5) UNDER "ELECTRONIC APPEARANCE" SELECT "CLICK HERE TO SUBMIT ELECTRONIC APPEARANCE;"**

**6) SELECT "DENBURY RESOURCES INC., ET AL." FROM THE LIST OF ELECTRONIC APPEARANCE LINKS; AND**

**7) AFTER SELECTING DENBURY RESOURCES INC., ET AL. FROM THE LIST, COMPLETE THE REQUIRED FIELDS AND HIT THE "SUBMIT" BUTTON AT THE BOTTOM OF THE PAGE.**

**SUBMITTING YOUR APPEARANCE ELECTRONICALLY IN ADVANCE OF THE HEARING WILL NEGATE THE NEED TO MAKE AN APPEARANCE ON THE RECORD AT THE HEARING.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state the following in support of this motion (this "Motion"):

## Relief Requested

1.     The Debtors seek entry of an order (the "Order"), substantially in the form attached hereto:  (a) authorizing the Debtors to pay or apply any and all amounts owed to Mineral Payees and Working Interest Holders (each as defined below) in the ordinary course of business, whether such obligations were incurred prepetition or will be incurred postpetition and (b) granting related relief.

## Jurisdiction and Venue

2.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core

proceeding pursuant to 28 U.S.C. § 157 (b).  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), to the entry of an order by the Court.

3.       Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.       The bases for the relief requested herein are sections 105(a), 363(b), 541, and 1107 of chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Bankruptcy Rules 6003 and 6004, and rule 9013-1(i) of the Bankruptcy Local Rules for the Southern District of Texas (the "<u>Bankruptcy Local Rules</u>").

5.       On the date hereof (the "<u>Petition Date</u>"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Christian S. Kendall, Chief Executive Officer of Denbury Resources Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "<u>First Day Declaration</u>"), filed contemporaneously with this Motion and incorporated by reference herein.

6.       The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

<u>**Mineral Payments and Working Interest Disbursements**</u>

**I.       Mineral Payments.**

7.       A mineral interest generally consists of a real property interest in the minerals in place under a parcel of property and the right to, among other things, explore, drill, produce, and

capture such minerals from the land (collectively, the "Mineral and Other Interests").  Through a written agreement (an "Oil and Gas Lease"), owners of mineral interests convey their right to capture minerals (a "Working Interest") to a third party (a "Working Interest Holder") in exchange for either a share of production or payments in lieu of a share of production (a "Royalty Interest"). The Debtors hold Working Interests in various oil and gas properties in six states: Texas, Louisiana, Mississippi, Montana, North Dakota, Arkansas, and Wyoming.

8.     A Working Interest may be subject to or burdened by various other interests in minerals, production, or profits, which may have been created before or after the Oil and Gas Lease was entered into or which may exist in the absence of an Oil and Gas Lease.  Such interests can take many forms, including overriding royalty interests, non-participating royalty interests, net profits interests, production payments, and unleased mineral interests (collectively, with Royalty Interests, the "Interest Burdens").

9.     The Debtors operate or have working interests in approximately 3,108 gross producing oil and gas wells, which are generally subject to Interest Burdens.  Of those wells, the Debtors have a net effective working interest of 78 percent.  Failure to make payments on account of the Interest Burdens (the "Mineral Payments") would have a severe negative effect on the Debtors and their interests in the oil and gas properties.  Mineral Payments are governed by the terms of the Oil and Gas Leases or other documents pursuant to which such rights to payment were created, and, commonly, state statutory frameworks that set strict payment deadlines and contain enforcement mechanisms, including lien rights, interest, fines, recovery of costs and attorneys' fees, and, in some cases, punitive damages.  Failure to pay the Mineral Payments could expose the Debtors to enforcement actions and actions by the owners of the Mineral and Other Interests for breach of contract, conversion, or other claims for damages for breach of the relevant Oil and Gas

Lease or other document creating such payment.  Such enforcement actions could result in the assertion of significant secured or unsecured claims against the property of the estate.  Further, for certain Oil and Gas Leases, including those granted by the United States or agencies of individual states, the non-Debtor counterparty may have a statutory or contractual right to seek termination of the lease as a remedy for a breach, such as failure to pay Mineral Payments.  This could expose the Debtors to the forfeiture, cancellation, or termination of Oil and Gas Leases.  Clearly, failure to pay Mineral Payments as and when due could have a material adverse effect upon the Debtors and their operations.

