*Solicitation Version*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| DENBURY RESOURCES INC., *et al.*,[1] | ) | Case No. 20-_____ (__) |
|  | ) |  |
| Debtors. | ) |  |
|  | ) |  |

## DISCLOSURE STATEMENT FOR THE
## JOINT CHAPTER 11 PLAN OF REORGANIZATION
## OF DENBURY RESOURCES INC. AND ITS DEBTOR AFFILIATES

Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Christopher Marcus, P.C. (*pro hac vice* admission pending)
Rebecca Blake Chaikin (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900
Email:       joshua.sussberg@kirkland.com
                 christopher.marcus@kirkland.com
                 rebecca.chaikin@kirkland.com

David L. Eaton (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200
Email:   david.eaton@kirkland.com

-and-

Matthew D. Cavenaugh (TX Bar No. 24062656)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:       (713) 752-4284
Facsimile:       (713) 308-4184
Email:   mcavenaugh@jw.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

Dated:  July 24, 2020

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Denbury Resources Inc. (7835); Denbury Air, LLC (7621); Denbury Brookhaven Pipeline Partnership, LP (6322); Denbury Brookhaven Pipeline, LLC (6471); Denbury Gathering & Marketing, Inc. (6150); Denbury Green Pipeline-Montana, LLC (6443); Denbury Green Pipeline-North Dakota, LLC (7725); Denbury Green Pipeline-Riley Ridge, LLC (2859); Denbury Green Pipeline-Texas, LLC (2301); Denbury Gulf Coast Pipelines, LLC (0892); Denbury Holdings, Inc. (1216); Denbury Onshore, LLC (7798); Denbury Operating Company (7620); Denbury Pipeline Holdings, LLC (0190); Denbury Thompson Pipeline, LLC (0976); Encore Partners GP Holdings, LLC (N/A); Greencore Pipeline Company, LLC (9605); Plain Energy Holdings, LLC (0543).  The location of Debtor Denbury Resources Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 5320 Legacy Drive, Plano, Texas 75024.

THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126, 11 U.S.C. §§ 1125, 1126.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THE DEBTORS INTEND TO SUBMIT THIS DISCLOSURE STATEMENT TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING COMMENCEMENT OF SOLICITATION AND THE DEBTORS' FILING FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

**SOLICITATION OF VOTES ON THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF DENBURY RESOURCES INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE FROM THE HOLDERS OF OUTSTANDING:**

| VOTING CLASS | NAME OF CLASS UNDER THE PLAN |
|:---:|:---:|
| **CLASS 5** | **SECOND LIEN NOTES CLAIMS** |
| **CLASS 6** | **CONVERTIBLE NOTES CLAIMS** |
| **CLASS 7** | **SUBORDINATED NOTES CLAIMS** |
| **CLASS 11** | **EXISTING EQUITY INTERESTS** |

**IF YOU ARE IN CLASS 5, CLASS 6, CLASS 7, OR CLASS 11 YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN**

### DELIVERY OF BALLOTS

**MASTER BALLOTS, PRE-VALIDATED BENEFICIAL OWNER BALLOTS, AND DIRECT CLASS 11 BALLOTS, MUST BE <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT BY THE VOTING DEADLINE, WHICH IS 4:00 P.M. (PREVAILING CENTRAL TIME) ON AUGUST 28, 2020, VIA THE ENCLOSED PRE-PAID, PRE-ADDRESSED RETURN ENVELOPE, OR AS OTHERWISE DIRECTED ON THE BALLOT:**

*If you received an envelope addressed to your nominee, please return your ballot to your nominee, allowing enough time for your nominee to cast your vote on a master ballot before the Voting Deadline.*

| **BY REGULAR MAIL AT:** | **BY HAND DELIVERY OR OVERNIGHT MAIL AT:** |
|:---:|:---:|
| Denbury Resources Inc. | Denbury Resources Inc. |
| c/o Epiq Corporate Restructuring LLC | c/o Epiq Corporate Restructuring LLC |
| P.O. Box 4422 | 10300 SW Allen Blvd. |
| Beaverton, OR 97076-4422 | Beaverton, OR 97005 |

**BALLOTS RECEIVED VIA EMAIL OR FACSIMILE WILL NOT BE COUNTED**

**IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURE FOR VOTING ON THE PLAN, PLEASE CONTACT THE SOLICITATION AGENT CALLING THE TELEPHONE NUMBER INCLUDED IN YOUR BALLOT**

This disclosure statement (this "<u>Disclosure Statement</u>") provides information regarding the *Joint Chapter 11 Plan of Reorganization of Denbury Resources Inc. and Its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "<u>Plan</u>"),[2] for which the Debtors will seek confirmation by the Bankruptcy Court.  A copy of the Plan is attached hereto as <u>Exhibit A</u> and is incorporated herein by reference.  The Debtors are providing the information in this Disclosure Statement to certain holders of Claims or Interests for purposes of soliciting votes to accept or reject the Plan.

Pursuant to the Restructuring Support Agreement, the Plan is currently supported by the Debtors and certain Consenting Creditors that have executed the Restructuring Support Agreement, including Holders of 100% in principal of RBL Loans, approximately 67.2% in principal of the Second Lien Notes, and approximately 70.8% in principal of the Convertible Notes.

The consummation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan.  There is no assurance that the Bankruptcy Court will confirm the Plan or, if the Bankruptcy Court does confirm the Plan, that the conditions necessary for the Plan to become effective will be satisfied or, in the alternative, waived.

The Debtors urge each Holder of a Claim or Interest to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each proposed transaction contemplated by the Plan.

The Debtors strongly encourage Holders of Claims or Interests in Class 5, Class 6,  Class 7, and Class 11 to read this Disclosure Statement (including the Risk Factors described in Article VII hereof) and the Plan in their entirety before voting to accept or reject the Plan.  Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

---

### RECOMMENDATION BY THE DEBTORS

EACH DEBTOR'S BOARD OF DIRECTORS, GENERAL PARTNER, MEMBER, OR MANAGER, AS APPLICABLE, HAS APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND EACH DEBTOR BELIEVES THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH OF THE DEBTOR'S ESTATES, AND PROVIDE THE BEST RECOVERY TO CLAIM AND INTEREST HOLDERS.  AT THIS TIME, EACH DEBTOR BELIEVES THAT THE PLAN AND RELATED TRANSACTIONS REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES.  EACH OF THE DEBTORS THEREFORE STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO <u>ACCEPT</u> THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT NO LATER THAN <u>AUGUST 28, 2020 AT 4:00 P.M. (PREVAILING CENTRAL TIME)</u> PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND ON THE BALLOTS.

---

[2]   Capitalized terms used but not otherwise defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan.  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**

The Bankruptcy Court has not reviewed this Disclosure Statement or the Plan, and the securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the United States Securities and Exchange Commission (the "SEC") under the United States Securities Act of 1933 as amended (the "Securities Act") or any securities regulatory authority of any state under any state securities law ("Blue Sky Laws"). The Plan has not been approved or disapproved by the SEC or any state regulatory authority and neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan. Any representation to the contrary is a criminal offense. The Debtors are relying on section 4(a)(2) and/or Regulation D of the Securities Act, and similar Blue Sky Laws provisions, to exempt from registration under the Securities Act and Blue Sky Laws, the offer to certain Holders of Second Lien Notes Claims, Convertible Notes Claims, Subordinated Notes Claims, and Existing Equity Interests of new securities prior to the Petition Date, including in connection with the solicitation of votes to accept or reject the Plan (the "Solicitation").

After the Petition Date, the Debtors will rely on section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act and Blue Sky Laws the offer, issuance, and distribution of New DNR Equity and Warrants under the Plan, and the shares of New DNR Equity issuable upon exercise of the Warrants. Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Readers are cautioned that any forward-looking statements in this Disclosure Statement are based on assumptions that are believed to be reasonable, but are subject to a wide range of risks, including risks associated with the following: (a) future financial results and liquidity, including the ability to finance operations in the ordinary course of business; (b) the relationships with and payment terms provided by trade creditors; (c) additional post-restructuring financing requirements; (d) future dispositions and acquisitions; (e) the effect of competitive products, services, or procuring by competitors; (f) changes to the costs of commodities and raw materials; (g) the proposed restructuring and costs associated therewith; (h) the effect of conditions in the local, national, and global economy on the Debtors; (i) the ability to obtain relief from the bankruptcy court to facilitate the smooth operation of the Debtors' businesses under chapter 11; (j) the confirmation and consummation of the Plan; (k) the terms and conditions of the Exit Facility, the Warrants, and the New DNR Equity to be entered into, or issued, as the case may be, pursuant to the Plan; and (l) each of the other risks identified in this Disclosure Statement. Due to these uncertainties, reader cannot be assured that any forward-looking statements will prove to be correct. The Debtors are under no obligation to (and expressly disclaim any obligation to) update or alter any forward-looking statements whether as a result of new information, future events, or otherwise, unless instructed to do so by the Bankruptcy Court.

Except to the extent publicly available, this Disclosure Statement, the Plan, and the information set forth herein and therein are confidential. This Disclosure Statement and the Plan contain material non-public information concerning the Debtors, their subsidiaries, and their respective debt and Securities. Each recipient hereby acknowledges that it (a) is aware that the federal securities laws of the United States prohibit any person who has material non-public information about a company, which is obtained from the company or its representatives, from purchasing or selling Securities of such company or from communicating the information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such Securities and (b) is familiar with the United States Securities Exchange Act of 1934, as amended (the "Securities Exchange Act") and the rules and regulations promulgated thereunder, and agrees that it will not use or communicate to any Person or Entity, under circumstances where it is reasonably likely that such Person or Entity is likely to use or cause any Person or Entity to use, any confidential information in contravention of the Securities Exchange Act or any of its rules and regulations, including Rule 10b-5.

You are cautioned that all forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The liquidation analysis, financial projections, and other projections and forward-looking information contained herein and attached hereto are only estimates, and the timing and amount of actual distributions to Holders of Allowed Claims and Interests, among other things, may be affected

**by many factors that cannot be predicted.  Any analyses, estimates, or recovery projections may or may not turn out to be accurate.**

## DISCLAIMER

This Disclosure Statement contains summaries of certain provisions of the Plan and certain other documents and financial information.  The information included in this Disclosure Statement is provided solely for the purpose of soliciting acceptances of the Plan and should not be relied upon for any purpose other than to determine whether and how to vote on the Plan.  All Holders of Claims or Interests entitled to vote to accept or reject the Plan are advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan.  The Debtors believe that these summaries are fair and accurate.  The summaries of the financial information and the documents that are attached to, or incorporated by reference in, this Disclosure Statement are qualified in their entirety by reference to such information and documents.  In the event of any inconsistency or discrepancy between a description in this Disclosure Statement, on the one hand, and the terms and provisions of the Plan or the financial information and documents incorporated in this Disclosure Statement by reference, on the other hand, the Plan or the financial information and documents, as applicable, shall govern for all purposes.

Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.  The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or the Bankruptcy Court's endorsement of the merits of the Plan.  The statements and financial information contained in this Disclosure Statement have been made as of the date hereof unless otherwise specified.  Holders of Claims or Interests reviewing the Disclosure Statement should not assume at the time of such review that there have been no changes in the facts set forth in this Disclosure Statement since the date of this Disclosure Statement.  No Holder of a Claim or Interest should rely on any information, representations, or inducements that are not contained in or are inconsistent with the information contained in this Disclosure Statement, the documents attached to this Disclosure Statement, and the Plan.  This Disclosure Statement does not constitute legal, business, financial, or tax advice.  Any Person or Entity desiring any such advice should consult with their own advisors.  Additionally, this Disclosure Statement has not been approved or disapproved by the Bankruptcy Court, the SEC, or any securities regulatory authority of any state under Blue Sky Laws.  The Debtors are soliciting acceptances to the Plan prior to commencing any cases under chapter 11 of the Bankruptcy Code.

The financial information contained in or incorporated by reference into this Disclosure Statement has not been audited, except as specifically indicated otherwise.  The Debtors' management, in consultation with the Debtors' advisors, has prepared the financial projections attached hereto as **Exhibit E** and described in this Disclosure Statement (the "Financial Projections").  The Financial Projections, while presented with numerical specificity, necessarily were based on a variety of estimates and assumptions that are inherently uncertain and may be beyond the control of the Debtors' management.  Important factors that may affect actual results and cause the management forecasts not to be achieved include, but are not limited to, risks and uncertainties relating to the Debtors' businesses (including their ability to achieve strategic goals, objectives, and targets over applicable periods), industry performance, the regulatory environment, general business and economic conditions, and other factors.  The Debtors caution that no representations can be made as to the accuracy of these projections or to their ultimate performance compared to the information contained in the forecasts or that the forecasted results will be achieved.  Therefore, the Financial Projections may not be relied upon as a guarantee or other assurance that the actual results will occur.

Regarding contested matters, adversary proceedings, and other pending, threatened, or potential litigation or other actions, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather as a statement made in the context of settlement negotiations in accordance with Rule 408 of the Federal Rules of Evidence and any analogous state or foreign laws or rules.  As such, this Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving the Debtors or any other party in interest, nor shall it be construed to be conclusive advice on the tax, securities, financial, or other effects of the Plan to Holders of Claims against, or Interests in, the Debtors or any other party in interest.  Please refer to Article VII of this Disclosure Statement, entitled "Risk Factors," which begins on page 35, for a discussion of certain risk factors that Holders of Claims or Interests voting on the Plan should consider.

Except as otherwise expressly set forth herein, all information, representations, or statements contained herein have been provided by the Debtors.  No person is authorized by the Debtors in connection with this Disclosure Statement, the Plan, or the Solicitation to give any information or to make any representation or statement regarding this Disclosure Statement, the Plan, or the Solicitation, in each case, other than as contained in this Disclosure Statement and the exhibits attached hereto or as otherwise incorporated herein by reference or referred to herein.  If

any such information, representation, or statement is given or made, it may not be relied upon as having been authorized by the Debtors.

      This Disclosure Statement contains certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including, but not limited to, those summarized herein. When used in this Disclosure Statement, the words "anticipate," "believe," "estimate," "will," "may," "intend," and "expect" and similar expressions generally identify forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved. These statements are only predictions and are not guarantees of future performance or results. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth in this Disclosure Statement. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether as a result of new information, future events, or otherwise.

*[Remainder of page intentionally left blank.]*

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ..............................................................................................................1

II.     PRELIMINARY STATEMENT ......................................................................................1

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
        PLAN .................................................................................................................................5

        A.      What is chapter 11?.................................................................................................5
        B.      Why are the Debtors sending me this Disclosure Statement?.................................6
        C.      Why are votes being solicited prior to Bankruptcy Court approval of the Disclosure
                Statement?...............................................................................................................6
        D.      Am I entitled to vote on the Plan?...........................................................................6
        E.      What will I receive from the Debtors if the Plan is consummated?.........................7
        F.      What will I receive from the Debtors if I hold an Allowed Administrative Claim or a
                Priority Tax Claim?.................................................................................................9
        G.      Are any regulatory approvals required to consummate the Plan?.........................10
        H.      What happens to my recovery if the Plan is not confirmed or does not go effective?........10
        I.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan
                goes effective, and what is meant by "Confirmation," "Effective Date," and
                "Consummation?".................................................................................................10
        J.      What are the sources of Cash and other consideration required to fund the Plan?.........11
        K.      Are there risks to owning the New DNR Equity and Warrants upon emergence from
                chapter 11?...........................................................................................................11
        L.      Is there potential litigation related to the Plan?....................................................11
        M.      What is the Management Incentive Plan and how will it affect the distribution I receive
                under the Plan?.....................................................................................................11
        N.      Will the final amount of Allowed General Unsecured Claims affect the recovery of Holders
                of Allowed General Unsecured Claims under the Plan?........................................12
        O.      How will the preservation of the Causes of Action impact my recovery under the Plan? .........12
        P.      Will there be releases and exculpation granted to parties in interest as part of the Plan? ...........13
        Q.      What is the deadline to vote on the Plan?..............................................................17
        R.      How do I vote for or against the Plan?...................................................................17
        S.      Why is the Bankruptcy Court holding a Confirmation Hearing? ..........................17
        T.      What is the purpose of the Confirmation Hearing? ...............................................17
        U.      What is the effect of the Plan on the Debtors' ongoing businesses? .....................18
        V.      Will any party have significant influence over the corporate governance and operations of
                the Reorganized Debtors?.....................................................................................18
        W.      Who do I contact if I have additional questions with respect to this Disclosure Statement
                or the Plan?..........................................................................................................18
        X.      Do the Debtors recommend voting in favor of the Plan?.......................................19
        Y.      Who Supports the Plan?.........................................................................................19

IV.     THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN................................19

        A.      Restructuring Support Agreement .........................................................................19
        B.      The Plan ...............................................................................................................19

V.      THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW...........20

        A.      Denbury's Corporate History.................................................................................20
        B.      The Debtors' Key Assets and Operations ..............................................................21
        C.      The Debtor's Prepetition Capital Structure ...........................................................26

| VI. | **EVENTS LEADING TO THE CHAPTER 11 FILINGS** ................................................ | **31** |
| | | |
| A. | Prolonged Market Decline and Industry-Specific Challenges ................................ | 31 |
| B. | Capital Structure Rationalization Efforts ............................................................. | 33 |
| C. | Efforts to Preserve Shareholder Value ................................................................. | 34 |
| D. | The Restructuring Support Agreement and Committed Exit Facility ..................... | 34 |

| VII. | **RISK FACTORS** ................................................................................................ | **35** |
| | | |
| A. | Bankruptcy Law Considerations ........................................................................... | 35 |
| B. | Risks Related to Recoveries under the Plan .......................................................... | 40 |
| C. | Risks Related to the Debtors' and the Reorganized Debtors' Businesses .............. | 43 |

| VIII. | **SOLICITATION AND VOTING** ......................................................................... | **48** |
| | | |
| A. | Holders of Claims or Interests Entitled to Vote on the Plan ................................. | 48 |
| B. | Voting Record Date ............................................................................................. | 49 |
| C. | Voting on the Plan ............................................................................................... | 49 |
| D. | Ballots Not Counted ........................................................................................... | 51 |

| IX. | **CONFIRMATION OF THE PLAN** ..................................................................... | **51** |
| | | |
| A. | Requirements for Confirmation of the Plan .......................................................... | 51 |
| B. | Best Interests of Creditors/Liquidation Analysis ................................................. | 51 |
| C. | Feasibility .......................................................................................................... | 52 |
| D. | Acceptance by Impaired Classes .......................................................................... | 52 |
| E. | Confirmation Without Acceptance by All Impaired Classes .................................. | 53 |
| F. | Valuation of the Debtors ...................................................................................... | 54 |

| X. | **CERTAIN SECURITIES LAW MATTERS** ......................................................... | **54** |
| | | |
| A. | Issuance of Securities under the Plan ................................................................... | 54 |
| B. | Subsequent Transfers .......................................................................................... | 55 |

| XI. | **CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN** .................. | **56** |
| | | |
| A. | Introduction ........................................................................................................ | 56 |
| B. | Certain U.S. Federal Tax Consequences to the Debtors and the Reorganized Debtors ................. | 57 |
| C. | Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Claims and Interests ... | 60 |
| D. | Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims and Interests ... | 64 |
| E. | Information Reporting and Back-Up Withholding ................................................. | 68 |

| XII. | **RECOMMENDATION** ...................................................................................... | **69** |

**EXHIBITS**[3]

EXHIBIT A      Plan of Reorganization

EXHIBIT B      Restructuring Support Agreement (and annexes thereto, including the DIP-to-Exit
               Facility Term Sheet, Warrants Term Sheet, and Governance Term Sheet)

EXHIBIT C      Corporate Organization Chart

EXHIBIT D      Liquidation Analysis

EXHIBIT E      Financial Projections

EXHIBIT F      Valuation Analysis

---

[3]    Each Exhibit is incorporated herein by reference.

## I.      INTRODUCTION

Denbury Resources Inc. ("<u>DNR</u>") and its debtor affiliates, as debtors and debtors in possession (collectively,  the "<u>Debtors</u>,"  "<u>Denbury</u>,"  or  the "<u>Company</u>"),  submit  this  disclosure  statement (this "<u>Disclosure Statement</u>"),  pursuant  to  section 1125 of the Bankruptcy Code, to holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the *Joint Chapter 11 Plan of Reorganization of Denbury Resources Inc. and Its Debtor Affiliates* (the "<u>Plan</u>"), dated July 24, 2020.  A copy of the Plan is attached hereto as **<u>Exhibit A</u>** and incorporated herein by reference. The Plan constitutes a separate chapter 11 plan for each of the other Debtors.

**THE DEBTORS AND CERTAIN CONSENTING CREDITORS THAT HAVE EXECUTED THE RESTRUCTURING SUPPORT AGREEMENT, INCLUDING HOLDERS OF 100% IN PRINCIPAL OF THE RBL LOANS, APPROXIMATELY 67.2% IN PRINCIPAL OF THE SECOND LIEN NOTES, AND APPROXIMATELY 70.8% IN PRINCIPAL OF THE CONVERTIBLE NOTES, SUPPORT THE PLAN AND THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.     PRELIMINARY STATEMENT

Headquartered in Plano, Texas, Denbury is an independent oil and natural gas company with onshore  production  and  development  activities  in  the  Gulf  Coast  and  Rocky  Mountains  regions. Approximately 97% of Denbury's production is oil, and Denbury is the only United States-based public company of scale with a primary focus on carbon dioxide ("$CO_2$") enhanced oil recovery.  Denbury's utilization of $CO_2$ in it operations makes it uniquely situated to align with shifting investor sentiment associated with the energy transition.  Through the utilization of over 3 million tons per year of industrial-sourced $CO_2$—which means such $CO_2$ is captured at industrial facilities rather than allowed to be released into the atmosphere—the Company is already carbon-*negative* with respect to Scope 1 emissions (direct emissions from owned or controlled sources) and Scope 2 emissions (indirect emissions from the generation of purchased electricity, steam, heating and cooling consumed) associated with its operations.  Denbury has set a target to be *fully carbon-negative*, including with respect to scope 3 emissions (indirect emissions from refining and combustion of the hydrocarbons produced by the Company), by the end of this decade. Additionally, Denbury minimizes its impact on the surrounding environment through its focus on legacy oil fields, generally working within the footprint of historical development and extensively utilizing existing infrastructure.  Denbury is also focused on expanding its footprint in the carbon capture, use, and storage business ("<u>CCUS</u>"),  which  the  Company  believes  will  grow  into  an  important,  sustainable,  and complementary addition to the Company's oil and gas production business.

DNR, originally a Canadian company, was reincorporated in Delaware in 1999.  In August 1995, its common stock was first listed on the National Association of Securities Dealers Automated Quotations Exchange ("<u>NASDAQ</u>").  Since May 1997, Denbury's common stock has been trading under its current ticker, "DNR," on the New York Stock Exchange ("<u>NYSE</u>").  In December 2003, Denbury Onshore, LLC, a Delaware limited liability company ("<u>Denbury Onshore</u>"), became the primary operating entity and today holds the majority of the Debtors' assets and employees.  DNR is a holding company and the current parent entity of the Debtors.

As of the date of this Disclosure Statement, the Debtors have approximately $2.4 billion in total outstanding principal amount of funded debt obligations, including: (a) a first lien revolving credit agreement with approximately $230.0 million in principal outstanding; (b) four series of senior secured second lien notes with approximately $1.593 billion in principal outstanding in the aggregate; (c) convertible senior notes with approximately $225.7 million in principal outstanding in the aggregate; (d) three series of senior subordinated notes with approximately $245.7 million in principal outstanding in the aggregate; and (e) a pipeline financing lease with approximately $111.9 million in principal outstanding.

Denbury's revenues are derived primarily from the sale of oil and natural gas, with oil making up 97% of the Debtors' production in 2019 and 98% of the Debtors' proved reserves as of December 31, 2019. The Debtors have not been immune to the persistent, adverse macroeconomic trends in the oil and gas industry, which began with a steep decline in late 2014 in response to the worldwide oversupply of crude oil after many years of robust production growth in the U.S. Benchmark oil prices fell from approximately $100 per barrel in mid-2014 to a low point of approximately $26 per barrel by early 2016, representing an average price collapse of approximately 74% over that time period. Prices recovered somewhat from the early 2016 nadir, but the overall macroeconomic trend of a depressed and volatile commodity environment persisted until new shockwaves arrived in early 2020, as further depicted in the below graphic.

**WTI Crude Oil Closing Prices**



As COVID-19 spread globally in early 2020, global economic activity and transportation demand decreased, causing a decline in oil prices. In response, the Organization of the Petroleum Exporting Countries ("OPEC"), led by the Kingdom of Saudi Arabia, called for additional cuts in oil production, subject to agreement by Russia. However, initial discussions were not successful, and the parties failed to reach an agreement on production levels. Instead, both the Kingdom of Saudi Arabia and Russia announced that they would each increase, rather than decrease, production, resulting in surplus supply amidst already decreasing demand for oil. Meanwhile, the COVID-19 pandemic continued to spread, causing governments across the world to institute strict public health and safety measures including quarantine orders, stay-at-home orders, and social distancing guidelines that precipitously decreased oil demand globally, driving down oil prices. The result has been another sustained, historic downturn.

On April 20, 2020, the West Texas Intermediate ("WTI") index, the benchmark for U.S.-based oil exploration and production companies, declined **_over 300% in a single day_**, dropping below zero for the

first time in history.  As of the date of this Disclosure Statement, benchmark oil prices have partially rebounded from the record low and are hovering around $41 per barrel, which represents approximately a 30% decline from average oil prices for the twenty-four months prior.

Low oil prices and industry volatility are likely to continue through the near and long-term, affected by the domestic and foreign supply of oil and natural gas, the ability of OPEC members to comply with agreed-upon production cuts, social unrest and political instability, particularly in major producing regions outside the United States, pressure to reduce fossil fuel use as a means of reducing atmospheric $CO_2$ levels, and the levels and growth of domestic and global economic activity.  In particular, the U.S. "Shale Revolution"—the implementation of horizontal drilling and hydraulic fracking techniques to unlock oil and natural gas from previously non-producible shale formations—has resulted in a dramatic increase in U.S. crude oil and natural gas production, greatly increasing supply at a time of uncertain demand.

Over the past several years, the Debtors have taken a number of steps to reduce expenditures and forestall the need for a chapter 11 filing in a low-commodity-price environment, even while many of their peers pursued in-court restructurings.  These efforts included both a series of liquidity and credit enhancing transactions, including debt repurchases and exchanges, and steps to reduce general and administrative costs and streamline operations.  Since 2014, Denbury has reduced its workforce by approximately 55% and has significantly curtailed capital spending to preserve and manage liquidity.  Most recently, in late March 2020, the Company significantly reduced its planned capital spending for 2020 and, in May, implemented a reduction in force, including furloughing certain employees for several months.

Despite the Debtors' efforts to mitigate the financial strain brought on by current adverse market conditions through managing debt, optimizing operations, mitigating commodity price risk through prudent hedging, and reducing expenses, the Company's liquidity position was insufficient over the long-term to fund the Debtors' business operations and to service its still highly leveraged capital structure.  Consequently, the Debtors require a substantial balance sheet deleveraging to withstand the current and anticipated low commodity price environment and to continue to maximize the value of their oil and gas properties.  The trading prices of the Debtors' publicly-traded securities reflect these circumstances:



As a result, in March 2020, the Company instructed its financial and legal advisors, who had been evaluating additional liability management transactions since Fall 2019, to perform a comprehensive review of strategic alternatives available to the Company. These alternatives included a comprehensive restructuring to enhance the Debtors' liquidity and address their capital structure. Beginning in late April 2020, the Debtors commenced negotiations with an ad hoc committee of Holders of the Debtors' second lien notes represented by Paul, Weiss, Rifkind, Warton & Garrison LLP (the "Second Lien Ad Hoc Committee") regarding the terms of a value-maximizing, comprehensive restructuring. Concurrently, the Debtors began negotiating the terms of a debtor-in-possession credit facility and senior secured revolving exit credit facility with the RBL Agent (as defined below) and certain RBL Lenders (as defined below), represented by Vinson & Elkins LLP. In June 2020, the Debtors began to engage with an ad hoc group of Holders of the Debtors' convertible notes represented by Akin Gump Strauss Hauer & Feld LLP (the "Convertible Ad Hoc Group"). As negotiations with the Second Lien Ad Hoc Committee and Convertible Ad Hoc Group progressed, the Debtors determined not to make the June 30 and July 15, 2020 interest payments on the Convertible Notes and Subordinated Notes, totaling approximately $11 million.

After extensive, arm's-length negotiations over the course of several weeks, on July 28, 2020, the RBL Agent, certain RBL Lenders, the Second Lien Ad Hoc Committee, the Convertible Ad Hoc Group, and the Debtors arrived at the transactions embodied in the Restructuring Support Agreement, a copy of which is attached hereto as **Exhibit B**. The Restructuring Support Agreement will maximize stakeholder recoveries and ensure a viable enterprise upon emergence, and represents a significant achievement for the Debtors given the current industry environment. The Restructuring Support Agreement contemplates a swift restructuring by which the Debtors will (a) fully equitize *all* of the Debtors' $2.1 billion of bond debt, substantially delevering the Debtors' balance sheet, and (b) obtain from their current RBL Lenders a $615,000,000 revolving debtor-in-possession credit facility with JPMorgan Chase, N.A. as administrative agent (the "DIP Facility") that will roll into a new, senior secured revolving exit credit facility with initial availability thereunder of up to $615,000,000, subject to a conforming borrowing base to be set forth in the Exit Facility Documents and on such other terms and conditions as set forth therein, to be provided by RBL Lenders as lenders (in such capacity, the "Exit Facility Lenders") (collectively, the "Exit Facility"). The Plan provides for a meaningful recovery for Holders of the unsecured Convertible Notes in the form of 5% of new common equity and new warrants exercisable for up to an additional 5% ownership stake in the Reorganized Debtors. Although the Debtors believe their total enterprise value does not support a recovery to Subordinated Noteholders or Existing Equity Interests, the Plan provides an opportunity for a recovery to such classes (in the form of new warrants exercisable for up to a 3% ownership stake in the Reorganized Debtors for the Subordinated Notes Class and a 2.5% ownership stake in the Reorganized Debtors for the Existing Class Equity) that they likely would not otherwise be entitled to receive. Importantly, the Company's balance-sheet restructuring leaves unaffected trade creditors, whose claims will be reinstated or paid in full in the ordinary course of business.

The proposed restructuring transactions are value-maximizing for the Company's stakeholders. A right-sized capital structure will allow the Debtors to develop their assets and grow their $CO_2$ enhanced oil recovery operations. In addition, the compromises and settlements embodied in the Restructuring Support Agreement, and to be implemented by the Plan, preserve value by enabling the Debtors to avoid protracted, value-destructive litigation over potential recoveries and other causes of action that could delay the Debtors' emergence from chapter 11. As of the date of this Disclosure Statement, Holders of 100% in principal outstanding of RBL Loans, approximately 67.2% in principal outstanding under the Second Lien Notes, and approximately 70.8% in principal outstanding under the Convertible Notes have signed on to the Restructuring Support Agreement.

The core terms of the Restructuring Support Agreement will be implemented through a chapter 11 plan of reorganization—namely, the Plan (described more fully in Article IV.B of this Disclosure Statement, entitled "The Plan," which begins on page 19)—which contemplates, among other things:

- Holders of general unsecured claims receiving Reinstatement, payment in full in Cash, or such other treatment to render such claims Unimpaired;

- Holders of Pipeline Lease Claims receiving Reinstatement, payment in full in Cash, their collateral, or such other treatment to render such claims Unimpaired

- Holders of RBL Claims and Hedge Claims receiving payment in full in Cash or such other treatment to render such claims Unimpaired;

- Holders of Second Lien Notes Claims receiving their Pro Rata share of 95% of New DNR Equity, subject to dilution on account of the Warrants and the Management Incentive Plan;

- Holders of Convertible Notes Claims receiving their Pro Rata share of (a) 5% of New DNR Equity, subject to dilution on account of the Warrants and the Management Incentive Plan, and (b) the Convertible Notes Warrant Package;

- if the Class of Subordinated Notes Claims votes in favor of the Plan, Holders of Subordinated Notes Claims receiving their Pro Rata share of the Subordinated Notes Warrant Package; and

- if the Class of Subordinated Notes Claims and the Class of Existing Equity Interests both vote in favor of the Plan, Existing Equity Interests receiving their Pro Rata share of Existing Equity Warrant Package.

With a prepackaged Plan and key creditor support in place pursuant to the Restructuring Support Agreement, the Debtors expect to emerge positioned to capitalize on their asset base as the Company looks to reorient its go-forward growth and operating plans to be competitive in the new, lower-priced commodity environment. Given the Debtors' core strengths—including their experienced management team and employees, their leading position in $CO_2$ enhanced oil recovery, and the emerging CCUS business—the Debtors are confident that they can implement the Restructuring Support Agreement's balance sheet restructuring to ensure the Debtors' long-term viability.

## III. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A. What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court.

Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.     Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims or interests whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

**C.     Why are votes being solicited prior to Bankruptcy Court approval of the Disclosure Statement?**

By sending this Disclosure Statement and soliciting acceptances of the Plan prior to approval by the Bankruptcy Court, the Debtors are preparing to seek Confirmation of the Plan shortly after commencing the Chapter 11 Cases.  The Debtors will ask the Bankruptcy Court to approve this Disclosure Statement together with Confirmation of the Plan at the same hearing, which may be scheduled as shortly as four weeks after commencing the Chapter 11 Cases, all subject to the Bankruptcy Court's approval and availability.

**D.     Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim you hold and whether you held that Claim as of the Voting Record Date (as defined herein).  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Pipeline Lease Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 4 | RBL Claims / Hedge Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 5 | Second Lien Notes Claims | Impaired | Entitled to Vote |
| Class 6 | Convertible Notes Claims | Impaired | Entitled to Vote |
| Class 7 | Subordinated Notes Claims | Impaired | Entitled to Vote |
| Class 8 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 9 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 10 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 11 | Existing Equity Interests | Impaired | Entitled to Vote |

**E.        What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[1]**

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
| 1 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor: (i) payment in full in Cash of its Allowed Other Secured Claim; (ii) the collateral securing its Allowed Other Secured Claim; (iii) Reinstatement of its Allowed Other Secured Claim; or (iv) such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | TBD | 100% |
| 2 | Other Priority Claims | Each Holder of an allowed Other Priority Claim shall receive, at the option of the applicable Debtor:  (i) payment in full in Cash of its Allowed Other Priority Claim; or (ii) such other treatment that renders its Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code, or as otherwise permitted by section 1129(a)(9) of the Bankruptcy Code. | TBD | 100% |
| 3 | Pipeline Lease Claims | Each Holder of an Allowed Pipeline Lease Claim shall receive, at the option of the applicable Debtor: (i) payment in full in Cash of its Allowed Pipeline Lease Claim; (ii) the collateral securing its Allowed Pipeline Lease Claim; (iii) Reinstatement of its Allowed Pipeline Lease Claim; or (iv) such other treatment to render such Allowed Pipeline Lease Claim unimpaired in accordance with section 1124 of the Bankruptcy Code. | $113.8 | 100% |

---

[1]     The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.  "Allowed" means, as to a Claim or an Interest, a Claim or an Interest allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable.  For the avoidance of doubt, (a) there is no requirement to file a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (b) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable nonbankruptcy Law.

| | SUMMARY OF EXPECTED RECOVERIES | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
| 4 | RBL Claims / Hedge Claims | Each Holder of an Allowed RBL Claim or Allowed Hedge Claim shall receive payment in full in Cash or such other treatment rendering its Allowed RBL Claim or Allowed Hedge Claim, as applicable, Unimpaired in accordance with section 1124 of the Bankruptcy Code. | TBD | 100% |
| 5 | Second Lien Notes Claims | Each Holder of an Allowed Second Lien Notes Claim shall receive its Pro Rata share of 95% of the New DNR Equity, subject to dilution by the Warrants and the Management Incentive Plan. | $1,637.5 | 61.5% |
| 6 | Convertible Notes Claims | Each Holder of an allowed Convertible Notes Claim shall receive its Pro Rata share of: (i) 5% of the New DNR Equity, subject to dilution by the Warrants and the Management Incentive Plan; and (ii) the Convertible Notes Warrant Package. | $234.1 | 26.9% |
| 7 | Subordinated Notes Claims | (i) **if Class 7 votes to accept the Plan**, each Holder of an Allowed Subordinated Notes Claim shall receive its Pro Rata share of the Subordinated Notes Warrant Package. (ii) **if Class 7 votes to reject the Plan**, Holders of Subordinated Notes Claims will not receive any distribution on account of such Claims, which will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect. | $251.4 | 1.2% / 0% |
| 8 | General Unsecured Claims | Each Holder of an Allowed General Unsecured Claim shall receive, at the option of the applicable Debtor: (i) payment in full in Cash; (ii) Reinstatement; or (iii) such other treatment rendering such Allowed General Unsecured Claim Unimpaired. | TBD | 100% |
| 9 | Intercompany Claims | Each Allowed Intercompany Claim shall be, at the option of the applicable Debtor, either: (i) Reinstated; (ii) canceled, released, and extinguished, and will be of no further force or effect; or (iii) otherwise addressed at the option of each applicable Debtor such that Holders of Class 9 Intercompany Claims will not receive any distribution on account of such Class 9 Claims. | N/A | 0% |
| 10 | Intercompany Interests | Each Intercompany Interest shall be Reinstated as of the Effective Date or, at the Debtors' or the Reorganized Debtors' option, shall be cancelled. No distribution shall be made on account of any Intercompany Interests. | N/A | 0% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
| 11 | Existing Equity Interests | (i) **if (A) Class 7 votes to accept the Plan and (B) Class 11 votes to accept the Plan**, each Holder of Existing Equity Interests shall receive its Pro Rata share of the Existing Equity Warrant Package. <br><br>(ii) **if either Class 7 or Class 11 votes to reject the Plan**, Holders of Existing Equity Interests will not receive any distribution on account of such Interests, which will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect. | N/A | $2.5 million / $0 |

**F.    What will I receive from the Debtors if I hold an Allowed Administrative Claim or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims or Interests set forth in Article III of the Plan.

**1.    Administrative Claims**

Administrative Claims will be satisfied as set forth in Article II.A of the Plan, as summarized herein.  Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

**2.    Priority Tax Claims**

Priority Tax Claims will be satisfied as set forth in Article II.D of the Plan, as summarized herein. Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

**G.      Are any regulatory approvals required to consummate the Plan?**

There are no known regulatory approvals that are required to consummate the Plan.  However, to the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

**H.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article IX.B of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis," which begins on page 51, and the Liquidation Analysis attached hereto as **Exhibit D**.

**I.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  *See* Article IX of this Disclosure Statement, entitled "Confirmation of the Plan," which begins on page 51, for a discussion of the conditions precedent to consummation of the Plan.

**J.      What are the sources of Cash and other consideration required to fund the Plan?**

The Chapter 11 Cases will be financed by consensual use of cash collateral and the DIP Facility, subject to the terms and conditions of the DIP Facility Documents.  The Debtors or Reorganized Debtors, as applicable, shall fund distributions under the Plan with: (1) Cash on hand, including Cash from operations; (2) proceeds from the Exit Facility; (3) the New DNR Equity; and (4) the Warrants, as applicable.

**K.      Are there risks to owning the New DNR Equity and Warrants upon emergence from chapter 11?**

Yes.  *See* Article VII of this Disclosure Statement, entitled "Risk Factors," which begins on page 35.

**L.      Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which objections potentially could give rise to litigation. *See* Article VII.C.10 of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases," which begins on page 47.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See* Article IX.E of this Disclosure Statement, entitled "Confirmation Without Acceptance by All Impaired Classes," which begins on page 53.

**M.**      **What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan?**

On the Effective Date, the Reorganized Debtors shall implement the Management Incentive Plan pursuant to the terms set forth in Article IV.Q of the Plan and the Management Compensation Term Sheet, which shall be filed with the Plan Supplement. The New DNR Equity being provided in connection with the Management Incentive Plan will dilute all of the New DNR Equity equally.

As is typical for many of the Debtors' peer companies, to be a competitive employer and to maximize the value of the Debtors' estates, the Debtors have requested access to a pool of New DNR Equity that the New Board can use to attract, incentivize, and retain talented key employees (including officers) after the Effective Date. After the Effective Date, the New Board will implement the allocation and structure of the issuance of the New DNR Equity pursuant to the Management Compensation Term Sheet.

**N.**      **Will the final amount of Allowed General Unsecured Claims affect the recovery of Holders of Allowed General Unsecured Claims under the Plan?**

Each Holder of an Allowed General Unsecured Claim shall receive payment in full in Cash or Reinstatement. Therefore, the recovery for Holders of such Claims will be not be affected by the final amount of Allowed General Unsecured Claims.

**O.**      **How will the preservation of the Causes of Action impact my recovery under the Plan?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the Reorganized Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII thereof.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan. Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action,**

**all objections to the Schedule of Retained Causes of Action must be filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date.  Any such objection that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor, without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court.  If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objection party for thirty (30) days, such objection shall be resolved by the Bankruptcy Court.  Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

    **P.**    **Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties.  The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the Consenting Creditors in obtaining their support for the Plan pursuant to the terms of the Restructuring Support Agreement.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

<u>**IMPORTANTLY, THE FOLLOWING PARTIES ARE INCLUDED IN THE DEFINITION OF "RELEASING PARTIES" AND WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES:  ALL HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT (X) VALIDLY OPT OUT OF THE RELEASES CONTAINED IN THE PLAN, (Y) FILE AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN BY THE PLAN OBJECTION**</u>

**DEADLINE, OR (Z) TIMELY VOTE TO REJECT THE PLAN.  THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.**

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

 1. **Releases by the Debtors.**

**Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates (as applicable) would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:  the Debtors (including the management, ownership, or operation thereof), any securities issued by the Debtors and the ownership thereof, the Debtors' restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), any intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement, the Exit Facility, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement, the Exit Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Restructuring or (b) any individual from any claim or Causes of Action related to an act or omission that is determined in a Final Order by a court competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all holders**

of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

2.      **Releases by the Releasing Parties.**

**Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, each Releasing Party is deemed to have forever released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, the Reorganized Debtors, or their Estates (as applicable), that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), any securities issued by the Debtors and the ownership thereof, the Debtors' restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement, the Exit Facility, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement, the Exit Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Restructuring or (b) any individual from any claim or Causes of Action related to an act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.**

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

3.      **Exculpation.**

**Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of**

14

the Restructuring Support Agreement and related prepetition transactions, the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement, the Exit Facility, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement, the Exit Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order by a court competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

    4.    Injunction.

    Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action, suit or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

    Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim or Allowed Interest, as applicable, by

accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.E of the Plan.

        5.      **Release of Liens.**

Except as otherwise specifically provided in the Plan, the Exit Facility Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate or Hedge Claims with respect to which the applicable counterparty has agreed to Reinstatement in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be automatically and fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or the Reorganized Debtors, or any other Holder of a Secured Claim. Any Holder of such Secured Claims (and the applicable agent for such Holder) shall be authorized and directed to release any collateral or other property of the Debtors (including any cash collateral and possessory collateral) held by such Holders (and the applicable agent for such Holders), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of all documents reasonably requested by the Debtors, Reorganized Debtors, or the Exit Facility Agent to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such mortgages, deeds of trust, Liens, pledges, and other security interests.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or Exit Facility Agent that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf. Notwithstanding the foregoing paragraph, this Article shall not apply to any Secured Claims that are Reinstated pursuant to the terms of this Plan.

For more detail, see Article VIII of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

**Q.**     **What is the deadline to vote on the Plan?**

The Voting Deadline is August 28, 2020, at 4:00 p.m. (prevailing Central Time).

R.      **How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims or Interests that are entitled to vote on the Plan.  Certain Ballots in Class 11 (cast by "direct" Holders) must be returned directly to the Solicitation Agent (defined below) by the Voting Deadline shown below.  Ballots in Class 5, Class 6, Class 7, and any Ballots cast by "beneficial owners" in Class 11 voting through a nominee, the master ballot containing your vote and returned by your nominee, or the "pre-validated" ballot provided by your nominee for direct return by you must be properly completed, executed, and delivered as directed, so that the master ballot or pre-validated ballot containing your vote is **actually received** by the Debtors' solicitation agent, Epiq Corporate Restructuring, LLC (the "Solicitation Agent") **on or before the Voting Deadline, *i.e.* August 28, 2020, at 4:00 p.m., prevailing Central Time**. *See* Article VIII of this Disclosure Statement, entitled, "Solicitation and Voting" which begins on page 48 for more information.

S.      **Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan. The Confirmation Hearing will be scheduled by the Bankruptcy Court shortly after the commencement of the Chapter 11 Cases.  All parties in interest will be served notice of the time, date, and location of the Confirmation Hearing once scheduled.

T.      **What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest Holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

U.      **What is the effect of the Plan on the Debtors' ongoing businesses?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  As a result, the occurrence of the Effective Date means that the Debtors will ***not*** be liquidated or forced to go out of business. Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (1) no stay of the Confirmation Order is in effect, (2) all conditions to Consummation have been satisfied or waived (*see* Article IX of the Plan), and (3) the Debtors declare the Plan effective.  On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

V.      **Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

As of the Effective Date, the terms of the then-sitting members of the boards of directors of the Debtors shall expire, and the initial boards of directors, including the New Board, as well as the officers of

each of the Reorganized Debtors, shall be appointed in accordance with the New Organizational Documents. The initial New Board shall consist of those individuals that are selected in accordance with Article IV.L of the Plan.

Assuming that the Effective Date occurs, Holders of Allowed Claims or Allowed Interests (as applicable) that receive distributions representing a substantial percentage of outstanding shares of the New DNR Equity (including, as applicable, shares issued upon exercise of the Warrants), may be in a position to influence matters requiring approval by the Holders of shares of New DNR Equity, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors.

### W.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Solicitation Agent, Epiq Corporate Restructuring, LLC, via one of the following methods:

> *By calling the telephone number included in your Ballot, or by contacting the Solicitation Agent by phone at:*
> (855)917-3570 (toll free)
> (503)520-4467 (international)
>
> *By regular mail at:*
> Denbury Resources Inc.
> c/o Epiq Corporate Restructuring LLC
> P.O. Box 4422
> Beaverton, OR 97076-4422
>
> *By hand delivery or overnight mail at:*
> Denbury Resources Inc.
> c/o Epiq Corporate Restructuring LLC
> 10300 SW Allen Blvd.
> Beaverton, OR 97005

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Solicitation Agent at https://dm.epiq11.com/Denbury (free of charge) or the Bankruptcy Court's website at http://www.txs.uscourts.gov/bankruptcy/ (for a fee).

### X.    Do the Debtors recommend voting in favor of the Plan?

Yes. The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors and equity holders than would otherwise result from any other available alternative. The Debtors believe that the Plan, which contemplates a significant deleveraging of the Debtors' balance sheet and enables them to emerge from chapter 11 expeditiously, is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

**Y.      Who Supports the Plan?**

The Plan is supported by the Debtors, certain Holders of Claims, and certain Consenting Creditors that have executed the Restructuring Support Agreement, including Holders of 100% in principal amount outstanding of the RBL Loans, approximately 67.2% in principal amount outstanding of the Second Lien Notes, and approximately 70.8% in principal amount outstanding of the Convertible Notes.

## IV.      THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN

### A.      Restructuring Support Agreement

On July 28, 2020, the Debtors and the Consenting Creditors entered into the Restructuring Support Agreement, attached hereto as **Exhibit B**.  In connection with executing the Restructuring Support Agreement, the Debtors documented the terms of the prepackaged restructuring contemplated thereby, including the Plan.  The restructuring transactions contemplated by the Plan will significantly reduce the Debtors' funded-debt obligations and annual interest payments and result in a stronger balance sheet for the Debtors.

The Plan represents a significant step in the Debtors' months-long restructuring process.  The Restructuring Support Agreement will allow the Debtors to proceed expeditiously through chapter 11 to a successful emergence.  The Plan will significantly deleverage the Debtors' balance sheet and provide the capital injection needed for the Debtors to conduct competitive operations going forward.

### B.      The Plan

The key terms of the Plan, specific aspects of the restructuring transactions, and the Reorganized Debtors' operations following the Consummation of the Plan can be found in the Plan, attached hereto as **Exhibit A**, among others described herein and therein:

| Provision | Plan Section |
|---|---|
| General Settlement of Claims and Interests | Article IV, Section A |
| Restructuring | Article IV, Section B |
| Reorganized Debtors | Article IV, Section C |
| Sources of Consideration for Plan Distributions | Article IV, Sections D |
| Holders of Working and Similar Interests | Article IV, Section E |
| Corporate Existence | Article IV, Section F |
| Vesting of Assets in the Reorganized Debtors | Article IV, Section G |
| Cancellation of Existing Securities and Agreements | Article IV, Section H |
| Corporate Action | Article IV, Section I |
| New Organizational Documents | Article IV, Section J |
| Indemnification Provisions in Organizational Documents | Article IV, Section K |

| Provision | Plan Section |
|---|---|
| Directors and Officers of the Reorganized Debtors | Article IV, Section L |
| Effectuating Documents; Further Transactions | Article IV, Section M |
| Section 1146 Exemption | Article IV, Section N |
| Registration Rights Agreement | Article IV, Section O |
| Director and Officer Liability Insurance | Article IV, Section P |
| Management Incentive Plan | Article IV, Section Q |
| Employee and Retiree Matters and Benefits | Article IV, Section R |
| Preservation of Causes of Action | Article IV, Section S |
| Restructuring Expenses | Article IV, Section T |
| Releases<br><br>(The Releases are also described in Article III.P of this Disclosure Statement, which begins on page 13) | Article VII, Sections B and C |

## V.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.    Denbury's Corporate History

Denbury, originally a Canadian company, was privately held until August 1995, when its common stock was first listed on NASDAQ.  The common stock remained listed on NASDAQ until May 1997, when it transferred to the NYSE and began trading under its current ticker, "DNR."  The Company remained incorporated in Canada until April 1999, when it moved its corporate domicile to the United States as a Delaware corporation after shifting the focus of its operations to the Gulf Coast region of the United States.

In December 2003, Denbury Onshore became the primary operating entity and today holds the majority of the Debtors' assets and employees.  DNR is a holding company and is the current parent entity of the Debtors.

### B.    The Debtors' Key Assets and Operations

The Debtors' operations are focused primarily on development of oil fields in two distinct geographic regions in the United States—the Gulf Coast and Rocky Mountains.  Denbury's extensive use of $CO_2$ flooding enables the Company to recover oil from fields that would otherwise be left behind using traditional recovery methods.  By using $CO_2$ injection as a means to enhance oil recovery from the reservoir, Denbury is also sustainably managing its carbon footprint.  Denbury is the only U.S. public company of scale where injecting $CO_2$ into the ground to produce oil is its primary business.  The Debtors are also continuing to expand the CCUS business, whereby industrial $CO_2$ is captured and stored in nonhydrocarbon underground reservoirs. Considering the Debtors' two decades of technical and operational experience with industrial $CO_2$, it is uniquely qualified to become a leader in the field.

As of the date of this Disclosure Statement, the Debtors' senior management includes: (a) Christian S. Kendall, President and Chief Executive Officer; (b) Mark C. Allen, Executive Vice President, Treasurer,

Assistant Secretary and Chief Financial Officer; and (c) James S. Matthews, Executive Vice President, Chief Administrative Officer, General Counsel and Secretary.

### 1.     Oil & Gas Production

The Debtors' oil and gas assets currently are concentrated in the Gulf Coast and Rocky Mountain regions. A map illustrating the Debtors' assets is shown below.



As of June 30, 2020, the Debtors (i) held interests in approximately 2,946 gross (2,197 net) producing wells, of which all but 636 gross and 150 net wells are Debtor-operated, and (ii) had approximately 951,711 gross (510,602 net) total acres under lease.  As of December 31, 2019, the Debtors had estimated proved developed reserves of approximately 206.9 MMBOE of oil and condensate, natural gas, and NGLs, with such estimates based on Securities and Exchange Commission parameters.[2]  In 2019, the Debtors' activities yielded total production of 21,248 MBOE and had an adjusted EBITDAX of $607 million.

#### (a)     Enhanced Oil Recovery

The Debtors' primary focus is $CO_2$ enhanced oil recovery operations, which are an efficient means of tertiary recovery that can result in the recovery of crude oil volumes rivaling primary and secondary recovery, and which generate the majority of the Debtors' oil production revenue.  Denbury's oil and gas assets are primarily mature, liquids-rich oil fields.  For many years, oil has been produced using a variety of different production techniques, typically occurring in three phases: primary, secondary, and tertiary oil

---

[2]     The Debtors have not included any proved undeveloped reserves in such figures due to their financial condition in accordance with applicable accounting rules.

recovery.  Primary oil recovery is limited to hydrocarbons that rise to the surface naturally or through the use of artificial lift equipment, and secondary production typically involves injecting water to re-pressure the target formation and sweep additional hydrocarbons to the wellbore for recovery.  Utilizing only primary and secondary recovery methods can leave up to 70% of the original oil in place ("OOIP").  Tertiary production occurs after both primary and secondary recovery production is complete.  $CO_2$ enhanced oil recovery is a proven tertiary technique and involves injecting $CO_2$ into underground rock formations to act somewhat like a solvent for oil, removing it from the oil-bearing formation as the $CO_2$ travels through the reservoir rock.  This process can recover, on average, an additional 10% to 20% of the OOIP.



CO₂ moves through formation mixing with oil, expanding and moving it toward producing wells

While the time between initial investment and first production from tertiary development is greater than in primary oil recovery in most circumstances, it has several offsetting and unique benefits, including: (a) low exploration risk; (b) low production decline rates; (c) reasonable return metrics at anticipated long-term prices; (d) limited competition in the Debtor's geographical areas of operations; (e) less disruptive operations due to further developing existing oil fields rather than initiating new development; and (f) incidental storage of $CO_2$ in the same underground formations that previously trapped and stored oil and natural gas.

The Debtors began their $CO_2$ enhanced oil recovery operations in 1999 when they acquired Little Creek Field in Mississippi, followed by the acquisition of Jackson Dome $CO_2$ reserves and the NEJD Pipeline in 2001.  Based on the success at Little Creek Field and Jackson Dome, the Debtors began transitioning their capital spending and acquisition efforts to focus predominantly on $CO_2$ enhanced oil recovery. Today, the Debtors' oil and gas properties that utilize enhanced oil recovery operations include interests in approximately 14 oil and gas fields in the Gulf Coast region and three oil and gas fields in the Rocky Mountain region.  One of the Debtors' current projects involves expanding its $CO_2$ enhanced oil recovery activities in the Rocky Mountain region through the development of a new $CO_2$ flood at the Company's Cedar Creek Anticline oilfield, which the Debtors anticipate could be ready for $CO_2$ injection in 2023.  The Debtors' tertiary operations have grown such that, as of the date of this Disclosure Statement: (a) 60% of their proved reserves are proved tertiary oil reserves; (b) 64% of their 2019 total production was

related to tertiary oil operations (on a BOE basis); and (c) 63% of their 2019 capital expenditures (excluding acquisitions) were related to tertiary oil operations.

## 2.   Carbon Sources and Carbon Capture Use and Storage

The Debtors' ownership and control of extensive $CO_2$ pipeline infrastructure and significant sources of $CO_2$ in the Gulf Coast and Rocky Mountain regions benefit their oil and gas operations due to easy accessibility and predictable $CO_2$ costs.  In the Gulf Coast region, the Debtors used approximately 84% of their natural and industrial $CO_2$ production during 2019 in their own oil and gas operations and the remaining balance is delivered to third-parties, generating approximately $20 million in annual revenue.

The Company believes CCUS will become an increasingly essential business, and that Denbury's assets and expertise provide an opportunity for the Company to be a leader as this market continues to develop.  CCUS is a new and evolving industry that includes capturing industrial-sourced $CO_2$ and depositing it into safe and secure long-term storage locations where it will not enter the atmosphere, *i.e.,* underground geological formations.  CCUS thus prevents the release of large quantities of $CO_2$ into the atmosphere and provides an integral tool for the Debtors in their goal of fully offsetting their carbon emissions.

The Debtors do not only consider their Scope 1 emissions (direct emissions from owned or controlled sources) and Scope 2 emissions (indirect emissions from the generation of purchased electricity, steam, heating and cooling consumed) associated with their operations when accounting for their carbon footprint, but also their Scope 3 emissions (all other emissions generated other than Scope 1 or Scope 2 emissions) associated with the refining and combustion of the hydrocarbons.  The Debtors' extensive use of industrial-sourced $CO_2$ enhanced oil recovery in their operations prevents the release of $CO_2$ into the atmosphere while allowing them to reduce their use of naturally-occurring $CO_2$.  The Debtors' Scope 1 and Scope 2 emissions associated with their operations are currently carbon negative, as they more than offset those emissions by annually injecting over three million tons of industrial-sourced $CO_2$ into the ground as part of their $CO_2$ enhanced oil recovery process.  As the CCUS industry continues evolving, the Debtors have set a target to fully offset their emissions within this decade, and the Company believes that reaching carbon negative emissions on a Scope 3 level company-wide is both achievable and sustainable.

### (a)   Gulf Coast Region

The Debtors acquired their primary Gulf Coast natural $CO_2$ resource, Jackson Dome, located near Jackson, Mississippi, in 2001.  This acquisition also resulted in the ownership and control by the Debtors of the North East Jackson Dome pipeline (the "NEJD Pipeline").[3]  The NEJD Pipeline spans 183 miles from Jackson Dome to a location near Donaldsonville, Louisiana.  Since 2001, the Debtors have acquired or constructed nearly 750 miles of additional $CO_2$ pipelines in the Gulf Coast region giving them the ability to deliver $CO_2$ from Mississippi to Texas.  One of the Debtors' most significant expansions was the completion of the Green Pipeline, which connects to the NEJD Pipeline in Louisiana and expands into Texas for a total of 320 miles of $CO_2$ pipeline.  In addition to the Debtors' ownership of naturally-occurring $CO_2$ sourced from the Jackson Dome, the Debtors are party to two long-term contracts to purchase $CO_2$ from industrial plants in Port Arthur, Texas and Geismar, Louisiana.  The Debtors' $CO_2$ pipelines deliver $CO_2$ from both naturally-occurring and industrial sources to their oil fields in a cost-effective manner.

---

[3]   As further explained herein, the Debtors subsequently sold the NJED Pipeline to Genesis and currently lease it back pursuant to the Pipeline Lease.



(b)      **Rocky Mountain Region**

In connection with the merger with Encore Acquisition Company in 2010, the Debtors expanded their $CO_2$ operations to the Rocky Mountain region.  The key $CO_2$ resources in this area come from the Debtors' one-third ownership interest in ExxonMobil's $CO_2$ reserves in LaBarge Field, Wyoming and their supply contract with the Lost Cabin gas plant operated by ConocoPhillips.  Currently, the Debtors own one $CO_2$ pipeline in the Rocky Mountain region, the Greencore Pipeline, and have begun the process of building a second to connect to the Cedar Creek Anticline.



## C.      The Debtor's Prepetition Capital Structure

As of the date of this Disclosure Statement, the Debtors had approximately $2.4 billion in total outstanding principal amount of funded debt obligations and, as of June 30, 2020, approximately 507,725,516 shares of outstanding common stock.  As of the date of this Disclosure Statement, the Debtors' prepetition capital structure is as follows:

| Obligation | Maturity | Annual Interest Expense (millions) | Approx. Principal Amount (millions) |
|---|---|---|---|
| Pipeline Financing Lease Agreement (the "Pipeline Lease") | May 30, 2028 | N/A | $111.9 |
| RBL Credit Agreement | Dec. 9, 2021[4] | N/A | $230.0 |
| 9.00% Senior Secured Second Lien Notes (the "9.00% Notes") | May 15, 2021 | $52.6 | $584.7 |
| 9.25% Senior Secured Second Lien Notes (the "9.25% Notes") | Mar. 31, 2022 | $42.1 | $455.7 |
| 7.50% Senior Secured Second Lien Notes (the "7.50% Notes") | Feb. 15, 2024 | $1.5 | $20.6 |
| 7.75% Senior Secured Second Lien Notes (the "7.75% Notes") | Feb. 15, 2024 | $41.2 | $531.8 |
| *Total Secured Debt* | | *$137.5* | *$1,934.7* |

---

[4]      The RBL Facility's maturity date may spring to an earlier date, as further explained herein.

| Obligation | Maturity | Annual Interest Expense (millions) | Approx. Principal Amount (millions) |
|---|---|---|---|
| 6.375% Convertible Senior Notes (the "Convertible Notes") | Dec. 31, 2024 | $14.4 | $225.7 |
| 6.375% Senior Subordinated Notes (the "6.375% Notes") | Aug. 15, 2021 | $3.3 | $51.3 |
| 5.50% Senior Subordinated Notes (the "5.50% Notes") | May 1, 2022 | $3.2 | $58.4 |
| 4.625% Senior Subordinated Notes (the "4.625% Notes") | July 15, 2023 | $6.3 | $136.0 |
| | *Total Unsecured Debt* | *$27.2* | *$471.4* |
| | **Total:** | **$164.7** | **$2,406.1** |

### 1. Prepetition Debt Exchanges and Repurchases

In 2019 and early 2020, the Debtors completed a series of debt exchanges and repurchases to extend the maturities of their outstanding long-term debt and reduce their debt principal, as further explained herein. Beginning in June of 2019, the Debtors extended the maturities of $348.4 million of their outstanding long-term debt to 2024 and reduced their debt principal by $120.0 million. The debtholders exchanged approximately $468.4 million of subordinated notes for the following: (a) $245.5 million aggregate principal amount of 6.375% Convertible Notes; (b) $102.6 million aggregate principal amount of 7.75% Notes; and (c) $120.0 million of cash. During June and July 2019, the Debtors exchanged $429.2 million aggregate principal amount of 7.75% Notes for $429.4 million of previously outstanding 7.50% Notes. As a result of all of the above June and July note exchanges, the Debtors recognized a net gain on debt extinguishment of $100.5 million.

Between August and November of 2019, the Debtors repurchased approximately $112.1 million of their outstanding senior subordinated notes in exchange for $16.4 million of cash and issuance of 38.3 million shares of DNR common stock. This transaction resulted in a net gain on debt extinguishment of approximately $55.5 million. During March 2020, the Debtors repurchased a total of $30.2 million aggregate principal amount of 9.00% Second Lien Notes in open market transactions for a total purchase price of $14.2 million, excluding accrued interest. This transaction resulted in a net gain on debt extinguishment of $19.0 million.

### 2. The Pipeline Financing Lease Agreement

On May 30, 2008, Denbury Onshore, as lessee, entered into the Pipeline Lease with Genesis NEJD Pipeline, LLC ("Genesis NEJD"), as lessor, for a principal amount of $175 million. The Pipeline Lease is guaranteed by DNR and matures on May 30, 2028. Pursuant to the Pipeline Lease, Denbury Onshore holds the exclusive right to continue using the NEJD Pipeline for transportation of $CO_2$ for the duration of the Pipeline Lease and makes quarterly rent payments (approximately $20.7 million per year). Upon maturity of the Pipeline Lease on May 30, 2028, Denbury Onshore has the right to purchase the NEJD Pipeline from Genesis NEJD for $1.00. Because DNR's credit rating was downgraded, on March 4, 2016, pursuant to the terms of the Pipeline Lease, DNR provided a letter of credit for $41.3 million to Genesis NEJD. The Pipeline Lease is guaranteed by DNR and secured by (i) the NEJD Pipeline, (ii) all proceeds from the sale of the NEJD Pipeline, and (iii) and all rents, income, or related fees for transportation of $CO_2$ or any other substance through the NEJD Pipeline. As of the date of this Disclosure Statement, there is approximately $111.9 million in principal outstanding under the Pipeline Lease.

### 3.   RBL Credit Agreement

On December 9, 2014, DNR entered into that certain Amended and Restated Credit Agreement (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "RBL Credit Agreement") among DNR, as borrower, the lenders party thereto from time to time (the "RBL Lenders"), and JPMorgan Chase, N.A., as administrative agent (the "RBL Agent"), which provides the Company with revolving credit, letter of credit, and swingline facilities (collectively, the "RBL Facility"). Pursuant to that certain Amended and Restated Guarantee Agreement, dated as of December 9, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof), the RBL Facility is guaranteed by each of the Debtors other than DNR.  Pursuant to (a) that certain Amended and Restated Pledge Agreement, dated as of December 9, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof), by the Debtors in favor of the RBL Agent and (b) the mortgages granted by certain Debtors in favor of the RBL Agent, the RBL Facility is secured (subject to certain customary exceptions) on a first priority basis by security interests in (i) equity in DNR's subsidiaries, (ii) hedge agreements, (iii) certain deposit accounts, securities accounts and commodities accounts, (iv) the proceeds of the foregoing clauses (i) through (iii) above and (v) substantially all of the Debtors' oil and gas properties.

As of June 30, 2020, the Borrowing Base (as defined in the RBL Credit Agreement) and aggregate commitments under the RBL Facility are $615 million.  The RBL Facility matures on December 9, 2021; *provided* that such maturity date may be earlier if any of the following occurs:  (a) February 12, 2021, if on such date Liquidity (as defined in the RBL Credit Agreement) is less than 120% of the outstanding amounts then owed under the 9.00% Notes; (b) May 14, 2021, if on or before such date, the 9.00% Notes have not been repaid, exchanged, refinanced or otherwise redeemed in full; (c) May 14, 2021, if on such date Liquidity is less than 120% of the outstanding amounts then owed under the 6.375% Notes; or (d) August 13, 2021, if on or before such date, the 6.375% Notes have not been repaid, exchanged, refinanced or otherwise redeemed in full.  The Borrowing Base is subject to redetermination on May 1st and November 1st of each year.[5]  Pursuant to that certain 8th Amendment to the RBL Credit Agreement, dated as of June 26, 2020, by and between DNR and the RBL Agent, until the November 1, 2020 borrowing base redetermination, the availability under the RBL Facility was reduced to $275,000,000 *plus* the aggregate amount outstanding under the Letters of Credit (not to exceed $100 million) in effect at such time.

Under the RBL Credit Agreement, letters of credit are available in an aggregate amount not to exceed $100 million and swingline loans are available in an aggregate amount not to exceed $25 million. Loans made under the RBL Credit Agreement are subject to the following interest rates:  ABR + 1.75% to 2.75% per annum for ABR loans; and LIBOR + 2.75% to 3.75% per annum for LIBOR loans, as well as a commitment fee of 0.50% on the undrawn portion of the commitments.  As of the date of this Disclosure Statement, the Debtors have $94.7 million letters of credit and approximately $230.0 million of loans outstanding under the RBL Facility.

### 4.   Derivatives and Hedging Activities

To provide protection against volatility in commodity prices, the Debtors have historically entered into hedging transactions covering a portion of the Debtors' anticipated production levels.  The Debtors' hedging transactions have primarily consisted of financially-settled crude oil and natural gas option contracts— generally compromised of a mixture of costless collars, 3-way collars, and swaps—with 13 financial institutions, all of which are lenders under the RBL Facility.  For the year ending December 2020,

---

[5]   The Borrowing Base under the RBL Facility was reaffirmed at $615 million for the May 1, 2020 Scheduled Redetermination (as defined in the RBL Credit Agreement).

approximately 70% of the Debtors' currently estimated total oil and natural gas production is hedged by derivative contracts. As of June 30, 2020, the Debtors' derivative contracts represent a net asset of approximately $40 million on a mark-to-market basis. Pursuant to the Hedging Motion,[6] the Debtors will seek authorization to maintain their prepetition hedge contracts and enter into postpetition hedges in the ordinary course of business.

### 5. Senior Secured Second Lien Notes

#### (a) The 9.00% Notes

In May 2016, DNR issued $614.9 million in aggregate principal amount of the 9.00% Notes under an indenture dated as of May 10, 2016 (the "9.00% Notes Indenture"), by and among DNR, as issuer, each other Debtor, as guarantor parties thereto, and Wilmington Trust, National Association, as trustee and collateral trustee. Pursuant to the 9.00% Notes Indenture, the 9.00% Notes were issued at par, bear interest at a rate of 9.00% per year, payable semi-annually in arrears on May 15 and November 15 of each year, and mature on May 15, 2021. As of the date of this Disclosure Statement, there is $584.7 million in principal and $11.0 million in accrued interest outstanding under the 9.00% Notes.

The 9.00% Notes are guaranteed jointly and severally by each of the Debtors (other than DNR) and are secured by second-priority liens on all assets and property of the Debtors securing the RBL Facility, subordinated to the liens that secure the RBL Facility and any future priority lien debt.

#### (b) The 9.25% Notes

In December 2017 and January 2018, DNR issued $381.6 million and $74.1 million, respectively, in aggregate principal amount of the 9.25% Notes under an indenture dated as of December 6, 2017 (the "9.25% Notes Indenture"), by and among DNR, as issuer, each other Debtor, as guarantor parties thereto, and Wilmington Trust, National Association, as trustee and collateral trustee. Pursuant to the 9.25% Notes Indenture, the 9.25% Notes were issued at par,[7] bear interest at a rate of 9.25% per year, payable semi-annually in arrears on March 31 and September 30 of each year, and mature on March 31, 2022. As of the date of this Disclosure Statement, there is $455.7 million in principal and $14.0 million in accrued interest outstanding under the 9.25% Notes.

The 9.25% Notes are guaranteed jointly and severally by each of the Debtors (other than DNR) and are secured by second-priority liens on all assets and property of the Debtors securing the RBL Facility, subordinated to the liens that secure the RBL Facility and any future priority lien debt.

---

[6] As used herein, the "Hedging Motion" means *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Perform Under and/or Amend Prepetition Hedging Arrangements, (B) Enter Into, and Perform Under, Postpetition Hedging Arrangements, (C) Grant Liens and Superpriority Administrative Expense Claims, and (II) Granting Related Relief*, to be filed on the Petition Date.

[7] The December 2017 issuance, in addition to an $84.7 million issuance of 3.5% Convertible Senior Notes, was in exchange for $609.8 million aggregate of Denbury's existing senior subordinated notes. The January 2018 issuance, in addition to a $59.4 million issuance of 2023 Convertible Senior Notes, was in exchange for $174.3 million of Denbury's existing senior subordinated notes. In April and May 2018, the holders of $84.7 million in aggregate principal amount of the 3.5% Convertible Senior Notes and $59.4 million of the 2023 Convertible Senior Notes were converted to 55.2 million shares of Denbury's common stock.

(c)    The 7.75% Notes

In June 2019, DNR issued $528.0 million in aggregate principal amount of the 7.75% Notes under an indenture dated as of June 19, 2019 (the "7.75% Notes Indenture"), by and among DNR, as issuer, each other Debtor, as guarantor parties thereto, and Wilmington Trust, National Association, as trustee and collateral trustee.  The 7.75% Notes were issued as part of an exchange for certain senior subordinated notes and existing 7.50% Notes.  The 7.75% Notes bear interest at a rate of 7.75% per year, payable semi-annually in arrears on February 15 and August 15 of each year, and mature on February 15, 2024.  In July 2019, DNR issued an additional $3.8 million of 7.75% Notes in exchange for $4.0 million of 7.50% Notes, which were recorded at par.  As of the date of this Disclosure Statement, there is approximately $531.8 million in principal and $18.9 million in accrued interest outstanding under the 7.75% Notes.

The 7.75% Notes are guaranteed jointly and severally by each of the Debtors (other than DNR) and are secured by second-priority liens on all assets and property of the Debtors securing the RBL Facility, subordinated to the liens that secure the RBL Facility and any future priority lien debt.

(d)    The 7.50% Notes

In August 2018, DNR issued $450.0 million in aggregate principal amount of the 7.50% Notes (together with the 9.00% Notes, 9.25% Notes, and 7.75% Notes, the "Second Lien Notes") under an indenture dated as of August 21, 2018 (the "7.50% Notes Indenture"), by and among DNR, as issuer, each other Debtor, as guarantor parties thereto, and Wilmington Trust, National Association, as trustee and collateral trustee.  Pursuant to the 7.50% Notes Indenture, the 7.50% Notes were issued at par, bear interest at a rate of 7.50% per year, payable semi-annually in arrears on February 15 and August 15 of each year, and mature on February 15, 2024.  As of the date of this Disclosure Statement, there is approximately $20.6 million in principal and $0.7 million in accrued interest outstanding under the 7.50% Notes.

The 7.50% Notes are guaranteed jointly and severally by each of the Debtors (other than DNR) and are secured by second-priority liens on all assets and property of the Debtors securing the RBL Facility, subordinated to the liens that secure the RBL Facility and any future priority lien debt.

6.    Convertible Senior Notes

In June 2019, DNR issued $245.5 million in aggregate principal amount of Convertible Notes under an indenture dated as of June 19, 2019 (the "Convertible Notes Indenture"), by and among DNR, as issuer, and Wilmington Trust, National Association, as trustee and collateral trustee.  The Convertible Notes bear interest at a rate of 6.375% per year, payable semi-annually in arrears on June 30 and December 30 of each year, and mature on December 31, 2024.  As of the date of this Disclosure Statement, there is approximately $225.7 million in principal and $8.4 million in accrued interest outstanding under the Convertible Notes.  The Convertible Notes are convertible into shares of DNR's common stock at any time, at the option of the Holders, at a rate of 370 shares of common stock per $1,000 principal amount of the Convertible Notes, which is the equivalent of approximately 83.5 million shares.  The Convertible Notes will automatically convert to shares of common stock if the trading price equals or exceeds $2.43 per share for 10 trading days in any period of 15 consecutive days, subject to certain other conditions.

The Convertible Notes are guaranteed jointly and severally by each of the Debtors (other than DNR).

### 7.    The Senior Subordinated Notes

Each of the indentures governing the 6.375% Notes, the 5.50% Notes and the 4.625% Notes (collectively, the "Senior Subordinated Notes") contains a provision that prevents Denbury from making any principal or interest payment on the Senior Subordinated Notes if any senior indebtedness of Denbury is not paid when due.  If a payment is made to the Holders of the Senior Subordinated Notes that should not have been made to them pursuant to the indentures governing the Senior Subordinated Notes, the Holders who receive such payment must hold it in trust for the Holders of senior indebtedness of Denbury and pay over such payment to such Holders of senior indebtedness as their interests may appear.

#### (a)    The 6.375% Notes

In February 2011, DNR issued $400 million in aggregate principal amount of the 6.375% Notes under an indenture dated as of February 17, 2011 (the "6.375% Notes Indenture"), by and among DNR, as issuer, and Wilmington Trust, National Association, as trustee.  Pursuant to the 6.375% Notes Indenture, the 6.375% Notes were issued at par, bear interest at a rate of 6.375% per year, payable semi-annually on February 15 and August 15 of each year, and mature on August 15, 2021.  As of the date of this Disclosure Statement, there is approximately $51.3 million in principal and $1.5 million in accrued interest outstanding under the 6.375% Notes.

The 6.375% Notes are guaranteed jointly and severally on a senior subordinated basis by each of the Debtors (other than DNR).

#### (b)    The 5.50% Notes

In April 2014, DNR issued $1.25 billion in aggregate principal amount of the 5.50% Notes under an indenture dated as of April 30, 2014 (the "5.50% Notes Indenture"), by and among DNR, as issuer, and Wilmington Trust, National Association, as trustee.  Pursuant to the 5.50% Notes Indenture, the 5.50% Notes were issued at par, bear interest at a rate of 5.50% per year, payable semi-annually on May 1 and November 1 of each year, and mature on May 1, 2022.  As of the date of this Disclosure Statement, there is approximately $58.4 million in principal and $0.8 million in accrued interest outstanding under the 5.50% Notes.

The 5.50% Notes are guaranteed jointly and severally on a senior subordinated basis by each of the Debtors (other than DNR).

#### (c)    The 4.625% Notes

In February 2013, DNR issued $1.2 billion in aggregate principal amount of the 4.625% Notes (together with the 6.375% Notes and the 5.50% Notes, the "Subordinated Notes") under an indenture dated as of February 5, 2013 (the "4.625% Notes Indenture"), by and among Denbury, as issuer, and Wilmington Trust, National Association, as trustee.  Pursuant to the 4.625% Notes Indenture, the 4.625% Notes were issued at par, bear interest at a rate of 4.625% per year, payable semi-annually on January 15 and July 15 of each year, and mature on July 15, 2023.  As of the date of this Disclosure Statement, there is approximately $136.0 million in principal and $3.4 million in accrued interest outstanding under the 4.625% Notes.

The 4.625% Notes are guaranteed jointly and severally on a senior subordinated basis by each of the Debtors (other than DNR).

### 8.    Existing Equity Interests

DNR's certificate of incorporation authorizes two classes of stock:  common stock and preferred stock.  As of June 30, 2020, DNR had approximately 507,725,516 shares of common stock outstanding and no shares of preferred stock outstanding.  DNR has not paid a stock dividend since the fourth quarter of 2015.  In addition, the RBL Facility, Second Lien Notes, Convertible Notes, and Subordinated Notes all include in their agreements and indentures that certain financial covenants must be satisfied at the time dividend payments are made.

On March 5, 2020, the NYSE issued DNR a formal notice that its stock price had fallen below $1.00 per share over a period of 30 consecutive trading days, which is the minimum average share price for continued listing on the NYSE.  DNR initially had six months to regain compliance with the minimum share price requirement, but due to recent market turmoil the NYSE filed a rule change, effective April 20, 2020, tolling the compliance periods for price-based listing requirements through June 30, 2020, which extended DNR's compliance period by approximately two months.  To regain compliance with the minimum share price requirement, DNR's common stock share price must be at least $1.00 on the last trading day of any month during the cure period and have an average stock price of at least $1.00 over the previous 30 trading-day period.  As of the date of this Disclosure Statement, DNR's stock had a closing price of $0.23 per share.  DNR's stock has continued to trade on the NYSE during the cure period.

## VI.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    Prolonged Market Decline and Industry-Specific Challenges

The market difficulties faced by the Debtors are consistent with those faced industry-wide.  Oil and natural gas companies and others have been challenged by volatile commodity prices for years.  During the past nine years, the NYMEX WTI oil price has ranged from a high of $113.39 per Bbl in April 2011 to a low of **negative** $37.63 per Bbl on April 20, 2020, and traded at $41.14 as of July 24, 2020.  These markets will likely continue to be volatile in the future, especially given the current geopolitical conditions.  Additionally, NYMEX futures curves for both natural gas and crude oil indicate an expectation among traders in the derivatives market that these commodity prices are expected to remain at the current depressed levels over the next several years.



**WTI Crude Oil Closing Prices**

These market conditions have affected oil and gas companies at every level of the industry around the world.  Independent oil and gas companies have been especially hard-hit, however, as their revenues are generated from the sale of unrefined oil and gas.  Since the beginning of 2020, over 23 oil and gas companies have filed for chapter 11 protection.  Numerous other oil and gas companies have defaulted on their debt obligations, negotiated amendments or covenant relief with their creditors to avoid defaulting, or have effectuated out-of-court restructurings.

In early 2015, to address the effects of both the developing industry downturn as well as its over-levered capital structure, the Debtors began evaluating and subsequently implementing a liquidity protection and liability management strategy that focused on, among other things, adapting to the prolonged low-price commodity environment.  The Debtors thereafter pursued transactions to extend their liquidity runway by increasing short and long-term cash flows and reducing expenditures, as further detailed below.  Additionally, the Debtors have reduced headcount by approximately 837 employees since the end of 2014 through a combination of workforce reductions and a voluntary separation program.

Over the past two years, through initiatives by the management team, the Debtors have closely scrutinized their operating performance and made extensive changes to the organization and operating procedures to improve production results and drilling efficiency.  Following the precipitous drop in commodity prices in March 2020, the Debtors reduced their budgeted 2020 capital spending by 44%, deferred certain development projects, implemented changes in their workforce to better align with current and projected needs, and restructured certain hedge contracts to further increase downside protection.

## B.    Capital Structure Rationalization Efforts

Like many of its peers, the Debtors are over-levered. The Debtors have been hampered by significant adverse macroeconomic trends—principally lower commodity prices.

Beginning in 2016, the Debtors completed a number of deleveraging transactions to manage their liabilities in a sustained low oil price environment, including executing eight exchange transactions, issuing $450 million of new notes to facilitate an RBL extension, and conducting numerous open-market repurchase transactions to reduce leverage and extend runway. As a result of these efforts, the Debtors ultimately reduced their leverage ratio from 9.0x at June 30, 2017 to 3.7x at the close of 2019—by the end of 2019 the Debtors had eliminated approximately $1.3 billion of funded debt since December 31, 2014. The Debtors' significant liability management transactions are set forth in the graphic below. Over 2018 and 2019 alone, the Debtors completed eight significant deleveraging transactions, and as a result, the Debtors closed 2019 with no borrowings under the RBL Facility.



In addition to the liability management transactions set forth above, over the last couple years the the Debtors have divested of certain assets. In July 2019, the Debtors sold the Citronelle Field for approximately $10 million, and in March 2020, completed a transaction to sell nearly half of their 100% working positions in four southeast Texas oil fields for $40 million net cash and a carried interest in ten wells to be drilled by the purchaser. Also, through the end of 2019 the Company had sold $20 million in surface acreage and currently has $32 million of additional surface acreage parcels under contract for sale.

The Debtors intended to continue these liability management and liquidity enhancement efforts through 2020 to further right-size their capital structure. Indeed, in late 2019 and early 2020, the Company and its legal and financial advisors were evaluating several potential opportunities to address the Company's balance sheet out of court. However, the confluence of a worldwide reduction in oil demand due to the global COVID-19 pandemic and the price war among Russia, the Kingdom of Saudi Arabia, and other OPEC countries caused oil prices to plummet, significantly constraining liquidity for all independent oil and gas companies, including Denbury, and swiftly evaporating potential out-of-court solutions. On July 15, 2020, an alliance of certain OPEC nations led by Saudi Arabia agreed to increase oil production starting in August, citing theoretically increased demand due to the relaxing of COVID-19 restrictions. OPEC itself said it expected that the world's demand for oil would increase by 7 million barrels a day next year, after a forecasted 8.9 million-barrel-a-day decline in 2020. However, regardless of slight increased demand in the coming months, additional supply is likely to constrain price increases.

Despite the Debtors' proactive efforts, leverage remains elevated and the Debtors face a substantial maturity wall in 2021, with the need to address approximately $636 million in maturities for certain second lien notes and senior subordinated notes. The yields on the Company's notes suggests that a regular-way refinancing is unlikely without major improvements in oil prices. If current market conditions persist, the Debtors will not be able to continue to service their $165 million in aggregate interest payments due annually under the Company's notes. Consequently, a substantial balance sheet deleveraging is necessary to allow the Debtors to withstand the current low commodity price environment and to continue to maximize the value of their oil and gas properties. In March 2020, recognizing the need for a long-term solution, the Debtors directed their advisors, Kirkland & Ellis LLP and Evercore Group L.L.C. to explore strategic alternatives that included a comprehensive restructuring, and in May 2020 retained Alvarez & Marsal North America, LLC as restructuring advisor.

### C.      Efforts to Preserve Shareholder Value

Over the past several years, and as further detailed herein, the Debtors sought to avoid a bankruptcy filing and maximize value for their stakeholders.  The board of directors of the Debtors, 7 out of 8 of whom are independent, including the Chairman of the Board, evaluated and considered a variety of alternatives during this period to preserve value for its shareholders and sought the advice and counsel of advisors regarding such alternatives.  Despite these efforts, the Debtors could not avoid an in-court restructuring. The Restructuring Support Agreement represents the Debtors' best path forward at this time and provides for a recovery to stakeholders that the market has indicated likely is greater than their entitlement.  To avoid harm to the Debtors' business or losing the value inherent in the Restructuring Support Agreement, the time for the Debtors to move forward is now.

### D.      The Restructuring Support Agreement and Committed Exit Facility

Beginning in March 2020, the Debtors began to evaluate strategic alternatives that would comprehensively address the Company's balance sheet and strongly position Denbury to weather the new industry landscape.  The Company also began to engage with the newly formed Second Lien Ad Hoc Committee on the general contours of a potential transaction.  In May 2020, the Debtors and the Second Lien Ad Hoc Committee began to exchange term sheets and, as those negotiations progressed, the Debtors concurrently commenced discussions with the RBL Agent and RBL Lenders regarding financing for any in-court process and emergence.  To facilitate negotiations with the Second Lien Ad Hoc Committee, the Debtors, with the support of the RBL Agent and RBL Lenders, determined to make a $26.3 million coupon payment on the 9.00% second lien notes due 2021 on May 15, 2020.  The coupon payment provided the Debtors with additional runway to continue negotiations regarding a value maximizing transaction.

The Debtors engaged in robust, arm's-length negotiations with the Second Lien Ad Hoc Committee and, later, the Convertible Ad Hoc Group, the RBL Agent and certain RBL Lenders regarding the terms of a potential comprehensive restructuring that focused on fully equitizing the Company's bond debt pursuant to a prepackaged chapter 11 plan of reorganization and rolling certain of the existing indebtedness under the RBL Facility to the DIP Facility and ultimately to the Exit Facility upon emergence.  Those efforts culminated with the execution of a Restructuring Support Agreement on July 28, 2020.  The Restructuring Support Agreement and the Plan reflect a number of valuable concessions by both the Second Lien Noteholders and the Convertible Noteholders and contemplate the use of cash collateral and the proceeds of the DIP Facility and the Exit Facility to facilitate the Debtors' restructuring.  As consideration for the Second Lien Ad Hoc Committee's entry into the Restructuring Support Agreement and the compromises therein, the Debtors will pay in cash prior to the Petition Date accrued and unpaid interest under the Second Lien Notes up to $8,000,000 in the aggregate, as set forth in the Restructuring Support Agreement.  Given the Debtors' highly leveraged capital structure, which limits the Company's ability to access capital, the Debtors determined that the restructuring embodied in the Plan is the most viable path forward.  Moreover, the Restructuring Support Agreement and Plan will allow the Debtors to swiftly emerge from chapter 11 with an approximately 90% delevered capital structure that will enable necessary capital investment.

## VII.   RISK FACTORS

Holders of Claims or Interests should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

A.      **Bankruptcy Law Considerations**

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims or Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims or Interests in such Impaired Classes.

1.      **There Is a Risk of Termination of the Restructuring Support Agreement**

To the extent that events giving rise to termination of the Restructuring Support Agreement occur, the Restructuring Support Agreement may terminate prior to the Confirmation or Consummation of the Plan, which could result in the loss of support for the Plan by important creditor constituencies and could result in the loss of use of cash collateral by the Debtors under certain circumstances.  Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan.

2.      **Parties in Interest May Object to the Plan's Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

3.      **The Bankruptcy Court May Find the Solicitation of Acceptances Inadequate**

Usually, votes to accept or reject a plan of reorganization are solicited after the filing of a petition commencing a chapter 11 case.  Nevertheless, a debtor may solicit votes prior to the commencement of a chapter 11 case in accordance with sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b).  Sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) require that:

- solicitation comply with applicable nonbankruptcy law;

- the plan of reorganization be transmitted to substantially all creditors and other interest Holders entitled to vote; and

- the time prescribed for voting is not unreasonably short.

In addition, Bankruptcy Rule 3018(b) provides that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the court finds after notice and a hearing that the plan was not transmitted in accordance with reasonable solicitation procedures.  Section 1126(b) of the Bankruptcy Code provides that a holder of a claim or interest that has accepted or rejected a plan before the commencement of a case under the Bankruptcy Code is deemed to have accepted or rejected the plan if (i) the solicitation of such acceptance or rejection was in compliance with applicable nonbankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation or (ii) there is no such law, rule, or regulation, and such acceptance or rejection was solicited after disclosure to such holder of adequate information (as defined by section 1125(a) of the Bankruptcy Code).  While the Debtors believe that the

requirements of sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) will be met, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 4.        The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Allowed Claims or Interests as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

### 5.        The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement (including the requirement that the Plan be in form and substance acceptable to the Required Consenting Creditors), reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 6.        Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the

Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 7. Continued Risk Upon Confirmation

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for oil and natural gas (and thus demand for the services the Debtors provide), and increasing expenses. *See* Article VII.C of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Businesses," which begins on page 43. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

### 8. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, when commodities prices are at historically low levels, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 9. The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be

relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

> **10.     Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan**

The distributions available to Holders of Allowed Claims or Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims or Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

> **11.     Releases, Injunctions, and Exculpations Provisions May Not Be Approved**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties is necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions, including by agreeing to massive reductions in the amounts of their claims against the Debtors' estates and facilitating a critical source of post-emergence liquidity, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the Restructuring Support Agreement and Plan and the significant deleveraging and financial benefits that they embody.

> **12.     The Debtors Cannot Predict the Amount of Time Spent in Bankruptcy for the Purpose of Implementing the Plan, and a Lengthy Bankruptcy Proceeding Could Disrupt the Debtors' Businesses, as Well as Impair the Prospect for Reorganization on the Terms Contained in the Plan**

The Debtors estimate that the process of obtaining Confirmation and Consummation of the Plan by the Bankruptcy Court could last approximately 50 days from the Petition Date, but it could last considerably longer if, for example, Confirmation is contested or the conditions to Confirmation or Consummation are not satisfied or waived.

Although the Plan is designed to minimize the length of the bankruptcy proceedings, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the

Debtors cannot be certain that the Plan will be confirmed. Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Plan could itself have an adverse effect on the Debtors' businesses. There is a risk, due to uncertainty about the Debtors' futures that, among other things:

- employees could be distracted from performance of their duties or more easily attracted to other career opportunities; and

- suppliers, vendors, or other business partners could terminate their relationship with the Debtors or demand financial assurances or enhanced performance, any of which could impair the Debtors' prospects.

A lengthy bankruptcy proceeding also would involve additional expenses and divert the attention of management from the operation of the Debtors' businesses.

The disruption that the bankruptcy process would have on the Debtors' businesses could increase with the length of time it takes to complete the Chapter 11 Cases. If the Debtors are unable to obtain Confirmation of the Plan on a timely basis, because of a challenge to the Plan or otherwise, the Debtors may be forced to operate in bankruptcy for an extended period of time while they try to develop a different plan of reorganization that can be confirmed. A protracted bankruptcy case could increase both the probability and the magnitude of the adverse effects described above.

### 13.    Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur. As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Effective Date will not take place.

### B.    Risks Related to Recoveries under the Plan

#### 1.    The Reorganized Debtors May Not Be Able to Achieve Their Projected Financial Results

The Reorganized Debtors may not be able to achieve their projected financial results. The Financial Projections (as defined herein) set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular. While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. If the Debtors do not achieve their projected financial results, the value of the New DNR Equity may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

### 2. A Liquid Trading Market for the Shares of New DNR Equity or Warrants (as Applicable) May Not Develop

Although the Debtors and the Reorganized Debtors may apply to relist the New DNR Equity on a national securities exchange on or as soon as reasonably practicable after the Effective Date, the Debtors make no assurance that they will be able to obtain this listing or, even if the Debtors do, that liquid trading markets for shares of New DNR Equity will develop. The liquidity of any market for shares of New DNR Equity or the Warrants (as applicable) will depend upon, among other things, the number of Holders of shares of New DNR Equity, Reorganized Denbury's financial performance, and the market for similar securities, none of which can be determined or predicted. Accordingly, there can be no assurance that an active trading market for the New DNR Equity or Warrants (as applicable) will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded. In the event an active trading market does not develop, the ability to transfer or sell New DNR Equity or Warrants (as applicable) may be substantially limited.

### 3. The Trading Price for the Shares of New DNR Equity or the Warrants May Be Depressed Following the Effective Date

Assuming that the Effective Date occurs, shares of New DNR Equity and Warrants (as applicable) will be issued to Holders of certain Classes of Claims (as applicable). Following the Effective Date of the Plan, shares of New DNR Equity and Warrants (as applicable) may be sold to satisfy withholding tax requirements, to the extent necessary to fund such requirements. In addition, Holders of Claims or Interests (as applicable) that receive shares of New DNR Equity or Warrants (as applicable) may seek to sell such securities in an effort to obtain liquidity. These sales and the volume of New DNR Equity available for trading could cause the trading price for the shares of New DNR Equity or the Warrants (as applicable) to be depressed, particularly in the absence of an established trading market for the New DNR Equity or the Warrants (as applicable).

### 4. If the Warrants Are Exercised, the Underlying Shares of New DNR Equity Will Be Eligible for Future Resale in the Public Market, Which Could Lead to "Market Overhang," Resulting in Dilution and Potentially Depressing the Trading Price of the New DNR Equity

If the Warrants are exercised, a substantial number of additional shares of New DNR Equity could be eligible for resale in the public market, which could depress the trading price of the New DNR Equity.

The Reorganized Debtors also may grant options and equity awards pursuant to the Management Incentive Plan and may grant additional options, warrants, or other convertible securities in the future. The exercise or conversion of the Warrants (as applicable) or other options or convertible securities will dilute the percentage ownership of other Holders of the New DNR Equity. If Holders of the New DNR Equity sell substantial amounts of New DNR Equity, shares issued upon the exercise of the Warrants (as applicable), or other outstanding options or convertible securities in the public market, it could create a circumstance commonly referred to as an "overhang" and, in anticipation of which, the trading price of the New DNR Equity could fall. An overhang may adversely affect the Reorganized Debtors' ability to obtain financing on reasonable and acceptable terms whether or not sales have occurred or are occurring.

### 5. Certain Holders of New DNR Equity or Warrants May Be Restricted in Their Ability to Transfer or Sell Their Securities

To the extent that shares of the New DNR Equity or Warrants (as applicable) issued under the Plan are covered by section 1145(a)(1) of the Bankruptcy Code, such securities may be resold by the holders

thereof without registration under the Securities Act unless the holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities.  Resales by Holders of Claims or Interests (as applicable) who receive New DNR Equity or Warrants (as applicable) pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law.  Such holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

The New DNR Equity and the Warrants (as applicable) may not initially be registered under the Securities Act or any state securities laws, and the Debtors make no representation regarding the right of any Holder of New DNR Equity or Warrants (as applicable) to freely resell the New DNR Equity (including, as applicable, shares issuable upon exercise of the Warrants) or the Warrants (as applicable).  *See* Article X to this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 54.

6. **Restricted Securities Issued under the Plan May Not Be Resold or Otherwise Transferred Unless They Are Registered Under the Securities Act or an Exemption from Registration Applies**

To the extent that securities issued pursuant to the Plan are not covered by section 1145(a)(1) of the Bankruptcy Code, such securities shall be issued pursuant to section 4(a)(2) under the Securities Act and will be deemed "restricted securities" that may not be sold, exchanged, assigned, or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act. Holders of such restricted securities may not be entitled to have their restricted securities registered and will be required to agree not to resell them except in accordance with an available exemption from registration under the Securities Act.  Under Rule 144 of the Securities Act, the public resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144.  A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period unless certain current public information regarding the issuer is not available at the time of sale, in which case the non-affiliate may resell after a one-year holding period.  An affiliate may resell restricted securities after a six-month holding period but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale, and notice requirements of Rule 144.  While the Debtors currently expect that the current public information requirement will be met when the six-month holding period expires, they cannot guarantee that resales of the restricted securities will qualify for an exemption from registration under Rule 144.  In any event, holders of restricted securities should expect to be required to hold their restricted securities for at least six months.

Holders of New DNR Equity or Warrants (as applicable) who are deemed to be "underwriters" under Section 1145(b) of the Bankruptcy Code will also be subject to restrictions under the Securities Act on their ability to resell those securities.  Resale restrictions are discussed in more detail in Article X to this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 54.

7. **Certain Significant Holders of Shares of New DNR Equity May Have Substantial Influence Over the Reorganized Debtors Following the Effective Date**

Assuming that the Effective Date occurs, Holders of Claims or Interests (as applicable) who receive distributions representing a substantial percentage of the outstanding shares of the New DNR Equity (including, as applicable, shares issued upon exercise of the Warrants) may be in a position to influence matters requiring approval by the Holders of shares of New DNR Equity, including, among other things,

the election of directors and the approval of a change of control of the Reorganized Debtors. The Holders may have interests that differ from those of the other Holders of shares of New DNR Equity and may vote in a manner adverse to the interests of other Holders of shares of New DNR Equity. This concentration of ownership may facilitate or may delay, prevent, or deter a change of control of the Reorganized Debtors and consequently impact the value of the shares of New DNR Equity or the Warrants (as applicable). In addition, a Holder of a significant number of shares of New DNR Equity may sell all or a large portion of its shares of New DNR Equity within a short period of time, which sale may adversely affect the trading price of the shares of New DNR Equity or the Warrants (as applicable). A Holder of a significant number of shares of New DNR Equity may, on its own account, pursue acquisition opportunities that may be complementary to the Reorganized Debtors' businesses, and as a result, such acquisition opportunities may be unavailable to the Reorganized Debtors. Such actions by Holders of a significant number of shares of New DNR Equity may have a material adverse impact on the Reorganized Debtors' businesses, financial condition, and operating results.

### 8. Certain Tax Implications of the Plan

Holders of Allowed Claims should carefully review Article XI of this Disclosure Statement entitled "Certain U.S. Federal Tax Consequences of the Plan" which begins on page 56, to determine how the tax implications of the Plan and the Chapter 11 Cases may affect the Debtors, the Reorganized Debtors, and Holders of Claims or Interests, as well as certain tax implications of owning and disposing of the consideration to be received pursuant to the Plan.

### 9. The Debtors May Not Be Able to Accurately Report Their Financial Results

The Debtors have established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under SEC rules and regulations and the terms of the agreements governing the Debtors' indebtedness. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

### C. Risks Related to the Debtors' and the Reorganized Debtors' Businesses

### 1. The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest and/or fees on their indebtedness, including, without limitation, anticipated borrowings under the Exit Facility upon emergence.

2. **The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases**

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

3. **Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses**

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors may be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases. If the chapter 11 proceedings last longer than anticipated, the Debtors will require debtor-in-possession financing to fund the Debtors' operations. If the Debtors are unable obtain such financing in those circumstances, the chances of successfully reorganizing the Debtors' businesses may be seriously jeopardized, the likelihood that the Debtors will instead be required to liquidate or sell their assets may be increased, and, as a result, creditor recoveries may be significantly impaired.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible

43

reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 4. Financial Results May Be Volatile and May Not Reflect Historical Trends

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, and/or claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("<u>Reorganizations</u>") in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends. The Financial Projections contained in **Exhibit E** hereto do not currently reflect the impact of fresh start accounting, which may have a material impact on the Financial Projections.

### 5. The Debtors' Substantial Liquidity Needs May Impact Revenue

The Debtors operate in a capital-intensive industry. The Debtors' principal sources of liquidity historically have been cash flow from operations, availability of borrowing capacity under the RBL Facility, asset sale proceeds associated with sales of surface land with no active oil and gas operations and minor producing asset sales. If the Debtors' cash flow from operations remains depressed or decreases as a result of lower commodity prices or otherwise, the Debtors' ability to expend the capital necessary to replace proved reserves, maintain leasehold acreage, or maintain current production may be limited, resulting in decreased production and proved reserves over time.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources and have extremely limited, if any, access to additional financing. In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases. The Debtors cannot guarantee that cash on hand and cash flow from operations will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) their ability to comply with the terms and condition of any debtor-in-possession financing and/or cash collateral order entered by the Bankruptcy Court in connection with the Chapter 11 Cases; (b) their ability to maintain adequate cash on hand; (c) their ability to generate cash flow from operations; (d) their ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; and (e) the cost, duration, and outcome of the Chapter 11 Cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control. In the event that cash on hand and cash flow from operations are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing. The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms. The Debtors'

access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all.  The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

6.     **Oil and Natural Gas Prices Are Volatile, and Continued Low Oil or Natural Gas Prices Could Materially Adversely Affect the Debtors' Businesses, Results of Operations, and Financial Condition**

The Debtors' revenues, profitability, and the value of the Debtors' properties substantially depend on prevailing oil and natural gas prices.  In short, the Debtors face a high level of exposure to oil and natural gas price swings.  Oil and natural gas are commodities, and therefore, their prices are subject to wide fluctuations in response to changes in supply and demand and are subject to both short- and long-term cyclical trends.  Oil and natural gas prices historically have been volatile and are likely to continue to be volatile in the future, especially given current economic and geopolitical conditions.  Over the last several years, oil prices have ranged from $26 per Bbl in early 2016 to a high of $76 per Bbl in October 2018 before plummeting into negative territory for the first time in history in April 2020.  This historic price collapse resulted from the convergence of the global COVID-19 pandemic and the failure of OPEC to reach an agreement over proposed oil production cuts.  The Debtors expect such volatility to continue in the future. The prices for oil and natural gas are subject to a variety of factors beyond the Debtors' control, such as:

- the current uncertainty in the global economy;

- changes in global supply and demand for oil and natural gas;

- the condition of the United States and global economies;

- the actions of certain foreign countries;

- the price and quantity of imports of foreign oil and natural gas;

- political conditions, including embargoes, war or civil unrest in or affecting other oil producing activities of certain countries;

- the macroeconomic effects from the continuing COVID-19 pandemic;

- the level of global oil and natural gas exploration and production activity;

- the level of global oil and natural gas inventories;

- production or pricing decisions made by OPEC;

- weather conditions;

- technological advances affecting energy consumption; and

- the price and availability of alternative fuels.

Oil and natural gas prices affect the amount of cash flow available to the Debtors to meet their financial commitments and fund capital expenditures.  Oil and natural gas prices also impact the Debtors' ability to borrow money and raise additional capital.  For example, the amount the Debtors will be able to borrow under the Exit Facility will be subject to periodic borrowing base redeterminations based, in part, on then-current oil and natural gas prices and on changing expectations of future prices.  Lower oil and natural gas prices may not only decrease the Debtors' revenues on a per-unit basis, but also may reduce the

45

amount of oil and natural gas that the Debtors can produce economically in the future. Higher operating costs associated with any of the Debtors' oil or natural gas fields will make their profitability more sensitive to oil or natural gas, price declines. A sustained decline in oil and natural gas prices may materially and adversely affect the Debtors' future business, financial condition, results of operations, liquidity, or ability to finance planned capital expenditures. In addition, a sustained decline in oil or natural gas prices might result in substantial downward estimates of the Debtors' proved reserves. As a result, if there is a further decline or sustained depression in commodity prices, the Debtors may, among other things, be unable to maintain or increase their borrowing capacity, meet their debt obligations or other financial commitments, or obtain additional capital, all of which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

7.    **The Debtors' Business is Subject to Complex Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business**

The Debtors' oil and natural gas operations are subject to various federal, state and local governmental regulations, including environmental laws and regulations that impose penalties and other sanctions for noncompliance and that require measures to remediate or mitigate pollution and environmental impacts from current and former operations. Significant expenditures may be required to comply with these laws and regulations. The Debtors could be liable for costs of investigation, removal and remediation, damages to and loss of use of natural resources, loss of profits or impairment of earning capacity, property damages, costs of increased public services, as well as administrative, civil and criminal fines and penalties, and injunctive relief. Certain environmental statutes impose strict, joint and several liability for costs required to investigate, clean up and restore sites where hazardous substances or other waste products have been disposed of or otherwise released (i.e., liability may be imposed regardless of whether the current owner or operator was responsible for the release or contamination or whether the operations were in compliance with all applicable laws at the time the release or contamination occurred). In general, oil and natural gas operations (including hydraulic fracturing operations) recently have been the subject of increased legislative and regulatory attention with respect to public health and environmental matters, which could result in increased costs for environmental compliance, such as emissions control, permitting, or waste handling, storage, transport, remediation or disposal for the oil and natural gas industry and could have a significant impact on the Debtors' operating costs..

8.    **The Debtors' Operations are Subject to Hazards Inherent in the Energy Industry**

Risks inherent in the oil and natural gas industry, such as equipment defects, vehicle accidents, explosions, and uncontrollable flows of gas or well fluids, can cause personal injury, loss of life, suspension of operations, damage to formations, damage to facilities, business interruption, and damage to, or destruction of property, equipment, and the environment. In addition, the Debtors' hydraulic fracturing and well completion services could become a source of spills or releases of fluids, including chemicals used during hydraulic fracturing activities, at the site where such services are performed, or could result in the discharge of such fluids into underground formations that were not targeted for fracturing or well completion activities. These risks could expose the Debtors to substantial liability for personal injury, wrongful death, property damage, loss of oil and natural gas production, pollution, and other environmental damages and could result in a variety of claims, losses, regulatory enforcement actions and remedial obligations that could have an adverse effect on the Debtors' business and results of operations. The existence, frequency, and severity of such incidents will affect operating costs, insurability, and relationships with customers, employees, and regulators. In particular, the Debtors' customers may elect not to purchase Denbury's services if they view its safety record as unacceptable, which could cause us to lose customers and substantial revenue.

9.      **The Debtors Operate in a Highly Competitive Industry with Significant Potential for Excess Capacity**

The oil and natural gas industry in which the Debtors operate is highly competitive. The Debtors compete with numerous entities, including major domestic and foreign oil companies, other independent oil and natural gas concerns, and individual producers and operators. Many of these competitors are large, well-established companies and have financial and other resources substantially greater than the Debtors. As a result, the Debtors' competitors may be able to pay more for productive oil and natural gas properties and exploratory prospects, as well as evaluate, bid for and purchase a greater number of properties and prospects than the Debtors' financial or personnel resources permit. The Debtors ability to acquire additional properties and to find and develop reserves will depend on the Debtors' ability to evaluate and select suitable properties and to consummate transactions in a highly competitive environment.

Competitive pressures and other factors may result in significant price competition, particularly during industry downturns, which could have a material adverse effect on the Company's results of operations and financial condition.

10.     **The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases**

In the future, the Reorganized Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

11.     **The Loss of Key Personnel Could Adversely Affect the Debtors' Operations**

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly-skilled employee base. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition. Because competition for experienced personnel in the oil and natural gas industry can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or field levels could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

12.     **Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations**

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

## VIII.   SOLICITATION AND VOTING

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.

### A.   Holders of Claims or Interests Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan.  The table in Article III.D of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?," which begins on page 6, provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims or Interests in Classes 5, 6, 7, and 11 (collectively, the "Voting Classes").  The Holders of Claims or Interests in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims or Interests in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are ***not*** soliciting votes from Holders of Claims or Interests in Classes 1, 2, 3, 4, 8, 9, and 10.

### B.   Voting Record Date

**The Voting Record Date is July 22, 2020** (the "Voting Record Date").  The Voting Record Date is the date on which it will be determined which Holders of Claims or Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

### C.   Voting on the Plan

**The Voting Deadline is August 28, 2020, at 4:00 p.m. (prevailing Central Time)**.  In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered as directed, so that your ballot or the master ballot containing your vote is **actually received** by the Solicitation Agent on or before the Voting Deadline.  Ballots or master ballots returned by facsimile will not be counted.

### 1.   Holders of Claims in Class 5, Class 6, Class 7, and Beneficial Holders of Existing Equity Interests in Class 11

A majority of the voting parties hold their Claims or Interests in "street name" through a nominee, including Holders of Second Lien Notes Claims, Convertible Notes Claims, and Subordinated Notes Claims, and beneficial Holders of Interests in Class 11.  Such Holders may vote on the Plan by one of the following two methods (as selected by such Holder's nominee):

- Complete and sign the enclosed beneficial holder ballot.  Return the beneficial holder ballot to your nominee as promptly as possible and in sufficient time to allow such nominee to process your instructions and return a completed master ballot to the

Solicitation Agent by the Voting Deadline. If no self-addressed, postage-paid envelope was enclosed for this purpose, contact the Solicitation Agent for instructions; or

- Complete and sign the pre-validated beneficial holder ballot (as described below) provided to you by your nominee. Return the pre-validated beneficial holder ballot to the Solicitation Agent by the Voting Deadline using the return envelope provided in the Solicitation Package.

Any beneficial holder ballot returned to a nominee will not be counted for purposes of acceptance or rejection of the Plan until such nominee properly completes and delivers to the Solicitation Agent that beneficial holder ballot (properly validated) or a master ballot casting the vote of such holder.

If any Holder holds Second Lien Notes Claims, Convertible Notes Claims, Subordinated Notes Claims, or Existing Equity Interests through more than one nominee, such Holder may receive multiple mailings containing beneficial holder ballots. The Holder should execute a separate beneficial holder ballot for each block of Second Lien Notes Claims, Convertible Notes Claims, Subordinated Notes Claims, or Existing Equity Interests that it holds through any particular nominee and return each beneficial holder ballot to the respective nominee in the return envelope provided therewith. Holders who execute multiple beneficial holder ballots with respect to Second Lien Notes Claims, Convertible Notes Claims, or Subordinated Notes Claims held through more than one nominee must indicate on each beneficial holder ballot the names of all such other nominees and the additional amounts of such Second Lien Notes Claims, Convertible Notes Claims or Subordinated Notes Claims so held and voted.

A nominee that, on the Voting Record Date, is the record Holder of the Second Lien Notes Claims, Convertible Notes Claims, Subordinated Notes Claims, or Existing Equity Interests for one or more Holders can obtain the votes of the Holders of such Second Lien Notes Claims, Convertible Notes Claims, Subordinated Notes Claims, or Existing Equity Interests consistent with customary practices for obtaining the votes of securities held in "street name," in one of the following two ways:

### (a)   Pre-Validated Ballots

The nominee may "pre-validate" a beneficial holder ballot by: (i) signing the beneficial holder ballot and indicating on the beneficial holder ballot the name of the nominee and DTC Participant Number; (ii) indicating on the beneficial holder ballot the amount and the account number of the Second Lien Notes Claims, Convertible Notes Claims, Subordinated Notes Claims, or Existing Equity Interests held by the nominee for the Holder; and (iii) forwarding such beneficial holder ballot—together with this Disclosure Statement, a pre-addressed, postage-paid return envelope addressed to, and provided by, the Solicitation Agent, and other materials requested to be forwarded—to the Holder for voting. The Holder must then complete the remaining portions of the beneficial holder ballot and return the beneficial holder ballot directly to the Solicitation Agent in the pre-addressed, postage-paid return envelope so that it is **actually received** by the Solicitation Agent on or before the Voting Deadline. A list of the Holders to whom "pre-validated" beneficial holder ballots were delivered should be maintained by nominees for inspection for at least one year from the Voting Deadline.

### (b)   Master Ballots

If the nominee elects not to pre-validate beneficial holder ballots, the nominee may obtain the votes of Holders by forwarding to the Holders the unsigned beneficial holder ballots—together with this Disclosure Statement, a pre-addressed, postage-paid return envelope provided by, and addressed to, the nominee, and other materials requested to be forwarded. Each such Holder must then indicate its vote on the beneficial holder ballot, complete the information requested on the beneficial holder ballot, review the

certifications contained on the beneficial holder ballot, execute the beneficial holder ballot, and return the beneficial holder ballot to the nominee.  After collecting the beneficial holder ballots, the nominee should, in turn, complete a master ballot compiling the votes and other information from the beneficial holder ballots, execute the master ballot, and deliver the master ballot to the Solicitation Agent so that it is **actually received** by the Solicitation Agent on or before the Voting Deadline.  All beneficial holder ballots returned by holders should either be forwarded to the Solicitation Agent (along with the master ballot) or retained by nominees for inspection for at least one year from the Voting Deadline.  EACH NOMINEE SHOULD ADVISE ITS ELIGIBLE HOLDERS TO RETURN THEIR BENEFICIAL HOLDER BALLOTS TO THE NOMINEE BY A DATE CALCULATED BY THE NOMINEE TO ALLOW IT TO PREPARE AND RETURN THE MASTER BALLOT TO THE SOLICITATION AGENT SO THAT IT IS **ACTUALLY RECEIVED** BY THE SOLICITATION AGENT ON OR BEFORE THE VOTING DEADLINE.

      **2.**      **Holders of Interests in Class 11**

If you are a direct Holder of Existing Equity Interests, you must complete, sign, and date your ballot and return it (with an original signature) ***promptly*** in the enclosed reply envelope or to one of the following addresses:

| **If sent by first-class mail** | **If sent by hand delivery or overnight mail:** |
|---|---|
| Denbury Resources Inc.<br>c/o Epiq Corporate Restructuring LLC<br>P.O. Box 4422<br>Beaverton, OR 97076-4422 | Denbury Resources Inc.<br>c/o Epiq Corporate Restructuring LLC<br>10300 SW Allen Blvd.<br>Beaverton, OR 97005 |

> **If you are a direct Holder of Existing Equity Interests and have any questions about the solicitation or voting process, please contact the Solicitation Agent by calling the telephone number included in your Ballot.**

      **D.**      **Ballots Not Counted**

**No ballot will be counted toward Confirmation if, among other things**:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by means other than as specifically set forth in the ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was sent to the Debtors, the Debtors' agents/representatives (other than the Solicitation Agent), the Second Lien Notes Trustee, the Convertible Notes Trustee, the Subordinated Notes Trustee, or the Debtors' financial or legal advisors instead of the Solicitation Agent; (5) it is unsigned; or (6) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to the Scheduling Order to be entered by the Bankruptcy Court for additional requirements with respect to voting to accept or reject the Plan.**

      **ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR THAT IS OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION AND VOTING PROCEDURES PROVIDED IN THIS ARTICLE VIII OF THE DISCLOSURE STATEMENT WILL <u>NOT</u> BE COUNTED.**

IX.    **CONFIRMATION OF THE PLAN**

A.    **Requirements for Confirmation of the Plan**

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

B.    **Best Interests of Creditors/Liquidation Analysis**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting Holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit D** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated pursuant to the provisions of a chapter 11 liquidating plan.  In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7.  Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs.  Any distribution to Holders of Claims or Interests (to the extent Holders of Interests would receive distributions at all) under a chapter 11 liquidation plan would most likely be substantially delayed.  Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their businesses, which is reflected in the New DNR Equity to be distributed under the Plan.  Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

C.    **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of A&M and Evercore, have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared the Financial Projections. Creditors and other interested parties should review Article VII of this Disclosure Statement, entitled "Risk Factors," which begins on page 35, for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit E** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### D.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[8]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims eligible to vote and no holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims in such Class shall be deemed to have accepted the Plan.

### E.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and

---

[8]    A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1. No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2. Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F.    Valuation of the Debtors

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors. Accordingly, the Debtors, with the assistance of Evercore, produced the Valuation Analysis that is set forth in **Exhibit F** attached hereto and incorporated herein by reference. As set forth in the Valuation Analysis, the Debtors' going concern value is substantially less than the aggregate amount of its funded-debt obligations. Accordingly, the Valuation Analysis further supports the Debtors conclusion that the treatment of Classes under the Plan is fair and equitable and otherwise satisfies the Bankruptcy Code's requirements for confirmation.

## X.      CERTAIN SECURITIES LAW MATTERS

The Debtors believe that the New DNR Equity, the Warrants (as applicable), and the options or other equity awards (and any New DNR Equity underlying such awards) to be issued pursuant to the Management Incentive Plan will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any Blue Sky Law.  The Debtors further believe that the offer, sale, issuance, and initial distribution of the New DNR Equity and Warrants (as applicable) by Reorganized DNR pursuant to the Plan is exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and any applicable state Blue Sky Law as described in more detail below.  The New DNR Equity underlying the Management Incentive Plan will be issued pursuant to a registration statement or another available exemption from registration under the Securities Act and other applicable law.

### A.      Issuance of Securities under the Plan

As discussed herein, the Plan provides for the offer, issuance, sale, and distribution by Reorganized DNR of the New DNR Equity, the Warrants, and the shares of New DNR Equity (including any securities issuable upon exercise of the Warrants) underlying the Warrants (as applicable) (collectively, the "1145 Securities").

Section 1145 of the Bankruptcy Code provides that Section 5 of the Securities Act and any state law requirements for the issuance of a security do not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization, (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor, and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange or partly for cash and property.  The Debtors believe that the issuance of the 1145 Securities, in exchange for the Claims and Interests described above satisfy the requirements of section 1145(a) of the Bankruptcy Code.

Accordingly, no registration statement will be filed under the Securities Act or any state securities laws.  Recipients of the New DNR Equity and the Warrants are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state Blue Sky Law.

### B.      Subsequent Transfers

The 1145 Securities may be freely transferred by most recipients following the initial issuance under the Plan, and all resales and subsequent transfers of the 1145 Securities are exempt from registration under the Securities Act and state securities laws, unless the holder is an "underwriter" with respect to such securities.  Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer":  (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates" which are all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of 1145 Securities by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of New DNR Equity or Warrants who are deemed to be "underwriters" may be entitled to resell their New DNR Equity or Warrants pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met. Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New DNR Equity or Warrants would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New DNR Equity and the Warrants and, in turn, whether any Person may freely resell New DNR Equity or the Warrants.

Persons who receive securities under the Plan are urged to consult their own legal advisor with respect to the restrictions applicable under the federal or state securities laws and the circumstances under which securities may be sold in reliance on such laws. The foregoing summary discussion is general in nature and has been included in this Disclosure Statement solely for informational purposes. Denbury makes no representations concerning, and do not provide, any opinions or advice with respect to the Securities or the bankruptcy matters described in this Disclosure Statement. In light of the uncertainty concerning the availability of exemptions from the relevant provisions of federal and state securities laws, we encourage each recipient of securities and party in interest to consider carefully and consult with its own legal advisors with respect to all such matters. Because of the complex, subjective nature of the question of whether a security is exempt from the registration requirements under the federal or state securities laws or whether a particular recipient of securities may be an underwriter, Denbury makes no representation concerning the ability of a person to dispose of the securities issued under the Plan.

## XI.    CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN

### A.    Introduction

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and certain holders of Claims and Interests. This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and

published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law").  Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address non-U.S., state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income tax consequences that may be relevant to a holder in light of such holder's individual circumstances or to a holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, persons subject to the alternative minimum tax or the "Medicare" tax on net investment income, non-U.S. taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, persons who hold Claims or Interests or who will hold the New DNR Equity or Warrants (together, the "New Securities") as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and holders of Claims or Interests who are themselves in bankruptcy).  Further, this summary assumes that each holder holds only Claims or Interests in a single Class and holds each Claim or Interest, and will hold each New Security, only as a "capital asset" (within the meaning of section 1221 of the Tax Code).  This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.  This summary does not discuss differences in tax consequences to holders of Claims or Interests that act or receive consideration in a capacity other than as a holder of Claims or Interests of the same Class or Classes, and the tax consequences for such holders may differ materially from those described below.  This summary does not address the U.S. federal income tax consequences to holders (1) that have Claims that are Unimpaired or otherwise entitled to payment in full under the Plan or (2) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim or Interest that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.  For purposes of this discussion, a "non-U.S. Holder" is any holder of a Claim or Interest that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a holder of a Claim or Interest, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity.  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are holders of Claims or Interests should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE

FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST.  ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.

### B.        Certain U.S. Federal Tax Consequences to the Debtors and the Reorganized Debtors

#### 1.        Characterization of the Restructuring Transactions

As of December 31, 2019, the Debtors had no federal net operating losses ("NOLs") carryforwards, $77.5 million of federal tax credit carryforward, $52.9 million of state NOLs and tax credit carryforward, and approximately $24.5 million of interest expense deductions that have been deferred under Section 163(j) of the Tax Code.[9]  The Debtors expect to generate losses and additional credits in 2020, which will create an NOL and increase other tax attributes.  Any NOLs or other attributes remaining upon implementation of the Plan may be able to offset future taxable income, thereby reducing the Debtors' future aggregate tax obligations.

The Restructuring Transactions are not expected to give rise to any gain or loss to the Debtors (other than as a result of CODI, as described below, and potentially as a result of the satisfaction of certain Claims with collateral securing such Claims).  The Debtors' tax attributes generally will, subject to the rules discussed below regarding CODI and sections 382 and 383 of the Tax Code, survive the restructuring process and potentially be usable by the Reorganized Debtors going forward.

#### 2.        Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor will realize and recognize income from the cancelation of indebtedness ("CODI"), for U.S. federal income tax purposes, upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of CODI, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other new consideration (including equity interests in the debtor) given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a debtor is not required to include CODI in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of CODI that it excluded from gross income pursuant to the rule discussed in the preceding sentence.  Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined.  In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers.  Alternatively, a debtor with CODI may elect first to reduce the basis of its depreciable assets

---

[9]    Certain of the amounts included herein are based on the annual report of Denbury on Form 10-K for the fiscal year ended December 31, 2019.  Such amounts are subject to adjustment as a result of the Coronavirus Aid, Relief, and Economic Security Act signed into law in March 2020, as described on Form 10-Q for the quarter ended March 31, 2020.

pursuant to section 108(b)(5) of the Tax Code. Any excess CODI over the amount of available tax attributes is not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

The Treasury Regulations address the method and order for applying tax attribute reduction to an affiliated group of corporations. Under these Treasury Regulations, the tax attributes of each member of an affiliated group of corporations that is excluding CODI is first subject to reduction. To the extent the debtor member's tax basis in stock of a lower-tier member of the affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of such lower-tier member. If a debtor member's excluded CODI exceeds its tax attributes, the excess CODI is applied to reduce certain remaining consolidated tax attributes of the affiliated group.

As a result of the Restructuring Transactions, the Debtors expect to realize a substantial amount of CODI. The exact amount of any CODI that will be realized by the Debtors will not be determinable until the consummation of the Plan. Because the Plan provides that certain holders of Claims or Interests will receive non-Cash consideration (e.g., New Securities), the amount of CODI, and accordingly the amount of tax attributes required to be reduced, will depend, in part, on the fair market value of the non-Cash consideration received, which cannot be known with certainty at this time.

### 3. Limitation of NOL Carryforwards and Other Tax Attributes

Following the Effective Date, unless the 382(l)(5) Exception (as defined below) applies, the Debtors anticipate that, any NOL carryforwards, credits and certain other tax attributes (such as losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change) of the Reorganized Debtors that are not reduced according to the CODI rules described above and that are allocable to periods before the Effective Date (collectively, "Pre-Change Losses") may be subject to limitation under sections 382 and 383 of the Tax Code as a result of an "ownership change" of the Reorganized Debtors by reason of the transactions consummated pursuant to the Plan.

Under sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation. The rules of sections 382 and 383 of the Tax Code are complicated, but as a general matter, the Debtors anticipate that the distribution of New DNR Equity pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Reorganized Debtors' use of Pre-Change Losses will be subject to limitation unless the 382(l)(5) Exception (as defined below) applies.

For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In this case, the Debtors do not expect to have a substantial net unrealized built-in loss as of the Effective Date. However, any net unrealized built-in loss of the Debtors would be subject to the foregoing rules in the absence of the 382(l)(5) Exception (as discussed below).

### (a) General Section 382 and 383 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the

3-calendar-month period ending with the calendar month in which the "ownership change" occurs, currently 0.89 percent for August 2020).  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

Notwithstanding the rules described above, if post-ownership change, a debtor corporation and its subsidiaries do not continue the debtor corporation's historic business or use a significant portion of its historic business assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero.

### (b)        Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their claims, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception").  Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis, but, instead, NOL carryforwards will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses effectively would be eliminated in their entirety.

If the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule generally will apply (the "382(l)(6) Exception").  Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change and the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo an ownership change within two years without triggering the elimination of its Pre-Change Losses.  The resulting limitation from a subsequent ownership change would be determined under the regular rules for ownership changes.

The Debtors currently believe that the Restructuring Transactions may qualify for the 382(l)(5) Exception, although analysis is still ongoing.  If the Restructuring Transactions are eligible for the 382(l)(5) Exception, the Debtors have not yet decided whether the Debtors would elect out of its application. Regardless of whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of section 382 of the Tax Code were to occur after the Effective Date.

C.    **Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Claims and Interests**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. Holders of Claims and Interests are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

1.    **Exchanges of Claims Under the Plan**

Pursuant to the Plan, (a) each U.S. Holder of an Allowed Second Lien Notes Claim will receive its Pro Rata share of 95% of the New DNR Equity (subject to dilution by the Warrants and the Management Incentive Plan); (b) each holder of an Allowed Convertible Notes Claim will receive its Pro Rata share of (i) 5% of the New DNR Equity (subject to dilution by the Warrants and the Management Incentive Plan), and (ii) the Convertible Notes Warrant Package; and (c) if the Class of Allowed Subordinated Notes Claims accepts the Plan, each Holder of an Allowed Subordinated Notes Claim will receive its Pro Rata share of the Subordinated Notes Warrant Package. The U.S. federal income tax consequences to a U.S. Holder of such exchange will depend, in part, on whether the applicable Claims surrendered constitute "securities" of Denbury for U.S. federal income tax purposes.

Neither the Tax Code nor the Treasury Regulations promulgated thereunder defines the term "security." Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. Although not free from doubt, the Debtors intend to take the position (and, unless otherwise indicated, the remainder of this discussion assumes) that the 9.00% Notes, 7.75% Notes, 7.50% Notes, Convertible Notes, and Subordinated Notes constitute securities for U.S. federal income tax purposes. However, it is unclear whether the 9.25% Notes constitute securities for such purposes. Due to the inherently factual nature of the determination, U.S. Holders are urged to consult their own tax advisors regarding the status of their Claims as "securities."

If a Claim qualifies as a "security" of Denbury, the holder of such Claim should be treated as receiving the New Securities in a recapitalization. Subject to the rules regarding "accrued but untaxed interest" (as discussed in Article XI(C)(4) of this Disclosure Statement, entitled "Accrued Interest on Claims"), a holder of such Claim should not recognize any gain or loss. The holder should obtain a tax basis in the New Securities received, other than such amounts treated as received in satisfaction of accrued but untaxed interest, equal to the tax basis of the Claim surrendered. The tax basis of any New Securities treated as received in satisfaction of accrued but untaxed interest should equal the amount of such accrued but untaxed interest. Subject to amounts treated as received in satisfaction of accrued but untaxed interest, the holding period for the New Securities received should include the holding period for the exchanged Claim. The holding period for any New Securities treated as received in satisfaction of accrued but untaxed interest should begin on the day following the receipt of such property.

If a Claim does not qualify as a "security" of Denbury, the holder of such Claim will be treated as exchanging such Claim for New Securities in a taxable exchange under section 1001 of the Tax Code.

Subject to the rules regarding accrued but untaxed interest, each holder of such Claim should recognize gain or loss equal to the difference between (i) the fair market value of the New Securities received and (ii) such holder's adjusted basis in such Claim. The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the holder, the rules regarding accrued but untaxed interest and market discount, whether the Claim constitutes a capital asset in the hands of the holder, and whether and to what extent the holder had previously claimed a bad debt deduction with respect to its Claim. If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the holder held its Claim for more than one year at the time of the exchange. Subject to the rules regarding accrued but untaxed interest, if applicable, a holder's tax basis in any New Securities received should equal the fair market value of the New Securities as of the date such New Securities are distributed to the holder. A holder's holding period for the New Securities received should begin on the day following the date it receives the New Securities.

### 2.     Exchanges of Existing Equity Interests Under the Plan

Pursuant to the Plan, if both the Class of Allowed Subordinated Notes Claims and the Class of Existing Equity Interests accept the Plan, each U.S. Holder of Existing Equity Interests will receive its Pro Rata share of the Existing Equity Warrant Package. Generally in accordance with the rules described above, the U.S. Holder of such Existing Equity Interests should be treated as receiving Series B Warrants in a recapitalization, and thus, should not recognize any gain or loss. The U.S. Holder should obtain a tax basis in the Series B Warrants received equal to the tax basis of the surrendered Existing Equity Interests. The holding period for the Series B Warrants received should include the holding period for the exchanged Existing Equity Interests.

### 3.     Treatment of Warrants

The Debtors believe, and the entirety of this disclosure assumes, that the Warrants will be properly treated as "warrants" to acquire New DNR Equity for U.S. federal income tax purposes. However, there can be no assurance that the IRS will not assert (and if asserted, that a court will not sustain) the position that the Warrants should instead be treated as an outstanding equity interest in Reorganized DNR. Each U.S. Holder should consult its own tax advisor regarding the proper characterization of the Warrants for U.S. federal income tax purposes and the consequences to it of such treatment given its particular circumstances.

A U.S. Holder that exercises the Warrants for cash should not recognize gain or loss and should take a tax basis in the New DNR Equity equal to its tax basis in the Warrants plus the exercise price. Such a U.S. Holder's holding period in the New DNR Equity should begin on the day following the date of exercise.

Although not free from doubt, a U.S. Holder that engages in a cashless exercise of the Warrants should be treated as receiving New DNR Equity in a recapitalization. Such a U.S. Holder should not recognize any gain or loss upon such exercise. A U.S. Holder's aggregate tax basis in the New DNR Equity received upon exercise should equal such U.S. Holder's tax basis in its Warrants immediately before the Warrants are exercised. Such U.S. Holder's holding period for the New DNR Equity received upon exercise should include its holding period in the Warrants. If the exercise were not treated as a recapitalization, a U.S. Holder's holding period should begin on the day following the date of exercise.

Section 305 of the Tax Code treats certain warrant holders as receiving a constructive distribution of stock (which is taxable to the extent of the issuer's current and accumulated earnings and profits, as determined under U.S. federal income tax principles) in certain situations when such warrant holders increase their proportionate interest in the assets or earnings and profits of the issuer while other

stockholders receive a taxable distribution of property. A change in conversion ratio or any transaction having a similar effect with respect to the Warrants may be treated as a distribution with respect to any U.S. Holder of the Warrants whose proportionate interest in the Company's earnings and profits is increased by such change or transaction. Certain adjustments to the conversion ratio made pursuant to a bona fide reasonable adjustment formula that have the effect of preventing dilution will generally not be considered to result in a deemed distribution.

A U.S. Holder that does not exercise the Warrants and instead allows the Warrants to lapse may be entitled to claim a capital loss upon expiration of the Warrants in an amount equal to the adjusted tax basis of the Warrants, subject to any limitations on such U.S. Holder's ability to utilize capital losses. U.S. Holders are urged to consult with their own tax advisors as to the tax consequences of electing, or not electing, to exercise the Warrants.

### 4. Accrued Interest on Claims

To the extent that any amount received by a U.S. Holder of a Claim is attributable to accrued but untaxed interest on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest previously was included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration is not sufficient to fully satisfy all principal and interest on Claims, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to holders of Claims in each Class will be allocated first to the principal amount of Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the Holder should be allocated in some way other than as provided in the Plan.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

### 5. Market Discount on Claims

Under the "market discount" provisions of the Tax Code, some or all of the gain realized, if any, by a U.S. Holder of a Claim who exchanges the Claim for consideration on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on Claims constituting debt instruments. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim (determined as described above) that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). To the extent that the Claims that were acquired with market discount are exchanged in a tax-free transaction for other property (such as the New Securities), any market discount that accrued on the Claims (i.e., up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefor, and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount, with respect to the exchanged debt instrument.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR CLAIMS.**

### 6. Ownership and Disposition of New DNR Equity

#### (a) Distributions on New DNR Equity

Any distributions (or deemed distributions) made on account of the New DNR Equity will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Denbury as determined under U.S. federal income tax principles. "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates. To the extent that a U.S. Holder receives distributions (or deemed distributions) that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its New DNR Equity. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions (or deemed distributions) treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the "dividend" is paid, all or a portion of the dividends received deduction may be disallowed.

#### (b) Sale, Redemption, or Repurchase of New DNR Equity

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New DNR Equity. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder has held the New DNR Equity for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described below.

### 7. Limitation on use of Capital Losses

A U.S. Holder that recognizes capital losses will be subject to limits on the use of such capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without

regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, capital losses may only be used to offset capital gains. A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### D. Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims and Interests

The following discussion includes only certain U.S. federal income tax consequences of the Restructuring Transactions to certain non-U.S. Holders of Claims and Interests. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to non-U.S. Holders are complex. Each non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the non-U.S. tax consequences of the consummation of the Plan to such non-U.S. Holder and the ownership and disposition of the New Securities.

#### 1. Gain Recognition

Whether a non-U.S. Holder recognizes gain or loss in connection with an exchange of Claims or Interests pursuant to the Plan or the subsequent sale or other disposition of New Securities, as applicable, and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders.

A non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain recognized unless:

- such non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition and certain other conditions are met;

- such gain is effectively connected with such non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States); or

- the Claims or Interest exchanged for New Securities or the New Securities received constitute U.S. real property interests for U.S. federal income tax purposes.

If the first exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (unless an applicable income tax treaty provides for a reduced rate or exemption from tax) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition.

If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to such gains at a rate of 30 percent (unless a reduced rate or exemption applies under an applicable income tax treaty).

In relation to the third exception, under provisions commonly referred to as "FIRPTA," taxable gain from the disposition of a U.S. real property interest (generally equal to the difference between the amount realized and such non-U.S. Holder's adjusted tax basis in such interest) will constitute effectively

connected income.  Further, any nonrecognition provision shall apply to the disposition of a U.S. real property interest on which gain is realized only to the extent that the transferred U.S. real property interest is exchange for another U.S. real property interest that, immediately following such exchange, would be subject to U.S. taxation upon its disposition and if the non-U.S. Holder complies with certain filing requirements.  In addition, the buyer of such U.S. real property interest generally will be required to withhold a tax equal to 15 percent of the amount realized on the sale ("FIRPTA Withholding").  The amount of any such FIRPTA Withholding would be allowed as a credit against the non-U.S. Holder's federal income tax liability and may entitle the non-U.S. Holder to a refund, provided that the non-U.S. Holder properly and timely files a tax return with the IRS.

In general, an interest in a corporation (other than an interest solely as a creditor) will constitute a U.S. real property interest if such corporation is a "U.S. real property holding corporation" (a "USRPHC") for U.S. federal income tax purposes during a specified period, unless (a) the non-U.S. Holder does not directly or indirectly own more than 5 percent of the value of such interest during a specified testing period, and (b) such interest is "regularly traded" on an established securities market within the meaning of the applicable Treasury Regulations ("Regularly Traded").  In addition, if any class of interests in such corporation is Regularly Traded, with respect to any non-regularly traded class of interests that is convertible into a Regularly Traded class of interests, an interest in such non-regularly traded class shall be treated as a U.S. real property interest if, on the date it was acquired by its present holder, it had a fair market value greater than the fair market value on that date of 5 percent of the Regularly Traded class of interests into which it is convertible.

The Debtors expect that Denbury is, and Reorganized Denbury will continue to be, a USRPHC but also believe that the existing common equity and the New DNR Equity will be Regularly Traded.

If the third exception applies with respect to the Claims or Interests exchanged for New Securities, the non-U.S. Holder generally will be subject to U.S. federal income tax on (i) any gain recognized on the exchange or (ii) any gain realized in connection with a nonrecognition transaction (e.g., a recapitalization) if the New Securities received in such exchange do not constitute U.S. real property interests. In each case, the non-U.S. Holder will be required to file U.S. federal income tax returns. The existing common stock will constitute a U.S. real property interest with respect to any non-U.S. Holder that owned more than 5 percent of the existing common stock at any time during the shorter of the five-year period preceding the relevant disposition date or the non-U.S. Holder's holding period upon the relevant disposition. The Convertible Notes likely do not constitute an interest solely as a creditor under FIRPTA and thus will be a U.S. real property interest if (1) the Convertible Notes are not considered Regularly Traded and the fair market value of the Convertible Notes owned by the non-U.S. Holder on the date that any of the Convertible Notes were acquired by such non-U.S. Holder was greater than the fair market value of 5 percent of the existing common stock, or (2) the Convertible Notes are considered Regularly Traded and, at any time during the shorter of the five-year period preceding the relevant disposition date or the non-U.S. Holder's holding period upon the relevant disposition, the non-U.S. Holder owned more than 5 percent of the outstanding Convertible Notes. Under the rules described above, if the existing common stock or the Convertible Notes constitute a U.S. real property interest with respect to any non-U.S. Holder, and the New Securities received upon the exchange of such interests do not constitute a U.S. real property interest, any gain realized in connection with such exchange will be subject to U.S. federal income tax under FIRPTA, and Denbury may be required to impose FIRPTA Withholding with respect to any amount realized in connection with such exchange (notwithstanding whether the non-U.S. Holder recognizes gain or loss in connection with such exchange).

If the third exception applies with respect to the New Securities received in the exchange, (1) the non-U.S. Holder generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its New Securities and will be required to file U.S. federal income tax

returns, and (2) any buyer of such New Securities may be required to impose FIRPTA Withholding with respect to any amount realized in connection with such disposition (notwithstanding whether the non-U.S. Holder recognizes gain or loss in connection with such disposition). The New DNR Equity will constitute a U.S. real property interest with respect to any non-U.S. Holder that owns more than 5 percent of the New DNR Equity at any time during the shorter of the five-year period preceding the relevant disposition date or the non-U.S. Holder's holding period upon the relevant disposition.  Whether the Warrants will constitute a U.S. real property interest depends in part on whether the Warrants are treated as Regularly Traded. The Warrants will constitute a U.S. real property interest if (1) the Warrants are not considered Regularly Traded and the fair market value of the Warrants owned by the non-U.S. Holder on the date that any of the Warrants were acquired by such non-U.S. Holder was greater than the fair market value of 5 percent of the New DNR Equity, or (2) the Warrants are considered Regularly Traded and, at any time during the shorter of the five-year period preceding the relevant disposition date or the non-U.S. Holder's holding period upon the relevant disposition, the non-U.S. Holder owned more than 5 percent of the outstanding Warrants. At this time, the Debtors are unable to predict whether the Warrants will be treated as Regularly Traded. Non-U.S. Holders who may receive or acquire New Securities in connection with the Restructuring Transactions are urged to consult a U.S. tax advisor with respect to the U.S. tax consequences applicable to their acquisition, holding, and disposition of New Securities.

## 2.  Payments Attributable to Accrued but Untaxed Interest

Payments to a non-U.S. Holder that are attributable to accrued but untaxed interest received pursuant to the Plan generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the non-U.S. Holder is not a U.S. person, unless:

- the non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of Denbury;

- the non-U.S. Holder is a "controlled foreign corporation" related to Denbury, actually or constructively through the ownership rules under section 864(d)(4) of the Tax Code;

- the non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the Tax Code; or

- such interest is effectively connected with the conduct by the non-U.S. Holder of a trade or business within the United States, in which case, provided the non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to such interest (including accrued but untaxed interest) at a rate of 30 percent (unless a reduced rate or exemption applies under an applicable income tax treaty).

A non-U.S. Holder that does not qualify for exemption from withholding tax with respect to interest (including accrued but untaxed interest) that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (unless a reduced rate or exemption applies under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest received pursuant to the Plan.  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through

qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

### 3. Distributions on New DNR Equity

Any distributions made (or deemed made) with respect to New DNR Equity will constitute "dividends" for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Denbury, as determined under U.S. federal income tax principles.  To the extent any distribution exceeds Reorganized Denbury's current and accumulated earnings and profits, such distribution will be treated (i) as a non-taxable return of the non-U.S. Holder's adjusted basis in the New DNR Equity and may be subject to FIRPTA withholding if such New DNR Equity is a U.S. real property interest (as described above) and (ii) thereafter as capital gain treated as described above.

Except as described below, "dividends" made (or deemed made) with respect to New DNR Equity held by a non-U.S. Holder that are not effectively connected with a non-U.S. Holder's conduct of a U.S. trade or business (or, if an income tax treaty applies, are not attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30% (unless a reduced rate or exemption applies under an applicable income tax treaty).

A non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or successor form), upon which the non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments.  Any "dividends" made (or deemed made) with respect to New DNR Equity held by a non-U.S. Holder that are effectively connected with a non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, are attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (unless a reduced rate or exemption applies under an applicable income tax treaty).

### 4. FATCA

Under the Foreign Account Tax Compliance Act ("FATCA"), non-U.S. financial institutions and certain other non-U.S. entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including "dividends" on the New Securities).  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

Each non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such non-U.S. Holder.

### E. Information Reporting and Back-Up Withholding

The Debtors will withhold all amounts required by law to be withheld from payments of interest, "dividends," and other amounts payable under the Plan or with respect to the New Securities.  The Debtors will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a holder of a Claim or Interest under the Plan. In addition, backup withholding of taxes will generally apply to payments in respect of a Claim or Interest

under the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9.

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XII.    RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims or Interests entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  July 24, 2020
                                                    Denbury Resources Inc.
                                                    on behalf of itself and all other Debtors


                                                    */s/ Christian S. Kendall*
                                                    _____
                                                    Christian S. Kendall
                                                    President and Chief Executive Officer
                                                    Denbury Resources Inc.

## Exhibit A

**Plan of Reorganization**

*Solicitation Version*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DENBURY RESOURCES INC., *et al.*,[1] | ) | Case No. 20-_____ (__) |
| | ) | |
| Debtors. | ) | |
| | ) | |

## JOINT CHAPTER 11 PLAN OF REORGANIZATION
## OF DENBURY RESOURCES INC. AND ITS DEBTOR AFFILIATES

---

**THIS CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND WITHIN THE MEANING OF SECTION 1126 OF THE BANKRUPTCY CODE. THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 BANKRUPTCY.**

---

Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Christopher Marcus, P.C. (*pro hac vice* admission pending)
Rebecca Blake Chaikin (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:           joshua.sussberg@kirkland.com
                 christopher.marcus@kirkland.com
                 rebecca.chaikin@kirkland.com

David L. Eaton (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:           david.eaton@kirkland.com

-and-

Matthew D. Cavenaugh (TX Bar No. 24062656)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4284
Facsimile:      (713) 308-4184
Email:           mcavenaugh@jw.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

Dated: July 28, 2020

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Denbury Resources Inc. (7835); Denbury Air, LLC (7621); Denbury Brookhaven Pipeline Partnership, LP (6322); Denbury Brookhaven Pipeline, LLC (6471); Denbury Gathering & Marketing, Inc. (6150); Denbury Green Pipeline-Montana, LLC (6443); Denbury Green Pipeline-North Dakota, LLC (7725); Denbury Green Pipeline-Riley Ridge, LLC (2859); Denbury Green Pipeline-Texas, LLC (2301); Denbury Gulf Coast Pipelines, LLC (0892); Denbury Holdings, Inc. (1216); Denbury Onshore, LLC (7798); Denbury Operating Company (7620); Denbury Pipeline Holdings, LLC (0190); Denbury Thompson Pipeline, LLC (0976); Encore Partners GP Holdings, LLC (N/A); Greencore Pipeline Company, LLC (9605); Plain Energy Holdings, LLC (0543). The location of Debtor Denbury Resources Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 5320 Legacy Drive, Plano, Texas 75024.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
     GOVERNING LAW ......................................................................................................1
  A.  Defined Terms. .............................................................................................1
  B.  Rules of Interpretation. ................................................................................12
  C.  Computation of Time. ..................................................................................12
  D.  Governing Law. ...........................................................................................12
  E.  Reference to Monetary Figures. ..................................................................13
  F.  Reference to the Debtors or the Reorganized Debtors..................................13
  G.  Controlling Document. ................................................................................13
  H.  Consent Rights. ...........................................................................................13

ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS.....................................13
  A.  Administrative Claims. ................................................................................13
  B.  Professional Fee Claims...............................................................................14
  C.  DIP Facility Claims. ....................................................................................14
  D.  Priority Tax Claims. ....................................................................................15

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...............15
  A.  Classification of Claims and Interests. ........................................................15
  B.  Treatment of Claims and Interests. ..............................................................15
  C.  Special Provision Governing Unimpaired Claims. .......................................20
  D.  Elimination of Vacant Classes. ...................................................................20
  E.  Voting Classes, Presumed Acceptance by Non-Voting Classes.....................20
  F.  Intercompany Interests.................................................................................20
  G.  Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ...20
  H.  Controversy Concerning Impairment. .........................................................20
  I.  Subordinated Claims and Interests. .............................................................20

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN.............................................21
  A.  General Settlement of Claims and Interests..................................................21
  B.  Restructuring...............................................................................................21
  C.  Reorganized Debtors....................................................................................21
  D.  Sources of Consideration for Plan Distributions. .........................................22
  E.  Holders of Working and Similar Interests. ...................................................23
  F.  Corporate Existence.....................................................................................23
  G.  Vesting of Assets in the Reorganized Debtors. .............................................23
  H.  Cancellation of Existing Securities and Agreements.....................................24
  I.  Corporate Action.........................................................................................24
  J.  New Organizational Documents. ..................................................................24
  K.  Indemnification Provisions in Organizational Documents. ............................25
  L.  Directors and Officers of the Reorganized Debtors.......................................25
  M.  Effectuating Documents; Further Transactions. ...........................................25
  N.  Section 1146 Exemption. .............................................................................25
  O.  Registration Rights Agreement.....................................................................26
  P.  Director and Officer Liability Insurance. .....................................................26
  Q.  Management Incentive Plan..........................................................................26
  R.  Employee and Retiree Matters and Benefits.................................................27
  S.  Preservation of Causes of Action. ...............................................................27
  T.  Restructuring Expenses................................................................................28

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES............28
  A.  Assumption and Rejection of Executory Contracts and Unexpired Leases. ....28

B.     Claims Based on Rejection of Executory Contracts or Unexpired Leases. ......................29
C.     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ...................29
D.     Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. 30
E.     Indemnification Obligations. ..................................................................................................30
F.     Insurance Policies. .................................................................................................................31
G.     Reservation of Rights. ............................................................................................................31
H.     Nonoccurrence of Effective Date. .........................................................................................31
I.     Employee Compensation and Benefits. .................................................................................31
J.     Contracts or Leases Entered Into After the Petition Date. ....................................................32

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ..................................................................32
A.     Distributions on Account of Claims or Interests Allowed as of the Effective Date. ...........32
B.     Distribution Agent. .................................................................................................................32
C.     Rights and Powers of Distribution Agent. .............................................................................32
D.     Delivery of Distributions and Undeliverable or Unclaimed Distributions. ..........................33
E.     Manner of Payment. ...............................................................................................................34
F.     Section 1145 Exemption. .......................................................................................................34
G.     Compliance with Tax Requirements. .....................................................................................34
H.     Allocations. .............................................................................................................................35
I.     No Postpetition Interest on Claims. .......................................................................................35
J.     Foreign Currency Exchange Rate. .........................................................................................35
K.     Setoffs and Recoupment. .......................................................................................................35
L.     Claims Paid or Payable by Third Parties. ..............................................................................35

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
         DISPUTED CLAIMS .....................................................................................................36
A.     Disputed Claims Process. .......................................................................................................36
B.     Allowance of Claims. .............................................................................................................36
C.     Claims Administration Responsibilities. ................................................................................37
D.     Adjustment to Claims or Interests without Objection. ...........................................................37
E.     Estimation of Claims. .............................................................................................................37
F.     Disallowance of Claims or Interests. .....................................................................................38
G.     No Distributions Pending Allowance. ....................................................................................38
H.     Distributions After Allowance. ..............................................................................................38

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS .............................38
A.     Discharge of Claims and Termination of Interests. ...............................................................38
**B.**     **Releases by the Debtors.** ......................................................................................................38
**C.**     **Releases by the Releasing Parties.** .....................................................................................39
**D.**     **Exculpation.** ...........................................................................................................................40
**E.**     **Injunction.** .............................................................................................................................40
F.     Protections Against Discriminatory Treatment. ....................................................................41
G.     Release of Liens. ....................................................................................................................41
H.     Document Retention. ..............................................................................................................42
I.     Reimbursement or Contribution. ...........................................................................................42

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF
         THE PLAN .....................................................................................................................42
A.     Conditions Precedent to the Effective Date. ..........................................................................42
B.     Waiver of Conditions. ............................................................................................................43
C.     Effect of Non-Occurrence of Conditions. .............................................................................44
D.     Substantial Consummation ....................................................................................................44

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN .......................................44
A.     Modification and Amendments. .............................................................................................44
B.     Effect of Confirmation on Modifications. .............................................................................44

C.       Revocation or Withdrawal of Plan.............................................................44

ARTICLE XI. RETENTION OF JURISDICTION ................................................................................44

ARTICLE XII. MISCELLANEOUS PROVISIONS .............................................................................46
    A.       Immediate Binding Effect.....................................................................46
    B.       Additional Documents. ........................................................................46
    C.       Payment of Statutory Fees. ..................................................................47
    D.       Statutory Committee and Cessation of Fee and Expense Payment. ..................47
    E.       Reservation of Rights............................................................................47
    F.       Successors and Assigns..........................................................................47
    G.       Notices. ..............................................................................................47
    H.       Term of Injunctions or Stays.................................................................48
    I.       Entire Agreement. ...............................................................................48
    J.       Exhibits. .............................................................................................49
    K.       Nonseverability of Plan Provisions.........................................................49
    L.       Votes Solicited in Good Faith. ..............................................................49
    M.       Closing of Chapter 11 Cases. ................................................................49
    N.       Waiver or Estoppel. .............................................................................49

**INTRODUCTION**

Denbury Resources Inc., Denbury Air, LLC, Denbury Brookhaven Pipeline Partnership, LP, Denbury Brookhaven Pipeline, LLC, Denbury Gathering & Marketing, Inc., Denbury Green Pipeline-Montana, LLC, Denbury Green Pipeline-North Dakota, LLC, Denbury Green Pipeline-Riley Ridge, LLC, Denbury Green Pipeline-Texas, LLC, Denbury Gulf Coast Pipelines, LLC, Denbury Holdings, Inc., Denbury Onshore, LLC, Denbury Operating Company, Denbury Pipeline Holdings, LLC, Denbury Thompson Pipeline, LLC, Encore Partners GP Holdings, LLC, Greencore Pipeline Company, LLC, and Plain Energy Holdings, LLC (each a "Debtor" and, collectively, the "Debtors") propose this joint prepackaged chapter 11 plan of reorganization (the "Plan") for the resolution of the outstanding claims against, and equity interests in, the Debtors.  Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor.  Holders of Claims or Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, risk factors, a summary and analysis of this Plan, the Restructuring, and certain related matters.  The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.      *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 327, 328, 330, 365, 503(b), 507(a), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors incurred on or after the Petition Date and through the Effective Date; (b) Allowed Professional Fee Claims; (c) any adequate protection Claim provided for in the DIP Orders; and (d) all fees and charges assessed against the Estates under chapter 123 of the Judicial Code.

2.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

3.      "*Allowed*" means, with respect to a Claim, any Claim (or portion thereof) that (a) is not Disputed within the applicable period of time, if any, fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, (b) is allowed, compromised, settled, or otherwise resolved pursuant to the terms of the Plan, in any stipulation that is approved by a Final Order of the Bankruptcy Court, or pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith, or (c) has been allowed by a Final Order of the Bankruptcy Court.  For the avoidance of doubt, (x) there is no requirement to file a Proof of Claim (or move the Bankruptcy Court for allowance) to have a Claim Allowed for the purposes of the Plan except as provided in Article V.B of this Plan, (y) the Debtors may deem any Unimpaired Claim to be Allowed in an asserted amount for the purposes of the Plan, and (z) any Claim (or portion thereof) that has been disallowed pursuant to a Final Order shall not be an "Allowed" Claim.

4.      "*Assumed Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, which shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

5.      "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims,

Causes of Action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

6.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532.

7.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas presiding over the Chapter 11 Cases, or any other court having jurisdiction over the Chapter 11 Cases, including to the extent of the withdrawal of reference under 28 U.S.C. § 157, the United States District Court for the Southern District of Texas.

8.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each, as amended from time to time.

9.      "*Business Day*" means any day other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

10.      "*Cash*" means cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

11.      "*Cause of Action*" or "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claims.

12.      "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

13.      "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

14.      "*Claims and Balloting Agent*" means Epiq Corporate Restructuring, LLC, the notice, claims, and solicitation agent proposed to be retained by the Debtors in the Chapter 11 Cases.

15.      "*Claims Register*" means the official register of Claims maintained by the Claims and Balloting Agent.

16.      "*Class*" means a class of Claims or Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

17.      "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

18.      "*Company*" means DNR and each of its direct and indirect subsidiaries.

19.      "*Compensation and Benefits Programs*" means all employee employment, wages, compensation, and benefits plans and policies, workers' compensation programs, savings plans, retirement plans, supplemental executive retirement plans, deferred compensation plans, healthcare plans, disability plans, employment and severance agreements and policies, severance benefit plans, policies, and guidelines (including the Severance Protection Plan),

incentive and retention plans (including the plans approved by the board of directors of DNR on June 3, 2020), life and accidental death and dismemberment insurance plans, and programs of the Debtors, and all amendments and modifications thereto, applicable to any of the Debtors' employees, former employees, retirees, non-employee directors, and other individual service provides, in each case existing with the Debtors as of the immediately prior to the Effective Date.

20.      "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

21.      "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

22.      "*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court on confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

23.      "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, consistent with the Restructuring Support Agreement (and subject to the consent, approval and consultation rights set forth therein), and approving the Disclosure Statement.

24.      "*Consenting Second Lien Noteholders*" has the meaning set forth in the Restructuring Support Agreement.

25.      "*Convertible* Ad Hoc *Group*" means the *ad hoc* group of Holders of Convertible Notes represented by Akin Gump Strauss Hauer & Feld LLP.

26.      "*Convertible Notes*" means the 6⅜% Convertible Senior Notes Due 2024 issued under the Convertible Notes Indenture.

27.      "*Convertible Notes Claims*" means any Claims on account of the Convertible Notes.

28.      "*Convertible Notes Indenture*" means that certain indenture governing the Convertible Notes, dated June 19, 2019, by and among DNR, as issuer, the subsidiary guarantors named therein, as guarantors, and the Convertible Notes Trustee.

29.      "*Convertible Notes Trustee*" means Wilmington Trust, National Association, as Trustee under the Convertible Notes Indenture.

30.      "*Convertible Notes Warrant Package*" means 100% of the Series A Warrants, as defined in the Warrants Term Sheet, attached to the Restructuring Support Agreement as <u>Annex 3</u>.

31.      "*Consummation*" means the occurrence of the Effective Date.

32.      "*Cure Amounts*" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

33.      "*Debtor Release*" means the release set forth in Article VIII.B of the Plan.

34.      "*D&O Liability Insurance Policies*" means all insurance policies of any of the Debtors for directors', managers', and officers' liability existing as of the Petition Date (including any "tail policy") and all agreements, documents, or instruments relating thereto.

3

35. "*DIP Agent*" means JPMorgan Chase Bank, N.A., or any successor thereto, as administrative agent under the DIP Facility, solely in its capacity as such.

36. "*DIP Facility*" means the debtor-in-possession financing facility on terms and conditions consistent in all material respects with the Restructuring Support Agreement (including the DIP-to-Exit Facility Term Sheet) and the DIP Orders and otherwise in form and substance acceptable to the Debtors, the DIP Agent, and the DIP Lenders, and reasonably acceptable to the Required Consenting Second Lien Noteholders.

37. "*DIP Facility Claims*" means any Claim derived from, based upon, or secured by the DIP Facility Documents or DIP Orders, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising under or related to the DIP Facility.

38. "*DIP Facility Documents*" means any documents governing or related to the DIP Facility (including the DIP Orders), which documents shall be consistent in all material respects with the Restructuring Support Agreement (including the DIP-to-Exit Facility Term Sheet) and the DIP Orders and otherwise in form and substance acceptable to the Debtors, the DIP Agent, and the DIP Lenders as to such documents and to the Debtors and the DIP Agent as to the DIP Orders, and reasonably acceptable to the Required Consenting Second Lien Noteholders.

39. "*DIP Final Order*" means the final order authorizing use of cash collateral and debtor-in-possession financing on terms consistent with the DIP-to-Exit Facility Term Sheet, and in form and substance acceptable to the Debtors and the DIP Agent, and reasonably acceptable to the Required Consenting Second Lien Noteholders.

40. "*DIP Interim Order*" means the interim order authorizing use of cash collateral and debtor-in-possession financing on terms consistent with the DIP-to-Exit Facility Term Sheet, and in form and substance acceptable to the Debtors and the DIP Agent, and reasonably acceptable to the Required Consenting Second Lien Noteholders.

41. "*DIP Lenders*" means the lenders under the DIP Facility, solely in their capacity as such.

42. "*DIP Orders*" means the collectively, the DIP Interim Order and the DIP Final Order.

43. "*DIP-to-Exit Facility Term Sheet*" means the term sheet describing the material terms of the DIP Facility, attached as Annex 2 to the Restructuring Support Agreement.

44. "*Disclosure Statement*" means the disclosure statement with respect to the Plan that is prepared and distributed in accordance with, among other things, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018 and other applicable Law, and all exhibits, schedules, supplements, modifications and amendments thereto, all of which shall be consistent in all material respects with the Restructuring Support Agreement and the Plan.

45. "*Disputed*" means, as to a Claim or an Interest, a Claim or an Interest (or portion thereof) (a) that an objection to such Claim or Interest (or portion thereof) has been filed on or before the Effective Date; (b) for which a Proof of Claim is filed; or (c) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order, as applicable; *provided* that in no event shall a Claim or an Interest (or portion thereof) that is deemed Allowed pursuant to the Plan be a Disputed Claim.

46. "*Distribution Agent*" means the Reorganized Debtors or the Entity or Entities selected by the Debtors or the Reorganized Debtors, as applicable, to make or facilitate distributions pursuant to the Plan.

47. "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Reorganized Debtors, on or after the Effective Date, with the first such date occurring on or as soon as is reasonably practicable after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims or Interests entitled to receive distributions under the Plan.

48.      "*Distribution Record Date*" means, other than with respect to publicly held Securities, the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be the first day of the Confirmation Hearing.

49.      "*DNR*" means Denbury Resources Inc.

50.      "*Effective Date*" means the date on which all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

51.      "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

52.      "*Estate*" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of such Debtor's Chapter 11 Case.

53.      "*Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*, as amended from time to time.

54.      "*Exculpated Partie*s" means collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the RBL Agent; (d) the RBL Lenders; (e) the Second Lien Notes Trustee; (f) the Second Lien *Ad Hoc* Committee and all members thereof; (g) the Convertible Notes Trustee; (h) the Convertible *Ad Hoc* Group and all members thereof; (i) the DIP Agent; (j) the DIP Lenders; (k) the Exit Facility Agent; (l) the Exit Facility Lenders; (m) with respect to each of the foregoing parties in clauses (a) through (l), each of such party's current and former predecessors, successors, participants, Affiliates (regardless of whether such interests are held directly or indirectly), assigns, subsidiaries, direct and indirect equity holders or beneficiaries, funds, portfolio companies, and management companies; and (n) with respect to each of the foregoing parties in clauses (a) through (m), each of such party's current and former directors, officers, members, employees, partners, managers, general partners, limited partners, managing members, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, advisory board members, investment advisors or sub advisors, and other professionals.

55.      "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

56.      "*Existing Equity Interests*" means the common Interests of DNR, together with any and all outstanding and unexercised or unvested warrants, options, or rights to acquire DNR's currently outstanding equity.

57.      "*Existing Equity Warrants Package*" means 45.45% of the Series B Warrants, as defined in the Warrants Term Sheet, attached to the Restructuring Support Agreement as <u>Annex 3</u>.

58.      "*Exit Commitment Letter*" means the commitment letter attached as <u>Annex 2(a)</u> to the Restructuring Support Agreement, and the related fee letters with respect thereto.

59.      "*Exit Facility*" means the revolving credit facility in an aggregate maximum principal amount up to $615,000,000, subject to a conforming borrowing base to be set forth in the Exit Facility Documents and on such other terms and conditions consistent in all material respects with the Restructuring Support Agreement, the DIP-to-Exit Facility Term Sheet, the Exit Commitment Letter, and the Exit Facility Term Sheet, and otherwise in form and substance acceptable to the Debtors, the Exit Facility Agent, and the Exit Facility Lenders, and reasonably acceptable to the Required Consenting Second Lien Noteholders.

60.      "*Exit Facility Agent*" means JPMorgan Chase, N.A., as administrative agent for the Exit Facility, or any successor thereto, solely in its capacity as such.

61.      "*Exit Facility Documents*" means the documents governing the Exit Facility and any other guarantee, security agreement, deed of trust, mortgage, and relevant documentation with respect to the Exit Facility,

5

which shall be consistent in all material respects with the Plan, Restructuring Support Agreement, the DIP-to-Exit Facility Term Sheet, the Exit Commitment Letter, and the Exit Facility Term Sheet, and otherwise in form and substance acceptable to the Debtors, the Exit Facility Agent, and the Exit Facility Lenders, and reasonably acceptable to the Required Consenting Second Lien Noteholders.

62. "*Exit Facility Lenders*" means those lenders from time to time party to the Exit Facility Documents, solely in their capacity as such.

63. "*Exit Facility Term Sheet*" means the term sheet describing the material terms of the Exit Facility, attached as Exhibit A to the Exit Commitment Letter.

64. "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

65. "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

66. "*Final Order*" means as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

67. "*General Unsecured Claim*" means any unsecured Claim other than (a) a DIP Facility Claim; (b) an Administrative Claim; (c) a Professional Fee Claim; (d) a Priority Tax Claim; (e) an Other Secured Claim; (f) an Other Priority Claim; (g) a Pipeline Lease Claim; (h) a Hedge Claim; (i) an RBL Claim; (j) a Second Lien Notes Claim; (k) a Convertible Notes Claim; (l) a Subordinated Notes Claim; or (m) an Existing Equity Interest, against one or more of the Debtors.

68. "*Governance Term Sheet*" means the term sheet attached to the Restructuring Support Agreement as Annex 4 setting forth the terms of certain agreements related to the corporate governance of the Reorganized Debtors.

69. "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

70. "*Holder*" means an Entity holding a Claim or Interest, as applicable.

71. "*Hedge Claim*" means any Claim arising from commodity hedge transactions pursuant to an ISDA Master Agreement and Schedules thereto.

72. "*Impaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

73. "*Indemnification Obligations*" means each of the Debtors' indemnification provisions in place, whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, management or indemnification agreements, employment contracts, or otherwise, for the current and former directors, officers, managers, employees, attorneys, other professionals, and agents of the Debtors and such current and former directors', officers', and managers' respective Affiliates.

74. "*Intercompany Claim*" means any Claim held by a Debtor or an Affiliate against a Debtor or an Affiliate.

75. "*Intercompany Interest*" means any Interest in a Debtor held by another Debtor and, for the avoidance of doubt, excludes the Existing Equity Interests.

76.    "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable Securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

77.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time.

78.    "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

79.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

80.    "*Management Compensation Term Sheet*" means the term sheet setting forth the terms of the Management Incentive Plan, which shall be included in the Plan Supplement.

81.    *Management Employment Agreements*" means, collectively, the employment agreements between the Debtors and the Debtors' Chief Executive Officer and Chief Financial Officer in the forms agreed to and in effect on the Petition Date.

82.    "*Management Incentive Plan*" means any equity incentive program for the members of the management team of the Reorganized Debtors to be established as contemplated in the Plan, and in accordance with the Restructuring Support Agreement and the Definitive Documents.

83.    "*New Board*" means the board of directors of the Reorganized Debtors appointed in accordance with the terms of the Governance Term Sheet. The identities of directors on the New Board shall be set forth in the Plan Supplement.

84.    "*New DNR Equity*" means the common equity in Reorganized DNR.

85.    "*New Organizational Documents*" means the documents providing for corporate governance of the Reorganized Debtors, including charters, bylaws, operating agreements, or other organizational documents, as applicable, which shall be consistent with the Restructuring Support Agreement (and subject to the consent, approval and consultation rights set forth therein), the Governance Term Sheet, this Plan, and section 1123(a)(6) of the Bankruptcy Code (as applicable), and shall be included in the Plan Supplement.

86.    "*Other Priority Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

87.    "*Other Secured Claim*" means any Secured Claim, other than a DIP Facility Claim, Hedge Claim, RBL Claim, Pipeline Lease Claim, or Second Lien Notes Claim, including any Claim arising under, derived from, or based upon any letter of credit issued in favor of one or more Debtors, the reimbursement obligation for which is either secured by a Lien on collateral or is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

88.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

89.    "*Petition Date*" means the first date on which any of the Debtors commences a Chapter 11 Case.

90.    "*Pipeline Lease*" means that certain Pipeline Financing Agreement, dated as of May 30, 2008 (as amended, restated, amended and restated, supplemented, or otherwise modified) by and between Genesis NEJD Pipeline, LLC, as lessor, and Denbury Onshore, LLC as lessee.

91.     "*Pipeline Lease Claim*" means any Claim arising under, derived from, based on, or secured pursuant to the Pipeline Lease.

92.     "*Plan Distribution*" means a payment or distribution to Holders of Allowed Claims, Allowed Interests, or other eligible Entities under and in accordance with this Plan.

93.     "*Plan Objection Deadline*" means the date the Bankruptcy Court establishes as the deadline to File an objection to Confirmation of the Plan.

94.     "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and consistent with the Restructuring Support Agreement (and subject to the consent, approval and consultation rights set forth therein) and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Debtors no later than seven (7) days before the Plan Objection Deadline or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, including the following, as applicable: (a) the New Organizational Documents; (b) to the extent known, the identities of the members of the New Board; (c) the Assumed Executory Contracts and Unexpired Leases Schedule; (d) the Rejected Executory Contracts and Unexpired Leases Schedule; (e) the Schedule of Retained Causes of Action; (f) the Exit Facility Documents; (g) the Management Compensation Term Sheet; (h) the Warrants Agreement; and (i) the Registration Rights Agreement.  The Debtors shall have the right to alter, amend, modify, or supplement the documents contained in the Plan Supplement through the Effective Date as set forth in this Plan and in accordance with the Restructuring Support Agreement (and subject to the consent, approval and consultation rights set forth therein).

95.     "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

96.     "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

97.     "*Professional*" means an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

98.     "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors as set forth in Article II.B hereof.

99.     "*Professional Fee Claim*" means a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

100.     "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

101.     "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

102.     "*RBL Agent*" means JPMorgan Chase Bank, N.A., and any successor thereto, solely in its capacity as successor agent under the RBL Credit Agreement.

103.     "*RBL Credit Agreement*" means that certain Amended and Restated Credit Agreement, dated as of December 9, 2014 (as amended, restated, amended, and supplemented or otherwise modified prior to the date hereof), by and among DNR, as borrower, the RBL Lenders, as lenders, and the RBL Agent.

104.    "*RBL Claim*" means any Claim arising under, derived from, based on, or secured pursuant to the RBL Credit Agreement.

105.    "*RBL Lenders*" means the lenders under the RBL Credit Agreement, from time to time.

106.    "*RBL Loans*" means any loan made under the RBL Credit Agreement.

107.    "*Registration Rights Agreement*" means the registration rights agreement to be entered into on the Effective Date by Reorganized DNR and the Registration Rights Parties, the terms of which shall be consistent in all material respects with the Governance Term Sheet.

108.    "*Registration Rights Parties*" means the Consenting Second Lien Noteholders and any recipient of New DNR Equity that receives (together with its affiliates and related funds) 4% or more of the voting Securities of Reorganized DNR issued pursuant to this Plan.

109.    "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall not be discharged hereunder and the Holder's legal, equitable, and contractual rights on account Hof such Claim or Interest shall remain unaltered by Consummation in accordance with section 1124(1) of the Bankruptcy Code.

110.    "*Rejected Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, which schedule shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

111.    "*Released Party*" means each of the following, solely in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) the RBL Agent; (d) the RBL Lenders; (e) the Second Lien Notes Trustee; (f) the Second Lien Noteholders; (g) the Second Lien *Ad Hoc* Committee, and all members thereof; (h) the Convertible Notes Trustee; (i) the Convertible Noteholders; (j) the Convertible *Ad Hoc* Group, and all members thereof; (k) the Subordinated Notes Trustee; (l) the Subordinated Noteholders; (m) the DIP Agent; (n) the DIP Lenders; (o) the Exit Facility Agent; (p) the Exit Facility Lenders; (q) with respect to each of the foregoing parties in clauses (a) through (p), each of such party's current and former predecessors, successors, participants, Affiliates (regardless of whether such interests are held directly or indirectly), assigns, subsidiaries, direct and indirect equity holders or beneficiaries, funds, portfolio companies, and management companies; (r) with respect to each of the foregoing parties in clauses (a) through (q), each of such party's current and former directors, officers, members, employees, partners, managers, general partners, limited partners, managing members, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, advisory board members, investment advisors, and other professionals; and (s) all Holders of Claims or Interests, *provided* that any Holder of a Claim or Interest that (x) validly opts out of the releases contained in the Plan, (y) files an objection to the releases contained in the Plan by the Plan Objection Deadline, or (z) timely votes to reject the Plan shall not be a "Released Party."

112.    "*Releasing Parties*" means each of the following, solely in its capacity as such: (a) the RBL Agent; (b) the RBL Lenders; (c) the Second Lien Notes Trustee; (d) the Second Lien Noteholders; (e) the Second Lien *Ad Hoc* Committee, and all members thereof; (f) the Convertible Notes Trustee; (g) the Convertible Noteholders; (h) the Convertible *Ad Hoc* Group, and all members thereof; (i) the Subordinated Notes Trustee; (j) the Subordinated Noteholders; (k) the DIP Agent; (l) the DIP Lenders; (m) the Exit Facility Agent; (n) the Exit Facility Lenders; (o) with respect to the foregoing clauses (a) through (n), each of such party's current and former predecessors, successors, participants, Affiliates (regardless of whether such interests are held directly or indirectly), assigns, subsidiaries, direct and indirect equity Holders or beneficiaries, funds, portfolio companies, and management companies; (p) with respect to each of the foregoing parties in clauses (a) through (o), each of such party's current and former directors, officers, members, employees, partners, managers, general partners, limited partners, managing members, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, advisory board members, investment advisors, and other professionals; and (q) all Holders of Claims or Interests; *provided* that any Holder of a Claim or Interest that (x) validly opts out of the releases contained

9

in the Plan, (y) files an objection to the releases contained in the Plan by the Plan Objection Deadline, or (z) timely votes to reject the Plan shall not be a "Releasing Party."

113.    "*Reorganized Debtors*" means collectively, a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Effective Date, including any new entity established in connection with the implementation of the Restructuring.

114.    "*Reorganized DNR*" means DNR, as reorganized pursuant to and under the Plan, on and after the Effective Date, or any successor or assign thereto.

115.    "*Required Consenting Convertible Noteholders*" means, as of any time of determination, beneficial Holders of (or investment advisors, sub-advisors, or managers of discretionary accounts that hold) at least 50.01% of the aggregate outstanding principal amount of the Convertible Notes subject to the Restructuring Support Agreement.

116.    "*Required Consenting Creditors*" means, collectively, the Required Consenting RBL Lenders, the Required Consenting Second Lien Noteholders, and the Required Consenting Convertible Noteholders.

117.    "*Required Consenting RBL Lenders*" means, as of any time of determination, beneficial Holders of (or investment advisors, sub-advisors, or managers of discretionary accounts that hold) at least 50.01% of the aggregate outstanding principal amount of the RBL Loans subject to the Restructuring Support Agreement.

118.    "*Required Consenting Second Lien Noteholders*" means, as of any time of determination, (a) beneficial Holders of (or investment advisors, sub-advisors, or managers of discretionary accounts that hold) at least 50.01% of the aggregate outstanding principal amount of the Second Lien Notes subject to the Restructuring Support Agreement that are members of the Second Lien *Ad Hoc* Committee and (b) constituting at least two (2) members of the Second Lien *Ad Hoc* Committee, as set forth in the Restructuring Support Agreement.

119.    "*Restructuring*" means any transaction and any actions as may be necessary or appropriate to effect a corporate restructuring of the Debtors' and the Reorganized Debtors' respective businesses or a corporate restructuring of the overall corporate structure of the Debtors on the terms set forth in the Plan, and the Restructuring Support Agreement, including the issuance of all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions, as described in Article IV.B hereof.

120.    "*Restructuring Expenses*" means, collectively, all reasonable and documented fees and expenses to be paid pursuant to section 14.02 of the Restructuring Support Agreement.

121.    "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of July 28, 2020, by and among (a) the Debtors, and (b) each RBL Lender, Second Lien Noteholder, and Convertible Noteholder that executes a signature page to the Restructuring Support Agreement, as may be further amended, modified, or supplemented from time to time, in accordance with its terms.

122.    "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time.

123.    "*Second Lien* Ad Hoc *Committee*" means the *ad hoc* committee of Holders of Second Lien Notes represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP, PJT Partners LP, and any local or foreign advisors.

124.    "*Second Lien Notes*" means collectively, the: (a) 9% Senior Secured Second Lien Notes Due 2021, issued under the Indenture, dated as of May 10, 2016, (b) 9¼% Senior Secured Second Lien Notes Due 2022, issued under the Indenture, dated as of December 6, 2017, (c) 7½% Senior Secured Second Lien Notes Due 2024, issued under the Indenture, dated as of August 21, 2018, and (d) 7¾% Senior Secured Second Lien Notes Due 2024, issued

under the Indenture, dated as of June 19, 2019, each by and among DNR, certain of its subsidiaries, and the Second Lien Notes Trustee.

125.    "*Second Lien Notes Claims*" means any Claims on account of Second Lien Notes.

126.    "*Second Lien Notes Indentures*" means those certain indentures governing the Second Lien Notes, dated as of May 10, 2016, December 6, 2017, August 21, 2018, and June 19, 2019, each by and among DNR, certain of its subsidiaries, and the Second Lien Notes Trustee.

127.    "*Second Lien Notes Trustee*" means Wilmington Trust, National Association as Trustee and Collateral Trustee under the Second Lien Notes.

128.    "*Secured Claim*" means a Claim:  (a) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

129.    "*Securities Act*" means the Securities Act of 1933, as amended, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

130.    "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

131.    "*Series A Warrants*" has the meaning set forth in the Warrants Term Sheet, attached to the Restructuring Support Agreement as Annex 3.

132.    "*Series B Warrants*" has the meaning set forth in the Warrants Term Sheet, attached to the Restructuring Support Agreement as Annex 3.

133.    "*Subordinated Notes*" means, collectively, the: (a) 6⅜% Senior Subordinated Notes Due 2021, issued under the Indenture, dated as of February 17, 2011, (b) 5½% Senior Subordinated Notes Due 2022, issued under the Indenture, dated as of April 30, 2014, and (c) 4⅝% Senior Subordinated Notes Due 2023, issued under the Indenture, dated as of February 5, 2013, each by and among DNR, certain of its subsidiaries, and the Subordinated Notes Trustee.

134.    "*Subordinated Notes Claims*" means any Claims on account of the Subordinated Notes.

135.    "*Subordinated Notes Indentures*" means those certain indentures governing the Subordinated Notes, dated as of February 17, 2011, April 30, 2014, and February 5, 2013, each as supplemented and by and among DNR, certain of its subsidiaries, and the Subordinated Notes Trustee.

136.    "*Subordinated Notes Trustee*" means Wilmington Trust, National Association, as successor trustee under the Subordinated Notes.

137.    "*Subordinated Notes Warrant Package*" means 54.55% of the Series B Warrants, as defined in the Warrants Term Sheet, attached to the Restructuring Support Agreement as Annex 3.

138.    "*Third-Party Release*" means the releases set forth in Article VIII.C of the Plan.

139.    "*U.S. Trustee*" means the United States Trustee for the Southern District of Texas.

140.    "*Unclaimed Distributio*n" means any distribution under the Plan on account of an Allowed Claim or Interest to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

141.     "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

142.     "*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

143.     "*Warrants*" mean the warrants issued by the Debtors on the Effective Date in accordance with the terms set forth in the Warrants Term Sheet, attached to the Restructuring Support Agreement as <u>Annex 3</u>.

144.     "*Warrants Agreement*" means that certain agreement providing for, among other things, the issuance and terms of the Warrants, which shall be included in the Plan Supplement, on terms and conditions consistent in all material respects with the Plan and the Warrants Term Sheet.

145.     "*Warrants Term Sheet*" means the term sheet governing the issuance of Warrants attached to the Restructuring Support Agreement as <u>Annex 3</u>.

B.     *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable Law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) any effectuating provisions may be interpreted by the Debtors or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (11) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (12) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (13) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (14) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (15) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (16) references to "Proofs of Claim," "holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "holders of Interests," "Disputed Interests," and the like, as applicable; (17) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (18) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail.

C.       *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.       *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided*, *however*, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Reorganized Debtors, as applicable.

E.       *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.       *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.       *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

H.       *Consent Rights.*

Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights of the parties to the Restructuring Support Agreement set forth in the Restructuring Support Agreement (including the annexes and exhibits thereto) with respect to the form and substance of this Plan, all exhibits to the Plan, and the Plan Supplement, and all other Definitive Documents (as defined in the Restructuring Support Agreement), including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein.  Failure to reference the rights referred to in this paragraph as such rights relate to any document referenced in the Restructuring Support Agreement shall not impair such rights or obligations.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.      *Administrative Claims.*

Except with respect to the Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code, and except to the extent that a Holder of an Allowed Administrative Claim and the Debtors against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, or such Holder has been paid by any Debtor on account of such Allowed Administrative Claim prior to the Effective Date, each Holder of such an Allowed Administrative Claim will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:   (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

B.      *Professional Fee Claims.*

1.      <u>Final Fee Applications and Payment of Professional Fee Claims.</u>

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 45 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.  The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date.

2.      <u>Professional Fee Escrow Account.</u>

As soon as possible after Confirmation and not later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust for the Professionals.  Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.  The Professional Fee Claims shall be paid in Cash to the Professionals from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed.  When such Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

3.      <u>Professional Fee Amount.</u>

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for

payment in the Chapter 11 Cases.  If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

    4.   <u>Post-Confirmation Fees and Expenses</u>.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

*C.*    *DIP Facility Claims*

On the Plan Effective Date, each Holder of a DIP Facility Claim shall be deemed to hold an Allowed Claim and shall receive its *pro rata* share of participation in the Exit Facility.

*D.*    *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

*A.*    *Classification of Claims and Interests.*

This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest fits within the description of that Class and is classified in other Class(es) to the extent that any portion of the Claim or Interest fits within the description of such other Class(es).  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Pipeline Lease Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 4 | RBL Claims / Hedge Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 5 | Second Lien Notes Claims | Impaired | Entitled to Vote |
| Class 6 | Convertible Notes Claims | Impaired | Entitled to Vote |

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 7 | Subordinated Notes Claims | Impaired | Entitled to Vote |
| Class 8 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 9 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 10 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 11 | Existing Equity Interests | Impaired | Entitled to Vote |

B.     *Treatment of Claims and Interests.*

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date (or, if payment is not then due, in accordance with its terms in the ordinary course of business) or as soon as reasonably practicable thereafter.

1.     Class 1 – Other Secured Claims

(a)     *Classification*:  Class 1 consists of all Other Secured Claims.

(b)     *Treatment*: Each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor:

(i)     payment in full in Cash of its Allowed Other Secured Claim;

(ii)     the collateral securing its Allowed Other Secured Claim;

(iii)     Reinstatement of its Allowed Other Secured Claim; or

(iv)     such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)     *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2.     Class 2 – Other Priority Claims

(a)     *Classification*:  Class 2 consists of all Other Priority Claims.

(b)     *Treatment*:  Each Holder of an Allowed Other Priority Claim shall receive, at the option of the applicable Debtor:

(i)     payment in full in Cash of its Allowed Other Priority Claim; or

(ii)     such other treatment that renders its Allowed Other Priority Claim Unimpaired in

16

accordance with section 1124 of the Bankruptcy Code, or as otherwise permitted by section 1129(a)(9) of the Bankruptcy Code.

    (c)    *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.    <u>Class 3 – Pipeline Lease Claims</u>

    (a)    *Classification*:  Class 3 consists of all Pipeline Lease Claims.

    (b)    *Treatment*:  Each Holder of an Allowed Pipeline Lease Claim shall receive, at the option of the applicable Debtor:

        (i)    payment in full in Cash of its Allowed Pipeline Lease Claim;

        (ii)    the collateral securing its Allowed Pipeline Lease Claim;

        (iii)    Reinstatement of its Allowed Pipeline Lease Claim; or

        (iv)    such other treatment to render such Allowed Pipeline Lease Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

    (c)    *Voting:*  Class 3 is Unimpaired under the Plan.  Holders of Claims in Class 3 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

4.    <u>Class 4 – RBL Claims and Hedge Claims</u>

    (a)    *Classification*:  Class 4 consists of all RBL Claims and Hedge Claims.

    (b)    *Allowance*:  On the Effective Date:

        (i)    the RBL Claims shall be Allowed in the aggregate principal amount of not less than $[●], plus any accrued and unpaid interest on such principal amount as of the Petition Date at the applicable contractual interest rate and any unpaid fees and expenses payable in accordance with the RBL Credit Agreement; and

        (ii)    the Hedge Claims shall be Allowed in the aggregate amount of not less than $[●], plus any unpaid fees and expenses payable in accordance with any ISDA Master Agreement.

    (c)    *Treatment*:  Each Holder of an Allowed RBL Claim or Allowed Hedge Claim shall receive payment in full in Cash or such other treatment rendering its Allowed RBL Claim or Allowed Hedge Claim, as applicable, Unimpaired in accordance with section 1124 of the Bankruptcy Code.

    (d)    *Voting:*  Class 4 is Unimpaired under the Plan.  Holders of Claims in Class 4 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

5. <u>Class 5 – Second Lien Notes Claims</u>

(a)   *Classification*:  Class 5 consists of all Second Lien Notes Claims.

(b)   *Allowance*:  On the Effective Date, the Second Lien Notes Claims shall be Allowed in the aggregate principal amount of not less than $[1,592,839,000], plus any accrued and unpaid interest on such principal amount as of the Petition Date at the applicable contractual interest rate and any unpaid fees and expenses payable in accordance with the Second Lien Notes Indentures.

(c)   *Treatment*:  Each Holder of an Allowed Second Lien Notes Claim shall receive its *Pro Rata* share of 95% of the New DNR Equity, subject to dilution by the Warrants and the Management Incentive Plan.

(d)   *Voting*:  Class 5 is Impaired under the Plan.  Holders of Claims in Class 5 are entitled to vote to accept or reject the Plan.

6. <u>Class 6 – Convertible Notes Claims</u>

(a)   *Classification*:  Class 6 consists of all Convertible Notes Claims.

(b)   *Allowance*:  On the Effective Date, the Convertible Notes Claims shall be Allowed in the aggregate principal amount of not less than $[225,663,000], plus any accrued and unpaid interest on such principal amount as of the Petition Date at the applicable contractual interest rate and any unpaid fees and expenses payable in accordance with the Convertible Notes Indenture.

(c)   *Treatment*:  Each Holder of an allowed Convertible Notes Claim shall receive its *Pro Rata* share of:

(i)   5% of the New DNR Equity, subject to dilution by the Warrants and the Management Incentive Plan; and

(ii)   the Convertible Notes Warrant Package.

(d)   *Voting*:  Class 6 is Impaired under the Plan.  Holders of Claims in Class 6 are entitled to vote to accept or reject the Plan.

7. <u>Class 7 – Subordinated Notes Claims</u>

(a)   *Classification*:  Class 7 consists of all Subordinated Notes Claims.

(b)   *Allowance*:  On the Effective Date, the Subordinated Notes Claims shall be Allowed in the aggregate principal amount of not less than $[245,690,000], plus any accrued and unpaid interest on such principal amount as of the Petition Date at the applicable contractual interest rate and any unpaid fees and expenses payable in accordance with the Subordinated Notes Indentures.

(c)   *Treatment*:

(i)   **if Class 7 votes to accept the Plan**, each Holder of an Allowed Subordinated Notes Claim shall receive its *Pro Rata* share of the Subordinated Notes Warrant Package.

(ii)   **if Class 7 votes to reject the Plan**, Holders of Subordinated Notes Claims will

18

not receive any distribution on account of such Claims, which will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect.

    (d)    *Voting*:  Class 7 is Impaired under the Plan.  Holders of Claims in Class 7 are entitled to vote to accept or reject the Plan.

8.    <u>Class 8 – General Unsecured Claims</u>

    (a)    *Classification*:  Class 8 consists of all General Unsecured Claims.

    (b)    *Treatment*:  Each Holder of an Allowed General Unsecured Claim shall receive, at the option of the applicable Debtor:

        (i)    payment in full in Cash;

        (ii)    Reinstatement; or

        (iii)    such other treatment rendering such Allowed General Unsecured Claim Unimpaired.

    (c)    *Voting*:  Class 8 is Unimpaired under the Plan.  Holders of Claims in Class 8 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

9.    <u>Class 9 – Intercompany Claims</u>

    (a)    *Classification*:  Class 9 consists of all Intercompany Claims.

    (b)    *Treatment*:  Each Allowed Intercompany Claim shall be, at the option of the applicable Debtor, either:

        (i)    Reinstated;

        (ii)    canceled, released, and extinguished, and will be of no further force or effect; or

        (iii)    otherwise addressed at the option of each applicable Debtor such that Holders of Class 9 Intercompany Claims will not receive any distribution on account of such Class 9 Claims.

    (c)    *Voting*:  Class 9 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 9 is not entitled to vote to accept or reject the Plan.

10.  <u>Class 10 – Intercompany Interests</u>

    (a)    *Classification*:  Class 10 consists of all Intercompany Interests.

    (b)    *Treatment*:  Each Intercompany Interest shall be Reinstated as of the Effective Date or, at the Debtors' or the Reorganized Debtors' option, shall be cancelled.  No distribution shall be made on account of any Intercompany Interests.

(c)    *Voting*:  Class 10 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 10 is not entitled to vote to accept or reject the Plan.

11.  <u>Class 11 – Existing Equity Interests</u>

(a)    *Classification*:  Class 11 consists of all Existing Equity Interests.

(b)    *Treatment*:

(i)    **if (A) Class 7 votes to accept the Plan and (B) Class 11 votes to accept the Plan**, each Holder of Existing Equity Interests shall receive its *Pro Rata* share of the Existing Equity Warrant Package.

(ii)    **if either Class 7 or Class 11 votes to reject the Plan**, Holders of Existing Equity Interests will not receive any distribution on account of such Interests, which will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect.

(c)    *Voting*:  Class 11 is Impaired under the Plan.  Holders of Interests in Class 11 are entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including, all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

D.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.    *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

F.    *Intercompany Interests.*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure for the ultimate benefit of the Holders of New DNR Equity, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

G.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan.  The Debtors reserve the right to modify the Plan in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a

Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.      *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.      *Subordinated Claims and Interests.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, and subject to the Restructuring Support Agreement, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

A.      *General Settlement of Claims and Interests.*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan, including (1) any challenge to the amount, validity, perfection, enforceability, priority or extent of the Pipeline Lease Claims, RBL Claims, Hedge Claims, Second Lien Notes Claims, Convertible Notes Claims, or the Subordinated Notes Claims, and (2) any claim to avoid, subordinate, or disallow any Pipeline Lease Claim, RBL Claim, Hedge Claim, Second Lien Notes Claim, Convertible Notes Claim, or Subordinated Notes Claim, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to Holders of Allowed Claims or Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.      *Restructuring.*

On or before the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into and shall take any actions as may be necessary or appropriate to effect the Restructuring.  The actions to implement the Restructuring may include, in accordance with the consent rights in the Restructuring Support Agreement:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable Law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law;

(4) such other transactions that are required to effectuate the Restructuring; and (5) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable Law in connection with the Plan. The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan.

C.      *Reorganized Debtors.*

On the Effective Date, the New Board shall be established, and the Reorganized Debtors shall adopt their New Organizational Documents, which shall be consistent with the Governance Term Sheet. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan. Cash payments to be made pursuant to the Plan will be made by the Debtors or Reorganized Debtors, as applicable. The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or Reorganized Debtors, as applicable, to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date agreement, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of directors of the applicable Reorganized Debtors deem appropriate.

D.      *Sources of Consideration for Plan Distributions.*

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with: (1) Cash on hand, including Cash from operations; (2) the proceeds from the Exit Facility; (3) the New DNR Equity; and (4) the Warrants, as applicable.

1.      Exit Facility.

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facility, the terms of which will be set forth in the Exit Facility Documents, *provided* that the Debtors or the Reorganized Debtors, as applicable, determine that entry into the Exit Facility is in the best interests of the Reorganized Debtors, *provided*, *further*, such determination is reasonably acceptable to the Required Consenting Second Lien Noteholders.

To the extent applicable, Confirmation of the Plan shall be deemed (a) approval of the Exit Facility (including the transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), to the extent not approved by the Bankruptcy Court previously, and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the Exit Facility, including the Exit Facility Documents, and incur and pay any fees and expenses in connection therewith, and (ii) act or take action under applicable Law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to consummate the Exit Facility; *provided* that such modifications are acceptable to the Exit Facility Lenders and reasonably acceptable to the Required Consenting Second Lien Noteholders.

As of the Effective Date, upon the granting of Liens in accordance with the Exit Facility Documents, such Liens shall constitute valid, binding, enforceable, and automatically perfected Liens in the collateral specified in the Exit Facility Documents. To the extent provided in the Exit Facility Documents, the Exit Facility Agent or Holder(s) of Liens under the Exit Facility Documents are authorized to file with the appropriate authorities mortgages, financing statements and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests. The guarantees, mortgages, pledges, Liens, and other security interests granted to secure the obligations arising under the Exit Facility Documents shall be granted in good faith, for legitimate business purposes,

and for reasonably equivalent value as an inducement to the Exit Facility Lenders to extend credit thereunder shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination, and the priorities of such Liens and security interests shall be as set forth in the Exit Facility Documents.

2.   Issuance of New DNR Equity.

The issuance of the New DNR Equity, including options or other equity awards, if any, reserved for the Management Incentive Plan and the Warrants, by the Reorganized Debtors shall be authorized without the need for any further corporate action or without any further action by the Holders of Claims or Interests. The Reorganized Debtors shall be authorized to issue a certain number of shares, units, or equity interests (as the case may be based on how the New DNR Equity is denominated and the identity of the Reorganized Debtor issuing such shares, units, or equity interests) of New DNR Equity required to be issued under the Plan and pursuant to their New Organizational Documents. On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall issue all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan.

All of the shares, units, or equity interests (as the case may be based on how the New DNR Equity is denominated) of New DNR Equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

3.   Issuance of Warrants.

On the Effective Date, the applicable Reorganized Debtor will issue the Warrants only to the extent required to provide for distributions to Holders of Convertible Notes Claims, Subordinated Notes Claims, and Existing Equity Interests, as contemplated by this Plan. All of the Warrants issued pursuant to the Plan shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance without the need for execution by any party thereto other than the applicable Reorganized Debtor(s).

E.   *Holders of Working and Similar Interests.*

The legal and equitable rights, interests, defenses, and obligations of lessors under the Debtors' oil and gas leases, Holders of certain other mineral interests related to the Debtors' oil and gas properties, owners of non-operating working interests in the Debtors' oil and gas properties, counterparties to the Debtors' joint operating agreements, and Holders of claims related to joint-interest billings and other similar working interests shall not be impaired in any manner by the provisions of this Plan. Nor shall anything in this Plan impair the related legal and equitable rights, interests, defenses, or obligations of the Debtors or the Reorganized Debtors. To the extent applicable, such Claims or Interests shall be Reinstated pursuant to this Plan.

Notwithstanding the foregoing, nothing in this Article IV.E hereof shall limit the Debtors' rights to reject any Executory Contract or Unexpired Lease in accordance with the Bankruptcy Code or pursuant to Article V hereof.

F.   *Corporate Existence.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable Law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent

such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, in each case, consistent with the Restructuring Support Agreement (and subject to the consent, approval and consultation rights set forth therein), and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).  After the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized Debtors may be amended or modified without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  After the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

G.     *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan or Plan Supplement, including the Exit Facility Documents, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

H.     *Cancellation of Existing Securities and Agreements.*

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, credit agreements, indentures, and other documents evidencing Claims or Interests, shall be cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect.  Holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to this Plan.  Notwithstanding anything to the contrary herein, but subject to any applicable provisions of Article VI hereof, the Second Lien Notes Indentures, Convertible Notes Indenture, and the Subordinated Notes Indentures shall continue in effect solely to the extent necessary to:  (1) permit Holders of Claims under the Second Lien Notes Indentures, the Convertible Notes Indenture, or the Subordinated Notes Indentures to receive their respective Plan Distributions; and (2) permit the Reorganized Debtors and the Distribution Agent, as applicable, to make Plan Distributions on account of the Allowed Claims under the Second Lien Notes Indentures, the Convertible Notes Indenture, and the Subordinated Notes Indentures, as applicable.  Except as provided in this Plan (including Article VI hereof), on the Effective Date, the agents and trustees under the Second Lien Notes Indentures, the Convertible Notes Indenture, and the Subordinated Notes Indentures, and their respective agents, successors, and assigns, shall be automatically and fully discharged of all of their duties and obligations associated with the Second Lien Notes Indentures, the Convertible Notes Indenture, and the Subordinated Notes Indentures.  The commitments and obligations (if any) of the Second Lien Noteholders, the Convertible Noteholders, or the Subordinated Noteholders to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries or any of their respective successors or assigns under the Second Lien Notes Indentures, the Convertible Notes Indenture, or the Subordinated Notes Indentures, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

I.     *Corporate Action.*

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including: (1) adoption or assumption, as applicable, of the Compensation and Benefit Programs; (2) selection of the directors and officers for the Reorganized Debtors; (3) the issuance and distribution of the New DNR Equity; (4) implementation of the Restructuring; (5) issuance and distribution of the Warrants; (6) entry into the Registration Rights Agreement, the Warrants Agreement and the Exit Facility Documents, as applicable; (7) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (8) adoption of or entry into the New Organizational Documents; (9) the rejection, assumption, or assumption and assignment, as applicable,

of Executory Contracts and Unexpired Leases; and (10) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security Holders, members, directors, or officers of the Debtors or the Reorganized Debtors, as applicable.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New DNR Equity, the New Organizational Documents, the Warrants and the Warrants Agreement (as applicable), the Exit Facility Documents, and any and all other agreements, documents, Securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Article IV.I shall be effective notwithstanding any requirements under non-bankruptcy Law.

J.      *New Organizational Documents.*

On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically adopted by the applicable Reorganized Debtors.  To the extent required under the Plan or applicable non-bankruptcy Law, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state or country of organization if and to the extent required in accordance with the applicable Laws of the respective state or country of organization.  The New Organizational Documents will prohibit the issuance of non-voting equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code.  For the avoidance of doubt, the New Organizational Documents shall be consistent with the Governance Term Sheet.  After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents, and the Reorganized Debtors may file such amended certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the applicable Laws of the respective states, provinces, or countries of incorporation and the New Organizational Documents.

K.      *Indemnification Provisions in Organizational Documents.*

As of the Effective Date, the New Organizational Documents of each Reorganized Debtor shall, to the fullest extent permitted by applicable Law, provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to, the Debtors' and the Reorganized Debtors' current and former managers, directors, officers, employees, or agents at least to the same extent as the certificate of incorporation, bylaws, or similar organizational document of each of the respective Debtors on the Petition Date, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, or asserted or unasserted. Notwithstanding anything in the Plan to the contrary, none of the Reorganized Debtors will amend and/or restate the New Organizational Documents before or after the Effective Date to terminate or adversely affect any of the Reorganized Debtors' obligations to provide such indemnification rights or such managers', directors', officers', employees', or agents' indemnification rights with respect to any claims relating to acts or omissions occurring at or prior to the Effective Date.

L.      *Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the term of the current members of the board of directors of DNR shall expire, and all of the directors for the initial term of the New Board shall be appointed in accordance with the Governance Term Sheet.  The New Board shall initially consist of 7 members.  In subsequent terms, the directors shall be selected in accordance with the New Organizational Documents of the Reorganized Debtors.  To the extent known, the identity of the members of the New Board will be disclosed in the Plan Supplement or prior to the Confirmation Hearing, consistent with section 1129(a)(5) of the Bankruptcy Code.  Each director and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the applicable New Organizational Documents and other constituent documents.

M.      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

N.      *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity, Security, or other interest in the Debtors or the Reorganized Debtors; (2) the Restructuring; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit Facility; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

O.      *Registration Rights Agreement*

On the Effective Date, Reorganized DNR and the Registration Rights Parties shall enter into the Registration Rights Agreement. The Registration Rights Agreement shall provide the Registration Rights Parties with commercially reasonable demand and piggyback registration rights and other customary terms and conditions.

P.      *Director and Officer Liability Insurance.*

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

Q.    *Management Incentive Plan.*

On the Effective Date, the Reorganized Debtors shall implement the Management Incentive Plan, the principal terms of which shall be set forth in the Management Compensation Term Sheet Filed with the Plan Supplement. The New DNR Equity provided in connection with the Management Incentive Plan will dilute all of the New DNR Equity equally. The Management Incentive Plan will (i) reserve exclusively for participants in the Management Incentive Plan a pool of equity interests of Reorganized DNR (or another entity designated pursuant to the Plan to issue equity interests on the Plan Effective Date) of up to 10.0% of New DNR Equity, which may take the form of awards of equity, options, restricted stock units, or other equity instruments, determined on a fully diluted and fully distributed basis (i.e., assuming conversion of all outstanding convertible securities (including the Warrants) and full distribution of such equity pool), (ii) grant a portion of such equity pool no later than 60 days following the Effective Date, with the remainder of such equity pool to be available for future grants to participants in the Management Incentive Plan, each in amounts and on terms to be determined by the New Board in consultation with the Chief Executive Officer and the Chief Financial Officer of DNR (and such other consultants as the New Board determines), and (iii) include other terms and conditions customary for similar type equity plans.

R.    *Employee and Retiree Matters and Benefits.*

Unless otherwise provided herein, and subject to Article V of the Plan, all Compensation and Benefits Programs shall be assumed by the Reorganized Debtors (and assigned to the Reorganized Debtors, if necessary, pursuant to section 365(a) of the Bankruptcy Code) and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable Law. The foregoing does not curtail the Reorganized Debtors' ability to enter into additional or supplemental agreements, arrangements, programs, or plans regarding employee wages, compensation, and benefit programs.

S.    *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII hereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII hereof. Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any such objection that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor, without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court. If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objection party for thirty (30) days, such objection shall be resolved by the Bankruptcy Court. Unless any Causes of Action of

the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII hereof.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

*T.      Restructuring Expenses.*

Promptly following the receipt of an invoice therefor, the Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Restructuring Support Agreement, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval.  All such Restructuring Expenses to be paid on the Effective Date shall be calculated or estimated as of the Effective Date, as applicable, and invoices documenting such Restructuring Expenses shall be delivered to the Debtors at least two (2) Business Days prior to the anticipated Effective Date; *provided* that such estimates shall not be considered an admission or limitation with respect to such fees and expenses.  On or as soon as reasonably practicable after the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors or Reorganized Debtors, as applicable, and such invoices shall be paid in full in Cash in accordance with, and subject to, the terms of the Restructuring Support Agreement.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*A.      Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided in Article V.I.1 and elsewhere herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that are: (1) identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (2) previously expired or terminated pursuant to their own terms; (3) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (4) are the subject of a motion to reject that is pending on the Effective Date; or (5) have an ordered or requested effective date of rejection that is after the Effective Date, *provided* that notwithstanding anything to the contrary herein, no Executory Contract or Unexpired Lease shall be assumed, assumed and assigned, or rejected without the written consent of the Required Consenting Second Lien Noteholders (such consent not to be unreasonably withheld); *provided* that approval of the Assumed Executory Contracts and Unexpired Leases Schedule and the Rejected Executory Contracts and Unexpired Leases Schedule shall be sufficient consent with respect to the Executory Contracts and Unexpired Leases listed therein.  The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contract and Unexpired Leases Schedule, or the Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set

forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

To the maximum extent permitted by Law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

If certain, but not all, of a non-Debtor counterparty's Executory Contracts or Unexpired Leases are assumed pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases Schedule and the Rejected Executory Contracts and Unexpired Leases Schedule at any time up to forty-five (45) days after the Effective Date, so long as such alteration, amendment, modification, or supplement is consistent with the Restructuring Support Agreement (and subject to the consent, approval and consultation rights set forth therein).

B.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of: (a) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (b) the effective date of such rejection, or (c) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.8 of this Plan.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

No later than seven (7) calendar days before the Plan Objection Deadline, the Debtors shall provide notices of proposed Cure Amounts to the counterparties to the agreements listed on the Assumed Executory Contracts and Unexpired Leases Schedule, which shall include a description of the procedures for objecting to the proposed Cure Amounts or the Reorganized Debtors' ability to provide "adequate assurance of future performance thereunder" (within the meaning of section 365 of the Bankruptcy Code).  Unless otherwise agreed in writing by the parties in the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure Amount must be Filed, served, and actually received by the counsel to the Debtor no later than the date and time specified in the notice.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Amount will be deemed to have assented to such assumption or Cure Amount.  Notwithstanding anything herein to the contrary, in the event that any Executory Contract or Unexpired Lease is added to the Assumed Executory Contracts and Unexpired Leases Schedule after such 7-day deadline, a notice of proposed Cure Amounts with respect to such Executory Contract or Unexpired Lease will be sent promptly to the counterparty thereof.

Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure Amount that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Bankruptcy Court no later than the date and time specified in the notice.  Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure Amount shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure Amount; *provided* that nothing herein shall prevent the Reorganized Debtors from paying any Cure Amount despite the failure of the relevant counterparty to file such request for payment of such Cure Amount.  The Reorganized Debtors also may settle any Cure Amount without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors or the Reorganized Debtors, as applicable, shall pay the Cure Amounts, if any, on the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may agree.  If there is any dispute regarding any Cure Amount, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of the applicable Cure Amount shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

If the Bankruptcy Court determines that the Allowed Cure Amount with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or Reorganized Debtors, as applicable, will have the right to add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cure Amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, arising at any time prior to the effective date of assumption.  **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption, (2) the effective date of such assumption or (3) the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

D.      *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any applicable non-bankruptcy Law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

E.      *Indemnification Obligations.*

On and as of the Effective Date, the Indemnification Obligations will be assumed, irrevocable with respect to any claims relating to acts or omissions occurring at or prior to the Effective Date, and will survive the effectiveness of the Plan.

F.      *Insurance Policies.*

Notwithstanding anything in the Plan to the contrary, each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

G.      *Reservation of Rights.*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

H.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

I.      *Employee Compensation and Benefits.*

1.      Compensation and Benefit Programs.

Subject to the provisions of the Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for:

(a)      all employee equity or equity-based incentive plans, and any provisions set forth in the Compensation and Benefits Programs that provide for rights to acquire Interests in any of the Debtors; and

(b)      any Compensation and Benefits Programs that, as of the entry of the Confirmation Order, have been specifically waived by the beneficiaries of any Compensation and Benefits Programs plan or contract.

Any assumption of Compensation and Benefits Programs pursuant to the terms herein shall not be deemed to trigger any applicable change of control, immediate vesting, termination, or similar provisions therein.   No counterparty shall have rights under a Compensation and Benefits Program assumed pursuant to the Plan other than those applicable immediately prior to such assumption.

On the Effective Date, pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, the Management Employment Agreements shall be deemed assumed, and the Debtors and the Reorganized Debtors shall not seek to reject the Management Employment Agreements after the Effective Date.

2.      Workers' Compensation Programs.

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (a) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (b) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance.  All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy Law with respect to any such contracts, agreements, policies, programs, and plans; *provided further* that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law.

*J.*      *Contracts or Leases Entered Into After the Petition Date.*

Contracts or leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors in the ordinary course of their business.  Accordingly, such contracts or leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

**ARTICLE VI.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

*A.*      *Distributions on Account of Claims or Interests Allowed as of the Effective Date.*

Except as otherwise provided herein, in a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of the applicable Allowed Claim or Interest on the first Distribution Date, the Reorganized Debtors shall make initial distributions under the Plan on account of Claims or Interests Allowed on or before the Effective Date, subject to the Reorganized Debtors' right to object to any Claims or Interests; *provided* that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.D of the Plan, and (3) Allowed General Unsecured Claims against the Debtors shall be paid in accordance with Article III.B.8 of the Plan.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy

Law or in the ordinary course of business.  Thereafter, a Distribution Date shall occur no less frequently than once in every ninety (90) days, as necessary, in the Reorganized Debtors' sole discretion.

B.    *Distribution Agent.*

All distributions under the Plan shall be made by the Reorganized Debtors.  The Distribution Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Distribution Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

C.    *Rights and Powers of Distribution Agent.*

1.    Powers of the Distribution Agent.

The Distribution Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

2.    Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Distribution Agent shall be paid in Cash by the Reorganized Debtors.

D.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.    Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim, other than one based on a publicly traded Security, is transferred twenty (20) or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

2.    Delivery of Distributions in General.

Except as otherwise provided herein, the Distribution Agent shall make distributions to Holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

3.    Delivery of Distributions on Second Lien Notes Claims, Convertible Notes Claims, and Subordinated Notes Claims.

The Second Lien Notes Trustee shall be deemed to be the Holder of all Allowed Class 5 Claims, the Convertible Notes Trustee shall be deemed to be the Holder of all Allowed Class 6 Claims, and the Subordinated Notes Trustee shall be deemed to be the Holder of all Allowed Class 7 Claims, for purposes of distributions to be made hereunder, and all distributions on account of such Allowed Claims shall be deemed to have been made at the direction of the applicable indenture trustee, and subject to the Indenture Trustees' Charging Liens.  Notwithstanding anything in the Plan to the contrary, and without limiting the exculpation and release provisions of the Plan, the Second Lien Notes Trustee, the Convertible Notes Trustee, or the Subordinated Notes Trustee shall not have any liability to

33

any Entity with respect to distributions directed to be made by the Second Lien Notes Trustee, Convertible Notes Trustee, or the Subordinated Notes Trustee.

4.    Minimum Distributions.

No fractional shares of New DNR Equity or Warrants shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of shares of New DNR Equity or Warrants that is not a whole number, the actual distribution of shares of New DNR Equity or Warrants shall be rounded as follows:  (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized shares of New DNR Equity or Warrants to be distributed to Holders of Allowed Claims and Allowed Interests hereunder shall be adjusted as necessary to account for the foregoing rounding.

5.    Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the Effective Date.  After such date, all Unclaimed Distributions shall revest in the applicable Reorganized Debtor automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary) and, to the extent such Unclaimed Distribution is comprised of New DNR Equity, such New DNR Equity shall be canceled.  Upon such revesting, the Claim of the Holder or its successors with respect to such property shall be canceled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

If any distribution to a Holder of an Allowed Claim is returned to the Distribution Agent as undeliverable, no further distributions shall be made to such Holder unless and until the Distribution Agent is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such Holder on the next Distribution Date.  Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is canceled pursuant to this Article VI.D.5 of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

6.    Surrender of Canceled Instruments or Securities.

On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a certificate or instrument evidencing a Claim or an Interest shall be deemed to have surrendered such certificate or instrument to the Distribution Agent.  Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect for purposes of allowing Holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights.  Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims that are Unimpaired under the Plan.

E.      *Manner of Payment.*

1.    All distributions of the New DNR Equity and Warrants to the Holders of the applicable Allowed Claims or Allowed Interests under the Plan shall be made by the Distribution Agent on behalf of the Debtors or Reorganized Debtors, as applicable.

2.    All distributions of Cash to the Holders of the applicable Allowed Claim under the Plan shall be made by the Distribution Agent on behalf of the applicable Debtor or Reorganized Debtor.

3.    At the option of the Distribution Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.      *Section 1145 Exemption.*

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New DNR Equity and the Warrants, as contemplated by Article III.B hereof, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable Law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  In addition, under section 1145 of the Bankruptcy Code, such New DNR Equity and the Warrants will be freely tradable in the U.S. by the recipients thereof, subject to the provisions of (i) section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (ii) compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities, and (iii) any restrictions in the New Organizational Documents.

G.      *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Debtors, Reorganized Debtors, Distribution Agent, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors and Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and similar spousal awards, Liens, and encumbrances.  Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim or Interest shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

H.      *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

I.      *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any prepetition Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

J.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

K.      *Setoffs and Recoupment.*

Except as expressly provided in this Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and the Holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, *however*, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable Holder. In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G hereof on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

L.      *Claims Paid or Payable by Third Parties.*

1.    <u>Claims Paid by Third Parties.</u>

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

2.    <u>Claims Payable by Third Parties.</u>

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    <u>Applicability of Insurance Policies.</u>

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A.      *Disputed Claims Process.*

There is no requirement to file a Proof of Claim (or move the Bankruptcy Court for allowance) to have a Claim Allowed for the purposes of the Plan, except as provided in Article V.B of the Plan.  On and after the Effective Date, except as otherwise provided in this Plan, all Allowed Claims shall be satisfied in the ordinary court of business of the Reorganized Debtors.  The Debtors and the Reorganized Debtors, as applicable, shall have the exclusive authority to (i) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a claim subject to any Proof of Claim that is Filed is Allowed and (ii) file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan.  If the Debtors or Reorganized Debtors dispute any Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced; *provided* that the Debtors or Reorganized Debtors may elect, at their sole option, to object to any Claim (other than Claims expressly Allowed by this Plan) and to have the validity or amount of any Claim adjudicated by the Bankruptcy Court; *provided, further*, that Holders of Claims may elect to resolve the validity or amount of any Claim in the Bankruptcy Court.  If a Holder makes such an election, the Bankruptcy Court shall apply the Law that would have governed the dispute if the Chapter 11 Cases had not been filed.  All Proofs of Claim Filed in the Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors.  **Except as otherwise provided herein, all Proofs of Claim Filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

B.      *Allowance of Claims.*

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy Law.

C.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval of the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval of the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.S of the Plan.

Any objections to Claims and Interests other than General Unsecured Claims shall be served and filed on or before the 180th day after the Effective Date or by such later date as ordered by the Bankruptcy Court.  All Claims and Interests other than General Unsecured Claims not objected to by the end of such 180-day period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court.

Notwithstanding the foregoing, the Debtors and Reorganized Debtors shall be entitled to dispute and/or otherwise object to any General Unsecured Claim in accordance with the Bankruptcy Code or any applicable non-bankruptcy Law.  If the Debtors, or Reorganized Debtors dispute any General Unsecured Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced.  In any action or proceeding to determine the existence, validity, or amount of any General Unsecured

Claim, any and all claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim are preserved as if the Chapter 11 Cases had not been commenced.

D.      *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Estimation of Claims.*

Before, on, or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable Law, including pursuant to section 502(c) of the Bankruptcy Code and/or Bankruptcy Rule 3012 for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim and does not provide otherwise, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors or Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

F.      *Disallowance of Claims or Interests.*

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if:  (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

G.      *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only the Allowed amount of an otherwise valid Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

H.      *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any

Disputed Claim or Interest becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.     *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than the Reinstated Claims) and Interests (other than the Intercompany Interests that are Reinstated) subject to the occurrence of the Effective Date.

B.     **Releases by the Debtors.**

**Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates (as applicable) would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:  the Debtors (including the management, ownership, or operation thereof), any securities issued by the Debtors and the ownership thereof, the Debtors' restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), any intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement, the Exit Facility, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement, the Exit Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring**

transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Restructuring or (b) any individual from any claim or Causes of Action related to an act or omission that is determined in a Final Order by a court competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

C.      *Releases by the Releasing Parties.*

Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, the Reorganized Debtors, or their Estates (as applicable), that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), any securities issued by the Debtors and the ownership thereof, the Debtors' restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the DIP Facility, the Disclosure Statement, the Plan, the Exit Facility, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the Disclosure Statement, the Plan, the Exit Facility, the Plan Supplement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Restructuring or (b) any individual from any claim or Causes of Action related to an act or omission that is determined in a Final Order by a court competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

**D.**      *Exculpation.*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the DIP Facility, the Disclosure Statement, the Plan, the Exit Facility, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the Disclosure Statement, the Plan, the Exit Facility,  the Plan Supplement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order by a court competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

**E.**      *Injunction.*

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action, suit or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.E.

F.        *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Entities, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

G.        *Release of Liens.*

Except as otherwise specifically provided in the Plan, the Exit Facility Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate or Hedge Claims with respect to which the applicable counterparty has agreed to Reinstatement in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be automatically and fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or the Reorganized Debtors, or any other Holder of a Secured Claim.  Any Holder of such Secured Claims (and the applicable agent for such Holder) shall be authorized and directed to release any collateral or other property of the Debtors (including any cash collateral and possessory collateral) held by such Holders (and the applicable agent for such Holders), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of all documents reasonably requested by the Debtors, Reorganized Debtors, or the Exit Facility Agent to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such mortgages, deeds of trust, Liens, pledges, and other security interests.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or Exit Facility Agent that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.  Notwithstanding the foregoing paragraph, this Article VIII.G shall not apply to any Secured Claims that are Reinstated pursuant to the terms of this Plan.

H.        *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

I.        *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent or (2) the relevant

Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.      the Bankruptcy Court shall have entered the Confirmation Order, which shall:

(a)      be in form and substance consistent with the Restructuring Support Agreement (and subject to the consent, approval and consultation rights set forth therein);

(b)      authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

(c)      decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

(d)      authorize the Debtors and Reorganized Debtors, as applicable or necessary, to, among other things:  (i) implement the Restructuring; (ii) issue and distribute the Warrants and the New DNR Equity pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; (iii) make all distributions and issuances as required under the Plan, including Cash, the Warrants, and the New DNR Equity; and (iv) enter into any agreements and transactions as necessary to effectuate the Restructuring, including the Exit Facility and the Management Incentive Plan;

(e)      authorize the implementation of the Plan in accordance with its terms;

(f)      provide that, pursuant to section 1146 of the Bankruptcy Code, the issuance or exchange of any Security, assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax; and

(g)      be a Final Order;

2.      the Definitive Documents (as defined in the Restructuring Support Agreement) will contain terms and conditions consistent in all material respects with the Restructuring Support Agreement and will otherwise be subject to the consent of the applicable Consenting Creditors in accordance with section 3 of the Restructuring Support Agreement (such consent not to be unreasonably withheld);

3.      the Debtors shall have obtained all governmental and third-party authorizations, consents, approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

4.      the final version of all schedules, documents, and exhibits in the Plan Supplement shall have been Filed in a manner consistent in all material respects with the Restructuring Support Agreement, including the consent rights provided for therein and in the Plan;

5.      the Restructuring Support Agreement shall remain in full force and effect;

6.      adoption or assumption, as applicable, of the Compensation and Benefits Programs;

7.      assumption of the Management Employment Agreements;

8.      all actions, documents, certificates, and agreements necessary to implement the Plan (including any documents contained in the Plan Supplement) shall have been effected or executed and delivered to the applicable parties, and, to the extent required, filed with the applicable Governmental Units, in accordance with applicable Laws, and shall comply with the consent rights set forth in the Restructuring Support Agreement;

9.      all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been placed in the Professional Fee Escrow Account in accordance with Article II.B hereof pending approval by the Bankruptcy Court;

10.      the Debtors shall have paid the Restructuring Expenses in accordance with the terms of Article IV.T hereof, the Restructuring Support Agreement, and the DIP Orders, as applicable;

11.      the Exit Facility Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the Exit Facility shall have been satisfied or duly waived in writing; and

12.      the Debtors and Reorganized Debtors, as applicable, shall have implemented the Restructuring (including the Exit Facility) and all transactions contemplated herein, in a manner consistent with the Restructuring Support Agreement (and subject to the consent, approval and consultation rights set forth therein), the Plan, and the Plan Supplement.

B.      *Waiver of Conditions.*

The conditions to Consummation set forth in this Article IX may be waived by the Debtors with the consent of the Required Consenting Second Lien Noteholders, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan; *provided* that any waiver of the conditions to Consummation set forth in Article IX.A.3, Article IX.A.5, Article IX.A.8, Article IX.A.10, Article IX.A.11, and Article IX.A.12, and solely to the extent they affect the DIP Facility Documents, the DIP Orders, or the Exit Facility Documents and consistent with the Restructuring Support Agreement (and subject to the consent, approval, and consultation rights set forth therein), Article IX.A.1, Article IX.A.2, and Article IX.A.4 shall also require the consent of the Required Consenting RBL Lenders.

C.      *Effect of Non-Occurrence of Conditions.*

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan, the Disclosure Statement, or Restructuring Support Agreement shall:  (1) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity.

D.      *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.     *Modification and Amendments.*

Except as otherwise specifically provided in this Plan and subject to the consent rights set forth in the Restructuring Support Agreement, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to those restrictions on modifications set forth in the Plan and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan; *provided* that each of the foregoing actions shall not violate the Restructuring Support Agreement.

B.     *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.     *Revocation or Withdrawal of Plan.*

To the extent permitted by the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.     allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.     decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.     resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cures pursuant

to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.      enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Confirmation Order, or the Disclosure Statement, including the Restructuring Support Agreement;

8.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.L hereof;

14.     enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.     determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement, including the Restructuring Support Agreement;

16.     enter an order or final decree concluding or closing the Chapter 11 Cases;

17.     adjudicate any and all disputes arising from or relating to distributions under the Plan;

18.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.      determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

21.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.      hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article VIII hereof, regardless of whether such termination occurred prior to or after the Effective Date;

23.      enforce all orders previously entered by the Bankruptcy Court; and

24.      hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article XI to the contrary, the New Organizational Documents and the Exit Facility and any documents related thereto shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests have, or are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.     *Additional Documents.*

On or before the Effective Date, and consistent in all respects with the terms of the Restructuring Support Agreement, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan and the Restructuring Support Agreement.  The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.     *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Distribution Agent on behalf of each of the Reorganized Debtors) for each quarter (including any fraction thereof) until the earlier of entry of a final decree closing such Chapter 11 Cases or an order of dismissal or conversion, whichever comes first.

D.      *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code.  The Debtors (or Reorganized Debtors, as applicable) shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committee after the Effective Date.

E.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| Denbury Resources Inc.<br>5320 Legacy Drive<br>Plano, Texas 75024<br>Attention:  Jim Matthews | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention:  Joshua A. Sussberg, P.C. Christopher Marcus, P.C., and Rebecca Blake Chaikin<br>Email: jsussberg@kirkland.com; cmarcus@kirkland.com; rebecca.chaikin@kirkland.com<br><br>- and -<br><br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Attention: David Eaton<br>Email: deaton@kirkland.com<br><br>- and -<br><br>Jackson Walker LLP<br>1401 McKinney Street, Suite 1900<br>Houston, TX 77010<br>Attention: Matthew D. Cavenaugh<br>Email: mcavenaugh@jw.com |

| United States Trustee | Counsel to the Second Lien Ad Hoc Committee |
|---|---|
| Office of The United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, TX 77002 | Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, NY 10019-6064<br>Attention: Andrew N. Rosenberg, Elizabeth R. McColm,<br>and Michael Turkel<br>Email: arosenberg@paulweiss.com;<br>emccolm@paulweiss.com; mturkel@paulweiss.com |
| **Counsel to the RBL Agent** | **Counsel to the Convertible Ad Hoc Group** |
| Vinson & Elkins, LLP<br>2001 Ross Avenue<br>Suite 3900<br>Dallas, TX 75201<br>Attention: Erec Winandy and Bill Wallander<br>Email: ewinandy@velaw.com;<br>bwallander@velaw.com | Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park<br>Bank of America Tower<br>New York, NY 10036-6745<br>Attention: Michael S. Stamer<br>Email: mstamer@akingump.com |

After the Effective Date, the Reorganized Debtors have the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.      *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.      *Entire Agreement.*

Except as otherwise indicated, and without limiting the effectiveness of the Restructuring Support Agreement, the Plan (including, for the avoidance of doubt, the documents and instruments in the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.      *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://dm.epiq11.com/Denbury or the Bankruptcy Court's website at www.txs.uscourts.gov/bankruptcy.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

K.      *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; *provided* that any such deletion or modification must be consistent with the Restructuring Support Agreement (and subject to the consent, approval and consultation rights set forth therein); and (3) nonseverable and mutually dependent.

L.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable Law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

M.      *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N.      *Waiver or Estoppel.*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

Dated:  July 28, 2020                               DENBURY RESOURCES INC.

                                                    on behalf of itself and all other Debtors


                                                    _/s/ Christian S. Kendall_
                                                    Christian S. Kendall
                                                    President and Chief Executive Officer
                                                    Denbury Resources Inc.

**Exhibit B**

**Restructuring Support Agreement**

*Execution Version*

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER, SOLICITATION, OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED IN THIS AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES TO THIS AGREEMENT.**

### *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto and as amended, supplemented, or otherwise modified from time to time in accordance with Section 13 hereof, this "**Agreement**"), is made and entered into as of July 28, 2020 (the "**Execution Date**"), by and among the following parties (each of the following described in sub clauses (i) through (iv) of this preamble, and any person or Entity that becomes a party hereto in accordance with the terms hereof, collectively, the "**Parties**"):[1]

    i.    Denbury Resources Inc., Denbury Air, LLC, Denbury Brookhaven Pipeline Partnership, LP, Denbury Brookhaven Pipeline, LLC, Denbury Gathering & Marketing, Inc., Denbury Green Pipeline-Montana, LLC; Denbury Green Pipeline-North Dakota, LLC, Denbury Green Pipeline-Riley Ridge, LLC, Denbury Green Pipeline-Texas, LLC, Denbury Gulf Coast Pipelines, LLC; Denbury Holdings, Inc., Denbury Onshore, LLC, Denbury Operating Company, Denbury Pipeline Holdings, LLC, Denbury Thompson Pipeline, LLC, Encore Partners GP Holdings, LLC, Greencore Pipeline Company, LLC, and Plain Energy Holdings, LLC (collectively, the "**Company Parties**" or the "**Debtors**");

    ii.    the RBL Lenders that have executed and delivered to Counsel to the Company Parties counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement (collectively, the "**Consenting RBL Lenders**");

    iii.    the beneficial holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, Second Lien Notes that have executed and delivered to Counsel to the Company Parties counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement (collectively, the "**Consenting Second Lien Noteholders**"); and

    iv.    the beneficial holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, Convertible Notes that have executed and delivered to Counsel to the Company Parties counterpart signature pages to this

---

[1] Capitalized terms used, but not defined in this Agreement, have the meanings given to them in Section 1 of this Agreement or the Plan (as defined herein), as applicable.

Agreement, a Joinder, or a Transfer Agreement (collectively, the "**Consenting Convertible Noteholders**" and, together with the RBL Agent, the Consenting RBL Lenders and the Consenting Second Lien Noteholders, the "**Consenting Creditors**").

## *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Creditors have in good faith and at arm's length negotiated or been apprised of certain restructuring transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in (i) the prepackaged chapter 11 plan of reorganization attached hereto as **Annex 1** (the "**Plan**"), (ii) the financing term sheet attached hereto as **Annex 2** (the "**DIP-to-Exit Facility Term Sheet**") and the Exit Commitment Letter (as defined below) attached hereto as **Annex 2(a)**, (iii) the warrants term sheet attached hereto as **Annex 3** (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, the "**Warrants Term Sheet**"), and, (iv) the governance term sheet attached hereto as **Annex 4** (the "**Governance Term Sheet**", and such transactions described in this Agreement, the Plan, the DIP-to-Exit Facility Term Sheet, the Exit Commitment Letter, the Warrants Term Sheet, the Governance Term Sheet, and all attachments thereto, the "**Restructuring**");

**WHEREAS**, the Debtors will implement the Restructuring through prepackaged voluntary reorganization cases (the "**Chapter 11 Cases**") filed under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**");

**WHEREAS**, as of the Execution Date, the Consenting RBL Lenders hold, in the aggregate, 100 percent of the aggregate principal amount outstanding of the RBL Loans;

**WHEREAS**, as of the Execution Date, the Consenting Second Lien Noteholders hold, in the aggregate, approximately 67.2 percent of the aggregate principal amount outstanding of the Second Lien Notes Claims;

**WHEREAS**, as of the Execution Date, the Consenting Convertible Noteholders hold, in the aggregate, approximately 70.8 percent of the aggregate principal amount outstanding of the Convertible Notes Claims;

**WHEREAS**, the Parties agree that this Agreement and the Restructuring are the product of arm's-length and good-faith negotiations among all of the Parties; and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring on the terms and conditions set forth in this Agreement and the Plan.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained in this Agreement, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound by this Agreement, agrees as follows:

*AGREEMENT*

**Section 1.**      *Definitions and Interpretation.*

1.01.   <u>Definitions</u>.  The following terms have the following definitions:

(a)      "**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules attached to this Agreement in accordance with <u>Section 14.04</u> hereof (including the annexes and exhibits hereto).

(b)      "**Agreement Effective Date**" means the date on which the conditions set forth in <u>Section 2</u> hereof have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

(c)      "**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date until the Termination Date applicable to such Party.

(d)      "**Alternative Restructuring Proposal**" means any plan, inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, asset sale, share issuance, tender offer, exchange offer, consent solicitation, recapitalization, plan of reorganization, share exchange, business combination, joint venture, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to, in whole or in part, or is inconsistent with the terms of the Restructuring.

(e)      "**Bankruptcy Code**" has the meaning set forth in the recitals to this Agreement.

(f)      "**Bankruptcy Court**" has the meaning set forth in the recitals to this Agreement, and for the avoidance of doubt, includes any other court having jurisdiction over the Chapter 11 Cases, including to the extent of the withdrawal of reference under 28 U.S.C. § 157, the United States District Court for the Southern District of Texas.

(g)      "**Business Day**" means any day other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

(h)      "**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

(i)      "**Claim**" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

(j)      "**Company Claims**" means any Claim against a Company Party.  Company Claims shall expressly exclude any Interest in a Company Party.

(k)      "**Company Parties**" has the meaning set forth in the recitals to this Agreement.

(l)     "**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other agreement relating to public disclosure of material non-public information, in connection with any proposed Restructuring.

(m)     "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan.

(n)     "**Consenting Convertible Noteholders**" has the meaning set forth in the preamble to this Agreement.

(o)     "**Consenting Creditors**" has the meaning set forth in the preamble to this Agreement.

(p)     "**Consenting RBL Lenders**" has the meaning set forth in the preamble to this Agreement.

(q)     "**Consenting Second Lien Noteholders**" has the meaning set forth in the preamble to this Agreement.

(r)     "**Convertible Notes**" has the meaning set forth in the Plan.

(s)     "**Convertible Notes Claims**" has the meaning set forth in the Plan.

(t)     "**Counsel to the Company Parties**" means Kirkland & Ellis LLP.

(u)     "**Definitive Documents**" means the documents set forth in Section 3.01.

(v)     "**DIP Agent**" means JPMorgan Chase Bank, N.A., or any successor thereto, as administrative agent under the DIP Facility, solely in its capacity as such.

(w)     "**DIP Facility**" means the debtor-in-possession financing facility on terms and conditions consistent in all material respects with this Agreement (including the DIP-to-Exit Facility Term Sheet) and the DIP Orders and otherwise in form and substance acceptable to the Company Parties and the DIP Lenders, and reasonably acceptable to the Required Consenting Second Lien Noteholders.

(x)     "**DIP Facility Documents**" means any documents governing or related to the DIP Facility (including the DIP Orders), which documents shall be consistent in all material respects with the Plan, this Agreement (including the DIP-to-Exit Facility Term Sheet) and the DIP Orders and otherwise in form and substance acceptable to the Company Parties and the DIP Agent and the DIP Lenders as to such documents and to the Company Parties and the DIP Agent as to the DIP Orders, and reasonably acceptable to the Required Consenting Second Lien Noteholders.

(y)     "**DIP Final Order**" means the final order authorizing use of cash collateral and debtor-in-possession financing on terms consistent with the DIP-to-Exit Facility Term Sheet, and in form and substance acceptable to the Company Parties and the DIP Agent, and reasonably acceptable to the Required Consenting Second Lien Noteholders.

(z)      "**DIP Interim Order**" means the interim order authorizing use of cash collateral and debtor-in-possession financing on terms consistent with the DIP-to-Exit Facility Term Sheet, and in form and substance acceptable to the Company Parties and the DIP Agent, and reasonably acceptable to the Required Consenting Second Lien Noteholders.

(aa)      "**DIP Lenders**" means the lenders under the DIP Facility.

(bb)      "**DIP Orders**" means, collectively, the DIP Interim Order and the DIP Final Order.

(cc)      "**DIP-to-Exit Facility Term Sheet**" has the meaning set forth in the preamble to this Agreement.

(dd)      "**Disclosure Statement**" means the disclosure statement with respect to the Plan that is prepared and distributed in accordance with, among other things, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable Law, and all exhibits, schedules, supplements, modifications and amendments thereto, all of which shall be consistent in all material respects with this Agreement

(ee)      "**Disclosure Statement Order**" means the order approving the Disclosure Statement, which order shall be consistent in all material respects with this Agreement.

(ff)      "**Execution Date**" has the meaning set forth in the preamble to this Agreement.

(gg)      "**Existing Equity Interests**" means the common stock of the Company Parties that is existing as of the Petition Date.

(hh)      "**Exit Commitment Letter**" means the commitment letter attached as **Annex 2(a)** hereto, and the related fee letters with respect thereto.

(ii)      "**Exit Facility**" means the revolving credit facility in an aggregate maximum principal amount of up to $615,000,000, subject to a conforming borrowing base to be set forth in the Exit Facility Documents and on such other terms and conditions consistent in all material respects with this Agreement, the DIP-to-Exit Facility Term Sheet, the Exit Commitment Letter, and the Exit Facility Term Sheet, and otherwise in form and substance acceptable to the Debtors and the Exit Facility Lenders, and reasonably acceptable to the Required Consenting Second Lien Noteholders.

(jj)      "**Exit Facility Documents**" has the meaning set forth in the Plan, and each of which shall be consistent in all material respects with the Plan, this Agreement, the DIP-to-Exit Facility Term Sheet, the Exit Facility Term Sheet, and the Exit Commitment Letter, and otherwise in form and substance acceptable to the Debtors and the Exit Facility Lenders, and reasonably acceptable to the Required Consenting Second Lien Noteholders.

(kk)      "**Exit Facility Lenders**" means the lenders under the Exit Facility.

(ll)      "**Exit Facility Term Sheet**" means the financing term sheet attached as Exhibit A to the Exit Commitment Letter.

(mm)   "**First Day Pleadings**" means the first-day pleadings that the Company Parties file with the Bankruptcy Court upon the commencement of the Chapter 11 Cases.

(nn)   "**Governance Term Sheet**" has the meaning set forth in the preamble to this Agreement.

(oo)   "**Hedge Contract**" means any futures contract, forward contract, swap contract, derivative contract, hedging contract or other like instrument with a Company Party.

(pp)   "**Interest**" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable Securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

(qq)   "**Joinder**" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit B**.

(rr)   "**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

(ss)   "*Management Compensation Term Sheet*" means the term sheet setting forth the terms of the Management Incentive Plan, which shall be included in the Plan Supplement.

(tt)   "**Management Incentive Plan**" means any equity incentive program for the members of the management team of the Reorganized Debtors to be established as contemplated in the Plan, and in accordance with this Agreement and the Definitive Documents.

(uu)   "**Milestones**" means the milestones set forth in Section 4 hereof.

(vv)   "**New DNR Equity**" has the meaning set forth in the Plan.

(ww)   "**New Organizational Documents**" has the meaning set forth in the Plan.

(xx)   "**Parties**" has the meaning set forth in the preamble to this Agreement.

(yy)   "**Permitted Transfer**" means each transfer of any Company Claims that meet the requirements of Section 9.01 hereof.

(zz)   "**Permitted Transferee**" means each transferee of any Company Claims who meets the requirements of Section 9.01 hereof.

(aaa)   "**Petition Date**" means the first date on which any of the Company Parties commences a Chapter 11 Case.

(bbb) "**Plan**" has the meaning set forth in the recitals to this Agreement.

(ccc) "**Plan Effective Date**" means the date on which the Plan becomes effective in accordance with its terms.

(ddd) "**Plan Supplement**" means the compilation of documents and forms and/or term sheets of documents, schedules, and exhibits to the Plan that will be filed by the Company Parties with the Bankruptcy Court, each of which shall be consistent in all material respects with this Agreement (to the extent applicable) and subject to the consent rights set forth in Section 3.02.

(eee) "**Qualified Marketmaker**" means an Entity that (i) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims (or enter with customers into long and short positions in Company Claims), in its capacity as a dealer or market maker in Company Claims and (ii) is, in fact, regularly in the business of making a market in Claims against issuers or borrowers (including debt securities or other debt).

(fff) "**RBL Agent**" means JPMorgan Chase Bank, N.A., and any successor thereto, solely in its capacity as successor administrative agent under the RBL Credit Agreement.

(ggg) "**RBL Claims**" has the meaning set forth in the Plan.

(hhh) "**RBL Credit Agreement**" has the meaning set forth in the Plan.

(iii) "**RBL Facility Documents**" means any documents governing or related to the revolving credit facility governed by the RBL Credit Agreement, including the RBL Credit Agreement, and provided by the RBL Lenders to certain of the Company Parties.

(jjj) "**RBL Lenders**" means the lenders under the RBL Credit Agreement, from time to time.

(kkk) "**RBL Loans**" has the meaning set forth in the Plan.

(lll) "**Required Consenting Convertible Noteholders**" means, as of any time of determination, the Consenting Convertible Noteholders holding at least 50.01% of the aggregate outstanding principal amount of the Convertible Notes that are held by all Consenting Convertible Noteholders.

(mmm)"**Required Consenting Creditors**" means, collectively, the Required Consenting RBL Lenders, the Required Consenting Second Lien Noteholders, and the Required Consenting Convertible Noteholders.

(nnn) "**Required Consenting RBL Lenders**" means, as of any time of determination, the Consenting RBL Lenders holding at least 50.01% of the aggregate outstanding principal amount of RBL Loans that are held by all Consenting RBL Lenders.

(ooo) "**Required Consenting Second Lien Noteholders**" means, as of any time of determination, the Consenting Second Lien Noteholders (a) holding at least 50.01% of the

aggregate outstanding principal amount of Second Lien Notes that are held by all Consenting Second Lien Noteholders that are members of the Second Lien *Ad Hoc* Committee and (b) constituting at least two (2) members[2] of the Second Lien *Ad Hoc* Committee.

(ppp)    "**Required Parties**" means the Company Parties and the Required Consenting Creditors.

(qqq)    "**Restructuring**" has the meaning set forth in the recitals to this Agreement.

(rrr)    "**Second Lien *Ad Hoc* Committee**" means the *ad hoc* committee of holders of Second Lien Notes represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP, PJT Partners LP, and any local or foreign advisors.

(sss)    "**Second Lien Notes**" has the meaning set forth in the Plan.

(ttt)    "**Second Lien Notes Claims**" has the meaning set forth in the Plan.

(uuu)    "**Securities Act**" means the Securities Act of 1933, as amended, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

(vvv)    "**Securities Rules**" means Rules 501(a)(1), (2), (3), and (7) promulgated under the Securities Act.

(www)   "**Solicitation Materials**" means all solicitation materials in respect of the Plan.

(xxx)    "**Subordinated Notes**" has the meaning set forth in the Plan.

(yyy)    "**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Section 12 hereof.

(zzz)    "**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions).

(aaaa)   "**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that the transferee is bound by the terms of this Agreement, substantially in the form attached hereto as **Exhibit A**.

(bbbb)   "**Warrants Documentation**" means the definitive documentation with respect to the issuance of the Warrants, which shall be included in the Plan Supplement, on terms and conditions consistent in all material respects with the Plan and the Warrants Term Sheet.

---

[2]    For the purposes of determining the number of Consenting Second Lien Noteholders in the Second Lien *Ad Hoc* Committee, each member thereof, together with any of its affiliates or managed funds, shall be counted as one Consenting Second Lien Noteholder in the Second Lien *Ad Hoc* Committee.

(cccc) "**Warrants Term Sheet**" has the meaning set forth in the recitals to this Agreement.

1.02.   Interpretation.  For purposes of this Agreement:

(a)   in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)   capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)   unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time in accordance with this Agreement; *provided* that any capitalized terms herein that are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the Execution Date;

(d)   unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(e)   the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(f)   captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(g)   references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws; and

(h)   the use of "include" or "including" is without limitation, whether stated or not.

**Section 2.**   *Effectiveness of this Agreement.*

2.01.   This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)   each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

(b)   holders of at least 100 percent of the aggregate outstanding principal amount of RBL Loans shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

(c)     holders of at least 66.67 percent of the aggregate outstanding principal amount of the Second Lien Notes shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

(d)     holders of at least 66.67 percent of the aggregate outstanding principal amount of the Convertible Notes shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

(e)     each Consenting RBL Lender that is participating in the Exit Facility as of the Execution Date shall have executed and delivered the Exit Commitment Letter with respect to its ratable share of the Exit Facility; and

(f)     Counsel to the Company Parties shall have given notice to counsel to the other Parties in the manner set forth in <u>Section 14.12</u> (by email or otherwise) that the conditions to the Agreement Effective Date set forth in this <u>Section 2</u> have occurred or are otherwise waived.

**Section 3.      *Definitive Documents.***

3.01.     The Definitive Documents governing the Restructuring shall consist of the following:

(a)     the DIP Orders;

(b)     the DIP Facility Documents;

(c)     the Disclosure Statement, its exhibits, and any pleadings filed in support of the Disclosure Statement;

(d)     the Solicitation Materials, and the order approving the Solicitation Materials;

(e)     the Disclosure Statement Order;

(f)     the Plan, Plan Supplement, and all material documents, annexes, schedules, exhibits, amendments, modifications, or supplements thereto, or other documents contained therein, including any schedules of rejected contracts;

(g)     the First Day Pleadings, and orders granting requested relief;

(h)     the Confirmation Order, and any pleadings filed in support of Confirmation;

(i)     the Exit Facility Documents;

(j)     the Warrants Documentation;

(k)     any new Hedge Contracts or amendments to existing Hedge Contracts entered into by the Company Parties during the Agreement Effective Period;

(l)     the Management Incentive Plan, Management Compensation Term Sheet, and all additional documents or agreements thereto;

(m)     the New Organizational Documents;

(n)     this Agreement; and

(o)     the motions seeking approval of each of the above (and, to the extent applicable and not otherwise noted, the orders approving each of the above) and any other document necessary to implement or achieve the Restructuring not otherwise listed above.

3.02.    The Definitive Documents not executed or not in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion and, except as expressly contemplated in this Agreement (including as set forth in the exhibits and annexes hereto), shall be consistent with this Agreement and otherwise in form and substance reasonably acceptable to the Company Parties or Debtors, as applicable, and the Required Consenting Second Lien Noteholders; *provided* that (a) (1) the DIP Facility Documents (other than the DIP Orders) shall also be in form and substance acceptable to the Company Parties or Debtors, as applicable, and the DIP Lenders, (2) the DIP Orders shall also be in form and substance acceptable to the Company Parties or Debtors, as applicable, and the DIP Agent, (3) the Plan and Confirmation Order shall also be in form and substance acceptable to the Company Parties or Debtors, as applicable, and the Consenting RBL Lenders and DIP Agent, (4) the Exit Facility Documents shall also be in form and substance acceptable to the Company Parties or Debtors, as applicable, and the Exit Facility Lenders, and (5) to the extent any First Day Pleadings and orders granting requested relief affect the RBL Lenders, the DIP Lenders, or the Exit Facility Lenders, as applicable, such First Day Pleadings and orders, shall also be in form and substance acceptable to the Company Parties or Debtors, as applicable, and the Consenting RBL Lenders, DIP Agent, or Exit Facility Lenders, as applicable, (b) any new Hedge Contracts or amendments to existing Hedge Contracts entered into by the Parties during the Agreement Effective Period shall also be in form and substance acceptable to the Debtors and the counterparty to such Hedge Contracts or amendments, and (c) the Warrants Documentation shall also be in form and substance reasonably acceptable to the Required Consenting Convertible Noteholders, the Required Consenting RBL Lenders, and the Exit Facility Agent.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter, or instrument related to the Restructuring shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement (including the exhibits and annexes hereto), as they may be modified, amended, or supplemented in accordance with Section 13.

3.03.    The Company Parties acknowledge and agree that they will use commercially reasonable efforts to provide advance initial draft copies of the Definitive Documents to counsel for the Consenting Creditors at least three (3) Business Days prior to the date when any Company Parties intend to file the applicable Definitive Documents with the Bankruptcy Court; *provided* that if three (3) Business Days in advance is not reasonably practicable, such initial draft Definitive Document shall be provided as soon as reasonably practicable prior to filing, but in no event later than twenty-four (24) hours in advance of any filing hereof.

**Section 4.**     *Milestones.*

(a)     On and after the Agreement Effective Date, the Company Parties shall use commercially reasonable efforts to implement the Restructuring in accordance with the following Milestones:

(i)     no later than July 29, 2020, the Company Parties shall have commenced solicitation of the Plan;

(ii)     no later than July 30, 2020, the Company Parties shall have commenced the Chapter 11 Cases and filed the Plan and Disclosure Statement;

(iii)     no later than August 1, 2020, the Bankruptcy Court shall have entered the DIP Interim Order;

(iv)     no later than September 6, 2020, the Bankruptcy Court shall have entered an order approving the Disclosure Statement and the Confirmation Order;

(v)     no later than the earlier of (a) the entry of the Confirmation Order or (b) 35 days after the Petition Date (unless the Plan Effective Date has already occurred), the Bankruptcy Court shall have entered the DIP Final Order; and

(vi)     no later than 14 days after entry of the Confirmation Order, the Plan Effective Date shall have occurred.

(b)     The Milestones may be extended or waived by the Company Parties with the prior written consent, with email from counsel being sufficient, of the Required Consenting Second Lien Noteholders and the Required Consenting RBL Lenders.

**Section 5.**     *Commitments of the Consenting Creditors.*

5.01.   General Commitments, Forbearances, and Waivers.

(a)     Affirmative Commitments.     During the Agreement Effective Period, each Consenting Creditor agrees, severally, and not jointly, in respect of all of its Company Claims presently owned and hereafter acquired to:

(i)     support the Restructuring, and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which it is legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring;

(ii)     use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Agreement and Restructuring from (1) in the case of the Consenting RBL Lenders, the other RBL Lenders, (2) in the case of the Consenting Second Lien Noteholders, the other Second Lien Noteholders, and (3) in the case of the Consenting Convertible Noteholders, the other Convertible Noteholders;

(iii)     take all steps reasonably necessary to consummate the Restructuring in accordance with this Agreement;

(iv)     subject to Section 3, support, and not oppose, entry of the DIP Orders;

(v)     give any notice, order, instruction, or direction to the applicable trustee(s) or agent(s) reasonably necessary to consummate the Restructuring, *provided* that in no event shall the Consenting Creditors be required to provide an indemnity or bear responsibility for any out of pocket costs related to any such notice, order, instruction, or direction;

(vi)     negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents to which it is required to be a party or to which it has consent rights pursuant to Section 3.02; and

(vii)     negotiate in good faith any additional or alternative provisions or agreements to address any legal, financial, or structural impediment that may arise that would reasonably be expected to prevent, hinder, impede, delay, or are necessary to effectuate the consummation of the Restructuring.

(b)     Negative Commitments.  Notwithstanding anything to the contrary herein, during the Agreement Effective Period, each Consenting Creditor agrees severally, and not jointly, in respect of all of its Company Claims presently owned and hereafter acquired that it shall not directly or indirectly:

(i)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring;

(ii)     propose, file, support, or vote for any Alternative Restructuring Proposal;

(iii)     file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement, or the Plan;

(iv)     exercise any right or remedy for the enforcement, collection, or recovery of any of the Company Claims other than to enforce this Agreement, the DIP Orders, the DIP Facility Documents, the Plan, the Confirmation Order, or any other Definitive Document or as otherwise permitted under this Agreement;

(v)     initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or any of the transactions implementing the Restructuring as contemplated in this Agreement, against the Company Parties or the other Parties other than to enforce this Agreement, the DIP Orders, the DIP Facility Documents, the Plan, the Confirmation Order, or any other Definitive Document or as otherwise permitted under this Agreement;

(vi)     object to, delay, impede or take any other action to interfere with Bankruptcy Court approval of any retention application or fee application filed in the Chapter 11 Cases for Evercore Group L.L.C., as investment banker and financial advisor to the Company

Parties, *provided* that the terms of such applications do not substantively differ from the engagement letter dated March 26, 2020;

(vii)   object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code; *provided*, *however*, that nothing in this Agreement shall limit the right of any Party to exercise any right or remedy provided under this Agreement, the DIP Orders, the DIP Facility Documents, the Plan, the Confirmation Order, or any other Definitive Document or as otherwise permitted under this Agreement; or

(viii)   object to, delay, impede, or take any other action that would reasonably be expected to interfere with, any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

(c)   <u>Financing Commitments</u>.

(i)   During the Agreement Effective Period, and subject in each case to the terms and conditions of the DIP Facility Documents and the DIP Order, each Consenting RBL Lender shall, (A) no later than the entry of the DIP Interim Order, make available for funding its ratable share of the DIP Commitments (as defined in the DIP-to-Exit Facility Term Sheet), with a maximum amount of up to the New Money Interim Cap (as defined in the DIP-to-Exit Facility Term Sheet) available to be drawn from the New Money DIP Commitment (as defined in the DIP-to-Exit Facility Term Sheet), and (B) no later than the entry of the DIP Final Order, make available for funding its ratable share of the DIP Commitments (as defined in the DIP-to-Exit Facility Term Sheet), in each case as consistent with the DIP-to-Exit Facility Term Sheet, attached hereto as **Annex 2**; and

(ii)   Each Consenting RBL Lender agrees to enter into the Exit Facility, and subject in each case to the terms and conditions of the Exit Facility Documents, shall make available for funding its ratable share of the RBL Commitment (as defined in the Exit Facility Term Sheet) upon the terms and conditions set forth in the Exit Commitment Letter attached hereto as **Annex 2(a)** and consistent with the Exit Facility Term Sheet attached as <u>Exhibit A</u> to the Exit Commitment Letter.

5.02.   <u>Commitments with Respect to Chapter 11 Cases</u>.

(a) During the Agreement Effective Period, each Consenting Creditor that is entitled to vote to accept or reject the Plan pursuant to its terms, severally, and not jointly, agrees that it shall, subject to receipt by such Consenting Creditor, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i)   vote each of its Company Claims to accept the Plan by delivering its duly executed and completed ballot(s) accepting the Plan to the Company's solicitation agent on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot(s);

(ii)      not object to the releases set forth in the Plan and, to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, not select on its ballot(s) the "opt-out" with respect to the releases set forth in the Plan; and

(iii)      not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (a)(i) and (ii) above.

(b)      During the Agreement Effective Period, each Consenting Creditor, in respect of each of its Company Claims, severally, and not jointly, will not object to any motion or other pleading or document filed by a Company Party in the Chapter 11 Cases in furtherance of the Restructuring that is consistent with this Agreement, including for the avoidance of doubt, Section 3 of this Agreement.

**Section 6.      *Additional Provisions Regarding the Consenting Creditors' Commitments.***

6.01.      The Parties understand that the Consenting RBL Lenders are engaged in a wide range of financial services and businesses.  In furtherance of the foregoing, the Parties acknowledge and agree that, to the extent a Consenting RBL Lender expressly indicates on its signature page hereto that it is executing this Agreement on behalf of specific trading desk(s) and/or business group(s) of such Consenting RBL Lender, the obligations set forth in this Agreement shall only apply to such trading desk(s) and/or business group(s) and shall not apply to any other trading desk or business group of the Consenting RBL Lenders until such trading desk or business group is or becomes a party to this Agreement.

6.02.      Notwithstanding anything contained in this Agreement, nothing in this Agreement shall:

(a)      be construed to prohibit any Consenting Creditor from appearing as a party in interest in any matter to be adjudicated in a Chapter 11 Case, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and are not for the purpose of delaying, interfering, impeding, or taking any other action to delay, interfere, or impede, directly or indirectly, the Restructuring;

(b)      affect the ability of any Consenting Creditor to consult with any other Consenting Creditor, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee) in a manner consistent with its obligations under Section 5.01(a); *provided* that before disclosing any confidential material of the Company Parties to any such third party, such third party must have signed a Confidentiality Agreement in form and substance acceptable to the Company Parties;

(c)      impair or waive the rights of any Consenting Creditor to assert or raise any objection permitted under this Agreement in connection with the Restructuring;

(d)      prevent any Consenting Creditor from enforcing this Agreement, the DIP Orders, the DIP Facility Documents, the Plan, the Confirmation Order, or any other Definitive Document, or from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, such documents;

(e)   (i) prevent any Consenting Creditor from taking any action which is required by applicable Law, (ii) require any Consenting Creditor to take any action which is prohibited by applicable Law or to waive or forego the benefit of any applicable legal professional privilege, or (iii) require any Consenting Creditor to incur any expenses, liabilities, or other obligations, or agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations; *provided*, *however*, that if any Consenting Creditor proposes to take any action that is otherwise inconsistent with this Agreement in order to comply with applicable Law, such Consenting Creditor shall, to the extent practicable, provide advance reasonable notice to the Company Parties, and Counsel to the Company Parties;

(f)   prevent any Consenting Creditor by reason of this Agreement or the transactions implementing the Restructuring from making, seeking, or receiving any regulatory filings, notifications, consents, determinations, authorizations, permits, approvals, licenses, or the like; or

(g)   prevent any Consenting Creditor from taking any customary perfection step or other action as is necessary to preserve or defend the validity, existence, or priority of its Company Claims in accordance with the terms of the DIP Facility Documents or the RBL Facility Documents (including, without limitation, the filing of a proof of claim against any Company Party).

**Section 7.**   ***Commitments of the Company Parties.***

7.01.   <u>Affirmative Commitments</u>.  Except as set forth in <u>Section 8</u>, during the Agreement Effective Period, the Company Parties agree to:

(a)   do all things reasonably necessary to (i) support and take all steps to consummate the Restructuring in accordance with this Agreement, (ii) prosecute and defend any appeals relating to the Confirmation Order, and (iii) comply with each Milestone set forth in this Agreement;

(b)   to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring contemplated herein, support and take all steps reasonably necessary and desirable to address any such impediment;

(c)   use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals reasonably necessary or required for implementation or consummation of the Restructuring or approval by the Bankruptcy Court of the Definitive Documents as provided herein;

(d)   negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring as contemplated by this Agreement;

(e)   actively oppose and object to the efforts of any person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring (including, if applicable, the filing of timely filed objections or written responses) to the extent such opposition or objection is reasonably necessary or desirable to facilitate implementation of the Restructuring;

16

(f)     upon reasonable request of any Consenting Creditor, inform the advisors to such Consenting Creditor as to:

(i)     the material business and financial (including liquidity) performance of the Company Parties;

(ii)     the status and progress of the negotiations of the Definitive Documents; and

(iii)     the status of obtaining any necessary or desirable authorizations (including consents) from any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body or any stock exchange;

(g)     inform counsel to the Consenting Creditors as soon as reasonably practicable after becoming aware of:

(i)     any event or circumstance that has occurred, or that is reasonably likely to occur (and if it did so occur), that would permit any Party to terminate, or would result in the termination of, this Agreement with respect to such Party;

(ii)     any matter or circumstance which they know, or suspect is likely, to be a material impediment to the implementation or consummation of the Restructuring;

(iii)     any notice of any commencement of any material involuntary insolvency proceeding, legal suit for payment of debt, or enforcement of a security interest by any person in respect of any Company Party;

(iv)     any breach of this Agreement (including a breach by any Company Party);

(v)     any representation or statement made or deemed to be made by them under this Agreement which is or proves to have been materially incorrect or misleading in any respect when made or deemed to be made; and

(vi)     any material operations or financial developments of the Company Parties.

(h)     make commercially reasonable efforts to maintain their good standing under the Laws of the state or other jurisdiction in which they are incorporated or organized;

(i)     (i) provide counsel for the Consenting Second Lien Noteholders, the RBL Agent, and the DIP Agent a reasonable opportunity to review draft copies of all material substantive motions, documents, and other pleadings to be filed in the Chapter 11 Cases  (for the avoidance of doubt, the following are ***not*** material substantive motions, documents, or other pleadings: ministerial notices and similar ministerial documents; retention applications; fee applications; fee statements; any similar pleadings or motions relating to the retention or fees of any professional; and statements of financial affairs and schedules of assets and liabilities), and (ii) to the extent materially affected by such material substantive filings, provide counsel to the Consenting Convertible Noteholders a reasonable opportunity to review draft copies of such filings, in each case (i) and (ii), the Company Parties shall consult in good faith with the applicable Consenting Creditors regarding the form and substance of such material substantive filings;

(j)      operate their businesses in the ordinary course, taking into account the Restructuring and the Chapter 11 Cases;

(k)      comply with the terms, conditions, and obligations of the DIP Facility Documents and the DIP Orders, once approved or entered, as applicable, by the Bankruptcy Court;

(l)      timely file a formal objection, in form and substance reasonably acceptable to the Consenting Creditors, to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing any of the Chapter 11 Cases; and

(m)      timely file a formal objection, in form and substance reasonably acceptable to the Consenting Creditors, to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order modifying or terminating the Company Parties' exclusive right to file and/or solicit acceptances of a plan reorganization, as applicable.

7.02.   Negative Commitments.  Except as set forth in Section 8, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring;

(b)      take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, and consummation of the Restructuring described in this Agreement or the Plan;

(c)      modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects; or

(d)      file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement, the Plan, and the Definitive Documents.

**Section 8.      *Additional Provisions Regarding Company Parties' Commitments.***

8.01.   Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 8.01 shall not be deemed to constitute a breach of this Agreement.

8.02.   Notwithstanding anything to the contrary in this Agreement, but subject to the terms of Section 8.01 and Section Section 12 each Company Party and its respective directors, officers,

employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to:

(a)     consider, respond to, and facilitate any Alternative Restructuring Proposals (or inquiries or indications of interest with respect thereto), *provided* that if any Company Party receives a written or oral proposal or expression of interest regarding any Alternative Restructuring Proposal, within two (2) Business Days of receipt thereof, the Company Party shall notify (with email being sufficient) counsel to the RBL Agent, the DIP Agent, Second Lien *Ad Hoc* Committee, and Convertible *Ad Hoc* Group of any such proposal or expression of interest, with such notice to include a copy of such proposal if it is in writing, or otherwise a summary of the material terms thereof;

(b)     provide access to non-public information concerning any Company Party to any person or Entity or enter into Confidentiality Agreements or nondisclosure agreements with any person or Entity in connection with any Alternative Restructuring Proposal (or inquiries or indications of interest with respect thereto);

(c)     engage in discussions or negotiations with respect to Alternative Restructuring Proposals (or inquiries or indications of interest with respect thereto); and

(d)     enter into or continue discussions or negotiations with holders of Company Claims or Interests (including any Consenting Creditor), any other party in interest in the Chapter 11 Cases (including any official committee or the United States Trustee), or any other person or Entity regarding the Restructuring or Alternative Restructuring Proposals; *provided* that the Company Parties shall, with respect to any Alternative Restructuring Proposal that a majority of a Company Party's Board of Directors determines in good faith and following consultation with counsel is a bona fide committed proposal that represents a higher or otherwise better economic recovery to the Company's stakeholders than the Restructuring taken as a whole, (x) provide a copy of any such Alternative Restructuring Proposal, if it is in writing or otherwise a summary of the material terms thereof, to the advisors to the RBL Agent, the DIP Agent, and the Second Lien *Ad Hoc* Committee within two (2) Business Days of such determination, and (y) provide such information necessary to the advisors to the RBL Agent, the DIP Agent, and the Second Lien *Ad Hoc* Committee regarding such discussions as necessary to keep the RBL Agent, the DIP Agent, and the Second Lien *Ad Hoc* Committee contemporaneously informed as to the status and substance of such discussions. Upon any determination by any Company Party to exercise a fiduciary out, the other Parties to this Agreement shall be immediately and automatically relieved of any obligation to comply with their respective covenants and agreements herein in accordance with Section 12.05 hereof.

8.03.   Nothing in this Agreement shall:

(a)     impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the implementation of the Restructuring; or

(b)     prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

8.04.   Payment of Accrued Second Lien Notes Interest.   On the Execution Date, or as soon as reasonably practicable thereafter, but in any event prior to the Petition Date, the Company Parties shall pay accrued and unpaid interest under the Second Lien Notes up to $8,000,000.00 in the aggregate as follows:  (a) $1,965,923.11 ratable to each Holder of 9.00% Notes Due 2021; (b) $2,519,384.69 ratable to each Holder of 9.25% Notes Due 2022; (c) $127,232.75 ratable to each Holder of 7.50% Notes Due 2024; and (d) $3,387,459.45 ratable to each Holder of 7.75% Notes Due 2024.  The Company Parties agree and acknowledge in connection with the payments described in this Section 8.04 that the Company Parties are a "customer" of Wilmington Trust, National Association, in its capacity as trustee for the Second Lien Notes, as such term is defined in 11 U.S.C. § 741(2).

**Section 9.**   *Transfer of Interests and Securities.*

9.01.   During the Agreement Effective Period, a Consenting Creditor shall not Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 promulgated under the Securities Exchange Act of 1934, as amended) in any Company Claims (other than any RBL Claims or any claims arising under the DIP Facility to the extent provided in the RBL Credit Agreement or the DIP Facility Documents, as applicable) to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)   in the case of any Company Claims, the authorized transferee is either (1) a qualified institutional buyer as defined in Rule 144A promulgated under the Securities Act, (2) a non-U.S. person in an offshore transaction as defined in Regulation S promulgated under the Securities Act, (3) an institutional accredited investor (as defined in the Securities Rules), or (4) a Consenting Creditor;

(b)   either (i) the transferee executes and delivers to Counsel to the Company Parties, at or before the time of the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting Creditor and the transferee provides notice of such Transfer (including the amount and type of Company Claims Transferred) to Counsel to the Company Parties at or before the time of the proposed Transfer; and

(c)   with respect to the Transfer of any Company Claims, such Transfer shall not violate the terms of any order entered by the Bankruptcy Court with respect to preservation of net operating losses or other tax attributes.

9.02.   Upon compliance with the requirements of Section 9.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims.  Any Transfer in violation of Section 9.01 shall be void *ab initio*.

9.03.   This Agreement shall in no way be construed to preclude any Consenting Creditor from acquiring additional Company Claims; *provided*, *however*, that (a) such additional Company Claims shall automatically and immediately upon acquisition by a Consenting Creditor be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to Counsel to the Company Parties or counsel to the Consenting Creditors) and (b) such Consenting Creditor must provide notice of such acquisition (including the amount and type of

Company Claims acquired) either (i) to Counsel to the Company Parties or (ii) if such Company Claims are Second Lien Notes Claims, counsel to the Second Lien *Ad Hoc* Committee (who shall promptly notify counsel to the Company Parties), within fifteen (15) Business Days of such acquisition.

9.04.    This Section 9 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Creditor to Transfer any of its Company Claims.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect after any Transfer according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

9.05.    Notwithstanding Section 9.01, a Qualified Marketmaker that acquires any Company Claims of a Consenting Creditor with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims if (a) such Qualified Marketmaker subsequently Transfers such Company Claims within fifteen (15) Business Days of its acquisition to a transferee that is an Entity that is not an affiliate, affiliated fund, or affiliated Entity with a common investment advisor; (b) the transferee otherwise is a Permitted Transferee under Section 9.01; and (c) the Transfer otherwise is a Permitted Transfer under Section 9.01 hereof. Notwithstanding Section 9.01 and Section 9.03, to the extent that a Consenting Creditor is acting in its capacity as a Qualified Marketmaker, it may Transfer any right, title or interests in Company Claims that the Qualified Marketmaker acquires from a holder of the Company Claims who is not a Consenting Creditor without the requirement that the transferee be a Permitted Transferee.  To the extent that a Qualified Marketmaker that is not otherwise a Party to this Agreement acquires Company Claims of a Consenting Creditor and such Qualified Marketmaker is eligible and entitled to vote such Company Claims acquired pursuant to this Section 9.05, and such Qualified Marketmaker is not otherwise precluded from voting such Company Claims in favor of the Plan, and receives a separate ballot for such Company Claims, such Qualified Marketmaker shall vote such Company Claims to accept the Plan on a timely basis as contemplated hereunder.

9.06.    Notwithstanding anything to the contrary in this Section 9, the restrictions on Transfers set forth in this Section 9 shall not apply to the grant of any liens or encumbrances on any Company Claims in favor of a bank or broker dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 10.    *Representations and Warranties of Consenting Creditors.***  Each Consenting Creditor (other than the Consenting RBL Lenders solely with respect to subsection (e) below) severally, and not jointly, represents and warrants that, as of the date such Consenting Creditor executes and delivers this Agreement and as of the Agreement Effective Date:

(a)       it is the beneficial or record owner of the face amount of the Company Claims or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims reflected in, and having made reasonable inquiry is not the beneficial or record owner of any

21

Company Claims other than those reflected in, such Consenting Creditor's signature page to this Agreement, a Joinder, or a Transfer Agreement, as applicable (as may be updated pursuant to <u>Section 9</u>);

(b)      it has the full power and authority to act on behalf of, vote, and consent to matters concerning such Company Claims;

(c)      such Company Claims are free and clear of any pledge, lien, security interest, charge, Claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, Transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Creditor's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)      it has the full power to vote, approve changes to, Transfer, and compromise all of its Company Claims as contemplated by this Agreement subject to applicable Law and, with respect to the RBL Claims, the RBL Credit Agreement; and

(e)      (i) it is either (A) a qualified institutional buyer as defined in Rule 144A promulgated under the Securities Act, (B) not a U.S. person (as defined in Regulation S promulgated under the Securities Act), or (C) an institutional accredited investor (as defined in the Securities Rules), and (ii) any securities acquired by the Consenting Creditor in connection with the Restructuring will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**Section 11.      *Mutual Representations, Warranties, and Covenants.*** Each of the Parties, severally and not jointly, represents, warrants, and covenants to each other Party, as of the date such Party executes and delivers this Agreement:

(a)      it is validly existing and in good standing under the Laws of the jurisdiction of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)      except as expressly provided in this Agreement, no consent or approval is required by any other person or Entity in order for it to effectuate the Restructuring contemplated by, and perform its respective obligations under, this Agreement;

(c)      the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)      except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and, with respect to the Company Parties, subject to the necessary approvals of the Bankruptcy Court to effectuate the Restructuring contemplated by, and perform its respective obligations under, this Agreement; and

(e)      except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement regarding the Company Parties that have not been disclosed to all Parties to this Agreement.

**Section 12.    *Termination Events.***

12.01.   <u>Consenting Creditor Termination Events</u>.  This Agreement may be terminated (x) with respect to the Consenting RBL Lenders, by the Required Consenting RBL Lenders, (y) with respect to the Consenting Second Lien Noteholders, by the Required Consenting Second Lien Noteholders and (z) with respect to the Consenting Convertible Noteholders, by the Required Consenting Convertible Noteholders (such Consenting Creditors seeking to terminate, the "<u>Terminating Consenting Creditors</u>"), in each case by the delivery to the Company Parties of a written notice in accordance with <u>Section 14.12</u> upon the occurrence of the following events:

(a)      the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that (i) is, or could reasonably be expected to be, adverse to the Terminating Consenting Creditors and (ii) remains uncured (to the extent curable) for five (5) Business Days after the Terminating Consenting Creditors transmit a written notice in accordance with <u>Section 14.12</u> detailing any such breach;

(b)      the breach in any material respect by (i) the Consenting Creditors holding an aggregate principal amount outstanding of the RBL Loans that would result in non-breaching Consenting RBL Lenders holding less than two-thirds of the aggregate principal amount outstanding of the RBL Loans or (ii) the Consenting Creditors holding an amount of the Second Lien Notes Claims that would result in non-breaching Consenting Second Lien Noteholders holding less than two-thirds of the aggregate principal amount outstanding of the Second Lien Notes Claims, in each case of any provision set forth in this Agreement that remains uncured for a period of five (5) Business Days after the Terminating Consenting Creditors transmit a written notice in accordance with <u>Section 14.12</u> detailing any such breach;

(c)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling, judgment, or order that (i) enjoins the consummation of a material portion of the Restructuring and (ii) either (A) such ruling, judgment, or order has been issued at the request of any of the Company Parties in contravention of any obligations set forth in this Agreement or (B) remains in effect for fifteen (15) Business Days after the Terminating Consenting Creditors transmit a written notice in accordance with <u>Section 14.12</u> detailing any such issuance; notwithstanding the foregoing, this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(d)      the Bankruptcy Court enters an order denying confirmation of the Plan and such order remains in effect for five (5) Business Days after entry of such order or the Confirmation Order is reversed, stayed, dismissed, vacated, or reconsidered, in each case without the written consent of the Required Consenting RBL Lenders, the Required Consenting Second Lien Noteholders, or the Required Consenting Convertible Noteholders;

(e)     the Bankruptcy Court enters an order, or any Company Party files a motion or application seeking an order (without the prior written consent of the Required Consenting Creditors, which consent is not to be unreasonably withheld), (i) converting one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, (iii) dismissing one or more of the Chapter 11 Cases of a Company Party, (iv) terminating exclusivity under section 1121 of the Bankruptcy Code, or (v) rejecting this Agreement;

(f)     the failure to meet a Milestone, which has not been waived or extended in a manner consistent with Section 4, unless such failure is the result of any act, omission, or delay on the part of the Terminating Consenting Creditors in violation of its obligations under this Agreement;

(g)     the Bankruptcy Court grants relief that is inconsistent in any material respect with this Agreement, the Definitive Documents or the Restructuring, and such inconsistent relief is not dismissed, vacated or modified to be consistent with this Agreement and the Restructuring within five (5) Business Days following written notice thereof to the Company Parties by the Required Consenting Creditors;

(h)     any Company Party (i) files, amends, or modifies, files a pleading seeking approval of, or otherwise makes public any Definitive Document or authority to amend or modify any Definitive Document, in a manner or form that is materially inconsistent with, or constitutes a material breach of, this Agreement and is adverse to the Terminating Consenting Creditors (including with respect to the consent rights afforded the Consenting Creditors under this Agreement), without the prior written consent of the Consenting Creditors with consent rights with respect to such Definitive Document, (ii) withdraws the Plan without the prior consent of the Required Consenting Creditors, or (iii) publicly announces its intention to take any such acts listed in the foregoing clause (i) or (ii), in the case of each of the foregoing clauses (i) through (iii), which remains uncured (to the extent curable) for five (5) Business Days after such terminating Consenting Creditors transmit a written notice in accordance with Section 14.12 detailing any such breach;

(i)     any Company Party files, or publicly announces that it will file, with the Bankruptcy Court any plan of reorganization other than the Plan, or files with the Bankruptcy Court any motion or application seeking authority to sell any material assets, without the prior written consent of the Required Consenting Second Lien Noteholders or the Required Consenting RBL Lenders;

(j)     a determination is made with respect to any Company Party that (i) its continued support of the Restructuring would be inconsistent with its fiduciary obligations under applicable law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal and the continued support of the Restructuring is inconsistent with the Company Party's fiduciary duties or applicable Law;

(k)     any Company Party files, or publicly announces that it will file, with the Bankruptcy Court a motion, application, or adversary proceeding (or any Company Party supports any such motion, application, or adversary proceeding filed or commenced by any third party)

(i) challenging the validity, enforceability, or priority of, or seeking the avoidance, disallowance, subordination, or recharacterization, as applicable, of the liens of the RBL Agent or the DIP Agent, the claims arising on account of the DIP Facility, the RBL Claims, Second Lien Notes Claims, or Convertible Notes Claims, or (ii) asserting any other cause of action against the Consenting Creditors;

(l)     the Bankruptcy Court enters an order providing relief against any of the Consenting Creditors with respect to any of the causes of action or proceedings specified in <u>Section 12.01(k)</u> and such order remains in effect for five (5) Business Days after entry of such order;

(m)     the occurrence of any termination event or event of default under the DIP Orders or DIP Facility Documents, that has not been cured (if susceptible to cure) or waived in accordance with the terms thereof;

(n)     any Company Party (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, receivership, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect, except as expressly contemplated by this Agreement, (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described in the preceding subsection (i), (iii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official with respect to any Company Party or for a substantial part of such Company Party's assets, (iv) makes a general assignment or arrangement for the benefit of creditors, or (v) takes any corporate action for the purpose of authorizing any of the foregoing; or

(o)     the Company Parties terminate their obligations under and in accordance with this Agreement.

(p)     Notwithstanding anything to the contrary herein, if there is an order of the Bankruptcy Court providing that the giving of notice under and/or termination of this Agreement in accordance with its terms is prohibited by the automatic stay imposed by section 362 of the Bankruptcy Code, the occurrence of any of the Consenting Creditor Termination Events in this Section 12.01 shall result in an automatic termination of this Agreement, to the extent the Required Consenting Creditors would otherwise have the ability to terminate this Agreement in accordance with this Section 12.01, five (5) Business Days following such occurrence unless waived (including retroactively) in writing by the Required Consenting Creditors.

12.02.  <u>Company Party Termination Events</u>.  Any Company Party may terminate this Agreement as to any Party upon prior written notice to all Parties in accordance with <u>Section 14.12</u> upon the occurrence of any of the following events:

(a)     with respect to the Consenting RBL Lenders, the breach in any material respect by the Consenting Creditors holding an aggregate principal amount outstanding of the RBL Loans that would result in non-breaching Consenting RBL Lenders holding less than two-thirds of the aggregate principal amount outstanding of the RBL Loans, of any provision set forth in this

Agreement that remains uncured for a period of five (5) Business Days after the receipt by counsel to RBL Agent of notice of such breach;

(b)      with respect to the Consenting Second Lien Noteholders, the breach in any material respect by the Consenting Creditors holding an amount of Second Lien Notes that would result in non-breaching Consenting Second Lien Noteholders holding less than two-thirds of the aggregate principal amount of the Second Lien Notes, of any provision set forth in this Agreement that remains uncured for a period of five (5) Business Days after the receipt by counsel to the Second Lien *Ad Hoc* Committee of notice of such breach;

(c)      with respect to the Consenting Convertible Noteholders, the breach in any material respect by the Consenting Creditors holding an amount of Convertible Notes that would result in non-breaching Consenting Convertible Noteholders holding less than two-thirds of the aggregate principal amount of the Convertible Notes, of any provision set forth in this Agreement that remains uncured for a period of five (5) Business Days after the receipt by counsel to the Consenting Convertible Noteholders of notice of such breach;

(d)      the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal, and the continued support of the Restructuring pursuant to this Agreement would be inconsistent with its fiduciary obligations;

(e)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring and (ii) remains in effect for fifteen (15) Business Days after such terminating Company Party transmits a written notice in accordance with Section 14.12 detailing any such issuance; notwithstanding the foregoing, this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(f)      the Bankruptcy Court enters an order denying confirmation of the Plan and such order remains in effect for five (5) Business Days after entry of such order.

12.03.  <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) each Company Party; (b) the Required Consenting RBL Lenders; (c) the Required Consenting Second Lien Noteholders; and (d) the Required Consenting Convertible Noteholders.

12.04.  <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date.

12.05.  <u>Effect of Termination.</u>  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the

Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action.  Upon the occurrence of a Termination Date prior to entry of the Confirmation Order by the Bankruptcy Court, any and all consents or ballots tendered before the Termination Date by the Parties subject to such termination shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement or otherwise.  Nothing in this Agreement shall be construed as prohibiting any Party from contesting whether any termination of this Agreement by any other Party is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before the applicable Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right or the ability of any Company Party to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its Claims against any Consenting Creditor, or (b) any right or the ability of any Consenting Creditor to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its Claims against any Company Party or any other Party.  No purported termination of this Agreement, except a termination pursuant to Section 12.02(d), shall be effective under this Section 12.05 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement.  Nothing in this Section 12.05 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 12.02(d).

**Section 13.**     *Amendments and Waivers.*

(a)     This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 13.

(b)     This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by:  (a) each Company Party and (b) the following Parties: (i) the Required Consenting Second Lien Noteholders, and (ii) solely with respect to any modification, amendment, waiver, or supplement that alters the rights of such Parties (which, for the avoidance of doubt, includes any change to this Section 13 affecting such Parties), the Required Consenting RBL Lenders and the Required Consenting Convertible Noteholders.  Notwithstanding the foregoing, the consent of each such affected Consenting Creditor shall also be required to effectuate any modification, amendment, waiver, or supplement if the proposed modification, amendment, waiver, or supplement (x) has a material, disproportionate (as compared to other Consenting Creditors holding Claims within the same class as provided for in the Plan) adverse effect on any of the Company Claims held by a Consenting Creditor, or (y) changes the economic treatment provided to any Consenting Creditor.

(c)     Any proposed modification, amendment, waiver, or supplement that does not comply with this Section 13 shall be ineffective and void *ab initio* as to any non-consenting Party affected thereby.

(d)     The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising,

any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by a Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy by such Party.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

(e)     Any consent or waiver contemplated in this <u>Section 13</u> may be provided by electronic mail from counsel to the relevant Parties.

(f)     Notwithstanding Section 13(a) of this Agreement, any modification, amendment or change to the definition of "Required Consenting RBL Lenders" shall require the consent of the Company Parties and each Required Consenting RBL Lender.

(g)     Notwithstanding Section 13(a) of this Agreement, any modification, amendment or change to the definition of "Required Consenting Second Lien Noteholders" shall require the consent of the Company Parties and each member of the Second Lien *Ad Hoc* Committee holding Second Lien Notes Claims that was a Consenting Creditor and member of the Second Lien *Ad Hoc* Committee, as of the date of such modification, amendment, or change.

## Section 14.     *Miscellaneous.*

14.01.  <u>Confidentiality</u>.  The Parties understand and acknowledge that this Agreement may be disclosed and filed with the Bankruptcy Court as an exhibit to the Disclosure Statement and included in the Solicitation Materials; *provided* that in such disclosure the executed signature pages to this Agreement shall be redacted and no individual holdings information shall be included, except as may be required by law.  The Company Parties shall not disclose to any person the amount or percentage of Claims held by any individual Consenting Creditor, except as may be required by law.  If in either case such disclosure is required by law, the Company Parties shall provide each Consenting Creditor with advanced notice of the intent to disclose and shall afford each Consenting Creditor a reasonable opportunity to (i) seek a protective order or other appropriate remedy or (ii) review and comment upon any such disclosure prior to the Company Parties making such disclosure.

14.02.  <u>Fees and Expenses</u>.  The Company Parties shall pay and reimburse all reasonable and documented fees and expenses when due (including travel costs and expenses) and all outstanding and unpaid amounts incurred in connection with the Restructuring since the inception of the applicable fee or engagement letters of the attorneys, advisors, and consultants of (a) the Second Lien *Ad Hoc* Committee (whether incurred directly or on their behalf and regardless of whether such fees and expenses are incurred before or after the Petition Date), including the fees and expenses of (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel, (ii) PJT Partners LP, as investment banker (including any success or transaction fees when earned), and (iii) one local counsel, (b) the Convertible *Ad Hoc* Group (whether incurred directly or on their behalf and regardless of whether such fees and expenses are incurred before or after the Petition Date), limited to the fees and expenses of Akin Gump Strauss Hauer & Feld LLP, (c) the Consenting RBL Lenders (whether incurred directly or on their behalf and regardless of whether such fees and expenses are incurred before or after the Petition Date), including the fees and expenses of (i) Vinson & Elkins LLP, as counsel to the RBL Agent, (ii) Opportune LLP, as financial advisor

to the RBL Agent, (iii) one local counsel, and (iv) and any fees and expenses provided for under the DIP Orders and DIP Facility Documents, and (d) each Hedge Contract counterparty that is, or whose affiliate is, a Party to this Agreement, to the extent provided for under the DIP Orders and DIP Facility Documents; *provided* that all invoices of such advisors for such fees and expenses outstanding as of the Agreement Effective Date that are received at least three (3) Business Days prior to the Petition Date shall be paid in full prior to the Petition Date; *provided*, *further*, that the Company Parties shall not be obligated to pay any fees and expenses under this Section 14.01 and the Agreement that have accrued after the Termination Date; *provided*, *further*, that nothing herein shall relieve the Company Parties from any such payment or reimbursement obligations under the RBL Facility Documents or the DIP Facility Documents.

14.03.   Acknowledgement.  Notwithstanding any other provision of this Agreement, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

14.04.   Annexes Incorporated by Reference; Conflicts.   Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.   In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

14.05.   Further Assurances.   Subject to the other terms of this Agreement, during the Agreement Effective Period, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters specified in this Agreement, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring, as applicable.

14.06.   Complete Agreement.   Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.   The Parties acknowledge and agree that they are not relying on any representations or warranties other than as set forth in this Agreement.

14.07.   GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM.   THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN NEW YORK, WITHOUT GIVING EFFECT TO ITS CONFLICT OF LAWS PRINCIPLES.   Each Party to this Agreement agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in federal or state courts located in the City of New York, Borough of Manhattan.   Notwithstanding the foregoing consent to jurisdiction, upon the commencement of the Chapter 11 Cases, each of the Parties hereby agrees that, if the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising

out of or in connection with this Agreement.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto; and (d) consents to entry of a Final Order or judgment by the Bankruptcy Court.

14.08.  <u>TRIAL BY JURY WAIVER</u>.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

14.09.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement; *provided* that signature pages executed by the Consenting Creditors shall be delivered in a form consistent with <u>Section 2.01</u>.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

14.10.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Creditors and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Creditors were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

14.11.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or Transferred to any other person or Entity except as set forth in <u>Section 9</u>.

14.12.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

    (a)      if to a Company Party, to:

        Denbury Resources Inc.
        5320 Legacy Drive
        Plano, Texas 75024
        Attention:  Jim Matthews
        Email: jim.matthews@denbury.com

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Joshua A. Sussberg, P.C., Christopher Marcus, P.C., and Rebecca
Blake Chaikin
E-mail address: jsussberg@kirkland.com, cmarcus@kirkland.com, and
rebecca.chaikin@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention:     David Eaton
E-mail:          david.eaton@kirkland.com


(b)      if to the RBL Agent, to:

Vinson & Elkins, LLP
2001 Ross Avenue
Suite 3900
Dallas, TX 75201
Attention: Erec Winandy and Bill Wallander
Email: ewinandy@velaw.com; bwallander@velaw.com

(c)      if to a Consenting Second Lien Noteholder, to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Attention: Andrew N. Rosenberg, Elizabeth R. McColm, and Michael Turkel
E-mail address: arosenberg@paulweiss.com; emccolm@paulweiss.com;
mturkel@paulweiss.com

(d)      if to a Consenting Convertible Noteholder, to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
Bank of America Tower
New York, NY 10036-6745
Attention: Michael S. Stamer
E-mail address: mstamer@akingump.com


Any notice given by delivery, mail, or courier shall be effective when received.

14.13.  _Independent Due Diligence and Decision Making_.   Each of the Consenting Creditors hereby confirms that its decision to execute and deliver this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

14.14.  _Enforceability of Agreement_.  The Parties hereby acknowledge and agree: (i) that the provision of any notice or exercise of termination rights under this Agreement is not prohibited by the automatic stay provisions of the Bankruptcy Code, (ii) each Party waives any right to assert that the exercise of any notice or termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising notice and termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required, (iii) that they shall not take a position to the contrary of this _Section 14.14_ in the Bankruptcy Court or any other court of competent jurisdiction and (iv) they will not initiate, or assert in, any litigation or other legal proceeding that this _Section 14.14_ is illegal, invalid, or unenforceable, in whole or in part.  Notwithstanding anything herein to the contrary, following the commencement of the Chapter 11 Cases and unless and until there is an unstayed order of the Bankruptcy Court providing that the giving of notice under and/or termination of this Agreement in accordance with its terms is not prohibited by the automatic stay imposed by section 362 of the Bankruptcy Code, the occurrence of any of the termination events in _Sections 12.01_, _12.03_, and _12.04_, shall result in automatic termination of this Agreement, to the extent any of the Terminating Consenting Creditors would otherwise have the ability to terminate this Agreement in accordance with _Sections 12.01_, _12.03_, _12.04_, five (5) calendar days following such occurrence unless waived in writing by all of the Terminating Consenting Creditors.

14.15.  _Waiver_.  If the Restructuring is not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their respective rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

14.16.  _Specific Performance_.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of a court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

14.17.  _Damages_.  Notwithstanding anything to the contrary in this Agreement, none of the Parties shall claim or seek to recover from any other Party on the basis of anything in this Agreement any punitive, special, indirect, or consequential damages or damages for lost profits.

14.18.  _Relationship Among Parties_.  Notwithstanding anything herein to the contrary, the agreements, representations, warranties, and obligations of the Consenting Creditors under this Agreement are, in all respects, several and not joint.  No Party shall have any responsibility by

32

virtue of this Agreement for any trading by any other Entity or person. No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement. The Parties hereto acknowledge that this Agreement does not constitute an agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Company Parties and the Consenting Creditors do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended. No action taken by any Consenting Creditor pursuant to this Agreement shall be deemed to constitute or to create a presumption by any of the Parties that any of the Consenting Creditors are in any way acting in concert or as such a "group."

14.19.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

14.20.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

14.21.  <u>Capacities of Consenting Creditors</u>.  Each Consenting Creditor has entered into this Agreement on account of all Company Claims that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims.

14.22.  <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to <u>Section 3.02</u> or <u>Section 13</u>, or otherwise, including a written approval by the Company Parties, RBL Agent, the DIP Agent, the DIP Lenders, the Exit Facility Lenders, the Required Consenting RBL Lenders, the Required Consenting Second Lien Noteholders, or the Required Consenting Convertible Noteholders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

14.23.  <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements representations, warranties, duties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

14.24.  <u>Settlement Discussions</u>.  This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties. Nothing in this Agreement shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement, and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

14.25.  <u>Good Faith Cooperation; Further Assurances</u>.  The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent reasonably practicable) in respect of all matters concerning the implementation and consummation of the Restructuring. Further, each of the Parties shall take such action (including executing and delivering any other agreements and making and filing any required regulatory filings) as may be reasonably necessary to carry out the purposes and intent of this Agreement.

*[Signature pages follow.]*

## <u>Annex 1</u>

**Plan**

*Solicitation Version*

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DENBURY RESOURCES INC., *et al.*,[1] | ) | Case No. 20-_____ (__) |
| | ) | |
| Debtors. | ) | |
| | ) | |

## JOINT CHAPTER 11 PLAN OF REORGANIZATION
## OF DENBURY RESOURCES INC. AND ITS DEBTOR AFFILIATES

> **THIS CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND WITHIN THE MEANING OF SECTION 1126 OF THE BANKRUPTCY CODE. THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 BANKRUPTCY.**

Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Christopher Marcus, P.C. (*pro hac vice* admission pending)
Rebecca Blake Chaikin (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                christopher.marcus@kirkland.com
                rebecca.chaikin@kirkland.com

David L. Eaton (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          david.eaton@kirkland.com

-and-

Matthew D. Cavenaugh (TX Bar No. 24062656)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4284
Facsimile:     (713) 308-4184
Email:          mcavenaugh@jw.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

Dated:  July 28, 2020

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Denbury Resources Inc. (7835); Denbury Air, LLC (7621); Denbury Brookhaven Pipeline Partnership, LP (6322); Denbury Brookhaven Pipeline, LLC (6471); Denbury Gathering & Marketing, Inc. (6150); Denbury Green Pipeline-Montana, LLC (6443); Denbury Green Pipeline-North Dakota, LLC (7725); Denbury Green Pipeline-Riley Ridge, LLC (2859); Denbury Green Pipeline-Texas, LLC (2301); Denbury Gulf Coast Pipelines, LLC (0892); Denbury Holdings, Inc. (1216); Denbury Onshore, LLC (7798); Denbury Operating Company (7620); Denbury Pipeline Holdings, LLC (0190); Denbury Thompson Pipeline, LLC (0976); Encore Partners GP Holdings, LLC (N/A); Greencore Pipeline Company, LLC (9605); Plain Energy Holdings, LLC (0543).   The location of Debtor Denbury Resources Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 5320 Legacy Drive, Plano, Texas 75024.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
      GOVERNING LAW ...........................................................................................................1
    A.     Defined Terms. ...........................................................................................................1
    B.     Rules of Interpretation. .............................................................................................12
    C.     Computation of Time. ...............................................................................................12
    D.     Governing Law. .........................................................................................................12
    E.     Reference to Monetary Figures. ................................................................................13
    F.     Reference to the Debtors or the Reorganized Debtors. .............................................13
    G.     Controlling Document. ..............................................................................................13
    H.     Consent Rights. .........................................................................................................13

ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS ..................................13
    A.     Administrative Claims. ..............................................................................................13
    B.     Professional Fee Claims. ...........................................................................................14
    C.     DIP Facility Claims. ..................................................................................................14
    D.     Priority Tax Claims. ..................................................................................................15

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...........15
    A.     Classification of Claims and Interests. .....................................................................15
    B.     Treatment of Claims and Interests. ...........................................................................15
    C.     Special Provision Governing Unimpaired Claims. ....................................................20
    D.     Elimination of Vacant Classes. .................................................................................20
    E.     Voting Classes, Presumed Acceptance by Non-Voting Classes. ..............................20
    F.     Intercompany Interests. .............................................................................................20
    G.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ...20
    H.     Controversy Concerning Impairment. .......................................................................20
    I.     Subordinated Claims and Interests. ...........................................................................20

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ..........................................21
    A.     General Settlement of Claims and Interests. ..............................................................21
    B.     Restructuring. ............................................................................................................21
    C.     Reorganized Debtors. ................................................................................................21
    D.     Sources of Consideration for Plan Distributions. ......................................................22
    E.     Holders of Working and Similar Interests. ................................................................23
    F.     Corporate Existence. .................................................................................................23
    G.     Vesting of Assets in the Reorganized Debtors. .........................................................23
    H.     Cancellation of Existing Securities and Agreements. ................................................24
    I.     Corporate Action. ......................................................................................................24
    J.     New Organizational Documents. ...............................................................................24
    K.     Indemnification Provisions in Organizational Documents. ........................................25
    L.     Directors and Officers of the Reorganized Debtors. .................................................25
    M.     Effectuating Documents; Further Transactions. ........................................................25
    N.     Section 1146 Exemption. ..........................................................................................25
    O.     Registration Rights Agreement. ................................................................................26
    P.     Director and Officer Liability Insurance. ..................................................................26
    Q.     Management Incentive Plan. ......................................................................................26
    R.     Employee and Retiree Matters and Benefits. ............................................................27
    S.     Preservation of Causes of Action. .............................................................................27
    T.     Restructuring Expenses. ............................................................................................28

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .....28
    A.     Assumption and Rejection of Executory Contracts and Unexpired Leases. .............28

i

B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases. ......................29
C.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ...................29
D.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. 30
E.      Indemnification Obligations. ....................................................................................30
F.      Insurance Policies. ..................................................................................................31
G.      Reservation of Rights. .............................................................................................31
H.      Nonoccurrence of Effective Date. ..............................................................................31
I.      Employee Compensation and Benefits. .......................................................................31
J.      Contracts or Leases Entered Into After the Petition Date. ..............................................32

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ..........................................................32
A.      Distributions on Account of Claims or Interests Allowed as of the Effective Date. .........32
B.      Distribution Agent. ..................................................................................................32
C.      Rights and Powers of Distribution Agent. ..................................................................32
D.      Delivery of Distributions and Undeliverable or Unclaimed Distributions. ......................33
E.      Manner of Payment. ................................................................................................34
F.      Section 1145 Exemption. .........................................................................................34
G.      Compliance with Tax Requirements. ..........................................................................34
H.      Allocations. ...........................................................................................................35
I.      No Postpetition Interest on Claims. ............................................................................35
J.      Foreign Currency Exchange Rate. ..............................................................................35
K.      Setoffs and Recoupment. ..........................................................................................35
L.      Claims Paid or Payable by Third Parties. ....................................................................35

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
           DISPUTED CLAIMS .........................................................................................36
A.      Disputed Claims Process. .........................................................................................36
B.      Allowance of Claims. ..............................................................................................36
C.      Claims Administration Responsibilities. .....................................................................37
D.      Adjustment to Claims or Interests without Objection. ...................................................37
E.      Estimation of Claims. ..............................................................................................37
F.      Disallowance of Claims or Interests. ..........................................................................38
G.      No Distributions Pending Allowance. ........................................................................38
H.      Distributions After Allowance. ..................................................................................38

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ..............38
A.      Discharge of Claims and Termination of Interests. .......................................................38
B.      Releases by the Debtors. .........................................................................................38
C.      Releases by the Releasing Parties. ...........................................................................39
D.      Exculpation. ..........................................................................................................40
E.      Injunction. ............................................................................................................40
F.      Protections Against Discriminatory Treatment. ...........................................................41
G.      Release of Liens. ....................................................................................................41
H.      Document Retention. ...............................................................................................42
I.      Reimbursement or Contribution. ...............................................................................42

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF
           THE PLAN ......................................................................................................42
A.      Conditions Precedent to the Effective Date. ................................................................42
B.      Waiver of Conditions. .............................................................................................43
C.      Effect of Non-Occurrence of Conditions. ...................................................................44
D.      Substantial Consummation .......................................................................................44

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN......................44
A.      Modification and Amendments...................................................................................44
B.      Effect of Confirmation on Modifications. ...................................................................44

C.        Revocation or Withdrawal of Plan..................................................................................44

ARTICLE XI. RETENTION OF JURISDICTION ...................................................................................44

ARTICLE XII. MISCELLANEOUS PROVISIONS ...............................................................................46
A.        Immediate Binding Effect........................................................................................46
B.        Additional Documents. ............................................................................................46
C.        Payment of Statutory Fees. .....................................................................................47
D.        Statutory Committee and Cessation of Fee and Expense Payment. ....................47
E.        Reservation of Rights...............................................................................................47
F.        Successors and Assigns.............................................................................................47
G.        Notices. .....................................................................................................................47
H.        Term of Injunctions or Stays..................................................................................48
I.        Entire Agreement. ...................................................................................................48
J.        Exhibits. ...................................................................................................................49
K.        Nonseverability of Plan Provisions.........................................................................49
L.        Votes Solicited in Good Faith..................................................................................49
M.        Closing of Chapter 11 Cases...................................................................................49
N.        Waiver or Estoppel. ................................................................................................49

# INTRODUCTION

Denbury Resources Inc., Denbury Air, LLC, Denbury Brookhaven Pipeline Partnership, LP, Denbury Brookhaven Pipeline, LLC, Denbury Gathering & Marketing, Inc., Denbury Green Pipeline-Montana, LLC, Denbury Green Pipeline-North Dakota, LLC, Denbury Green Pipeline-Riley Ridge, LLC, Denbury Green Pipeline-Texas, LLC, Denbury Gulf Coast Pipelines, LLC, Denbury Holdings, Inc., Denbury Onshore, LLC, Denbury Operating Company, Denbury Pipeline Holdings, LLC, Denbury Thompson Pipeline, LLC, Encore Partners GP Holdings, LLC, Greencore Pipeline Company, LLC, and Plain Energy Holdings, LLC (each a "Debtor" and, collectively, the "Debtors") propose this joint prepackaged chapter 11 plan of reorganization (the "Plan") for the resolution of the outstanding claims against, and equity interests in, the Debtors.  Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor.  Holders of Claims or Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, risk factors, a summary and analysis of this Plan, the Restructuring, and certain related matters.  The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.
### DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.    "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 327, 328, 330, 365, 503(b), 507(a), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors incurred on or after the Petition Date and through the Effective Date; (b) Allowed Professional Fee Claims; (c) any adequate protection Claim provided for in the DIP Orders; and (d) all fees and charges assessed against the Estates under chapter 123 of the Judicial Code.

2.    "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

3.    "*Allowed*" means, with respect to a Claim, any Claim (or portion thereof) that (a) is not Disputed within the applicable period of time, if any, fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, (b) is allowed, compromised, settled, or otherwise resolved pursuant to the terms of the Plan, in any stipulation that is approved by a Final Order of the Bankruptcy Court, or pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith, or (c) has been allowed by a Final Order of the Bankruptcy Court.  For the avoidance of doubt, (x) there is no requirement to file a Proof of Claim (or move the Bankruptcy Court for allowance) to have a Claim Allowed for the purposes of the Plan except as provided in Article V.B of this Plan, (y) the Debtors may deem any Unimpaired Claim to be Allowed in an asserted amount for the purposes of the Plan, and (z) any Claim (or portion thereof) that has been disallowed pursuant to a Final Order shall not be an "Allowed" Claim.

4.    "*Assumed Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, which shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

5.    "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims,

Causes of Action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

6.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532.

7.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas presiding over the Chapter 11 Cases, or any other court having jurisdiction over the Chapter 11 Cases, including to the extent of the withdrawal of reference under 28 U.S.C. § 157, the United States District Court for the Southern District of Texas.

8.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each, as amended from time to time.

9.      "*Business Day*" means any day other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

10.      "*Cash*" means cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

11.      "*Cause of Action*" or "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claims.

12.      "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

13.      "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

14.      "*Claims and Balloting Agent*" means Epiq Corporate Restructuring, LLC, the notice, claims, and solicitation agent proposed to be retained by the Debtors in the Chapter 11 Cases.

15.      "*Claims Register*" means the official register of Claims maintained by the Claims and Balloting Agent.

16.      "*Class*" means a class of Claims or Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

17.      "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

18.      "*Company*" means DNR and each of its direct and indirect subsidiaries.

19.      "*Compensation and Benefits Programs*" means all employee employment, wages, compensation, and benefits plans and policies, workers' compensation programs, savings plans, retirement plans, supplemental executive retirement plans, deferred compensation plans, healthcare plans, disability plans, employment and severance agreements and policies, severance benefit plans, policies, and guidelines (including the Severance Protection Plan),

2

incentive and retention plans (including the plans approved by the board of directors of DNR on June 3, 2020), life and accidental death and dismemberment insurance plans, and programs of the Debtors, and all amendments and modifications thereto, applicable to any of the Debtors' employees, former employees, retirees, non-employee directors, and other individual service provides, in each case existing with the Debtors as of the immediately prior to the Effective Date.

20.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

21.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

22.     "*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court on confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

23.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, consistent with the Restructuring Support Agreement (and subject to the consent, approval and consultation rights set forth therein), and approving the Disclosure Statement.

24.     "*Consenting Second Lien Noteholders*" has the meaning set forth in the Restructuring Support Agreement.

25.     "*Convertible* Ad Hoc *Group*" means the *ad hoc* group of Holders of Convertible Notes represented by Akin Gump Strauss Hauer & Feld LLP.

26.     "*Convertible Notes*" means the 6⅜% Convertible Senior Notes Due 2024 issued under the Convertible Notes Indenture.

27.     "*Convertible Notes Claims*" means any Claims on account of the Convertible Notes.

28.     "*Convertible Notes Indenture*" means that certain indenture governing the Convertible Notes, dated June 19, 2019, by and among DNR, as issuer, the subsidiary guarantors named therein, as guarantors, and the Convertible Notes Trustee.

29.     "*Convertible Notes Trustee*" means Wilmington Trust, National Association, as Trustee under the Convertible Notes Indenture.

30.     "*Convertible Notes Warrant Package*" means 100% of the Series A Warrants, as defined in the Warrants Term Sheet, attached to the Restructuring Support Agreement as <u>Annex 3</u>.

31.     "*Consummation*" means the occurrence of the Effective Date.

32.     "*Cure Amounts*" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

33.     "*Debtor Release*" means the release set forth in Article VIII.B of the Plan.

34.      "*D&O Liability Insurance Policies*" means all insurance policies of any of the Debtors for directors', managers', and officers' liability existing as of the Petition Date (including any "tail policy") and all agreements, documents, or instruments relating thereto.

3

35.     "*DIP Agent*" means JPMorgan Chase Bank, N.A., or any successor thereto, as administrative agent under the DIP Facility, solely in its capacity as such.

36.     "*DIP Facility*" means the debtor-in-possession financing facility on terms and conditions consistent in all material respects with the Restructuring Support Agreement (including the DIP-to-Exit Facility Term Sheet) and the DIP Orders and otherwise in form and substance acceptable to the Debtors, the DIP Agent, and the DIP Lenders, and reasonably acceptable to the Required Consenting Second Lien Noteholders.

37.     "*DIP Facility Claims*" means any Claim derived from, based upon, or secured by the DIP Facility Documents or DIP Orders, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising under or related to the DIP Facility.

38.     "*DIP Facility Documents*" means any documents governing or related to the DIP Facility (including the DIP Orders), which documents shall be consistent in all material respects with the Restructuring Support Agreement (including the DIP-to-Exit Facility Term Sheet) and the DIP Orders and otherwise in form and substance acceptable to the Debtors, the DIP Agent, and the DIP Lenders as to such documents and to the Debtors and the DIP Agent as to the DIP Orders, and reasonably acceptable to the Required Consenting Second Lien Noteholders.

39.     "*DIP Final Order*" means the final order authorizing use of cash collateral and debtor-in-possession financing on terms consistent with the DIP-to-Exit Facility Term Sheet, and in form and substance acceptable to the Debtors and the DIP Agent, and reasonably acceptable to the Required Consenting Second Lien Noteholders.

40.     "*DIP Interim Order*" means the interim order authorizing use of cash collateral and debtor-in-possession financing on terms consistent with the DIP-to-Exit Facility Term Sheet, and in form and substance acceptable to the Debtors and the DIP Agent, and reasonably acceptable to the Required Consenting Second Lien Noteholders.

41.     "*DIP Lenders*" means the lenders under the DIP Facility, solely in their capacity as such.

42.     "*DIP Orders*" means the collectively, the DIP Interim Order and the DIP Final Order.

43.     "*DIP-to-Exit Facility Term Sheet*" means the term sheet describing the material terms of the DIP Facility, attached as Annex 2 to the Restructuring Support Agreement.

44.     "*Disclosure Statement*" means the disclosure statement with respect to the Plan that is prepared and distributed in accordance with, among other things, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018 and other applicable Law, and all exhibits, schedules, supplements, modifications and amendments thereto, all of which shall be consistent in all material respects with the Restructuring Support Agreement and the Plan.

45.     "*Disputed*" means, as to a Claim or an Interest, a Claim or an Interest (or portion thereof) (a) that an objection to such Claim or Interest (or portion thereof) has been filed on or before the Effective Date; (b) for which a Proof of Claim is filed; or (c) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order, as applicable; *provided* that in no event shall a Claim or an Interest (or portion thereof) that is deemed Allowed pursuant to the Plan be a Disputed Claim.

46.     "*Distribution Agent*" means the Reorganized Debtors or the Entity or Entities selected by the Debtors or the Reorganized Debtors, as applicable, to make or facilitate distributions pursuant to the Plan.

47.     "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Reorganized Debtors, on or after the Effective Date, with the first such date occurring on or as soon as is reasonably practicable after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims or Interests entitled to receive distributions under the Plan.

48.     "*Distribution Record Date*" means, other than with respect to publicly held Securities, the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be the first day of the Confirmation Hearing.

49.     "*DNR*" means Denbury Resources Inc.

50.     "*Effective Date*" means the date on which all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

51.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

52.     "*Estate*" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of such Debtor's Chapter 11 Case.

53.     "*Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*, as amended from time to time.

54.     "*Exculpated Partie*s" means collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the RBL Agent; (d) the RBL Lenders; (e) the Second Lien Notes Trustee; (f) the Second Lien *Ad Hoc* Committee and all members thereof; (g) the Convertible Notes Trustee; (h) the Convertible *Ad Hoc* Group and all members thereof; (i) the DIP Agent; (j) the DIP Lenders; (k) the Exit Facility Agent; (l) the Exit Facility Lenders; (m) with respect to each of the foregoing parties in clauses (a) through (l), each of such party's current and former predecessors, successors, participants, Affiliates (regardless of whether such interests are held directly or indirectly), assigns, subsidiaries, direct and indirect equity holders or beneficiaries, funds, portfolio companies, and management companies; and (n) with respect to each of the foregoing parties in clauses (a) through (m), each of such party's current and former directors, officers, members, employees, partners, managers, general partners, limited partners, managing members, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, advisory board members, investment advisors or sub advisors, and other professionals.

55.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

56.     "*Existing Equity Interests*" means the common Interests of DNR, together with any and all outstanding and unexercised or unvested warrants, options, or rights to acquire DNR's currently outstanding equity.

57.     "*Existing Equity Warrants Package*" means 45.45% of the Series B Warrants, as defined in the Warrants Term Sheet, attached to the Restructuring Support Agreement as Annex 3.

58.     "*Exit Commitment Letter*" means the commitment letter attached as Annex 2(a) to the Restructuring Support Agreement, and the related fee letters with respect thereto.

59.     "*Exit Facility*" means the revolving credit facility in an aggregate maximum principal amount up to $615,000,000, subject to a conforming borrowing base to be set forth in the Exit Facility Documents and on such other terms and conditions consistent in all material respects with the Restructuring Support Agreement, the DIP-to-Exit Facility Term Sheet, the Exit Commitment Letter, and the Exit Facility Term Sheet, and otherwise in form and substance acceptable to the Debtors, the Exit Facility Agent, and the Exit Facility Lenders, and reasonably acceptable to the Required Consenting Second Lien Noteholders.

60.     "*Exit Facility Agent*" means JPMorgan Chase, N.A., as administrative agent for the Exit Facility, or any successor thereto, solely in its capacity as such.

61.     "*Exit Facility Documents*" means the documents governing the Exit Facility and any other guarantee, security agreement, deed of trust, mortgage, and relevant documentation with respect to the Exit Facility,

which shall be consistent in all material respects with the Plan, Restructuring Support Agreement, the DIP-to-Exit Facility Term Sheet, the Exit Commitment Letter, and the Exit Facility Term Sheet, and otherwise in form and substance acceptable to the Debtors, the Exit Facility Agent, and the Exit Facility Lenders, and reasonably acceptable to the Required Consenting Second Lien Noteholders.

62.     "*Exit Facility Lenders*" means those lenders from time to time party to the Exit Facility Documents, solely in their capacity as such.

63.     "*Exit Facility Term Sheet*" means the term sheet describing the material terms of the Exit Facility, attached as <u>Exhibit A</u> to the Exit Commitment Letter.

64.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

65.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

66.     "*Final Order*" means as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

67.     "*General Unsecured Claim*" means any unsecured Claim other than (a) a DIP Facility Claim; (b) an Administrative Claim; (c) a Professional Fee Claim; (d) a Priority Tax Claim; (e) an Other Secured Claim; (f) an Other Priority Claim; (g) a Pipeline Lease Claim; (h) a Hedge Claim; (i) an RBL Claim; (j) a Second Lien Notes Claim; (k) a Convertible Notes Claim; (l) a Subordinated Notes Claim; or (m) an Existing Equity Interest, against one or more of the Debtors.

68.     "*Governance Term Sheet*" means the term sheet attached to the Restructuring Support Agreement as <u>Annex 4</u> setting forth the terms of certain agreements related to the corporate governance of the Reorganized Debtors.

69.     "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

70.     "*Holder*" means an Entity holding a Claim or Interest, as applicable.

71.     "*Hedge Claim*" means any Claim arising from commodity hedge transactions pursuant to an ISDA Master Agreement and Schedules thereto.

72.     "*Impaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

73.     "*Indemnification Obligations*" means each of the Debtors' indemnification provisions in place, whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, management or indemnification agreements, employment contracts, or otherwise, for the current and former directors, officers, managers, employees, attorneys, other professionals, and agents of the Debtors and such current and former directors', officers', and managers' respective Affiliates.

74.     "*Intercompany Claim*" means any Claim held by a Debtor or an Affiliate against a Debtor or an Affiliate.

75.     "*Intercompany Interest*" means any Interest in a Debtor held by another Debtor and, for the avoidance of doubt, excludes the Existing Equity Interests.

76. "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable Securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

77. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time.

78. "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

79. "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

80. "*Management Compensation Term Sheet*" means the term sheet setting forth the terms of the Management Incentive Plan, which shall be included in the Plan Supplement.

81. *Management Employment Agreements*" means, collectively, the employment agreements between the Debtors and the Debtors' Chief Executive Officer and Chief Financial Officer in the forms agreed to and in effect on the Petition Date.

82. "*Management Incentive Plan*" means any equity incentive program for the members of the management team of the Reorganized Debtors to be established as contemplated in the Plan, and in accordance with the Restructuring Support Agreement and the Definitive Documents.

83. "*New Board*" means the board of directors of the Reorganized Debtors appointed in accordance with the terms of the Governance Term Sheet. The identities of directors on the New Board shall be set forth in the Plan Supplement.

84. "*New DNR Equity*" means the common equity in Reorganized DNR.

85. "*New Organizational Documents*" means the documents providing for corporate governance of the Reorganized Debtors, including charters, bylaws, operating agreements, or other organizational documents, as applicable, which shall be consistent with the Restructuring Support Agreement (and subject to the consent, approval and consultation rights set forth therein), the Governance Term Sheet, this Plan, and section 1123(a)(6) of the Bankruptcy Code (as applicable), and shall be included in the Plan Supplement.

86. "*Other Priority Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

87. "*Other Secured Claim*" means any Secured Claim, other than a DIP Facility Claim, Hedge Claim, RBL Claim, Pipeline Lease Claim, or Second Lien Notes Claim, including any Claim arising under, derived from, or based upon any letter of credit issued in favor of one or more Debtors, the reimbursement obligation for which is either secured by a Lien on collateral or is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

88. "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

89. "*Petition Date*" means the first date on which any of the Debtors commences a Chapter 11 Case.

90. "*Pipeline Lease*" means that certain Pipeline Financing Agreement, dated as of May 30, 2008 (as amended, restated, amended and restated, supplemented, or otherwise modified) by and between Genesis NEJD Pipeline, LLC, as lessor, and Denbury Onshore, LLC as lessee.

91.     "*Pipeline Lease Claim*" means any Claim arising under, derived from, based on, or secured pursuant to the Pipeline Lease.

92.     "*Plan Distribution*" means a payment or distribution to Holders of Allowed Claims, Allowed Interests, or other eligible Entities under and in accordance with this Plan.

93.     "*Plan Objection Deadline*" means the date the Bankruptcy Court establishes as the deadline to File an objection to Confirmation of the Plan.

94.     "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and consistent with the Restructuring Support Agreement (and subject to the consent, approval and consultation rights set forth therein) and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Debtors no later than seven (7) days before the Plan Objection Deadline or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, including the following, as applicable: (a) the New Organizational Documents; (b) to the extent known, the identities of the members of the New Board; (c) the Assumed Executory Contracts and Unexpired Leases Schedule; (d) the Rejected Executory Contracts and Unexpired Leases Schedule; (e) the Schedule of Retained Causes of Action; (f) the Exit Facility Documents; (g) the Management Compensation Term Sheet; (h) the Warrants Agreement; and (i) the Registration Rights Agreement.  The Debtors shall have the right to alter, amend, modify, or supplement the documents contained in the Plan Supplement through the Effective Date as set forth in this Plan and in accordance with the Restructuring Support Agreement (and subject to the consent, approval and consultation rights set forth therein).

95.     "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

96.     "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

97.     "*Professional*" means an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

98.     "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors as set forth in Article II.B hereof.

99.     "*Professional Fee Claim*" means a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

100.    "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

101.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

102.    "*RBL Agent*" means JPMorgan Chase Bank, N.A., and any successor thereto, solely in its capacity as successor agent under the RBL Credit Agreement.

103.    "*RBL Credit Agreement*" means that certain Amended and Restated Credit Agreement, dated as of December 9, 2014 (as amended, restated, amended, and supplemented or otherwise modified prior to the date hereof), by and among DNR, as borrower, the RBL Lenders, as lenders, and the RBL Agent.

104. "*RBL Claim*" means any Claim arising under, derived from, based on, or secured pursuant to the RBL Credit Agreement.

105. "*RBL Lenders*" means the lenders under the RBL Credit Agreement, from time to time.

106. "*RBL Loans*" means any loan made under the RBL Credit Agreement.

107. "*Registration Rights Agreement*" means the registration rights agreement to be entered into on the Effective Date by Reorganized DNR and the Registration Rights Parties, the terms of which shall be consistent in all material respects with the Governance Term Sheet.

108. "*Registration Rights Parties*" means the Consenting Second Lien Noteholders and any recipient of New DNR Equity that receives (together with its affiliates and related funds) 4% or more of the voting Securities of Reorganized DNR issued pursuant to this Plan.

109. "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall not be discharged hereunder and the Holder's legal, equitable, and contractual rights on account Hof such Claim or Interest shall remain unaltered by Consummation in accordance with section 1124(1) of the Bankruptcy Code.

110. "*Rejected Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, which schedule shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

111. "*Released Party*" means each of the following, solely in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) the RBL Agent; (d) the RBL Lenders; (e) the Second Lien Notes Trustee; (f) the Second Lien Noteholders; (g) the Second Lien *Ad Hoc* Committee, and all members thereof; (h) the Convertible Notes Trustee; (i) the Convertible Noteholders; (j) the Convertible *Ad Hoc* Group, and all members thereof; (k) the Subordinated Notes Trustee; (l) the Subordinated Noteholders; (m) the DIP Agent; (n) the DIP Lenders; (o) the Exit Facility Agent; (p) the Exit Facility Lenders; (q) with respect to each of the foregoing parties in clauses (a) through (p), each of such party's current and former predecessors, successors, participants, Affiliates (regardless of whether such interests are held directly or indirectly), assigns, subsidiaries, direct and indirect equity holders or beneficiaries, funds, portfolio companies, and management companies; (r) with respect to each of the foregoing parties in clauses (a) through (q), each of such party's current and former directors, officers, members, employees, partners, managers, general partners, limited partners, managing members, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, advisory board members, investment advisors, and other professionals; and (s) all Holders of Claims or Interests, *provided* that any Holder of a Claim or Interest that (x) validly opts out of the releases contained in the Plan, (y) files an objection to the releases contained in the Plan by the Plan Objection Deadline, or (z) timely votes to reject the Plan shall not be a "Released Party."

112. "*Releasing Parties*" means each of the following, solely in its capacity as such: (a) the RBL Agent; (b) the RBL Lenders; (c) the Second Lien Notes Trustee; (d) the Second Lien Noteholders; (e) the Second Lien *Ad Hoc* Committee, and all members thereof; (f) the Convertible Notes Trustee; (g) the Convertible Noteholders; (h) the Convertible *Ad Hoc* Group, and all members thereof; (i) the Subordinated Notes Trustee; (j) the Subordinated Noteholders; (k) the DIP Agent; (l) the DIP Lenders; (m) the Exit Facility Agent; (n) the Exit Facility Lenders; (o) with respect to the foregoing clauses (a) through (n), each of such party's current and former predecessors, successors, participants, Affiliates (regardless of whether such interests are held directly or indirectly), assigns, subsidiaries, direct and indirect equity Holders or beneficiaries, funds, portfolio companies, and management companies; (p) with respect to each of the foregoing parties in clauses (a) through (o), each of such party's current and former directors, officers, members, employees, partners, managers, general partners, limited partners, managing members, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, advisory board members, investment advisors, and other professionals; and (q) all Holders of Claims or Interests; *provided* that any Holder of a Claim or Interest that (x) validly opts out of the releases contained

in the Plan, (y) files an objection to the releases contained in the Plan by the Plan Objection Deadline, or (z) timely votes to reject the Plan shall not be a "Releasing Party."

113.     "*Reorganized Debtors*" means collectively, a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Effective Date, including any new entity established in connection with the implementation of the Restructuring.

114.     "*Reorganized DNR*" means DNR, as reorganized pursuant to and under the Plan, on and after the Effective Date, or any successor or assign thereto.

115.     "*Required Consenting Convertible Noteholders*" means, as of any time of determination, beneficial Holders of (or investment advisors, sub-advisors, or managers of discretionary accounts that hold) at least 50.01% of the aggregate outstanding principal amount of the Convertible Notes subject to the Restructuring Support Agreement.

116.     "*Required Consenting Creditors*" means, collectively, the Required Consenting RBL Lenders, the Required Consenting Second Lien Noteholders, and the Required Consenting Convertible Noteholders.

117.     "*Required Consenting RBL Lenders*" means, as of any time of determination, beneficial Holders of (or investment advisors, sub-advisors, or managers of discretionary accounts that hold) at least 50.01% of the aggregate outstanding principal amount of the RBL Loans subject to the Restructuring Support Agreement.

118.     "*Required Consenting Second Lien Noteholders*" means, as of any time of determination, (a) beneficial Holders of (or investment advisors, sub-advisors, or managers of discretionary accounts that hold) at least 50.01% of the aggregate outstanding principal amount of the Second Lien Notes subject to the Restructuring Support Agreement that are members of the Second Lien *Ad Hoc* Committee and (b) constituting at least two (2) members of the Second Lien *Ad Hoc* Committee, as set forth in the Restructuring Support Agreement.

119.     "*Restructuring*" means any transaction and any actions as may be necessary or appropriate to effect a corporate restructuring of the Debtors' and the Reorganized Debtors' respective businesses or a corporate restructuring of the overall corporate structure of the Debtors on the terms set forth in the Plan, and the Restructuring Support Agreement, including the issuance of all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions, as described in Article IV.B hereof.

120.     "*Restructuring Expenses*" means, collectively, all reasonable and documented fees and expenses to be paid pursuant to section 14.02 of the Restructuring Support Agreement.

121.     "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of July 28, 2020, by and among (a) the Debtors, and (b) each RBL Lender, Second Lien Noteholder, and Convertible Noteholder that executes a signature page to the Restructuring Support Agreement, as may be further amended, modified, or supplemented from time to time, in accordance with its terms.

122.     "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time.

123.     "*Second Lien* Ad Hoc *Committee*" means the *ad hoc* committee of Holders of Second Lien Notes represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP, PJT Partners LP, and any local or foreign advisors.

124.     "*Second Lien Notes*" means collectively, the: (a) 9% Senior Secured Second Lien Notes Due 2021, issued under the Indenture, dated as of May 10, 2016, (b) 9¼% Senior Secured Second Lien Notes Due 2022, issued under the Indenture, dated as of December 6, 2017, (c) 7½% Senior Secured Second Lien Notes Due 2024, issued under the Indenture, dated as of August 21, 2018, and (d) 7¾% Senior Secured Second Lien Notes Due 2024, issued

under the Indenture, dated as of June 19, 2019, each by and among DNR, certain of its subsidiaries, and the Second Lien Notes Trustee.

125. "*Second Lien Notes Claims*" means any Claims on account of Second Lien Notes.

126. "*Second Lien Notes Indentures*" means those certain indentures governing the Second Lien Notes, dated as of May 10, 2016, December 6, 2017, August 21, 2018, and June 19, 2019, each by and among DNR, certain of its subsidiaries, and the Second Lien Notes Trustee.

127. "*Second Lien Notes Trustee*" means Wilmington Trust, National Association as Trustee and Collateral Trustee under the Second Lien Notes.

128. "*Secured Claim*" means a Claim: (a) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

129. "*Securities Act*" means the Securities Act of 1933, as amended, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

130. "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

131. "*Series A Warrants*" has the meaning set forth in the Warrants Term Sheet, attached to the Restructuring Support Agreement as Annex 3.

132. "*Series B Warrants*" has the meaning set forth in the Warrants Term Sheet, attached to the Restructuring Support Agreement as Annex 3.

133. "*Subordinated Notes*" means, collectively, the: (a) 6⅜% Senior Subordinated Notes Due 2021, issued under the Indenture, dated as of February 17, 2011, (b) 5½% Senior Subordinated Notes Due 2022, issued under the Indenture, dated as of April 30, 2014, and (c) 4⅝% Senior Subordinated Notes Due 2023, issued under the Indenture, dated as of February 5, 2013, each by and among DNR, certain of its subsidiaries, and the Subordinated Notes Trustee.

134. "*Subordinated Notes Claims*" means any Claims on account of the Subordinated Notes.

135. "*Subordinated Notes Indentures*" means those certain indentures governing the Subordinated Notes, dated as of February 17, 2011, April 30, 2014, and February 5, 2013, each as supplemented and by and among DNR, certain of its subsidiaries, and the Subordinated Notes Trustee.

136. "*Subordinated Notes Trustee*" means Wilmington Trust, National Association, as successor trustee under the Subordinated Notes.

137. "*Subordinated Notes Warrant Package*" means 54.55% of the Series B Warrants, as defined in the Warrants Term Sheet, attached to the Restructuring Support Agreement as Annex 3.

138. "*Third-Party Release*" means the releases set forth in Article VIII.C of the Plan.

139. "*U.S. Trustee*" means the United States Trustee for the Southern District of Texas.

140. "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Interest to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

11

141.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

142.    "*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

143.    "*Warrants*" mean the warrants issued by the Debtors on the Effective Date in accordance with the terms set forth in the Warrants Term Sheet, attached to the Restructuring Support Agreement as <u>Annex 3</u>.

144.    "*Warrants Agreement*" means that certain agreement providing for, among other things, the issuance and terms of the Warrants, which shall be included in the Plan Supplement, on terms and conditions consistent in all material respects with the Plan and the Warrants Term Sheet.

145.    "*Warrants Term Sheet*" means the term sheet governing the issuance of Warrants attached to the Restructuring Support Agreement as <u>Annex 3</u>.

B.    *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable Law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) any effectuating provisions may be interpreted by the Debtors or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (11) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (12) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (13) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (14) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (15) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (16) references to "Proofs of Claim," "holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "holders of Interests," "Disputed Interests," and the like, as applicable; (17) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (18) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail.

C.    *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.    *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided*, *however*, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Reorganized Debtors, as applicable.

E.    *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.    *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.    *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

H.    *Consent Rights.*

Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights of the parties to the Restructuring Support Agreement set forth in the Restructuring Support Agreement (including the annexes and exhibits thereto) with respect to the form and substance of this Plan, all exhibits to the Plan, and the Plan Supplement, and all other Definitive Documents (as defined in the Restructuring Support Agreement), including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein.  Failure to reference the rights referred to in this paragraph as such rights relate to any document referenced in the Restructuring Support Agreement shall not impair such rights or obligations.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.    *Administrative Claims.*

Except with respect to the Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code, and except to the extent that a Holder of an Allowed Administrative Claim and the Debtors against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, or such Holder has been paid by any Debtor on account of such Allowed Administrative Claim prior to the Effective Date, each Holder of such an Allowed Administrative Claim will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:   (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

B.    *Professional Fee Claims.*

1.    <u>Final Fee Applications and Payment of Professional Fee Claims.</u>

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 45 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.  The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date.

2.    <u>Professional Fee Escrow Account.</u>

As soon as possible after Confirmation and not later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust for the Professionals.  Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.  The Professional Fee Claims shall be paid in Cash to the Professionals from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed.  When such Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

3.    <u>Professional Fee Amount.</u>

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for

payment in the Chapter 11 Cases.  If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

    4.   <u>Post-Confirmation Fees and Expenses</u>.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

*C.*    *DIP Facility Claims*

On the Plan Effective Date, each Holder of a DIP Facility Claim shall be deemed to hold an Allowed Claim and shall receive its *pro rata* share of participation in the Exit Facility.

*D.*    *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

*A.*    *Classification of Claims and Interests.*

This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest fits within the description of that Class and is classified in other Class(es) to the extent that any portion of the Claim or Interest fits within the description of such other Class(es).  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Pipeline Lease Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 4 | RBL Claims / Hedge Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 5 | Second Lien Notes Claims | Impaired | Entitled to Vote |
| Class 6 | Convertible Notes Claims | Impaired | Entitled to Vote |

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 7 | Subordinated Notes Claims | Impaired | Entitled to Vote |
| Class 8 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 9 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 10 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 11 | Existing Equity Interests | Impaired | Entitled to Vote |

B.      *Treatment of Claims and Interests.*

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date (or, if payment is not then due, in accordance with its terms in the ordinary course of business) or as soon as reasonably practicable thereafter.

1.   Class 1 – Other Secured Claims

   (a)   *Classification*:  Class 1 consists of all Other Secured Claims.

   (b)   *Treatment*: Each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor:

      (i)      payment in full in Cash of its Allowed Other Secured Claim;

      (ii)     the collateral securing its Allowed Other Secured Claim;

      (iii)    Reinstatement of its Allowed Other Secured Claim; or

      (iv)     such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

   (c)   *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2.   Class 2 – Other Priority Claims

   (a)   *Classification*:  Class 2 consists of all Other Priority Claims.

   (b)   *Treatment*:  Each Holder of an Allowed Other Priority Claim shall receive, at the option of the applicable Debtor:

      (i)      payment in full in Cash of its Allowed Other Priority Claim; or

      (ii)     such other treatment that renders its Allowed Other Priority Claim Unimpaired in

16

accordance with section 1124 of the Bankruptcy Code, or as otherwise permitted by section 1129(a)(9) of the Bankruptcy Code.

(c)    *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.    <u>Class 3 – Pipeline Lease Claims</u>

(a)    *Classification*:  Class 3 consists of all Pipeline Lease Claims.

(b)    *Treatment*:  Each Holder of an Allowed Pipeline Lease Claim shall receive, at the option of the applicable Debtor:

(i)    payment in full in Cash of its Allowed Pipeline Lease Claim;

(ii)    the collateral securing its Allowed Pipeline Lease Claim;

(iii)    Reinstatement of its Allowed Pipeline Lease Claim; or

(iv)    such other treatment to render such Allowed Pipeline Lease Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)    *Voting:*  Class 3 is Unimpaired under the Plan.  Holders of Claims in Class 3 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

4.    <u>Class 4 – RBL Claims and Hedge Claims</u>

(a)    *Classification*:  Class 4 consists of all RBL Claims and Hedge Claims.

(b)    *Allowance*: On the Effective Date:

(i)    the RBL Claims shall be Allowed in the aggregate principal amount of not less than $[●], plus any accrued and unpaid interest on such principal amount as of the Petition Date at the applicable contractual interest rate and any unpaid fees and expenses payable in accordance with the RBL Credit Agreement; and

(ii)    the Hedge Claims shall be Allowed in the aggregate amount of not less than $[●], plus any unpaid fees and expenses payable in accordance with any ISDA Master Agreement.

(c)    *Treatment*:  Each Holder of an Allowed RBL Claim or Allowed Hedge Claim shall receive payment in full in Cash or such other treatment rendering its Allowed RBL Claim or Allowed Hedge Claim, as applicable, Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(d)    *Voting:*  Class 4 is Unimpaired under the Plan.  Holders of Claims in Class 4 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

5.   <u>Class 5 – Second Lien Notes Claims</u>

    (a)    *Classification*:  Class 5 consists of all Second Lien Notes Claims.

    (b)    *Allowance*:  On the Effective Date, the Second Lien Notes Claims shall be Allowed in the aggregate principal amount of not less than $[1,592,839,000], plus any accrued and unpaid interest on such principal amount as of the Petition Date at the applicable contractual interest rate and any unpaid fees and expenses payable in accordance with the Second Lien Notes Indentures.

    (c)    *Treatment*:  Each Holder of an Allowed Second Lien Notes Claim shall receive its *Pro Rata* share of 95% of the New DNR Equity, subject to dilution by the Warrants and the Management Incentive Plan.

    (d)    *Voting*:  Class 5 is Impaired under the Plan.  Holders of Claims in Class 5 are entitled to vote to accept or reject the Plan.

6.   <u>Class 6 – Convertible Notes Claims</u>

    (a)    *Classification*:  Class 6 consists of all Convertible Notes Claims.

    (b)    *Allowance*:  On the Effective Date, the Convertible Notes Claims shall be Allowed in the aggregate principal amount of not less than $[225,663,000], plus any accrued and unpaid interest on such principal amount as of the Petition Date at the applicable contractual interest rate and any unpaid fees and expenses payable in accordance with the Convertible Notes Indenture.

    (c)    *Treatment*:  Each Holder of an allowed Convertible Notes Claim shall receive its *Pro Rata* share of:

        (i)    5% of the New DNR Equity, subject to dilution by the Warrants and the Management Incentive Plan; and

        (ii)    the Convertible Notes Warrant Package.

    (d)    *Voting*:  Class 6 is Impaired under the Plan.  Holders of Claims in Class 6 are entitled to vote to accept or reject the Plan.

7.   <u>Class 7 – Subordinated Notes Claims</u>

    (a)    *Classification*:  Class 7 consists of all Subordinated Notes Claims.

    (b)    *Allowance*:  On the Effective Date, the Subordinated Notes Claims shall be Allowed in the aggregate principal amount of not less than $[245,690,000], plus any accrued and unpaid interest on such principal amount as of the Petition Date at the applicable contractual interest rate and any unpaid fees and expenses payable in accordance with the Subordinated Notes Indentures.

    (c)    *Treatment*:

        (i)    **if Class 7 votes to accept the Plan**, each Holder of an Allowed Subordinated Notes Claim shall receive its *Pro Rata* share of the Subordinated Notes Warrant Package.

        (ii)    **if Class 7 votes to reject the Plan**, Holders of Subordinated Notes Claims will

not receive any distribution on account of such Claims, which will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect.

(d)    *Voting*:  Class 7 is Impaired under the Plan.  Holders of Claims in Class 7 are entitled to vote to accept or reject the Plan.

8.   Class 8 – General Unsecured Claims

(a)    *Classification*:  Class 8 consists of all General Unsecured Claims.

(b)    *Treatment*:  Each Holder of an Allowed General Unsecured Claim shall receive, at the option of the applicable Debtor:

(i)       payment in full in Cash;

(ii)      Reinstatement; or

(iii)     such other treatment rendering such Allowed General Unsecured Claim Unimpaired.

(c)    *Voting*:  Class 8 is Unimpaired under the Plan.  Holders of Claims in Class 8 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

9.   Class 9 – Intercompany Claims

(a)    *Classification*:  Class 9 consists of all Intercompany Claims.

(b)    *Treatment*:  Each Allowed Intercompany Claim shall be, at the option of the applicable Debtor, either:

(i)       Reinstated;

(ii)      canceled, released, and extinguished, and will be of no further force or effect; or

(iii)     otherwise addressed at the option of each applicable Debtor such that Holders of Class 9 Intercompany Claims will not receive any distribution on account of such Class 9 Claims.

(c)    *Voting*:  Class 9 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 9 is not entitled to vote to accept or reject the Plan.

10.  Class 10 – Intercompany Interests

(a)    *Classification*:  Class 10 consists of all Intercompany Interests.

(b)    *Treatment*:  Each Intercompany Interest shall be Reinstated as of the Effective Date or, at the Debtors' or the Reorganized Debtors' option, shall be cancelled.  No distribution shall be made on account of any Intercompany Interests.

(c)    *Voting*:  Class 10 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 10 is not entitled to vote to accept or reject the Plan.

11.  Class 11 – Existing Equity Interests

(a)    *Classification*:  Class 11 consists of all Existing Equity Interests.

(b)    *Treatment*:

(i)    **if (A) Class 7 votes to accept the Plan and (B) Class 11 votes to accept the Plan**, each Holder of Existing Equity Interests shall receive its *Pro Rata* share of the Existing Equity Warrant Package.

(ii)   **if either Class 7 or Class 11 votes to reject the Plan**, Holders of Existing Equity Interests will not receive any distribution on account of such Interests, which will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect.

(c)    *Voting*:  Class 11 is Impaired under the Plan.  Holders of Interests in Class 11 are entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including, all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

D.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.    *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

F.    *Intercompany Interests.*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure for the ultimate benefit of the Holders of New DNR Equity, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

G.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan.  The Debtors reserve the right to modify the Plan in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a

Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.     *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.     *Subordinated Claims and Interests.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, and subject to the Restructuring Support Agreement, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

A.     *General Settlement of Claims and Interests.*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan, including (1) any challenge to the amount, validity, perfection, enforceability, priority or extent of the Pipeline Lease Claims, RBL Claims, Hedge Claims, Second Lien Notes Claims, Convertible Notes Claims, or the Subordinated Notes Claims, and (2) any claim to avoid, subordinate, or disallow any Pipeline Lease Claim, RBL Claim, Hedge Claim, Second Lien Notes Claim, Convertible Notes Claim, or Subordinated Notes Claim, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to Holders of Allowed Claims or Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.     *Restructuring.*

On or before the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into and shall take any actions as may be necessary or appropriate to effect the Restructuring.  The actions to implement the Restructuring may include, in accordance with the consent rights in the Restructuring Support Agreement:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable Law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law;

(4) such other transactions that are required to effectuate the Restructuring; and (5) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable Law in connection with the Plan. The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan.

C.       *Reorganized Debtors.*

On the Effective Date, the New Board shall be established, and the Reorganized Debtors shall adopt their New Organizational Documents, which shall be consistent with the Governance Term Sheet. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan. Cash payments to be made pursuant to the Plan will be made by the Debtors or Reorganized Debtors, as applicable. The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or Reorganized Debtors, as applicable, to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date agreement, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of directors of the applicable Reorganized Debtors deem appropriate.

D.       *Sources of Consideration for Plan Distributions.*

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with: (1) Cash on hand, including Cash from operations; (2) the proceeds from the Exit Facility; (3) the New DNR Equity; and (4) the Warrants, as applicable.

1.       Exit Facility.

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facility, the terms of which will be set forth in the Exit Facility Documents, *provided* that the Debtors or the Reorganized Debtors, as applicable, determine that entry into the Exit Facility is in the best interests of the Reorganized Debtors, *provided*, *further*, such determination is reasonably acceptable to the Required Consenting Second Lien Noteholders.

To the extent applicable, Confirmation of the Plan shall be deemed (a) approval of the Exit Facility (including the transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), to the extent not approved by the Bankruptcy Court previously, and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the Exit Facility, including the Exit Facility Documents, and incur and pay any fees and expenses in connection therewith, and (ii) act or take action under applicable Law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to consummate the Exit Facility; *provided* that such modifications are acceptable to the Exit Facility Lenders and reasonably acceptable to the Required Consenting Second Lien Noteholders.

As of the Effective Date, upon the granting of Liens in accordance with the Exit Facility Documents, such Liens shall constitute valid, binding, enforceable, and automatically perfected Liens in the collateral specified in the Exit Facility Documents. To the extent provided in the Exit Facility Documents, the Exit Facility Agent or Holder(s) of Liens under the Exit Facility Documents are authorized to file with the appropriate authorities mortgages, financing statements and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests. The guarantees, mortgages, pledges, Liens, and other security interests granted to secure the obligations arising under the Exit Facility Documents shall be granted in good faith, for legitimate business purposes,

and for reasonably equivalent value as an inducement to the Exit Facility Lenders to extend credit thereunder shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination, and the priorities of such Liens and security interests shall be as set forth in the Exit Facility Documents.

    2.    <u>Issuance of New DNR Equity</u>.

The issuance of the New DNR Equity, including options or other equity awards, if any, reserved for the Management Incentive Plan and the Warrants, by the Reorganized Debtors shall be authorized without the need for any further corporate action or without any further action by the Holders of Claims or Interests. The Reorganized Debtors shall be authorized to issue a certain number of shares, units, or equity interests (as the case may be based on how the New DNR Equity is denominated and the identity of the Reorganized Debtor issuing such shares, units, or equity interests) of New DNR Equity required to be issued under the Plan and pursuant to their New Organizational Documents. On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall issue all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan.

All of the shares, units, or equity interests (as the case may be based on how the New DNR Equity is denominated) of New DNR Equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

    3.    <u>Issuance of Warrants</u>.

On the Effective Date, the applicable Reorganized Debtor will issue the Warrants only to the extent required to provide for distributions to Holders of Convertible Notes Claims, Subordinated Notes Claims, and Existing Equity Interests, as contemplated by this Plan. All of the Warrants issued pursuant to the Plan shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance without the need for execution by any party thereto other than the applicable Reorganized Debtor(s).

E.    *Holders of Working and Similar Interests.*

The legal and equitable rights, interests, defenses, and obligations of lessors under the Debtors' oil and gas leases, Holders of certain other mineral interests related to the Debtors' oil and gas properties, owners of non-operating working interests in the Debtors' oil and gas properties, counterparties to the Debtors' joint operating agreements, and Holders of claims related to joint-interest billings and other similar working interests shall not be impaired in any manner by the provisions of this Plan. Nor shall anything in this Plan impair the related legal and equitable rights, interests, defenses, or obligations of the Debtors or the Reorganized Debtors. To the extent applicable, such Claims or Interests shall be Reinstated pursuant to this Plan.

Notwithstanding the foregoing, nothing in this Article IV.E hereof shall limit the Debtors' rights to reject any Executory Contract or Unexpired Lease in accordance with the Bankruptcy Code or pursuant to Article V hereof.

F.    *Corporate Existence.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable Law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent

such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, in each case, consistent with the Restructuring Support Agreement (and subject to the consent, approval and consultation rights set forth therein), and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).  After the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized Debtors may be amended or modified without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  After the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

G.      *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan or Plan Supplement, including the Exit Facility Documents, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

H.      *Cancellation of Existing Securities and Agreements.*

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, credit agreements, indentures, and other documents evidencing Claims or Interests, shall be cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect.  Holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to this Plan.  Notwithstanding anything to the contrary herein, but subject to any applicable provisions of Article VI hereof, the Second Lien Notes Indentures, Convertible Notes Indenture, and the Subordinated Notes Indentures shall continue in effect solely to the extent necessary to:  (1) permit Holders of Claims under the Second Lien Notes Indentures, the Convertible Notes Indenture, or the Subordinated Notes Indentures to receive their respective Plan Distributions; and (2) permit the Reorganized Debtors and the Distribution Agent, as applicable, to make Plan Distributions on account of the Allowed Claims under the Second Lien Notes Indentures, the Convertible Notes Indenture, and the Subordinated Notes Indentures, as applicable.  Except as provided in this Plan (including Article VI hereof), on the Effective Date, the agents and trustees under the Second Lien Notes Indentures, the Convertible Notes Indenture, and the Subordinated Notes Indentures, and their respective agents, successors, and assigns, shall be automatically and fully discharged of all of their duties and obligations associated with the Second Lien Notes Indentures, the Convertible Notes Indenture, and the Subordinated Notes Indentures.  The commitments and obligations (if any) of the Second Lien Noteholders, the Convertible Noteholders, or the Subordinated Noteholders to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries or any of their respective successors or assigns under the Second Lien Notes Indentures, the Convertible Notes Indenture, or the Subordinated Notes Indentures, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

I.      *Corporate Action.*

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including: (1) adoption or assumption, as applicable, of the Compensation and Benefit Programs; (2) selection of the directors and officers for the Reorganized Debtors; (3) the issuance and distribution of the New DNR Equity; (4) implementation of the Restructuring; (5) issuance and distribution of the Warrants; (6) entry into the Registration Rights Agreement, the Warrants Agreement and the Exit Facility Documents, as applicable; (7) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (8) adoption of or entry into the New Organizational Documents; (9) the rejection, assumption, or assumption and assignment, as applicable,

of Executory Contracts and Unexpired Leases; and (10) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security Holders, members, directors, or officers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New DNR Equity, the New Organizational Documents, the Warrants and the Warrants Agreement (as applicable), the Exit Facility Documents, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.I shall be effective notwithstanding any requirements under non-bankruptcy Law.

J.      *New Organizational Documents.*

On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically adopted by the applicable Reorganized Debtors. To the extent required under the Plan or applicable non-bankruptcy Law, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state or country of organization if and to the extent required in accordance with the applicable Laws of the respective state or country of organization. The New Organizational Documents will prohibit the issuance of non-voting equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code. For the avoidance of doubt, the New Organizational Documents shall be consistent with the Governance Term Sheet. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents, and the Reorganized Debtors may file such amended certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the applicable Laws of the respective states, provinces, or countries of incorporation and the New Organizational Documents.

K.      *Indemnification Provisions in Organizational Documents.*

As of the Effective Date, the New Organizational Documents of each Reorganized Debtor shall, to the fullest extent permitted by applicable Law, provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to, the Debtors' and the Reorganized Debtors' current and former managers, directors, officers, employees, or agents at least to the same extent as the certificate of incorporation, bylaws, or similar organizational document of each of the respective Debtors on the Petition Date, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, or asserted or unasserted. Notwithstanding anything in the Plan to the contrary, none of the Reorganized Debtors will amend and/or restate the New Organizational Documents before or after the Effective Date to terminate or adversely affect any of the Reorganized Debtors' obligations to provide such indemnification rights or such managers', directors', officers', employees', or agents' indemnification rights with respect to any claims relating to acts or omissions occurring at or prior to the Effective Date.

L.      *Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the term of the current members of the board of directors of DNR shall expire, and all of the directors for the initial term of the New Board shall be appointed in accordance with the Governance Term Sheet. The New Board shall initially consist of 7 members. In subsequent terms, the directors shall be selected in accordance with the New Organizational Documents of the Reorganized Debtors. To the extent known, the identity of the members of the New Board will be disclosed in the Plan Supplement or prior to the Confirmation Hearing, consistent with section 1129(a)(5) of the Bankruptcy Code. Each director and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the applicable New Organizational Documents and other constituent documents.

M.      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

N.      *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity, Security, or other interest in the Debtors or the Reorganized Debtors; (2) the Restructuring; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit Facility; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

O.      *Registration Rights Agreement*

On the Effective Date, Reorganized DNR and the Registration Rights Parties shall enter into the Registration Rights Agreement.  The Registration Rights Agreement shall provide the Registration Rights Parties with commercially reasonable demand and piggyback registration rights and other customary terms and conditions.

P.      *Director and Officer Liability Insurance.*

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

*Q.      Management Incentive Plan.*

On the Effective Date, the Reorganized Debtors shall implement the Management Incentive Plan, the principal terms of which shall be set forth in the Management Compensation Term Sheet Filed with the Plan Supplement.  The New DNR Equity provided in connection with the Management Incentive Plan will dilute all of the New DNR Equity equally.  The Management Incentive Plan will (i) reserve exclusively for participants in the Management Incentive Plan a pool of equity interests of Reorganized DNR (or another entity designated pursuant to the Plan to issue equity interests on the Plan Effective Date) of up to 10.0% of New DNR Equity, which may take the form of awards of equity, options, restricted stock units, or other equity instruments, determined on a fully diluted and fully distributed basis (i.e., assuming conversion of all outstanding convertible securities (including the Warrants) and full distribution of such equity pool), (ii) grant a portion of such equity pool no later than 60 days following the Effective Date, with the remainder of such equity pool to be available for future grants to participants in the Management Incentive Plan, each in amounts and on terms to be determined by the New Board in consultation with the Chief Executive Officer and the Chief Financial Officer of DNR (and such other consultants as the New Board determines), and (iii) include other terms and conditions customary for similar type equity plans.

*R.      Employee and Retiree Matters and Benefits.*

Unless otherwise provided herein, and subject to Article V of the Plan, all Compensation and Benefits Programs shall be assumed by the Reorganized Debtors (and assigned to the Reorganized Debtors, if necessary, pursuant to section 365(a) of the Bankruptcy Code) and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable Law.  The foregoing does not curtail the Reorganized Debtors' ability to enter into additional or supplemental agreements, arrangements, programs, or plans regarding employee wages, compensation, and benefit programs.

*S.      Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII hereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII hereof.  Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date.  Any such objection that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor, without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.**  The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court.  If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objection party for thirty (30) days, such objection shall be resolved by the Bankruptcy Court.  Unless any Causes of Action of

the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII hereof.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

*T.      Restructuring Expenses.*

Promptly following the receipt of an invoice therefor, the Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Restructuring Support Agreement, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval.  All such Restructuring Expenses to be paid on the Effective Date shall be calculated or estimated as of the Effective Date, as applicable, and invoices documenting such Restructuring Expenses shall be delivered to the Debtors at least two (2) Business Days prior to the anticipated Effective Date; *provided* that such estimates shall not be considered an admission or limitation with respect to such fees and expenses.  On or as soon as reasonably practicable after the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors or Reorganized Debtors, as applicable, and such invoices shall be paid in full in Cash in accordance with, and subject to, the terms of the Restructuring Support Agreement.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*A.      Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided in Article V.I.1 and elsewhere herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that are: (1) identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (2) previously expired or terminated pursuant to their own terms; (3) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (4) are the subject of a motion to reject that is pending on the Effective Date; or (5) have an ordered or requested effective date of rejection that is after the Effective Date, *provided* that notwithstanding anything to the contrary herein, no Executory Contract or Unexpired Lease shall be assumed, assumed and assigned, or rejected without the written consent of the Required Consenting Second Lien Noteholders (such consent not to be unreasonably withheld); *provided* that approval of the Assumed Executory Contracts and Unexpired Leases Schedule and the Rejected Executory Contracts and Unexpired Leases Schedule shall be sufficient consent with respect to the Executory Contracts and Unexpired Leases listed therein.  The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contract and Unexpired Leases Schedule, or the Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set

28

forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

To the maximum extent permitted by Law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

If certain, but not all, of a non-Debtor counterparty's Executory Contracts or Unexpired Leases are assumed pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases Schedule and the Rejected Executory Contracts and Unexpired Leases Schedule at any time up to forty-five (45) days after the Effective Date, so long as such alteration, amendment, modification, or supplement is consistent with the Restructuring Support Agreement (and subject to the consent, approval and consultation rights set forth therein).

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of: (a) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (b) the effective date of such rejection, or (c) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.8 of this Plan.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

No later than seven (7) calendar days before the Plan Objection Deadline, the Debtors shall provide notices of proposed Cure Amounts to the counterparties to the agreements listed on the Assumed Executory Contracts and Unexpired Leases Schedule, which shall include a description of the procedures for objecting to the proposed Cure Amounts or the Reorganized Debtors' ability to provide "adequate assurance of future performance thereunder" (within the meaning of section 365 of the Bankruptcy Code). Unless otherwise agreed in writing by the parties in the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure Amount must be Filed, served, and actually received by the counsel to the Debtor no later than the date and time specified in the notice. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Amount will be deemed to have assented to such assumption or Cure Amount. Notwithstanding anything herein to the contrary, in the event that any Executory Contract or Unexpired Lease is added to the Assumed Executory Contracts and Unexpired Leases Schedule after such 7-day deadline, a notice of proposed Cure Amounts with respect to such Executory Contract or Unexpired Lease will be sent promptly to the counterparty thereof.

Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure Amount that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Bankruptcy Court no later than the date and time specified in the notice. Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure Amount shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure Amount; *provided* that nothing herein shall prevent the Reorganized Debtors from paying any Cure Amount despite the failure of the relevant counterparty to file such request for payment of such Cure Amount. The Reorganized Debtors also may settle any Cure Amount without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors or the Reorganized Debtors, as applicable, shall pay the Cure Amounts, if any, on the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may agree. If there is any dispute regarding any Cure Amount, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of the applicable Cure Amount shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

If the Bankruptcy Court determines that the Allowed Cure Amount with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or Reorganized Debtors, as applicable, will have the right to add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cure Amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, arising at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption, (2) the effective date of such assumption or (3) the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

D.      *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any applicable non-bankruptcy Law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

E.      *Indemnification Obligations.*

On and as of the Effective Date, the Indemnification Obligations will be assumed, irrevocable with respect to any claims relating to acts or omissions occurring at or prior to the Effective Date, and will survive the effectiveness of the Plan.

F.      *Insurance Policies.*

Notwithstanding anything in the Plan to the contrary, each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

G.      *Reservation of Rights.*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

H.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

I.      *Employee Compensation and Benefits.*

1.      Compensation and Benefit Programs.

Subject to the provisions of the Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for:

(a)     all employee equity or equity-based incentive plans, and any provisions set forth in the Compensation and Benefits Programs that provide for rights to acquire Interests in any of the Debtors; and

(b)     any Compensation and Benefits Programs that, as of the entry of the Confirmation Order, have been specifically waived by the beneficiaries of any Compensation and Benefits Programs plan or contract.

Any assumption of Compensation and Benefits Programs pursuant to the terms herein shall not be deemed to trigger any applicable change of control, immediate vesting, termination, or similar provisions therein. No counterparty shall have rights under a Compensation and Benefits Program assumed pursuant to the Plan other than those applicable immediately prior to such assumption.

On the Effective Date, pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, the Management Employment Agreements shall be deemed assumed, and the Debtors and the Reorganized Debtors shall not seek to reject the Management Employment Agreements after the Effective Date.

2.     Workers' Compensation Programs.

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (a) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (b) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance. All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy Law with respect to any such contracts, agreements, policies, programs, and plans; *provided further* that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law.

*J.     Contracts or Leases Entered Into After the Petition Date.*

Contracts or leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors in the ordinary course of their business. Accordingly, such contracts or leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

*A.     Distributions on Account of Claims or Interests Allowed as of the Effective Date.*

Except as otherwise provided herein, in a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of the applicable Allowed Claim or Interest on the first Distribution Date, the Reorganized Debtors shall make initial distributions under the Plan on account of Claims or Interests Allowed on or before the Effective Date, subject to the Reorganized Debtors' right to object to any Claims or Interests; *provided* that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.D of the Plan, and (3) Allowed General Unsecured Claims against the Debtors shall be paid in accordance with Article III.B.8 of the Plan. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy

Law or in the ordinary course of business. Thereafter, a Distribution Date shall occur no less frequently than once in every ninety (90) days, as necessary, in the Reorganized Debtors' sole discretion.

B.    *Distribution Agent.*

All distributions under the Plan shall be made by the Reorganized Debtors. The Distribution Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Distribution Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

C.    *Rights and Powers of Distribution Agent.*

1.    Powers of the Distribution Agent.

The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

2.    Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Distribution Agent shall be paid in Cash by the Reorganized Debtors.

D.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.    Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date. If a Claim, other than one based on a publicly traded Security, is transferred twenty (20) or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

2.    Delivery of Distributions in General.

Except as otherwise provided herein, the Distribution Agent shall make distributions to Holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

3.    Delivery of Distributions on Second Lien Notes Claims, Convertible Notes Claims, and Subordinated Notes Claims.

The Second Lien Notes Trustee shall be deemed to be the Holder of all Allowed Class 5 Claims, the Convertible Notes Trustee shall be deemed to be the Holder of all Allowed Class 6 Claims, and the Subordinated Notes Trustee shall be deemed to be the Holder of all Allowed Class 7 Claims, for purposes of distributions to be made hereunder, and all distributions on account of such Allowed Claims shall be deemed to have been made at the direction of the applicable indenture trustee, and subject to the Indenture Trustees' Charging Liens. Notwithstanding anything in the Plan to the contrary, and without limiting the exculpation and release provisions of the Plan, the Second Lien Notes Trustee, the Convertible Notes Trustee, or the Subordinated Notes Trustee shall not have any liability to

33

any Entity with respect to distributions directed to be made by the Second Lien Notes Trustee, Convertible Notes Trustee, or the Subordinated Notes Trustee.

4.    Minimum Distributions.

No fractional shares of New DNR Equity or Warrants shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of shares of New DNR Equity or Warrants that is not a whole number, the actual distribution of shares of New DNR Equity or Warrants shall be rounded as follows:  (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized shares of New DNR Equity or Warrants to be distributed to Holders of Allowed Claims and Allowed Interests hereunder shall be adjusted as necessary to account for the foregoing rounding.

5.    Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the Effective Date.  After such date, all Unclaimed Distributions shall revest in the applicable Reorganized Debtor automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary) and, to the extent such Unclaimed Distribution is comprised of New DNR Equity, such New DNR Equity shall be canceled.  Upon such revesting, the Claim of the Holder or its successors with respect to such property shall be canceled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

If any distribution to a Holder of an Allowed Claim is returned to the Distribution Agent as undeliverable, no further distributions shall be made to such Holder unless and until the Distribution Agent is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such Holder on the next Distribution Date.  Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is canceled pursuant to this Article VI.D.5 of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

6.    Surrender of Canceled Instruments or Securities.

On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a certificate or instrument evidencing a Claim or an Interest shall be deemed to have surrendered such certificate or instrument to the Distribution Agent.  Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect for purposes of allowing Holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights.  Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims that are Unimpaired under the Plan.

E.      *Manner of Payment.*

1.      All distributions of the New DNR Equity and Warrants to the Holders of the applicable Allowed Claims or Allowed Interests under the Plan shall be made by the Distribution Agent on behalf of the Debtors or Reorganized Debtors, as applicable.

2.      All distributions of Cash to the Holders of the applicable Allowed Claim under the Plan shall be made by the Distribution Agent on behalf of the applicable Debtor or Reorganized Debtor.

3.      At the option of the Distribution Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.      *Section 1145 Exemption.*

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New DNR Equity and the Warrants, as contemplated by Article III.B hereof, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable Law requiring registration prior to the offering, issuance, distribution, or sale of Securities. In addition, under section 1145 of the Bankruptcy Code, such New DNR Equity and the Warrants will be freely tradable in the U.S. by the recipients thereof, subject to the provisions of (i) section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (ii) compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities, and (iii) any restrictions in the New Organizational Documents.

G.      *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Debtors, Reorganized Debtors, Distribution Agent, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors and Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and similar spousal awards, Liens, and encumbrances. Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim or Interest shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

H.      *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

I.      *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any prepetition Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

J.        *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

K.        *Setoffs and Recoupment.*

Except as expressly provided in this Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and the Holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, *however*, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable Holder. In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G hereof on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

L.        *Claims Paid or Payable by Third Parties.*

1.    Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

2.    Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT,
## UNLIQUIDATED, AND DISPUTED CLAIMS

A.    *Disputed Claims Process.*

There is no requirement to file a Proof of Claim (or move the Bankruptcy Court for allowance) to have a Claim Allowed for the purposes of the Plan, except as provided in Article V.B of the Plan.  On and after the Effective Date, except as otherwise provided in this Plan, all Allowed Claims shall be satisfied in the ordinary court of business of the Reorganized Debtors.  The Debtors and the Reorganized Debtors, as applicable, shall have the exclusive authority to (i) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a claim subject to any Proof of Claim that is Filed is Allowed and (ii) file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan.  If the Debtors or Reorganized Debtors dispute any Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced; *provided* that the Debtors or Reorganized Debtors may elect, at their sole option, to object to any Claim (other than Claims expressly Allowed by this Plan) and to have the validity or amount of any Claim adjudicated by the Bankruptcy Court; *provided, further*, that Holders of Claims may elect to resolve the validity or amount of any Claim in the Bankruptcy Court.  If a Holder makes such an election, the Bankruptcy Court shall apply the Law that would have governed the dispute if the Chapter 11 Cases had not been filed.  All Proofs of Claim Filed in the Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors.  **Except as otherwise provided herein, all Proofs of Claim Filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

B.    *Allowance of Claims.*

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy Law.

C.    *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval of the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval of the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.S of the Plan.

Any objections to Claims and Interests other than General Unsecured Claims shall be served and filed on or before the 180th day after the Effective Date or by such later date as ordered by the Bankruptcy Court.  All Claims and Interests other than General Unsecured Claims not objected to by the end of such 180-day period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court.

Notwithstanding the foregoing, the Debtors and Reorganized Debtors shall be entitled to dispute and/or otherwise object to any General Unsecured Claim in accordance with the Bankruptcy Code or any applicable non-bankruptcy Law.  If the Debtors, or Reorganized Debtors dispute any General Unsecured Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced.  In any action or proceeding to determine the existence, validity, or amount of any General Unsecured

Claim, any and all claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim are preserved as if the Chapter 11 Cases had not been commenced.

D.       *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.       *Estimation of Claims.*

Before, on, or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable Law, including pursuant to section 502(c) of the Bankruptcy Code and/or Bankruptcy Rule 3012 for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Claim and does not provide otherwise, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors or Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated. Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

F.       *Disallowance of Claims or Interests.*

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

G.       *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only the Allowed amount of an otherwise valid Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

H.       *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any

Disputed Claim or Interest becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

# ARTICLE VIII.
# SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A. *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than the Reinstated Claims) and Interests (other than the Intercompany Interests that are Reinstated) subject to the occurrence of the Effective Date.

B. **Releases by the Debtors.**

**Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates (as applicable) would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:  the Debtors (including the management, ownership, or operation thereof), any securities issued by the Debtors and the ownership thereof, the Debtors' restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), any intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement, the Exit Facility, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement, the Exit Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring**

transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Restructuring or (b) any individual from any claim or Causes of Action related to an act or omission that is determined in a Final Order by a court competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

C.      *Releases by the Releasing Parties.*

Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, the Reorganized Debtors, or their Estates (as applicable), that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), any securities issued by the Debtors and the ownership thereof, the Debtors' restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the DIP Facility, the Disclosure Statement, the Plan, the Exit Facility, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the Disclosure Statement, the Plan, the Exit Facility, the Plan Supplement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Restructuring or (b) any individual from any claim or Causes of Action related to an act or omission that is determined in a Final Order by a court competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

**D.      Exculpation.**

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the DIP Facility, the Disclosure Statement, the Plan, the Exit Facility, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the Disclosure Statement, the Plan, the Exit Facility,  the Plan Supplement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order by a court competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

**E.      Injunction.**

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action, suit or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.E.

F.      *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Entities, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

G.      *Release of Liens.*

Except as otherwise specifically provided in the Plan, the Exit Facility Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate or Hedge Claims with respect to which the applicable counterparty has agreed to Reinstatement in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be automatically and fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or the Reorganized Debtors, or any other Holder of a Secured Claim.  Any Holder of such Secured Claims (and the applicable agent for such Holder) shall be authorized and directed to release any collateral or other property of the Debtors (including any cash collateral and possessory collateral) held by such Holders (and the applicable agent for such Holders), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of all documents reasonably requested by the Debtors, Reorganized Debtors, or the Exit Facility Agent to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such mortgages, deeds of trust, Liens, pledges, and other security interests.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or Exit Facility Agent that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.  Notwithstanding the foregoing paragraph, this Article VIII.G shall not apply to any Secured Claims that are Reinstated pursuant to the terms of this Plan.

H.      *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

I.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent or (2) the relevant

Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

A.     *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.     the Bankruptcy Court shall have entered the Confirmation Order, which shall:

(a)     be in form and substance consistent with the Restructuring Support Agreement (and subject to the consent, approval and consultation rights set forth therein);

(b)     authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

(c)     decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

(d)     authorize the Debtors and Reorganized Debtors, as applicable or necessary, to, among other things:  (i) implement the Restructuring; (ii) issue and distribute the Warrants and the New DNR Equity pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; (iii) make all distributions and issuances as required under the Plan, including Cash, the Warrants, and the New DNR Equity; and (iv) enter into any agreements and transactions as necessary to effectuate the Restructuring, including the Exit Facility and the Management Incentive Plan;

(e)     authorize the implementation of the Plan in accordance with its terms;

(f)     provide that, pursuant to section 1146 of the Bankruptcy Code, the issuance or exchange of any Security, assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax; and

(g)     be a Final Order;

2.     the Definitive Documents (as defined in the Restructuring Support Agreement) will contain terms and conditions consistent in all material respects with the Restructuring Support Agreement and will otherwise be subject to the consent of the applicable Consenting Creditors in accordance with section 3 of the Restructuring Support Agreement (such consent not to be unreasonably withheld);

3.     the Debtors shall have obtained all governmental and third-party authorizations, consents, approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

4.     the final version of all schedules, documents, and exhibits in the Plan Supplement shall have been Filed in a manner consistent in all material respects with the Restructuring Support Agreement, including the consent rights provided for therein and in the Plan;

5.     the Restructuring Support Agreement shall remain in full force and effect;

6.       adoption or assumption, as applicable, of the Compensation and Benefits Programs;

7.       assumption of the Management Employment Agreements;

8.       all actions, documents, certificates, and agreements necessary to implement the Plan (including any documents contained in the Plan Supplement) shall have been effected or executed and delivered to the applicable parties, and, to the extent required, filed with the applicable Governmental Units, in accordance with applicable Laws, and shall comply with the consent rights set forth in the Restructuring Support Agreement;

9.       all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been placed in the Professional Fee Escrow Account in accordance with Article II.B hereof pending approval by the Bankruptcy Court;

10.      the Debtors shall have paid the Restructuring Expenses in accordance with the terms of Article IV.T hereof, the Restructuring Support Agreement, and the DIP Orders, as applicable;

11.      the Exit Facility Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the Exit Facility shall have been satisfied or duly waived in writing; and

12.      the Debtors and Reorganized Debtors, as applicable, shall have implemented the Restructuring (including the Exit Facility) and all transactions contemplated herein, in a manner consistent with the Restructuring Support Agreement (and subject to the consent, approval and consultation rights set forth therein), the Plan, and the Plan Supplement.

B.     *Waiver of Conditions.*

The conditions to Consummation set forth in this Article IX may be waived by the Debtors with the consent of the Required Consenting Second Lien Noteholders, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan; *provided* that any waiver of the conditions to Consummation set forth in Article IX.A.3, Article IX.A.5, Article IX.A.8, Article IX.A.10, Article IX.A.11, and Article IX.A.12, and solely to the extent they affect the DIP Facility Documents, the DIP Orders, or the Exit Facility Documents and consistent with the Restructuring Support Agreement (and subject to the consent, approval, and consultation rights set forth therein), Article IX.A.1, Article IX.A.2, and Article IX.A.4 shall also require the consent of the Required Consenting RBL Lenders.

C.     *Effect of Non-Occurrence of Conditions.*

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan, the Disclosure Statement, or Restructuring Support Agreement shall:  (1) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity.

D.     *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

# ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.    *Modification and Amendments.*

Except as otherwise specifically provided in this Plan and subject to the consent rights set forth in the Restructuring Support Agreement, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to those restrictions on modifications set forth in the Plan and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan; *provided* that each of the foregoing actions shall not violate the Restructuring Support Agreement.

B.    *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.    *Revocation or Withdrawal of Plan.*

To the extent permitted by the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

# ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.    decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.    resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cures pursuant

to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.      enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Confirmation Order, or the Disclosure Statement, including the Restructuring Support Agreement;

8.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.L hereof;

14.     enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.     determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement, including the Restructuring Support Agreement;

16.     enter an order or final decree concluding or closing the Chapter 11 Cases;

17.     adjudicate any and all disputes arising from or relating to distributions under the Plan;

18.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.      determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

21.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.      hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article VIII hereof, regardless of whether such termination occurred prior to or after the Effective Date;

23.      enforce all orders previously entered by the Bankruptcy Court; and

24.      hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article XI to the contrary, the New Organizational Documents and the Exit Facility and any documents related thereto shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests have, or are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.      *Additional Documents.*

On or before the Effective Date, and consistent in all respects with the terms of the Restructuring Support Agreement, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan and the Restructuring Support Agreement.  The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Distribution Agent on behalf of each of the Reorganized Debtors) for each quarter (including any fraction thereof) until the earlier of entry of a final decree closing such Chapter 11 Cases or an order of dismissal or conversion, whichever comes first.

D.      *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code. The Debtors (or Reorganized Debtors, as applicable) shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committee after the Effective Date.

E.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| Denbury Resources Inc.<br>5320 Legacy Drive<br>Plano, Texas 75024<br>Attention: Jim Matthews | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention: Joshua A. Sussberg, P.C. Christopher Marcus, P.C., and Rebecca Blake Chaikin<br>Email: jsussberg@kirkland.com; cmarcus@kirkland.com; rebecca.chaikin@kirkland.com<br><br>- and -<br><br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Attention: David Eaton<br>Email: deaton@kirkland.com<br><br>- and -<br><br>Jackson Walker LLP<br>1401 McKinney Street, Suite 1900<br>Houston, TX 77010<br>Attention: Matthew D. Cavenaugh<br>Email: mcavenaugh@jw.com |

| United States Trustee | Counsel to the Second Lien Ad Hoc Committee |
|---|---|
| Office of The United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, TX 77002 | Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, NY 10019-6064<br>Attention: Andrew N. Rosenberg, Elizabeth R. McColm, and Michael Turkel<br>Email: arosenberg@paulweiss.com;<br>emccolm@paulweiss.com; mturkel@paulweiss.com |
| **Counsel to the RBL Agent** | **Counsel to the Convertible Ad Hoc Group** |
| Vinson & Elkins, LLP<br>2001 Ross Avenue<br>Suite 3900<br>Dallas, TX 75201<br>Attention: Erec Winandy and Bill Wallander<br>Email: ewinandy@velaw.com;<br>bwallander@velaw.com | Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park<br>Bank of America Tower<br>New York, NY 10036-6745<br>Attention: Michael S. Stamer<br>Email: mstamer@akingump.com |

After the Effective Date, the Reorganized Debtors have the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.      *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.      *Entire Agreement.*

Except as otherwise indicated, and without limiting the effectiveness of the Restructuring Support Agreement, the Plan (including, for the avoidance of doubt, the documents and instruments in the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.      *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://dm.epiq11.com/Denbury or the Bankruptcy Court's website at www.txs.uscourts.gov/bankruptcy. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

K.       *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; *provided* that any such deletion or modification must be consistent with the Restructuring Support Agreement (and subject to the consent, approval and consultation rights set forth therein); and (3) nonseverable and mutually dependent.

L.       *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable Law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

M.       *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N.       *Waiver or Estoppel.*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

Dated:  July 28, 2020

DENBURY RESOURCES INC.

on behalf of itself and all other Debtors

_/s/ Christian S. Kendall_
Christian S. Kendall
President and Chief Executive Officer
Denbury Resources Inc.

## **Annex 2**

**DIP-to-Exit Facility Term Sheet**

CONFIDENTIAL

## DENBURY RESOURCES INC.

### $615,000,000 Senior Secured Super Priority Debtor-in-Possession Revolving Credit Facility
### Summary of Principal Terms and Conditions

Unless specifically defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the Amended and Restated Credit Agreement dated as of December 9, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date (as defined below), the "**Pre-Petition Credit Agreement**"), among Denbury Resources Inc, a Delaware corporation (the "**Borrower**"), the lenders party thereto (the "**Pre-Petition Lenders**") and JPMorgan Chase Bank, N.A., as administrative agent for the Pre-Petition Lenders (the "**Pre-Petition Agent**").

| | |
|---|---|
| Borrower: | Denbury Resources Inc., a Delaware corporation. |
| Debtors: | The Borrower and each of its direct and indirect subsidiaries (collectively, the "**Debtors**"). |
| Post-Petition Agent / Post-Petition Lenders: | JPMorgan Chase Bank, N.A. ("**JPMCB**") in its capacity as administrative agent and collateral agent (in such capacities, the "**Post-Petition Agent**") in respect of the DIP Facility (as hereinafter defined) for the Pre-Petition Lenders under the Pre-Petition Credit Agreement participating in the DIP Facility (together with JPMCB, the "**Post-Petition Lenders**"). To the extent that all of the Pre-Petition Lenders participate in the Post-Petition Credit Agreement, their respective commitments thereunder will be in accordance with their pro rata commitments under the Pre-Petition Credit Agreement as in effect immediately prior to the Petition Date. |
| Joint Bookrunners and Lead Arrangers: | JPMCB, Bank of America, N.A., Wells Fargo Securities, LLC and Capital One, National Association, in their respective capacities as joint lead arrangers (in such capacities, the "**Joint Lead Arrangers**") for the DIP Facility. |
| Co-Syndication Agents: | Bank of America, N.A. and Wells Fargo Bank, National Association. |
| Co-Documentation Agents: | Canadian Imperial Bank of Commerce, New York Branch, Comerica Bank, Credit Suisse AG, Cayman Islands Branch, Royal Bank of Canada and ABN AMRO Capital USA LLC. |
| Venue: | Debtors will file a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**", and the date the Debtors' bankruptcy cases (the "**Chapter 11 Cases**") are commenced, the "**Petition Date**"). |
| DIP Facility: | A priming senior secured super priority debtor-in-possession revolving credit facility of up to $615,000,000 (such amount, the "**Maximum Credit Amount**", such facility the "**DIP** |

*Facility*", and the commitments under such DIP Facility, the "*DIP Commitments*"), consisting of (a) the Roll-Up Amount (as defined below) upon entry of the Interim Order and the Final Order (as each term is defined below), as the case may be and (b) new money commitments in an aggregate amount not to exceed the difference of $614,000,000 <u>minus</u> the Roll-Up Amount (this clause (b), the "*New Money DIP Commitment*"). Upon entry of the Interim Order and on the Closing Date, the DIP Commitments will be an amount equal to $614,000,000.

Until the entry of the Final Order, a maximum amount of up to $25,000,000 (the "*New Money Interim Cap*") will be available to be drawn from the New Money DIP Commitments on an interim basis. The actual amounts available to be borrowed under the DIP Facility will be subject to the conditions set forth in this DIP Term Sheet.

The loans (including the deemed issuance of any Roll-Up Loans (as defined below)) under the DIP Facility are collectively referred to as "*DIP Loans*".

(a) Upon entry of the Interim Order, (i) all outstanding Pre-Petition Letters of Credit (as defined below) issued by any Pre-Petition Lender (to the extent it is a Post-Petition Lender) shall be deemed to be issued as DIP Letters of Credit (as defined below) under the DIP Facility and shall constitute obligations due under the DIP Facility (the "*Roll-Up Letters of Credit*") and (ii) a portion of the principal amount of the outstanding Pre-Petition Loans (as defined below) held by the Pre-Petition Lenders (to the extent they are Post-Petition Lenders) in an amount equal to $185,000,000 shall be deemed to be refinanced under the DIP Facility as a DIP Loan ratably based on the Post-Petition Lenders' allocation of the DIP Commitment and shall constitute obligations due under the DIP Facility (the "*Interim Roll-Up Loans*"), and (b) upon entry of the Final Order, the remaining principal amount of all outstanding Pre-Petition Loans not rolled-up pursuant to the foregoing clauses (a)(ii) that are held by the Pre-Petition Lenders (to the extent they are Post-Petition Lenders), other than $1,000,000 of Pre-Petition Loans (the "*Retained Pre-Petition Claim*"), shall be deemed to be refinanced under the DIP Facility as a DIP Loan ratably based on the Post-Petition Lenders' allocation of the DIP Commitment and shall constitute obligations due under the DIP Facility (the "*Final Roll-Up Loans*", and together with the Interim Roll-Up Loans, the "*Roll-Up Loans*") (the aggregate amount under the foregoing clauses (a) and (b), the "*Roll-Up Amount*"). Any unpaid interest and fees due in respect of the Pre-Petition Secured Indebtedness described in the above clauses (a) and (b) as of the date of the Interim Order shall also be rolled into the DIP Facility and deemed to constitute obligations due under the DIP Facility.

The DIP Facility will be more fully described and documented in the Financing Orders (as defined below) and a senior secured super priority debtor-in-possession credit agreement entered into by and among the Debtors, the Post-Petition Agent and the Post-Petition Lenders, in each case, which must be in form and substance acceptable to the Borrower, the Post-Petition Agent and the Post-Petition Lenders (the "**Post-Petition Credit Agreement**").

The closing date of the DIP Facility is hereinafter referred to as the "**Closing Date**".

**Pre-Petition Secured Indebtedness:**    All indebtedness and other obligations under the Pre-Petition Credit Agreement and Credit Documents (as defined in the Pre-Petition Credit Agreement), comprised of (collectively, the "**Pre-Petition Secured Indebtedness**"): (a) 100% of the principal amount of the outstanding "Loans" (as defined in the Pre-Petition Credit Agreement) (such outstanding loans, the "**Pre-Petition Loans**"), (b) 100% of the "Letters of Credit Outstanding" (as defined in the Pre-Petition Credit Agreement) (such outstanding letters of credit, the "**Pre-Petition Letters of Credit**"), and (c) any obligations owing under any treasury and cash management arrangements that are entered into prior the Petition Date with any Pre-Petition Lender or any affiliate of a Pre-Petition Lender.

**Pre-Petition Hedges:**    Any obligations owing by the Debtors under any hedging transactions that were entered into prior to the Petition Date by the Debtors with a counterparty that is a Pre-Petition Lender or any affiliate of a Pre-Petition Lender (collectively, the "**Pre-Petition Hedges**").

**Purpose / Use of Proceeds:**    All proceeds of DIP Loans shall be used to, among other things, (a) pay fees, interest, and expenses associated with the DIP Facility, (b) provide for the ongoing working capital and capital expenditure needs of the Debtors during the pendency of the Chapter 11 Cases strictly in accordance with the Budget (as updated from time to time as set forth herein), subject to the Permitted Variances (as defined below), including to pay obligations under any DIP Hedges as they become due, (c) fund the adequate protection payments as authorized by the Bankruptcy Court in the Financing Orders, (d) fund the costs of the administration of the Chapter 11 Cases (including the Carve Out (as defined below)) strictly in accordance with the Budget (as updated from time to time as set forth herein), subject to the Permitted Variances, and (e) to refinance the portion of the Pre-Petition Secured Indebtedness constituting the Roll-Up Amount (which, for the avoidance of doubt, does not include the Retained Pre-Petition Claim).

DIP Letters of Credit shall be used by the Borrower and its subsidiaries for general corporate purposes, including, without

4

limitation, to secure bids, tenders, bonds and contracts entered into in the ordinary course of the Debtors' business and to support deposits required under purchase agreements pursuant to which the Borrower or one or more subsidiaries may acquire oil and gas assets (in each case, to the extent such transactions are permitted under the Post-Petition Credit Agreement and so long as issued strictly in accordance with the Budget, as updated from time to time as set forth herein and subject to the Permitted Variances).

Availability:

So long as the Total Outstandings (as defined below) do not exceed the lesser of (i) the DIP Loan Limit (as defined below) and (ii) the amount then authorized by any Financing Order: (A) DIP Loans will be available to be made at any time (on same day notice in the case of ABR (as defined in Annex I) Loans) prior to the Maturity Date (as defined below), in minimum principal amounts of $1,000,000 or increments of $100,000 in excess thereof, (B) DIP Letters of Credit will be issued and renewed as described in the section entitled "Letters of Credit" below and (C) amounts repaid under the DIP Facility may be reborrowed.

"***Total Outstandings***" means, at any time, the aggregate principal amount of the DIP Loans then outstanding plus the aggregate stated amount of all issued but undrawn DIP Letters of Credit and, without duplication, all unreimbursed disbursements on any DIP Letter of Credit as of such date (unless cash collateralized or backstopped pursuant to arrangements reasonably acceptable to the Issuing Lender (as hereinafter defined)).

"***DIP Loan Limit***" means, the least of (i) the DIP Commitments, (ii) the Borrowing Base (as hereinafter defined), less the amount of any Carve-Out Reserve (as defined on Annex II hereto) and (iii)  the Maximum Credit Amount.

Borrowing Base:

The borrowing base for the DIP Facility will be based on the loan value of the Debtors' proved oil and gas reserves as reflected in a Reserve Report (as hereinafter defined) and other oil and gas properties of the Debtors, in each case located within the geographic boundaries of the United States or the outer continental shelf adjacent to the United States, determined in accordance with the terms set forth below (the "***Borrowing Base***").

The Borrowing Base as of the Closing Date will be $615,000,000 based on the reserve report as of December 31, 2019 delivered under, and pursuant to the terms of, the Pre-Petition Credit Agreement (the "***Initial Reserve Report***") and will remain at such level until the next re-determination date, which re-determination date shall be subject to adjustment as set forth in the Post-Petition Credit Agreement.  The Borrowing

5

Base shall be re-determined on January 1, 2021 and July 1, 2021 (or, in each case, such date reasonably practicable thereafter), based upon a reserve report prepared as of the immediately preceding September 30, 2020 (with regard to the January 1, 2021 redetermination) and December 31, 2020 (with regard to the July 1, 2021 redetermination), and delivered on or before December 1, 2020 (with regard to the January 1, 2021 redetermination) and June 1, 2021 (with regard to the July 1, 2021 redetermination) (each such reserve report, together with the Initial Reserve Report, each a "***Reserve Report***"), and other related information, if any, required to be delivered to the Post-Petition Agent in accordance with the Post-Petition Credit Agreement.   Each Reserve Report shall be in form and substance reasonably satisfactory to the Post-Petition Agent. The Reserve Report prepared as of September 30, 2020 shall be prepared by or under the supervision of the chief engineer of the Borrower who shall certify such Reserve Report to be true and accurate in all material respects and to have been prepared in accordance with procedures used in the Initial Reserve Report. The Reserve Report prepared as of December 31, 2020 shall be prepared by (a) DeGolyer and MacNaughton, (b) Netherland, Sewell & Associates, Inc., (c) Cawley, Gillespie & Associates, Inc., (d) Ryder Scott Company, L.P., or (e) at the Borrower's election, such other independent petroleum engineering firm reasonably acceptable to the Post-Petition Agent.

The Borrowing Base shall be proposed by the Post-Petition Agent and approved by all of the Post-Petition Lenders (in the case of increases) or the Required Post-Petition Lenders (as hereinafter defined) (in the case of decreases or reaffirmation) as provided below.  Each determination of the Borrowing Base shall be made by the Post-Petition Agent and, (i) to the extent any determination represents an increase in the Borrowing Base in effect immediately prior to such determination, all of the Post-Petition Lenders, and (ii) to the extent any determination represents a decrease in or reaffirmation of the Borrowing Base in effect immediately prior to such determination, the Required Post-Petition Lenders, in each case, in their respective sole discretion, but in good faith in accordance with their respective usual and customary oil and gas lending criteria as they exist at the particular time and as specified in the DIP Facility Documentation; underlined provided that no Post-Petition Lender shall be required to increase its commitment amount under the DIP Facility in connection with an increase in the Borrowing Base.

To the extent any re-determination represents an increase in the Borrowing Base in effect immediately prior to such re-determination, such Borrowing Base will be the largest amount approved by all of the Post-Petition Lenders, and to the extent any re-determination represents a decrease in, or reaffirmation of, the Borrowing Base in effect prior to such re-determination,

such Borrowing Base will be the largest amount approved by the Required Post-Petition Lenders.

Interest Rates and Fees:

As set forth on Annex I attached hereto.

Default Rate:

With respect to overdue principal, the applicable interest rate plus 2.00% per annum, and with respect to any other overdue amount, including overdue interest, the interest rate applicable to ABR Loans plus 2.00% per annum.

Letters of Credit:

A portion of the DIP Facility in an aggregate amount not to exceed $100,000,000 (as may be increased solely with the consent of the Post-Petition Agent and the Issuing Lender) will be available to the Debtors for the purpose of issuing standby letters of credit (the "**DIP Letters of Credit**").  DIP Letters of Credit will be issued by JPMCB or any of its affiliates (the "**Issuing Lender**").  For the avoidance of doubt, upon entry of the Interim Order, all outstanding Pre-Prepetition Letters of Credit issued by any Pre-Petition Lender (to the extent it is a Post-Petition Lender) shall be deemed to be issued as DIP Letters of Credit under the DIP Facility and shall constitute obligations due under the DIP Facility.

Drawings under any DIP Letter of Credit shall be reimbursed by the Borrower (whether with its own funds or with the proceeds of borrowings under the DIP Facility) within one business day after notice of such drawing is received by the Borrower from the Issuing Lender.  To the extent that the Borrower does not reimburse the Issuing Lender within the time period specified above, the Post-Petition Lenders under the DIP Facility shall be irrevocably obligated to reimburse the Issuing Lender pro rata based upon their respective DIP Commitments.

Final Maturity:

All commitments of the Post-Petition Lenders under the DIP Facility shall terminate at the earliest of (herein, a "**Post-Petition Default**", and the earliest of which, the "**Maturity Date**"):  (a) the date which is twelve (12) months after the Petition Date; (b) the consummation of a sale of all or substantially all of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code; (c) the effective date of any plan of reorganization; (d) the entry of an order for the conversion of any of the Debtors' bankruptcy cases to a case under Chapter 7 of the Bankruptcy Code; (e) the entry of an order for the dismissal of any of the Debtors' bankruptcy cases; (f) the date of acceleration of the DIP Obligations and the termination of the DIP Commitments upon and during the continuance of an Event of Default, in accordance with the DIP Facility Documentation; (g) thirty-five (35) days after the Petition Date, if the Final Order has not been entered by such date (which date may be extended with the prior written consent of the Post-Petition Agent); or (h) appointment of a chapter 11 trustee in

any of the Chapter 11 Cases.

<u>DIP Obligations / Guarantees:</u>

All obligations of the Debtors under (i) the DIP Facility and the DIP Facility Documentation, but excluding, for the avoidance of doubt, the Retained Pre-Petition Claim, (ii) (a) any amounts owing by the Debtors under any Pre-Petition Hedges with a counterparty that is a Pre-Petition Lender or any affiliate of a Pre-Petition Lender, in either case in respect of which such Pre-Petition Lender or affiliate thereof enters into, within 30 days after the Petition Date (at the expense of the Debtors, which shall pay each counterparty's out of pocket legal expenses), (1) an amended and restated Schedule to the ISDA Master Agreement (a "***Post-Petition ISDA Schedule***") between the applicable Debtor and the applicable counterparty that is mutually acceptable to the parties, providing among other things, that such counterparty shall not terminate such Pre-Petition Hedges during the pendency of the Chapter 11 Cases solely as a result of a termination event or event of default under the Pre-Petition Hedges that occurred and/or existed on the Petition Date as a result of the filing of the Chapter 11 Cases, the insolvency of any Debtor or any default or event of default (howsoever defined) relating to pre-petition indebtedness of any Debtor and (2) contemporaneously with entering into the Post-Petition ISDA Schedule, a further amended and restated ISDA Schedule that will automatically replace the Post-Petition ISDA Schedule upon effectiveness of the Exit Credit Facility so long as the Exit Credit Facility conforms in all applicable material respects with the Exit Credit Facility Term Sheet and subject to conditions to be mutually agreed to by the parties in the Post-Petition ISDA Schedule and (b) any post-petition hedging transaction with a Post-Petition Lender or an affiliate of a Post-Petition Lender, in each case, to the extent permitted under the Financing Orders (including hedging orders) (all hedges in this clause (ii), the "***DIP Hedges***") and (iii) treasury and cash management arrangements that are entered into prior to or after the Petition Date with any Post-Petition Lender or any affiliate of a Post-Petition Lender (all obligations described in the foregoing clauses (i) through (iii), the "***DIP Obligations***") will, in each case, be unconditionally guaranteed jointly and severally (the "***Guarantees***") by each of the Debtors (other than the Borrower).

<u>Adequate Protection Payments and Liens:</u>

As adequate protection of the interests of the Pre-Petition Lenders as a result of the DIP Facility advances, use of cash collateral and other collateral or the imposition of the automatic stay to the extent of any post-petition diminution in value of the Pre-Petition Lenders' collateral, the Pre-Petition Lenders will receive, subject and junior to the Carve Out: (a) valid and automatically perfected first-priority replacement liens and security interests in and upon the DIP Collateral (as defined below), but junior to the liens and security interests securing the

DIP Facility (the "***Adequate Protection Liens***"), (b) adequate protection payments consisting of cash reimbursement of the reasonable and documented (in summary format) fees, costs, and expenses (including reasonable professional fees) of the Pre-Petition Agent and the Pre-Petition Lenders, and (c) super-priority administrative expense claims under Section 507(b) of the Bankruptcy Code and junior to the Superpriority Claims (as defined below); provided, however, that (x) the Adequate Protection Liens and adequate protection payments described above shall be paid or granted to the extent that the stay under Bankruptcy Code Section 362, use, sale, or lease under Bankruptcy Code 363 of this title, or any grant of a lien under Bankruptcy Code 364 of this title results in a decrease in the value of such entity's interest in such property, and (y) the Adequate Protection Liens and adequate protection payments described above shall not attach to any Avoidance Actions but shall attach to any Avoidance Proceeds, subject to entry of the Final Order.

The Financing Orders shall provide for adequate protection in the form of replacement liens and superpriority claims, financial reporting and rights of access and information, payment of fees and expenses of professionals (as described below) mutually acceptable to the Post-Petition Agent and the Second Lien Notes Trustee for the benefit of the Second Lien Notes Trustee and the Second Lien Ad Hoc Group and all members thereof.

Security:

All DIP Obligations will be secured by (in each case, other than Excluded Assets (as defined below) and subject to Permitted Liens (to be defined in the DIP Facility Documentation) and junior to the Carve Out): (i) superpriority priming liens on all property of the Debtors secured by valid, unavoidable and perfected security interests and liens securing any Pre-Petition Secured Indebtedness or Pre-Petition Hedges as of the Petition Date (the "***Priority Lien***"); (ii) junior liens on any property of the Debtors secured by valid, unavoidable and perfected security interests and liens of any parties (other than the Pre-Petition Lenders) securing any indebtedness (other than the Pre-Petition Secured Indebtedness or Pre-Petition Hedges); and (iii) first-priority liens on all unencumbered assets of the Debtors, (A) including, without limitation, all real and personal property of the Debtors, tangible or intangible, wherever located, including, but not limited to, all cash, bank accounts, accounts receivable, inventory, equipment, patents, trademarks, copyrights, other general intangibles and membership interests that were not, as of the Petition Date, subject to valid, unavoidable and perfected security interests and liens, but (B) excluding any avoidance actions under Chapter 5 of the Bankruptcy Code, whether now existing or hereafter acquired by the Debtors and the Debtors' bankruptcy estates ("***Avoidance Actions***") other than, subject to and effective upon

entry of the Final Order, all proceeds, products, rents, revenues and profits of Avoidance Actions ("***Avoidance Proceeds***") (the foregoing clauses (i) through (iii), the "***DIP Collateral***").

Notwithstanding anything to the contrary herein, DIP Collateral shall not include the following  (collectively, the "***Excluded Assets***"): (a) any Building (as defined in the applicable "Flood Insurance Regulation" or Manufactured (Mobile) Home (as defined in the applicable Flood Insurance Regulation), (b)(i) that certain Pipeline Financing Lease Agreement, dated as of May 30, 2018 (as amended), among Denbury Onshore, LLC and Genesis NEJD Pipeline, LLC, (ii) any interest, title and right that the Debtors have to the "Pipeline System" (as defined in the Pipeline Financing Lease Agreement) (hereinafter referred to as the "***Pipeline System***"), (iii) any proceeds received at any time resulting from the sale or other disposition of all or part of the Debtors' interest, title and right to the Pipeline System, and (iv) all rents, income or related fees or charges for transportation of carbon dioxide or any other substance through the Pipeline System; *provided that*, in the case of this clause (b), such assets shall be excluded solely to the extent that the grant of a security interest therein is prohibited by, or constitutes a breach or default under or results in the termination of or gives rise to a right on the part of the parties thereto other than any Debtor to terminate (or materially modify) or requires any consent under, the subject contract, license, agreement, instrument or other document, except to the extent that the term in such contract, license, agreement, instrument or other document providing for such prohibition, breach, default or right of termination or modification or requiring such consent is ineffective under Sections 9-406, 9-407, 9-408 or 9-409 of the UCC of any relevant jurisdiction or any other applicable law; and (c) any deposit account which is used as an escrow account or fiduciary or trust account and solely maintains cash and cash equivalents made for the benefit of third parties (other than the Debtors) to be used exclusively in the ordinary course of the Debtors' business for royalty obligations, suspense payments, working interest payments, plugging and abandonment, remediation, and similar payments owed or to be made to such third parties (other than the Debtors).

In addition, all DIP Obligations and all amounts owing by the Debtors in respect thereof at all times shall constitute allowed super-priority administrative expense claims, pursuant to Section 364(c) of the Bankruptcy Code, in the bankruptcy cases, having priority over all administrative expenses of the kind specified in, or ordered pursuant to, Sections 503(b) and 507(b) or any other provisions of the Bankruptcy Code, subject and junior only to the Carve Out (the "***Superpriority Claims***"). All of the liens and security interests described above securing

the DIP Obligations and the Adequate Protection Liens shall be effective and perfected as of the Petition Date upon entry of the Interim Order.

All liens and security interests authorized and granted pursuant to Financing Orders entered by the Bankruptcy Court approving the DIP Facility and the Adequate Protection Liens shall be deemed effective and automatically perfected as of the Petition Date, and no further filing, notice or act will be required to effect such perfection by any person.   The Post-Petition Lenders, or the Post-Petition Agent on behalf of the Post-Petition Lenders, shall be permitted, but not required, to make any filings, deliver any notices, make recordations, perform any searches or take any other acts as may be desirable under law in order to reflect the security, perfection or priority of the Post-Petition Lenders' liens, security interests, and claims described herein; *provided* that no actions in any non-United States jurisdiction shall be required to be taken and no security agreements or pledge agreements governed under the laws of any non-United States jurisdiction shall be required to be entered into.

| | |
|---|---|
| <u>No Surcharge & Marshalling / Equities of the Case Waiver:</u> | In each case, subject to and effective upon entry of the Final Order, the DIP Facility shall provide that (i) no costs or expenses of administration shall be imposed against the Post-Petition Lenders' or the Pre-Petition Lenders' pre-petition or post-petition collateral under Section 506(c) of the Bankruptcy Code or otherwise, and (ii) the Post-Petition Lenders' and the Pre-Petition Lenders' collateral shall not be subject to the doctrine of marshalling or Section 552 of the Bankruptcy Code "equities of the case" arguments. |
| <u>Carve Out:</u> | The Financing Orders shall include a carve out (the "***Carve Out***") substantially consistent with Annex II attached hereto. |

| Mandatory Prepayments: | Limited to the following: |
|---|---|

(a) If at any time the Total Outstandings exceed the Borrowing Base as a result of scheduled redetermination of the Borrowing Base (a "***Borrowing Base Deficiency***"), the Borrower shall, within three (3) business days after written notice from the Post-Petition Agent to the Borrower of such Borrowing Base Deficiency, prepay the DIP Loans in an amount sufficient to eliminate such Borrowing Base Deficiency (or if no DIP Loans remain outstanding, cash collateralize all unreimbursed disbursements on any DIP Letter of Credit in an amount sufficient to eliminate such Borrowing Base Deficiency); provided that any such Borrowing Base Deficiency must be cured prior to the Maturity Date of the DIP Facility;

(b) If any Borrowing Base Deficiency results from a voluntary termination of DIP Commitments, such deficiency shall be required to be eliminated contemporaneously with and on the date of such termination; and

(c) If, (i) on the first business day after the Closing Date, the Debtors have any Excess Cash (as defined below), when taken as a whole, in excess of $20,000,000 and (ii) on any business day thereafter, the Debtors have any Excess Cash, when taken as a whole, in excess of $75,000,000, in each case, the Borrower shall prepay the DIP Loans within one business day following such date in an amount equal to such excess amount (such excess amount to be paid on the first business day after the Closing Date, if any, the "***Specified Excess Cash Payment***").

"***Excess Cash***" means, as of any date of determination, the difference, if positive, between Consolidated Cash Balance (as defined below) of the Debtors as of such date and Excluded Cash (as defined below) of the Debtors as of such date.

"***Consolidated Cash Balance***" means, as of any date of determination, the aggregate amount of all (a) cash, (b) cash equivalents and (c) any other marketable securities, treasury bonds and bills, certificates of deposit, investments in money market funds and commercial paper, in each case, held or owned by (either directly or indirectly) any Debtor as of such date.

"***Excluded Cash***" means as of any date of determination, (a) any cash collateral required to cash collateralize any DIP Letter of Credit, (b) any cash or cash equivalents constituting purchase price deposits made by or held by an unaffiliated third party pursuant to a binding and enforceable purchase and sale agreement with an unaffiliated third party containing customary provisions regarding the payment and refunding of such deposits, (c) any cash or cash equivalents for which any Debtor

has, in the ordinary course of business, issued checks or initiated wires or ACH transfers in order to utilize such cash or cash equivalents, (d) any cash or cash equivalents set aside to pay payroll, payroll taxes, other taxes, employee wage and benefits payments, and trust and fiduciary obligations or other similar obligations of the Debtors then due and owing to third parties and for which the Debtors have issued checks or initiated wires or ACH transfers (or, in their respective good faith discretion, will issue checks or initiate wires or ACH wires within five business days in order to make such payments), (e) any cash or cash equivalents set aside to pay royalty obligations, working interest obligations, production payments, vendor payments, suspense payments, severance and ad valorem taxes of the Debtors then due and owing to third parties and for which the Debtors have issued checks or initiated wires or ACH transfers (or, in their respective good faith discretion, will issue checks or initiate wires or ACH wires within five business days in order to make such payments) and (f) any cash or cash equivalents in any escrow accounts or fiduciary or trust accounts that are used exclusively in the ordinary course of the Debtors' business for plugging and abandonment, remediation, and similar obligations owed to third parties.

The application of proceeds from mandatory prepayments shall not reduce the aggregate amount of DIP Commitments and amounts prepaid may be reborrowed, subject to availability and the other conditions to borrowing set forth below.

<u>Voluntary Prepayments and Reductions in Commitments</u>:

Voluntary reductions of the unutilized portion of the DIP Commitments and voluntary prepayments of outstanding DIP Loans by the Borrower will be permitted at any time, in minimum principal amounts of $500,000 or increments of $100,000 in excess thereof, without premium or penalty, subject to reimbursement of the Post-Petition Lenders' redeployment costs in the case of a prepayment of LIBOR (as defined in Annex I)  Loan other than on the last day of the relevant interest period.

<u>Documentation</u>:

The definitive documentation for the DIP Facility, including the Post-Petition Credit Agreement, the Financing Orders, and all other related agreements and documents creating, evidencing, or securing indebtedness or obligations of any of the Debtors to the Post-Petition Agent and the Post-Petition Lenders on account of the DIP Facility or granting or perfecting liens or security interests by any of the Debtors in favor of and for the benefit of the Post-Petition Agent, for itself and for and on behalf of the Post-Petition Lenders, on account of the DIP Facility (the "***DIP Facility Documentation***") shall contain the terms set forth in this DIP Term Sheet and shall otherwise be negotiated in good faith.  The Post-Petition Credit Agreement shall take into account the terms and conditions consistent with

the Pre-Petition Credit Agreement (as modified to reflect the terms and provisions of this DIP Term Sheet) and subject to (i) materiality qualifications and other exceptions that give effect to, permit, and/or accommodate the DIP Facility Milestones (as defined below), (ii) provisions to reflect (A) the transactions and business operations contemplated by the Budget and (B) the Post-Petition Agent's required agency and other form updates (including with respect to replacement of LIBOR) and (iii) other modifications as mutually agreed by the parties.

<u>Conditions to Closing of DIP Facility and Roll-Up on Closing Date:</u>

Customary for facilities and transactions of this type, the effectiveness of the DIP Facility and the deemed issuance and incurrence of the Roll-Up Letters of Credit and the Interim Roll-Up Loans on the Closing Date shall be subject to the following conditions precedent, including, without limitation:

(a) the entry of an order by the Bankruptcy Court approving a cash management system for the Debtors and other "first day" orders satisfactory to the Post-Petition Agent (it being understood and agreed that drafts approved by counsel to the Post-Petition Agent on or prior to the Closing Date are satisfactory to the Post-Petition Agent);

(b) execution and delivery of satisfactory DIP Facility Documentation;

(c) receipt of satisfactory Budget approved by the Post-Petition Agent in its reasonable discretion;

(d) Bankruptcy Court's entry within three (3) business days of the Petition Date as part of the "first day" orders of an interim order approving the DIP Facility (including the roll-up of the Interim Roll-Up Loans and the Roll-Up Letters of Credit) and use of cash collateral and other arrangements described herein, in form and substance acceptable to the Post-Petition Agent (the "***Interim Order***");

(e) reimbursement of all documented (in summary form) fees and expenses of the Pre-Petition Agent, the Pre-Petition Lenders, the Joint Lead Arrangers and Post-Petition Agent and Post-Petition Lenders payable under the Pre-Petition Credit Agreement or under the DIP Facility Documentation (including the unpaid documented (in summary form) fees and expenses of Vinson & Elkins LLP, Opportune LLP and the other professionals retained by any of the foregoing) that are invoiced to the Borrower at least two (2) Business Days prior to the Closing Date;

(f) all representations and warranties of the Debtors in the Post-Petition Credit Agreement shall be true and correct

in all material respects, and there shall be no default, Event of Default or Post-Petition Default in existence;

(g)    the Post-Petition Agent and the Post-Petition Lenders shall have received, by at least three (3) business days (or such later date as agreed by the Post-Petition Agent in its sole discretion) prior to the Closing Date, "know your customer" and similar information required by bank regulatory authorities that is requested at least eight (8) business days (or such later date as agreed by the Borrower in its sole discretion) prior to the Closing Date;

(h)    receipt of appropriate UCC lien search results for each jurisdiction reasonably requested by the Post-Petition Agent;

(i)    the Petition Date shall have occurred, and each Debtor shall be a "debtor-in-possession" in the Chapter 11 Cases;

(j)    the Restructuring Support Agreement shall be in full force and effect and no termination of such agreement by any party thereto shall have occurred pursuant to the terms thereof; and

(k)    the delivery of customary secretary and officer certificates.

<u>Conditions to All Extensions of Credit</u>:    The making of DIP Loans and issuance/renewal of DIP Letters of Credit at any time and from time to time shall be subject solely to the satisfaction of the following conditions precedent:

(a)    all representations and warranties of the Debtors in the DIP Facility Documentation shall be true and correct in all material respects (without duplication of any materiality or material adverse effect or material adverse change qualifier therein), and there shall be no default, Event of Default or Post-Petition Default in existence at the time of, or after giving effect to the making of, such funding;

(b)    solely with respect to the making of the first DIP Loan or issuance of a DIP Letter of Credit (other than the deemed issuance and incurrence of any Roll-Up Loans and Roll-Up Letters of Credit), the Specified Excess Cash Payment shall have been made prior to making such requested credit extension;

(c)    with respect to borrowings or issuances of DIP Letters of Credit that would cause the Total Outstandings (assuming the deemed funding under the DIP Facility of

100% of the Roll-Up Loans and deemed issuance of 100% the Roll-Up Letters of Credit as such time of determination) to exceed the sum of the Roll-Up Amount *plus* the New Money Interim Cap, Bankruptcy Court's entry within thirty-five (35) days after the Petition Date of a final order approving the DIP Facility and use of cash collateral and other arrangements described herein, in form and substance acceptable to the Post-Petition Agent (the "***Final Order***", and the Interim Order and Final Order collectively are referred to herein as the "***Financing Orders***");

(d)     the Interim Order or Final Order, if and as applicable, shall be in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified;

(e)     other than with respect to the deemed issuance and incurrence of any Roll-Up Loans and Roll-Up Letters of Credit, delivery of a borrowing request certifying as to, among other things, that the DIP Loan and/or issuance of a DIP Letter of Credit will be utilized in accordance with the Budget;

(f)     the making of the requested credit extension would not cause Total Outstandings to be greater than the lesser of (A) the DIP Loan Limit and (B) the amount then authorized by any Financing Order; and

(g)     other than with respect to the deemed issuance and incurrence of any Roll-Up Loans and Roll-Up Letters of Credit, the making of the requested credit extension would not cause the Debtors to have Excess Cash in excess of $75,000,000.

| | |
|---|---|
| <u>Representations and Warranties:</u> | The Post-Petition Credit Agreement shall contain representations and warranties substantially similar to those contained in the Pre-Petition Credit Agreement, subject to modifications customarily found in the loan agreements for debtor-in-possession financings, as reasonably agreed to by the Post-Petition Agent and the Borrower. |
| <u>Affirmative Covenants:</u> | The Post-Petition Credit Agreement shall contain affirmative covenants substantially similar to those in the Pre-Petition Credit Agreement, subject to modifications customarily found in the loan agreements for debtor-in-possession financings, as reasonably agreed to by the Post-Petition Agent and the Borrower, including, without limitation, the following, in each case, with exceptions and materiality qualifications and thresholds to be agreed:  (a) comply with customary reporting requirements, including audited annual financial reports, quarterly and monthly consolidated financial reports; monthly reports detailing results of operations and cash flow; bi-monthly |

reports showing variance from the Budget (in addition to the Variance Report) and updates on cash flow and projections for the following rolling thirteen week period; notice of any material change in projected disbursements in an aggregate amount through anticipated emergence; other reporting covenants to be mutually agreed; (b) maintenance of organizational existence and rights and privileges; (c) maintenance of properties and collateral; (d) permit inspections and host lender meetings; (e) maintain current financial records in accordance with GAAP, (f) maintain insurance; (g) acknowledge the right of the Post-Petition Agent and Pre-Petition Agent, as applicable, to credit bid at any sale of the Debtors' assets (whether 363 sale or otherwise) in accordance with the DIP Facility Documentation or the Pre-Petition Credit Agreement, as applicable; and (h) monthly Variance Report as set forth under the heading "Budget and Variances" herein.

<u>Negative Covenants:</u>

The Post-Petition Credit Agreement shall contain negative covenants substantially similar to those in the Pre-Petition Credit Agreement, subject to modifications customarily found in the loan agreements for debtor-in-possession financings, as reasonably agreed to by the Post-Petition Agent and the Borrower, including, without limitation, covenants that none of the Debtors shall, in each case, with baskets, materiality thresholds and other exceptions to be mutually agreed:

(a) merge, divide or consolidate with any other entity, transfer or otherwise dispose of any assets other than inventory in the ordinary course of business or assets that constitute worn-out, excess, unused or non-useful equipment, or make any fundamental changes in its corporate structure;

(b) create or permit to exist any lien or encumbrance on any asset, except as permitted by the Post-Petition Credit Agreement;

(c) incur or permit to exist any financing under Section 364 of the Bankruptcy Code or any other indebtedness or contingent obligations, except as permitted by the Post-Petition Credit Agreement;

(d) create or permit to exist any superpriority administrative expense claim except as specifically permitted by the Post-Petition Agent (other than with respect to the DIP Facility);

(e) make investments (to be defined in a manner consistent with the Pre-Petition Credit Agreement) (except as permitted in the Budget);

(f) declare or pay dividends or make any distributions to equityholders or pay amounts with respect to indebtedness except as specifically permitted by the Post-Petition Credit Agreement;

(g) enter into early monetizations or early terminations of any hedge or swap position, except as permitted by the Post-Petition Credit Agreement;

(h) use cash collateral or the proceeds of the DIP Facility except in accordance with the Budget and Permitted Variances; and

(i) fail to operate strictly in accordance with the Budget (subject to the Permitted Variances).

Case Milestones:     The Debtors shall comply with the following deadlines (each of which may be extended with the written consent of the Majority Post-Petition Lenders without the consent of any other person or any further order of the Bankruptcy Court) (the "***DIP Facility Milestones***"):

DIP Facility

(a) on the Petition Date, filing of a motion seeking approval of the DIP Facility;

(b) not later than three (3) business days after the Petition Date, entry of the Interim Order; and

(c) not later than thirty-five (35) days after the Petition Date, entry of the Final Order approving the DIP Facility and the use of cash collateral, in form and substance satisfactory to the Post-Petition Agent.

Plan

(a) not later than September 6, 2020, the Bankruptcy Court shall have entered an order (the "***Confirmation Order***") approving the chapter 11 plan (the "***Plan***") and corresponding disclosure statement (the "***Disclosure Statement***"), in each case, in form and substance acceptable to the Post-Petition Agent and the Pre-Petition Agent;

(b) not later than 14 days after entry of the Confirmation Order, the occurrence of the effective date of the Plan, and the discharge of the obligations under the DIP Facility by (i) indefeasible payment in full in cash (including via conversion into the Exit Credit Facility) or (ii) such other treatment under the Plan as may be agreed to by the Majority Post-Petition Lenders and the Debtors.

Financial Covenant (Budget and Variances):     As a condition precedent to the DIP Facility, there shall be established a 13 week cash flow budget updated on a rolling four week basis acceptable to the Post-Petition Agent (the "***Initial Budget***") for the Debtors' cash receipts and expenses (including professional fees and expenses), which shall provide,

among other things, for the payment of interest in respect of the DIP Facility on a monthly basis to the Post-Petition Lenders, and the adequate protection amounts set forth above.

The Debtors shall provide to the Post-Petition Agent an updated budget (the "***Proposed Budget***"). Each Proposed Budget shall be due on each 4-week anniversary (or, if such day is not a business day, the immediately succeeding business day) of the previous rolling four-week Budget period, with the first Proposed Budget after the Initial Budget to be delivered on or prior to August 27, 2020.

Such Proposed Budget, once approved by the Post-Petition Agent, shall constitute the approved budget (the "***Approved Budget***") for the immediately succeeding Testing Period (as defined below). To the extent that any Proposed Budget is not approved by the Post-Petition Agent by the end of the then-effective Testing Period, the then-existing Approved Budget will remain the Approved Budget until replaced by a Proposed Budget that is approved by the Post-Petition Agent.

On the Friday (or, if such Friday is not a business day, the immediately succeeding Business Day) immediately after the last day of each rolling four-week period after the delivery of the Initial Budget (for the avoidance of doubt, such first date to be August 28, 2020) until the payment in full in cash of the DIP Obligations (each such delivery date, a "***Compliance Date***"), the Borrower shall deliver to the Post-Petition Agent a variance report (the "***Variance Report***") (a) detailing the Debtors' receipts and disbursements for such Testing Period and a comparison to the amounts set forth in the Budget therefor for the Testing Period ending prior to such Compliance Date (on an aggregate and a line item by line item basis in the case of disbursements) and (b) including reasonably detailed calculations demonstrating compliance with the Permitted Variance for such Testing Period.

As used herein, "***Permitted Variance***" shall mean, with respect to the period of four consecutive calendar weeks ending on the day immediately prior to any Compliance Date (each such four-week period, a "***Testing Period***"), any variance within the following parameters: (i) the aggregate actual disbursements by the Debtors for such Testing Period shall not exceed 110% of the aggregate forecasted disbursements (excluding professional fees) as set forth in the Budget for such Testing Period and (ii) actual disbursements for certain line items to be agreed by the Debtors for such Testing Period shall not exceed 115% of the forecasted disbursements for such line items as set forth in the Budget for such Testing Period.

| | |
|---|---|
| <u>Other Financial Covenants</u>: | (a) <u>Minimum Liquidity</u>:  At all times, the Borrower will not permit the sum of (i) unused DIP Commitments plus (ii) the |

Debtors' unrestricted cash and cash equivalents on hand to be less than an amount to be determined based on the initial Budget.

(b) Asset Coverage Ratio:  The Borrower shall not permit, as of the last day of every other calendar month, beginning with the calendar month ending August 30, 2020, the ratio of (a) the sum of (i) the total present value (using a discount rate of 10% and utilizing 5-year NYMEX strip pricing with pricing held flat each year thereafter) of projected future net revenues from proved developed producing reserves as reflected in the most recently delivered Reserve Report and (ii) the net mark-to-market value of the Debtors' hedging agreements in connection with such reserves as of such date to (b) the sum of (i) Total Outstandings as of such date plus (ii) the outstanding principal amount of the Pre-Petition Loans as of such date to be less than 1.50 to 1.0.

Commodity Hedging:

The Debtors may enter into hedging arrangements with (i) any Post-Petition Lender, the Post-Petition Agent and any affiliate of a Post-Petition Lender or the Post-Petition Agent or (ii) Approved Counterparties, which hedges shall not be for speculative purposes and, with respect to commodity hedges, shall be limited to no more than 85% of the reasonably anticipated forecasted production from the proved oil and gas properties of the Debtors (based on the most recent Reserve Report) for the period not exceeding 60 months from the date such hedging arrangement is created.

As used herein, "**Approved Counterparty**" means, with respect to any hedging arrangement with a Debtor, any person if such person or its credit support provider has a long-term senior unsecured debt rating of BBB+/Baa1 by S&P or Moody's (or their equivalent) or higher at the time of entering into such hedging arrangement.

It is understood that for purposes hereof, the following hedging agreements shall not be deemed speculative or entered into for speculative purposes: (a) any commodity hedging agreement intended, at inception of execution, to hedge or manage any of the risks related to existing and/or forecasted oil and gas production (based on the most recently delivered Reserve Report) of the Borrower or any other Debtor (whether or not contracted) and (b) any hedging agreement intended, at inception of execution, (i) to hedge or manage the interest rate exposure associated with any debt securities, debt facilities or leases (existing or forecasted) of the Borrower or any other Debtor, (ii) for foreign exchange or currency exchange management, (iii) to manage commodity portfolio exposure associated with changes in commodity prices or (iv) to hedge any exposure that the Borrower or any other Debtor may have to counterparties under other hedging agreements such that the

combination of such hedging agreements is not speculative taken as a whole.

Events of Default:

Events of default customary for transactions of this type, including, without limitation:

(a) nonpayment of principal, interest or mandatory prepayments when due (with a 3 business day grace period for non-principal payments), including, as applicable, the Debtors failure to timely pay any amount required to be paid to the Pre-Petition Agent, the Pre-Petition Lenders, the Post-Petition Agent, or the Post-Petition Lenders under the Financing Orders or the Approved Budget (subject to the Permitted Variance);

(b) the failure or breach of any warranties, representations, agreements, or covenants of the Debtors (subject to a grace period with respect to certain affirmative covenants and materiality thresholds, to be further specified in the Post-Petition Credit Agreement);

(c) entry of an order for the dismissal or conversion to Chapter 7 of any Debtor's bankruptcy case; the appointment of a bankruptcy trustee or examiner except with the express written consent of the Pre-Petition Agent and the Post-Petition Agent in any Chapter 11 Case; the granting of any other superpriority administrative expense claim (if not in favor of the Post-Petition Agent or the Pre-Petition Agent) except with the express written consent of the Post-Petition Agent; the grant of any security interest in any of the DIP Collateral that is *pari passu* with or senior to the liens of the Post-Petition Agent or the Adequate Protection Liens of the Pre-Petition Agent; any Debtor shall attempt to vacate or modify the Interim Order or the Final Order over the objection of the Post-Petition Agent; the entry of any order modifying, reversing, revoking, staying, rescinding, vacating, or amending any Financing Order without the consent of the Post-Petition Agent; any Debtor shall institute any proceeding or investigation or support same by any other person who seeks to challenge the status and/or validity of the liens of the Pre-Petition Agent or the Post-Petition Agent (as security for the Pre-Petition Lenders and the Post-Petition Lenders, respectively) or the claims of any of the Pre-Petition Agent, the Pre-Petition Lenders, the Post-Petition Agent, or the Post-Petition Lenders; or any Debtor shall file a motion or other pleading or support any other motion or other pleading filed seeking any of the foregoing;

(d) the Bankruptcy Court shall enter an order or orders

granting relief from the automatic stay to the holder or holders of any security interest or lien (other than Post-Petition Lenders) to permit the pursuit of any judicial or non-judicial transfer or other remedy against any DIP Collateral, in each case involving assets with an aggregate value in excess of $1,000,000; <u>provided</u> that any order granting relief from the automatic stay to permit prepetition litigation to which the Debtors are a party to proceed shall not constitute an event of default;

(e)     the Debtors shall fail to meet any DIP Facility Milestone beyond any grace period applicable thereto;

(f)     entry of a sale order unless such order contemplates either indefeasible payment in full in cash of the DIP Obligations upon consummation of the sale or is otherwise consented to in writing by the Post-Petition Agent; and

(g)     the filing or support by the Debtors of any plan of reorganization that (i) does not provide for termination of the unused commitments under the DIP Facility and indefeasible payment in full in cash of all of the DIP Obligations and (ii) is not otherwise acceptable to the Post-Petition Agent in its sole discretion.

Immediately upon the earlier of (x) the date that is 35 days after the Petition Date if the Final Order has not been entered by the Court on or before such date (unless such period is extended by mutual agreement of the Debtors and the Majority Post-Petition Lenders, notice of which will be filed with the Bankruptcy Court) and (y) five (5) business days (any such five-business-day period of time, the "***Default Notice Period***") following the delivery of a written notice (with a copy filed with the Bankruptcy Court) (a "***Default Notice***") by the Post-Petition Agent to the Debtors of the occurrence of an Event of Default unless such occurrence is cured by the Debtors prior to the expiration of the Default Notice Period or such occurrence is waived in writing by the requisite Post-Petition Lenders in their sole discretion and in accordance with "Voting" section below, one or more of the following shall occur to the extent elected by the Majority Post-Petition Lenders in their sole discretion: (i) the automatic stay shall terminate, (ii) authority to use cash collateral shall terminate, (iii) the DIP Loans shall accelerate, and (iv) the Post-Petition Agent may exercise its other rights and remedies in accordance with the DIP Facility Documentation and applicable law; *provided* that during the Default Notice Period, the Debtors shall be entitled to continue to use Cash Collateral in accordance with the terms of the Financing Orders; provided, further, that the Post-Petition Agent shall be required to seek relief and shall be entitled to an emergency hearing regarding the termination of the automatic

stay as to clause (iv) above before expiration of the Default Notice Period.

Notwithstanding the foregoing, and irrespective of the Default Notice Period, the Post-Petition Lenders shall not be obligated to provide any DIP Loans at any time a default, an Event of Default, or a Post-Petition Default has occurred and is continuing.

Releases / Covenant Not to Sue:

The Debtors shall provide each of the Pre-Petition Agent, the Pre-Petition Lenders, and their respective partners, equityholders, directors, members, principals, agents advisors, officers, professionals (including, but not limited to, counsel), subsidiaries and affiliates a standard release and covenant not to sue as to any and all claims and causes of action against any of them as of the Petition Date.  This release and covenant not to sue shall be without prejudice to any review period as to any appointed creditors' committee or any other party in interest as more fully set forth in the Financing Orders.

Credit Bid:

The DIP Facility shall include a provision that, in connection with any sale of any or all of the Debtors' assets under section 363 of the Bankruptcy Code, a Chapter 11 plan of reorganization or liquidation, or any equivalent thereof under any other law, the Post-Petition Agent, at the direction of the Majority Post-Petition Lenders, shall have the absolute right to credit bid any portion, up to the full amount, of all DIP Obligations.

Voting:

Amendments and waivers of the DIP Facility Documentation for the DIP Facility will require the approval of Post-Petition Lenders holding more than 50% of the aggregate amount of the commitments then outstanding under the DIP Facility (the "***Majority Post-Petition Lenders***"), except that:

(i)  the consent of each Post-Petition Lender directly and adversely affected thereby shall be required with respect to: (A) increases in the commitment of such Post-Petition Lender, (B) reductions of principal, interest or fees owing to such Post-Petition Lender (or any extension or postponement of such payments), and (C) extensions or postponement of final maturity of the DIP Facility,

(ii) the consent of 100% of the Post-Petition Lenders will be required with respect to releases of all or substantially all of the value of the Guarantees or releases of liens on all or substantially all of the DIP Collateral (other than in connection with any sale of DIP Collateral or the release or sale of the relevant guarantor permitted by the DIP Facility),

(iii) the consent of 100% of the Post-Petition Lenders will be required with respect to modifications to any of the voting percentages or such modifications that would alter the ratable allocation / priority of payments to the holders of DIP Obligations,

(iv) the consent of all of the Post-Petition Lenders will be required with respect to increases in the Borrowing Base and to certain provisions related to adjustment to the Borrowing Base,

(v) the consent of 100% of the Post-Petition Lenders will be required with respect to amendments, modifications or waivers of any provisions in the Post-Petition Credit Agreement substantially equivalent to the provisions of Sections 13.17 and 13.22 of the Pre-Petition Credit Agreement,

(vi) the consent of Post-Petition Lenders holding not less than 66⅔% of the aggregate amount of the commitments then outstanding under the DIP Facility (the "***Required Post-Petition Lenders***") will be required in the case of decreases in, or reaffirmations of, the Borrowing Base, and

(vii) customary protections for the Post-Petition Agent and the Issuing Lender will be provided.

The DIP Facility contains customary provisions permitting the Borrower to replace non-consenting Post-Petition Lenders in connection with amendments and waivers requiring greater than a Majority Post-Petition Lender or Required Post-Petition Lender vote or of the consent of all Post-Petition Lenders or of all Post-Petition Lenders directly affected thereby so long as the Majority Post-Petition Lenders shall have consented thereto.

The DIP Facility also contains usual and customary provisions regarding "Defaulting Lenders".

The DIP Facility shall include provisions substantially equivalent to the provisions of Sections 13.17 and 13.22 of the Pre-Petition Credit Agreement, with such modifications to be mutually agreed upon.

<u>Cost and Yield Protection</u>:

Usual for facilities and transactions of this type, with provisions protecting the Post-Petition Lenders from withholding tax liabilities; <u>provided</u> that requests for additional payments due to increased costs from market disruption shall be limited to circumstances generally affecting the banking market or when the Majority Post-Petition Lenders have made such a request. The DIP Facility contains provisions regarding the timing for asserting a claim under these provisions and permitting the Borrower to replace a Post-Petition Lender who asserts such

24

claim without premium or penalty.

<u>Assignments and Participations:</u>

The DIP Facility will contains customary provisions regarding assignments and participations that are substantially similar to those in the Pre-Petition Credit Agreement, subject to modifications customarily found in the loan agreements for debtor-in-possession financings, as agreed to by the Post-Petition Agent and the Borrower.

<u>Expenses and Indemnification:</u>

All documented (in summary form) fees, expenses, and costs (including but not limited to due diligence) of the Pre-Petition Agent, the Post-Petition Agent, the Post-Petition Lenders, and the Pre-Petition Lenders (including without limitation the documented fees, disbursements and other charges of counsel, financial advisors, engineers and environmental consultants) in the making, administration, collection, enforcement, or pursuing remedies related to the Pre-Petition Secured Indebtedness or DIP Facility shall be paid by the Debtors upon demand (subject to the Financing Orders).

The Debtors will indemnify the Post-Petition Agent, the Post-Petition Lenders and their respective officers, directors, employees, affiliates, agents, attorneys, financial advisors, and controlling persons (each, an "***Indemnified Person***") and hold them harmless from and against all documented costs, expenses (including fees, disbursements and other charges of counsel) and liabilities of any such indemnified person arising out of or relating to any claim arising out of or relating to any claim or litigation or other proceedings (regardless of whether any such indemnified person is a party thereto), that relate to the transactions contemplated hereby or any transaction connected therewith; <u>provided</u> that no Indemnified Person will be indemnified for any losses, claims, damages, liabilities or related expenses to the extent that they have resulted from (i) the bad faith, willful misconduct or gross negligence of such Indemnified Person, including any of such Indemnified Person's affiliates or any of its or their respective officers, directors, employees, agents, controlling persons, members or the successors of any of the foregoing, (as determined by a court of competent jurisdiction in a final and non-appealable decision), (ii) a material breach of the obligations of such Indemnified Person (or any of such Indemnified Person's affiliates or any of its or their respective officers, directors, employees, agents, controlling persons, members or the successors of any of the foregoing) or (iii) any proceeding not arising from any act or omission by the Borrower or its affiliates that is brought by an Indemnified Person against any other Indemnified Person (other than disputes involving claims against the Joint Lead Arrangers or the Post-Petition Agent in its capacity as such).

| | |
|---|---|
| DIP to Exit Conversion: | On the date upon which the conditions precedent to the effectiveness of an "exit credit facility" shall have been satisfied or waived (the "***Conversion Date***") as contemplated by the terms specified in the Exit Credit Facility Term Sheet attached as Exhibit A (the "***Exit Credit Facility Term Sheet***") to that certain Exit Facility Commitment Letter (the "***Exit Facility Commitment Letter***") by and among the Debtors and the Commitment Parties (as defined therein) (the following clauses (a) through (d), collectively, the "***DIP Debt Conversion***"): (a) all DIP Loans outstanding as of such date and any Pre-Petition Secured Indebtedness that was not converted into the DIP Facility shall, in each case, be automatically converted on a dollar-for-dollar basis for "Revolving Loans" (as defined in the Exit Credit Facility Term Sheet) under the Exit Credit Facility, (b) all outstanding DIP Letters of Credit shall be deemed to be issued as "Letters of Credit" (as defined in the Exit Credit Facility Term Sheet) under the Exit Credit Facility, (c) all outstanding DIP Hedges with a Lender or an affiliate of a Lender under the DIP Facility shall be deemed to be included in the Exit Credit Facility, and (d) all outstanding treasury management arrangements with a Lender or an affiliate of a Lender under the DIP Facility shall be deemed to be included in the Exit Credit Facility. Upon payment in full of the DIP Obligations (including all or in part as a result of the DIP Debt Conversion), the DIP Facility will terminate and be superseded and replaced in its entirety by the Exit Credit Facility. |
| Governing Law and Forum: | New York. |
| Counsel to the Pre-Petition Agent and the Post-Petition Agent: | Vinson & Elkins L.L.P. |

<div align="right"><u>**ANNEX I**</u></div>

<u>Interest Rates:</u>

The Borrower may elect that the DIP Loans comprising each borrowing bear interest at a rate per annum equal to: (i) ABR plus the Applicable Margin or (ii) LIBOR plus the Applicable Margin.

The Borrower may elect interest periods of 1, 2, 3 or 6 months (or, if available to all relevant Post-Petition Lenders, 12 months or a shorter period (including 1 week or 2 weeks)) for LIBOR borrowings.

Calculation of interest shall be on the basis of the actual days elapsed in a year of 360 days (or 365 or 366 days, as the case may be, in the case of ABR Loans based on the prime rate) and interest shall be payable at the end of each interest period and, in any event, at least every 3 months.

"***ABR***" means the Alternate Base Rate, which is the highest of (a) the Post-Petition Agent's Prime Rate, (b) the Federal Funds Effective Rate plus 1/2 of 1.0% and (c) one-month LIBOR plus 1.0%..

"***LIBOR***" means the London interbank offered rate for dollars, subject to a 1.0% floor.

"***Applicable Margin***" means for any day, with respect to any LIBOR or ABR borrowing or with respect to any Unused Commitment Fee, the applicable rate per annum set forth below.

| DIP Facility Usage | Unused Commitment Fee | Applicable Margin | |
|---|---|---|---|
| | | ABR Loans | LIBOR Loans |
| X ≤25% | 0.500% | 2.00% | 3.00% |
| > 25% X ≤50% | 0.500% | 2.25% | 3.25% |
| > 50% X ≤75% | 0.500% | 2.50% | 3.50% |
| > 75% X ≤90% | 0.500% | 2.75% | 3.75% |
| X > 90% | 0.500% | 3.00% | 4.00% |

"***DIP Facility Usage***" means, as of any date and for all purposes, the quotient, expressed as a percentage, of (i) Total Outstandings divided by (ii) the aggregate DIP Commitment.

<u>Letters of Credit Fees:</u>

A per annum fee equal to the Applicable Margin then in effect for LIBOR borrowings will accrue on the aggregate face amount of outstanding DIP Letters of Credit, payable in arrears at the end of each quarter and upon the termination of the DIP Facility, in each case for the actual number of days elapsed over a 360-day year.  Such fees shall be distributed to the Post-Petition Lenders pro rata in accordance with the amount of each such Post-Petition Lender's DIP Commitment.  In addition, the Borrower shall pay to the Issuing Lender, for its own account, (a) a fronting fee equal to 0.125% per annum of the aggregate face amount of outstanding DIP Letters of Credit or such other amount as may be agreed by the Borrower and the Issuing Lender, payable in arrears at the end of each quarter and upon the termination of the DIP Facility, calculated based upon the actual number of days elapsed over a 360-day year, and (b)

customary issuance and administration fees to be mutually agreed.

Commitment Fees:

The Borrower will pay a fee (the "***Commitment Fee***"), in an amount computed on a daily basis equal to the total DIP Commitments of the Post-Petition Lenders less the Total Outstandings on each day, multiplied by the applicable percentage specified as the "Unused Commitment Fee" in the table set forth under the definition of "Applicable Margin" corresponding to the DIP Facility Usage as of the end of such day. The Commitment Fee is payable quarterly in arrears commencing after the Closing Date.

Upfront Fees:

20.0 bps per year for the Post-Petition Lenders, payable on the Closing Date in proportion to each Lender's final allocation of its New Money DIP Commitment.

**Carve Out**

1.      <u>Carve Out</u>.

(a)     <u>Carve Out</u>.      Notwithstanding anything to the contrary in this [Final/Interim] Order, any DIP Documents (as defined in the Financing Orders), or any other order of the Court, all of the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the Adequate Protection Superpriority Claims (each as defined in the Financing Orders) shall be subject and subordinate only to the payment of the Carve-Out as and only to the extent set forth in this [Final/Interim] Order.  As used in this [Final/Interim] Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $[50,000] incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses, other than any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors of the Debtors or any committee[1] (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and any official committee appointed in the Chapter 11 Cases (each, a "<u>Committee</u>")  pursuant to section 328 or 1103 of the Bankruptcy Code  (the  "<u>Committee Professionals</u>"  and,  together  with  the  Debtor  Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by

---

[1]      Any fee due and payable to a Professional Person that is employed as an investment banker or financial advisor arising from the consummation of any transaction shall be payable only to the extent allowed by the Court and as and to the extent set forth in such Professional Person's engagement letter, and solely from the proceeds received by the Debtors resulting from the consummation of such transaction, free and clear of the liens of the Post-Petition Agent and the Post-Petition Lenders.

the Post-Petition Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $2,750,000 incurred after the first business day following delivery by the Post-Petition Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the Post-Petition Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to any Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)      Fee Estimates.  Not later than 7:00 p.m. New York time on the third business day of each week starting with the first full calendar week following the [Closing Date], each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of fees and expenses (collectively, "Estimated Fees and Expenses") incurred during the preceding week by such Professional Person (through Saturday of such week, the "Calculation Date"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "Weekly Statement"); *provided*, *that* within one business day of the occurrence of the Termination Declaration Date (as defined below), each Professional Person shall deliver to the Debtors one additional statement (the "Final Statement") setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the

29

calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date (and the Debtors shall cause such Weekly Statement and Final Statement to be delivered on the same day received to the Post-Petition Agent). If any Professional Person fails to deliver a Weekly Statement or the Final Statement within three calendar days after such Weekly Statement or Final Statement is due, such Professional Person's entitlement (if any) to any funds in the Pre-Carve Out Trigger Notice Reserve (as defined below) with respect to the aggregate unpaid amount of Allowed Professional Fees of such Professional Person for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement or Final Statement covering such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the Budget (as defined in the Post-Petition Credit Agreement, the "Budget") for such period for such Professional Person; *provided*, *that* such Professional Person shall be entitled to be paid any unpaid amount of Allowed Professional Fees in excess of Allowed Professional Fees included in the Budget for such period for such Professional Person from a reserve to be funded by the Debtors from all cash on hand as of such date and any available cash thereafter held by any Debtor pursuant to paragraph [●](c) below. Solely as it relates to the Post-Petition Agent and the Post-Petition Lenders, any deemed draw and borrowing pursuant to paragraph [●](c)(i)(x) for amounts under paragraph [●](a)(iii) above shall be limited to the greater of (x) the sum of (I) the aggregate unpaid amount of Estimated Fees and Expenses included in such Weekly Statements timely received by the Debtors prior to the Termination Declaration Date *plus*, without duplication, (II) the lesser of (1) the aggregate unpaid amount of Estimated Fees and Expenses included in the Final Statements timely received by the Debtors pertaining to the period through and including the Termination Declaration Date and (2) the Budgeted Cushion Amount (as defined below), and (y) the aggregate unpaid amount of Allowed Professional Fees included in the Budget for the

period prior to the Termination Declaration Date (such amount, the "DIP Professional Fee Carve Out Cap"). For the avoidance of doubt, the Post-Petition Agent shall be entitled to maintain at all times a reserve (the "Carve-Out Reserve") against availability under the DIP Facility in an amount (the "Carve-Out Reserve Amount") equal to the sum of (i) the greater of (x) the aggregate unpaid amount of Estimated Fees and Expenses included in all Weekly Statements timely received by the Debtors, and (y) the aggregate amount of Allowed Professional Fees contemplated to be unpaid in the Budget at the applicable time, *plus* (ii) the Post-Carve Out Trigger Notice Cap, *plus* (iii) the amounts contemplated under paragraph [●](a)(i) and [●](a)(ii) above, *plus* (iv) an amount equal to the amount of Allowed Professional Fees set forth in the Budget for the then current week occurring after the most recent Calculation Date and the two weeks succeeding such current week (such amount set forth in (iv), regardless of whether such reserve is maintained, the "Budgeted Cushion Amount"). Not later than 7:00 p.m. New York time on the fourth business day of each week starting with the first full calendar week following the [Closing Date], the Debtors shall deliver to the Post-Petition Agent a report setting forth the Carve-Out Reserve Amount as of such time, and, in setting the Carve-Out Reserve, the Post-Petition Agent shall be entitled to rely upon such reports in accordance with section [●] of the Post-Petition Credit Agreement. Prior to the delivery of the first report setting forth the Carve-Out Reserve Amount, the Post-Petition Agent shall calculate the Carve-Out Reserve Amount by reference to the Budget for subsection (i) of the Carve-Out Reserve Amount.

(c)     Carve Out Reserves.

(i)     On the day on which a Carve Out Trigger Notice is given by the Post-Petition Agent to the Debtors and their lead restructuring counsel with a copy to counsel to any Committee (the "Termination Declaration Date"), the Carve Out Trigger Notice shall (x) be deemed a draw request and notice of borrowing by the Borrower for the DIP Loans under the

DIP Facility, in an amount equal to the sum of (1) the amounts set forth in paragraphs [●](a)(i) and [●](a)(ii) above, and (2) the lesser of (a) the then unpaid amounts of the Allowed Professional Fees and (b) the DIP Professional Fee Carve Out Cap (any such amounts actually advanced shall constitute DIP Loans) and (y) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the sum of the amounts set forth in paragraphs [●](a)(i)–(iii) above.  The Debtors shall deposit and hold such amounts in a segregated account at the Post-Petition Agent in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.

(ii)     On the Termination Declaration Date, the Carve Out Trigger Notice shall also (x) be deemed a request by the Debtors for DIP Loans under the DIP Facility, in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP Loans) and (y) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in a segregated account at the Post-Petition Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.

(iii)     On the first business day after the Post-Petition Agent gives such notice to such Post-Petition Lenders, notwithstanding anything in the Post-Petition Credit Agreement to the contrary, including with respect to the existence of a Default or Event of Default (as such terms are defined in the Post-Petition Credit Agreement), the failure of the

Debtors to satisfy any or all of the conditions precedent for DIP Loans under the DIP Facility, any termination of the DIP Commitments following an Event of Default, or the occurrence of the Maturity Date, each Post-Petition Lender with an outstanding DIP Commitment (on a pro rata basis based on the then outstanding DIP Commitments) shall make available to the Post-Petition Agent such Post-Petition Lender's pro rata share with respect to such borrowing in accordance with the DIP Facility; *provided* that in no event shall the Post-Petition Agent or the Post-Petition Lenders be required to extend DIP Loans pursuant to a deemed draw and borrowing pursuant to paragraphs [●](c)(i)(x) and [●](c)(ii)(x) in an aggregate amount exceeding the Carve-Out Reserve Amount.

(iv)      All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Post-Petition Agent for the benefit of the Post-Petition Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated, in which case any such excess shall be paid to the [Prepetition Secured Creditors] in accordance with their rights and priorities as of the Petition Date.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Post-Petition Agent for the benefit of the Post-Petition Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated, in which case any such excess shall be paid to the

[Prepetition Secured Creditors] in accordance with their rights and priorities as of the Petition Date.

(v)    Notwithstanding anything to the contrary in the DIP Documents, or this [Final/Interim] Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph [●], then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph [●], prior to making any payments to the Post-Petition Agent or the [Prepetition Secured Creditors], as applicable.  Notwithstanding anything to the contrary in the DIP Documents or this [Final/Interim] Order, following delivery of a Carve Out Trigger Notice, the Post-Petition Agent and the Pre-Petition Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the Post-Petition Agent for application in accordance with the DIP Documents.  Further, notwithstanding anything to the contrary in this [Final/Interim] Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this [Final/Interim] Order, the DIP Facility, the Prepetition RBL Facility, or the Second Lien Notes Indenture, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, and the 507(b)

Claim, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the [Prepetition Secured Obligations].

(d)     Payment of Allowed Professional Fees Prior to the Termination Declaration Date.   Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(e)     No Direct Obligation To Pay Allowed Professional Fees.   None of the Post-Petition Agent, Post-Petition Lenders, or the [Prepetition Secured Creditors] shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.   Nothing in this [Final/Interim] Order or otherwise shall be construed to obligate the Post-Petition Agent, the Post-Petition Lenders, or the [Prepetition Secured Creditors], in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)     Payment of Carve Out On or After the Termination Declaration Date. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.   Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this [Final/Interim] Order, the DIP Documents, the Bankruptcy Code, and applicable law.

**Annex 2(a)**

**Exit Commitment Letter**

*Execution Version*

| | | | |
|---|---|---|---|
| JPMORGAN CHASE BANK, N.A.<br>2200 Ross Avenue<br>3rd Floor<br>Dallas, TX 75201 | BANK OF AMERICA, N.A.<br>1 Cowboys Way<br>Suite 500<br>Frisco, TX 75034 | WELLS FARGO BANK, NATIONAL ASSOCIATION<br>1445 Ross Avenue<br>Suite 4500<br>Dallas, TX 75202 | CAPITAL ONE, NATIONAL ASSOCIATION<br>201 St. Charles Avenue<br>18th Floor<br>New Orleans, LA 70170 |
| CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH<br>Eleven Madison Avenue<br>11th Floor<br>New York, NY 10010-3629 | ROYAL BANK OF CANADA<br>200 Vesey Street<br>12th Floor<br>New York, NY 10281 | ABN AMRO CAPITAL USA LLC<br>100 Park Avenue<br>17th Floor<br>New York, NY 10017 | COMERICA BANK<br>P.O. Box 650282<br>Dallas, TX 75265-0282 |
| CANADIAN IMPERIAL BANK OF COMMERCE, NEW YORK BRANCH<br>1001 Fannin Street<br>Suite 4450<br>Houston, TX 77002 | ING CAPITAL LLC<br>1111 Bagby Street<br>Suite 2650<br>Houston, TX 77002 | TRUIST BANK<br>401 East Jackson Street<br>Mail Code – 4104<br>Tampa, FL 33602 | KEYBANK NATIONAL ASSOCIATION<br>127 Public Square<br>Second Floor<br>Cleveland, OH 44114-1306 |
| | FIFTH THIRD BANK, NATIONAL ASSOCIATION<br>515 North Flagler Drive<br>Suite 703<br>West Palm Beach, FL 33401 | GOLDMAN SACHS BANK USA<br>200 West Street<br>New York, NY 10282 | |

**CONFIDENTIAL**

July 28, 2020

Denbury Resources Inc.
5320 Legacy Drive
Plano, Texas 75024
Attention: Mark C. Allen

<u>Senior Secured Revolving Credit Facility Commitment Letter</u>

Ladies and Gentlemen:

Denbury Resources Inc., a Delaware corporation (the "**Borrower**" or "**you**") has advised JPMorgan Chase Bank, N.A. ("**JPMorgan**"), Bank of America, N.A. ("**BofA**"), Wells Fargo Bank, National Association ("**Wells**"), Capital One, National Association ("**Capital One**"), Credit Suisse AG, Cayman Islands Branch ("**CSAG**"), Royal Bank of Canada ("**RBC**"), ABN AMRO Capital USA LLC ("**ABN**"), Comerica Bank ("**Comerica**"), Canadian Imperial Bank of Commerce, New York Branch ("**CIBC**"), ING Capital LLC ("**ING**"), Truist Bank ("**Truist**"), KeyBank National Association ("**KeyBank**"), Fifth Third Bank, National Association ("**Fifth Third**") and Goldman Sachs Bank USA ("**Goldman**", and together with JPMorgan, BofA, Wells,

Capital One, CSAG, RBC, ABN, Comerica, CIBC, ING, Truist, KeyBank and Fifth Third, collectively, the "**Initial Lenders**", "**we**", "**our**" or "**us**") that the Borrower and certain of its subsidiaries (collectively with the Borrower, the "**Credit Parties**") will on or about the date hereof file voluntary petitions commencing cases under title 11 of the United States Code (the "**Chapter 11 Cases**", and such code, the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") in order to implement the Transactions (as defined below). In connection therewith, you have requested that the Initial Lenders provide financing to (a) refinance (the "**Refinancing**") any outstanding Pre-Petition Secured Indebtedness (as defined in the DIP Term Sheet (as defined below)) that was not converted into DIP Obligations (as defined in the Exit Facility Term Sheet (as defined below)) and any outstanding indebtedness under that certain Senior Secured Super Priority Debtor-In-Possession Credit Agreement, to be dated on or about the date hereof (as amended from time to time, the "**DIP Credit Agreement**"), among the Borrower, the other Credit Parties party thereto and each of the Initial Lenders party thereto, via a cashless conversion on the Conversion Date (as defined in the Exit Facility Term Sheet) in accordance with the terms of the Exit Facility Term Sheet, (b) pay fees, commissions and expenses in connection with the Transactions and (c) finance ongoing working capital requirements and other general corporate purposes of the Credit Parties, all as more fully described in the Exit Facility Term Sheet (as defined below).

This Commitment Letter (as defined below) describes the general terms and conditions for a senior secured exit facility constituting a reserve-based revolving credit facility of up to an aggregate maximum credit amount of $615,000,000 (the "**Revolving Facility**") on substantially the terms described in, and subject to the conditions precedent set forth in, the Exit Facility Term Sheet attached hereto as Exhibit A (the "**Exit Facility Term Sheet**"), with availability thereunder being subject to an initial borrowing base (the "**Initial Borrowing Base**"), which Initial Borrowing Base will not, in any event, be greater than the borrowing base in effect under the DIP Credit Agreement immediately prior to the Conversion Date. The Initial Borrowing Base will be determined in accordance with the terms of the Exit Facility Term Sheet and will be determined by the Administrative Agent (and approved by the Initial Lenders constituting the Required Lenders (as defined in the Exit Facility Term Sheet), including JPMorgan) in good faith in their sole discretion, based upon the Initial Reserve Report and such other reports, data and supplemental information (including status of title information with respect to proved oil and gas properties, the Credit Parties' other assets, liabilities, fixed charges, cash flow, business, properties, prospects, hedged and unhedged exposure of the Credit Parties to price, price and production scenarios, interest rate and operating cost changes) as the Administrative Agent deems appropriate in its sole discretion, acting in good faith and consistent with its normal oil and gas lending criteria as it exists at such time for such purpose with respect to similar oil and gas reserve-based credits for similarly situated borrowers.

As used herein, the term "**Transactions**" means, collectively, (a) the restructuring contemplated under the Chapter 11 Cases, (b) the Refinancing, (c) the initial borrowings and other extensions of credit under the Revolving Facility on the Conversion Date and (d) the payment of fees, commissions and expenses in connection with each of the foregoing. This letter, including the Exit Facility Term Sheet and any other annexes, exhibits or other attachments hereto, are hereinafter collectively referred to as the "**Commitment Letter**".

Capitalized terms used but not defined herein are used with the meanings assigned to them in the Exit Facility Term Sheet attached hereto.

1.      Commitments and Undertakings

In connection with the Transactions, subject to the terms and conditions set forth in this Commitment Letter, each of the Initial Lenders is pleased to advise you of its several (and not joint) commitment to provide the following percentages with respect to the Initial Borrowing Base under the Revolving Facility: (i) JPMorgan, 10.646242907%, (ii) BofA, 10.380086836%, (iii) Wells, 10.380086836%, (iv) Capital One, 9.861086021%, (v) CSAG, 8.596841229%, (vi) RBC, 8.144375824%, (vii) ABN, 8.144339324%, (viii) Comerica, 8.143868860%, (ix) CIBC, 7.300280850%, (x) ING, 5.748971171%, (xi) Truist, 4.562675532%, (xii) KeyBank, 3.832647447%, (xiii) Fifth Third, 3.193872872% and (xiv) Goldman, 1.064624291%, which in the aggregate for all Initial Lenders, equals 100% of the Revolving Facility.

2.      Titles and Roles

It is agreed that (a) JPMorgan will act as a lead arranger and bookrunner for the Revolving Facility (acting in such capacities, the "**Lead Arranger**") and (b) JPMorgan will act as administrative agent and collateral agent for the Revolving Facility. You further agree that the Lead Arranger shall not have any other responsibilities except as otherwise mutually agreed. You agree that, except as otherwise set forth in the Exit Facility Term Sheet, (i) no other agents, co-agents, arrangers, co-arrangers, bookrunners, co-bookrunners, managers or co-managers will be appointed and (ii) no other titles will be awarded unless you and JPMorgan shall so reasonably agree.  You further agree that no compensation (other than that expressly contemplated by this Commitment Letter and the Fee Letter referred to below) will be paid in connection with the Revolving Facility unless you and JPMorgan shall so reasonably agree (it being understood and agreed that no other agent, co-agent, arranger, co-arranger, bookrunner, co-bookrunner, manager or co-manager shall be entitled to greater economics in respect of the Revolving Facility than JPMorgan).

3.      Information

You hereby represent and warrant that (a) all written information (including all financial information, reserve information and reports, information to conduct diligence and Projections (as defined below), that JPMorgan may reasonably request in connection with the arrangement of the Revolving Facility (the "**Information Materials**")), other than (x) the financial projections and other forward-looking information (collectively, the "**Projections**") and (y) information of a general economic or general industry nature (the "**Information**"), that has been or will be made available to us by you or any of your representatives in connection with the transactions contemplated hereby, when taken as a whole, does not or will not, when furnished to us, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (giving effect to all supplements thereto) and (b) the Projections that have been or will be made available to us by you or any of your representatives in connection with the transactions contemplated hereby have been or will be prepared in good faith based upon assumptions believed by you to be reasonable at the time furnished to us (it being recognized by

3

the Initial Lenders that such Projections are not to be viewed as facts and that actual results during the period or periods covered by any such Projections may differ from the projected results, and such differences may be material). You agree that if, at any time prior to the Conversion Date, you become aware that any of the representations in the preceding sentence would be incorrect if such Information or Projections were furnished at such time and such representations were remade, in any material respect, then you will promptly supplement the Information and the Projections so that such representations when remade would be correct, in all material respects, under those circumstances. You understand that in arranging the Revolving Facility we may use and rely on the Information and Projections without independent verification thereof.

You will assist us in preparing Information Materials, including but not limited to a confidential information memorandum or lender slides, for distribution to the Lenders (as defined in the Exit Facility Term Sheet). If requested, you also will assist us in preparing an additional version of the Information Materials (the "**Public-Side Version**") to be used by the Lenders' public-side employees and representatives ("**Public-Siders**") who do not wish to receive material non-public information (within the meaning of United States federal securities laws) with respect to the Borrower, its affiliates and any of their respective securities ("**MNPI**") and who may be engaged in investment and other market related activities with respect to the Borrower's or its affiliates' securities or loans. Before distribution of any Information Materials, you agree to execute and deliver to us (i) a letter in which you authorize distribution of the Information Materials to a Lender's employees willing to receive MNPI ("**Private-Siders**") and (ii) a separate letter in which you authorize distribution of the Public-Side Version to Public-Siders and represent that either (x) no MNPI is contained therein  or (y) neither the Borrower nor any of its controlling or controlled entities has any debt or equity securities issued pursuant to a public offering or Rule 144A private placement and agree that if the Borrower or any of its controlling or controlled entities becomes the issuer of any debt or equity securities issued pursuant to a public offering or Rule 144A private placement thereafter, you will publicly disclose any information contained in the Information Materials delivered to Public-Siders that constitutes MNPI at such time.

You hereby authorize JPMorgan to download copies of the Credit Parties' trademark logos from its website and post copies thereof and any Information Materials to a deal site on IntraLinks™, DebtDomain, SyndTrak, ClearPar or any other electronic platform chosen by JPMorgan to be its electronic transmission system (an "**Electronic Platform**") established by JPMorgan to perform services in its capacity as the administrative agent of the Revolving Facility and to use the Credit Parties' trademark logos on any confidential information memoranda, presentations and other marketing materials prepared in connection with the administration of the Revolving Facility, with your consent (which consent not to be unreasonably withheld, conditioned or delayed), in any advertisements that we may place after the closing of the Revolving Facility in financial and other newspapers, journals, the World Wide Web, our home page or otherwise, at our own expense describing our services to the Credit Parties hereunder. You also understand and acknowledge that we may provide to market data collectors, such as league table, or other service providers to the lending industry, information regarding the closing date, size, type, purpose of, and parties to, the Revolving Facility.

US 7272694v.3 CHA715/23017

4.      Fees

As consideration for the commitments and agreements of the Initial Lenders hereunder, you agree to pay or cause to be paid the fees described in that certain DIP and Exit Facilities Fee Letter, dated as of the date hereof and delivered herewith (the "**Fee Letter**") on the terms and subject to the conditions set forth therein.

5.      Conditions

Each Initial Lender's commitments and agreements hereunder are subject to the conditions set forth in the Exit Facility Term Sheet under the heading "Conditions to Initial Borrowing and Closing of Revolving Facility". It being understood and agreed that there are no conditions (implied or otherwise) to the commitments hereunder, including compliance with the terms of this Commitment Letter, the Fee Letter and the Revolving Facility Documentation other than those expressly stated in this **Section 5**. Notwithstanding anything to the contrary in this Commitment Letter or the Fee Letter, your obligations hereunder and thereunder are subject to the entry of the Final Order (as defined in the DIP Term Sheet attached as Exhibit B hereto (the "**DIP Term Sheet**") by the Bankruptcy Court.

6.      Indemnification and Expenses

You agree (a) to indemnify and hold harmless the Initial Lenders, the Lead Arranger and any other arrangers or agents in respect of the Revolving Facility appointed pursuant to this Commitment Letter, their affiliates and their respective directors, officers, employees, advisors, agents and other representatives (each, an "**indemnified person**") from and against any and all losses, claims, damages and liabilities to which any such indemnified person may become subject arising out of or in connection with this Commitment Letter, the Fee Letter, the Revolving Facility, the use of the proceeds thereof, or the Transactions or any claim, litigation, investigation or proceeding relating to any of the foregoing (including in relation to enforcing the terms of this paragraph) (each, a "**Proceeding**"), regardless of whether any indemnified person is a party thereto, whether or not such Proceedings are brought by you, your equity holders, affiliates, creditors or any other person, and to reimburse each indemnified person upon written demand with customary backup documentation for any reasonable and documented out-of-pocket legal or other reasonable and documented out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing (limited, in the case of counsel, to the reasonably and documented out-of-pocket fees, disbursements and other charges of a single outside counsel to all indemnified persons, taken as a whole, including (if necessary) one local counsel in each relevant jurisdiction and solely in the event of a conflict of interest, one additional counsel (and if necessary, one local counsel in each relevant jurisdiction) to each group of similarly situated affected indemnified persons), *provided* that the foregoing indemnity will not, as to any indemnified person, apply (i) to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise or result from the willful misconduct, bad faith or gross negligence of such indemnified person or its affiliates, directors, officers or employees, advisors or agents (collectively, the "**Related Parties**"), (ii) to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise or result from a material breach of the obligations of such indemnified person or affiliate of such indemnified person under

5

this Commitment Letter or the Revolving Facility or (iii) to the extent arising from any dispute solely among indemnified persons (other than a Proceeding against any indemnified person in its capacity or in fulfilling its role as the Lead Arranger, administrative agent, collateral agent, bookrunner, lender, letter of credit issuer or any other similar role in connection with this Commitment Letter, the Fee Letter, the Revolving Facility or the use of the proceeds thereof) not arising out of any act or omission on the part of you or your affiliates; and (b) regardless of whether the Conversion Date occurs, to reimburse each Initial Lender and its affiliates for all reasonable and documented out-of-pocket expenses (including, without limitation, due diligence expenses, syndication expenses, financial advisor's fees, consultant's fees, travel expenses, and the fees, charges and disbursements of a single outside counsel) incurred in connection with the Revolving Facility and any related documentation (including this Commitment Letter, the Fee Letter and the definitive financing documentation in connection with the Revolving Facility) or the administration, amendment, modification or waiver thereof (limited, in the case of counsel, to the reasonable and documented out-of-pocket fees, disbursements and other charges of a single outside counsel to the indemnified persons, including (if necessary) one local counsel in each relevant jurisdiction and solely in the event of a conflict of interest, one additional counsel (and if necessary, one local counsel in each relevant jurisdiction) to each group of similarly situated affected persons). No indemnified person shall be liable for any damages arising from the use by others of the Information or other materials obtained through electronic, telecommunications or other information transmission systems, including an Electronic Platform or otherwise via the internet, or for any special, indirect, consequential or punitive damages in connection with the Revolving Facility, or in connection with its activities related to the Revolving Facility, and you agree, to the extent permitted by applicable law, not to assert any claims against any indemnified person with respect to the foregoing. None of the indemnified persons or you or any of your or their respective Related Parties shall be liable for any indirect, special, punitive or consequential damages in connection with this Commitment Letter, the Fee Letter, the Revolving Facility, or the transactions contemplated hereby, *provided* that nothing contained in this sentence shall limit your indemnity obligations to the extent set forth in this **Section 6**.

You shall not, without the prior written consent of an indemnified person (which consent shall not be unreasonably withheld, conditioned or delayed), effect any settlement of any pending or threatened Proceedings in respect of which indemnity could have been sought hereunder by such indemnified person unless such settlement (x) includes a full and unconditional release of such indemnified person in form and substance reasonably satisfactory to such indemnified person from all liability on claims that are the subject matter of such Proceedings and (y) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any indemnified person or any injunctive relief or other non-monetary remedy. You acknowledge that any failure to comply with your obligations under the preceding sentence may cause irreparable harm to JPMorgan, any other Initial Lender, the Lead Arranger and the other indemnified persons.

7.      Sharing of Information, Affiliate Activities, Absence of Fiduciary Relationship

JPMorgan, the other Initial Lenders and the Lead Arranger may employ the services of their respective affiliates in providing certain services hereunder and, in connection with the provision of such services, may exchange with such affiliates information concerning you and the other companies that may be the subject of the Transactions contemplated by this Commitment Letter, and, to the extent so employed, such affiliates shall be entitled to the benefits, and be subject

to the obligations, of JPMorgan, the other Initial Lenders and the Lead Arranger hereunder. JPMorgan, each other Initial Lender and the Lead Arranger shall be responsible for its respective affiliates' failure to comply with such obligations under this Commitment Letter.

You acknowledge that any of the Initial Lenders or their respective affiliates may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which you may have conflicting interests regarding the transactions described herein and otherwise. Each Initial Lender agrees severally (and not jointly) that it will not use confidential information obtained from you by virtue of the transactions contemplated by this Commitment Letter or its other relationships with you in connection with the performance by it of services for other companies, and it will not furnish any such information to other companies. You also acknowledge that the Initial Lenders have no obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you, confidential information obtained from other companies.

You further acknowledge that each Initial Lender is a full service securities or banking firm engaged in securities trading and brokerage activities as well as providing investment banking and other financial services. In the ordinary course of business, an Initial Lender and/or its affiliates may provide investment banking and other financial services to, and/or acquire, hold or sell, for its own accounts and the accounts of customers, equity, debt and other securities and financial instruments (including bank loans and other obligations) of, you and other companies with which you may have commercial or other relationships. With respect to any securities and/or financial instruments so held by an Initial Lender, its affiliates or any of its respective customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion.

You agree that the Initial Lenders and the Lead Arranger will act under this Commitment Letter as independent contractors and that nothing in this Commitment Letter will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Initial Lender or the Lead Arranger and you, your respective equity holders or your and their respective affiliates. You acknowledge and agree that (a) the transactions contemplated by this Commitment Letter are arm's-length commercial transactions between each Initial Lender or the Lead Arranger and, if applicable, its affiliates, on the one hand, and you, on the other, (b) in connection therewith and with the process leading to such transaction each Initial Lender and the Lead Arranger and, if applicable, its respective affiliates, is acting solely as a principal and has not been, is not and will not be acting as an advisor, agent or fiduciary of you, your management, equity holders, creditors, affiliates or any other person and (c) each Initial Lender and the Lead Arranger, if applicable, and each of their respective affiliates, has not assumed an advisory or fiduciary responsibility or any other obligation in favor of you or your affiliates with respect to the transactions contemplated hereby or the process leading thereto (irrespective of whether such Initial Lender or the Lead Arranger or any of its respective affiliates has advised or is currently advising you or your affiliates on other matters) except the obligations expressly set forth in this Commitment Letter. You further acknowledge and agree that (x) you are responsible for making your own independent judgment with respect to such transactions and the process leading thereto, (y) you are capable of evaluating and you understand and accept the terms, risks and conditions of the transactions contemplated hereby, and neither JPMorgan, nor any other Initial Lender or the Lead Arranger shall have any responsibility or liability to you with respect thereto, and (z) no

Initial Lender or the Lead Arranger is advising the Credit Parties as to any legal, tax, investment, accounting, regulatory or any other matters in any jurisdiction, and you shall consult with your own advisors concerning such matters and you shall be responsible for making your own independent investigation and appraisal of the transactions contemplated hereby. Any review by JPMorgan or any other Initial Lender or the Lead Arranger of the Credit Parties, the transactions contemplated hereby or other matters relating to such transactions will be performed solely for the benefit of JPMorgan or such other Initial Lender or the Lead Arranger, respectively, and shall not be on behalf of the Credit Parties. You agree that you will not assert any claim against JPMorgan or any other Initial Lender or the Lead Arranger based on an alleged breach of fiduciary duty by JPMorgan or such other Initial Lender or the Lead Arranger in connection with this Commitment Letter and the transactions contemplated hereby.

8.    <u>Confidentiality</u>

This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter nor the Fee Letter nor any of their terms or substance shall be disclosed by you, directly or indirectly, to any other person, except (a) to you and your officers, directors, employees, affiliates, members, partners, stockholders, attorneys, accountants, agents and advisors, in each case on a confidential and need-to-know basis, (b) as may be required by or in any legal, judicial or administrative proceeding or as otherwise required by law or regulation or as requested by a governmental or regulatory authority (in which case you agree, to the extent permitted by law, to inform us promptly thereof), (c) if the Initial Lenders consent in writing to such proposed disclosure, (d) in connection with the enforcement of your rights hereunder or under the Fee Letter or (e) this Commitment Letter and the existence and contents hereof (but not the Fee Letter or the contents thereof other than the existence thereof and the contents thereof as part of projections, pro forma information and a generic disclosure of aggregate sources and uses to the extent customary in marketing materials and other required filings) may be disclosed (x) in connection with the syndication or arrangement of the Revolving Facility or in connection with, and as may be required for, any public filing and (y) to the parties to that certain Restructuring Support Agreement dated as of even date herewith to which this Commitment Letter will be attached to and to any party required by the Bankruptcy Court. Notwithstanding anything to the contrary in the foregoing, you shall be permitted to file the Fee Letter with the Bankruptcy Court under seal in form and substance reasonably satisfactory to JPMorgan or in a redacted manner in form and substance reasonably satisfactory to JPMorgan and provide an unredacted copy of the Fee Letter to (u) the Bankruptcy Court, (v) the Office of the United States Trustee for the Southern District of Texas, (w) the advisors to the official committee of unsecured creditors appointed in the Chapter 11 Cases, (x) Paul, Weiss, Rifkind, Wharton and Garrison LLP, as counsel to the holders of the Second Lien Notes (as defined in the Plan), (y) Akin Gump Strauss Hauer & Feld LLP as counsel to the holders of the Convertible Notes (as defined in the Plan), and (z) any other party or advisor as required by the Bankruptcy Court; *provided, that* the disclosure of the Fee Letter to such advisors is on a confidential, "professionals only" basis.

Each Initial Lender severally (and not jointly) shall use all nonpublic information received by it in connection with the Revolving Facility and the related transactions solely for the purposes of providing the services that are the subject of this Commitment Letter and shall treat confidentially all such information; *provided, however*, that nothing herein shall prevent any Initial Lender from disclosing any such information (a) to any Lenders or participants or prospective

8

Lenders or participants, (b) in any legal, judicial, administrative proceeding or other compulsory process or as required by applicable law or regulations (in which case such Initial Lender shall promptly notify you, in advance, to the extent permitted by law), (c) upon the request or demand of any regulatory authority (including any self-regulatory authority) or other governmental authority purporting to have jurisdiction over JPMorgan, an Initial Lender or the Lead Arranger, or any of its respective affiliates (in which case such person agrees (except with respect to any audit or examination conducted by bank accountants or any self-regulatory authority or governmental or regulatory authority exercising examination or regulatory authority), to the extent practicable and not prohibited by applicable law or regulation, to inform you promptly thereof prior to disclosure), (d) to the employees, legal counsel, independent auditors, professionals and other experts or agents of such Initial Lender (collectively, "**Representatives**") who are informed of the confidential nature of such information and are or have been advised of their obligation to keep information of this type confidential, (e) to any of its respective affiliates (*provided* that any such affiliate is advised of its obligation to retain such information as confidential, and such Initial Lender shall be responsible for its respective affiliates' compliance with this paragraph) solely in connection with the Transactions, (f) to the extent any such information becomes publicly available other than by reason of disclosure by such Initial Lender, its affiliates or Representatives in breach of this Commitment Letter or any applicable confidentiality obligation to you, (g) for purposes of establishing a "due diligence" defense, (h) in connection with the exercise of any remedies hereunder or under the Fee Letter or any suit, action or proceeding relating to this Commitment Letter, the Fee Letter or the Revolving Facility and (i) pursuant to customary disclosure about the terms of the financing contemplated hereby in the ordinary course of business to market data collectors and similar service providers to the loan industry for league table purposes; *provided* that the disclosure of any such information to any Lenders or prospective Lenders or participants or prospective participants referred to above shall be made subject to the acknowledgment and acceptance in writing by such Lender or prospective Lender or participant or prospective participant that such information is being disseminated on a confidential basis in accordance with the standard syndication processes of such Initial Lender or customary market standards for dissemination of such type of information. The provisions of this paragraph shall automatically terminate on the earlier of (a) the Conversion Date and (b) one year following the date of this Commitment Letter.

9.      Assignments

        This Commitment Letter shall not be assignable by you without the prior written consent of each Initial Lender (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and the indemnified persons and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the indemnified persons to the extent expressly set forth herein.

10.     Acceptance/ Expiration of Commitments

        If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Commitment Letter and the Fee Letter by returning to us executed counterparts of this Commitment Letter and the Fee Letter not later than 11:59 p.m., Dallas, Texas time, on July 29, 2020 (the "**Acceptance Deadline**"). This offer will automatically expire at such time if we have not received such executed counterparts in accordance with the preceding sentence. In the

9

event that the initial borrowings or the roll-up under the DIP Facility do not occur on or before the Expiration Date (as defined below), then this Commitment Letter and the commitments hereunder (including, for the avoidance of doubt, the commitments with respect to the Revolving Facility) shall automatically terminate unless the Initial Lenders shall, in their discretion, agree to an extension. In addition, if not otherwise terminated in accordance with the immediately preceding sentence, this Commitment Letter and the commitments hereunder shall automatically terminate without further action or notice on the first day after the Maturity Date (as defined under the DIP Term Sheet) if the Conversion Date shall not have occurred by such time.

For purposes of this Commitment Letter, "**Expiration Date**" means 5:00 p.m., Dallas, Texas time on the date that is thirty-five (35) days after the Petition Date (as defined in the DIP Term Sheet) if the Final Order (as defined in the DIP Term Sheet) has not been entered by the Bankruptcy Court on or prior to such date.

11.    Miscellaneous

Each Initial Lender reserves the right to employ the services of its affiliates in providing services contemplated hereby and to allocate, in whole or in part, to its affiliates certain fees payable to such Initial Lender in such manner as such Initial Lender and its affiliates may agree in their sole discretion. This Commitment Letter may not be amended or waived except by an instrument in writing signed by you and each Initial Lender. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile or electronic transmission (e.g., "pdf" or "tif" shall be effective as delivery of a manually executed counterpart hereof. This Commitment Letter and the Fee Letter are the only agreements that have been entered into among us and you with respect to the Revolving Facility and set forth the entire understanding of the parties with respect thereto.

**THIS COMMITMENT LETTER AND THE FEE LETTER AND ANY CLAIM OR CONTROVERSY ARISING HEREUNDER OR RELATED HERETO (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF OR THEREOF) SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ANY OTHER CONFLICTS OR CHOICE OF LAW PRINCIPLES THEREOF AND, TO THE EXTENT APPLICABLE, TITLE 11 OF THE UNITED STATES CODE. YOU AND WE HEREBY IRREVOCABLY AGREE TO WAIVE TRIAL BY JURY IN ANY SUIT, ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THE TRANSACTIONS, THIS COMMITMENT LETTER OR THE FEE LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER OR THEREUNDER.**

You and we hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the Bankruptcy Court or any state or Federal court sitting in the Borough of Manhattan in the City of New York, over any suit, action or proceeding arising out of or relating to the Transactions or the other transactions contemplated hereby, this Commitment Letter or the Fee Letter or the performance of services hereunder or thereunder. You and we agree that service of any process,

summons, notice or document by registered mail addressed to you or us shall be effective service of process for any suit, action or proceeding brought in any such court. You and we hereby irrevocably and unconditionally waive any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in any inconvenient forum. Each of the Initial Lenders hereby notifies you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "**PATRIOT Act**"), it is required to obtain, verify and record information that identifies the Borrower and each Guarantor, which information includes names, addresses, tax identification numbers and other information that will allow such Lender to identify the Borrower and each Guarantor in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective for the Initial Lenders and each Lender.

Section headings used herein are for convenience of reference only and are not to affect the construction of, or to be taken into consideration in interpreting, this Commitment Letter.

The indemnification, fee, expense, jurisdiction, information and confidentiality provisions contained herein and in the Fee Letter shall remain in full force and effect regardless of whether definitive financing documentation for the Revolving Facility shall be executed and delivered and notwithstanding the termination of this Commitment Letter or the commitments hereunder; *provided* that your obligations under this Commitment Letter (other than your obligations with respect to confidentiality) shall automatically terminate and be superseded, to the extent comparable, by the provisions of the Revolving Facility Documentation upon the occurrence of the effectiveness thereof.

[*Signature Pages Follow*]

11

## Exhibit A

**Exit Facility Term Sheet**

[See attached.]

CONFIDENTIAL

### DENBURY RESOURCES INC.
#### $615,000,000 Senior Secured Revolving Credit Facility

| | |
|---|---|
| Borrower: | Denbury Resources Inc., a Delaware corporation (the "**Borrower**"). |
| Administrative Agent: | JPMorgan Chase Bank, N.A. ("**JPMCB**") in its capacity as administrative agent and collateral agent (in such capacities, the "**Administrative Agent**") in respect of the Revolving Facility (as hereinafter defined) for a syndicate of banks, financial institutions and other institutional lenders from time to time party thereto (together with JPMCB and the Initial Lenders, the "**Lenders**").  On the Conversion Date (as defined below), the Lenders shall constitute all of the Existing Lenders (as defined below) participating in the DIP Facility (as defined below). |
| Joint Bookrunners and Lead Arrangers: | JPMCB, Bank of America, N.A., Wells Fargo Securities, LLC and Capital One, National Association, in their respective capacities as joint lead arrangers (in such capacities, the "**Joint Lead Arrangers**") for the Revolving Facility. |
| Co-Syndication Agents: | Bank of America, N.A. and Wells Fargo Bank, National Association. |
| Co-Documentation Agents: | Canadian Imperial Bank of Commerce, New York Branch, Comerica Bank, Credit Suisse AG, Cayman Islands Branch, Royal Bank of Canada and ABN AMRO Capital USA LLC. |
| Revolving Credit Facility: | A senior secured revolving credit facility (the "**Revolving Facility**", and the commitments thereunder, the "**RBL Commitments**") in an aggregate maximum principal amount of $615,000,000 (the "**Maximum Amount**"), subject to availability as described under the heading "Availability" below.  The loans under the Revolving Facility are collectively referred to as "**Revolving Loans**" or the "**Loans**". |
| Swingline: | In connection with the Revolving Facility, JPMCB (in such capacity, the "**Swingline Lender**") will make available to the Borrower a swingline facility in U.S. dollars under which the Borrower may make short term borrowings upon same day notice up to an aggregate amount not to exceed $25,000,000 in minimum principal amounts of $100,000 or increments of $10,000 in excess thereof subject to customary notice requirements.  Any such swingline borrowing will reduce availability under the Revolving Facility on a dollar-for-dollar basis.

Upon notice from the Swingline Lender, the Lenders will be unconditionally obligated to purchase participations in any |

swingline loan pro rata based upon their RBL Commitments.

Purpose / Use of Proceeds:

(A)    The proceeds of borrowings under the Revolving Facility may be used by the Borrower (i) for payments of certain fees, costs and expenses in connection with the Borrower's exit from chapter 11 and refinancing certain debt in connection therewith (including, without limitation, the DIP Facility (as defined in the DIP Term Sheet)), (ii) to make investments, payments, dividends or distributions on, or redemptions of, the Borrower's capital stock to the extent permitted under the Revolving Facility, (iii) to provide for the working capital needs of the Borrower and its subsidiaries, (iv) to pay the fees and expenses related to the Revolving Facility, and (v) for other general corporate purposes, including, without limitation, the exploration, acquisition and development of oil and gas properties.

(B)    Letters of credit are used by the Borrower and its restricted subsidiaries for general corporate purposes, including, without limitation, to secure bids, tenders, bonds and contracts entered into in the ordinary course of the Borrower's business and to support deposits required under purchase agreements pursuant to which the Borrower or one or more restricted subsidiaries may acquire oil and gas assets.

Availability:

So long as the Total Outstandings (as defined below) do not exceed the Revolving Loan Limit (as defined below): (i) Revolving Loans will be available at any time (on same day notice in the case of ABR (as defined in Annex I) Loans) prior to the Maturity Date (as defined below), in minimum principal amounts of $1,000,000 or increments of $100,000 in excess thereof, (ii) Letters of Credit under the Revolving Facility will be issued as described in the section entitled "Letters of Credit" below and (iii) amounts repaid under the Revolving Facility may be reborrowed.

"***Total Outstandings***" means, at any time, the aggregate principal amount of Revolving Loans then outstanding plus the aggregate stated amount of all issued but undrawn Letters of Credit (as hereinafter defined) and, without duplication, all unreimbursed disbursements on any Letter of Credit as of such date (unless cash collateralized or backstopped pursuant to arrangements reasonably acceptable to the Issuing Lender (as hereinafter defined)).

"***Revolving Loan Limit***" means, the least of (i) the RBL Commitments, (ii) the Borrowing Base (as hereinafter defined) and (iii) the Maximum Amount.

For purposes hereof, "***Availability***" shall mean an amount (if positive) equal to the Revolving Loan Limit less Total Outstandings.

Borrowing Base:

The borrowing base for the Revolving Facility will be based on the loan value of the Credit Parties' (as hereinafter defined) proved oil and gas reserves as reflected in a Reserve Report (as hereinafter defined) and other oil and gas properties of the Credit Parties, in each case located within the geographic boundaries of the United States or the outer continental shelf adjacent to the United States, determined in accordance with the terms set forth below (the "***Borrowing Base***").

The initial Borrowing Base as of the Conversion Date will be an amount determined by the Required Lenders based on the Initial Reserve Report (as defined below) (but will not, in any event, be an amount in excess of the borrowing base in effect under the DIP Facility immediately prior to the Conversion Date) and will remain at such level until, subject to the Borrower's right of optional re-determination and any Adjustment (as hereafter defined), the next re-determination date, which re-determination date shall be subject to adjustment as set forth in the Revolving Facility. The Borrowing Base shall be re-determined semi-annually on or about May 1 and November 1 of each year (or in each case, such date reasonably practicable thereafter), beginning on the first May 1 or November 1 after the Conversion Date (as defined below), based upon a reserve report prepared as of the immediately preceding June 30 (with regard to the November 1 redetermination) or December 31 (with regard to the May 1 redetermination), and delivered on or before October 1 (with regard to the November 1 redetermination) and April 1 (with regard to the May 1 redetermination), as applicable (each such report, a "***Reserve Report***"), and other related information, if any, required to be delivered to the Administrative Agent; provided that if the Conversion Date occurs less than 90 days prior to the first May 1 or November 1 thereafter, then the first scheduled Borrowing Base redetermination after the Conversion Date shall occur on the next May 1 or November 1, whichever is first.  Each Reserve Report shall be in a form reasonably acceptable to the Administrative Agent.  Subject to the following two sentences, all Reserve Reports, including those prepared in connection with a re-determination, may be prepared internally by petroleum engineers who are employees of the Borrower or its subsidiaries.  Each December 31st Reserve Report shall be prepared by (a) DeGolyer and MacNaughton, (b) Netherland, Sewell & Associates, Inc., (c) Cawley, Gillespie & Associates, Inc., (d) Ryder Scott Company, L.P., or (e) at the Borrower's election, such other independent petroleum engineering firm reasonably acceptable to the Administrative Agent (each, an

4

"***Approved Petroleum Engineer***").  Each June 30th Reserve Report will be prepared, at the Borrower's option, by an Approved Petroleum Engineer or internally under the supervision of the chief petroleum engineer of the Borrower who shall certify such Reserve Report to be true and accurate in all material respects and to have been prepared in accordance with the procedures used in the immediately preceding December 31st Reserve Report.

The Borrowing Base shall be proposed by the Administrative Agent and approved by all of the Lenders (in the case of increases) or the Required Lenders (as hereinafter defined) (in the case of decreases or reaffirmation) as provided below. Each determination of the Borrowing Base shall be made by the Administrative Agent and, to the extent any determination represents an increase in the Borrowing Base in effect immediately prior to such determination, all of the Lenders, and to the extent any determination represents a decrease in or reaffirmation of, the Borrowing Base in effect immediately prior to such determination, the Required Lenders, in each case, in their respective sole discretion, but in good faith in accordance with their respective usual and customary oil and gas lending criteria as they exist at the particular time and as specified in the Revolving Facility Documentation (as defined below); provided that no Lender shall be required to increase its commitment amount under the Revolving Facility in connection with an increase in the Borrowing Base.

The Borrower and the Administrative Agent (at the direction of the Required Lenders) shall each have the option to request one unscheduled re-determination of the Borrowing Base between each scheduled redetermination (including prior to the first scheduled re-determination date). To the extent any re-determination represents an increase in the Borrowing Base in effect immediately prior to such re-determination, such Borrowing Base will be the largest amount approved by all of the Lenders, and to the extent any re-determination represents a decrease in, or reaffirmation of, the Borrowing Base in effect prior to such re-determination, such Borrowing Base will be the largest amount approved by the Required Lenders.

In addition to the foregoing scheduled and unscheduled re-determinations, the Borrowing Base is also subject to adjustments (each, an "***Adjustment***") between re-determinations in connection with:

(i) sales or other dispositions (including in connection with the designation of unrestricted subsidiaries and investments) of Borrowing Base Properties (as hereinafter defined) and early monetization or early termination of any hedge or swap positions relied on by the Lenders (as

determined by the Administrative Agent) in determining the Borrowing Base, in each case since the later of (A) the most recent re-determination date and (B) the last adjustment made pursuant to this clause (i), and with an aggregate value (together with the economic value of any earlier sales or dispositions during such period or any early monetization or early termination of any hedge or swap positions relied on by the Lenders (as determined by the Administrative Agent) in determining the Borrowing Base (net of (x) any positions entered into (1) contemporaneously with such early monetization or termination or (2) since the last re-determination of the Borrowing Base and (y) acquisitions consummated since the last re-determination with respect to which the Borrower has delivered a Reserve Report and other engineering information reasonably satisfactory to the Administrative Agent)) exceeding 5% of the Borrowing Base then in effect;

(ii) at the Borrower's election, acquisitions (including in connection with the designation of an unrestricted subsidiary as a restricted subsidiary) of domestic oil and gas properties between scheduled redeterminations, with an aggregate value (together with the economic value of any earlier such acquisitions during such period) exceeding 5% of the Borrowing Base then in effect; and

(iii) upon the issuance of any senior unsecured or senior subordinated loans or notes after the Conversion Date ("***Specified Additional Debt***"), other than permitted refinancing debt in respect thereof, the Borrowing Base will be immediately reduced by $0.25 for every $1.00 of the principal amount of Specified Additional Debt.

The Borrower may on any re-determination date elect a reduced Borrowing Base.

<u>Accordion</u>:

The Revolving Facility shall permit the Borrower to increase commitments under the Revolving Facility (any such increase, an "***Incremental Increase***") at any time and from time to time in a minimum amount per increase of at least $25,000,000 (and increments of $1,000,000 above that minimum), up to a maximum aggregate incremental commitment such that after giving effect thereto the total RBL Commitments shall not exceed the lesser of (a) the Borrowing Base then in effect and (b) the Maximum Amount; <u>provided</u> that (i) no existing Lender will be required to participate in any such Incremental Increase without its consent, (ii) no Event of Default under the Revolving Facility shall exist after giving effect thereto, (iii) the Administrative Agent, the Swingline Lender and the Issuing Lender shall have been given notice of the

Incremental Increase, (iv) the Borrower shall have paid to the Administrative Agent, for payment to any increasing Lender or Additional Lender, as applicable, any fees payable in the amounts and at the times separately agreed upon among the Borrower, the Administrative Agent and each such Lender or Lenders and (v) such Incremental Increase shall be on the same terms (including the same maturity date) and pursuant to the same documentation applicable to the Revolving Facility (other than with respect to any arrangement, structuring, upfront or other fees or discounts payable in connection with such Incremental Increase (provided that the Applicable Margin of the Revolving Facility may be increased to be consistent with the applicable margin for such Incremental Increase)).

The Borrower may seek commitments in respect of the Incremental Increase, in its sole discretion, from either existing Lenders (each of which shall be entitled to agree or decline to participate in its sole discretion) or from additional banks, financial institutions and other institutional lenders or investors who will become Lenders in connection therewith (in each case (i.e., existing or new Lenders), with the consent of the Administrative Agent, the Swingline Lender and the Issuing Lender (in each case, such consent not to be unreasonably withheld or delayed)) (“***Additional Lenders***”) or from both existing Lenders and Additional Lenders.

<u>Interest Rates and Fees</u>:      As set forth on Annex I to this Exhibit A.

<u>Default Rate</u>:      With respect to overdue principal, the applicable interest rate plus 2.00% per annum, and with respect to any other overdue amount, including overdue interest, the interest rate applicable to ABR Loans plus 2.00% per annum.

<u>Letters of Credit</u>:      An aggregate amount of $100,000,000 (as may be increased solely with the consent of the Administrative Agent and the Issuing Lender) of the Revolving Facility shall be available to the Borrower for the purpose of issuing standby letters of credit (the “***Letters of Credit***”). Letters of Credit will be issued by JPMCB or any of its affiliates or any replacement or successor thereof (the “***Issuing Lender***”). The Administrative Agent will be promptly notified by the Borrower and the Issuing Lender of each issuance, extension or amendment of a Letter of Credit. Each Letter of Credit shall expire not later than the earlier of (a) 12 months (or 18 months in the case of Letters of Credit issued in favor of the Texas Railroad Commission) after its date of issuance or such longer period of time as may be agreed by the Issuing Lender and (b) the fifth business day prior to the Maturity Date; provided that any Letter of Credit may provide for automatic renewal thereof for additional periods of up to 12 months (or 18

months in the case of Letters of Credit issued in favor of the Texas Railroad Commission) or such longer period of time as may be agreed by the Issuing Lender (which in no event shall extend beyond the date referred to in clause (b) above, except to the extent cash collateralized or backstopped pursuant to arrangements reasonably acceptable to the Issuing Lender; provided that no Lender shall be required to fund participations in Letters of Credit after the maturity date applicable to its commitments.

Drawings under any Letter of Credit shall be reimbursed by the Borrower (whether with its own funds or with the proceeds of borrowings under the Revolving Facility) within one business day after notice of such drawing is received by the Borrower from the Issuing Lender.  To the extent that the Borrower does not reimburse the Issuing Lender within the time period specified above, the Lenders under the Revolving Facility shall be irrevocably obligated to reimburse the Issuing Lender pro rata based upon their respective Revolving Facility commitments.

On the Conversion Date, all outstanding "DIP Letters of Credit" (as defined in the DIP Term Sheet) under the DIP Facility shall automatically be deemed issued under the Revolving Facility as "Letter of Credit".

Final Maturity:

The Revolving Facility will mature, and lending commitments will terminate, on the date that is 42 months after the Petition Date (as defined in the DIP Term Sheet, as defined below) (the "***Maturity Date***").

Guarantees:

All obligations of the Credit Parties (the "***Obligations***") under (i) the Revolving Facility and Revolving Facility Documentation, (ii) interest rate protection, commodity trading or hedging, currency exchange or other non-speculative hedging or swap arrangements entered into with any Lender or any affiliate of a Lender (including any hedging agreements entered into with such Lender or affiliate thereof under the DIP Facility prior to the Conversion Date) (the "***Hedging Arrangements***") and (iii) treasury management arrangements entered into with any Lender or any affiliate of a Lender (including any treasury agreements entered into with such Lender or affiliate thereof under the DIP Facility prior to the Conversion Date) ("***Treasury Arrangements***") will, in each case, be unconditionally guaranteed jointly and severally on a pari passu senior secured basis (the "***Guarantees***") by each existing and subsequently acquired or organized direct or indirect subsidiary of the Borrower other than an Excluded Subsidiary (as defined below) (the "***Guarantors***"; together with the Borrower, the "***Credit Parties***").   Notwithstanding the foregoing, any subsidiary that owns Borrowing Base

Properties shall be required to be a Guarantor.

The Borrower will not be permitted to create or acquire any foreign subsidiaries without the prior written consent of the Administrative Agent.

"***Approved Counterparty***" means any person if such person or its credit support provider has a long-term senior unsecured debt rating of BBB+/Baa1 by S&P or Moody's (or their equivalent) or higher.

The Revolving Facility Documentation contains customary provisions to address the status of Guarantors as eligible contract participants.

Subject to the investments covenant in the Revolving Facility Documentation and other customary limitations, the Borrower may designate any subsidiary as an "unrestricted subsidiary" and subsequently redesignate any such unrestricted subsidiary as a restricted subsidiary.  Unrestricted subsidiaries are not subject to the representations and warranties, covenants, events of default or other provisions of the Revolving Facility Documentation, and the results of operations and indebtedness of unrestricted subsidiaries will not be taken into account for purposes of calculating any financial metric contained in the Revolving Facility Documentation except to the extent that distributions in the form of cash or cash equivalents are received by a Credit Party therefrom.

Security:

Subject to the limitations set forth below in the Revolving Facility, the Obligations, including in respect of the Guarantees and any Hedging Arrangements or Treasury Arrangements, shall be secured by the following (collectively, but excluding the Excluded Assets (as hereinafter defined), the "***Collateral***"): (a) substantially all personal property of the Credit Parties, including, without limitation, (i) a first-priority (subject to permitted liens) perfected pledge of all the equity interests of each direct material wholly-owned restricted U.S. subsidiary held by any Credit Party and the equity interests of any Guarantor, (ii) a first priority (subject to permitted liens) perfected security interest in all of the Credit Parties' commodity hedge contracts and the proceeds thereof and  (iii) a first-priority (subject to permitted liens) perfected security interest in all deposit accounts, securities accounts and commodity accounts of the Credit Parties other than Excluded Accounts (as defined below); and (b) first-priority (subject to permitted liens) perfected real property mortgages on oil and gas reserves and related assets of the Credit Parties located in the United States included in the most recent Reserve Report delivered to the Administrative Agent (such properties, the "***Borrowing Base Properties***") and representing not less than

ninety percent (90%) of the PV-9 of the Borrowing Base Properties.

The Borrower shall provide reasonably satisfactory title information on at least ninety percent (90%) of the PV-9 of the Borrowing Base Properties evaluated in the most recent Reserve Report.

"*PV-9*" means, with respect to any proved reserves expected to be produced from any oil and gas properties, the net present value, discounted at 9% per annum, of the future net revenues expected to accrue to the Credit Parties' collective interests in such reserves during the remaining expected economic lives of such reserves, calculated in accordance with the most recent bank price deck provided to the Borrower by the Administrative Agent.

For the avoidance of doubt, the Collateral shall exclude the following: (i) any real property (owned or leased), any midstream assets, and any oil and gas properties (owned or leased) other than those constituting Borrowing Base Properties, (ii) any contract, license, agreement, instrument or other document (or any items of property, subject thereto) to the extent that the grant of a security interest therein is prohibited by, or constitutes a breach or default under or results in the termination of or gives rise to a right on the part of the parties thereto other than any Credit Party to terminate (or materially modify) or requires any consent not obtained under, any such contract, license, agreement, instrument or other document, except to the extent that the term in such contract, license, agreement, instrument or other document providing for such prohibition, breach, default or right of termination or modification or requiring such consent is ineffective under Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law, (iii) intellectual property and licenses, including any United States "intent to use" trademark applications for which a statement of use has not been filed, in relation to which any applicable law, or any agreement with a domain name registrar or any other person entered into by any grantor, prohibits the creation of a security interest therein or would otherwise invalidate or result in the abandonment of any of such grantor's right, title or interest therein, (iv) any motor vehicles and other assets subject to certificates of title (except to the extent the security interest in such assets can be perfected by the filing of a UCC-1 financing statement), (v) letter of credit rights (except to the extent the security interest in such assets can be perfected by the filing of a UCC-1 financing statement), (vi) margin stock, (vii) any building or manufactured (mobile) home located within an area having special flood hazards and in which

flood insurance is available under the National Flood Insurance Act of 1968, (viii) any consumer goods, (ix) any Excluded Accounts, (x) equity interests in Excluded Subsidiaries, (xi) the Genesis Assets (as defined below), (xii) those assets as to which the Administrative Agent reasonably determines that the cost or other consequences of obtaining such a security interest or perfection thereof are excessive in relation to the benefit to the Lenders of the security to be afforded thereby, and (xiii) other exceptions to be reasonably agreed by the Administrative Agent and the Borrower.  The foregoing described in clauses (i) through (xiii) are, collectively, the "***Excluded Assets***".

"***Genesis Assets***" means, collectively, (a) that certain Pipeline Financing Lease Agreement, dated as of May 30, 2008 (as amended), among Denbury Onshore, LLC and Genesis NEJD Pipeline, LLC, (b) any interest, title and right that the Credit Parties have to the "Pipeline System" (as defined in the Pipeline Financing Lease Agreement) (hereinafter referred to as the "Pipeline System"), (c) any proceeds received at any time resulting from the sale or other disposition of all or part of the Credit Parties' interest, title and right to the Pipeline System, and (d) all rents, income or related fees or charges for transportation of carbon dioxide or any other substance through the Pipeline System.

"***Excluded Accounts***" means, collectively, (a) any deposit account, securities account or commodity account that is exclusively used for trust, payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of any employees of the Credit parties or any of their subsidiaries, (b) any deposit account, securities account or commodity account that is exclusively used in the ordinary course of the Credit Parties' business for (i) deposits that are escrowed amounts in connection with transactions with third parties or (ii) deposits that are pledged to third parties to secure obligations (other than debt for borrowed money) incurred in the ordinary course of the Credit Parties' business, (c) any deposit account, securities account or commodity account that is exclusively used for deposits to fund one or more political action committees of the Credit Parties so long as the balance of all such deposit accounts, securities accounts and commodity accounts does not in the aggregate exceed $1,000,000 at any time, (d) any deposit account that is a zero balance account, (e) any deposit account, commodity account or securities account so long as the balance in each such account, individually, does not at any time exceed $1,000,000 and the aggregate balance of all such deposit accounts, commodity accounts and securities accounts does not at any time exceed $3,000,000, (f) any deposit account which is used as an escrow account or fiduciary or trust account and solely

maintains cash and cash equivalents made for the benefit of third parties (other than the Debtors) to be used exclusively in the ordinary course of the Debtors' business for royalty obligations, suspense payments, working interest payments, plugging and abandonment, remediation, and similar payments owed or to be made to such third parties (other than the Debtors), and (g) the Professional Fee Escrow Account (as defined in the Plan) (as defined in the DIP Term Sheet)) so long as, at any time, the balance in such account includes only the amounts deposited therein on or prior to the Conversion Date in accordance with the Plan.

"***Excluded Subsidiary***" means (a) any subsidiary that is not a wholly-owned domestic Material Subsidiary, "***Material Subsidiary***" shall mean each subsidiary whose revenues or total assets are less than 7.5% of the consolidated revenues or total assets of the Borrower and its restricted subsidiaries (provided that if at any time the aggregate amount of revenues or total assets of all such subsidiaries of the Borrower excluded as Guarantors pursuant to this clause (a) exceeds 10% of the consolidated revenues or total assets, respectively, of the Borrower and its restricted subsidiaries (as of the end of any period of four fiscal quarters), the Borrower shall designate sufficient subsidiaries as Guarantors to eliminate such excess (unless such designation would not be permitted pursuant to clauses (c), (d), (e) or (f) below)), (b) any unrestricted subsidiary, (c) any subsidiary that owns no material assets other than the Stock or Indebtedness of one or more direct or indirect foreign subsidiaries, (d) each subsidiary that, subject to customary limitations, is acquired pursuant to a permitted acquisition and is prohibited from guaranteeing or providing liens to secure the obligations by the financing documentation relating to such permitted acquisition, (e) that is not permitted by law, such subsidiary's organizational documents, regulation or contract to provide the guarantee or liens to secure the obligations, or would require governmental or regulatory consent, approval, license or authorization to provide such guarantee or such liens (unless such consent, approval, license or authorization has been received), (f) for which the provision of the guarantee of the obligations would result in a material adverse tax consequence to the Borrower or one of its subsidiaries (as reasonably determined by the Borrower), or (g) for which the Administrative Agent reasonably determines that the cost or other consequences of providing such a guarantee is excessive in relation to the value afforded thereby

It is understood and agreed that (a) no actions in any non-U.S. jurisdiction or required by the laws of any non-U.S. jurisdiction shall be required to be taken to create any security interests in assets located or titled outside of the U.S. or to

perfect or make enforceable any security interests in any assets (it being understood that there shall be no security agreements or pledge agreements governed under the laws of any non-U.S. jurisdiction) and (b) with respect to all assets of the Credit Parties other than the Borrowing Base Properties, the Credit Parties shall not be required to take any action to perfect a lien on any such assets unless such perfection may be accomplished by (i) the filing of a UCC-1 financing statement or other equivalent filing, (ii) delivery of certificates representing any pledged equity consisting of certificated securities, and delivery of tangible paper, documents or instruments, in each case, with appropriate endorsements or transfer powers, or (iii) delivery of control agreements in respect of deposit accounts, commodity accounts and securities accounts (other than Excluded Accounts).

Mandatory Prepayments / Adjustments of the Borrowing Base:

Other than as a result of an Adjustment, if the Total Outstandings exceed the Borrowing Base (a "***Borrowing Base Deficiency***"), the Borrower shall, within ten (10) business days after written notice from the Administrative Agent to the Borrower of such Borrowing Base Deficiency, notify the Administrative Agent that it elects to take one or more of the following actions (provided that if the Borrower fails to elect an option, option (c) shall be designated by default):

(a) within thirty (30) days after such election, provide additional Borrowing Base Properties to the extent necessary to eliminate such Borrowing Base Deficiency;

(b) within thirty (30) days after such election, prepay the Revolving Loans in an amount sufficient to eliminate such Borrowing Base Deficiency (or if no Revolving Loans remain outstanding, cash collateralize all unreimbursed disbursements on any Letter of Credit in an amount sufficient to eliminate such Borrowing Base Deficiency);

(c) prepay such Borrowing Base Deficiency in six equal monthly installments with interest beginning on the 30th day after the Borrower's receipt of notice of such Borrowing Base Deficiency from the Administrative Agent (as such Borrowing Base Deficiency may be reduced during such six-month period as a result of a Borrowing Base re-determination or Adjustment); or

(d) take any combination of actions set forth in clauses (a) through (c) above;

provided, in each case, that any such Borrowing Base Deficiency must be cured prior to the Maturity Date.

If the Borrowing Base is adjusted as the result of an asset sale, disposition, early monetization or termination of any hedge position or issuance of Specified Additional Debt (as described in the section entitled "Borrowing Base") and a Borrowing Base Deficiency results from such adjustment, then no later than three business days following the date it receives written notice of the adjustment or determination of the Borrowing Base and the resulting Borrowing Base Deficiency, the Borrower shall eliminate such Borrowing Base Deficiency. Additionally, any Borrowing Base Deficiency resulting from a voluntary termination of commitments shall be required to be eliminated contemporaneously with and on the date of such termination.

If, on the last business day of any calendar week (or, on any business day if a Borrowing Base Deficiency or Event of Default then exists and is continuing), the Debtors have any

Excess Cash (as defined below) as of the end of such day in excess of $75,000,000, the Borrower shall prepay the Loans within one business day following such date in an amount equal to such excess.

"**Excess Cash**" means, as of any date of determination, the difference, if positive, between Consolidated Cash Balance (as defined below) of the Credit Parties and their restricted subsidiaries as of such date and Excluded Cash (as defined below) of the Credit Parties and their restricted subsidiaries as of such date.

"**Consolidated Cash Balance**" means, as of any date of determination, the aggregate amount of all (a) cash, (b) cash equivalents and (c) any other marketable securities, treasury bonds and bills, certificates of deposit, investments in money market funds and commercial paper, in each case, held or owned by (either directly or indirectly) any Credit Party or any restricted subsidiary as of such date.

"**Excluded Cash**" means as of any date of determination, (a) cash or cash equivalents of the Credit Parties and their restricted subsidiaries from (i) the issuance of any Specified Additional Debt or other unsecured indebtedness permitted to be incurred pursuant to the Revolving Facility Documentation, (ii) the issuance by the Borrower of any equity interests in the Borrower, or (iii) any disposition of property, in each case so long as the Borrower and the other Credit Parties keep any such proceeds in segregated accounts until such proceeds are used for the purpose(s) obtained, as the case may be, (b) without duplication of clauses (f), (g) and (h) below, and other than cash and cash equivalents held or maintained in accounts described in clause (e) of the definition of Excluded Accounts, any cash or cash equivalents in Excluded Accounts, (c) any cash collateral required to cash collateralize any Letter of Credit, (d) any cash or cash equivalents constituting purchase price deposits made by or held by an unaffiliated third party pursuant to a binding and enforceable purchase and sale agreement with an unaffiliated third party containing customary provisions regarding the payment and refunding of such deposits, (e) any cash or cash equivalents for which any Credit Party or any restricted subsidiary has, in the ordinary course of business, issued checks or initiated wires or ACH transfers in order to utilize such cash or cash equivalents, (f) any cash or cash equivalents set aside to pay payroll, payroll taxes, other taxes, employee wage and benefits payments, and trust and fiduciary obligations or other similar obligations of the Credit Parties then due and owing to third parties and for which the Debtors have issued checks or initiated wires or ACH transfers (or, in their respective good faith discretion, will issue checks or

initiate wires or ACH wires within five business days in order to make such payments), (g) any cash or cash equivalents set aside to pay royalty obligations, working interest obligations, production payments, vendor payments, suspense payments, severance and ad valorem taxes of the Credit Parties and their restricted subsidiaries then due and owing to third parties and for which the Credit Parties and their restricted subsidiaries have issued checks or initiated wires or ACH transfers (or, in their respective good faith discretion, will issue checks or initiate wires or ACH wires within five business days in order to make such payments) and (h) any cash or cash equivalents in any escrow accounts or fiduciary or trust accounts that are used exclusively in the ordinary course of the Debtors' business for plugging and abandonment, remediation, and similar obligations owed to third parties.

The application of proceeds from mandatory prepayments shall not reduce the aggregate amount of commitments under the Revolving Facility and amounts prepaid may be reborrowed, subject to Availability and the other conditions to borrowing set forth below.

| | |
|---|---|
| <u>Voluntary Prepayments and Reductions in Commitments</u>: | Voluntary reductions of the unutilized portion of the RBL Commitments and voluntary prepayments of borrowings under the Revolving Facility will be permitted at any time, in minimum principal amounts of $500,000 or increments of $100,000 in excess thereof, without premium or penalty, subject to reimbursement of the Lenders' redeployment costs in the case of a prepayment of LIBOR Loans (as defined in Annex I) other than on the last day of the relevant interest period. |
| <u>Documentation</u>: | The definitive documentation for the Revolving Facility, including all other related agreements and documents creating, evidencing or securing indebtedness or obligations of any of the Credit Parties to the Administrative Agent or granting or perfecting liens or security interests by any of the Credit Parties in favor of and for the benefit of the Administrative Agent, for itself and for and on behalf of the Lenders, on account of the Revolving Facility (the "***Revolving Facility Documentation***") shall contain the terms set forth herein and shall otherwise be negotiated in good faith within a reasonable time period to be determined based on the expected Conversion Date.  The Revolving Facility Documentation will be based on the applicable "Credit Documents" under and as defined in that certain Amended and Restated Credit Agreement dated as of December 9, 2014 (as in effect immediately prior to the Eighth Amendment thereto dated as of June 26, 2020, the "***Existing RBL Credit Agreement***"; and, the lenders thereunder, the "***Existing Lenders***"), among the Borrower, JPMCB, as administrative |

agent, and the lenders from time to time party thereto, with changes consistent with this Exit Credit Facility Term Sheet and taking into account recent precedent credit agreements negotiated between the Administrative Agent and similarly situated companies to the Borrower, and otherwise to reflect customary lender form updates, including without limitation updated LIBOR replacement provisions, and modifications to baskets and materiality thresholds to be agreed (the "***Documentation Principles***").

Conditions to Initial Borrowing and Closing of Revolving Facility:

The availability of the initial borrowing under the Revolving Facility shall be conditioned upon satisfaction of the following conditions precedent (the date upon which all such conditions precedent shall be satisfied or waived, the "***Conversion Date***"):

(a)   the negotiation, execution, and delivery of reasonably satisfactory Revolving Facility Documentation, including security documentation, promissory notes and other usual and customary closing documents, certificates, and authorizing resolutions for the Revolving Facility;

(b)   the Lenders, the Joint Lead Arrangers and the Administrative Agent shall have received all reasonable and documented out-of-pocket fees and expenses required to be paid on or before the Conversion Date (including the reasonable and documented fees and expenses of professional retained by the foregoing) invoiced at least two business days prior thereto;

(c)   all representations and warranties of the Credit Parties in the Revolving Facility Documentation shall be true and correct in all respects, and there shall be no default or event of default, in existence at the time of, or after giving effect to the making of, such funding on such date;

(d)   receipt and reasonably satisfactory review of (i) Borrower's audited financial statements for the most recent fiscal year ending at least 90 days prior to the Conversion Date, (ii) Borrower's unaudited financial statements for the most recent fiscal quarter ending at least 60 days prior to the Conversion Date, (iii) pro forma financial statements of the Borrower (after giving effect to closing) and (iv) detailed financial projections (to be mutually agreed upon) of the Borrower (prepared on a quarterly basis for the first two fiscal years following the Conversion Date and on an annual basis for the subsequent two fiscal years);

(e)   receipt and reasonably satisfactory review of the reserve reports and engineering reports prepared internally by

petroleum engineers who are employees of the Borrower or its subsidiaries with an "as of" date to be determined; provided that if the Conversion Date has not occurred by July 1, 2021, such reserve report shall be prepared by an independent petroleum engineering firm reasonably acceptable to the Administrative Agent (the "***Initial Reserve Report***");

(f)  reasonably satisfactory title information as reasonably required by the Administrative Agent on at least 90% of the PV-9 of the initial Borrowing Base Properties;

(g)  receipt of mortgages and security agreements providing perfected, first priority (subject to permitted liens to be as defined in the Revolving Facility Documentation) liens and security interests on (i) all personal property assets of the Borrower and the Guarantors constituting Collateral, and (ii) not less than 90% of the PV-9 of the initial Borrowing Base Properties;

(h)  all governmental and third party approvals necessary in connection with the financing contemplated hereby shall have been obtained and be in full force and effect;

(i)  the Administrative Agent shall have received lien search results and be reasonably satisfied that there are no liens and security interests on the Borrower's and Guarantor's property other than (i) those being released and (ii) other liens to be agreed upon;

(j)  the Lenders shall have received such legal opinions, including, as applicable, opinions of local counsel (which opinions shall include, among other things, the enforceability of the Revolving Facility Documentation under applicable local law), documents and other instruments as are customary for transactions of this type or as they may reasonably request;

(k)  the Administrative Agent and the Lenders shall have received, by at least three (3) business days prior to the Conversion Date, "know your customer" and similar information required by bank regulatory authorities at least eight (8) business days prior to the Conversion Date;

(l)  reasonably satisfactory review of the legal, corporate, and capital structure of the Borrower and its subsidiaries, upon closing;

(m)  no material adverse change from the Petition Date until closing (excluding the pendency of the bankruptcy cases);

(n)  satisfaction of the Administrative Agent with the Confirmation Order (as defined in the DIP Term Sheet)

and the entry thereof by the Bankruptcy Court;

(o)   the effective date of the Plan (and which Plan shall be satisfactory to the Administrative Agent) shall have occurred (or shall occur concurrently with the Conversion Date);

(p)   immediately prior to giving effect to closing, the sum of the unused DIP Commitments (as defined in the DIP Term Sheet) and unrestricted cash and cash equivalents of the Credit Parties on hand shall be not less than $[285,000,000];

(q)   the making of any requested credit extension on the Conversion Date would not cause Total Outstandings to be greater than $[275,000,000];

(r)   subject to the section titled "Commodity Hedging" herein, on or prior to the Conversion Date (solely in the event the Conversion Date occurs after December 31, 2020), the Borrower shall, or shall have caused another Credit Party to, enter into commodity swap agreements, collar agreements or put agreements (whether deferred premium or fully-paid) with Approved Counterparties to hedge notional amounts of crude oil covering not less than, for the period beginning August 1, 2020 through July 31, 2021 (the "*Initial Measurement Period*"), 65% of the reasonably anticipated production of such crude oil constituting proved, developed, producing oil and gas properties for such Initial Measurement Period as such anticipated production is set forth in the Initial Reserve Report; *provided* that, such swap, collar or put agreements (whether deferred premium or fully-paid) shall have effective floor prices of not less than the lesser of (x) the prices set forth in JPMCB's price deck or (y) the NYMEX strip price less 10%, in each case, for the applicable maturity dates of such hedges as of the date such swap, collar or put agreement (whether deferred premium or fully-paid) is entered into; and

(s)   after giving effect to any requested credit extension on the Conversion Date, the Borrower and its subsidiaries shall have no outstanding debt except for the (i) Obligations, (ii) debt arising as a result of the "Genesis Pipeline Dropdown Transaction" (as such term is defined under the Existing RBL Credit Agreement) to the extent permitted under the Revolving Facility Documentation, and (iii) capital leases in an amount not to exceed $1,000,000 in the aggregate.

<u>Conditions to All Extensions of Credit</u>:   Limited to the following: (a) the accuracy of representations and warranties set forth in the Revolving Facility Documentation in all material respects, (b) delivery of a customary borrowing notice, (c) before and after giving effect

to such borrowing Availability shall not be less than zero, (d) the absence of defaults or events of default at the time of, and after giving effect to the making of, such extension of credit and (e) immediately before and after giving effect to such Borrowing, the Borrower and the other Credit Parties not having any Excess Cash in excess of $75,000,000 after giving pro forma effect thereto.

Representations and Warranties:

Representations and warranties, applicable to the Borrower and its restricted subsidiaries (other than certain customary representations and warranties that will be applicable to restricted subsidiaries and unrestricted subsidiaries) subject to customary exceptions, baskets and materiality qualifiers to be agreed and otherwise consistent with the Documentation Principles, including: existence and organizational status; power and authority; qualification; execution, delivery and enforceability of Revolving Facility Documentation; compliance with laws; with respect to the execution, delivery and performance of the Revolving Facility Documentation, no violation of, or conflict with, law, charter documents or material agreements; litigation; margin regulations; licenses and permits; governmental approvals and other consents with respect to the execution, delivery and performance of the Revolving Facility; Investment Company Act; PATRIOT Act; absence of undisclosed liabilities; accuracy of disclosure and financial statements; since the Conversion Date, no material adverse effect (as hereinafter defined); no defaults; insurance; taxes; ERISA; creation and perfection of security interests; environmental laws; ownership of properties; subsidiaries and equity interests; sanctions laws/OFAC; direct benefit and consolidated solvency.

Affirmative Covenants:

Affirmative covenants, applicable to the Borrower and its restricted subsidiaries, subject to customary exceptions, baskets and materiality qualifiers to be agreed and otherwise consistent with the Documentation Principles, including: delivery of annual and quarterly financial statements and other information (with annual financial statements to be accompanied by an audit opinion from nationally recognized auditors that is not subject to qualification as to "going concern" or the scope of such audit other than solely with respect to, or resulting solely from (i) an upcoming maturity date under the Revolving Facility occurring within one year from the time such opinion is delivered or (ii) any potential inability to satisfy any financial maintenance covenant on a future date or in a future period); certificates and other information; delivery of notices of defaults, certain material events and changes in beneficial ownership; inspections (including books and records); maintenance of organizational

existence and rights and privileges; maintenance of insurance; payment of taxes; corporate franchises; compliance with laws (including environmental laws); maintenance of properties; reasonably satisfactory title review on at least ninety percent (90%) of the PV-9 of the Borrowing Base Properties evaluated in the most recent Reserve Report; operations; ERISA; additional guarantors and collateral; use of proceeds; know-your-customer information; sanctions laws/OFAC/anti-money laundering laws; further assurances on collateral matters; ECP guarantor/keepwell and reserve reports.

Negative Covenants:

Negative covenants, applicable to the Borrower and its restricted subsidiaries, subject to customary exceptions, baskets and materiality qualifiers to be agreed and otherwise consistent with the Documentation Principles, including:

(a) incurrence of debt, with exceptions for, among other things, (i) the Revolving Facility (including any Incremental Increase), (ii) capital lease arrangements up to a cap to be agreed, (iii) the Genesis Pipeline Dropdown Transactions, (iv) non-speculative hedging and swap arrangements, including, without limitation, in respect of interest rate protection, commodity hedging, or currency exchange and (v) Specified Additional Debt in an aggregate principal amount not to exceed $150,000,000, but subject to pro forma compliance with the financial covenants, no default, event of default or Borrowing Base Deficiency existing at the time or resulting from the incurrence thereof, the maturity of such debt being at least 180 days after the Maturity Date, there being no scheduled amortization or principal payments before 180 days after the Maturity Date, no restrictions on the ability of the Borrower and its restricted subsidiaries to guarantee the Revolving Facility, no covenants (other than financial maintenance covenants) or events of default that are more onerous, taken as a whole than those in the Revolving Facility, no financial maintenance covenants that are more onerous that those in the Revolving Facility, no mandatory prepayment or redemption in priority to the Revolving Facility, no prohibition on prior repayment of the Revolving Facility, and  a reduction in Borrowing Base in the manner described in section above with the heading titled "Borrowing Base";

(b) liens, which shall permit, among other things, liens (i) created under the Revolving Facility Documentation (including those liens securing the Revolving Facility, the Guarantees, any Hedging Arrangements and any Treasury Arrangements), (ii) in respect of the Genesis Pipeline Dropdown Transactions, and (iii) in respect of purchase money or capital lease arrangements up to a cap to be agreed;

(c) fundamental changes;

(d) asset sales and early monetization or early termination of any hedge or swap positions relied on by the Lenders (as determined by the Administrative Agent) in determining the Borrowing Base, which shall permit, among other things, (i) asset sales or dispositions of Borrowing Base Properties (or subsidiaries or affiliates which own or lease Borrowing Base Properties) and early monetization or early termination of any hedge or swap positions relied on by the Lenders (as determined by the Administrative Agent) in determining the Borrowing Base, in each case, subject only to Adjustments, and compliance with the mandatory prepayment provisions of the Revolving Facility Documentation to the extent any Borrowing Base Deficiency results therefrom; (ii) sales or dispositions of any assets that are not Borrowing Base Properties ("***Non-Borrowing Base Properties***") without limit (provided that during the continuation of an Event of Default or Borrowing Base Deficiency, 100% of the net proceeds of such disposition shall be used to pay any outstanding Revolving Loans), including, without limitation, any oil and gas properties not included in the Borrowing Base and any subsidiaries or affiliates which own or lease oil and gas properties not included in the Borrowing Base; provided that all proved oil and gas properties included in the Reserve Report for which the most recent Borrowing Base has been established and all commodity hedge contracts entered into on or prior to the date on which the most recent Borrowing Base has been established shall be deemed to have been included in the determination of the then existing Borrowing Base and (iii) other asset sales or dispositions of other assets under specified baskets to be set forth in the RBL Facility Documentation;

(e) investments, which shall permit (i) investments consisting of acquisitions, farm-outs, farm-ins, and similar joint ventures without limit; (ii) other investments under specified baskets to be set forth in the Revolving Facility Documentation and (ii) loans and advances; provided no limitation on intercompany investments among Credit Parties or permitted acquisitions (subject to compliance with guarantee and collateral requirements described below, if applicable);

(f) dividends or distributions on, or redemptions of, Borrower capital stock;

(g) exchanges, prepayments or redemptions in respect of indebtedness;

(h) limitations on negative pledges and limitations on the

prohibition of subsidiary distributions;

(i) commodity hedging that does not exceed the limits set forth under "Commodity Hedging" below;

(j) transactions with affiliates;

(k) change in nature of business; and

(l) use of proceeds.

Financial Covenants:

Limited to the following:

(i) a maximum ratio of Consolidated Total Debt to Consolidated EBITDAX for the most recently completed four fiscal quarter period not to exceed 3.50 to 1.0 and (ii) a minimum ratio of Consolidated Current Assets to Consolidated Current Liabilities as of the most recently completed fiscal quarter of 1.0 to 1.0.

The financial covenants will be tested in accordance with GAAP as in effect on the Conversion Date with respect to the Borrower and its restricted subsidiaries on a consolidated basis beginning with the last day of the fiscal quarter of the Borrower and thereafter will be tested as of the last day of each fiscal quarter ended thereafter for which financial statements are delivered.

Commodity Hedging:

Commodity hedging arrangements shall be with (i) any Lender or any affiliate of a Lender or (ii) an Approved Counterparty, shall not be for speculative purposes and shall be limited to no more than 85% of the reasonably anticipated forecasted production from the proved oil and gas properties of the Credit Parties (based on the most recent Reserve Report) for the period not exceeding 60 months from the date such hedging arrangement is created (collectively, the "***Ongoing Hedges***"); <u>provided</u> that, in addition to the Ongoing Hedges, in connection with a proposed acquisition (each, a "***Proposed Acquisition***") by a Credit Party of oil and gas properties, the Credit Parties may also enter into incremental hedging contracts from and after the date on which such Credit Party signs a definitive acquisition agreement in connection with a Proposed Acquisition (but not earlier than 90 days prior to the anticipated closing date of the Proposed Acquisition) with respect to the reasonably anticipated forecasted production from the oil and gas reserves attributable to such Proposed Acquisition (based on the Borrower's internal engineering reports) having notional volumes not in excess of 70% of such projected production for a period not exceeding 36 months from the date such hedging arrangement is created; *provided further* that if the

Proposed Acquisition has not been consummated within 90 days after such definitive acquisition agreement was executed (or such longer period as to which the Administrative Agent may agree) or if the Proposed Acquisition terminates or is terminated, then within 15 days after the earlier of such 90 day period (or longer) or such termination, the Borrower shall novate, unwind or otherwise dispose of such incremental hedging contracts to the extent necessary to be in compliance with the hedging covenants concerning Ongoing Hedges.

It is understood that for purposes hereof, the following hedging agreements shall not be deemed speculative or entered into for speculative purposes: (a) any commodity hedging agreement intended, at inception of execution, to hedge or manage any of the risks related to existing and or forecasted oil and gas production (based on the most recently delivered Reserve Report) of the Borrower or its restricted subsidiaries (whether or not contracted) and (b) any hedging agreement intended, at the time of execution, (i) to hedge or manage the interest rate exposure associated with any debt securities, debt facilities or leases (existing or forecasted) of the Borrower or its restricted subsidiaries, (ii) for foreign exchange or currency exchange management, (iii) to manage commodity portfolio exposure associated with changes in interest rates or (iv) to hedge any exposure that the Borrower or its restricted subsidiaries may have to counterparties under other hedging agreements such that the combination of such hedging agreements is not speculative taken as a whole.

The Credit Parties shall provide evidence satisfactory to the Administrative Agent of the Credit Parties having entered into commodity swap agreements, collar agreements or put agreements (whether deferred premium or fully-paid) with Approved Counterparties hedging notional volumes of crude oil covering not less than (i) if the Conversion Date occurs on or prior to December 31, 2020, 65% of the reasonably anticipated production of such crude oil constituting proved, developed, producing oil and gas properties for the Initial Measurement Period as such anticipated production is set forth in the Initial Reserve Report by no later than December 31, 2020, (ii) 17.5% of the reasonably anticipated production of crude oil constituting proved, developed, producing oil and gas properties for the period of 12 consecutive calendar months following the Initial Measurement Period by no later than December 31, 2020 and (iii) 35% of the reasonably anticipated production of crude oil constituting proved, developed, producing oil and gas properties for the period of 12 consecutive calendar months following the Initial Measurement Period, as such anticipated production is set forth in the Initial Reserve Report by the later of (A) 60 days following the Conversion Date and (B) December 31, 2020;

*provided* that, such swap, collar or put agreements (whether deferred premium or fully-paid) shall have effective floor prices of not less than the lesser of (x) the prices set forth in JPMCB's price deck or (y) the NYMEX strip price less 10%, in each case, for the applicable maturity dates of such hedges as of the date such swap, collateral or put agreement (whether deferred premium or fully-paid) is entered into.

Events of Default:

Events of default, subject to customary exceptions, grace/cure periods, and materiality qualifiers to be agreed and otherwise consistent with the Documentation Principles, including: nonpayment of principal, interest or other amounts (subject, in the case of non-principal nonpayments, to a 3-business day grace period); violation of covenants (subject, in the case of certain affirmative covenants, to a 30-day grace period); inaccuracy of representations and warranties in any material respect; cross-payment default and cross-acceleration of material indebtedness in excess of $50,000,000; bankruptcy events; judgments in excess of $50,000,000; ERISA events; actual or asserted revocation or invalidity of Guarantees or Collateral documents; and change of control.

Voting:

Amendments and waivers of the Revolving Facility Documentation for the Revolving Facility will require the approval of Lenders holding more than 50% of the aggregate amount of the commitments then outstanding under the Revolving Facility (the "***Majority Lenders***"), except that:

(i) the consent of each Lender directly and adversely affected thereby shall be required with respect to: (A) increases in the commitment of such Lender, (B) reductions of principal, interest or fees owing to such Lender (or any extension or postponement of such payments), and (C) extensions or postponement of the Maturity Date,

(ii) the consent of 100% of Lenders will be required with respect to releases of all or substantially all of the value of the Guarantees or releases of liens on all or substantially all of the Collateral (other than in connection with any sale of Collateral or the release or sale of the relevant guarantor permitted by the Revolving Facility),

(iii) the consent of 100% of the Lenders will be required with respect to modifications to any of the voting percentages or such modifications that would alter the ratable allocation / priority of payments to the holders of the Obligations,

(iv) the consent of 100% of the Lenders will be required with respect to increases in the Borrowing Base and to certain

provisions related to adjustment to the Borrowing Base,

(v) the consent of 100% of the Lenders will be required with respect to amendments, modifications or waivers of any provisions in the Revolving Facility substantially equivalent to the provisions of Sections 13.17 and 13.22 of the Existing RBL Credit Agreement,

(vi) the consent of Lenders holding not less than 66⅔% of the aggregate amount of the commitments then outstanding under the Revolving Facility (the "***Required Lenders***") will be required in the case of decreases in, or reaffirmations of, the Borrowing Base; and

(vii) customary protections for the Administrative Agent, the Issuing Lender and the Swingline Lender will be provided.

The Revolving Facility contains customary provisions permitting the Borrower to replace non-consenting Lenders in connection with amendments and waivers requiring greater than a Majority Lender or Required Lender vote or the consent of all Lenders or of all Lenders directly affected thereby so long as the Majority Lenders shall have consented thereto.

The Revolving Facility also contains usual and customary provisions regarding "Defaulting Lenders".

The Revolving Facility shall include provisions substantially equivalent to the provisions of Sections 13.17 and 13.22 of the Existing RBL Credit Agreement, with such modifications to be mutually agreed upon.

<u>Cost and Yield Protection:</u>

Usual for facilities and transactions of this type, with provisions protecting the Lenders from withholding tax liabilities; <u>provided</u> that requests for additional payments due to increased costs from market disruption shall be limited to circumstances generally affecting the banking market or when Majority Lenders have made such a request.  The Revolving Facility shall contain provisions regarding the timing for asserting a claim under these provisions and permitting the Borrower to replace a Lender who asserts such claim without premium or penalty.

<u>Assignments and Participations:</u>

The Lenders are permitted to assign Loans and RBL Commitments with the consent of the Borrower (not to be unreasonably withheld or delayed); <u>provided</u> that no consent of the Borrower shall be required after the occurrence and during the continuance of a payment or bankruptcy event of default (with respect to any Credit Party).  All assignments will require the consent of the Administrative Agent, the

Swingline Lender and the Issuing Lender (in each case, not to be unreasonably withheld or delayed).  No assignments or participations shall be made to (i) natural persons, (ii) the Borrower or its subsidiaries, or (iii) Industry Competitors (to be defined in the Revolving Facility Documentation in a manner to be agreed, which definition shall in any event be limited to oil and gas companies that are competitors of, and have primary oil and gas exploration and production operations within the same geographical basins as, the Borrower).  Each assignment will be not less than $5,000,000 (and increments of $1,000,000 in excess thereof) or, if less, all of such Lender's remaining loans and commitments of the applicable class.  The Administrative Agent shall receive a processing and recordation fee of $3,500 for each assignment (unless waived by the Administrative Agent).

The Lenders are permitted to sell participations in the Revolving Facility without restriction, other than as set forth in the next sentence, and in accordance with applicable law.  Voting rights of participants, as among the applicable Lender and the participant, shall be limited to matters in respect of (a) increases in commitments participated to such participants, (b) reductions of principal, interest or fees, (c) extensions of the Maturity Date and (d) releases of all or substantially all of the value of the Guarantees or all or substantially all of the Collateral.

Expenses and Indemnification:

The Borrower shall pay all reasonable and documented out-of-pocket expenses of the Administrative Agent and the Joint Lead Arrangers in connection with the syndication of the Revolving Facility and the preparation, execution, delivery, administration, amendment, waiver or modification and enforcement of the Revolving Facility Documentation (including the reasonable and documented fees and expenses of a single outside counsel identified herein and of a single firm of local counsel in each appropriate jurisdiction or otherwise retained with the Borrower's consent).

The Borrower will indemnify and hold harmless the Administrative Agent, the Joint Lead Arrangers and the Lenders and their respective affiliates, and the officers, directors, employees, agents, controlling persons, members and the successors of the foregoing (each, an "*Indemnified Person*") from and against any and all losses, claims, damages and liabilities of any kind or nature (regardless of whether any such Indemnified Person is a party thereto and whether any such proceeding is brought by the Borrower or any other person) in connection with the transactions contemplated hereby or arising under the Revolving Facility Documentation and all reasonable and documented out-of-pocket fees and expenses incurred in connection with

investigating or defending any of the foregoing, including, without limitation, reasonable and documented fees, disbursements and other charges of one firm of outside counsel for all Indemnified Persons, taken as a whole, and, if necessary, a single firm of local counsel in each appropriate jurisdiction for all Indemnified Persons, taken as a whole (unless representation of all such Indemnified Persons in such matter by a single counsel would be inappropriate due to the existence of an actual or reasonably perceived conflict of interest in which case each such affected Indemnified Person may, with your consent (not to be unreasonably withheld or delayed), retain its own counsel and you shall be required to reimburse such Indemnified Person(s) for the reasonable and documented out-of-pocket legal fees and expenses of such additional counsel); underlined provided that no Indemnified Person will be indemnified for any losses, claims, damages, liabilities or related expenses to the extent that they have resulted from (i) the bad faith, willful misconduct or gross negligence of such Indemnified Person, including any of such Indemnified Person's affiliates or any of its or their respective officers, directors, employees, agents, controlling persons, members or the successors of any of the foregoing, (as determined by a court of competent jurisdiction in a final and non-appealable decision), (ii) a material breach (or, in the case of a proceeding brought by the Borrower, a breach) of the obligations of such Indemnified Person (or any of such Indemnified Person's affiliates or any of its or their respective officers, directors, employees, agents, controlling persons, members or the successors of any of the foregoing) or (iii) any proceeding not arising from any act or omission by the Borrower or its affiliates that is brought by an Indemnified Person against any other Indemnified Person (other than disputes involving claims against the Joint Lead Arrangers or Administrative Agent in its capacity as such).

<u>DIP to Exit Conversion:</u>

On the Conversion Date, (the following clauses (i) through (iv), collectively, the "***DIP Debt Conversion***"): (i) all "DIP Loans" under and as defined in that certain DIP Term Sheet attached hereto as <u>Exhibit A</u> (the "***DIP Term Sheet***") that are outstanding as of such date and any Pre-Petition Secured Indebtedness (as defined in the DIP Term Sheet) that was not converted into the DIP Facility shall, in each case, be automatically converted on a dollar-for-dollar basis for Revolving Loans under the Revolving Facility, (ii) all outstanding "DIP Letters of Credit" (as defined in the DIP Term Sheet) shall be deemed to be issued as Letters of Credit under the Revolving Facility, (iii) all outstanding "DIP Hedges" (as defined in the DIP Term Sheet) with a Lender or an affiliate of a Lender under the DIP Facility shall be deemed to be included in the Revolving Facility, and the Credit Parties shall receive credit therefor for purposes of

satisfying the minimum hedging requirements set forth herein (but solely to the extent satisfying the conditions in the section titled "Commodity Hedging" herein), and (iv) all outstanding treasury management arrangements with a Lender or an affiliate of a Lender under the DIP Facility shall be deemed to be included in the Revolving Facility. Upon payment in full of the DIP Obligations (as defined in the DIP Term Sheet, including all or in part as a result of the DIP Debt Conversion (as defined therein)), the DIP Facility will terminate and be superseded and replaced in its entirety by the Revolving Facility.

Governing Law and Forum:                    New York.

Counsel to the Administrative Agent:        Vinson & Elkins L.L.P.

<u>**ANNEX I**</u>

| | |
|---|---|
| <u>Interest Rates:</u> | The Borrower may elect that the Revolving Loans comprising each borrowing bear interest at a rate per annum equal to: (i) ABR plus the Applicable Margin or (ii) LIBOR plus the Applicable Margin. |

The Borrower may elect interest periods of 1, 2, 3 or 6 months (or, if available to all relevant Lenders, 12 months or a shorter period (including 1 week or 2 weeks)) for LIBOR borrowings.

Calculation of interest shall be on the basis of the actual days elapsed in a year of 360 days (or 365 or 366 days, as the case may be, in the case of ABR Loans based on the prime rate) and interest shall be payable at the end of each interest period and, in any event, at least every 3 months.

"***ABR***" means the Alternate Base Rate, which is the highest of the Administrative Agent's Prime Rate, the Federal Funds Effective Rate plus 1/2 of 1.0% and one-month LIBOR plus 1.0%.

"***LIBOR***" means the London interbank offered rate for dollars, subject to a 1.0% floor.

"***Applicable Margin***" means for any day, with respect to any LIBOR or ABR borrowing or with respect to any Unused Commitment Fee, the applicable rate per annum set forth below.

| Borrowing <br> Base Usage | Unused <br> Commitment Fee | Applicable Margin | |
|---|---|---|---|
| | | ABR Loans | LIBOR Loans |
| X $\leq$ 25% | 0.500% | 2.00% | 3.00% |
| > 25% X $\leq$ 50% | 0.500% | 2.25% | 3.25% |
| > 50% X $\leq$ 75% | 0.500% | 2.50% | 3.50% |
| > 75% X $\leq$ 90% | 0.500% | 2.75% | 3.75% |
| X > 90% | 0.500% | 3.00% | 4.00% |

"***Borrowing Base Usage***" means, as of any date and for all purposes, the quotient, expressed as a percentage, of (i) Total Outstandings divided by (ii) the Borrowing Base.

| | |
|---|---|
| <u>Letters of Credit Fees:</u> | A per annum fee equal to the Applicable Margin then in effect for LIBOR borrowings will accrue on the aggregate face amount of outstanding Letters of Credit, payable in arrears at the end of each quarter and upon the termination of the Revolving Facility, in each case for the actual number of days elapsed over a 360-day year.  Such fees shall be distributed to the Lenders pro rata in accordance with the amount of each such Lender's RBL Commitment.  In addition, the Borrower shall pay to the Issuing Lender, for its own account, (a) a fronting fee equal to 0.125% per annum of the aggregate face amount of outstanding Letters of Credit or such other amount as may be agreed by the Borrower and the Issuing Lender, payable in arrears at the end of each quarter and upon the termination of the Revolving Facility, calculated based upon the actual number of days elapsed over a 360-day year, and (b) customary issuance |

and administration fees to be mutually agreed.

<u>Commitment Fees:</u>
The Borrower will pay a fee (the "***Commitment Fee***"), in an amount computed on a daily basis equal to the Revolving Loan Limit less the Total Outstandings on each day, multiplied by the applicable percentage specified as the "Unused Commitment Fee" in the table set forth under the definition of "Applicable Margin" corresponding to the Borrowing Base Usage as of the end of such day.  The Commitment Fee is payable quarterly in arrears commencing after the Conversion Date.

<u>Upfront Fees:</u>
20.0 bps per year (for the period commencing on the Conversion Date and ending on the Maturity Date) for the Lenders, payable on each Lender's final allocation of its RBL Commitment.

## Exhibit B

### DIP Term Sheet

[See attached.]

## DENBURY RESOURCES INC.

### $615,000,000 Senior Secured Super Priority Debtor-in-Possession Revolving Credit Facility
### Summary of Principal Terms and Conditions

Unless specifically defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the Amended and Restated Credit Agreement dated as of December 9, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date (as defined below), the "***Pre-Petition Credit Agreement***"), among Denbury Resources Inc, a Delaware corporation (the "***Borrower***"), the lenders party thereto (the "***Pre-Petition Lenders***") and JPMorgan Chase Bank, N.A., as administrative agent for the Pre-Petition Lenders (the "***Pre-Petition Agent***").

| | |
|---|---|
| Borrower: | Denbury Resources Inc., a Delaware corporation. |
| Debtors: | The Borrower and each of its direct and indirect subsidiaries (collectively, the "***Debtors***"). |
| Post-Petition Agent / Post-Petition Lenders: | JPMorgan Chase Bank, N.A. ("***JPMCB***") in its capacity as administrative agent and collateral agent (in such capacities, the "***Post-Petition Agent***") in respect of the DIP Facility (as hereinafter defined) for the Pre-Petition Lenders under the Pre-Petition Credit Agreement participating in the DIP Facility (together with JPMCB, the "***Post-Petition Lenders***). To the extent that all of the Pre-Petition Lenders participate in the Post-Petition Credit Agreement, their respective commitments thereunder will be in accordance with their pro rata commitments under the Pre-Petition Credit Agreement as in effect immediately prior to the Petition Date. |
| Joint Bookrunners and Lead Arrangers: | JPMCB, Bank of America, N.A., Wells Fargo Securities, LLC and Capital One, National Association, in their respective capacities as joint lead arrangers (in such capacities, the "***Joint Lead Arrangers***") for the DIP Facility. |
| Co-Syndication Agents: | Bank of America, N.A. and Wells Fargo Bank, National Association. |
| Co-Documentation Agents: | Canadian Imperial Bank of Commerce, New York Branch, Comerica Bank, Credit Suisse AG, Cayman Islands Branch, Royal Bank of Canada and ABN AMRO Capital USA LLC. |
| Venue: | Debtors will file a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***", and the date the Debtors' bankruptcy cases (the "***Chapter 11 Cases***") are commenced, the "***Petition Date***"). |
| DIP Facility: | A priming senior secured super priority debtor-in-possession revolving credit facility of up to $615,000,000 (such amount, the "***Maximum Credit Amount***", such facility the "***DIP*** |

*Facility*", and the commitments under such DIP Facility, the "*DIP Commitments*"), consisting of (a) the Roll-Up Amount (as defined below) upon entry of the Interim Order and the Final Order (as each term is defined below), as the case may be and (b) new money commitments in an aggregate amount not to exceed the difference of $614,000,000 <u>minus</u> the Roll-Up Amount (this clause (b), the "*New Money DIP Commitment*"). Upon entry of the Interim Order and on the Closing Date, the DIP Commitments will be an amount equal to $614,000,000.

Until the entry of the Final Order, a maximum amount of up to $25,000,000 (the "*New Money Interim Cap*") will be available to be drawn from the New Money DIP Commitments on an interim basis.  The actual amounts available to be borrowed under the DIP Facility will be subject to the conditions set forth in this DIP Term Sheet.

The loans (including the deemed issuance of any Roll-Up Loans (as defined below)) under the DIP Facility are collectively referred to as "*DIP Loans*".

(a) Upon entry of the Interim Order, (i) all outstanding Pre-Petition Letters of Credit (as defined below) issued by any Pre-Petition Lender (to the extent it is a Post-Petition Lender) shall be deemed to be issued as DIP Letters of Credit (as defined below) under the DIP Facility and shall constitute obligations due under the DIP Facility (the "*Roll-Up Letters of Credit*") and (ii) a portion of the principal amount of the outstanding Pre-Petition Loans (as defined below) held by the Pre-Petition Lenders (to the extent they are Post-Petition Lenders) in an amount equal to $185,000,000 shall be deemed to be refinanced under the DIP Facility as a DIP Loan ratably based on the Post-Petition Lenders' allocation of the DIP Commitment and shall constitute obligations due under the DIP Facility (the "*Interim Roll-Up Loans*"), and (b) upon entry of the Final Order, the remaining principal amount of all outstanding Pre-Petition Loans not rolled-up pursuant to the foregoing clauses (a)(ii) that are held by the Pre-Petition Lenders (to the extent they are Post-Petition Lenders), other than $1,000,000 of Pre-Petition Loans (the "*Retained Pre-Petition Claim*"), shall be deemed to be refinanced under the DIP Facility as a DIP Loan ratably based on the Post-Petition Lenders' allocation of the DIP Commitment and shall constitute obligations due under the DIP Facility (the "*Final Roll-Up Loans*", and together with the Interim Roll-Up Loans, the "*Roll-Up Loans*") (the aggregate amount under the foregoing clauses (a) and (b), the "*Roll-Up Amount*").  Any unpaid interest and fees due in respect of the Pre-Petition Secured Indebtedness described in the above clauses (a) and (b) as of the date of the Interim Order shall also be rolled into the DIP Facility and deemed to constitute obligations due under the DIP Facility.

The DIP Facility will be more fully described and documented in the Financing Orders (as defined below) and a senior secured super priority debtor-in-possession credit agreement entered into by and among the Debtors, the Post-Petition Agent and the Post-Petition Lenders, in each case, which must be in form and substance acceptable to the Borrower, the Post-Petition Agent and the Post-Petition Lenders (the "***Post-Petition Credit Agreement***").

The closing date of the DIP Facility is hereinafter referred to as the "***Closing Date***".

**Pre-Petition Secured Indebtedness:**   All indebtedness and other obligations under the Pre-Petition Credit Agreement and Credit Documents (as defined in the Pre-Petition Credit Agreement), comprised of (collectively, the "***Pre-Petition Secured Indebtedness***"): (a) 100% of the principal amount of the outstanding "Loans" (as defined in the Pre-Petition Credit Agreement) (such outstanding loans, the "***Pre-Petition Loans***"), (b) 100% of the "Letters of Credit Outstanding" (as defined in the Pre-Petition Credit Agreement) (such outstanding letters of credit, the "***Pre-Petition Letters of Credit***"), and (c) any obligations owing under any treasury and cash management arrangements that are entered into prior the Petition Date with any Pre-Petition Lender or any affiliate of a Pre-Petition Lender.

**Pre-Petition Hedges:**   Any obligations owing by the Debtors under any hedging transactions that were entered into prior to the Petition Date by the Debtors with a counterparty that is a Pre-Petition Lender or any affiliate of a Pre-Petition Lender (collectively, the "***Pre-Petition Hedges***").

**Purpose / Use of Proceeds:**   All proceeds of DIP Loans shall be used to, among other things, (a) pay fees, interest, and expenses associated with the DIP Facility, (b) provide for the ongoing working capital and capital expenditure needs of the Debtors during the pendency of the Chapter 11 Cases strictly in accordance with the Budget (as updated from time to time as set forth herein), subject to the Permitted Variances (as defined below), including to pay obligations under any DIP Hedges as they become due, (c) fund the adequate protection payments as authorized by the Bankruptcy Court in the Financing Orders, (d) fund the costs of the administration of the Chapter 11 Cases (including the Carve Out (as defined below)) strictly in accordance with the Budget (as updated from time to time as set forth herein), subject to the Permitted Variances, and (e) to refinance the portion of the Pre-Petition Secured Indebtedness constituting the Roll-Up Amount (which, for the avoidance of doubt, does not include the Retained Pre-Petition Claim).

DIP Letters of Credit shall be used by the Borrower and its subsidiaries for general corporate purposes, including, without

limitation, to secure bids, tenders, bonds and contracts entered into in the ordinary course of the Debtors' business and to support deposits required under purchase agreements pursuant to which the Borrower or one or more subsidiaries may acquire oil and gas assets (in each case, to the extent such transactions are permitted under the Post-Petition Credit Agreement and so long as issued strictly in accordance with the Budget, as updated from time to time as set forth herein and subject to the Permitted Variances).

Availability:

So long as the Total Outstandings (as defined below) do not exceed the lesser of (i) the DIP Loan Limit (as defined below) and (ii) the amount then authorized by any Financing Order: (A) DIP Loans will be available to be made at any time (on same day notice in the case of ABR (as defined in Annex I) Loans) prior to the Maturity Date (as defined below), in minimum principal amounts of $1,000,000 or increments of $100,000 in excess thereof, (B) DIP Letters of Credit will be issued and renewed as described in the section entitled "Letters of Credit" below and (C) amounts repaid under the DIP Facility may be reborrowed.

"***Total Outstandings***" means, at any time, the aggregate principal amount of the DIP Loans then outstanding plus the aggregate stated amount of all issued but undrawn DIP Letters of Credit and, without duplication, all unreimbursed disbursements on any DIP Letter of Credit as of such date (unless cash collateralized or backstopped pursuant to arrangements reasonably acceptable to the Issuing Lender (as hereinafter defined)).

"***DIP Loan Limit***" means, the least of (i) the DIP Commitments, (ii) the Borrowing Base (as hereinafter defined), less the amount of any Carve-Out Reserve (as defined on Annex II hereto) and (iii)  the Maximum Credit Amount.

Borrowing Base:

The borrowing base for the DIP Facility will be based on the loan value of the Debtors' proved oil and gas reserves as reflected in a Reserve Report (as hereinafter defined) and other oil and gas properties of the Debtors, in each case located within the geographic boundaries of the United States or the outer continental shelf adjacent to the United States, determined in accordance with the terms set forth below (the "***Borrowing Base***").

The Borrowing Base as of the Closing Date will be $615,000,000 based on the reserve report as of December 31, 2019 delivered under, and pursuant to the terms of, the Pre-Petition Credit Agreement (the "***Initial Reserve Report***") and will remain at such level until the next re-determination date, which re-determination date shall be subject to adjustment as set forth in the Post-Petition Credit Agreement.  The Borrowing

Base shall be re-determined on January 1, 2021 and July 1, 2021 (or, in each practicable case, such date reasonably practicable thereafter), based upon a reserve report prepared as of the immediately preceding September 30, 2020 (with regard to the January 1, 2021 redetermination) and December 31, 2020 (with regard to the July 1, 2021 redetermination), and delivered on or before December 1, 2020 (with regard to the January 1, 2021 redetermination) and June 1, 2021 (with regard to the July 1, 2021 redetermination) (each such reserve report, together with the Initial Reserve Report, each a "***Reserve Report***"), and other related information, if any, required to be delivered to the Post-Petition Agent in accordance with the Post-Petition Credit Agreement.  Each Reserve Report shall be in form and substance reasonably satisfactory to the Post-Petition Agent. The Reserve Report prepared as of September 30, 2020 shall be prepared by or under the supervision of the chief engineer of the Borrower who shall certify such Reserve Report to be true and accurate in all material respects and to have been prepared in accordance with procedures used in the Initial Reserve Report. The Reserve Report prepared as of December 31, 2020 shall be prepared by (a) DeGolyer and MacNaughton, (b) Netherland, Sewell & Associates, Inc., (c) Cawley, Gillespie & Associates, Inc., (d) Ryder Scott Company, L.P., or (e) at the Borrower's election, such other independent petroleum engineering firm reasonably acceptable to the Post-Petition Agent.

The Borrowing Base shall be proposed by the Post-Petition Agent and approved by all of the Post-Petition Lenders (in the case of increases) or the Required Post-Petition Lenders (as hereinafter defined) (in the case of decreases or reaffirmation) as provided below.  Each determination of the Borrowing Base shall be made by the Post-Petition Agent and, (i) to the extent any determination represents an increase in the Borrowing Base in effect immediately prior to such determination, all of the Post-Petition Lenders, and (ii) to the extent any determination represents a decrease in or reaffirmation of the Borrowing Base in effect immediately prior to such determination, the Required Post-Petition Lenders, in each case, in their respective sole discretion, but in good faith in accordance with their respective usual and customary oil and gas lending criteria as they exist at the particular time and as specified in the DIP Facility Documentation; underline provided that no Post-Petition Lender shall be required to increase its commitment amount under the DIP Facility in connection with an increase in the Borrowing Base.

To the extent any re-determination represents an increase in the Borrowing Base in effect immediately prior to such re-determination, such Borrowing Base will be the largest amount approved by all of the Post-Petition Lenders, and to the extent any re-determination represents a decrease in, or reaffirmation of, the Borrowing Base in effect prior to such re-determination,

6

such Borrowing Base will be the largest amount approved by the Required Post-Petition Lenders.

Interest Rates and Fees:    As set forth on Annex I attached hereto.

Default Rate:    With respect to overdue principal, the applicable interest rate plus 2.00% per annum, and with respect to any other overdue amount, including overdue interest, the interest rate applicable to ABR Loans plus 2.00% per annum.

Letters of Credit:    A portion of the DIP Facility in an aggregate amount not to exceed $100,000,000 (as may be increased solely with the consent of the Post-Petition Agent and the Issuing Lender) will be available to the Debtors for the purpose of issuing standby letters of credit (the "**DIP Letters of Credit**").  DIP Letters of Credit will be issued by JPMCB or any of its affiliates (the "**Issuing Lender**").  For the avoidance of doubt, upon entry of the Interim Order, all outstanding Pre-Prepetition Letters of Credit issued by any Pre-Petition Lender (to the extent it is a Post-Petition Lender) shall be deemed to be issued as DIP Letters of Credit under the DIP Facility and shall constitute obligations due under the DIP Facility.

Drawings under any DIP Letter of Credit shall be reimbursed by the Borrower (whether with its own funds or with the proceeds of borrowings under the DIP Facility) within one business day after notice of such drawing is received by the Borrower from the Issuing Lender.  To the extent that the Borrower does not reimburse the Issuing Lender within the time period specified above, the Post-Petition Lenders under the DIP Facility shall be irrevocably obligated to reimburse the Issuing Lender pro rata based upon their respective DIP Commitments.

Final Maturity:    All commitments of the Post-Petition Lenders under the DIP Facility shall terminate at the earliest of (herein, a "**Post-Petition Default**", and the earliest of which, the "**Maturity Date**"):  (a) the date which is twelve (12) months after the Petition Date; (b) the consummation of a sale of all or substantially all of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code; (c) the effective date of any plan of reorganization; (d) the entry of an order for the conversion of any of the Debtors' bankruptcy cases to a case under Chapter 7 of the Bankruptcy Code; (e) the entry of an order for the dismissal of any of the Debtors' bankruptcy cases; (f) the date of acceleration of the DIP Obligations and the termination of the DIP Commitments upon and during the continuance of an Event of Default, in accordance with the DIP Facility Documentation; (g) thirty-five (35) days after the Petition Date, if the Final Order has not been entered by such date (which date may be extended with the prior written consent of the Post-Petition Agent); or (h) appointment of a chapter 11 trustee in

any of the Chapter 11 Cases.

<u>DIP Obligations / Guarantees:</u>

All obligations of the Debtors under (i) the DIP Facility and the DIP Facility Documentation, but excluding, for the avoidance of doubt, the Retained Pre-Petition Claim, (ii) (a) any amounts owing by the Debtors under any Pre-Petition Hedges with a counterparty that is a Pre-Petition Lender or any affiliate of a Pre-Petition Lender, in either case in respect of which such Pre-Petition Lender or affiliate thereof enters into, within 30 days after the Petition Date (at the expense of the Debtors, which shall pay each counterparty's out of pocket legal expenses), (1) an amended and restated Schedule to the ISDA Master Agreement (a "***Post-Petition ISDA Schedule***") between the applicable Debtor and the applicable counterparty that is mutually acceptable to the parties, providing among other things, that such counterparty shall not terminate such Pre-Petition Hedges during the pendency of the Chapter 11 Cases solely as a result of a termination event or event of default under the Pre-Petition Hedges that occurred and/or existed on the Petition Date as a result of the filing of the Chapter 11 Cases, the insolvency of any Debtor or any default or event of default (howsoever defined) relating to pre-petition indebtedness of any Debtor and (2) contemporaneously with entering into the Post-Petition ISDA Schedule, a further amended and restated ISDA Schedule that will automatically replace the Post-Petition ISDA Schedule upon effectiveness of the Exit Credit Facility so long as the Exit Credit Facility conforms in all applicable material respects with the Exit Credit Facility Term Sheet and subject to conditions to be mutually agreed to by the parties in the Post-Petition ISDA Schedule and (b) any post-petition hedging transaction with a Post-Petition Lender or an affiliate of a Post-Petition Lender, in each case, to the extent permitted under the Financing Orders (including hedging orders) (all hedges in this clause (ii), the "***DIP Hedges***") and (iii) treasury and cash management arrangements that are entered into prior to or after the Petition Date with any Post-Petition Lender or any affiliate of a Post-Petition Lender (all obligations described in the foregoing clauses (i) through (iii), the "***DIP Obligations***") will, in each case, be unconditionally guaranteed jointly and severally (the "***Guarantees***") by each of the Debtors (other than the Borrower).

<u>Adequate Protection Payments and Liens:</u>

As adequate protection of the interests of the Pre-Petition Lenders as a result of the DIP Facility advances, use of cash collateral and other collateral or the imposition of the automatic stay to the extent of any post-petition diminution in value of the Pre-Petition Lenders' collateral, the Pre-Petition Lenders will receive, subject and junior to the Carve Out: (a) valid and automatically perfected first-priority replacement liens and security interests in and upon the DIP Collateral (as defined below), but junior to the liens and security interests securing the

DIP Facility (the "***Adequate Protection Liens***"), (b) adequate protection payments consisting of cash reimbursement of the reasonable and documented (in summary format) fees, costs, and expenses (including reasonable professional fees) of the Pre-Petition Agent and the Pre-Petition Lenders, and (c) super-priority administrative expense claims under Section 507(b) of the Bankruptcy Code and junior to the Superpriority Claims (as defined below); provided, however, that (x) the Adequate Protection Liens and adequate protection payments described above shall be paid or granted to the extent that the stay under Bankruptcy Code Section 362, use, sale, or lease under Bankruptcy Code 363 of this title, or any grant of a lien under Bankruptcy Code 364 of this title results in a decrease in the value of such entity's interest in such property, and (y) the Adequate Protection Liens and adequate protection payments described above shall not attach to any Avoidance Actions but shall attach to any Avoidance Proceeds, subject to entry of the Final Order.

The Financing Orders shall provide for adequate protection in the form of replacement liens and superpriority claims, financial reporting and rights of access and information, payment of fees and expenses of professionals (as described below) mutually acceptable to the Post-Petition Agent and the Second Lien Notes Trustee for the benefit of the Second Lien Notes Trustee and the Second Lien Ad Hoc Group and all members thereof.

Security:

All DIP Obligations will be secured by (in each case, other than Excluded Assets (as defined below) and subject to Permitted Liens (to be defined in the DIP Facility Documentation) and junior to the Carve Out): (i) superpriority priming liens on all property of the Debtors secured by valid, unavoidable and perfected security interests and liens securing any Pre-Petition Secured Indebtedness or Pre-Petition Hedges as of the Petition Date (the "***Priority Lien***"); (ii) junior liens on any property of the Debtors secured by valid, unavoidable and perfected security interests and liens of any parties (other than the Pre-Petition Lenders) securing any indebtedness (other than the Pre-Petition Secured Indebtedness or Pre-Petition Hedges); and (iii) first-priority liens on all unencumbered assets of the Debtors, (A) including, without limitation, all real and personal property of the Debtors, tangible or intangible, wherever located, including, but not limited to, all cash, bank accounts, accounts receivable, inventory, equipment, patents, trademarks, copyrights, other general intangibles and membership interests that were not, as of the Petition Date, subject to valid, unavoidable and perfected security interests and liens, but (B) excluding any avoidance actions under Chapter 5 of the Bankruptcy Code, whether now existing or hereafter acquired by the Debtors and the Debtors' bankruptcy estates ("***Avoidance Actions***") other than, subject to and effective upon

entry of the Final Order, all proceeds, products, rents, revenues and profits of Avoidance Actions ("***Avoidance Proceeds***") (the foregoing clauses (i) through (iii), the "***DIP Collateral***").

Notwithstanding anything to the contrary herein, DIP Collateral shall not include the following  (collectively, the "***Excluded Assets***"): (a) any Building (as defined in the applicable "Flood Insurance Regulation" or Manufactured (Mobile) Home (as defined in the applicable Flood Insurance Regulation), (b)(i) that certain Pipeline Financing Lease Agreement, dated as of May 30, 2018 (as amended), among Denbury Onshore, LLC and Genesis NEJD Pipeline, LLC, (ii) any interest, title and right that the Debtors have to the "Pipeline System" (as defined in the Pipeline Financing Lease Agreement) (hereinafter referred to as the "***Pipeline System***"), (iii) any proceeds received at any time resulting from the sale or other disposition of all or part of the Debtors' interest, title and right to the Pipeline System, and (iv) all rents, income or related fees or charges for transportation of carbon dioxide or any other substance through the Pipeline System; *provided that*, in the case of this clause (b), such assets shall be excluded solely to the extent that the grant of a security interest therein is prohibited by, or constitutes a breach or default under or results in the termination of or gives rise to a right on the part of the parties thereto other than any Debtor to terminate (or materially modify) or requires any consent under, the subject contract, license, agreement, instrument or other document, except to the extent that the term in such contract, license, agreement, instrument or other document providing for such prohibition, breach, default or right of termination or modification or requiring such consent is ineffective under Sections 9-406, 9-407, 9-408 or 9-409 of the UCC of any relevant jurisdiction or any other applicable law; and (c) any deposit account which is used as an escrow account or fiduciary or trust account and solely maintains cash and cash equivalents made for the benefit of third parties (other than the Debtors) to be used exclusively in the ordinary course of the Debtors' business for royalty obligations, suspense payments, working interest payments, plugging and abandonment, remediation, and similar payments owed or to be made to such third parties (other than the Debtors).

In addition, all DIP Obligations and all amounts owing by the Debtors in respect thereof at all times shall constitute allowed super-priority administrative expense claims, pursuant to Section 364(c) of the Bankruptcy Code, in the bankruptcy cases, having priority over all administrative expenses of the kind specified in, or ordered pursuant to, Sections 503(b) and 507(b) or any other provisions of the Bankruptcy Code, subject and junior only to the Carve Out (the "***Superpriority Claims***"). All of the liens and security interests described above securing

the DIP Obligations and the Adequate Protection Liens shall be effective and perfected as of the Petition Date upon entry of the Interim Order.

All liens and security interests authorized and granted pursuant to Financing Orders entered by the Bankruptcy Court approving the DIP Facility and the Adequate Protection Liens shall be deemed effective and automatically perfected as of the Petition Date, and no further filing, notice or act will be required to effect such perfection by any person. The Post-Petition Lenders, or the Post-Petition Agent on behalf of the Post-Petition Lenders, shall be permitted, but not required, to make any filings, deliver any notices, make recordations, perform any searches or take any other acts as may be desirable under law in order to reflect the security, perfection or priority of the Post-Petition Lenders' liens, security interests, and claims described herein; *provided* that no actions in any non-United States jurisdiction shall be required to be taken and no security agreements or pledge agreements governed under the laws of any non-United States jurisdiction shall be required to be entered into.

|  |  |
|---|---|
| <u>No Surcharge & Marshalling / Equities of the Case Waiver:</u> | In each case, subject to and effective upon entry of the Final Order, the DIP Facility shall provide that (i) no costs or expenses of administration shall be imposed against the Post-Petition Lenders' or the Pre-Petition Lenders' pre-petition or post-petition collateral under Section 506(c) of the Bankruptcy Code or otherwise, and (ii) the Post-Petition Lenders' and the Pre-Petition Lenders' collateral shall not be subject to the doctrine of marshalling or Section 552 of the Bankruptcy Code "equities of the case" arguments. |
| <u>Carve Out:</u> | The Financing Orders shall include a carve out (the "***Carve Out***") substantially consistent with Annex II attached hereto. |

Mandatory Prepayments:            Limited to the following:

(a) If at any time the Total Outstandings exceed the Borrowing Base as a result of scheduled redetermination of the Borrowing Base (a "***Borrowing Base Deficiency***"), the Borrower shall, within three (3) business days after written notice from the Post-Petition Agent to the Borrower of such Borrowing Base Deficiency, prepay the DIP Loans in an amount sufficient to eliminate such Borrowing Base Deficiency (or if no DIP Loans remain outstanding, cash collateralize all unreimbursed disbursements on any DIP Letter of Credit in an amount sufficient to eliminate such Borrowing Base Deficiency); provided that any such Borrowing Base Deficiency must be cured prior to the Maturity Date of the DIP Facility;

(b) If any Borrowing Base Deficiency results from a voluntary termination of DIP Commitments, such deficiency shall be required to be eliminated contemporaneously with and on the date of such termination; and

(c) If, (i) on the first business day after the Closing Date, the Debtors have any Excess Cash (as defined below), when taken as a whole, in excess of $20,000,000 and (ii) on any business day thereafter, the Debtors have any Excess Cash, when taken as a whole, in excess of $75,000,000, in each case, the Borrower shall prepay the DIP Loans within one business day following such date in an amount equal to such excess amount (such excess amount to be paid on the first business day after the Closing Date, if any, the "***Specified Excess Cash Payment***").

"***Excess Cash***" means, as of any date of determination, the difference, if positive, between Consolidated Cash Balance (as defined below) of the Debtors as of such date and Excluded Cash (as defined below) of the Debtors as of such date.

"***Consolidated Cash Balance***" means, as of any date of determination, the aggregate amount of all (a) cash, (b) cash equivalents and (c) any other marketable securities, treasury bonds and bills, certificates of deposit, investments in money market funds and commercial paper, in each case, held or owned by (either directly or indirectly) any Debtor as of such date.

"***Excluded Cash***" means as of any date of determination, (a) any cash collateral required to cash collateralize any DIP Letter of Credit, (b) any cash or cash equivalents constituting purchase price deposits made by or held by an unaffiliated third party pursuant to a binding and enforceable purchase and sale agreement with an unaffiliated third party containing customary provisions regarding the payment and refunding of such deposits, (c) any cash or cash equivalents for which any Debtor

has, in the ordinary course of business, issued checks or initiated wires or ACH transfers in order to utilize such cash or cash equivalents, (d) any cash or cash equivalents set aside to pay payroll, payroll taxes, other taxes, employee wage and benefits payments, and trust and fiduciary obligations or other similar obligations of the Debtors then due and owing to third parties and for which the Debtors have issued checks or initiated wires or ACH transfers (or, in their respective good faith discretion, will issue checks or initiate wires or ACH wires within five business days in order to make such payments), (e) any cash or cash equivalents set aside to pay royalty obligations, working interest obligations, production payments, vendor payments, suspense payments, severance and ad valorem taxes of the Debtors then due and owing to third parties and for which the Debtors have issued checks or initiated wires or ACH transfers (or, in their respective good faith discretion, will issue checks or initiate wires or ACH wires within five business days in order to make such payments) and (f) any cash or cash equivalents in any escrow accounts or fiduciary or trust accounts that are used exclusively in the ordinary course of the Debtors' business for plugging and abandonment, remediation, and similar obligations owed to third parties.

The application of proceeds from mandatory prepayments shall not reduce the aggregate amount of DIP Commitments and amounts prepaid may be reborrowed, subject to availability and the other conditions to borrowing set forth below.

| | |
|---|---|
| <u>Voluntary Prepayments and Reductions in Commitments</u>: | Voluntary reductions of the unutilized portion of the DIP Commitments and voluntary prepayments of outstanding DIP Loans by the Borrower will be permitted at any time, in minimum principal amounts of $500,000 or increments of $100,000 in excess thereof, without premium or penalty, subject to reimbursement of the Post-Petition Lenders' redeployment costs in the case of a prepayment of LIBOR (as defined in Annex I)  Loan other than on the last day of the relevant interest period. |
| <u>Documentation</u>: | The definitive documentation for the DIP Facility, including the Post-Petition Credit Agreement, the Financing Orders, and all other related agreements and documents creating, evidencing, or securing indebtedness or obligations of any of the Debtors to the Post-Petition Agent and the Post-Petition Lenders on account of the DIP Facility or granting or perfecting liens or security interests by any of the Debtors in favor of and for the benefit of the Post-Petition Agent, for itself and for and on behalf of the Post-Petition Lenders, on account of the DIP Facility (the "***DIP Facility Documentation***") shall contain the terms set forth in this DIP Term Sheet and shall otherwise be negotiated in good faith.  The Post-Petition Credit Agreement shall take into account the terms and conditions consistent with |

the Pre-Petition Credit Agreement (as modified to reflect the terms and provisions of this DIP Term Sheet) and subject to (i) materiality qualifications and other exceptions that give effect to, permit, and/or accommodate the DIP Facility Milestones (as defined below), (ii) provisions to reflect (A) the transactions and business operations contemplated by the Budget and (B) the Post-Petition Agent's required agency and other form updates (including with respect to replacement of LIBOR) and (iii) other modifications as mutually agreed by the parties.

<u>Conditions to Closing of DIP Facility and Roll-Up on Closing Date:</u>

Customary for facilities and transactions of this type, the effectiveness of the DIP Facility and the deemed issuance and incurrence of the Roll-Up Letters of Credit and the Interim Roll-Up Loans on the Closing Date shall be subject to the following conditions precedent, including, without limitation:

(a) the entry of an order by the Bankruptcy Court approving a cash management system for the Debtors and other "first day" orders satisfactory to the Post-Petition Agent (it being understood and agreed that drafts approved by counsel to the Post-Petition Agent on or prior to the Closing Date are satisfactory to the Post-Petition Agent);

(b) execution and delivery of satisfactory DIP Facility Documentation;

(c) receipt of satisfactory Budget approved by the Post-Petition Agent in its reasonable discretion;

(d) Bankruptcy Court's entry within three (3) business days of the Petition Date as part of the "first day" orders of an interim order approving the DIP Facility (including the roll-up of the Interim Roll-Up Loans and the Roll-Up Letters of Credit) and use of cash collateral and other arrangements described herein, in form and substance acceptable to the Post-Petition Agent (the "***Interim Order***");

(e) reimbursement of all documented (in summary form) fees and expenses of the Pre-Petition Agent, the Pre-Petition Lenders, the Joint Lead Arrangers and Post-Petition Agent and Post-Petition Lenders payable under the Pre-Petition Credit Agreement or under the DIP Facility Documentation (including the unpaid documented (in summary form) fees and expenses of Vinson & Elkins LLP, Opportune LLP and the other professionals retained by any of the foregoing) that are invoiced to the Borrower at least two (2) Business Days prior to the Closing Date;

(f) all representations and warranties of the Debtors in the Post-Petition Credit Agreement shall be true and correct

in all material respects, and there shall be no default, Event of Default or Post-Petition Default in existence;

(g)    the Post-Petition Agent and the Post-Petition Lenders shall have received, by at least three (3) business days (or such later date as agreed by the Post-Petition Agent in its sole discretion) prior to the Closing Date, "know your customer" and similar information required by bank regulatory authorities that is requested at least eight (8) business days (or such later date as agreed by the Borrower in its sole discretion) prior to the Closing Date;

(h)    receipt of appropriate UCC lien search results for each jurisdiction reasonably requested by the Post-Petition Agent;

(i)    the Petition Date shall have occurred, and each Debtor shall be a "debtor-in-possession" in the Chapter 11 Cases;

(j)    the Restructuring Support Agreement shall be in full force and effect and no termination of such agreement by any party thereto shall have occurred pursuant to the terms thereof; and

(k)    the delivery of customary secretary and officer certificates.

<u>Conditions to All Extensions of Credit</u>:    The making of DIP Loans and issuance/renewal of DIP Letters of Credit at any time and from time to time shall be subject solely to the satisfaction of the following conditions precedent:

(a)    all representations and warranties of the Debtors in the DIP Facility Documentation shall be true and correct in all material respects (without duplication of any materiality or material adverse effect or material adverse change qualifier therein), and there shall be no default, Event of Default or Post-Petition Default in existence at the time of, or after giving effect to the making of, such funding;

(b)    solely with respect to the making of the first DIP Loan or issuance of a DIP Letter of Credit (other than the deemed issuance and incurrence of any Roll-Up Loans and Roll-Up Letters of Credit), the Specified Excess Cash Payment shall have been made prior to making such requested credit extension;

(c)    with respect to borrowings or issuances of DIP Letters of Credit that would cause the Total Outstandings (assuming the deemed funding under the DIP Facility of

100% of the Roll-Up Loans and deemed issuance of 100% the Roll-Up Letters of Credit as such time of determination) to exceed the sum of the Roll-Up Amount *plus* the New Money Interim Cap, Bankruptcy Court's entry within thirty-five (35) days after the Petition Date of a final order approving the DIP Facility and use of cash collateral and other arrangements described herein, in form and substance acceptable to the Post-Petition Agent (the "***Final Order***", and the Interim Order and Final Order collectively are referred to herein as the "***Financing Orders***");

(d)    the Interim Order or Final Order, if and as applicable, shall be in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified;

(e)    other than with respect to the deemed issuance and incurrence of any Roll-Up Loans and Roll-Up Letters of Credit, delivery of a borrowing request certifying as to, among other things, that the DIP Loan and/or issuance of a DIP Letter of Credit will be utilized in accordance with the Budget;

(f)    the making of the requested credit extension would not cause Total Outstandings to be greater than the lesser of (A) the DIP Loan Limit and (B) the amount then authorized by any Financing Order; and

(g)    other than with respect to the deemed issuance and incurrence of any Roll-Up Loans and Roll-Up Letters of Credit, the making of the requested credit extension would not cause the Debtors to have Excess Cash in excess of $75,000,000.

<u>Representations and Warranties:</u>    The Post-Petition Credit Agreement shall contain representations and warranties substantially similar to those contained in the Pre-Petition Credit Agreement, subject to modifications customarily found in the loan agreements for debtor-in-possession financings, as reasonably agreed to by the Post-Petition Agent and the Borrower.

<u>Affirmative Covenants:</u>    The Post-Petition Credit Agreement shall contain affirmative covenants substantially similar to those in the Pre-Petition Credit Agreement, subject to modifications customarily found in the loan agreements for debtor-in-possession financings, as reasonably agreed to by the Post-Petition Agent and the Borrower, including, without limitation, the following, in each case, with exceptions and materiality qualifications and thresholds to be agreed:  (a) comply with customary reporting requirements, including audited annual financial reports, quarterly and monthly consolidated financial reports; monthly reports detailing results of operations and cash flow; bi-monthly

reports showing variance from the Budget (in addition to the Variance Report) and updates on cash flow and projections for the following rolling thirteen week period; notice of any material change in projected disbursements in an aggregate amount through anticipated emergence; other reporting covenants to be mutually agreed; (b) maintenance of organizational existence and rights and privileges; (c) maintenance of properties and collateral; (d) permit inspections and host lender meetings; (e) maintain current financial records in accordance with GAAP, (f) maintain insurance; (g) acknowledge the right of the Post-Petition Agent and Pre-Petition Agent, as applicable, to credit bid at any sale of the Debtors' assets (whether 363 sale or otherwise) in accordance with the DIP Facility Documentation or the Pre-Petition Credit Agreement, as applicable; and (h) monthly Variance Report as set forth under the heading "Budget and Variances" herein.

<u>Negative Covenants:</u>

The Post-Petition Credit Agreement shall contain negative covenants substantially similar to those in the Pre-Petition Credit Agreement, subject to modifications customarily found in the loan agreements for debtor-in-possession financings, as reasonably agreed to by the Post-Petition Agent and the Borrower, including, without limitation, covenants that none of the Debtors shall, in each case, with baskets, materiality thresholds and other exceptions to be mutually agreed:

(a) merge, divide or consolidate with any other entity, transfer or otherwise dispose of any assets other than inventory in the ordinary course of business or assets that constitute worn-out, excess, unused or non-useful equipment, or make any fundamental changes in its corporate structure;

(b) create or permit to exist any lien or encumbrance on any asset, except as permitted by the Post-Petition Credit Agreement;

(c) incur or permit to exist any financing under Section 364 of the Bankruptcy Code or any other indebtedness or contingent obligations, except as permitted by the Post-Petition Credit Agreement;

(d) create or permit to exist any superpriority administrative expense claim except as specifically permitted by the Post-Petition Agent (other than with respect to the DIP Facility);

(e) make investments (to be defined in a manner consistent with the Pre-Petition Credit Agreement) (except as permitted in the Budget);

(f) declare or pay dividends or make any distributions to equityholders or pay amounts with respect to indebtedness except as specifically permitted by the Post-Petition Credit Agreement;

(g) enter into early monetizations or early terminations of any hedge or swap position, except as permitted by the Post-Petition Credit Agreement;

(h) use cash collateral or the proceeds of the DIP Facility except in accordance with the Budget and Permitted Variances; and

(i) fail to operate strictly in accordance with the Budget (subject to the Permitted Variances).

Case Milestones:

The Debtors shall comply with the following deadlines (each of which may be extended with the written consent of the Majority Post-Petition Lenders without the consent of any other person or any further order of the Bankruptcy Court) (the "***DIP Facility Milestones***"):

DIP Facility

(a) on the Petition Date, filing of a motion seeking approval of the DIP Facility;

(b) not later than three (3) business days after the Petition Date, entry of the Interim Order; and

(c) not later than thirty-five (35) days after the Petition Date, entry of the Final Order approving the DIP Facility and the use of cash collateral, in form and substance satisfactory to the Post-Petition Agent.

Plan

(a)  not later than September 6, 2020, the Bankruptcy Court shall have entered an order (the "***Confirmation Order***") approving the chapter 11 plan (the "***Plan***") and corresponding disclosure statement (the "***Disclosure Statement***"), in each case, in form and substance acceptable to the Post-Petition Agent and the Pre-Petition Agent;

(b) not later than 14 days after entry of the Confirmation Order, the occurrence of the effective date of the Plan, and the discharge of the obligations under the DIP Facility by (i) indefeasible payment in full in cash (including via conversion into the Exit Credit Facility) or (ii) such other treatment under the Plan as may be agreed to by the Majority Post-Petition Lenders and the Debtors.

Financial Covenant (Budget and Variances):

As a condition precedent to the DIP Facility, there shall be established a 13 week cash flow budget updated on a rolling four week basis acceptable to the Post-Petition Agent (the "***Initial Budget***") for the Debtors' cash receipts and expenses (including professional fees and expenses), which shall provide,

among other things, for the payment of interest in respect of the DIP Facility on a monthly basis to the Post-Petition Lenders, and the adequate protection amounts set forth above.

The Debtors shall provide to the Post-Petition Agent an updated budget (the "***Proposed Budget***"). Each Proposed Budget shall be due on each 4-week anniversary (or, if such day is not a business day, the immediately succeeding business day) of the previous rolling four-week Budget period, with the first Proposed Budget after the Initial Budget to be delivered on or prior to August 27, 2020.

Such Proposed Budget, once approved by the Post-Petition Agent, shall constitute the approved budget (the "***Approved Budget***") for the immediately succeeding Testing Period (as defined below). To the extent that any Proposed Budget is not approved by the Post-Petition Agent by the end of the then-effective Testing Period, the then-existing Approved Budget will remain the Approved Budget until replaced by a Proposed Budget that is approved by the Post-Petition Agent.

On the Friday (or, if such Friday is not a business day, the immediately succeeding Business Day) immediately after the last day of each rolling four-week period after the delivery of the Initial Budget (for the avoidance of doubt, such first date to be August 28, 2020) until the payment in full in cash of the DIP Obligations (each such delivery date, a "***Compliance Date***"), the Borrower shall deliver to the Post-Petition Agent a variance report (the "***Variance Report***") (a) detailing the Debtors' receipts and disbursements for such Testing Period and a comparison to the amounts set forth in the Budget therefor for the Testing Period ending prior to such Compliance Date (on an aggregate and a line item by line item basis in the case of disbursements) and (b) including reasonably detailed calculations demonstrating compliance with the Permitted Variance for such Testing Period.

As used herein, "***Permitted Variance***" shall mean, with respect to the period of four consecutive calendar weeks ending on the day immediately prior to any Compliance Date (each such four-week period, a "***Testing Period***"), any variance within the following parameters: (i) the aggregate actual disbursements by the Debtors for such Testing Period shall not exceed 110% of the aggregate forecasted disbursements (excluding professional fees) as set forth in the Budget for such Testing Period and (ii) actual disbursements for certain line items to be agreed by the Debtors for such Testing Period shall not exceed 115% of the forecasted disbursements for such line items as set forth in the Budget for such Testing Period.

Other Financial Covenants:

(a) <u>Minimum Liquidity</u>:  At all times, the Borrower will not permit the sum of (i) unused DIP Commitments plus (ii) the

Debtors' unrestricted cash and cash equivalents on hand to be less than an amount to be determined based on the initial Budget.

(b) <u>Asset Coverage Ratio</u>:  The Borrower shall not permit, as of the last day of every other calendar month, beginning with the calendar month ending August 30, 2020, the ratio of (a) the sum of (i) the total present value (using a discount rate of 10% and utilizing 5-year NYMEX strip pricing with pricing held flat each year thereafter) of projected future net revenues from proved developed producing reserves as reflected in the most recently delivered Reserve Report and (ii) the net mark-to-market value of the Debtors' hedging agreements in connection with such reserves as of such date to (b) the sum of (i) Total Outstandings as of such date <u>plus</u> (ii) the outstanding principal amount of the Pre-Petition Loans as of such date to be less than 1.50 to 1.0.

| Commodity Hedging: | The Debtors may enter into hedging arrangements with (i) any Post-Petition Lender, the Post-Petition Agent and any affiliate of a Post-Petition Lender or the Post-Petition Agent or (ii) Approved Counterparties, which hedges shall not be for speculative purposes and, with respect to commodity hedges, shall be limited to no more than 85% of the reasonably anticipated forecasted production from the proved oil and gas properties of the Debtors (based on the most recent Reserve Report) for the period not exceeding 60 months from the date such hedging arrangement is created. |
|---|---|

As used herein, "***Approved Counterparty***" means, with respect to any hedging arrangement with a Debtor, any person if such person or its credit support provider has a long-term senior unsecured debt rating of BBB+/Baa1 by S&P or Moody's (or their equivalent) or higher at the time of entering into such hedging arrangement.

It is understood that for purposes hereof, the following hedging agreements shall not be deemed speculative or entered into for speculative purposes: (a) any commodity hedging agreement intended, at inception of execution, to hedge or manage any of the risks related to existing and/or forecasted oil and gas production (based on the most recently delivered Reserve Report) of the Borrower or any other Debtor (whether or not contracted) and (b) any hedging agreement intended, at inception of execution, (i) to hedge or manage the interest rate exposure associated with any debt securities, debt facilities or leases (existing or forecasted) of the Borrower or any other Debtor, (ii) for foreign exchange or currency exchange management, (iii) to manage commodity portfolio exposure associated with changes in commodity prices or (iv) to hedge any exposure that the Borrower or any other Debtor may have to counterparties under other hedging agreements such that the

combination of such hedging agreements is not speculative taken as a whole.

Events of Default:

Events of default customary for transactions of this type, including, without limitation:

(a)     nonpayment of principal, interest or mandatory prepayments when due (with a 3 business day grace period for non-principal payments), including, as applicable, the Debtors failure to timely pay any amount required to be paid to the Pre-Petition Agent, the Pre-Petition Lenders, the Post-Petition Agent, or the Post-Petition Lenders under the Financing Orders or the Approved Budget (subject to the Permitted Variance);

(b)     the failure or breach of any warranties, representations, agreements, or covenants of the Debtors (subject to a grace period with respect to certain affirmative covenants and materiality thresholds, to be further specified in the Post-Petition Credit Agreement);

(c)     entry of an order for the dismissal or conversion to Chapter 7 of any Debtor's bankruptcy case; the appointment of a bankruptcy trustee or examiner except with the express written consent of the Pre-Petition Agent and the Post-Petition Agent in any Chapter 11 Case; the granting of any other superpriority administrative expense claim (if not in favor of the Post-Petition Agent or the Pre-Petition Agent) except with the express written consent of the Post-Petition Agent; the grant of any security interest in any of the DIP Collateral that is *pari passu* with or senior to the liens of the Post-Petition Agent or the Adequate Protection Liens of the Pre-Petition Agent; any Debtor shall attempt to vacate or modify the Interim Order or the Final Order over the objection of the Post-Petition Agent; the entry of any order modifying, reversing, revoking, staying, rescinding, vacating, or amending any Financing Order without the consent of the Post-Petition Agent; any Debtor shall institute any proceeding or investigation or support same by any other person who seeks to challenge the status and/or validity of the liens of the Pre-Petition Agent or the Post-Petition Agent (as security for the Pre-Petition Lenders and the Post-Petition Lenders, respectively) or the claims of any of the Pre-Petition Agent, the Pre-Petition Lenders, the Post-Petition Agent, or the Post-Petition Lenders; or any Debtor shall file a motion or other pleading or support any other motion or other pleading filed seeking any of the foregoing;

(d)     the Bankruptcy Court shall enter an order or orders

granting relief from the automatic stay to the holder or holders of any security interest or lien (other than Post-Petition Lenders) to permit the pursuit of any judicial or non-judicial transfer or other remedy against any DIP Collateral, in each case involving assets with an aggregate value in excess of $1,000,000; <u>provided</u> that any order granting relief from the automatic stay to permit prepetition litigation to which the Debtors are a party to proceed shall not constitute an event of default;

(e)     the Debtors shall fail to meet any DIP Facility Milestone beyond any grace period applicable thereto;

(f)     entry of a sale order unless such order contemplates either indefeasible payment in full in cash of the DIP Obligations upon consummation of the sale or is otherwise consented to in writing by the Post-Petition Agent; and

(g)     the filing or support by the Debtors of any plan of reorganization that (i) does not provide for termination of the unused commitments under the DIP Facility and indefeasible payment in full in cash of all of the DIP Obligations and (ii) is not otherwise acceptable to the Post-Petition Agent in its sole discretion.

Immediately upon the earlier of (x) the date that is 35 days after the Petition Date if the Final Order has not been entered by the Court on or before such date (unless such period is extended by mutual agreement of the Debtors and the Majority Post-Petition Lenders, notice of which will be filed with the Bankruptcy Court) and (y) five (5) business days (any such five-business-day period of time, the "***Default Notice Period***") following the delivery of a written notice (with a copy filed with the Bankruptcy Court) (a "***Default Notice***") by the Post-Petition Agent to the Debtors of the occurrence of an Event of Default unless such occurrence is cured by the Debtors prior to the expiration of the Default Notice Period or such occurrence is waived in writing by the requisite Post-Petition Lenders in their sole discretion and in accordance with "Voting" section below, one or more of the following shall occur to the extent elected by the Majority Post-Petition Lenders in their sole discretion: (i) the automatic stay shall terminate, (ii) authority to use cash collateral shall terminate, (iii) the DIP Loans shall accelerate, and (iv) the Post-Petition Agent may exercise its other rights and remedies in accordance with the DIP Facility Documentation and applicable law; *provided* that during the Default Notice Period, the Debtors shall be entitled to continue to use Cash Collateral in accordance with the terms of the Financing Orders; provided, further, that the Post-Petition Agent shall be required to seek relief and shall be entitled to an emergency hearing regarding the termination of the automatic

stay as to clause (iv) above before expiration of the Default Notice Period.

Notwithstanding the foregoing, and irrespective of the Default Notice Period, the Post-Petition Lenders shall not be obligated to provide any DIP Loans at any time a default, an Event of Default, or a Post-Petition Default has occurred and is continuing.

| | |
|---|---|
| <u>Releases / Covenant Not to Sue:</u> | The Debtors shall provide each of the Pre-Petition Agent, the Pre-Petition Lenders, and their respective partners, equityholders, directors, members, principals, agents advisors, officers, professionals (including, but not limited to, counsel), subsidiaries and affiliates a standard release and covenant not to sue as to any and all claims and causes of action against any of them as of the Petition Date.  This release and covenant not to sue shall be without prejudice to any review period as to any appointed creditors' committee or any other party in interest as more fully set forth in the Financing Orders. |
| <u>Credit Bid:</u> | The DIP Facility shall include a provision that, in connection with any sale of any or all of the Debtors' assets under section 363 of the Bankruptcy Code, a Chapter 11 plan of reorganization or liquidation, or any equivalent thereof under any other law, the Post-Petition Agent, at the direction of the Majority Post-Petition Lenders, shall have the absolute right to credit bid any portion, up to the full amount, of all DIP Obligations. |
| <u>Voting:</u> | Amendments and waivers of the DIP Facility Documentation for the DIP Facility will require the approval of Post-Petition Lenders holding more than 50% of the aggregate amount of the commitments then outstanding under the DIP Facility (the "***Majority Post-Petition Lenders***"), except that: |

(i) the consent of each Post-Petition Lender directly and adversely affected thereby shall be required with respect to: (A) increases in the commitment of such Post-Petition Lender, (B) reductions of principal, interest or fees owing to such Post-Petition Lender (or any extension or postponement of such payments), and (C) extensions or postponement of final maturity of the DIP Facility,

(ii) the consent of 100% of the Post-Petition Lenders will be required with respect to releases of all or substantially all of the value of the Guarantees or releases of liens on all or substantially all of the DIP Collateral (other than in connection with any sale of DIP Collateral or the release or sale of the relevant guarantor permitted by the DIP Facility),

(iii) the consent of 100% of the Post-Petition Lenders will be required with respect to modifications to any of the voting percentages or such modifications that would alter the ratable allocation / priority of payments to the holders of DIP Obligations,

(iv) the consent of all of the Post-Petition Lenders will be required with respect to increases in the Borrowing Base and to certain provisions related to adjustment to the Borrowing Base,

(v) the consent of 100% of the Post-Petition Lenders will be required with respect to amendments, modifications or waivers of any provisions in the Post-Petition Credit Agreement substantially equivalent to the provisions of Sections 13.17 and 13.22 of the Pre-Petition Credit Agreement,

(vi) the consent of Post-Petition Lenders holding not less than 66⅔% of the aggregate amount of the commitments then outstanding under the DIP Facility (the "***Required Post-Petition Lenders***") will be required in the case of decreases in, or reaffirmations of, the Borrowing Base, and

(vii) customary protections for the Post-Petition Agent and the Issuing Lender will be provided.

The DIP Facility contains customary provisions permitting the Borrower to replace non-consenting Post-Petition Lenders in connection with amendments and waivers requiring greater than a Majority Post-Petition Lender or Required Post-Petition Lender vote or or of the consent of all Post-Petition Lenders or of all Post-Petition Lenders directly affected thereby so long as the Majority Post-Petition Lenders shall have consented thereto.

The DIP Facility also contains usual and customary provisions regarding "Defaulting Lenders".

The DIP Facility shall include provisions substantially equivalent to the provisions of Sections 13.17 and 13.22 of the Pre-Petition Credit Agreement, with such modifications to be mutually agreed upon.

Cost and Yield Protection:

Usual for facilities and transactions of this type, with provisions protecting the Post-Petition Lenders from withholding tax liabilities; underlined provided that requests for additional payments due to increased costs from market disruption shall be limited to circumstances generally affecting the banking market or when the Majority Post-Petition Lenders have made such a request. The DIP Facility contains provisions regarding the timing for asserting a claim under these provisions and permitting the Borrower to replace a Post-Petition Lender who asserts such

claim without premium or penalty.

Assignments and Participations:

The DIP Facility will contains customary provisions regarding assignments and participations that are substantially similar to those in the Pre-Petition Credit Agreement, subject to modifications customarily found in the loan agreements for debtor-in-possession financings, as agreed to by the Post-Petition Agent and the Borrower.

Expenses and Indemnification:

All documented (in summary form) fees, expenses, and costs (including but not limited to due diligence) of the Pre-Petition Agent, the Post-Petition Agent, the Post-Petition Lenders, and the Pre-Petition Lenders (including without limitation the documented fees, disbursements and other charges of counsel, financial advisors, engineers and environmental consultants) in the making, administration, collection, enforcement, or pursuing remedies related to the Pre-Petition Secured Indebtedness or DIP Facility shall be paid by the Debtors upon demand (subject to the Financing Orders).

The Debtors will indemnify the Post-Petition Agent, the Post-Petition Lenders and their respective officers, directors, employees, affiliates, agents, attorneys, financial advisors, and controlling persons (each, an "*Indemnified Person*") and hold them harmless from and against all documented costs, expenses (including fees, disbursements and other charges of counsel) and liabilities of any such indemnified person arising out of or relating to any claim arising out of or relating to any claim or litigation or other proceedings (regardless of whether any such indemnified person is a party thereto), that relate to the transactions contemplated hereby or any transaction connected therewith; provided that no Indemnified Person will be indemnified for any losses, claims, damages, liabilities or related expenses to the extent that they have resulted from (i) the bad faith, willful misconduct or gross negligence of such Indemnified Person, including any of such Indemnified Person's affiliates or any of its or their respective officers, directors, employees, agents, controlling persons, members or the successors of any of the foregoing, (as determined by a court of competent jurisdiction in a final and non-appealable decision), (ii) a material breach of the obligations of such Indemnified Person (or any of such Indemnified Person's affiliates or any of its or their respective officers, directors, employees, agents, controlling persons, members or the successors of any of the foregoing) or (iii) any proceeding not arising from any act or omission by the Borrower or its affiliates that is brought by an Indemnified Person against any other Indemnified Person (other than disputes involving claims against the Joint Lead Arrangers or the Post-Petition Agent in its capacity as such).

| | |
|---|---|
| DIP to Exit Conversion: | On the date upon which the conditions precedent to the effectiveness of an "exit credit facility" shall have been satisfied or waived (the "***Conversion Date***") as contemplated by the terms specified in the Exit Credit Facility Term Sheet attached as Exhibit A (the "***Exit Credit Facility Term Sheet***") to that certain Exit Facility Commitment Letter (the "***Exit Facility Commitment Letter***") by and among the Debtors and the Commitment Parties (as defined therein) (the following clauses (a) through (d), collectively, the "***DIP Debt Conversion***"): (a) all DIP Loans outstanding as of such date and any Pre-Petition Secured Indebtedness that was not converted into the DIP Facility shall, in each case, be automatically converted on a dollar-for-dollar basis for "Revolving Loans" (as defined in the Exit Credit Facility Term Sheet) under the Exit Credit Facility, (b) all outstanding DIP Letters of Credit shall be deemed to be issued as "Letters of Credit" (as defined in the Exit Credit Facility Term Sheet) under the Exit Credit Facility, (c) all outstanding DIP Hedges with a Lender or an affiliate of a Lender under the DIP Facility shall be deemed to be included in the Exit Credit Facility, and (d) all outstanding treasury management arrangements with a Lender or an affiliate of a Lender under the DIP Facility shall be deemed to be included in the Exit Credit Facility.  Upon payment in full of the DIP Obligations (including all or in part as a result of the DIP Debt Conversion), the DIP Facility will terminate and be superseded and replaced in its entirety by the Exit Credit Facility. |
| Governing Law and Forum: | New York. |
| Counsel to the Pre-Petition Agent and the Post-Petition Agent: | Vinson & Elkins L.L.P. |

| | |
|---|---|
| <u>Interest Rates:</u> | The Borrower may elect that the DIP Loans comprising each borrowing bear interest at a rate per annum equal to: (i) ABR plus the Applicable Margin or (ii) LIBOR plus the Applicable Margin. |

The Borrower may elect interest periods of 1, 2, 3 or 6 months (or, if available to all relevant Post-Petition Lenders, 12 months or a shorter period (including 1 week or 2 weeks)) for LIBOR borrowings.

Calculation of interest shall be on the basis of the actual days elapsed in a year of 360 days (or 365 or 366 days, as the case may be, in the case of ABR Loans based on the prime rate) and interest shall be payable at the end of each interest period and, in any event, at least every 3 months.

"***ABR***" means the Alternate Base Rate, which is the highest of (a) the Post-Petition Agent's Prime Rate, (b) the Federal Funds Effective Rate plus 1/2 of 1.0% and (c) one-month LIBOR plus 1.0%..

"***LIBOR***" means the London interbank offered rate for dollars, subject to a 1.0% floor.

"***Applicable Margin***" means for any day, with respect to any LIBOR or ABR borrowing or with respect to any Unused Commitment Fee, the applicable rate per annum set forth below.

| DIP Facility Usage | Unused Commitment Fee | Applicable Margin | |
|---|---|---|---|
| | | ABR Loans | LIBOR Loans |
| X ≤25% | 0.500% | 2.00% | 3.00% |
| > 25% X ≤50% | 0.500% | 2.25% | 3.25% |
| > 50% X ≤75% | 0.500% | 2.50% | 3.50% |
| > 75% X ≤90% | 0.500% | 2.75% | 3.75% |
| X > 90% | 0.500% | 3.00% | 4.00% |

"***DIP Facility Usage***" means, as of any date and for all purposes, the quotient, expressed as a percentage, of (i) Total Outstandings divided by (ii) the aggregate DIP Commitment.

| | |
|---|---|
| <u>Letters of Credit Fees:</u> | A per annum fee equal to the Applicable Margin then in effect for LIBOR borrowings will accrue on the aggregate face amount of outstanding DIP Letters of Credit, payable in arrears at the end of each quarter and upon the termination of the DIP Facility, in each case for the actual number of days elapsed over a 360-day year.  Such fees shall be distributed to the Post-Petition Lenders pro rata in accordance with the amount of each such Post-Petition Lender's DIP Commitment.  In addition, the Borrower shall pay to the Issuing Lender, for its own account, (a) a fronting fee equal to 0.125% per annum of the aggregate face amount of outstanding DIP Letters of Credit or such other amount as may be agreed by the Borrower and the Issuing Lender, payable in arrears at the end of each quarter and upon the termination of the DIP Facility, calculated based upon the actual number of days elapsed over a 360-day year, and (b) |

customary issuance and administration fees to be mutually agreed.

<u>Commitment Fees:</u>

The Borrower will pay a fee (the "***Commitment Fee***"), in an amount computed on a daily basis equal to the total DIP Commitments of the Post-Petition Lenders less the Total Outstandings on each day, multiplied by the applicable percentage specified as the "Unused Commitment Fee" in the table set forth under the definition of "Applicable Margin" corresponding to the DIP Facility Usage as of the end of such day.  The Commitment Fee is payable quarterly in arrears commencing after the Closing Date.

<u>Upfront Fees:</u>

20.0 bps per year for the Post-Petition Lenders, payable on the Closing Date in proportion to each Lender's final allocation of its New Money DIP Commitment.

**Carve Out**

1.      <u>Carve Out</u>.

        (a)      <u>Carve Out</u>.      Notwithstanding anything to the contrary in this [Final/Interim] Order, any DIP Documents (as defined in the Financing Orders), or any other order of the Court, all of the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the Adequate Protection Superpriority Claims (each as defined in the Financing Orders) shall be subject and subordinate only to the payment of the Carve-Out as and only to the extent set forth in this [Final/Interim] Order.  As used in this [Final/Interim] Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $[50,000] incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses, other than any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors of the Debtors or any committee[1] (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and any official committee appointed in the Chapter 11 Cases (each, a "<u>Committee</u>")  pursuant to section 328 or 1103 of the Bankruptcy Code  (the  "<u>Committee  Professionals</u>"  and,  together  with  the  Debtor  Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by

---

[1]      Any fee due and payable to a Professional Person that is employed as an investment banker or financial advisor arising from the consummation of any transaction shall be payable only to the extent allowed by the Court and as and to the extent set forth in such Professional Person's engagement letter, and solely from the proceeds received by the Debtors resulting from the consummation of such transaction, free and clear of the liens of the Post-Petition Agent and the Post-Petition Lenders.

the Post-Petition Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $2,750,000 incurred after the first business day following delivery by the Post-Petition Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "<u>Post-Carve Out Trigger Notice Cap</u>").  For purposes of the foregoing, "<u>Carve Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the Post-Petition Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to any Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)     <u>Fee Estimates</u>.  Not later than 7:00 p.m. New York time on the third business day of each week starting with the first full calendar week following the [Closing Date], each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of fees and expenses (collectively, "<u>Estimated Fees and Expenses</u>") incurred during the preceding week by such Professional Person (through Saturday of such week, the "<u>Calculation Date</u>"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "<u>Weekly Statement</u>"); *provided*, *that* within one business day of the occurrence of the Termination Declaration Date (as defined below), each Professional Person shall deliver to the Debtors one additional statement (the "<u>Final Statement</u>") setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the

29

calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date (and the Debtors shall cause such Weekly Statement and Final Statement to be delivered on the same day received to the Post-Petition Agent).  If any Professional Person fails to deliver a Weekly Statement or the Final Statement within three calendar days after such Weekly Statement or Final Statement is due, such Professional Person's entitlement (if any) to any funds in the Pre-Carve Out Trigger Notice Reserve (as defined below) with respect to the aggregate unpaid amount of Allowed Professional Fees of such Professional Person for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement or Final Statement covering such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the Budget (as defined in the Post-Petition Credit Agreement, the "Budget") for such period for such Professional Person; *provided*, *that* such Professional Person shall be entitled to be paid any unpaid amount of Allowed Professional Fees in excess of Allowed Professional Fees included in the Budget for such period for such Professional Person from a reserve to be funded by the Debtors from all cash on hand as of such date and any available cash thereafter held by any Debtor pursuant to paragraph [●](c) below.  Solely as it relates to the Post-Petition Agent and the Post-Petition Lenders, any deemed draw and borrowing pursuant to paragraph [●](c)(i)(x) for amounts under paragraph [●](a)(iii) above shall be limited to the greater of (x) the sum of (I) the aggregate unpaid amount of Estimated Fees and Expenses included in such Weekly Statements timely received by the Debtors prior to the Termination Declaration Date *plus*, without duplication, (II) the lesser of (1) the aggregate unpaid amount of Estimated Fees and Expenses included in the Final Statements timely received by the Debtors pertaining to the period through and including the Termination Declaration Date and (2) the Budgeted Cushion Amount (as defined below), and (y) the aggregate unpaid amount of Allowed Professional Fees included in the Budget for the

period prior to the Termination Declaration Date (such amount, the "<u>DIP Professional Fee Carve Out Cap</u>").  For the avoidance of doubt, the Post-Petition Agent shall be entitled to maintain at all times a reserve (the "<u>Carve-Out Reserve</u>") against availability under the DIP Facility in an amount (the "<u>Carve-Out Reserve Amount</u>") equal to the sum of (i) the greater of (x) the aggregate unpaid amount of Estimated Fees and Expenses included in <u>all</u> Weekly Statements timely received by the Debtors, and (y) the aggregate amount of Allowed Professional Fees contemplated to be unpaid in the Budget at the applicable time, *plus* (ii) the Post-Carve Out Trigger Notice Cap, *plus* (iii) the amounts contemplated under paragraph [●](a)(i) and [●](a)(ii) above, *plus* (iv) an amount equal to the amount of Allowed Professional Fees set forth in the Budget for the then current week occurring after the most recent Calculation Date and the two weeks succeeding such current week (such amount set forth in (iv), regardless of whether such reserve is maintained, the "<u>Budgeted Cushion Amount</u>").  Not later than 7:00 p.m. New York time on the fourth business day of each week starting with the first full calendar week following the [Closing Date], the Debtors shall deliver to the Post-Petition Agent a report setting forth the Carve-Out Reserve Amount as of such time, and, in setting the Carve-Out Reserve, the Post-Petition Agent shall be entitled to rely upon such reports in accordance with section [●] of the Post-Petition Credit Agreement.  Prior to the delivery of the first report setting forth the Carve-Out Reserve Amount, the Post-Petition Agent shall calculate the Carve-Out Reserve Amount by reference to the Budget for subsection (i) of the Carve-Out Reserve Amount.

   (c) <u>Carve Out Reserves</u>.

    (i) On the day on which a Carve Out Trigger Notice is given by the Post-Petition Agent to the Debtors and their lead restructuring counsel with a copy to counsel to any Committee (the "<u>Termination Declaration Date</u>"), the Carve Out Trigger Notice shall (x) be deemed a draw request and notice of borrowing by the Borrower for the DIP Loans under the

DIP Facility, in an amount equal to the sum of (1) the amounts set forth in paragraphs [●](a)(i) and [●](a)(ii) above, and (2) the lesser of (a) the then unpaid amounts of the Allowed Professional Fees and (b) the DIP Professional Fee Carve Out Cap (any such amounts actually advanced shall constitute DIP Loans) and (y) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the sum of the amounts set forth in paragraphs [●](a)(i)–(iii) above.  The Debtors shall deposit and hold such amounts in a segregated account at the Post-Petition Agent in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.

(ii)     On the Termination Declaration Date, the Carve Out Trigger Notice shall also (x) be deemed a request by the Debtors for DIP Loans under the DIP Facility, in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP Loans) and (y) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in a segregated account at the Post-Petition Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.

(iii)     On the first business day after the Post-Petition Agent gives such notice to such Post-Petition Lenders, notwithstanding anything in the Post-Petition Credit Agreement to the contrary, including with respect to the existence of a Default or Event of Default (as such terms are defined in the Post-Petition Credit Agreement), the failure of the

Debtors to satisfy any or all of the conditions precedent for DIP Loans under the DIP Facility, any termination of the DIP Commitments following an Event of Default, or the occurrence of the Maturity Date, each Post-Petition Lender with an outstanding DIP Commitment (on a pro rata basis based on the then outstanding DIP Commitments) shall make available to the Post-Petition Agent such Post-Petition Lender's pro rata share with respect to such borrowing in accordance with the DIP Facility; *provided* that in no event shall the Post-Petition Agent or the Post-Petition Lenders be required to extend DIP Loans pursuant to a deemed draw and borrowing pursuant to paragraphs [●](c)(i)(x) and [●](c)(ii)(x) in an aggregate amount exceeding the Carve-Out Reserve Amount.

(iv)    All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Post-Petition Agent for the benefit of the Post-Petition Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated, in which case any such excess shall be paid to the [Prepetition Secured Creditors] in accordance with their rights and priorities as of the Petition Date.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Post-Petition Agent for the benefit of the Post-Petition Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated, in which case any such excess shall be paid to the

[Prepetition Secured Creditors] in accordance with their rights and priorities as of the Petition Date.

(v)    Notwithstanding anything to the contrary in the DIP Documents, or this [Final/Interim] Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph [●], then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph [●], prior to making any payments to the Post-Petition Agent or the [Prepetition Secured Creditors], as applicable.  Notwithstanding anything to the contrary in the DIP Documents or this [Final/Interim] Order, following delivery of a Carve Out Trigger Notice, the Post-Petition Agent and the Pre-Petition Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the Post-Petition Agent for application in accordance with the DIP Documents.  Further, notwithstanding anything to the contrary in this [Final/Interim] Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this [Final/Interim] Order, the DIP Facility, the Prepetition RBL Facility, or the Second Lien Notes Indenture, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, and the 507(b)

Claim, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the [Prepetition Secured Obligations].

(d)      Payment of Allowed Professional Fees Prior to the Termination Declaration Date.    Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(e)      No Direct Obligation To Pay Allowed Professional Fees.    None of the Post-Petition Agent, Post-Petition Lenders, or the [Prepetition Secured Creditors] shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.   Nothing in this [Final/Interim] Order or otherwise shall be construed to obligate the Post-Petition Agent, the Post-Petition Lenders, or the [Prepetition Secured Creditors], in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)      Payment of Carve Out On or After the Termination Declaration Date. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.   Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this [Final/Interim] Order, the DIP Documents, the Bankruptcy Code, and applicable law.

**<u>Annex 3</u>**

**Warrants Term Sheet**

*Execution Version*

---

DENBURY RESOURCES INC.

WARRANTS TERM SHEET

**July 28, 2020**

---

This term sheet (this "**Warrants Term Sheet**") is a summary of indicative terms of the Series A Warrants and Series B Warrants of Denbury Resources Inc. ("**DNR**" and, following the Restructuring, "**Reorganized DNR**"), to be issued in connection with a proposed financial restructuring (the "**Restructuring**") of the existing indebtedness of, and equity interests in, DNR and each of its affiliates party to the Restructuring Support Agreement ("**RSA**"), to which this Warrants Term Sheet is attached as Annex 3. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the RSA, the annexes thereto, or the Plan, as applicable.

**THIS WARRANTS TERM SHEET IS PRESENTED FOR DISCUSSION AND SETTLEMENT PURPOSES, AND IS ENTITLED TO PROTECTION FROM ANY USE OR DISCLOSURE TO ANY PERSON PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER RULE OF SIMILAR IMPORT.**

**THIS WARRANTS TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, COVENANTS AND OTHER PROVISIONS THAT MAY BE CONTAINED IN THE FULLY NEGOTIATED AND EXECUTED DEFINITIVE DOCUMENTATION IN CONNECTION WITH THE RESTRUCTURING. THIS WARRANTS TERM SHEET AND THE INFORMATION CONTAINED HEREIN SHALL REMAIN STRICTLY CONFIDENTIAL.**

| WARRANTS | |
|---|---|
| **Issuer** | Reorganized DNR |
| **Holders** | The Convertible Noteholders with respect to the Series A Warrants. On the Plan Effective Date, the Convertible Noteholders shall receive 100 percent of the Series A Warrants (the "**Convertible Notes Warrant Package**"). |
| | The Subordinated Noteholders with respect to the Series B Warrants. If the Subordinated Noteholders accept the Plan, on the Plan Effective Date, the Subordinated Noteholders shall receive 54.55 percent of the Series B Warrants (the "**Subordinated Notes Warrant Package**"). |
| | Holders of Existing Equity Interests with respect to the Series B Warrants. If the Subordinated Noteholders and the Holders of Existing Equity Interests accept the Plan, on the Plan Effective Date, Holders of Existing Equity Interests shall receive 45.45 percent of the Series B Warrants (the "**Existing Equity Warrant Package**"). |
| **Securities to be Issued** | i. Series A warrants (the "**Series A Warrants**") to purchase up to five percent (after giving effect to the exercise of the Series A Warrants) of the New DNR Equity issued and outstanding on the |

| | |
|---|---|
| | Plan Effective Date (for the avoidance of doubt, not including any shares issued pursuant to the Management Incentive Plan) at a price that is in accordance with the Series A Strike Price Formula (as defined below).  The ownership percentage represented by the shares of New DNR Equity issuable in respect of such Series A Warrants shall be subject to dilution by the Series B Warrants, the Management Incentive Plan and any other issuances of New DNR Equity issued after the Plan Effective Date (other than as a result of the exercise of the Series A Warrants). |
| | ii.  With respect to the Subordinated Notes Warrants Package, Series B warrants (the "**Series B Warrants**" and, together with the Series A Warrants, the "**Warrants**") to purchase up to three percent (before giving effect to the exercise of the Series B Warrants, but after giving effect to the exercise of the Series A Warrants) of the New DNR Equity issued and outstanding on the Plan Effective Date (for the avoidance of doubt, not including any shares issued pursuant to the Management Incentive Plan) at a price that is in accordance with the Series B Strike Price Formula (as defined below).  The ownership percentage represented by the shares of New DNR Equity issuable in respect of such Series B Warrants shall be subject to dilution by the Management Incentive Plan and any other issuance of New DNR Equity issued after the Plan Effective Date (other than as a result of the exercise of the Series A Warrants). |
| | iii.  With respect to the Existing Equity Package, Series B Warrants to purchase up to two and a half percent (before giving effect to the exercise of the Series B Warrants, but after giving effect to the exercise of the Series A Warrants) of the New DNR Equity issued and outstanding on the Plan Effective Date (for the avoidance of doubt, not including any shares issued pursuant to the Management Incentive Plan) at a price that is in accordance with the Series B Strike Price Formula.  The ownership percentage represented by the shares of New DNR Equity issuable in respect of such Series B Warrants shall be subject to dilution by the Management Incentive Plan and any other issuance of New DNR Equity issued after the Plan Effective Date (other than as a result of the exercise of the Series A Warrants). |
| **Strike Price Formula** | The Series A Warrants and Series B Warrants will give the holder thereof the right to purchase New DNR Equity, for cash (or on a cashless basis, as set forth below), at an exercise price set at an equity value at which: |
| | i.  the value of all common shares issued pursuant to the Plan would be equal to par plus accrued and unpaid interest on the Second Lien Notes as of July 30, 2020 (for the avoidance of doubt, such amount shall be decreased by the $8.0 million prepayment of accrued and unpaid interest on the Second Lien Notes pursuant to the RSA) (the "**Series A Strike Price Formula**"); and |

|  | ii. the value of all common shares issued pursuant to the Plan and the Series A Warrants would be equal to par plus accrued and unpaid interest on each of the Second Lien Notes (for the avoidance of doubt, such amount shall be decreased by the $8.0 million prepayment of accrued and unpaid interest on the Second Lien Notes pursuant to the RSA) and the Convertible Notes as of July 30, 2020 (the "**Series B Strike Price Formula**"). |
|  | Such exercise prices shall be subject to adjustment from time to time as provided under "Dilution/Adjustments" below. |
| **Exercisability** | Exercisable in whole or in part at any time on or prior to the Expiration Date, in cash. |
|  | The Warrants may be exercised on a "cashless" basis at the times and in the manner described as follows: |
|  | 1. In connection with, and using the value of the New DNR Equity implied by, a Sale Transaction (as defined below) for cash, securities, other property, or any combination thereof; or |
|  | 2. If the New DNR Equity is at any time listed for trading on a national securities exchange or is traded over-the-counter, at any such time using a value of the New DNR Equity based on the average trading price for such New DNR Equity during the 10 trading day period immediately prior to any applicable date of determination. |
| **Sale Transaction** | If a sale of Reorganized DNR is consummated prior to the Expiration Date in which all of the consideration paid to non-employee stockholders consists of cash or property (including securities) or part cash and part property (including securities) and Reorganized DNR duly and timely effects notice to the holders of Warrants pursuant to the final paragraph of this "Sale Transaction," then any Warrants that are unexercised prior to the consummation of such sale of Reorganized DNR shall be deemed to have expired worthless and will be cancelled for no further consideration. |
|  | For the avoidance of doubt, holders of Warrants shall not be entitled to the fair market value of the Warrants (using the Black Scholes model or otherwise) in connection with a sale of Reorganized DNR, but shall have the right to exercise the Warrants at any time prior to any sale of Reorganized DNR. |
| **Transfers; Registration Rights** | All Warrants will be freely tradable, and will not be subject to any restrictions on transfer that are not also applicable to the New DNR Equity distributed pursuant to the Plan. Any Convertible Noteholder that receives (together with its affiliates and related funds) 4% or more of the voting Securities of New DNR Equity pursuant to the Plan, on a pro forma basis for the issuance of New DNR Equity upon exercise of its Series A Warrants, will have registration rights with respect to the New |

|  | DNR Equity issued upon exercise of its Series A Warrants. |
|---|---|
| **Expiration Date** | The Series A Warrants will expire five years from the Plan Effective Date. |
|  | The Series B Warrants will expire three years from the Plan Effective Date. |
| **Voting Rights** | The Convertible Noteholders, Subordinated Noteholders, and holders of Existing Equity Interests shall have no voting rights in respect of the Warrants. Holders of New DNR Equity issued upon exercise of any Warrants shall have the same voting rights as other holders of New DNR Equity. |
| **Dividends / Distributions** | The Warrants shall not be entitled to receive dividends or distributions. Holders of New DNR Equity issued upon exercise of any Warrants shall have the same rights with respect to dividends and distributions as other holders of New DNR Equity. |
| **Warrant Holders' Agreement** | The Warrants shall include customary information rights. |
| **Dilution/Adjustments** | The Warrants shall be subject to simple arithmetic anti-dilution protection regarding the exercise price for the Warrants and amount of New DNR Equity to be issued upon exercise of the Warrants only for corporate structural events (*e.g.*, recapitalizations, reclassifications, splits, reverse splits, stock dividends, reorganizations, consolidations, mergers, and similar structural transactions), not economic anti-dilution. |
| **Amendments** | The terms and conditions of each series of Warrants may be amended by the Company with the affirmative vote or written consent of holders of a majority of such series of Warrants. |
| **Administration** | The Warrants will be issued in book-entry form through DTC and administered by a warrant agent acceptable to the Company and the recipients of the Warrants. |
| **Governing Law** | New York. |

\* \* \* \* \*

## Annex 4

**Governance Term Sheet**

*Execution Version*

## DENBURY RESOURCES INC.
## CORPORATE GOVERNANCE TERM SHEET

*This term sheet (this "**Term Sheet**") describes the material corporate governance provisions to be in effect after the restructuring and recapitalization transactions (the "**Restructuring Transactions**") regarding certain indebtedness of Denbury Resources Inc. ("**Denbury**") and the other Company Parties.  This Term Sheet shall not constitute (nor shall it be construed as) an offer or a legally binding obligation to buy or sell, or a solicitation of an offer to buy or sell, any of the securities referred to herein, it being understood that such an offer or solicitation, if any, only will be made in compliance with applicable provisions of securities and/or other applicable laws.*

*Capitalized terms used in this Term Sheet but not defined herein shall have the meanings set forth in the Restructuring Support Agreement.*

*Except as otherwise specified, the certificate of incorporation of the Company (as defined below) shall be substantially similar to the Second Amended and Restated Certificate of Incorporation of Denbury, and the Bylaws of the Company shall be substantially similar to the Second Amended and Restated Bylaws of Denbury, each as in effect as of the date hereof.*

| Topic | Proposal |
|---|---|
| **Reorganized Issuer** | Denbury, as reorganized pursuant to and under the Plan, or any successor or assign thereto, by merger, amalgamation, consolidation, or otherwise, on or after the Plan Effective Date (the "**Company**"). The Company shall use commercially reasonable best efforts to cause the common stock to be issued by the Company on the Plan Effective Date to be listed on the New York Stock Exchange ("**NYSE**"), either by retaining or succeeding to the Company's existing NYSE listing or otherwise, so long as the Company is able to satisfy the initial listing requirements of the NYSE, or such alternative exchange as the Second Lien *Ad Hoc* Committee determines if the Company is not able to satisfy the initial listing requirements of the NYSE. |
| **Authorized Capital Stock** | The Company shall have authority to issue 300,000,000 shares, consisting of: (i) 250,000,000 shares of common stock, par value $0.001 per share and (ii) 50,000,000 shares of blank check preferred stock, par value $0.001 per share, in each case which shall be authorized on the Plan Effective Date. |
| **Board of Directors** | Initial Board of Directors (the "**Board**") to consist of: (i) the chief executive officer (the "**CEO**") (who shall not be the chairman of the Board), (ii) two (2) directors to be selected by Fidelity Management and Research Company, (i) one (1) director to be selected by GoldenTree Asset Management LP, and (iv) three (3) additional directors, or such other number to be determined by the Required Consenting Second Lien Noteholders, to be selected by the Second Lien *Ad Hoc* Committee.  The Second Lien *Ad Hoc* Committee may consider one or more current Denbury board members for initial Board membership. <br><br> Each Board member other than the CEO shall satisfy the independence requirements of the NYSE. <br><br> After the Plan Effective Date, the members of the Board will be elected annually by the shareholders of the Company. |

| Topic | Proposal |
|---|---|
| **Board Actions** | A majority of the total number of directors then in office shall constitute a quorum, and the affirmative vote of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board.<br><br>The Board or any committee thereof may act by written consent executed by all of the directors then in office or all members of such committee, as applicable, in lieu of a meeting. |
| **Special Meetings of Stockholders** | A special meeting may be called by stockholders of the Company in the same manner and upon the same thresholds as set forth in the Company's current Certificate of Incorporation and Bylaws. |
| **Preemptive Rights** | No preemptive rights. |
| **Transfer Restrictions** | The common stock will be transferrable without Company consent, subject to compliance with applicable securities laws.<br><br>No ROFRs, tag-alongs or other restrictions on transferability of common stock. |
| **Indemnification and Limitation on Liability** | The organizational documents of the Company shall contain indemnification provisions and limitation on liability provisions applicable to directors and officers of the Company to the fullest extent permitted under Delaware law. |
| **D&O Insurance** | The Company will purchase and maintain director and officer liability insurance in such amounts and with such limits as reasonably determined by the Board to be appropriate. |
| **Business Combinations with Interested Stockholders** | The Company shall not be governed by Section 203 of the DGCL. |
| **Registration Rights** | Customary registration rights. |
| **Exclusive Forum** | The sole and exclusive forum for actions or proceedings involving the Company as to which the Delaware General Corporation Law confers jurisdiction on the Court of Chancery of the State of Delaware (the "**Court of Chancery**"), shall be the Court of Chancery or, if and only if the Court of Chancery lacks subject matter jurisdiction, any state court located within the State of Delaware or, if and only if such state courts lack subject matter jurisdiction, the federal district court for the District of Delaware. |
| **Other** | Such other anti-takeover related provisions as the parties determine appropriate and as may be acceptable to the Second Lien *Ad Hoc* Committee. |

**<u>Exhibit A to RSA</u>**

**Transfer Agreement**

## Provision for Transfer Agreement

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____, 2020 (the "**Agreement**"),[1] by and among Denbury Resources Inc. and its affiliates and subsidiaries bound thereby, the Consenting RBL Lenders, Consenting Second Lien Noteholders, and the Consenting Convertible Noteholders, including the transferor to the Transferee of any Second Lien Notes, Convertible Notes, Subordinated Notes, or any other claims against the Debtors (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "**Consenting RBL Lender**," "**Consenting Second Lien Noteholder**," or "**Consenting Convertible Noteholder**," as applicable, under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____
Name:
Title:

Address:

E-mail address(es):
Telephone:
Facsimile:

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| RBL Loans | $ |
| Second Lien Notes (if any) | $ |
| Convertible Notes (if any) | $ |
| Subordinated Notes (if any) | $ |

---

[1]   Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

**Exhibit B to RSA**

**Form of Joinder**

# Joinder

This joinder (this "**Joinder**") to the Restructuring Support Agreement (the "**Agreement**"), dated as of [___], 2020, by and among: (i) Denbury Resources Inc., a company incorporated under the Laws of Delaware, and each of Denbury Air, LLC, Denbury Brookhaven Pipeline Partnership, LP, Denbury Brookhaven Pipeline, LLC, Denbury Gathering & Marketing, Inc., Denbury Green Pipeline-Montana, LLC; Denbury Green Pipeline-North Dakota, LLC, Denbury Green Pipeline-Riley Ridge, LLC, Denbury Green Pipeline-Texas, LLC, Denbury Gulf Coast Pipelines, LLC; Denbury Holdings, Inc., Denbury Onshore, LLC, Denbury Operating Company, Denbury Pipeline Holdings, LLC, Denbury Thompson Pipeline, LLC, Encore Partners GP Holdings, LLC, Greencore Pipeline Company, LLC, and Plain Energy Holdings, LLC (collectively, the "**Company Parties**"); (ii) the Consenting RBL Lenders, Noteholders; (iii) the Consenting Second Lien Noteholders, and (iv) the Consenting Convertible Noteholders, is executed and delivered by [_____] (the "**Joining Party**") as of [_____]. Each capitalized term used herein but not otherwise defined shall have the meaning ascribed to it in the Agreement.

1.     Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder as **Annex A** (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof).  The Joining Party shall hereafter be deemed to be a Party for all purposes under the Agreement and one or more of the entities comprising the Consenting Creditors.

2.     Representations and Warranties.  The Joining Party hereby represents and warrants to each other Party to the Agreement that, as of the date hereof, such Joining Party (a) is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to, the RBL, the Second Lien Notes, the Convertible Notes, and/or the Subordinated Notes identified below its name on the signature page hereof, and (b) makes, as of the date hereof, the representations and warranties set forth in Section 10 of the Agreement to each other Party.

3.     Governing Law.  This Joinder shall be governed by and construed in accordance with the internal laws of the State of New York without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

4.     Notice.  All notices and other communications given or made pursuant to the Agreement shall be sent to:

To the Joining Party at:

[JOINING PARTY]
[ADDRESS]
Attn:
Facsimile: [FAX]
EMAIL:

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**[JOINING PARTY]**

_____

By:

Name:

Title:

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| RBL Loans | $ |
| Second Lien Notes (if any) | $ |
| Convertible Notes (if any) | $ |
| Subordinated Notes (if any) | $ |

**<u>Annex A to Joinder</u>**

**Restructuring Support Agreement**

**Exhibit C**

**Corporate Organization Chart**



Denbury

Denbury Resources Inc. (DE)
Denbury Holdings Inc. (DE)
Denbury Gathering & Marketing, Inc. (DE)
Denbury Operating Company (DE)
Encore Partners GP Holdings LLC (DE)
Denbury Onshore, LLC (DE)
Denbury Pipeline Holdings, LLC (DE)
Denbury Air, LLC (DE)
Plain Energy Holdings, LLC (DE)
Denbury Green Pipeline-Texas, LLC (DE)
Greencore Pipeline Company LLC (DE)
Denbury Gulf Coast Pipelines, LLC (DE)
Denbury Green Pipeline-Montana, LLC (DE)
Denbury Green Pipeline-Riley Ridge, LLC (DE)
Denbury Thompson Pipeline, LLC (DE)
Denbury Green Pipeline-North Dakota, LLC (DE)
Denbury Brookhaven Pipeline, LLC (DE)
1% GP Interest
99% LP Interest
Denbury Brookhaven Pipeline Partnership, LP (DE)
LEGEND
Issuer / Borrower
Guarantor
RBL / Notes
Pipeline Lease
ENTITY TYPE
Corporation
LLC
Partnership

**Exhibit D**

**Liquidation Analysis**

**Exhibit D**

**Liquidation Analysis**

THE DEBTORS MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES AND ASSUMPTIONS CONTAINED HEREIN.  THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THIS LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION UNDER CHAPTER 7, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE ESTIMATED HEREIN.

### 1.  Introduction

The Debtors with the assistance of their restructuring, legal, and financial advisors, have prepared this hypothetical liquidation analysis (the "**Liquidation Analysis**") in connection with the *Joint Chapter 11 Plan of Reorganization of Denbury Resources Inc. and Its Debtor Affiliates* (as amended, supplemented, or modified from time to time, the "**Plan**")[1] and related disclosure statement (as amended, supplemented, or modified from time to time, the "**Disclosure Statement**").  This Liquidation Analysis indicates the estimated recoveries that may be obtained by holders of Claims and Interests in a hypothetical liquidation pursuant to chapter 7 of the Bankruptcy Code as an alternative to the Plan.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to confirmation of the Plan, that each holder of a Claim or Interest in each Impaired Class: (a) has accepted the Plan; or (b) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  To demonstrate compliance with section 1129(a)(7), this Liquidation Analysis: (1) estimates the cash proceeds (the "**Liquidation Proceeds**") that a chapter 7 trustee (the "**Trustee**") would generate if each of the Chapter 11 Cases were converted to a chapter 7 case on the Effective Date and the assets of each Debtor's Estate (as defined herein) were liquidated; (2) determines the distribution (the "**Liquidation Distribution**") that each holder of a Claim or Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7; and (3) compares each holder's Liquidation Distribution to the distribution under the Plan that such holder would receive if the Plan were confirmed and consummated.  Accordingly, asset values discussed herein may be different than amounts referred to in the Plan.  This Liquidation Analysis is based upon certain assumptions discussed herein and in the Disclosure Statement.

### 2.  Basis of Presentation

The Liquidation Analysis has been prepared assuming that the Debtors would convert their cases from chapter 11 cases to chapter 7 cases on October 1, 2020 (the "**Conversion Date**") and would be liquidated thereafter pursuant to chapter 7 of the Bankruptcy Code.  The Debtors believe that the Conversion Date is a reasonable proxy for the Effective Date of the Plan.  The Liquidation

---

[1]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan or Disclosure Statement, as applicable.

Analysis was prepared on a legal entity basis for each Debtor and summarized into a consolidated report.  The Liquidation Analysis is summarized in the tables contained herein.

The Liquidation Analysis represents an estimate of recovery values and percentages based upon a hypothetical liquidation of the Debtors.  It is assumed that, on the Conversion Date, the Bankruptcy Court would appoint the Trustee who would sell the assets of the Debtors during the course of a three-month period following the Conversion Date (the "**Marketing Period**") and distribute the cash proceeds, net of liquidation-related costs, to holders of Claims and Interests in accordance with the priority scheme set forth in chapter 7.  Following the three-month Marketing Period, a wind-down of the Estates is assumed to occur over a subsequent three-month period (the "**Wind-Down Period**").  It is assumed that the Trustee will retain lawyers and other necessary advisors and professionals to assist in the liquidation and wind-down.

The determination of the hypothetical proceeds from the liquidation of assets is a highly uncertain process involving the extensive use of estimates and assumptions which, although considered reasonable by the Debtors' managing officers ("**Management**") and the Debtors' advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors and Management.

The cessation of business in a liquidation is likely to trigger certain Claims that otherwise would not exist under a Plan absent a liquidation.  Examples of these kinds of Claims include various potential employee claims (including Claims related to the WARN Act), new bonding letters of credit for plugging and abandonment liabilities in addition to other potential Claims.  Some of these Claims could be significant and might be entitled to priority in payment over General Unsecured Claims.  Those priority Claims would be paid before any Liquidation Proceeds would be made available to pay General Unsecured Claims.

In preparing the Liquidation Analysis, the Debtors have estimated an amount of Allowed Claims for each Class of claimants based upon a review of the Debtors' balance sheets. The estimate of all Allowed Claims in the Liquidation Analysis is generally based on the par value of those Claims.  The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied upon for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan.  The actual amount of Allowed Claims could be materially different from the amount of Claims estimated in this Liquidation Analysis.   NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS.

No recovery or related litigation costs have been attributed to any potential avoidance actions under the Bankruptcy Code, including potential preferences or fraudulent transfer actions due to, among other issues, the cost of such litigation, the uncertainty of the outcome, and anticipated disputes regarding these matters.

Professional fees, Trustee fees, Broker fees, Debtor-in-Possession ("DIP") Claims, administrative Claims, priority tax Claims, other secured Claims, other priority Claims, and other such Claims that may arise in a liquidation scenario would have to be paid in full from the Liquidation Proceeds before any proceeds are made available to holders of General Unsecured

Claims.  Under the priority scheme dictated in chapter 7, no junior creditor would receive any distributions until all senior creditors are paid in full, and no equity holder would receive any distribution until all creditors are paid in full.  The assumed distributions to creditors as reflected in this Liquidation Analysis are estimated in accordance with the priority scheme dictated in chapter 7.

This Liquidation Analysis does not include comprehensive estimates for the tax consequences, that may be triggered upon the liquidation and sale of assets in the manner described above.  Such tax consequences could be material.

### 3.  Liquidation Process

For purposes of this analysis, the Debtors' hypothetical liquidation would be conducted in a chapter 7 environment with the Trustee managing the bankruptcy estate of each Debtor to maximize recoveries in an expedited process.  One of the Trustee's initial steps would be to develop a liquidation plan to generate proceeds from the sale of entity-specific assets for distribution to creditors.  The three major components of the liquidation are as follows:

- generation of cash proceeds from remaining assets;

- costs related to the liquidation process, such as wind-down costs of the Estates and Trustee, professional, broker and other administrative fees; and

- distribution of net proceeds generated from asset sales to the holders of Claims and Interests in accordance with the priority scheme under chapter 7 of the Bankruptcy Code.

### 4.  Distribution of Net Proceeds to Claimants

Any available net proceeds would be allocated to the applicable holders of Claims and Interests in strict priority in accordance with section 726 of the Bankruptcy Code:

- <u>Chapter 7 Liquidation Adjustments</u> – includes post-conversion cash flow, wind-down costs, estimated fees paid to the chapter 7 trustee and certain professional and/or broker fees;

- <u>Superpriority, Structurally Senior or Secured Claims</u> – includes the following amounts:

  o <u>Carve Out Claims</u> – includes estimated Allowed Professional Fees (as defined herein) incurred and unpaid prior to the Conversion Date[2];

  o <u>DIP Facility Claims</u> - estimated Claims derived from, based upon, or secured by the DIP Facility Documents or DIP Orders, including claims

---

[2] Any accrued and unpaid professional fees as of the Conversion Date that are greater than the Carve Out Cap are assumed to be asserted as Administrative Claims.

3

for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising under or related to the DIP Facility as of the Conversion Date. Claims amount also includes amounts expected to be drawn under the Debtors' $100M Letter of Credit facility upon chapter 7 conversion and the Allowed Professional Fees (as defined herein) incurred and unpaid prior to the Conversion Date subject to the Carve Out Cap included within the DIP Facility Documents;

- o <u>Class 1 – Other Secured Claims</u> – estimated secured claims, other than a Pipeline Lease Claim, a RBL Claim, a Hedge Claim or Second Lien Notes Claim, including any secured tax Claim the reimbursement obligation for which is either secured by a Lien on collateral or is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code;

- o <u>Class 2 – Other Priority Claims</u> – estimated amounts, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code;

- o <u>Class 3 – Pipeline Lease Claims</u> - estimated amounts arising under, derived from, based on, or secured pursuant to the Pipeline Lease;

- o <u>Class 4 – RBL / Hedge Claims</u> - estimated amounts arising under, derived from, based on, or secured pursuant to the RBL Credit Agreement;

- o <u>Class 5 – Second Lien Notes Claims</u> – includes estimated Claims on account of the Second Lien Notes including accrued unpaid prepetition interest.

- <u>Administrative Claims</u> – includes estimated Claims for unsecured postpetition accounts payable, taxes, accrued expenses, accrued and unpaid Allowed Professional Fee Amounts excluded from DIP Facility Claims;

- <u>Priority Tax Claims</u> – estimated unsecured prepetition Claims of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code;

- <u>Unsecured Claims</u> – includes the principal and accrued unpaid prepetition interest on the Class 6 - Convertible Notes Claims, the principal and accrued unpaid prepetition interest on the Class 7 - Subordinated Notes Claims, and Class 8 – General Unsecured Claims including unpaid amounts with respect to prepetition trade, executory contract rejection claims, litigation claims, and numerous other types of prepetition liabilities not contained elsewhere;

- <u>Intercompany Claims, Intercompany Interests, and Existing Equity Interests</u>– to the extent any available net proceeds remain available for distribution after satisfaction in full of the foregoing classes of Claims, distributions would be

4

made to holders of Intercompany Claims, Intercompany Interests, and Existing Equity Interests.

Pursuant to the distribution scheme of chapter 7, no junior creditor would receive any distribution until all senior creditors are paid in full, and no equity holder would receive any distribution until all creditors are paid in full.  The assumed distributions to creditors as reflected in this Liquidation Analysis are estimated in accordance with the applicable provisions of chapter 7.

## 5.  Conclusion

The final amount of Allowed Claims against the Debtors' Estates may materially differ from the Claim amounts used in this Liquidation Analysis.  Additionally, asset values discussed herein may be different than amounts referred to in the Plan, which presumes the reorganization of the Debtors' assets and liabilities as a going concern under chapter 11 of the Bankruptcy Code.

The Debtors have determined, as summarized in the following analysis, that upon the Effective Date, the Plan will provide all holders of Claims and Interests or a recovery (if any) that is not less than what they would otherwise receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.  Accordingly, the Debtors believe that the Plan satisfies the requirement of section 1129(a)(7) of the Bankruptcy Code.[3]

| Summary of Projected Liquidation Analysis Midpoint Claims and Recovery Percentages | | | ($ in millions) |
|---|---|---|---|
| Type of Claim | Projected Claims in Liquidation Analysis | Estimated Plan Recovery | Projected Liquidation Recovery |
| DIP Facility Claims | $            94.5 | 100.0% | 100.0% |
| Administrative Claims | 23.7 | 100.0% | 0.0% |
| Priority Tax Claims | 1.0 | 100.0% | 0.0% |
| Class 1 - Other Secured Claims | 81.1 | 100.0% | 100.0% |
| Class 2 - Other Priority Claims | N/A | N/A | N/A |
| Class 3 - Pipeline Lease Claims | 70.2 | 100.0% | 100.0% |
| Class 4 - RBL Claims / Hedge Claims | 1.0 | 100.0% | 100.0% |
| Class 5- Second Lien Notes Claims | 1,629.5 | 61.5% | 39.0% |
| Class 6- Convertible Notes Claims | 234.1 | 26.9% | 0.0% |
| Class 7- Subordinated Notes Claims | 251.4 | 1.2% / 0.0% | 0.0% |
| Class 8- General Unsecured Claims | 331.6 | 100.0% | 0.0% |
| Class 9 - Intercompany Claims [1] | 4,536.6 | N/A | 0.0% |
| Class 10 - Intercompany Interests [1] | 10,530.3 | N/A | 0.0% |
| Class 11 - Existing Equity Interests | 506 Miilion Shares | $2.5 / $0.0 | $0.0 |

Notes:

(1) Projected Claims amount based on book values

---

[3] This Liquidation Analysis was prepared by legal entity and the Projected Liquidation Recovery assumes that the Debtors would be liquidated in jointly administered chapter 7 cases but on a nonconsolidated basis.

The following table summarizes this Liquidation Analysis for the aggregated Debtor entities. This Liquidation Analysis should be reviewed with the accompanying notes.

Denbury Resouces Inc.
Liquidation Analysis
*USD in millions*

| USD in Millions | Notes | Pro Forma 9/30/2020 | Estimated Recovery - % Low | Mid | High | Estimated Liquidation Value Low | Mid | High |
|---|---|---|---|---|---|---|---|---|
| **Gross Liquidation Proceeds** | | | | | | | | |
| **Liquidated Balance Sheet** | | | | | | | | |
| Cash and Cash Equivalents | [1] | $ 5.0 | 100.0% | 100.0% | 100.0% | $ 5.0 $ | 5.0 $ | 5.0 |
| Accrued Production Receivables | [2] | 73.1 | 98.0% | 99.0% | 100.0% | 71.6 | 72.3 | 73.1 |
| Trade and Other Receivables, net | [3] | 33.5 | 67.0% | 69.1% | 71.1% | 22.5 | 23.2 | 23.9 |
| Other Current Assets | [4] | 20.9 | 7.5% | 8.8% | 10.2% | 1.6 | 1.8 | 2.1 |
| Derivative Assets, net | [5] | 20.5 | 97.6% | 98.8% | 100.0% | 20.0 | 20.2 | 20.5 |
| Net Property & Equipment | [6] | 3,495.6 | 21.7% | 23.5% | 25.3% | 757.6 | 821.7 | 886.0 |
| Operating lease right-of-use assets | [7] | 31.2 | 0.0% | 0.0% | 0.0% | - | - | - |
| Other Assets | [8] | 106.4 | 5.6% | 6.0% | 6.4% | 6.0 | 6.4 | 6.8 |
| Intercompany (Due From) | [9] | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Intercompany Interests | [10] | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Liquidated Assets** | | $ 3,786.1 | 23.4% | 25.1% | 26.9% | $ 884.1 $ | 950.7 $ | 1,017.3 |
| **Chapter 7 Liquidation Adjustments** | | | | | | | | |
| Wind Down Net Cash Flow | [11] | | | | | (9.0) | (9.0) | (9.0) |
| Chapter 7 Trustee Fees | [12] | | | | | (26.5) | (28.5) | (30.5) |
| Brokerage Fees | [13] | | | | | (16.0) | (17.2) | (18.5) |
| Chapter 7 Professional Fees | [14] | | | | | (14.2) | (14.2) | (14.2) |
| **Total Chapter 7 Liquidation Adjustments** | | | | | | $ (65.8) $ | (69.0) $ | (72.3) |
| **Net Estimated Proceeds from Liquidation Available for Distribution** | | | | | | $ 818.4 $ | 881.7 $ | 945.1 |

| Claim Classes | Notes | Estimated Claim 9/30/2020 | Total Recovery - % Low | Mid | High | Total Recovery - $ Low | Mid | High |
|---|---|---|---|---|---|---|---|---|
| **Superpriority and Structurally Senior Claims** | | | | | | | | |
| DIP Facility Claims | [15] | $ 94.5 | 100.0% | 100.0% | 100.0% | $ 94.5 $ | 94.5 $ | 94.5 |
| Class 1 - Other Secured Claims | [16] | 81.1 | 100.0% | 100.0% | 100.0% | 81.1 | 81.1 | 81.1 |
| Class 2 - Other Priority Claims | [17] | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Total Superpriority and Structurally Senior Claims** | | $ 175.7 | 100.0% | 100.0% | 100.0% | $ 175.7 $ | 175.7 $ | 175.7 |
| **Net Proceeds Available to Secured Claims Recoveries** | | | | | | $ 642.7 $ | 706.0 $ | 769.4 |
| **Secured Claims** | | | | | | | | |
| Class 3- Pipeline Lease Claims | [18] | $ 70.2 | 100.0% | 100.0% | 100.0% | $ 70.2 $ | 70.2 $ | 70.2 |
| Class 4 - RBL/Hedge Claims | [19] | 1.0 | 100.0% | 100.0% | 100.0% | 1.0 | 1.0 | 1.0 |
| Class 5- Second Lien Notes Claims | [20] | 1,629.5 | 35.1% | 39.0% | 42.8% | 571.5 | 634.8 | 698.2 |
| **Total Secured Claims** | | $ 1,700.6 | 37.8% | 41.5% | 45.2% | $ 642.7 $ | 706.0 $ | 769.4 |
| **Net Remaining Distributable Proceeds** | | | | | | $ - $ | - $ | - |
| Administrative Claims | [21] | 23.7 | 0.0% | 0.0% | 0.0% | - | - | - |
| Priority Tax Claims | [22] | 1.0 | 0.0% | 0.0% | 0.0% | - | - | - |
| **Net Remaining Distributable Proceeds for Unsecured Claims** | | | | | | $ - $ | - $ | - |
| **Unsecured Claims** | | | | | | | | |
| Class 6- Convertible Notes Claims | [23] | 234.1 | 0.0% | 0.0% | 0.0% | $ - $ | - $ | - |
| Class 7- Subordinated Notes Claims | [24] | 251.4 | 0.0% | 0.0% | 0.0% | - | - | - |
| Class 8- General Unsecured Claims | [25] | 331.6 | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Unsecured Claims** | | $ 817.0 | 0.0% | 0.0% | 0.0% | $ - $ | - $ | - |
| **Remaining Distributable Value after Unsecured Claims** | | | | | | $ - $ | - $ | - |
| **Other Claims and Interests** | | | | | | | | |
| Class 9- Intercompany Claims | [26] | $ 4,536.6 | 0.0% | 0.0% | 0.0% | - | - | - |
| Class 10- Intercompany Interests | [26] | $ 10,530.3 | 0.0% | 0.0% | 0.0% | - | - | - |
| Class 11- Existing Equity Interests | [26] | N/A | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Other Claims and Interests** | | $ 15,066.9 | 0.0% | 0.0% | 0.0% | $ - $ | - $ | - |
| **Total Claims** | | $ 17,784.8 | 4.4% | 4.8% | 5.1% | $ 818.4 $ | 881.7 $ | 945.1 |

**Specific Notes to this Liquidation Analysis**

*Total Liquidated Assets*

1.  Cash and Cash Equivalents

    a.  Cash and Cash Equivalents consists of unrestricted cash held in bank accounts.

    b.  The Cash and Cash Equivalents estimate consists of book cash rolled forward to the Conversion Date.

    c.  The cash balance accounts for any cash collection, disbursement, or DIP draw/(repayment) activity associated with the normal course of business through the Conversion Date.

    d.  The Conversion Date cash balance assumes a minimum book cash balance for normal operations is always maintained.  Cash balances are not assumed to be netted against DIP Facility Claims on the Conversion Date.

    e.  The Liquidation Proceeds from Cash and Cash Equivalents are estimated to be 100 percent of the pro forma balance.

2.  Accrued Production Receivables

    a.  Accrued Production Receivables are related to the sale of monthly produced oil, natural gas, and related products and are typically collected between zero and sixty days after month end.

    b.  Accrued Production Receivables are assumed to be highly-collectible based on counterparty credit quality and payment history.  Accordingly, Accrued Production Receivables assume a recovery range of 98.0 percent to 100 percent.

3.  Trade and Other Receivables

    a.  Trade and Other Receivables are recorded net of an allowance for doubtful accounts and rolled forward to the Conversion Date.  Trade and Other Receivables are broken into four (4) main components that are distinctly evaluated: (i) Joint Interest Owners Receivables; (ii) Tax Receivables; (iii) Hedge Receivables; and (iv) Other Receivables.

    b.  Joint Interest Owners ("JIB") Receivables represent accounts receivable from non-operating partners for various capital expenditures and lease operating expenses incurred by the Debtors as the operator of the assets under certain joint operating agreements.  Recovery percentages are based on an evaluation of the JIB aging and the collectible nature of certain aged buckets.  Based on this evaluation, JIB Receivables are assumed recoverable at a range of 25.2 percent to 29.9 percent.

    c.   Tax Receivables primarily represent accounts receivables from the federal government based on tax filings with respect to the 2019 federal tax return and form 1139 claiming a refund for net operating loss carrybacks to 2018 and a refundable minimum tax credit relative to the CARES act.  Tax Receivables are assumed recoverable at 98.0 to 100 percent.

    d.   Hedge Receivables represent accounts receivables from various counterparties relative to the Company's commodity hedging derivative program.  The Conversion Date balance relates to the hedge activity for the month of September 2020 and expected to be collected within 10 days of month-end.  Hedge Receivables are assumed to be highly-collectible based on counterparty credit quality.  Therefore, recovery rates for Hedge Receivables are assumed to be between 98.0 and 100 percent.

    e.   Other Receivables are primarily related to recoveries assumed from stop-loss insurance claims, recoveries on other insurance, vendor credit balances reclassed from accounts payable, and small amounts relative to divestitures.  Other Receivables are assumed recoverable at 59.5 to 100 percent.

4.   <u>Other Current Assets</u>

    a.   Other Current Assets include prepaid rent, prepaid insurance (including D&O insurance), prepaid franchise taxes, utility prepaids, software licensing fees, and various other types of short-term deposits.

    b.   The Liquidation Analysis assumes that all facilities, software, and insurance policies will be fully utilized through the remainder of the Marketing Period and the D&O policy will convert to tail coverage.

    c.   The Liquidation Analysis assumes utility vendors will offset prepaid amounts against pre-petition balances or contract rejection claims, as applicable.

    d.   This Liquidation Analysis assumes a recovery rate on Other Current Assets of 7.5 to 10.2 percent.

5.   <u>Derivative Assets, net</u>

    a.   Derivative Assets and related recoveries are based on the Debtors' expected value of commodity hedges at the Conversion Date assuming a September 30, 2020 mark-to-market.

    b.   Derivative Liabilities are based on the Debtors' expected liability of commodity hedges at the Conversion Date, assuming a September 30, 2020 mark-to-market.

    c.   Under normal conditions, the Debtors' separately record Derivative Assets and Derivative Liabilities on the balance sheet.  However, the Liquidation Analysis nets the expected value of both as of the Conversion Date as it is expected the Counterparties would net the hedge positions upon liquidation.

    d.   This Liquidation Analysis assumes a recovery of 97.6 to 100 percent to account for potential breakage costs associated with liquidating the derivative contracts.

6.   <u>Net Property & Equipment</u>

    a.   Net Property & Equipment includes Oil & Gas Reserves, $CO_2$ Properties, Pipelines & Plants, (collectively the "**<u>Oil & Gas Properties</u>**"), Land, & other nominal fixtures, furniture, and other equipment.

    b.   Oil & Gas Properties:

        i.   The Liquidation Analysis assumes that the Trustee sells or otherwise monetizes the reserves and associated equipment owned by the Debtors.

        ii.   The Liquidation Analysis assumes the divestiture will be directed by a qualified investment bank or firm that specializes in managing oil and gas acquisitions and divestitures.  The estimated values realized for such assets reflect, among other things, the following factors:

            1.   projected oil and natural gas prices;

            2.   projected production and operating performance for each asset;

            3.   projected operating and maintenance costs for each asset; and

            4.   assumed capital and environmental expenditure requirements.

        iii.   After a review of the Debtors' assets, the Debtors and their advisors concluded that the forced sale of these assets in the compressed timeframe during a chapter 7 liquidation would likely result in the Trustee receiving less than "going-concern" value for the assets.  The liquidation value of reserves is based on proved developed producing ("**<u>PDP</u>**") reserves, proved developed not producing ("**<u>PDNP</u>**") reserves, Proved Undeveloped ("**<u>PUD</u>**") reserves, probable reserves (**"<u>PROB</u>"**) reserves, and possible (**"<u>POS</u>"**) reserves valued as of September 30, 2020.

    c.   Other Property & Equipment

        i.   Other Property & Equipment primarily includes Land, Capital Leases, Auto Leases, Leasehold Improvements, Software, Computers, Fixtures and Furniture.  Only Land is assumed to have any meaningful recovery in the Liquidation Analysis.

    d.   Net Property & Equipment values are assumed to have a recovery range of 21.7 percent to 25.3 percent of pro forma book value.

7.   Operating lease right-of-use assets

   a.   Operating lease right-of-use assets consists of the present value of leased asset payments utilizing the Debtors' incremental borrowing rate through the projected lease term (inclusive of renewals).

   b.   Upon the Conversion Date it is assumed that 100 percent of all executory contracts will be rejected at various points through the end of the liquidation timeline. Therefore, no recovery value (0.0 percent) is assumed for Operating lease right-of-use assets.

8.   Other Assets

   a.   Other Assets consists of restricted cash escrow accounts, $CO_2$ & Oil Line fills, intangibles, environmental credits, utility deposits (including the adequate assurance deposit), and surety bond amounts.

   b.   Upon the Conversion Date it is assumed that 100 percent of the approximately $53.9 million in escrow account balances will be forfeited and subsequently controlled by third parties to satisfy abandonment and remediation costs. Similarly, any escrow amounts will become the property of the counterparty.

   c.   $CO_2$ & Oil Line fills recoveries are assumed to be included in the liquidation value of the Oil & Gas Properties.

   d.   Intangibles are accounting assets with no value in a liquidation.

   e.   Other Assets are assumed to have a recovery range of 5.6 percent to 6.4 percent of pro forma book value.

9.   Intercompany (Due From)

   a.   Intercompany (Due From) relates to the positive value of claims certain legal entities have against other legal entities within the Debtors' legal structure.

   b.   The Liquidation Analysis is performed on an entity by entity basis. Intercompany Claims would be treated as subordinate to general unsecured claims. Given the various guarantees of debt across legal entities, no recovery is assumed on account of Intercompany Claims.

10.  Intercompany Interests

   a.   Intercompany Interests relate to the equity value certain legal entities have with other legal entities across the Debtor legal structure.

b. The Liquidation Analysis is performed on an entity by entity basis. Intercompany Interests would be treated as subordinate to general unsecured claims and Intercompany (Due From). Given the various guarantees of debt across legal entities, no recovery is assumed on account of Intercompany Investments.

*Chapter 7 Liquidation Adjustments*

11. <u>Wind-Down Net Cash Flow</u>

a. Wind-Down Net Cash Flow is based on estimated net cash flows generated by the Debtor entities for the period from October 1, 2020 through the end of the Wind-Down Period on March 31, 2021.

b. General and administrative expenses during the Liquidation Period consist primarily of support functions that would be required to wind-down the Debtors' Estates in chapter 7, including administrative payroll, rent, information technology, interest on the DIP Facility balance, and other costs. These wind-down functions are assumed to occur over the entirety of the three-month Marketing Period and the three-month Wind-Down Period. For those employees that are retained during the six-month liquidation process, the analysis includes estimated salary, benefits, retention, and severance expenses.

12. <u>Chapter 7 Trustee Fees</u>

a. Chapter 7 Trustee Fees are limited by the fee guidelines of section 326(a) of the Bankruptcy Code. The Liquidation Analysis assumes Trustee fees are approximately 3.0 percent of each entity's gross Liquidation Proceeds available for distribution to creditors.

13. <u>Brokerage Fees</u>

a. Brokerage Fees are fees based on specific asset gross liquidation proceeds available for distribution to creditors. The Liquidation Analysis assumes a 2.0 percent estimate for Broker Fees associated with the sale of the Debtors' Oil and Gas Properties, Land and building assets.

14. <u>Chapter 7 Professional Fees</u>

a. Professional Fees are based on a monthly estimate of legal, financial advisory, and other costs to support the Trustee in the wind-down of the Debtors' Estates over the six-month Liquidation Period.

*Claims and Recoveries*

*Superpriority, Structurally Senior, and Secured Claims*

15. DIP Facility Claims

   a. The Debtors estimate that DIP Facility Claims will total approximately $94.5 million as of the Conversion Date.

   b. DIP Facility Claims include the unpaid principal and interest on the DIP Facility.

   c. DIP Facility Claims also include $63.9 million in assumed drawn letters of credit due to the conversion of the Cases from Chapter 11 to Chapter 7.

   d. Moreover, DIP Facility Claims also include $2.75 million in accrued and unpaid Chapter 11 Professional Fee Carve Out claims per the DIP Facility Documents as of the Conversion Date.

   e. The Liquidation Analysis assumes that the Liquidation Distribution available to holders of DIP Facility Claims would be sufficient to satisfy 100 percent of the outstanding DIP Facility Claims.

16. Class 1 – Other Secured Claims

   a. The Debtors estimate that Class 1 – Other Secured Claims will total approximately $81.1 million as of the Conversion Date.

   b. Class 1 – Other Secured Claims includes secured prepetition tax claims (ad-valorem, property), adequate assurance utility deposit amounts,  as well as an allowance for certain postpetition chapter 11 Claims, including accrued and unpaid capital expenditures and lease operating expenses that, if unpaid at the Conversion Date, could become subject to mechanic's and materialman's liens.  The Debtors' estimate the portion of Class 1 – Other Secured Claims associated with potential liens would total approximately $60.1 million as of the Conversion Date.

   c. The Liquidation Analysis assumes that the Liquidation Distribution available to holders of Class 1 – Other Secured Claims would be sufficient to satisfy 100.0 percent of the outstanding Claims.

17. Class 2 – Other Priority Claims

   a. The Debtors estimate that Class 2 – Other Priority Claims will total approximately $0.0 million as of the Conversion Date.

   b. The Debtors assume 100 percent of Class 2 – Other Priority Claims will be paid through FDMs prior to the Conversion Date.

*Secured Claims*

18. <u>Class 3 – Pipeline Lease Claims</u>

   a.  The Debtors estimate that there will be Claims associated with principal, accrued and unpaid interest related to the Pipeline Lease of approximately $70.2 million. This amount reflects an assumed reduction of $41.3 million associated with an assumed $41.3 million draw on the related letter of credit upon the conversion of the Cases to a Chapter 7.

   b.  The Pipeline Lease Claims are amounts arising under, derived from, based on, or secured pursuant to the Pipeline Financing Agreement.

   c.  The Liquidation Analysis projects that the Liquidation Proceeds will result in a 100 percent recovery to the Pipeline Lease Claims.

19. <u>Class 4 – RBL Claims and Hedge Claims</u>

   a.  The Debtors estimate that there will be $1.0 million in Claims associated with principal, accrued and unpaid interest and related to the RBL Facility (**"RBL Claims"**)

   b.  It is assumed that the prepetition RBL balance, less $1.0 million in a Retained Prepetition Claim per the DIP Facility Documents, will be converted into a DIP Facility Claim upon the Chapter 11 filing.

   c.  The Debtors also assume that any Hedge position, as of the Conversion Date, will be netted against any liability and be available as proceeds to pay DIP Facility Claims.

   d.  The Liquidation Analysis projects that the Liquidation Proceeds will result in a 100 percent recovery to the RBL Claims and Hedge Claims.

20. <u>Class 5 – Second Lien Notes Claims</u>

   a.  The Debtors estimate that there will be approximately $1,629.5 million of Second Lien Notes Claims.

   b.  The Second Lien Notes Claims totaling $1,629.5 million associated with the Debtors second lien notes outstanding on the Conversion Date consist of: (i) $21.2 million of 7.5% Senior Secured Notes; (ii) $547.3 million of 7.75% Senior Secured Notes; (iii) $593.8 million of 9.00% Senior Secured Notes; and (iv) $467.2 million of 9.25% Senior Secured Notes.

   c.  The Liquidation Analysis projects a recovery range of $571.5 to $698.2 million on the Second Lien Notes Claims which represents a 35.1 percent to 42.8 percent recovery.

*Administrative & Priority Tax Claims*

21. <u>Administrative Claims</u>

   a. The Debtors estimate that unsecured Administrative Claims will total approximately $23.7 million as of the Conversion Date.

   b. Moreover, Administrative Claims include $10.1 million in accrued and unpaid Chapter 11 professional fees not subject to the Carve Out included as part of DIP Facility Claims as of the Conversion Date.

   c. The Liquidation Analysis projects a zero ($0) recovery on Administrative Claims and a 0.0 percent recovery.

22. <u>Priority Tax Claims</u>

   a. The Debtors estimate that Priority Tax Claims will total approximately $1.0 million as of the Conversion Date.

   b. Priority Tax Claims include the estimated unsecured prepetition Claims of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

   c. The Liquidation Analysis projects a zero ($0) recovery on Priority Tax Claims and a 0.0 percent recovery.

*Unsecured Claims*

23. <u>Class 6 - Convertible Notes Claims</u>

   a. The Debtors estimate that there will be approximately $234.1 million of Convertible Notes Claims.

   b. The Convertible Notes Claims include accrued and unpaid interest through the Petition Date. This Liquidation Analysis projects a zero ($0) recovery on the Convertible Note Claims and a 0.0 percent recovery.

24. <u>Class 7 – Subordinated Notes Claims</u>

   a. The Debtors estimate that there will be approximately $251.4 million of Subordinated Notes Claims.

   b. Subordinated Notes Claims total approximately $251.4 million associated with the Debtors subordinated notes outstanding on the Liquidation Date and consist of: (i) $139.4 million of 4.625% Senior Subordinated Notes; (ii) $59.2 million of 5.5% Senior Subordinated Notes; and (iii) $52.8 million of 6.375% Senior Subordinated Notes. The Liquidation Analysis projects a zero ($0) recovery on the Subordinated Notes Claims and a 0.0 percent recovery.

25. Class 8 – General Unsecured Claims

    a.  The Debtors estimate that there will be approximately $331.6 million of General Unsecured Claims, consisting of accrued and unpaid general & administrative expenses, lease rejection and executory contract rejection claims, unpaid utility expenses, unpaid prepetition deferred compensation claims, and unsecured litigation claims.

    b.  General Unsecured Claims also include an estimate of claims resulting from (**"Lease Rejection, Litigation and Executory Contract Claims"**), which are claims asserted by impaired parties for damages as a result of a premature contract termination. The estimated total amount of claims associated with the Lease Rejection, Litigation and Executory Contract Claims total approximately $272.0 million as of the Conversion Date (excluding litigation).

    c.  The Liquidation Analysis projects a zero ($0) recovery on the General Unsecured Claims and a 0.0 percent recovery.

*Other Claims and Interests*

26. Class 9 – Intercompany Claims, Class 10 – Intercompany Interests, Class 11 – Existing Equity Interests

    a.  The Liquidation Analysis assumes that there would be no recovery to Class 9 – Intercompany Claims, Class 10 – Intercompany Interests, or Class 11 – Existing Equity Interests

**Exhibit E**

**Financial Projections**

**Financial Information and Projections**

## I.    FINANCIAL PROJECTIONS

For purposes of demonstrating feasibility of the Plan, the Debtors have prepared the forecasted, post-reorganized, consolidated balance sheet, income statement, and statement of cash flows (the "Financial Projections" or the "Projections") for the fourth quarter of 2020 and the annual periods ending December 31, 2021 (fiscal year 2021) through December 31, 2024 (fiscal year 2024) (the "Projection Period").  The Financial Projections were prepared based on a number of assumptions made by the Debtors' management team as to the future performance of the Reorganized Debtors, and reflect management's judgment and expectations regarding their future operations and financial position.

The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond management's control, including the exploration for and development, production, gathering and sale of oil, natural gas, natural gas liquids, and carbon dioxide.  In addition to the risk factors set forth in Article VII of the Disclosure Statement, factors that may cause actual results to differ from expected results include, but are not limited to:

|      |      |
|------|------|
| (i)  | fluctuations in oil and natural gas prices and the Reorganized Debtors' ability to hedge against pricing changes; |
| (ii) | fluctuations in the prices of goods and services; |
| (iii) | the uncertainty inherent in estimating reserves, future net revenues and discounted future cash flows; |
| (iv) | the timing and amount of future production of oil and natural gas; |
| (v)  | a financial downturn in one or more of the world's major markets; |
| (vi) | operational impacts due to unexpected drilling conditions, pressure or irregularities in formations, equipment failures or accidents, and adverse weather conditions; |
| (vii) | the loss of certain key customers, executive officers, or specialized technical employees; |
| (viii) | environmental, drilling and other operating risks; |
| (ix) | proved and unproved drilling locations and future drilling plans; and |
| (x)  | the effects of existing and future laws and governmental regulations. |

Should one or more of the risks or uncertainties referenced above or in the Disclosure Statement occur, or should underlying assumptions prove incorrect, actual results and plans could differ materially from those expressed in the Financial Projections.  Further, new factors could cause actual results to differ materially from those described in the Financial Projections, and it is not possible to predict all such factors or the extent to which any such factor or combination of factors may cause actual results to differ from those contained in the Financial Projections.  The Financial

Projections herein are not, and must not be viewed as, a representation of fact, predictions, or guaranty of the Reorganized Debtors' future performance.

## II.    ACCOUNTING POLICIES AND DISCLAIMER

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION.  THE FINANCIAL PROJECTIONS DO NOT REFLECT THE FORMAL IMPLEMENTATION OF REORGANIZATION ACCOUNTING PURSUANT TO FINANCIAL ACCOUNTING STANDARDS BOARD ACCOUNTING STANDARDS CODIFICATION TOPIC 852, REORGANIZATIONS ("ASC 852").   OVERALL, THE IMPLEMENTATION OF ASC 852 IS NOT ANTICIPATED TO HAVE A MATERIAL IMPACT ON THE UNDERLYING ECONOMICS OF THE PLAN.  WHILE THE FINANCIAL PROJECTIONS INCLUDE ASSUMPTIONS RELATED TO THE APPLICATION OF FRESH START REPORTING FOR PRESENTATION PURPOSES, THE ACTUAL FRESH START ADJUSTMENTS MAY BE MATERIALLY DIFFERENT THAN WHAT IS PRESENTED IN THESE FINANCIAL PROJECTIONS.  HOWEVER, ANY CHANGES TO THE FRESH START REPORTING PRESENTED IN THE FINANCIAL PROJECTIONS, IF ANY, SHOULD NOT HAVE AN IMPACT ON THE CASH GENERATING ABILITY OF THE REORGANIZED DEBTORS.    THE FINANCIAL PROJECTIONS HAVE BEEN PREPARED USING GENERALLY ACCEPTED ACCOUNTING POLICIES ("GAAP") THAT ARE MATERIALLY CONSISTENT WITH THOSE APPLIED IN THE DEBTORS' HISTORICAL FINANCIAL STATEMENTS.   THE FINANCIAL PROJECTIONS HAVE NOT BEEN AUDITED OR REVIEWED BY A REGISTERED INDEPENDENT ACCOUNTING FIRM.

ALTHOUGH MANAGEMENT HAS PREPARED THE PROJECTIONS IN GOOD FAITH AND BELIEVES THE ASSUMPTIONS TO BE REASONABLE, THE DEBTORS AND THE REORGANIZED DEBTORS CAN PROVIDE NO ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED. THE FINANCIAL PROJECTIONS HEREIN ARE NOT, AND MUST NOT BE VIEWED AS, A REPRESENTATION OF FACT, PREDICTION, OR GUARANTY OF THE COMPANY'S FUTURE PERFORMANCE.  AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT THE REORGANIZED DEBTORS' FINANCIAL RESULTS AND MUST BE CONSIDERED.  ACCORDINGLY, ANY REVIEW OF THE PROJECTIONS SHOULD TAKE INTO ACCOUNT THE RISK FACTORS SET FORTH IN THE DISCLOSURE STATEMENT AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.

MOREOVER, THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE

SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH WILL BE BEYOND THE CONTROL OF THE REORGANIZED DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, INDUSTRY-SPECIFIC RISK FACTORS, AND OTHER MARKET AND COMPETITIVE CONDITIONS, INCLUDING WITHOUT LIMITATION THOSE SET FORTH HEREIN. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS ARE AS OF THE DATE PREPARED AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS AND REORGANIZED DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS. THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THESE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, THE DISCLOSURE STATEMENT, OR THESE PROJECTIONS. THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE

REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

## III.   GENERAL ASSUMPTIONS

   a.   Overview

The Debtors are an independent oil and natural gas company with operations focused in two key operating areas in the United States: the Gulf Coast and Rocky Mountain regions. Their goal is to increase the value of their properties through a combination of exploitation, drilling, and proven engineering extraction practices, with the most significant emphasis relating to $CO_2$ enhanced oil recovery operations.

   b.   Methodology

Key personnel from each of the Debtors' operating areas and across various functions provided input in the development of the Projections.  In preparing the Projections, the Debtors considered the current commodity price environment, historical operating/production performance, and operating costs.  The Projections were developed taking into consideration the Debtors' current scope of operation and development of its acreage position based on projected commodity prices, capital investment and return requirements, and other operating and non-operating considerations.

   c.   Plan Consummation

The Financial Projections assume that the Plan will be consummated on or around October 1, 2020.

**Assumptions With Respect to the Projected Income Statement**

   a.   Production

Forecasted oil and natural gas volumes for operated production are based on production estimates by the Debtors' management team and contemplate future commodity prices and anticipated capital spending levels.  Forecasted volumes for non-operated production are based on anticipated development plans of outside operators obtained through active dialogue with those operators.

   b.   Revenues

Revenues are primarily derived from the sale of the consolidated Reorganized Debtors' share of oil and natural gas production primarily from their owned working interests in Texas, Louisiana, Mississippi, Montana, North Dakota, and Wyoming as well as the Reorganized Debtors' respective ownership interest in non-operated wells.  The Projections assume the Reorganized Debtors continue to own and produce $CO_2$ reserves that will be used in the Reorganized Debtors' tertiary oil recovery operations, with a portion sold to third-party industrial users.

c. Commodity Pricing

Revenues are sensitive to changes in the prices received for oil and natural gas production. Oil and natural gas production is sold at prevailing market prices, which may be volatile and subject to numerous factors that are outside of the Reorganized Debtors' control. The Projections assume New York Mercantile Exchange ("NYMEX") futures strip pricing as of June 30, 2020 for crude oil and natural gas as shown in the chart below:

| | Forecasted Prices | | | | |
| --- | --- | --- | --- | --- | --- |
| | Q4 2020 | 2021 | 2022 | 2023 | 2024 |
| NYMEX oil price ($ per BOE) | $ 39.58 | $ 40.31 | $ 41.38 | $ 42.52 | $ 43.62 |
| NYMEX gas price ($ per Mcf) | $ 2.31 | $ 2.61 | $ 2.43 | $ 2.38 | $ 2.39 |

Assumptions regarding realized pricing (*i.e.*, "differentials") from NYMEX are based on input from the Debtors' management, recent historical rates and existing marketing, gathering and transportation contracts with purchasers of the Debtors' production and are consistent with recent realized pricing. The proposed Exit Facility requires the Reorganized Debtors to enter into new swaps, collar agreements, or puts (whether deferred premium or fully-paid) by specified milestone dates such that the Company has hedges in place covering at least 65% of reasonably anticipated production for the period of August 1, 2020 through July 31, 2021 and 35% of reasonably anticipated production for the period of August 1, 2021 through July 31, 2022. The Debtors have historically used a combination of swaps, costless collars, and three-way collars to hedge a portion of anticipated production levels. As such, the costs of the proposed hedging requirements of the Exit Facility are not anticipated to have a material impact on the Financial Projections.

d. Production Taxes

Production taxes are based on production volumes and projected commodity pricing, as well as management's estimates of future tax obligations.

e. Operating Costs

Lease operating expenses ("LOE"), workover expenses, and gathering expenses are based on historical levels and management estimates of future expectations. LOE includes, among other items, $CO_2$ costs, power and fuel, labor and overhead, repairs and maintenance, chemicals, workovers, and other operating costs.

f. Transportation and Marketing Expenses

Transportation and marketing expenses are based on recent historical rates and existing marketing, gathering and transportation contracts with purchasers of the Debtors' production.

g. General and Administrative

General and Administrative Costs ("G&A") are primarily comprised of labor costs and other expenses associated with the Reorganized Debtors' corporate overhead.  Projected G&A is based on historical G&A costs, current development and operational plans, and are adjusted for recent cost reduction efforts.  The G&A costs also include assumptions for estimated go-forward stock based compensation programs.

    h.   Income Taxes

Income taxes are based on the assumption that the Reorganized Debtors' should have substantial tax attributes available, including depreciable assets, net operating losses, and tax credits, as a result of meeting the requirements of Section 382(l)(5). The Projections assume certain alternative minimum tax credit carryforward balances will be refundable during the fourth quarter of 2020, pursuant to the Tax Cut & Jobs Act and the CARES Act.

    i.   Interest Expense

Interest expense is comprised of interest on an Exit Facility, interest on the pipeline financing arrangements, and interest on capital lease obligations.  Interest expense on the Exit Facility is estimated based on anticipated funding requirements.

**Income Statement**

| ($ in millions) | Q4 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|
| | | Forecasted | | | |
| Oil, natural gas and related product sales | $ 169.9 | $ 701.4 | $ 690.6 | $ 671.44 | $ 683.3 |
| $CO_2$ sales and transportation fees | 10.1 | 40.8 | 45.5 | 45.286 | 45.1 |
| Purchased oil sales | 5.5 | 22.6 | 23.2 | 23.841 | 24.5 |
| Other income | 5.1 | 20.6 | 5.0 | 5.000 | 5.0 |
|    Total revenues and other income | 190.6 | 785.4 | 764.3 | 745.567 | 757.9 |
| Lease operating expenses | 96.3 | 385.0 | 373.6 | 360.1 | 358.0 |
| Transportation and marketing expenses | 9.7 | 36.5 | 35.0 | 33.1 | 32.8 |
| $CO_2$ discovery and operating expenses | 1.0 | 4.6 | 5.3 | 5.3 | 5.3 |
| Taxes other than income | 16.7 | 55.7 | 54.4 | 54.4 | 55.7 |
| Purchased oil expenses | 5.4 | 22.2 | 22.8 | 23.4 | 24.0 |
| General and administrative expenses | 9.8 | 49.4 | 46.8 | 46.8 | 46.8 |
| Interest | 5.5 | 19.5 | 18.4 | 17.2 | 14.9 |
| Depletion, depreciation, and amortization | 22.9 | 91.7 | 88.0 | 83.4 | 82.6 |
| Commodity derivative expense (income) | - | - | - | - | - |
| Other expenses | 0.6 | 2.3 | 2.3 | 2.3 | 2.3 |
|    Total expenses | 167.7 | 667.0 | 646.5 | 625.9 | 622.3 |
| Income (loss) before income taxes | 22.9 | 118.5 | 117.8 | 119.6 | 135.5 |
| Current income tax expense (benefit) | - | - | (0.0) | 0.3 | 0.9 |
| Deferred income tax expense (benefit) | 4.6 | 36.6 | 36.0 | 32.4 | 33.5 |
|    **Net income (loss)** | **18.3** | **81.9** | **81.9** | **86.9** | **101.1** |
| | | | | | |
| Reconciliation of net income (loss) to adjusted EBITDA | | | | | |
| Net income (loss) | 18.3 | 81.9 | 81.9 | 86.9 | 101.1 |
| (+) Current income tax expense (benefit) | - | - | (0.0) | 0.3 | 0.9 |
| (+) Deferred income tax expense (benefit) | 4.6 | 36.6 | 36.0 | 32.4 | 33.5 |
| (+) Interest | 5.5 | 19.5 | 18.4 | 17.2 | 14.9 |
| (+) Depletion, depreciation, and amortization | 22.9 | 91.7 | 88.0 | 83.4 | 82.6 |
|    **Adjusted EBITDA** | **$ 51.2** | **$ 229.7** | **$ 224.2** | **$ 220.2** | **$ 233.0** |

## Assumptions with Respect to the Projected Balance Sheet and Projected Statement of Cash Flows

    a.   Capital Expenditures

Projections for capital expenditures are based on  estimates by the Debtors' management team, and contemplate anticipated development activity.  These Projections reflect the Company's current capital expenditures plan and are subject to change based on pricing, general economic conditions, and continued evaluation of opportunities by the management team. The current capital expenditures forecast is not intended to be an exhaustive list of potential capital projects, but does include the projects the management team considers most feasible based on current commodity and economic conditions.   Accordingly, the Projections do not reflect the potential for the Company to pursue the tertiary development at Cedar Creek Anticline or other potential opportunities that are less economically feasible at the forecasted prices .  Forecasted capital

expenditures for non-development activities are based on plans of outside operators obtained through active dialogue with those operators. Development and non-development capital expenditures include capital associated with drilling and completing new producing wells, recompleting wells to new zones, implementing improved recovery systems, improving operational efficiency and safety, and capitalized maintenance expenditures.

b. Working Capital

The Projections contemplate timing of forecasted receivables and payables associated with the Reorganized Debtors' assets and liabilities that are consistent with the timing experienced with the Debtors' historical receipts and payments.

c. Land Sales

The Projections assume approximately $28 million of surface land sales between the fourth quarter of 2020 through year end 2021.

d. Pro Forma Adjustments Related to Emergence

The Balance Sheet included in the Projections presents a pro forma view assuming the effect of certain adjustments related to the Reorganized Debtors' emergence from the Chapter 11 Cases. These adjustments primarily relate to the additional borrowings under the Reorganized Debtors' Exit Facility and the exchange of the Second Lien Notes Claims, Convertible Notes Claims, and Subordinated Notes Claims for equity in the Reorganized Debtors.  The Financial Projections include pro forma adjustments to reflect the proposed restructuring, but do not purport to represent all aspects of the Financial Accounting Standards Board ASC 852.

e. Capital Structure

The Projections assume that the Reorganized Debtors are able to secure financing in the form of an Exit Facility.

f. Other Assumptions

The Projections do not assume a full cost pool ceiling test write-down, unevaluated property impairment, or long-lived asset impairment prior to emergence or other transfers of unevaluated property costs to the full cost amortization base. The Financial Projections make no assumptions with regards to any ongoing legal or settlement processes, the outcome of which are unknown.

## Opening Balance Sheet

| ($ in millions) | Predecessor Sep 30, 2020 | Reorganization Adjustments | Successor Sep 30, 2020 |
|---|---|---|---|
| **Assets** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ 5.0 | - | $ 5.0 |
| Accrued production receivable | 73.1 | - | 73.1 |
| Trade and other receivables, net | 33.5 | - | 33.5 |
| Derivative assets | 24.6 | - | 24.6 |
| Other current assets | 20.9 | - | 20.9 |
| Total current assets | 157.1 | - | 157.1 |
| | | | |
| Property and equipment: | | | |
| Property and equipment | 16,108.7 | (14,808.7) | 1,300.0 |
| Less: accumulated depletion, depreciation, amortization, and impairment | (12,613.1) | 12,613.1 | - |
| Net property and equipment | 3,495.6 | (2,195.6) | 1,300.0 |
| | | | |
| Other assets: | | | |
| Operating lease right-of-use assets | 31.2 | - | 31.2 |
| Other assets | 106.4 | 144.0 | 250.5 |
| **Total assets** | **3,790.3** | **(2,051.5)** | **1,738.8** |
| | | | |
| **Liabilities and stockholders' equity** | | | |
| Current liabilities: | | | |
| Accounts payable and accrued liabilities | 143.6 | (33.1) | 110.5 |
| Oil and gas production payable | 39.3 | - | 39.3 |
| Derivative liabilities | 4.2 | - | 4.2 |
| Current maturities of long-term debt | 14.9 | - | 14.9 |
| Operating lease liabilities | 8.0 | - | 8.0 |
| Total current liabilities | 209.9 | (33.1) | 176.8 |
| | | | |
| Long-term liabilities: | | | |
| Long-term debt | 170.0 | 45.6 | 215.6 |
| Asset retirement obligations | 180.9 | - | 180.9 |
| Deferred tax liabilities, net | 379.6 | (325.0) | 54.7 |
| Operating lease liabilities | 33.6 | - | 33.6 |
| Other liabilities | 2.7 | - | 2.7 |
| Liabilities subject to compromise | 2,118.7 | (2,118.7) | - |
| Total long-term liabilities | 2,885.5 | (2,398.1) | 487.4 |
| | | | |
| Stockholders' equity: | | | |
| Total stockholders' equity | 694.9 | 379.6 | 1,074.5 |
| **Total liabilities and stockholders' equity** | **$ 3,790.3** | **($ 2,051.5)** | **$ 1,738.8** |

# Balance Sheet

| | Forecasted (as of Dec 31) | | | | |
|---|---|---|---|---|---|
| ($ in millions) | 2020 | 2021 | 2022 | 2023 | 2024 |
| **Assets** | | | | | |
| Current assets: | | | | | |
| Cash and cash equivalents | $ 5.0 | $ 91.0 | $ 149.1 | $ 176.2 | $ 259.2 |
| Accrued production receivable | 73.3 | 73.2 | 71.5 | 70.8 | 72.1 |
| Trade and other receivables, net | 26.0 | 23.2 | 26.2 | 26.2 | 26.2 |
| Other current assets | 20.1 | 19.7 | 19.3 | 18.9 | 18.6 |
| Total current assets | 124.4 | 207.2 | 266.1 | 292.2 | 376.0 |
| | | | | | |
| Property and equipment: | | | | | |
| Property and equipment | 1,315.5 | 1,428.9 | 1,550.5 | 1,699.4 | 1,808.5 |
| Less: accumulated depletion, depreciation, amortization, and impairment | (19.0) | (95.1) | (167.5) | (235.3) | (302.4) |
| Net property and equipment | 1,296.5 | 1,333.7 | 1,382.9 | 1,464.1 | 1,506.1 |
| | | | | | |
| Other assets: | | | | | |
| Operating lease right-of-use assets | 29.8 | 24.1 | 18.4 | 12.0 | 8.5 |
| Other assets | 243.8 | 241.5 | 239.2 | 236.9 | 235.6 |
| **Total assets** | **1,694.5** | **1,806.5** | **1,906.6** | **2,005.2** | **2,126.2** |
| | | | | | |
| **Liabilities and stockholders' equity** | | | | | |
| Current liabilities: | | | | | |
| Accounts payable and accrued liabilities | 120.4 | 140.7 | 142.0 | 141.2 | 134.3 |
| Oil and gas production payable | 39.8 | 38.6 | 38.2 | 38.1 | 38.3 |
| Current maturities of long-term debt | 15.3 | 18.3 | 19.2 | 19.9 | 21.6 |
| Operating lease liabilities | 8.0 | 8.3 | 8.9 | 9.5 | 7.7 |
| Total current liabilities | 183.5 | 205.9 | 208.3 | 208.6 | 201.9 |
| | | | | | |
| Long-term liabilities: | | | | | |
| Long-term debt | 147.3 | 119.6 | 100.4 | 80.5 | 58.9 |
| Asset retirement obligations | 175.6 | 170.6 | 165.6 | 161.0 | 167.4 |
| Deferred tax liabilities, net | 59.2 | 95.8 | 131.8 | 164.2 | 197.7 |
| Operating lease liabilities | 31.5 | 23.2 | 14.3 | 4.8 | 0.1 |
| Other liabilities | 2.7 | 1.7 | 1.7 | 1.7 | 1.7 |
| Total long-term liabilities | 416.4 | 411.0 | 413.9 | 412.3 | 425.8 |
| | | | | | |
| Stockholders' equity: | | | | | |
| Total stockholders' equity | 1,094.6 | 1,189.5 | 1,284.4 | 1,384.4 | 1,498.5 |
| **Total liabilities and stockholders' equity** | **$ 1,694.5** | **$ 1,806.5** | **$ 1,906.6** | **$ 2,005.2** | **$ 2,126.2** |

## Statement of Cash Flows

| ($ in millions) | Q4 2020 | Forecasted 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|
| **Cash flows from operating activities:** | | | | | |
| Net income (loss) | $ 18.3 | $ 81.9 | $ 81.9 | $ 86.9 | $ 101.1 |
| Adjustments to reconcile net income to cash flow from operating activities: | | | | | |
| Depletion, depreciation and amortization | 22.9 | 91.7 | 88.0 | 83.4 | 82.6 |
| Deferred income taxes | 4.6 | 36.6 | 36.0 | 32.4 | 33.5 |
| Stock-based compensation | - | 13.0 | 13.0 | 13.0 | 13.0 |
| Other, net | 18.9 | (13.0) | 0.1 | 0.1 | (1.2) |
| Change in assets and liabilities: | | | | | |
| Accrued production receivable | (0.2) | (2.3) | 1.8 | 0.7 | (1.2) |
| Trade and other receivables | 7.5 | 2.8 | (3.0) | - | - |
| Other current and long-term assets | 6.1 | - | - | - | - |
| Accounts payable and accrued liabilities | 0.8 | (0.5) | (19.3) | (21.1) | (16.1) |
| Oil and natural gas production payable | 0.5 | (1.2) | (0.4) | (0.1) | 0.3 |
| Other liabilities | - | (1.0) | - | - | - |
| Net cash provided by operating activities | 79.3 | 208.2 | 198.0 | 195.3 | 212.0 |
| **Cash flows from investing activities:** | | | | | |
| Oil and natural gas capital expenditures | (18.7) | (114.6) | (116.8) | (148.0) | (108.1) |
| Net proceeds from sale of oil and natural gas properties and equipment | 7.5 | 20.0 | - | - | - |
| Other | (0.1) | (3.1) | (4.8) | (1.0) | (1.0) |
| Net cash used in investing activities | (11.3) | (97.7) | (121.6) | (149.0) | (109.0) |
| **Cash flows from financing activities:** | | | | | |
| Bank borrowings / (repayments) | (64.3) | (9.3) | - | - | - |
| Pipeline financing and capital lease debt repayments | (3.7) | (15.2) | (18.3) | (19.2) | (19.9) |
| Net cash used in financing activities | (68.0) | (24.5) | (18.3) | (19.2) | (19.9) |
| **Net increase in cash** | **-** | **86.0** | **58.1** | **27.1** | **83.0** |
| Beginning cash | 5.0 | 5.0 | 91.0 | 149.1 | 176.2 |
| Net increase in cash | - | 86.0 | 58.1 | 27.1 | 83.0 |
| **Ending cash** | **$ 5.0** | **$ 91.0** | **$ 149.1** | **$ 176.2** | **$ 259.2** |

## **Exhibit F**

**Valuation Analysis**

**Valuation Analysis**

THE VALUATION INFORMATION CONTAINED IN THE FOLLOWING ANALYSIS IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN. THIS VALUATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS. IN ADDITION, THE VALUATION OF NEWLY-ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, AND OTHER FACTORS WHICH GENERALLY INFLUENCE PRICES OF SECURITIES.

THE ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE DETERMINED BY EVERCORE REPRESENT ESTIMATED ENTERPRISE VALUES AND DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE IMPUTED ESTIMATE OF THE RANGE OF THE EQUITY VALUE OF THE REORGANIZED DEBTORS ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET TRADING VALUE. ANY SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATE OF THE EQUITY VALUE RANGE FOR THE REORGANIZED DEBTORS ASSOCIATED WITH EVERCORE'S VALUATION ANALYSIS.

Solely for purposes of the Plan[1] and the Disclosure Statement, Evercore Group L.L.C. ("**Evercore**"), as investment banker and financial advisor to the Debtors, has estimated the total enterprise value (the "**Total Enterprise Value**") and implied equity value (the "**Equity Value**") of the Reorganized Debtors on a going-concern basis and pro forma for the transactions contemplated by the Plan.

In estimating the Debtors' Total Enterprise Value, Evercore met with the Debtors' senior management team to discuss the Debtors' assets, operations, and future prospects; reviewed the Debtors' historical financial information; reviewed certain of the Debtors' internal financial and operating data, including the Debtors' reserve report; reviewed the Debtors' financial projections for the Reorganized Debtors provided in Exhibit F to the Disclosure Statement

---

[1]      Capitalized terms used but not otherwise defined in this Exhibit F have the meanings ascribed to such terms in the *Joint Chapter 11 Plan of Reorganization of Denbury Resources Inc. And Its Debtor Affiliates* (the "Plan"), attached as Exhibit A to the Disclosure Statement.

(the "**Projections**"); reviewed publicly available third-party information; and conducted such other studies, analyses, and inquiries we deemed appropriate.

The valuation analysis herein represents a valuation of the Reorganized Debtors as the continuing operators of the business and assets of the Debtors, after giving effect to the Plan, based on the application of standard valuation techniques. The estimated values set forth below: (i) do not purport to constitute an appraisal of the assets of the Reorganized Debtors; (ii) do not constitute an opinion on the terms and provisions or fairness from a financial point of view to any holder of the consideration to be received by such holder under the Plan; (iii) do not constitute a recommendation to any holder of Claims or Interests as to how such holder should vote or otherwise act with respect to the Plan; and (iv) do not necessarily reflect the actual market value that might be realized through a sale or liquidation of the Reorganized Debtors.

In preparing the estimates set forth below, Evercore has relied upon the accuracy, completeness, and fairness of financial, reserve, and other information furnished by the Debtors. Evercore did not attempt to independently audit or verify such information, nor did it perform an independent appraisal of the assets or liabilities of the Reorganized Debtors.

The estimated values set forth herein assume that the Reorganized Debtors will achieve their Projections in all material respects. Evercore has relied on the Debtors' representation and warranty that the Projections: (i) have been prepared in good faith; (ii) are based on fully disclosed assumptions, which, in light of the circumstances under which they were made, are reasonable; (iii) reflect the Debtors' best currently available estimates; and (iv) reflect the good faith judgments of the Debtors. Evercore does not offer an opinion as to the attainability of the Projections. As disclosed in the Disclosure Statement, the future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors and Evercore and, consequently, are inherently difficult to project.

This analysis contemplates facts and conditions known and existing as of the date of the Disclosure Statement. Events and conditions subsequent to this date, including updated projections, as well as other factors, could have a substantial effect upon the Total Enterprise Value. Among other things, failure to consummate the Plan in a timely manner may have a materially negative effect on the Total Enterprise Value. For purposes of this valuation, Evercore has assumed that no material changes that would affect value will occur between the date of the Disclosure Statement and the assumed Effective Date.

Evercore did not consider any one analysis or factor to the exclusion of any other analyses or factors. Accordingly, Evercore believes that its analysis and views must be considered as a whole and that selecting portions of its analysis and factors could create a misleading or incomplete view of the processes underlying the preparation of the valuation. Reliance on only one of these methodologies used or portions of the analysis performed could create a misleading or incomplete conclusion.

The following is a summary of analyses performed by Evercore to arrive at its recommended range of estimated Total Enterprise Value for the Reorganized Debtors.

### A.    Net Asset Value

The value of the Debtors' oil and gas reserves was estimated using a net asset value ("**NAV**") approach.  The NAV is calculated by estimating the sum of net cash flows directly attributable to the Debtors' oil and gas properties.  Future production volumes attributable to the properties are estimated and multiplied by the projected realized price, which incorporates the projected market price less an expected differential between the market price and the price at which the Debtors can sell their production.  Projected severance taxes, ad valorem taxes, lease operating expenses, gathering, processing, transportation and marketing expenses, and capital expenditures are then subtracted from revenue to calculate net cash flows.  Evercore then discounted the resulting net cash flows using selected risked discount rates at an industry standard range for economically producing properties.  These values were then adjusted for other non-reserve assets and liabilities, including general and administrative expenses, mark-to-market of hedges, potential sales of exploration rights and acreage, sales and transportation of $CO_2$ on the Company's infrastructure, in each case as estimated by the Company Management, and cash taxes, all of which are not captured in the underlying reserve-based cash flows to determine the net asset value of the Debtors.

### B.    Comparable Company Analysis

The comparable company analysis estimates the value of a company based on a relative comparison with publicly traded companies with similar operating and financial characteristics.  Under this methodology, the enterprise value for each selected public company is determined by examining the trading prices for the equity securities of such company in the public markets and adding either the aggregate amount or market value of outstanding net debt for such company.  Such enterprise values are commonly expressed as multiples of various measures of financial and operating statistics, such as earnings before interest, taxes, depreciation, depletion, amortization and exploration expenses ("**EBITDAX**"), proved reserves and production.  The Total Enterprise Value is then calculated by applying these multiples to the Reorganized Debtors' actual and projected financial and operational metrics.  The selection of public comparable companies for this purpose was based upon the geographic location, scale, percentage of developed and undeveloped reserves, quantum of reserves relative to production and percentage of reserves represented by oil and natural gas liquids relative to natural gas, as well as other characteristics that were deemed relevant.

### C.    Precedent Transactions Analysis

Precedent transactions analysis estimates the value of a company by examining public and private transactions on both a corporate and asset-level basis.  Under this methodology, transaction values are commonly expressed as multiples of various measures of financial and operating statistics, such as EBITDAX, proved reserves, and production.  The selection of asset-level transactions for this purpose was based upon the commodity weighting, reserve life, asset type, commodity price environment, development level, relative size, geographic location, development techniques and other characteristics that were deemed relevant.

The selection of corporate transactions for this purpose was based upon the asset type, relative size, asset development techniques and other characteristics that were deemed relevant.

The Total Enterprise Value is then calculated by applying these multiples to the Reorganized Debtors' actual and projected financial and operational metrics.

### D.    Total Enterprise Value and Implied Equity Value

The assumed range of the reorganization value, as of an assumed Effective Date of September 30, 2020, reflects work performed by Evercore on the basis of information with respect to the business and assets of the Debtors available to Evercore as of the date of the Disclosure Statement.  It should be understood that, although subsequent developments may affect Evercore's conclusions, Evercore does not have any obligation to update, revise, or reaffirm its estimate.

As a result of the analysis described herein, Evercore estimated the Total Enterprise Value of the Reorganized Debtors to be approximately $1.1 billion to $1.5 billion, with a midpoint of $1.3 billion as of the assumed Effective Date of September 30, 2020.  Based on the assumed pro forma net debt of $225.5 million[2] as of the Effective Date, the Total Enterprise Value implies an Equity Value range of $874.5 million to $1,274.5 million, with a midpoint of $1,074.5 million. This estimate is based in part on information provided by the Debtors, solely for purposes of the Plan, and Evercore assumes that no material changes would affect value as stipulated in the Plan between the date of the Disclosure Statement and the Effective Date.

The estimate of Total Enterprise Value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein depending on the results of the Debtors' operations or changes in the financial markets. Additionally, these estimates of value represent hypothetical enterprise and equity values of the Reorganized Debtors as the continuing operator of the Debtors' business and assets, and do not purport to reflect or constitute appraisals, liquidation values, or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein.  Such estimates were developed solely for purposes of analysis of implied relative recoveries to holders of Allowed Claims and Interests under the Plan.  The value of an operating business such as the Debtors' business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such business.

Evercore's estimated valuation range of the Reorganized Debtors does not constitute a recommendation to any holder of Claims or Interests as to how such holder should vote or otherwise act with respect to the Plan.  The estimated value of the Reorganized Debtors set forth herein does not constitute an opinion as to the fairness from a financial point of view to any holder of the consideration to be received by such holder under the Plan or of the terms and provisions of the Plan. Accordingly, because valuation estimates are inherently subject to uncertainties, none of the Debtors, Evercore, or any other person assumes responsibility for their accuracy or any differences between the estimated valuation ranges herein and any actual outcome.

---

[2] Projected gross debt of $230.5 million, including $156.9 million of pipeline financing and capital leases (inclusive of remaining Pipeline Lease Claims), less $5.0 million of estimated cash as of the Effective Date

Evercore is acting as investment banker and financial advisor to the Debtors and will not be responsible for, and will not provide, any tax, accounting, actuarial, legal, or other specialist advice.