10.     The Mineral Payments owed to holders of Mineral and Other Interests in a given month is subject to variation due to many factors, including the specific terms of the underlying agreements, changes in ownership, and changes in the amount or type of minerals captured.  The Debtors' Mineral Payments total approximately $12.4 million per month.  In the twelve month period ending December 31, 2019, the Debtors remitted Mineral Payments in an aggregate amount of approximately $222 million.[2]  These payments may be remitted by the Debtors to Interest Burden owners (the "Mineral Payees") throughout the course of a given month, but are generally paid after the 19th of each month.  As a result of the time required to market and sell the production and the significant accounting process required each month to accurately disburse the resulting proceeds, Mineral Payments are generally paid approximately thirty to ninety days following the end of the month in which production of the underlying oil and gas occurred.

---

[2]     By this Motion, the Debtors do not seek the authority to collect and remit state and federal taxes and withholdings related to the Interest Burdens.  Such relief is instead requested in the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief*, filed contemporaneously herewith.

11.     The Debtors estimate that, as of the Petition Date, the Debtors have approximately $20.7 million in accrued but unpaid Mineral Payments.  In addition, the Debtors estimate approximately $14.8 million in "suspense," consisting of Mineral Payments due and owing to certain holders of Mineral and Other Interests but which amounts are otherwise unpayable for a variety of reasons, including incorrect contact information, unmarketable title, ongoing federal and state litigation, and ongoing disputes over ownership of the underlying interest.  Accordingly, the Debtors request authority to pay prepetition amounts due and owing to holders of Mineral and Other Interests and to continue honoring Mineral Payments in the ordinary course of business on a postpetition basis, in each instance subject to the Debtors' rights to dispute asserted amounts and to withhold payment pending resolution of any such dispute.

## II.     Working Interest Disbursements.

12.     The efficient capture of minerals often requires use of an area of land or depths (a "Contract Area") that implicates the Working Interest of more than one Working Interest Holder and, typically, more than one Oil and Gas Lease.  Accordingly, the rights and responsibilities associated with the capture of minerals (including each Working Interest Holder's entitlement to production from the Contract Area) are allocated by and between such Working Interest Holders according to their respective Working Interests subject, in most cases, to a contractual arrangement governing operations on the Contract Area ordinarily referred to as a joint operating agreement (each, a "JOA," and together, "JOAs") or, absent a JOA or similar agreement, subject to the application of well-established real property and contractual precedents.

13.     Working Interest Holders, either through a JOA or otherwise, will designate one Working Interest Holder (or its designee) as the operator of the Contract Area (the "Operator"). The Operator conducts the exploration, drilling, and production associated with capturing minerals

in the Contract Area on behalf of itself and the other, non-operating Working Interest Holders (each, a holder of a "Non-Op Working Interest").

14.     In many instances, the Operator markets and sells the minerals captured in the Contract Area and administers the payment of Mineral Payments on behalf of itself and Non-Op Working Interest holders in accordance with their ownership therein (generally, the "Working Interest Disbursements").[3]   Generally, the Debtors make Working Interest Disbursements between thirty and ninety days after production of the underlying oil and gas.  In situations where a Debtor is an Operator pursuant to a JOA, in the ordinary course of business, the Debtors set-off Working Interest Disbursements owed to certain Working Interest Holders against the *pro rata* portion of operating expenses (the "JIBs") owed by such holders.

15.     Failure to pay Working Interest Disbursements could result in a material adverse effect on the Debtors and their interests in the oil and gas properties.  Non-Op Working Interest holders often have the same statutory protections as Mineral Payees.  As a result, failure to pay Working Interest Disbursements could expose the Debtors to statutory enforcement mechanisms. Moreover, Non-Op Working Interest holders often have additional remedies pursuant to mutual agreements such as a JOA.  Such remedies can include the grant of a security interest in production to secure amounts owed by the Operator, the right to remove the Operator, the right to suspend rights in the Contract Area, and the right to interest on amounts owed.[4]

---

[3]     Occasionally, mineral owners within a Contract Area will choose not to enter into leases with any third party.  If the Debtors end up drilling beneath the unleased mineral owners' properties, the Debtors generally must account to such unleased mineral owners which, under certain circumstances, can involve the distribution of a portion of the proceeds from the sale of oil and gas to such unleased mineral owners, less the necessary and reasonable cost of producing and marketing such product and improvements to the land.  *See Cox v. Davison*, 397 S.W.2d 200, 201 (Tex. 1965).

[4]     The Debtors reserve the right to dispute any such remedies irrespective of whether the relevant Working Interest Disbursements are made.

16.     In situations where a Debtor is an Operator, the Working Interest Disbursements are not typically uniform and are not entirely predictable on a month-to-month basis.  In the twelve month period ending December 31, 2019, the Debtors remitted approximately $67.6 million in Working Interest Disbursements.  As of the Petition Date, the Debtors estimate approximately $4 million in Working Interest Disbursements is outstanding.  Of the Working Interest Disbursements currently outstanding, a portion of such Working Interest Disbursements will be set-off in the ordinary course of business against JIBs indirectly owed to the Debtors by third parties.  The Debtors request authority to remit prepetition Working Interest Disbursements and to continue remitting Working Interest Disbursements in the ordinary course of business on a postpetition basis, in each instance subject to the Debtors' rights to dispute asserted amounts and to withhold payment pending resolution of any such dispute.

**III.     Non-Op Working Interest Expenses.**

17.     The Debtors operate the vast majority of the wells in which they own an interest. But, there are certain instances in which the Debtors hold non-operating in oil and gas properties subject to various JOAs.  In such instances, the Operator of such properties incurs expenses, including exploration, development and production costs, on behalf of the Debtors, to the extent of their working interest in the properties (the "Non-Op Working Interest Expenses").  The Debtors are required to reimburse such Operators for the Debtors' share of the Non-Op Working Interest Expenses.  With respect to oil properties, the Operator of such properties markets oil on behalf of the Debtors, incurring additional marketing expenses on behalf of the Debtors' Working Interests. Under a typical JOA, the Operator's right to payment of Non-Op Working Interest Expenses is secured under contractual lien rights or statutory lien rights in favor of the Operator against the Debtors' interest in the applicable oil and gas property.  The Debtors believe that approximately $6.6 million in prepetition Non-Op Working Interest Expenses remains outstanding.

## Basis for Relief Requested

I.      **Proceeds Attributable to Mineral and Other Interests May Not Be Property of the Debtors' Estates.**

18.      Holders of Mineral and Other Interests may assert that the Debtors merely hold bare legal title to the accrued prepetition amounts due to them from the proceeds of oil and gas sales as bailees. *See, e.g., In re MCZ, Inc.*, 82 B.R. 40, 42 (Bankr. S.D. Tex. 1987) ("Where Debtor merely holds bare legal title to property as agent or bailee for another, Debtor's bare legal title is of no value to the estate, and Debtor should convey the property to its rightful owner."). Assuming proceeds attributable to Mineral and Other Interests are not the Debtors' property, holders of such Mineral and Other Interests may assert that certain proceeds of oil and gas sales should be turned over in the ordinary course of business.

19.      With certain exceptions, section 541 of the Bankruptcy Code provides that all legal or equitable interests of a debtor in possession become property of the estate upon the commencement of a chapter 11 case. 11 U.S.C. § 541(a)(1). This includes any interest in property that the estate acquires after commencement of the chapter 11 cases. 11 U.S.C. § 541(a)(7). However, section 541 does not by itself create new legal or equitable interests in property; instead, "[p]roperty interests are created and defined by state law." *Butner v. United States*, 440 U.S. 48, 54–55 (1979) (noting that "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law"). Further, Congress was clear that section 541(a)(1) of the Bankruptcy Code "is not intended to expand the debtor's rights against others more than they existed at the commencement of the case." H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 367–68 (1977); *see also Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984) (holding that the "rights a debtor has in property at the commencement of the case continue in bankruptcy—no more, no less"). Thus, if a debtor holds no legal or equitable interest in property as of the

commencement of the case, such property does not become property of the debtor's estate under section 541 and the debtor is prohibited from distributing such property to its creditors. *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 135–36 (1962) ("The Bankruptcy Act simply does not authorize a [debtor] to distribute other people's property among a bankrupt's creditors . . . [S]uch property rights existing before bankruptcy in persons other than the bankrupt must be recognized and respected in bankruptcy.").

20.     Further, section 541(d) of the Bankruptcy Code provides that a debtor who holds only bare legal title to property but not equitable interest in such property as of the commencement of the case does not obtain equitable interest in such property pursuant to section 541 of the Bankruptcy Code.  Specifically, it states:

> Property in which the debtor holds, as of the commencement date of the case, only legal title and not an equitable interest . . . becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

21.     11 U.S.C. § 541(d).

22.     Courts have held that section 541(d) of the Bankruptcy Code expressly provides that when a debtor holds only a legal, but not an equitable, interest in property as of the petition date, such property is not property of the estate. *See, e.g.*, *In re Contractor Tech., Ltd.*, 343 B.R. 573, 583 (Bankr. S.D. Tex. 2006) (finding that a claimant with equitable title had a right to assert a beneficial interest to those funds held in the estate); *see also In re Lenox Healthcare, Inc.*, 343 B.R. 96, 100 (Bankr. D. Del. 2006).  Because holders of Mineral and Other Interests may assert that the Debtors only have legal title, and not an equitable interest, in the proceeds of the oil and gas sales attributable to the Mineral and Other Interests, any funds held by the Debtors on account of such interest owners may not be property of the Debtors' estates, and thus the Debtors may not

be entitled to distribute any such funds to their creditors.  *See, e.g.*, *In re Columbia Pac. Mortgage, Inc.*, 20 B.R. 259, 262–64 (Bankr. W.D. Wash. 1981) (holder of participation ownership interest brought successful action against bankruptcy trustee for proceeds of a sale of real property because holder was beneficial owner and debtor having only legal title held the proceeds in trust). Similarly, the holders of Mineral and Other Interests may assert that the Debtors hold no legal or equitable interests in the proceeds of marketed production and that the Debtors are simply a conduit that receives a fee in exchange for marketing and ensuring that other parties receive the amounts due to them (*i.e.*, the amounts received on account of the marketed production is not property of the estate). *See, e.g.*, 52 OK. Stat. § 52-549.3 ("[T]o secure the obligations of a first purchaser to pay the sales price, each interest owner is hereby granted an oil and gas lien to the extent of the owner's interest in oil and gas rights"); Tex. Bus. & Com. Code § 9.343 (providing a security interest in favor of interest owners, as secured parties, to secure the obligations of the first purchaser of oil and gas production, as debtor, to pay the purchase price).[5]

23.     The states in which the Debtors operate do not consider Oil and Gas Leases to be "leases" within the traditional use of the term.  Instead, the Working Interests conveyed thereby are considered conveyances of fee interests, incorporeal hereditaments, or profit à prendre. *See, e.g.*, *Norris v. Vaughan*, 260 S.W.2d 676, 678 (Tex. 1953) ("It is well established in Texas that the lessee in the usual oil and gas lease obtains a determinable fee in the oil and gas in place, and thus an interest in realty."); *Togeson v. Connelly*, 348 P.2d 63, 68 (Wyo. 1959) ("[T]he right created by an oil lease is to search for oil and gas and if either is found to remove it from the land,

---

[5]     Texas law grants an automatically perfected statutory lien to "interest owners" to secure the obligations of the "first purchaser of oil and gas production, as debtor, to pay the purchase price."  Tex. Bus. & Com. Code § 9.343(a) & (r).  The Debtors must avoid the potential expenses and burdens associated with these rights and associated issues by continuing to pay such claimants in the ordinary course of business.

and from this it would appear to be a profit à prendre and hence an incorporeal hereditament."); *Rives v. Gulf Refining Co. of Louisiana*, 133 La. 178, 182 (La. 1913) (holding that an oil and gas lease vests the lessee with *real* rights whereas a lease of real property creates only *personal* rights); *Williard v. Federal Surety Co.*, 8 P.2d 633, 635 (Mont. 1932) (holding that an oil and gas lease is "a right to take a profit from the lands of another, at common law regarded as a profit à prendre"); *Chevron U.S.A., Inc. v. State*, 578 So. 2d 644, 660 (Miss. 1991) (holding that oil and gas is part of the realty and an oil and gas lease in an interest in said realty); *Holman v. State*, 438 N.W.2d 534, 536 (N.D. 1989) ("[O]il and gas leases are not and should not be governed by the law or policy applicable to ordinary landlord and tenant leases."); *Henderson Co. v. Murphy*, 70 S.W.2d 1036, 1038 (Ark. 1934) ("[W]here a portion of the consideration for an oil and gas lease is payable out of the oil produced, if no oil is produced, then there is no payment due.").

24.     Certain of the Interest Burdens are also considered interests in real property in most of the states in which the Debtors operate. *See, e.g.*, *Alamo Nat. Bank of San Antonio v. Hurd*, 485 S.W.2d 335, 338–39 (Tex. Civ. App. 1972) ("[T]here can be no doubt in Texas but that an overriding royalty, whether payable in money or by the delivery of oil, is an interest in land . . . ."); *Johnson v. Anderson*, 768 P.2d 18, 23 (Wyo. 1989) (an overriding royalty interest is a nonpossessory interest in real property); *GeoStar Corp. v. Parkway Petroleum, Inc.*, 495 N.W.2d 61, 67 (N.D. 1993) (holding that "an unaccrued oil and gas royalty is an interest in real property"); *Estate of Haynes v. Steele*, 699 So. 2d 918, 925 (Miss. 1997) (holding that "although the right to receive royalty payments in the future from underlying mineral deposits is considered an interest in land, royalty proceeds, once paid, are personal property and no longer considered an interest in land"); *Wynn v. Sklar & Phillips Oil Co.*, 493 S.W.2d 439, 444 (Ark. 1973) ("royalties in gas and oil, until brought to the surface and reduced to possession, are interests in real estate and not

personal property"). In these jurisdictions, the real property Interest Burdens, once created, are arguably the property of their holders. *See, e.g.*, *Tennant v. Dunn*, 110 S.W. 2d 53, 56 (Tex. 1937) (holding under Texas law that conveyances made pursuant to the creation of an Oil and Gas Lease convey a vested real property right at the time of the conveyance). As such, parties may argue that the Interest Burdens, and the Mineral Payments owed on account thereof, are property of the third-party Mineral Payees and are therefore outside the scope of property of the estate.

25.     To the extent applicable nonbankruptcy law does not treat Interest Burdens as real property interests, parties may assert that section 541 expressly excludes certain Interest Burdens from the definition of property of the estate. Section 541(b)(4)(B) states that:

> Property of the estate does not include any interest of the debtor in liquid or gaseous hydrocarbons to the extent that the debtor has transferred such interest pursuant to a written conveyance of a production payment to an entity that does not participate in the operation of the property from which such production payment is transferred.

11 U.S.C. § 541(b)(4)(B).[6]

26.     Parties may further assert that, because Working Interests and Interest Burdens are not property of the estate either by application of state law or pursuant to section 541(b) of the Bankruptcy Code, any proceeds or profits that the Debtors may take possession of during the pendency of these chapter 11 cases earned on account of the Working Interests or Interest Burdens are not property of the estate under section 541(a)(6) of the Bankruptcy Code. *See* 11 U.S.C. § 541(a)(6) (providing that proceeds, products, offspring, rents, or profits *of or from property of*

---

[6]     Production payment means "a term overriding royalty satisfiable in cash or in kind contingent on the production of a liquid or gaseous hydrocarbon from particular real property . . . determined without regard to production costs." 11 U.S.C. § 101(42A).

*the estate* constitute property of the estate under section 541 of the Bankruptcy Code)
(emphasis added).

27.    Additionally, to the extent the Debtors have proceeds of Working Interest Holders
or Mineral Payees in their possession, parties may assert that the Debtors at most hold bare legal
title to such funds and hold *no* legal title to the percentage of the oil and gas production attributable
to the Working Interests Holders or Mineral Payees.  *See, e.g.*, *Vess Oil Corp. v. SemCrude, L.P.
(In re SemCrude, L.P.)*, 418 B.R. 98, 106 (Bankr. D. Del. 2009) (holding that funds in debtors'
possession held on behalf of royalty interest holders were held in a resulting trust for such parties,
debtors only held bare legal title to such property, and thus such funds were not property of the
estate).  The Supreme Court has held that property held by debtors for a third party (such as funds
held on account of a resulting trust) is not property of the estate.  *Begier v. Internal Revenue
Service,* 496 U.S. 53, 59 (1990) ("Because the debtor does not own an equitable interest in property
he holds in trust for another, that interest is not 'property of the estate.'"); *United States v. Whiting
Pools, Inc.*, 462 U.S. 198, 205 n.10 (1983) (noting that "Congress plainly excluded property of
others held by the debtor in trust at the time of the filing of the petition" from the bankruptcy
estate).  Thus, parties may argue that any property held by the Debtors on account of the Working
Interest Holders and Mineral Payees is not property of the Debtors' estates.[7]

28.    Because parties may argue that the Working Interest Disbursements and Mineral
Payments are not property of the estate, parties may assert that the automatic stay does not prevent
any action by a Working Interest Holder or Mineral Payee to obtain possession or exercise control
over the Working Interest Disbursements or Mineral Payments, as applicable.  *See* 11 U.S.C.

---

[7]    The Debtors reserve the right to dispute that the Working Interests, Interest Burdens, or the proceeds thereof are
real property interests, are not property of the estate, or are held in any form of trust.

§ 362(a)(3) (providing that the automatic stay is applicable to all entities for "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate").  Failure to grant the relief requested by this Motion could subject the Debtors to unnecessary litigation, either in or outside of the Bankruptcy Court, at a time when their resources are already subject to enormous strain.  As such, the Debtors believe payment of the Working Interest Disbursements and Mineral Payments in the ordinary course of business is in the best interests of the Debtors and their creditors, and should be authorized by the Court.

29.     If the Debtors merely hold bare legal title to the accrued prepetition proceeds of oil and gas sales that are due to be remitted to holders of Mineral and Other Interests, no creditors will be prejudiced by the relief requested in this Motion.  Accordingly, the Debtors respectfully request that the Court authorize the Debtors to satisfy their prepetition and postpetition obligations to holders of Mineral and Other Interests in the ordinary course of business.

## II. Payments on Account of Mineral and Other Interests Are Authorized by Sections 105(a) and 363(b) of the Bankruptcy Code.

30.     Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons.  *See, e.g.*, *Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Crutcher Res.s Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex.

1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale."); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989); *see also Ionosphere Clubs,* 98 B.R. at 175 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification).

31.     Furthermore, section 105(a) of the Bankruptcy Code further provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code, pursuant to the "doctrine of necessity."  11 U.S.C. § 105(a). The "doctrine of necessity" functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested herein.  *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation); *see also In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to debtor's continued operation); *In re Ionosphere Clubs, Inc.*, 98 B.R. at 175 ("The ability of a Bankruptcy Court to authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code "provides a statutory basis for payment of pre-petition claims" under the doctrine of necessity);

*In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (explaining that the doctrine of necessity is the standard in the Third Circuit for enabling a court to authorize the payment of prepetition claims prior to confirmation of a reorganization plan).

32.     Moreover, the doctrine of necessity is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *Ionosphere Clubs*, 98 B.R. at 176; *see also In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of toolmakers as "necessary to avert a serious threat to the Chapter 11 process"); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285–86 (S.D.N.Y. 1987) (approving lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

33.     The relief requested herein is appropriate and warranted. ***First***, if the Debtors fail to pay prepetition or postpetition Working Interest Disbursements, Non-Op Working Interest Expenses, or Mineral Payments, the Debtors' drilling and production operations would be severely impacted, as production could entirely cease for certain wells and leases could be lost. ***Second***, many states provide a statutory right to assert liens on account of unpaid Mineral Payments, and failure to timely pay outstanding Mineral Payments likely would lead to attempted setoff or recoupment. ***Third***, given that rights to payment of JIBs often are secured by contractual or statutory liens or other rights, such as setoff or recoupment, granting the requested relief may only

affect the timing of the payment and not result in the operating interest owners receiving more than they are otherwise entitled to receive under applicable law.

34.     Most significantly, the authority to satisfy the Mineral Payments and the Working Interest Disbursements in the initial days of these chapter 11 cases will send a clear signal to the marketplace, including to holders of such obligations, that the Debtors are willing and able to conduct business as usual during these chapter 11 cases.  If the relationships established by the Debtors with these parties are harmed, whether through nonpayment or perceived difficulties of working with a chapter 11 debtor, the Debtors may be unable to secure future opportunities with such parties and other third parties.  Such an occurrence would be value destructive and have a substantial negative impact on the Debtors' business, their estates, and creditors.

35.     Based on the dire consequences that could result if the Debtors fail to honor the Working Interest Disbursements and Mineral Payments, the Debtors submit that the relief requested herein represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under sections 105(a) and 363(b) of the Bankruptcy Code.

**IV.     Payment of the Mineral Payments, Non-Op Working Interest Expenses, and Working Interest Disbursements is in Furtherance of the Debtors' Fiduciary Duties Under Bankruptcy Code Sections 1107(a) and 1108.**

36.     The Debtors, operating their businesses as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate and operating the business for the benefit of its creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Implicit in the duties of chapter 11 debtors in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value."  *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ*, *L.L.C.*, 273 B.R. at 497)*.*

18

37.     Courts have noted that there are instances in which debtors in possession can fulfill their fiduciary duties "only . . . by the preplan satisfaction of a prepetition claim." *Id.* The *CoServ* court specifically noted that the preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate," and also when the payment was to "sole suppliers of a given product." *Id.* at 498. The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id.*

38.     Payment of the Mineral Payments, Non-Op Working Interest Expenses, and Working Interest Disbursements meets each element of the *CoServ* court's standard. First, as described above, each of the Mineral Payees and Working Interest Holders may argue they hold real property interests in the Debtors oil and gas interests. Second, failing to make the Mineral Payments, Non-Op Working Interest Expenses, and/or Working Interest Disbursements when due could result in liens being placed on the Debtors' oil and gas interests, including proceeds therefrom. The time and cost attendant to multiple liens being perfected on the Debtors' assets could significantly disrupt the Debtors' businesses and restructuring process, which could cost the Debtors' estate a substantial amount in lost revenue. Accordingly, the harm and economic disadvantage that would stem from failure to pay any of the prepetition Mineral Payments, Non-Op Working Interest Expenses, and Working Interest Disbursements is grossly disproportionate to the amount of the prepetition claims that would have to be paid. And, third, with respect to each of

the Mineral Payees and Working Interest Holders, the Debtors have determined that, to avoid significant disruption of the Debtors' business operations, there exists no practical or legal alternative to payment of the prepetition Mineral Payments, Non-Op Working Interest Expenses, and Working Interest Disbursements. Therefore, the Debtors can only meet their fiduciary duties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code through payment of the prepetition Mineral Payments, Non-Op Working Interest Expenses, and Working Interest Disbursements.

## Emergency Consideration

39.     Pursuant to Bankruptcy Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." The Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm. The failure to receive the requested relief during the first 21 days of these chapter 11 cases could disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring because failure to remit the Mineral Obligations to holders would likely result in the termination of crucial Oil and Gas Leases. The Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested herein on an emergency basis.

## Processing of Checks and Electronic Fund Transfers Should Be Authorized

40.     The Debtors have sufficient funds to pay the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral. Under the Debtors' existing cash management system,

the Debtors have made arrangements to readily identify checks or wire transfer requests relating to the Mineral Obligations, as applicable.  Accordingly, the Debtors believe that checks or wire transfer requests that are not related to authorized payments will not be honored inadvertently. The Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested herein.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

41.      To implement the foregoing successfully, the Debtors request that the Court enter the Order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Reservation of Rights**

42.      Nothing contained herein or any actions taken by the Debtors pursuant to any order granting the relief requested by this Motion is intended or should be construed as:  (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined herein or any order granting the relief requested by this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens.  If the Court grants the relief sought

21

herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

## Notice

43.     Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Bankruptcy Local Rules, and is sufficient under the circumstances.   Without limiting the foregoing, due notice will be afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties-in-interest, including:  (a) the U.S. Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) JPMorgan Chase Bank, N.A., as administrative agent under the Debtors' revolving credit facility; (d) Vinson & Elkins LLP, as counsel to the administrative agent under the Debtors' revolving credit facility; (e) Wilmington Trust, N.A., as indenture trustee under the Debtors' (i) 9.00% second lien secured notes due 2021, (ii) 9.250% second lien secured notes due 2022, (iii) 7.50% second lien secured notes due 2024, (iv) 7.750% second lien secured notes due 2024, and (v) 6.375% convertible notes due 2024; (f) Wilmington Trust, N.A., as successor indenture trustee under the Debtors' (i) 6.375% subordinated notes due 2021, (ii) 4.625% subordinated notes due 2023, and (iii) 5.50% subordinated notes due 2022; (g) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to the ad hoc committee of second lien bondholders; (h) Akin Gump Strauss Hauer & Feld LLP, as counsel to the ad hoc group of convertible bondholders; (i) the United States Attorney's Office for the Southern District of Texas; (j) the Internal Revenue Service; (k) the United States Securities and Exchange Commission; (l) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (m) the state attorneys general for states in which the Debtors conduct business;

(n) the holders of any Interest Burdens, Non-Op Working Interests, and rights to payment under JIBs; and (o) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Houston, Texas
July 30, 2020

*/s/ Matthew D. Cavenaugh*

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Vienna F. Anaya (TX Bar No. 24091225)
Victoria Argeroplos (TX Bar No. 24105799)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:       (713) 752-4221
Email:            mcavenaugh@jw.com
                    vanaya@jw.com
                    vargeroplos@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Christopher J. Marcus, P.C. (*pro hac vice* admission pending)
Rebecca Blake Chaikin (*pro hac vice* admission pending)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:            joshua.sussberg@kirkland.com
                    christopher.marcus@kirkland.com
                    rebecca.chaikin@kirkland.com

-and-

David L. Eaton (*pro hac vice* admission pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:      (312) 862-2200
Email:            david.eaton@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**<u>Certificate of Accuracy</u>**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Local Rule 9013-1(i).

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

**<u>Certificate of Service</u>**

I certify that on July 30, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh