**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DENBURY RESOURCES INC., *et al.*,[1] | ) | Case No. 20-33801 (DRJ) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF
INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS
TO (A) OBTAIN POSTPETITION FINANCING SECURED BY SENIOR
PRIMING LIENS AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS
AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,
(III) GRANTING ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC
STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

---

**EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON JULY 31, 2020, AT 7:30 A.M. (CENTRAL TIME) IN COURTROOM 400, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TEXAS 77002. IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**RELIEF IS REQUESTED NOT LATER THAN JULY 31, 2020.**

**PLEASE NOTE THAT ON MARCH 24, 2020, THROUGH THE ENTRY OF GENERAL ORDER 2020-10, THE COURT INVOKED THE PROTOCOL FOR EMERGENCY PUBLIC HEALTH OR SAFETY CONDITIONS.**

**IT IS ANTICIPATED THAT ALL PERSONS WILL APPEAR TELEPHONICALLY AND ALSO MAY APPEAR VIA VIDEO AT THIS HEARING.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S REGULAR DIAL-IN NUMBER. THE DIAL-IN NUMBER IS +1(832) 917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES. YOU WILL BE ASKED TO KEY IN THE CONFERENCE ROOM NUMBER. JUDGE JONES'S CONFERENCE ROOM NUMBER IS 205691.**

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Denbury Resources Inc. (7835); Denbury Air, LLC (7621); Denbury Brookhaven Pipeline Partnership, LP (6322); Denbury Brookhaven Pipeline, LLC (6471); Denbury Gathering & Marketing, Inc. (6150); Denbury Green Pipeline-Montana, LLC (6443); Denbury Green Pipeline-North Dakota, LLC (7725); Denbury Green Pipeline-Riley Ridge, LLC (2859); Denbury Green Pipeline-Texas, LLC (2301); Denbury Gulf Coast Pipelines, LLC (0892); Denbury Holdings, Inc. (1216); Denbury Onshore, LLC (7798); Denbury Operating Company (7620); Denbury Pipeline Holdings, LLC (0190); Denbury Thompson Pipeline, LLC (0976); Encore Partners GP Holdings, LLC (N/A); Greencore Pipeline Company, LLC (9605); Plain Energy Holdings, LLC (0543). The location of Debtor Denbury Resources Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 5320 Legacy Drive, Plano, Texas 75024.

> PARTIES MAY PARTICIPATE IN ELECTRONIC HEARINGS BY USE OF AN INTERNET CONNECTION. THE INTERNET SITE IS WWW.JOIN.ME. PERSONS CONNECTING BY MOBILE DEVICE WILL NEED TO DOWNLOAD THE FREE JOIN.ME APPLICATION.
>
> ONCE CONNECTED TO WWW.JOIN.ME, A PARTICIPANT MUST SELECT "JOIN A MEETING". THE CODE FOR JOINING THIS HEARING BEFORE JUDGE JONES IS "JUDGEJONES". THE NEXT SCREEN WILL HAVE A PLACE FOR THE PARTICIPANT'S NAME IN THE LOWER LEFT CORNER. PLEASE COMPLETE THE NAME AND CLICK "NOTIFY".
>
> HEARING APPEARANCES SHOULD BE MADE ELECTRONICALLY AND IN ADVANCE OF THE HEARING. YOU MAY MAKE YOUR ELECTRONIC APPEARANCE BY:
>
> 1) GOING TO THE SOUTHERN DISTRICT OF TEXAS WEBSITE;
>
> 2) SELECTING "BANKRUPTCY COURT" FROM THE TOP MENU;
>
> 3) SELECTING "JUDGES' PROCEDURES AND SCHEDULES";
>
> 4) SELECTING "VIEW HOME PAGE" FOR JUDGE JONES;
>
> 5) UNDER "ELECTRONIC APPEARANCE" SELECT "CLICK HERE TO SUBMIT ELECTRONIC APPEARANCE;"
>
> 6) SELECT "DENBURY RESOURCES INC., ET AL." FROM THE LIST OF ELECTRONIC APPEARANCE LINKS; AND
>
> 7) AFTER SELECTING DENBURY RESOURCES INC., ET AL. FROM THE LIST, COMPLETE THE REQUIRED FIELDS AND HIT THE "SUBMIT" BUTTON AT THE BOTTOM OF THE PAGE.
>
> SUBMITTING YOUR APPEARANCE ELECTRONICALLY IN ADVANCE OF THE HEARING WILL NEGATE THE NEED TO MAKE AN APPEARANCE ON THE RECORD AT THE HEARING.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state the following in support of this motion (this "Motion"):[2]

## Preliminary Statement

1.     The Debtors commence these chapter 11 cases with a restructuring transaction memorialized in a prepackaged chapter 11 plan  that sets forth a clear pathway to emergence, de-levers the enterprise by approximately 90%, and strongly positions the Debtors to realize the value of significant $CO_2$ enhanced oil recovery operations and valuable oil and gas assets.  A fundamental

---

[2]     Capitalized terms used but not immediately defined in their respective sections have the meanings given to them in this Motion, the First Day Declaration, the DIP Facility Documents, or the Interim DIP Order (each as defined herein), as applicable.

component of the proposed restructuring is the "DIP-to-Exit" facility negotiated with all of the Debtors' prepetition lenders and supported by the secured and convertible noteholders party to the restructuring support agreement (*i.e.*, the future owners of the Debtors).  The proposed financing provides invaluable certainty to the Debtors and their stakeholders at the outset of these cases (during an uncertain and constrained oil & gas lending environment) that they will have the liquidity to fund operations upon emergence on terms that are equal to or better than comparable recent facilities.  Moreover, by rolling immediately a significant portion of the existing revolver into postpetition financing, the Debtors will be able to reduce the amount of drawn loans to benefit from net savings on interest expense during the cases and effectively restore their financing to a regularly functioning revolver that supports operations as needed. The Debtors believe the negotiated facility is the best alternative to fund the company during and after these chapter 11 cases.

2.    As is well known, operating and market conditions in the oil and gas industry have undergone a profound transformation in recent years, leading many exploration and production companies to seek chapter 11 relief.  Over the last several years, the Debtors have taken a proactive approach to the market challenges facing the industry generally and have successfully navigated prolonged market distress by raising additional capital, optimizing their operations, and reducing expenses.  Despite the Debtors' significant liability management efforts, the confluence of a worldwide reduction in oil demand due to the global COVID-19 pandemic and the price war among Russia, the Kingdom of Saudi Arabia, and other countries that are part of the Organization of the Petroleum Exporting Countries ("OPEC") caused oil prices to plummet, significantly constraining liquidity for all independent oil and gas companies, including the Debtors. Consequently, a substantial balance sheet deleveraging is necessary to allow the Debtors to

withstand the current low commodity price environment and to continue to maximize the value of their oil and gas properties.

3.      The First Day Declaration, filed contemporaneously with this Motion, lays out in significant detail the factors leading to, and the principal terms of, the Debtors' proposed restructuring transaction that will equitize all of the Debtors' $2.1 billion of bond debt, while leaving the Debtors' operations as undisturbed as possible. Critically, the Debtors have secured a $615 million debtor-in-possession financing facility (the "DIP Facility") from all of their existing lenders under the RBL Facility that will roll into a new, senior secured revolving exit credit facility (the "Exit Facility") with initial availability of up to $615 million. The DIP Facility is one of the central pillars of the proposed restructuring transaction and is integral to the Debtors' ability to commence these chapter 11 cases in a coordinated fashion with a high-degree of consensus, as well as emerge with committed financing to support the Debtors' long-term business plan.

4.      The proposed DIP Facility provides for up to $615 million of liquidity and $100 million of letter of credit capacity during the pendency of these chapter 11 cases. Upon entry of the Interim DIP Order, the Debtors are seeking to "roll up" (a) $185 million of the principal amount outstanding under the RBL Facility and (b) all prepetition letters of credit. In addition to being able to re-borrow any of the $185 million that is paid down, the Debtors will have access to an incremental $25 million of new money commitments under the DIP Facility during the interim period. Upon entry of the Final DIP Order, the remaining principal amount of all outstanding prepetition loans under the RBL Facility (other than $1 million) shall be deemed to be refinanced under the DIP Facility.

5.      Approval of the DIP Facility will send a crucial signal to the Debtors' vendors, suppliers, royalties and working interest holders, customers, and employees that the Debtors

intend, and will have the ability, to maintain ordinary course operations and meet their financial commitments throughout the course of these chapter 11 cases. The DIP Facility provides for the consensual use of Cash Collateral essential to the operations of the Debtors' business and necessary for the Debtors to successfully pursue their restructuring goals in a manner that maximizes the value of the Debtors' estates.

6.      The DIP Facility allows the Debtors, among other things, to continue to enter into commodity hedges, which would not have been available to the Debtors using only Cash Collateral to fund these cases. Moreover, certain counterparties to prepetition ISDA agreements have agreed not to terminate their commodity hedging contracts during the pendency of these chapter 11 cases as a result of a termination event in existence on the Petition Date, including the filing of the Debtors' chapter 11 petitions or the Debtors' insolvency. As a result of this flexibility, the Debtors remain able to manage commodity price risk through the pendency of the cases and also mitigate risk associated with entering into significant levels of mandatory, prescribed hedging that are becoming the market norm in RBL exit conditions.

7.      Finally, the DIP Facility provides the Debtors with committed financing for the Exit Facility, which is particularly important in light of uncertain and tumultuous market conditions caused by the COVID-19 pandemic. There is a substantial risk of an adverse change in the financial markets or the occurrence of other circumstances, which might create obstacles to the Debtors' ability to obtain financing closer to their emergence from chapter 11. Absent the commitment of the Pre-Petition RBL Lenders to fund the Exit Facility, the Debtors may otherwise be unable to secure the exit financing needed to ensure the Debtors have sufficient liquidity upon emergence to continue operations in the ordinary course and effectuate their go-forward business plan.

8.     The relief requested by this Motion is necessary to both preserve the Debtors' operations as well as to provide a bridge to consummation of the restructuring transaction contemplated by the Restructuring Support Agreement and the Plan.  Entering into the DIP Facility is critical to ensuring the Debtors are able to retain access to favorable capital commitments and minimize the costs of financing these chapter 11 cases.  Absent interim approval of the DIP Facility and the associated roll-up, the Debtors could potentially incur costs on amounts currently borrowed under the RBL Facility in excess of the fees contemplated under the DIP Facility and would have less certainty as to the availability of excess funding above the current cash balance to withstand an unexpectedly longer process.  Accordingly, the Debtors believe that approval of the DIP Facility will maximize the value of the Debtors' estates for the benefit of all stakeholders and is a sound exercise of business judgment.  For these reasons, the Debtors respectfully request that the Court grant this Motion.

## Jurisdiction and Venue

9.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order.

10.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

11.     The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 2002 and 4001, and rules 4002-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

12.     On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.   A detailed description of the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Christian S. Kendall, Chief Executive Officer of Denbury Resources Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with this Motion and incorporated by reference herein.   In support of this Motion, the Debtors also respectfully submit the *Declaration of Brent Banks in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing Secured by Senior Priming Liens and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "Banks Declaration"), attached hereto as **Exhibit A**, and the *Declaration of Matt Kvarda in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing Secured by Senior Priming Liens and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "Kvarda Declaration"), attached hereto as **Exhibit B**.

13.     The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).   No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

## Relief Requested

14.     The Debtors seek entry of an interim order, substantially in the form attached hereto (the "Interim DIP Order") and a final order (the "Final DIP Order" and, together with the Interim DIP Order, the "DIP Orders"):

| DIP Facility Term | Relief Requested |
|---|---|
| **DIP Facility** | Authorizing Debtor Denbury Resources Inc., a Delaware corporation (the "Borrower") to obtain, and its direct and indirect subsidiary Debtors (collectively, the "Guarantors") to guaranty, post-petition debtor-in-possession credit financing in an aggregate principal amount of up to $615,000,000 from (i) JPMorgan Chase Bank, N.A. in its capacity as the post-petition administrative agent and collateral agent (in such capacity, the "DIP Agent") under that certain *Senior Secured Super Priority Debtor-in-Possession Credit Agreement* (the "DIP Credit Agreement")[3] and (ii) certain Pre-Petition RBL Secured Parties (as defined below) that are party to the DIP Credit Agreement (in their capacity as post-petition lenders under the DIP Credit Agreement, collectively, the "DIP Lenders", and together with the DIP Agent and the other Secured Parties (as defined in the DIP Credit Agreement) thereunder, the "DIP Secured Parties").   The DIP Facility (as defined below) consists of the following parts: (i) the Roll-Up and (ii) new money commitments available for the making of new money revolving credit loans and the issuance of new standby letters of credit in an amount not to exceed (1) $614,000,000 *less* (2) the amount of the Roll-Up (as defined below) (the "New Money Commitment").  The amount of $25,000,000 of the New Money Commitment (the "Interim New Money Cap") to be available for new revolving credit loans (the "Interim New Money DIP Loans") and the issuance of new standby letters of credit (the "Interim New Money Letters of Credit") upon entry of the Interim DIP Order. The remaining amount of the New Money Commitment will be available for (A) new revolving credit loans (the "Final New Money DIP Loans", and together with the Interim New Money DIP Loans, the "New Money DIP Loans") and the issuance of new standby letters of credit (the "Final New Money Letters of Credit", and together with the Interim New Money Letters of Credit, the "New Money Letters of Credit") upon entry of the Final DIP Order; (B) a sub-facility for the issuance of the New Money Letters of Credit and the deemed issuance of all Rolled-Up Letters of Credit (the New Money Letters of Credit, collectively with the Rolled-Up Letters of Credit, the "DIP Letters of Credit") in an aggregate amount not to exceed $100,000,000; (C) upon entry of this Interim DIP Order, (1) the deemed issuance of all Pre-Petition Letters of Credit (as defined below) as DIP Letters of Credit under the DIP Credit Agreement (the "Rolled-Up Letters of Credit") and (2) deemed incurrence of roll-up loans, as applicable, in an amount equal to $185,000,000 to refinance and repay such amount of the Pre-Petition RBL held by the DIP Lenders (the "Interim RBL Roll-Up Loans"), *plus* any unpaid interest, fees, and costs due in respect of the Pre-Petition RBL as of the date of the entry of this Interim DIP Order; and (D) upon entry of the Final DIP Order, deemed incurrence of roll-up loans, as applicable, in an amount equal to (1) the remaining principal amount of all then-outstanding Pre-Petition RBL not rolled up pursuant to the foregoing clause (C)(2) held by the DIP Lenders, *plus* (2) any unpaid interest, |

---

[3]     A copy of the DIP Credit Agreement is attached to the Interim DIP Order as **Exhibit 1**, and incorporated herein as if set forth *in haec verba*.

|  | fees, and costs due in respect of the Pre-Petition RBL Claim as of the date of the Final DIP Order, *less* (3) $1,000,000 of Pre-Petition RBL held by the DIP Lenders (the "<u>Retained Pre-Petition RBL Claim</u>"), to refinance and repay such Pre-Petition RBL (but excluding the Retained Pre-Petition RBL Claim) (the "Final RBL Roll-Up Loans," and together with the Interim RBL Roll-Up Loans, the "<u>Roll-Up Loans</u>," and together with the Rolled-Up Letters of Credit, the "<u>Roll-Up</u>") (the New Money DIP Loans, collectively with the RBL Roll-Up Loans, the "<u>DIP Loans</u>"), in each case in accordance with and subject to the terms and conditions set forth herein and in the DIP Credit Agreement and the other DIP Facility Documents (collectively, the "<u>DIP Facility</u>").  In addition, the obligations under post-petition hedging agreements and certain pre-petition hedging agreements will share in the Collateral on a *pari passu* basis with the DIP Loans under and in accordance with the terms of the DIP Credit Agreement. |
| --- | --- |
| **DIP Obligations** | Authorizing the Debtors to execute, deliver, and perform all of their obligations under the Interim DIP Order, the DIP Facility and the DIP Facility Documents, and all other related agreements and documents creating, evidencing, or securing indebtedness or obligations of any of the Debtors to the DIP Agent, for itself and for and on behalf of the other DIP Secured Parties, on account of the DIP Facility (the "<u>DIP Obligations</u>"). |
| **DIP Facility Documents** | Approving the terms and conditions of the DIP Facility Documents.  The DIP Facility Documents include, without limitation:  (i) the DIP Credit Agreement (together with all exhibits and schedules thereto); (ii) the DIP Orders (as defined below), (iii) the DIP Letters of Credit; (iv) Secured Hedges Agreements (as defined in the DIP Credit Agreement); (v) documents related to any treasury or cash management arrangements with any DIP Lender or any affiliate thereof, but excluding, for the avoidance of doubt, the Retained Pre-Petition RBL Claim); (vi) documents granting or perfecting liens or security interests by any of the Debtors in favor of and for the benefit of the DIP Agent, for itself and for and on behalf of the other DIP Secured Parties, on account of the DIP Facility, as the same now exists or may hereafter be amended, supplemented, assumed, extended, renewed, restated, or replaced; and (vii) all other guaranties, agreements and documents executed in connection therewith or related thereto, by and among any of the Debtors, the DIP Agent, and the DIP Secured Parties (including without limitation the DIP Credit Agreement), the terms of which are referenced and incorporated herein as if set forth *in haec verba* (collectively, the "<u>DIP Facility Documents</u>"). |
| **Cash Collateral** | Authorizing the Debtors to use Cash Collateral (as defined below) of JPMorgan Chase Bank, N.A., in its capacity as administrative agent (in such capacity, the "<u>Pre-Petition RBL Agent</u>", and together in its capacity as the DIP Agent, the "<u>Agent</u>") for itself and for and on behalf of the other lenders from time to time party to the Pre-Petition Credit Agreement (in such capacity, collectively, the "<u>Pre-Petition RBL Secured Parties</u>", and together with the DIP Lenders, the "<u>Lenders</u>") (the Pre-Petition RBL Agent, the Pre-Petition RBL Lenders, and such other secured parties, collectively, the "<u>Pre-Petition RBL Secured Parties</u>" and, collectively with the DIP Secured Parties, the "<u>RBL Secured Parties</u>") in accordance with the terms and conditions set forth herein and in the DIP Facility Documents. |

| | |
|---|---|
| **Cash Paydown** | Authorizing and directing the Debtors to (i) incur upon entry of this Interim DIP Order and the effectiveness of the DIP Credit Agreement pursuant to the terms thereof, Interim RBL Roll-Up Loans in the amount of $185,000,000, (ii) incur upon entry of the Final DIP Order, Final RBL Roll-Up Loans in the amount equal to the remaining amount of the Pre-Petition RBL, less the amount of the Retained Pre-Petition RBL Claim, and (iii) within one business day after the entry of this Interim DIP Order and the effectiveness of the DIP Credit Agreement, transfer indefeasibly cash in the amount equal to the Specified Excess Cash Payment (as defined in the DIP Credit Agreement) (the "Specified Excess Cash Paydown") to the DIP Agent. The Specified Excess Cash Paydown shall be applied against the Interim RBL Roll-Up Loans. |
| **Adequate Protection** | Subject to the Carve Out, granting (i)(A) automatically perfected, first-priority priming liens (subject to Permitted Liens as set forth in the DIP Credit Agreement) and security interests in the Collateral and (B) superpriority claims with priority over all other administrative expense claims and other post-petition claims against the Debtors' and their estates, to the DIP Agent, for itself and for and on behalf of the DIP Secured Parties, to secure the DIP Obligations, (ii) the grant of superpriority claims and the grant of automatically perfected liens, security interests, and other adequate protection to the Pre-Petition RBL Agent, for itself and for and on behalf of the Pre-Petition RBL Secured Parties with respect to their interests in the Pre-Petition Collateral, and (iii) the grant of superpriority claims and the grant of automatically perfected liens, security interests, and other adequate protection to the Pre-Petition Secured Notes Trustee), for itself and for and on behalf of the Pre-Petition Secured Noteholders with respect to their interests in the Collateral. |
| **Automatic Stay** | Waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Interim DIP Order and providing for the immediate effectiveness of the Interim DIP Order. |
| **Final Hearing** | Scheduling the Final Hearing (as defined below) within thirty-five (35) days of the entry of the Interim DIP Order and approving notice with respect thereto in accordance with Bankruptcy Rule 4001(c)(2). |

### Concise Statement Pursuant to
### Bankruptcy Rule 4001 and the United States Bankruptcy
### Court for the Southern District of Texas Procedures for Complex Chapter 11 Cases

15.     The following chart contains a summary of the material terms of the proposed DIP

Facility, together with references to the applicable sections of the relevant source documents, as

required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and the *Procedures for Complex Chapter 11 Cases in the Southern District of Texas* (the "Complex Case Procedures").[4]

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| **Parties to the DIP Credit Agreement** Bankruptcy Rule 4001(c)(1)(B) | **Borrower**: Denbury Resources, Inc. **Guarantors**:  The Debtors identified on Schedule 1.1(b) of the DIP Credit Agreement. **Agent for the DIP Facility**:  JPMorgan Chase Bank, N.A. **Lenders**:  The banks and other financial institutions or entities from time to time party to the DIP Facility pursuant to the DIP Credit Agreement. *See* DIP Credit Agreement, Preamble. |
| **Term** Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | The maturity date with respect to the DIP Facility (the "Maturity Date") is July 30, 2021. *See* DIP Credit Agreement, Section 1.1, "Defined Terms". The "Terminate Date" shall mean the earliest of: (a) the Maturity Date; (b) the date of acceleration of the Obligations and the termination of the unfunded Commitments with respect to the DIP Facility in accordance with the terms of this Agreement upon and during the continuance of an Event of Default that is not cured or waived in accordance with the terms of this Agreement and the Interim DIP Order or Final DIP Order, as applicable; (c) the effective date of an Acceptable Plan or the effective date of any other Chapter 11 Plan; (d) the consummation of a sale of all or substantially all of the Credit Parties' assets pursuant to Section 363 of the Bankruptcy Code; (e) the entry of an order for the dismissal of any of the Chapter 11 Cases; (f) the entry of an order for the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; (g) the date that is thirty-five (35) days after the Petition Date, unless the Final DIP Order has been entered by the Bankruptcy Court on or prior to such date; and (h) the appointment of a Chapter 11 trustee in any of the Chapter 11 Cases. *See* DIP Credit Agreement, Section 1.1, "Termination Date". |

---

[4]    The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced including.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Facility Documents or the Interim DIP Order, as applicable.

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
| --- | --- |
| **Commitment** Bankruptcy Rule 4001(c)(1)(B) | The DIP Facility shall consist of the following: (i) the Roll-Up and (ii) new money commitments available for the making of new money revolving credit loans and the issuance of new standby letters of credit in an amount not to exceed \$614,000,000 *less* (2) the amount of the Roll-Up (the "Ne<u>w Money Commitment</u>"). The amount of \$25,000,000 of the New Money Commitment (the "In<u>terim New Money Cap</u>") to be available for new revolving credit loans (the "In<u>terim New Money DIP Loans</u>") and the issuance of new standby letters of credit (the "In<u>terim New Money Letters of Credit</u>") upon entry of the Interim DIP Order.   The remaining amount of the New Money Commitment will be available for (A) new revolving credit loans (the "F<u>inal New Money DIP Loans</u>", and together with the Interim New Money DIP Loans, the "N<u>ew Money DIP Loans</u>") and the issuance of new standby letters of credit (the "F<u>inal Money Letters of Credit</u>", and together with the Interim New Money Letters of Credit, the "N<u>ew Money Letters of Credit</u>") upon entry of the Final DIP Order (as defined below); (B) a sub-facility for the issuance of the New Money Letters of Credit and the deemed issuance of all Rolled-Up Letters of Credit  (the New Money Letters of Credit, collectively with the Rolled-Up Letters of Credit, the "D<u>IP Letters of Credit</u>") in an aggregate amount not to exceed \$100,000,000; (C) upon entry of this Interim DIP Order, (1) the deemed issuance of all Pre-Petition Letters of Credit as DIP Letters of Credit under the DIP Credit Agreement (the "R<u>olled-Up Letters of Credit</u>") and (2) deemed incurrence of roll-up loans, as applicable, in an amount equal to \$185,000,000 to refinance and repay such amount of the Pre-Petition RBL held by the DIP Lenders (the "In<u>terim RBL Roll-Up Loans</u>"), *plus* any unpaid interest, fees, and costs due in respect of the Pre-Petition RBL as of the date of the entry of this Interim DIP Order; and (D) upon entry of the Final DIP Order, deemed incurrence of roll-up loans, as applicable, in an amount equal to (1) the remaining principal amount of all then-outstanding Pre-Petition RBL not rolled up pursuant to the foregoing clause (C)(2) held by the DIP Lenders, *plus* (2) any unpaid interest, fees, and costs due in respect of the Pre-Petition RBL Claim as of the date of the Final DIP Order, *less* (3) \$1,000,000 of Pre-Petition RBL held by the DIP Lenders (the "R<u>etained Pre-Petition RBL Claim</u>"), to refinance and repay such Pre-Petition RBL (but excluding the Retained Pre-Petition RBL Claim) (the "F<u>inal RBL Roll-Up Loans</u>," and together with the Interim RBL Roll-Up Loans, the "R<u>oll-Up Loans</u>," and together with the Rolled-Up Letters of Credit, the "R<u>oll-Up</u>") (the New Money DIP Loans, collectively with the RBL Roll-Up Loans, the "D<u>IP Loans</u>"), in each case in accordance with and subject to the terms and conditions set forth herein and in the DIP Credit Agreement and the other DIP Facility Documents (collectively, the "D<u>IP Facility</u>"). *See* Interim DIP Order, Preamble. |
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B) | The DIP Orders and DIP Documents include standard and customary conditions of borrowing, the satisfaction of which is a condition precedent to the obligations of each DIP Lender to make DIP Loans. *See* DIP Credit Agreement, Section 6.1–13. |
| **Interest Rates** Bankruptcy Rule 4001(c)(1)(B) | The unpaid principal amount of each ABR DIP Loan shall bear interest from the date of the Borrowing thereof until maturity (whether by acceleration or otherwise) at a rate per annum that shall at all times be the Applicable Margin plus the Alternate Base Rate, in each case, in effect from time to time. The unpaid principal amount of each LIBOR DIP Loan shall bear interest from the date of the Borrowing thereof until maturity thereof (whether by acceleration or otherwise) at a rate per annum that shall at all times be the Applicable Margin plus the relevant Adjusted LIBOR Rate, in each case, in effect from time to time. |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | *See* DIP Credit Agreement, Section 1.1, Section 2.8, and Section 2.9. |
| **Use of DIP Facility and Cash Collateral Bankruptcy Rule** 4001(b)(l)(B)(ii) | The Borrower will use the proceeds of the DIP Loans 1. for working capital, capital expenditures and other general corporate purposes of the Borrower and its Subsidiaries during the pendency of the Chapter 11 Cases strictly in accordance with the DIP Budget (subject to Permitted Variances), including to pay any Obligations under any Secured Hedge Agreement as they become due, 2. to refinance the Pre-Petition Secured Loans pursuant to the Roll-Up, 3. to pay fees, costs and expenses incurred by the Administrative Agent and the Lenders in connection with the Transactions and other fees, costs and expenses of the Administrative Agent and the Lenders to the extent reimbursable hereunder, 4. to fund adequate protection payments as authorized by the Bankruptcy Court in the DIP Order, 5. to fund the costs of the administration of the Chapter 11 Cases (including the Carve Out) strictly in accordance with the DIP Budget (subject to Permitted Variances) and 6. in accordance with <u>Section 9.15</u>.

The Borrower will use Letters of Credit 7. for general corporate purposes, including, to secure bids, tenders, bonds and contracts entered into in the ordinary course of the Credit Parties' business and to support deposits required under purchase agreements pursuant to which the Borrower or its Subsidiaries may acquire Oil and Gas Properties, Carbon Dioxide Interests and other assets, in each case, solely to the extent permitted under this Agreement and so long as issued strictly in accordance with the DIP Budget (subject to Permitted Variances) and 8. in accordance with <u>Section 9.15</u>.

The Credit Parties shall use all proceeds of the DIP Loans and any DIP Cash Collateral, and shall operate, strictly in accordance with the DIP Budget, as updated from time to time in accordance with this Agreement, and subject to the Permitted Variances.

*See* DIP Credit Agreement, Section 9.10, "<u>Use of Proceeds; DIP Budget</u>". |
| **Entities with Interests in Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(i) | Except as to all Excluded Assets (as defined in the DIP Credit Agreement), all cash of each of the Debtors' estates, wherever located, and all cash equivalents, whether in the form of negotiable instruments, documents of title, securities, deposit accounts, investment accounts, or in any other form, that were on the Petition Date in any of the Debtors' possession, custody, or control (or the possession, custody, or control of persons in privity with any of the Debtors), or in which any of the Debtors will obtain an interest during the pendency of these Chapter 11 Cases whether via advances under the DIP Facility or otherwise, or which represent income, proceeds, products, rents, or profits of any of the Collateral (as defined below) shall constitute the cash collateral of each of the Agent and the Pre-Petition Secured Notes Trustee, as applicable, within the meaning of section 363(a) of the Bankruptcy Code, for itself and on behalf of the other relevant Pre-Petition Secured Parties (collectively, the "<u>Cash Collateral</u>").  The Agent, on behalf of itself and the other RBL Secured Parties, has valid, perfected, and non-avoidable first-priority liens and security interests in the Cash Collateral pursuant to the applicable provisions of the Pre-Petition RBL Claim Documents, the DIP Facility Documents, sections 363(a) and 552(b) of the Bankruptcy Code, and the Interim DIP Order; *provided* that, subject to and effective upon entry of the Final DIP Order, the "equities of the case" exception of section 552(b) of the Bankruptcy Code shall not apply to the Pre-Petition Secured Parties with respect to proceeds, product, offspring, or profits of the Pre-Petition Collateral.

*See* Interim DIP Order, ¶ 17. |
| **Fees** Bankruptcy Rule 4001(c)(1)(B) | The Borrower agrees to pay to the Administrative Agent in Dollars, for the account of each Lender (in each case pro rata according to the respective Commitment Percentages of the Lenders), a commitment fee (the "Commitment Fee") for each day from the |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
| --- | --- |
| | Closing Date until but excluding the Termination Date. Each Commitment Fee shall be payable by the Borrower (i) quarterly in arrears on the last Business Day of each March, June, September and December (for the three-month period (or portion thereof) ended on such day for which no payment has been received) and (ii) on the Termination Date (for the period ended on such date for which no payment has been received pursuant to clause (a) above), and shall be computed for each day during such period at a rate per annum equal to the Commitment Fee Rate in effect on such day on the Available Commitment in effect on such day. |
| | The Borrower agrees to pay to the Administrative Agent in Dollars for the account of the Lenders pro rata on the basis of their respective Letter of Credit Exposure, a fee in respect of each Letter of Credit (the "Letter of Credit Fee"), for the period from the date of issuance of such Letter of Credit until the termination or expiration date of such Letter of Credit computed at the per annum rate for each day equal to the Applicable Margin for LIBOR DIP Loans on the average daily Stated Amount of such Letter of Credit. Such Letter of Credit Fees shall be due and payable (i) quarterly in arrears on the last Business Day of each March, June, September and December and (ii) on the Termination Date (for the period for which no payment has been received pursuant to clause (b) above). |
| | The Borrower agrees to pay to the Letter of Credit Issuer a fee in respect of each Letter of Credit issued by it (the "Fronting Fee"), for the period from the date of issuance of such Letter of Credit to the termination or expiration date of such Letter of Credit, computed at the rate for each day equal to 0.125% per annum (or such other amount a may be agreed in a separate writing between the Borrower and the Letter of Credit Issuer) on the average daily Stated Amount of such Letter of Credit (or at such other rate per annum as agreed in writing between the Borrower and the Letter of Credit Issuer). Such Fronting Fees shall be due and payable by the Borrower (i) quarterly in arrears on the last Business Day of each March, June, September and December and (ii) on the Termination Date (for the period for which no payment has been received pursuant to clause (c) above) |
| | *See* DIP Credit Agreement, Section 4.1, "Fees". |
| **Budget** <br> Bankruptcy Rule 4001 (c)(1)(B) | No later than 5:00 p.m. (Dallas, Texas time) on date that is the four week anniversary of the immediately prior rolling four-week period (or, if such date is not a Business Day, then the immediately succeeding Business Day), commencing with August 27, 2020, a proposed DIP Budget for the following rolling 13-week period in form and substance satisfactory to the Administrative Agent, which proposed DIP Budget shall replace and supersede the most recently delivered DIP Budget upon the approval thereof by the Administrative Agent. To the extent that the proposed DIP Budget is not approved by the Administrative Agent as set forth above in this clause (i), the then existing DIP Budget will remain as the DIP Budget until replaced by a proposed DIP Budget that is approved by the Administrative Agent. <br><br> *See* DIP Credit Agreement, Section 9.1(h), "DIP Budget and Reporting DIP Variance Requirements". |
| **Reporting Information** <br> Bankruptcy Rule 4001(c)(l)(B) | As soon as available and in any event within five days after the date on which such financial statements are required to be filed with the SEC (after giving effect to any permitted extensions) (or, if such financial statements are not required to be filed with the SEC, on or before the date that is 90 days after the end of each such fiscal year), the audited consolidated balance sheets of the Borrower as at the end of such fiscal year, and the related consolidated statements of operations, stockholders' equity and cash flows for such fiscal year, setting forth comparative consolidated figures for the |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
| --- | --- |
| | preceding fiscal years, all in reasonable detail and prepared in accordance with GAAP, and except with respect to such reconciliation, certified by independent certified public accountants of recognized national standing whose opinion shall not be materially qualified with a "going concern" qualification. |

*See* DIP Credit Agreement, Section 9.1(a) "Annual Financial Statements".

Quarterly Financial Statements. As soon as available and in any event within five days after the date on which such financial statements are required to be filed with the SEC (after giving effect to any permitted extensions) with respect to each of the first three quarterly accounting periods in each fiscal year of the Borrower (or, if such financial statements are not required to be filed with the SEC, on or before the date that is 60 days after the end of each such quarterly accounting period), the consolidated balance sheets of the Borrower as at the end of such quarterly period and the related consolidated statements of operations and cash flows for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly period, and setting forth comparative consolidated figures for the related periods in the prior fiscal year or, in the case of such consolidated balance sheet, for the last day of the prior fiscal year, all of which shall be certified by an Authorized Officer of the Borrower as fairly presenting in all material respects the consolidated financial condition, results of operations and cash flows, of the Borrower in accordance with GAAP, subject to changes resulting from audit and normal year-end audit adjustments and the absence of footnotes.

*See* DIP Credit Agreement, Section 9.1(b) "Quarterly Financial Statements".

Monthly Financial Statements. As soon as available and in any event within 30 days after the end of each calendar month, commencing with the calendar month ending July 31, 2020, the consolidated balance sheets of the Borrower as at the end of such calendar month and the related consolidated statements of operations and cash flows for such month and for the elapsed portion of the fiscal year ended with the last day of such calendar month, and setting forth comparative consolidated figures for the related periods in the prior fiscal year or, in the case of such consolidated balance sheet, for the last day of the prior fiscal year, all of which shall be certified by an Authorized Officer of the Borrower as fairly presenting in all material respects the consolidated financial condition, results of operations and cash flows, of the Borrower in accordance with GAAP, subject to changes resulting from audit and normal year-end audit adjustments and the absence of footnotes.

*See* DIP Credit Agreement, Section 9.1(c) "Monthly Financial Statements".

DIP Budget Variance Report. No later than 5:00 p.m. (Dallas, Texas time) on the Friday one week after the last day of each rolling four-week period (or, if such Friday is not a Business Day, then the immediately succeeding Business Day), commencing September 4, 2020, a DIP Budget Variance Report for the Variance Test Period most recently ended. Each DIP Budget Variance Report shall be certified by an Authorized Officer of the Borrower as being prepared in good faith and fairly presenting in all respects the information set forth therein.

Bi-Monthly Variance Reports. No later than 5:00 p.m. (Dallas, Texas time) on Friday of every other week (or, if such Friday is not a Business Day, then the immediately succeeding Business Day), commencing with August 14, 2020, a variance report which shall include a line-by-line reconciliation report showing the variances comparing actual cash receipts and disbursements of the Credit Parties during the immediately-preceding two calendar week period with corresponding forecasted amounts for such two calendar week period as set forth in the most recent DIP Budget, including written descriptions in reasonable detail explaining any material positive or negative variances.

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | *Notice of Material Changes in DIP Budget Disbursements.*  Promptly after an Authorized Officer of the Borrower or any of its Subsidiaries obtains actual knowledge thereof, notice of any material change in projected disbursements as set forth in the DIP Budget most recently delivered<br><br>*See* DIP Credit Agreement, Section 9.1(h) "DIP Budget and DIP Variance Reports". |
| **Variance Covenant**<br>Bankruptcy Rule 4001(c)(l)(B) | As of the last day of any Variance Test Period, the Credit Parties shall not permit (i) aggregate actual disbursements by the Credit Parties for such Variance Test Period to exceed 110% of the aggregate forecasted disbursements (excluding Allowed Professional Fees) as set forth in the DIP Budget for such Variance Test Period and (ii) actual disbursements for any line item in the DIP Budget with respect to each of, without duplication, (A) lease operating expenses (including pcard program and marketing expenses) and general and administrative expenses (excluding payroll), (B) payroll and benefit expenses, and (C) capital expenditures of the Credit Parties for such Variance Test Period to exceed 115% of the forecasted disbursements for each corresponding line item as set forth in the DIP Budget for such Variance Test Period.<br><br>*See* DIP Credit Agreement, Section 10.11(c), "DIP Budget Variance Test". |
| **Chapter 11 Milestones**<br>Bankruptcy Rule 4001(c)(1)(B) | Subject only to and effective upon entry of the Final Order, the Prepetition Secured Parties are entitled to the performance by the Debtors of the Milestones (as defined in the DIP Credit Agreement).<br><br>*See* DIP Credit Agreement, Section 9.18, "Case Milestones"; Interim DIP Order, ¶ 65. |
| **Liens and Priorities**<br>Bankruptcy Rule 4001(c)(l)(B)(i) | Effective as of the Petition Date, the DIP Agent, for itself and for and on behalf of the DIP Secured Parties, is hereby granted to secure the DIP Obligations: (a) pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all Collateral that is not subject to any lien or security interest, if any; (b) pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all Collateral that is junior and subordinate only to any Prior Permitted Liens in the Collateral; and (c) pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected first-priority senior priming security interest in and lien upon all Collateral (such liens and security interests granted in subsections (a) through (c) of this paragraph, the "DIP Liens"), and which shall secure the DIP Facility and the DIP Obligations (including, without limitation, principal and any other extensions of credit, interest, fees, expenses, and any fees and expenses of the DIP Agent and the DIP Secured Parties in these Chapter 11 Cases, however incurred), senior to all other liens, encumbrances, and security interests, including, without limitation, the Pre-Petition Liens and all adequate protection and replacement liens granted pursuant to the terms of this Interim DIP Order, but subject in the case of the DIP Liens only to any Prior Permitted Liens; *provided* that the DIP Liens are subject to the Carve Out.  Notwithstanding anything to the contrary herein, and subject to the Carve Out, all DIP Liens and all RBL Secured Parties' Adequate Protection Liens granted in favor of the Agent shall be senior to any and all liens and security interests in favor of the Pre-Petition Secured Notes Trustee or the Secured Noteholder Parties, whether in existence as of the Petition Date or granted thereafter, including but not limited to the Pre-Petition Notes Liens and the Secured Noteholders' Adequate Protection Liens.<br><br>*See* Interim DIP Order, ¶ 31. |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| **Carve Out**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Orders provide a "Carve Out" of certain statutory fees and allowed professional fees of the Debtors pursuant to section 1103 of the Bankruptcy Code.<br><br>*See* Interim DIP Order, ¶ 67. |
| **Challenge Period**<br>Bankruptcy Rule 4001(c)(l)(B) | The Interim DIP Order provides for a standard and customary challenge period at the earliest of:<br><br>• solely with respect to any Committee, sixty (60) calendar days after the appointment of any Committee if appointed within thirty (30) days after the Petition Date, and<br><br>• in the case of all other non-Debtor parties in interest with requisite standing (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so), no later than (i) the earlier of (x) five (5) business days prior to the commencement of the hearing to confirm a chapter 11 plan in these Chapter 11 Cases or (y) sixty (60) calendar days after entry of the Interim DIP Order.<br><br>*See* Interim DIP Order, ¶ 85. |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | Subject to the Carve Out and the DIP Liens, as adequate protection of the Pre-Petition RBL Secured Parties' interests in the Pre-Petition Collateral and for the Debtors' use of Cash Collateral, the Pre-Petition RBL Agent on behalf of the other Pre-Petition RBL Secured Parties is hereby granted, effective as of the Petition Date, valid and automatically perfected, first-priority replacement liens and security interests in and upon the Collateral to secure any decrease in the value of the Pre-Petition RBL Secured Parties' interest in the Pre-Petition Collateral (including Cash Collateral) on account of the Automatic Stay, the use, lease, or sale of such property (including Cash Collateral), or the granting of liens under section 364 of the Bankruptcy Code occurring from and after the Petition Date (the "RBL Secured Parties' Adequate Protection Liens", and the Collateral subject to the RBL Secured Parties' Adequate Protection Liens, the "Adequate Protection Collateral").<br><br>As adequate protection of the Secured Noteholder Parties' interests in the Pre-Petition Collateral and for the Debtors' use of Cash Collateral, and subject to the Carve Out and the terms of the Intercreditor Agreement and subject and subordinate to the DIP Liens, the Pre-Petition RBL Liens, the RBL Secured Parties' Adequate Protection Liens, and the Prior Permitted Liens, the Pre-Petition Secured Notes Trustee on behalf of the Pre-Petition Secured Noteholders, is hereby granted, effective as of the Petition Date, valid and automatically perfected, second-priority replacement liens and security interests in and upon the Collateral to secure any aggregate diminution in value of the Secured Noteholder Parties' interests in the Pre-Petition Collateral (including Cash Collateral) occurring from and after the Petition Date and for the Debtors' use of Collateral, including Cash Collateral, the imposition of the Automatic Stay and the granting of priming liens hereunder, among other things (the "Secured Noteholders' Adequate Protection Liens" together with the RBL Secured Parties' Adequate Protection Liens, the "Adequate Protection Liens"); *provided, however*, that the Adequate Protection Liens shall not attach to any Avoidance Actions but, subject entry of the Final DIP Order, shall attach to any Avoidance Proceeds.<br><br>See Interim Order, ¶¶ 40-41. |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B) | The DIP Credit Agreement and Interim Order contain events of default that are usual and customary for debtor-in-possession financings, including without limitation, a breach of any Milestone, in each case subject to a Remedies Notice Period (as defined in the Interim Order).<br><br>*See* Interim Order, ¶ 74; DIP Credit Agreement, Section 11, "Events of Default". |
| **Waiver/Modification of the Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv) | Pursuant to the Interim DIP Order, the automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement and effectuate the terms of the Interim Order.<br><br>*See* Interim DIP Order, ¶ 54. |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens**<br>Bankruptcy Rule 4001(c)(1)(B)(vii) | To the extent that any applicable non-bankruptcy law otherwise would restrict the granting, scope, enforceability, attachment, or perfection of the Agent's, the RBL Secured Parties', and the Secured Noteholder Parties' liens and security interests granted and created by this Interim DIP Order or otherwise would impose filing or registration requirements with respect to such liens and security interests, such law is pre-empted to the maximum extent permitted by the Bankruptcy Code, applicable federal law, and the judicial power of the Bankruptcy Court.<br><br>*See* Interim DIP Order, ¶ 45. |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The Lenders agree to indemnify the Administrative Agent in its capacity as such (to the extent not reimbursed by the Credit Parties and without limiting the obligation of the Credit Parties to do so), ratably according to their respective portions of the Commitments or DIP Loans, as applicable, outstanding in effect on the date on which indemnification is sought (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the DIP Loans shall have been paid in full, ratably in accordance with their respective portions of the Total Exposure in effect immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time occur (including at any time following the payment of the DIP Loans) be imposed on, incurred by or asserted against the Administrative Agent in any way relating to or arising out of the Commitments, this Agreement, any of the other Credit Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by the Administrative Agent under or in connection with any of the foregoing; provided that no Lender shall be liable to the Administrative Agent for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's gross negligence, bad faith or willful misconduct as determined by a final judgment of a court of competent jurisdiction (IT BEING THE INTENTION OF THE PARTIES HERETO THAT THE ADMINISTRATIVE AGENT AND ANY RELATED PARTIES SHALL, IN ALL CASES, BE INDEMNIFIED FOR ITS ORDINARY, COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE); provided, further, that no action taken in accordance with the directions of the Majority Lenders (or such other number or percentage of the Lenders as shall be required by the Credit Documents) shall be deemed to constitute gross negligence, bad faith or willful misconduct for purposes of this Section 12.7. In the case of any investigation, litigation or proceeding giving rise to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time occur (including at any time following the payment of the DIP Loans), this Section 12.7 applies whether any such investigation, litigation or proceeding is |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | brought by any Lender or any other Person. Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including attorneys' fees) incurred by the Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice rendered in respect of rights or responsibilities under, this Agreement, any other Credit Document, or any document contemplated by or referred to herein, to the extent that the Administrative Agent is not reimbursed for such expenses by or on behalf of the Borrower; provided that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto. If any indemnity furnished to the Administrative Agent for any purpose shall, in the opinion of the Administrative Agent, be insufficient or become impaired, the Administrative Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided, in no event shall this sentence require any Lender to indemnify the Administrative Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's pro rata portion thereof; and provided further, this sentence shall not be deemed to require any Lender to indemnify the Administrative Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement resulting from the Administrative Agent gross negligence, bad faith or willful misconduct. The agreements in this Section 12.7 shall survive the payment of the DIP Loans and all other amounts payable hereunder. <br><br> *See* DIP Credit Agreement, Section 12.7, "Indemnification". |

### Statement Regarding Significant Provisions

16.     The Interim DIP Order contains certain of the provisions (the "Significant Provisions")[5] identified in section I, paragraph 23 of the Complex Case Procedures as summarized in the Attorney Checklist Concerning Motion and Order Pertaining to Use of Cash Collateral attached hereto as **Exhibit C**.

17.     The Interim DIP Order and the Final DIP Order, as applicable:

    a.  grant superpriority administrative expense claims to the DIP Secured Parties, subject only to the Carve Out;

---

[5]     Significant Provisions refer to those provisions that contain:  (a) sale or plan confirmation milestones; (b) cross-collateralization; (c) roll ups; (d) liens on avoidance actions or proceeds of avoidance actions; (e) default provisions and remedies; (f) releases of claims against lenders or others; (g) limitations on fees for advisors to official committees; (h) priming liens; or (i) any other provision that limits the ability of estate fiduciaries to fulfill their duties under the Bankruptcy Code and applicable law.

b.  grant superpriority administrative expense claims to the Pre-Petition RBL Secured Parties, subject only to the Carve Out and the DIP Superpriority Claim;

c.  bind the Debtors and all parties in interest with respect to the validity, perfection, or amount of the Adequate Protection Liens, subject only to the Carve Out, the DIP Liens, and any liens to which the DIP Liens are junior (each subject to certain challenge rights);

d.  grant, subject only to and effective upon (a) entry of the Final DIP Order, with respect to the Pre-Petition Collateral and the Adequate Protection Collateral, and (b) entry of the Interim DIP Order, with respect to the DIP Collateral, in each case except to the extent of the Carve Out, no costs or expenses of administration of these Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral, the Pre-Petition Collateral, or the Adequate Protection Collateral (including, for the avoidance of doubt, Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, the Pre-Petition RBL Agent, or the Pre-Petition Secured Notes Trustee as applicable;

e.  grant, subject to and effective upon entry of the Final DIP Order, that the "equities of the case" exception of section 552(b) of the Bankruptcy Code shall not apply to the Pre-Petition RBL Secured Parties or the Secured Noteholder Parties with respect to proceeds, product, offspring, or profits of the Pre-Petition Collateral.

f.  subject to the entry of the Final DIP Order, grant the DIP Lenders liens on the proceeds of the Debtors' claims and causes of action under chapter 5 of the Bankruptcy Code;

g.  subject to the entry of the Final DIP Order and except to the extent of the Carve Out, grant that upon the indefeasible payment in full in cash of the DIP Obligations, the Pre-Petition RBL Secured Parties and the Secured Noteholder Parties shall be entitled to apply the payments or proceeds of the Pre-Petition Collateral and the Adequate Protection Collateral in accordance with the provisions of the Pre-Petition RBL Claim Documents and the Pre-Petition Secured Notes Documents, and subject to the entry of the Final DIP Order, in no event shall the Pre-Petition RBL Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Pre-Petition Collateral or the Adequate Protection Collateral;

h.  upon entry of the Interim DIP Order, authorize the roll into the DIP Facility of (i) all outstanding Pre-Petition Letters of Credit issued by any Pre-

Petition RBL Lender, (ii) a portion of the principal amount of the outstanding RBL Facility loans held by the Pre-Petition RBL Lenders equal to $185,000,000, and (iii) any unpaid interest and fees due in respect of the indebtedness described in the foregoing clauses (i) and (ii);

i.  upon entry of the Final DIP Order, authorize the roll into the DIP Facility of the remaining principal amount of all then-outstanding RBL Facility loans that are held by the Pre-Petition RBL Secured Parties, other than $1,000,000 of RBL Facility loans, not rolled-up pursuant to the forgoing clause (h);

j.  impose deadlines for the filing of a plan or disclosure statement; and

k.  grant adequate protection payments consisting of cash reimbursement of the reasonable and documented fees, costs, expenses, and charges (including reasonable professionals fees) of (i) the Pre-Petition RBL Agent and the Pre-Petition RBL Secured Parties, (ii) the DIP Agent and the DIP Lenders, and (iii) the Secured Noteholder Parties, among other adequate protection and liens.

18.    The DIP Facility is critical to the Debtors' continuing operations and essential to facilitating a consensual restructuring transaction.  In light of the foregoing, the Significant Provisions are appropriate under the facts and circumstances of these chapter 11 cases. Accordingly, the Significant Provisions in the Interim DIP Order and the Final DIP Order should be approved.

**The Debtors' Prepetition Capital Structure**

19.    As of the Petition Date, the Debtors have approximately $2.4 billion in total outstanding principal amount of funded debt obligations.  The table below summarizes the Debtors' prepetition capital structure:

| Obligation | Maturity | Annual Interest Expense (millions) | Approx. Principal Amount (millions) |
|---|---|---|---|
| Pipeline Financing Lease Agreement (the "Pipeline Lease") | May 30, 2028 | N/A | $111.9 |
| RBL Credit Agreement | Dec. 9, 2021[6] | N/A | $230.0 |

---

[6]    The RBL Facility's maturity date may spring to an earlier date, as further explained herein.

| Obligation | Maturity | Annual Interest Expense (millions) | Approx. Principal Amount (millions) |
|---|---|---|---|
| 9.00% Senior Secured Second Lien Notes (the "9.00% Notes") | May 15, 2021 | $52.6 | $584.7 |
| 9.25% Senior Secured Second Lien Notes (the "9.25% Notes") | Mar. 31, 2021 | $42.1 | $455.7 |
| 7.50% Senior Secured Second Lien Notes (the "7.50% Notes") | Feb. 15, 2024 | $1.5 | $20.6 |
| 7.75% Senior Secured Second Lien Notes (the "7.75% Notes") | Feb. 15, 2024 | $41.2 | $531.8 |
| *Total Secured Debt* | | *$137.5* | *$1,934.7* |
| 6.375% Convertible Senior Notes (the "Convertible Notes") | Dec. 31, 2024 | $14.4 | $225.7 |
| 6.375% Senior Subordinated Notes (the "6.375% Notes") | Aug. 15, 2021 | $3.3 | $51.3 |
| 5.50% Senior Subordinated Notes (the "5.50% Notes") | May 1, 2022 | $3.2 | $58.4 |
| 4.625% Senior Subordinated Notes (the "4.625% Notes") | July 15, 2023 | $6.3 | $136.0 |
| *Total Unsecured Debt* | | *$27.2* | *$471.4* |
| **Total:** | | **$164.7** | **$2,406.1** |

## A.      Prepetition Debt Exchanges and Repurchases.

20.      In 2019 and early 2020, the Debtors completed a series of debt exchanges and repurchases to extend the maturities of their outstanding long-term debt and reduce their debt principal, as further explained herein.  Beginning in June of 2019, the Debtors extended the maturities of $348.4 million of their outstanding long-term debt to 2024 and reduced their debt principal by $120.0 million.  The debtholders exchanged approximately $468.4 million of subordinated notes for the following: (a) $245.5 million aggregate principal amount of 6.375% Convertible Notes; (b) $102.6 million aggregate principal amount of 7.75% Notes; and (c) $120.0 million of cash.  During June and July 2019, the Debtors exchanged $429.2 million aggregate principal amount of 7.75% Notes for $429.4 million of previously outstanding 7.50%

Notes.  As a result of all of the above June and July note exchanges, the Debtors recognized a net gain on debt extinguishment of $100.5 million.

21.     Between August and November of 2019, the Debtors repurchased approximately $112.1 million of their outstanding senior subordinated notes in exchange for $16.4 million of cash and issuance of 38.3 million shares of DNR common stock.  This transaction resulted in a net gain on debt extinguishment of approximately $55.5 million.  During March 2020, the Debtors repurchased a total of $30.2 million aggregate principal amount of 9.00% Notes in open market transactions for a total purchase price of $14.2 million, excluding accrued interest.  This transaction resulted in a net gain on debt extinguishment of $19.0 million.

**B.     The Pipeline Financing Lease.**

22.     On May 30, 2008, Denbury Onshore, as lessee, entered into the Pipeline Lease with Genesis NEJD Pipeline, LLC ("Genesis NEJD"), as lessor, for a principal amount of $175 million. The Pipeline Lease is guaranteed by DNR and matures on May 30, 2028.  As of the Petition Date, there is approximately $111.9 million outstanding under the Pipeline Lease. Pursuant to the Pipeline Lease, Denbury Onshore holds the exclusive right to continue using the NEJD Pipeline system for transportation of $CO_2$ for the duration of the Pipeline Lease and makes quarterly rent payments (approximately $20.7 million per year).  Upon maturity of the Pipeline Lease on May 30, 2028, Denbury Onshore has the right to purchase the NEJD Pipeline from Genesis NEJD for $1.00.  Because DNR's credit rating was downgraded, on March 4, 2016, pursuant to the terms of the Pipeline Lease, DNR provided a letter of credit for $41.3 million to Genesis NEJD.  The Pipeline Lease is guaranteed by DNR and secured by (i) the NEJD Pipeline, (ii) all proceeds from the sale of the NEJD Pipeline, and (iii) all rents, income, or related fees for transportation of $CO_2$ or any other substance through the NEJD Pipeline.

C.     **RBL Credit Agreement.**

23.     On December 9, 2014, DNR entered into that certain Amended and Restated Credit Agreement (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "RBL Credit Agreement") among DNR, as borrower, the lenders party thereto from time to time (the "Pre-Petition RBL Lenders"), and JPMorgan Chase Bank, N.A., as administrative agent (the "RBL Agent"), which provides the Company with revolving credit, letter of credit, and swingline facilities (collectively, the "RBL Facility").   Pursuant to that certain Amended and Restated Guarantee Agreement, dated as of December 9, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof), the RBL Facility is guaranteed by each of the Debtors other than DNR.  Pursuant to (a) that certain Amended and Restated Pledge Agreement, dated as of December 9, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof), by the Debtors in favor of the RBL Agent and (b) the mortgages granted by certain Debtors in favor of the RBL Agent, the RBL Facility is secured (subject to certain customary exceptions) on a first priority basis by security interests in (i) equity in DNR's subsidiaries, (ii) hedge agreements, (iii) certain deposit accounts, securities accounts and commodities accounts, (iv) the proceeds of the foregoing clauses (i) through (iii) above and (v) substantially all of the Debtors' oil and gas properties.

24.     As of June 30, 2020, the Borrowing Base (as defined in the RBL Credit Agreement) and aggregate commitments under the RBL Facility are $615 million.  The RBL Facility matures on December 9, 2021; *provided* that such maturity date may be earlier if any of the following occurs:  (a) February 12, 2021, if on such date Liquidity (as defined in the RBL Credit Agreement) is less than 120% of the outstanding amounts then owed under the 9.00% Notes; (b) May 14, 2021, if on or before such date, the 9.00% Notes have not been repaid, exchanged, refinanced or

otherwise redeemed in full; (c) May 14, 2021, if on such date Liquidity is less than 120% of the outstanding amounts then owed under the 6.375% Notes; or (d) August 13, 2021, if on or before such date, the 6.375% Notes have not been repaid, exchanged, refinanced or otherwise redeemed in full.  The Borrowing Base is subject to redetermination on May 1st and November 1st of each year.[7]  Pursuant to that certain Eighth Amendment to the RBL Credit Agreement, dated as of June 26, 2020, by and among DNR, the RBL Agent, and the Pre-Petition RBL Lenders, until the November 1, 2020 borrowing base redetermination, the availability under the RBL Facility was reduced to $275,000,000 *plus* the aggregate amount outstanding under the Letters of Credit (not to exceed $100 million) in effect at such time.

25.     Under the RBL Credit Agreement, letters of credit are available in an aggregate amount not to exceed $100 million and swingline loans are available in an aggregate amount not to exceed $25 million.  Loans made under the RBL Credit Agreement are subject to the following interest rates:  ABR + 1.75% to 2.75% per annum for ABR loans; and LIBOR + 2.75% to 3.75% per annum for LIBOR loans, as well as a commitment fee of 0.50% on the undrawn portion of the commitments.  As of the Petition Date, the Debtors have $94.7 million letters of credit and approximately $230 million of loans outstanding under the RBL Facility.

**D.     Derivatives and Hedging Activities.**

26.     To provide protection against volatility in commodity prices, the Debtors have historically entered into hedging transactions covering a portion of the Debtors' anticipated production levels.  The Debtors' hedging transactions have primarily consisted of financially settled crude oil and natural gas option contracts—generally comprised of a mixture of costless

---

[7]     The Borrowing Base under the RBL Facility was reaffirmed at $615 million for the May 1, 2020 Scheduled Redetermination (as defined in the RBL Credit Agreement).

collars, 3-way collars, and swaps—with 13 financial institutions, all of which are lenders under the RBL Facility.  For the year ending December 2020, approximately 70% of the Debtors' currently estimated total oil and natural gas production is hedged by derivative contracts.  As of July 30, 2020, the Debtors' derivative contracts represent a net asset of approximately $40 million on a mark-to-market basis.  Pursuant to the Hedging Motion,[8] the Debtors will seek authorization to maintain their prepetition hedge contracts and enter into postpetition hedges in the ordinary course of business.

### E.      Senior Secured Second Lien Notes.

#### i.        The 9.00% Notes.

27.      In May 2016, DNR issued $614.9 million in aggregate principal amount of the 9.00% Notes under an indenture dated as of May 10, 2016 (the "9.00% Notes Indenture"), by and among DNR, as issuer, each other Debtor, as guarantor parties thereto, and Wilmington Trust, National Association, as trustee and collateral trustee.  Pursuant to the 9.00% Notes Indenture, the 9.00% Notes were issued at par, bear interest at a rate of 9.00% per year, payable semi-annually in arrears on May 15 and November 15 of each year, and mature on May 15, 2021.  As of the Petition Date, there is $584.7 million in principal and $9 million in accrued interest outstanding under the 9.00% Notes.

28.      The 9.00% Notes are guaranteed jointly and severally by each of the Debtors (other than DNR) and are secured by second-priority liens on all assets and property of the Debtors securing the RBL Facility, subordinated to the liens that secure the RBL Facility and any future priority lien debt.

---

[8]      As used herein, the "Hedging Motion" means *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Perform Under and/or Amend Prepetition Hedging Arrangements, (B) Enter Into, and Perform Under, Postpetition Hedging Arrangements, (C) Grant Liens and Superpriority Administrative Expense Claims, and (II) Granting Related Relief*, filed contemporaneously herewith.

ii.      The 9.25% Notes.

29.      In December 2017 and January 2018, DNR issued $381.6 million and $74.1 million, respectively, in aggregate principal amount of the 9.25% Notes under an indenture dated as of December 6, 2017 (the "9.25% Notes Indenture"), by and among DNR, as issuer, each other Debtor, as guarantor parties thereto, and Wilmington Trust, National Association, as trustee and collateral trustee.  Pursuant to the 9.25% Notes Indenture, the 9.25% Notes were issued at par,[9] bear interest at a rate of 9.25% per year, payable semi-annually in arrears on March 31 and September 30 of each year, and mature on March 31, 2022.  As of the Petition Date, there is $455.7 million in principal and $11.5 million in accrued interest outstanding under the 9.25% Notes.

30.      The 9.25% Notes are guaranteed jointly and severally by each of the Debtors (other than DNR) and are secured by second-priority liens on all assets and property of the Debtors securing the RBL Facility, subordinated to the liens that secure the RBL Facility and any future priority lien debt.

iii.      The 7.50% Notes.

31.      In August 2018, DNR issued $450.0 million in aggregate principal amount of the 7.50% Notes (together with the 9.00% Notes, 9.25% Notes, and 7.75% Notes, the "Second Lien Notes") under an indenture dated as of August 21, 2018 (the "7.50% Notes Indenture"), by and among DNR, as issuer, each other Debtor, as guarantor parties thereto, and Wilmington Trust, National Association, as trustee and collateral trustee.  Pursuant to the 7.50% Notes Indenture, the

---

[9]      The December 2017 issuance, in addition to an $84.7 million issuance of 3.5% Convertible Senior Notes, was in exchange for $609.8 million aggregate of Denbury's existing senior subordinated notes.  The January 2018 issuance, in addition to a $59.4 million issuance of 2023 Convertible Senior Notes, was in exchange for $174.3 million of Denbury's existing senior subordinated notes.  In April and May 2018, the holders of $84.7 million in aggregate principal amount of the 3.5% Convertible Senior Notes and $59.4 million of the 2023 Convertible Senior Notes were converted to 55.2 million shares of Denbury's common stock.

7.50% Notes were issued at par, bear interest at a rate of 7.50% per year, payable semi-annually in arrears on February 15 and August 15 of each year, and mature on February 15, 2024.  As of the Petition Date, there is approximately $20.6 million in principal and $0.6 million in accrued interest outstanding under the 7.50% Notes.

32.     The 7.50% Notes are guaranteed jointly and severally by each of the Debtors (other than DNR) and are secured by second-priority liens on all assets and property of the Debtors securing the RBL Facility, subordinated to the liens that secure the RBL Facility and any future priority lien debt.

### iv.       The 7.75% Notes.

33.     In June 2019, DNR issued $528.0 million in aggregate principal amount of the 7.75% Notes under an indenture dated as of June 19, 2019 (the "7.75% Notes Indenture"), by and among DNR, as issuer, each other Debtor, as guarantor parties thereto, and Wilmington Trust, National Association, as trustee and collateral trustee.  The 7.75% Notes were issued as part of an exchange for certain senior subordinated notes and existing 7.50% Notes.  The 7.75% Notes bear interest at a rate of 7.75% per year, payable semi-annually in arrears on February 15 and August 15 of each year, and mature on February 15, 2024.  In July 2019, DNR issued an additional $3.8 million of 7.75% Notes in exchange for $4.0 million of 7.50% Notes, which were recorded at par. As of the Petition Date, there is approximately $531.8 million in principal and $15.5 million in accrued interest outstanding under the 7.75% Notes.

34.     The 7.75% Notes are guaranteed jointly and severally by each of the Debtors (other than DNR) and are secured by second-priority liens on all assets and property of the Debtors securing the RBL Facility, subordinated to the liens that secure the RBL Facility and any future priority lien debt.

### F.       Convertible Senior Notes.

35.     In June 2019, DNR issued $245.5 million in aggregate principal amount of Convertible Notes under an indenture dated as of June 19, 2019 (the "Convertible Notes Indenture"), by and among DNR, as issuer, and Wilmington Trust, National Association, as trustee and collateral trustee.  The Convertible Notes bear interest at a rate of 6.375% per year, payable semi-annually in arrears on June 30 and December 30 of each year, and mature on December 31, 2024.  As of the Petition Date, there is approximately $225.7 million in principal and $8.4 million in accrued interest outstanding under the Convertible Notes.   The Convertible Notes are convertible into shares of DNR's common stock at any time, at the option of the Holders, at a rate of 370 shares of common stock per $1,000 principal amount of the Convertible Notes, which is the equivalent of approximately 83.5 million shares.  The Convertible Notes automatically convert to shares of common stock if the trading price equals or exceeds $2.43 per share for 10 trading days in any period of 15 consecutive days, subject to certain other conditions.

36.     The Convertible Notes are guaranteed jointly and severally by each of the Debtors (other than DNR).

### G.     The Senior Subordinated Notes.

37.     Each of the indentures governing the 6.375% Notes, the 5.50% Notes and the 4.625% Notes (collectively, the "Senior Subordinated Notes") contains a provision that expressly subordinates the Senior Subordinated Notes in right of payment to Senior Indebtedness (as defined in the indentures), which includes the RBL Facility, Second Lien Notes, and Convertible Notes. Upon a bankruptcy or reorganization (among other things), the Senior Indebtedness is entitled to receive payment in full before holders of Senior Subordinated Notes are entitled to any payment of principal or interest—and until the Senior Indebtedness is in fact paid in full, any payment or distribution received by holders of Senior Subordinated Notes must be held in trust for, and turned over to, the Holders of Senior Indebtedness.

i.        **The 6.375% Notes.**

38.        In February 2011, DNR issued $400 million in aggregate principal amount of the 6.375% Notes under an indenture dated as of February 17, 2011 (the "6.375% Notes Indenture"), by and among DNR, as issuer, and Wilmington Trust, National Association, as trustee.  Pursuant to the 6.375% Notes Indenture, the 6.375% Notes were issued at par, bear interest at a rate of 6.375% per year, payable semi-annually on February 15 and August 15 of each year, and mature on August 15, 2021.  As of the Petition Date, there is approximately $51.3 million in principal and $1.5 million in accrued interest outstanding under the 6.375% Notes.

39.        The 6.375% Notes are guaranteed jointly and severally on a senior subordinated basis by each of the Debtors (other than DNR).

ii.        **The 5.50% Notes.**

40.        In April 2014, DNR issued $1.25 billion in aggregate principal amount of the 5.50% Notes under an indenture dated as of April 30, 2014 (the "5.50% Notes Indenture"), by and among DNR, as issuer, and Wilmington Trust, National Association, as trustee.  Pursuant to the 5.50% Notes Indenture, the 5.50% Notes were issued at par, bear interest at a rate of 5.50% per year, payable semi-annually on May 1 and November 1 of each year, and mature on May 1, 2022.  As of the Petition Date, there is approximately $58.4 million in principal and $0.8 million in accrued interest outstanding under the 5.50% Notes.

41.        The 5.50% Notes are guaranteed jointly and severally on a senior subordinated basis by each of the Debtors (other than DNR).

iii.        **The 4.625% Notes.**

42.        In February 2013, DNR issued $1.2 billion in aggregate principal amount of the 4.625% Notes (together with the 6.375% Notes and the 5.50% Notes, the "Subordinated Notes") under an indenture dated as of February 5, 2013 (the "4.625% Notes Indenture"), by and among

DNR, as issuer, and Wilmington Trust, National Association, as trustee.  Pursuant to the 4.625%

Notes Indenture, the 4.625% Notes were issued at par, bear interest at a rate of 4.625% per year,

payable semi-annually on January 15 and July 15 of each year, and mature on July 15, 2023.  As

of the Petition Date, there is approximately $136.0 million in principal and $3.4 million in accrued

interest outstanding under the 4.625% Notes.

43.     The 4.625% Notes are guaranteed jointly and severally on a senior subordinated

basis by each of the Debtors (other than DNR).

**H.     Existing Equity Interests.**

44.     DNR's certificate of incorporation authorizes two classes of stock:  common stock

and preferred stock.  As of June 30, 2020, DNR had approximately 507,725,516 shares of common

stock outstanding and no shares of preferred stock outstanding.  DNR has not paid a stock dividend

since the fourth quarter of 2015.  In addition, the RBL Facility, Second Lien Notes, Convertible

Notes, and Subordinated Notes all include in their agreements and indentures that certain financial

covenants must be satisfied at the time dividend payments are made.

45.     DNR's stock had continued to trade on the NYSE during the cure period, but

recently halted on July 29, 2020 with a closing price of $0.24 per share.

**The Debtors Have a Need for
Debtor-in-Possession Financing and Use of Cash Collateral.**

46.     The Debtors require the continued use of the Cash Collateral.  In advance of the

Petition Date, the Debtors undertook an analysis of how much postpetition financing and liquidity

would be required to operate the Debtors' business and pay administrative costs during these

chapter 11 cases.  *See* Kvarda Decl. ¶ 7.  As of the Petition Date, the Debtors' total cash balance

is approximately $167 million, all of which is encumbered by pre-petition liens.  *See id.*  While

this cash position may be sufficient (assuming the Pre-Petition RBL Secured Parties' consent to

use their Cash Collateral) to operate the business and to fund these chapter 11 cases on the timeline proposed by the Debtors, the Debtors sought an efficient form of financing that would ensure the Debtors are able to (a) retain access to favorable capital commitments to minimize the costs of financing these chapter 11 cases and (b) obtain the greatest amount of capital at the lowest cost of capital reasonably available to fund the Debtors on a post-petition basis. *See id.*

47.     The Debtors' business is cash intensive. *See id.* ¶ 10.  Although the Debtors have paused new drilling, the Debtors still face significant costs related to maintaining extraction operations and running the corporate enterprise, including: satisfying obligations to employees, customers, suppliers, and vendors; paying expenses pursuant to joint operating agreements for properties operated by the Debtors; satisfying joint interest billings for properties where the Debtors are non-operating working interest owners; paying royalties; maintaining the safety of their pipeline and drilling operations; and making any other payments that are essential for the continued management, operation, and preservation of the Debtors' business and assets. *See id.* The ability to satisfy these expenses when due is essential to the Debtors' continued operation of their business during the pendency of these cases. *See id.*

48.     Significant availability under the RBL Facility enabled the Debtors to defensively draw down the RBL Facility by an incremental amount of approximately $200 million prior to the Petition Date, resulting in an available cash balance of approximately $167 million as of the Petition Date. *See id.* ¶ 11.  This draw likely provides the Debtors with sufficient liquidity to sustain operations and fund the expenses of these chapter 11 cases on the prepack timeline proposed by the Debtors (which assumes an emergence from bankruptcy by mid-September 2020); however, the carrying costs associated with these prepetition borrowings are significant (approximately $2 million for the anticipated approximately seven-week length of the chapter 11

cases), and as shown in the DIP Budget attached as <u>Exhibit 2</u> to the Interim DIP Order, the Debtors do not immediately require the entire approximately $167 million of cash on hand to fund near-term operations. *See id.* As such, by entering into the DIP Facility and initially "rolling" $185 million of RBL Facility loans into the DIP Facility while gaining access to $25 million of the new money commitments upon entry of the Interim DIP Order, the Debtors will have access to a functioning revolving credit facility during the interim period. *See id.* This will provide the necessary liquidity to fund the Debtors' operations and administration of the cases, while enabling the Debtors to obtain interest savings of approximately $2 million during the cases by immediately paying down a significant portion of the outstanding balance on the revolver. *See id.* Additionally, the DIP Facility provides the Debtors with protection if there is an unexpected downturn in commodity prices or the chapter 11 cases are unexpectedly prolonged. *See id.* Given the current volatility in the oil market, it is prudent for the Debtors to secure access to additional capital commitments in excess of the Debtors' cash balance. *See id.*

49.     The use of Cash Collateral is critical to the Debtors' ability to administer these chapter 11 cases and provide the Debtors with sufficient liquidity to continue operations in the ordinary course and pursue the restructuring contemplated by the Debtors' Restructuring Support Agreement and Plan. *See id.* ¶ 13. The Debtors do not have material unencumbered cash and, therefore, without access to the Cash Collateral, the Debtors would not have sufficient cash to fund the planned disbursements in the Budget, likely quickly bringing operations to a halt. *See id.* Accordingly, the Court should approve immediate access to the DIP Facility and Cash Collateral.

### Alternative Sources of Financing Are Not Available on Better Terms.

50.     As discussed above, while the Debtors' cash position may be sufficient (assuming the Pre-Petition RBL Secured Parties' and the Secured Noteholder Parties' consent to use their Cash Collateral) to operate the business and to fund these chapter 11 cases during the anticipated

case timeline, the Debtors determined it would be in their best interests to seek an efficient form of financing that would ensure they are able to (a) retain access to favorable capital commitments to minimize the costs of financing these chapter 11 cases and (b) obtain the greatest amount of capital at the lowest cost reasonably available.  *See* Banks Decl. ¶ 8.

51.     In light of the Debtors' overleveraged capital structure, beginning in late April 2020, the Debtors and their advisors commenced discussions with an ad hoc committee of holders of the Debtors' second lien notes (the "<u>Second Lien Ad Hoc Committee</u>") regarding the terms of a value-maximizing, comprehensive restructuring.  *See id.* ¶ 12.  Concurrently, the Debtors began negotiating the terms of a debtor-in-possession credit facility and exit financing with the Pre-Petition RBL Secured Parties.  *See id.*  These discussions coalesced around a $615 million senior secured debtor-in-possession revolving credit facility that will roll into a new, senior secured revolving exit credit facility with initial availability thereunder of up to $615 million, subject to a borrowing base to be set forth in the exit facility documents and on such other terms and conditions as set forth therein.  *See id.*  Notably, the Debtors had only drawn approximately $65 million on the RBL Facility (utilizing just over 10% of the facility) prior to drawing the maximum amount available under the RBL Facility in late June.  *See id.* ¶ 16.  As a consequence, and given the high quality of the Debtors' assets and the willingness of the Debtors' junior creditors to fully equitize all outstanding bond debt, the Debtors were able to negotiate one of the more attractively priced and structured facilities in the market.  *See id.*

52.     To ensure that the Debtors had access to the best financing option reasonably available, simultaneously with the negotiations with the Pre-Petition RBL Secured Parties, Evercore Group L.L.C. ("<u>Evercore</u>"), the Debtors' proposed investment banker, initiated a marketing process for debtor-in-possession financing.  *See id.* ¶ 17.  As part of this process,

Evercore reached out to approximately ten sources of financing outside the Debtors' capital structure, including four commercial bank and six institutional lenders. *See id.* All parties contacted by Evercore declined to provide an offer for financing. *See id.* Ultimately, many of the parties reported that they were unwilling to extend financing to the Debtors due to a number of factors, including their unwillingness to provide unsecured financing or financing secured by junior liens, the prospect of a priming fight with the Debtors' Pre-Petition RBL Secured Parties, unwillingness to provide an RBL, and the volatile state of the oil and gas industry. *See id.*

53.     As further evidence that the Debtors have obtained the best financing arrangement available, the Second Lien Ad Hoc Committee, which will ultimately own a significant equity interest in the reorganized Debtors, also reviewed, provided input into the negotiations, and approved the terms of the DIP Facility and exit facility. *See id.* ¶ 18.

54.     The DIP Facility is the product of good-faith negotiations with the DIP Lenders and is necessary for the Debtors to complete a successful, comprehensive restructuring of the Debtors' balance sheet. The economic terms of the DIP Facility are competitive and within the range of other postpetition financing facilities in recent years. *See id.* ¶ 14. Accordingly, approval of the DIP Facility is in the best interests of the Debtors' estates, and the Debtors respectfully request entry of the DIP Orders approving the DIP Facility.

### Basis for Relief

**II.     The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Facility Documents.**

    **A.     Entering into the DIP Facility Documents Is an Exercise of the Debtors' Sound Business Judgment.**

55.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Facility Documents, obtain access to the DIP Facility, and continue using the Cash Collateral. Courts grant considerable deference to a debtor's business judgment in

obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g.*, *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

56.     To determine whether a debtor has met this business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

57.     To evaluate whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n. 7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

58.     The Debtors' determination to move forward with the DIP Facility is a sound exercise of their business judgment following a thorough process and careful evaluation of alternatives.   Specifically, the Debtors and their advisors determined that the Debtors would require cash to support the administration of their chapter 11 cases and their ongoing operations. The DIP Facility is critical to ensuring the Debtors are able to retain access to favorable capital commitments and minimizing the costs of financing these chapter 11 cases. *See* Banks Decl. ¶ 29. Absent interim approval of the DIP Facility and the associated roll-up, the Debtors could potentially incur costs on amounts borrowed under the RBL Facility in excess of the fees contemplated under the DIP Facility and would have less certainty as to the availability of excess funding above the current cash balance to withstand an unexpectedly longer process. *See id.*

59.     The Debtors negotiated the DIP Facility Documents with the DIP Lenders in good faith, at arm's length, and with the assistance of their advisors, and the Debtors believe that they have obtained the best financing available.   Accordingly, the Court should authorize the Debtors' entry into the DIP Facility Documents as a reasonable exercise of the Debtors' business judgment.

### B.       The Repayment of the Pre-Petition RBL Facility Under the Interim DIP Order is Appropriate.

60.     The proposed refinancing of the existing RBL Facility in excess of $1 million with the proceeds of the DIP Facility is an exercise of the Debtors' sound business judgment. Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.   Courts in the Fifth Circuit have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258

37

B.R. 368, 369–70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation).  The business judgment rule shields a debtor's management from judicial second-guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

61.     Repayment of prepetition debt (often referred to as a "roll-up") is a common feature in debtor-in-possession financing arrangements.  Where, as here, the Pre-Petition RBL Secured Parties are oversecured, repaying creditors that stand to receive payment in full with postpetition loans will not harm the Debtors' estates and other creditors.  Rather, the DIP Facility's proposed repayment feature merely affects the timing, not the amount, of the Pre-Petition RBL Secured Parties' recovery of principal amounts owed.  *See* Banks Decl. ¶ 27.  Further, the roll-up will not prejudice any rights a party may otherwise have to challenge the amount, validity, perfection, enforceability, priority, or extent of the debt or liens associated therewith.  Pursuant to the procedures set forth in the Interim DIP Order, any official committee appointed in these chapter 11 cases and any other parties in interest have the ability to bring a challenge proceeding in accordance with applicable law.  Interim DIP Order ¶ 85.  These procedures were developed to ensure that no party in interest would be prejudiced by the relief requested herein and to provide the Court with comfort that any amounts provided on account of the refinancing can be disgorged, refunded, or repaid to the extent the DIP Facility debt or liens are successfully challenged.

62.     In contrast, the roll-up will result in savings for the Debtors' estates.  Prior to the Petition Date, the Debtors defensively drew down on the RBL Facility as a preventive measure to hedge against the possibility that the Debtors would not be able to obtain DIP financing or an exit

facility in light of current market conditions.  *See* Banks Decl. ¶ 26.  Prior to making the $200

million defensive draw, the Debtors had drawn approximately $65 million under the RBL Facility.

*See id.*  With a DIP-to-exit facility in hand, the Debtors can confidently use up to $147 million of

that Cash Collateral to pay down the outstanding balance of loans, as they will be able to re-borrow

such amounts if needed.  *See id.*  Repaying up to $147 million of the approximately $230 million

drawn under the RBL Facility upon entry of the Interim DIP Order will allow the Debtors to

eliminate a substantial amount of negative carry on interest.  Following paydown, the Debtors will

be required to pay an undrawn commitment fee of only 0.50%, as compared to the all-in rate of

approximately 7.50% if $230 million remains drawn under the prepetition RBL Facility.  *See id.*

The anticipated savings are expected to offset the approximately $2.1 million in aggregate upfront,

arrangement, and agency fees on the DIP Facility, which constitutes only approximately 0.34

percent of the $614 million of commitments provided under the DIP Facility.  *See id.* ¶ 20.  And,

if the chapter 11 cases take longer than the proposed seven-week timeline, the $1.2 million of

savings per month will continue to inure to the benefit of the estate (e.g., a nine-month case would

yield $8 million of savings net of fees).  *See id.*

63.     Given these circumstances, repayment of the RBL Facility is reasonable,

appropriate, and a sound exercise of the Debtors' business judgment.

**C.      The Debtors Should Be Authorized to Grant Liens and Superpriority Claims
         to the DIP Lenders.**

64.     The Debtors propose to obtain financing under the DIP Facility, in part, by

providing superpriority claims and liens pursuant to section 364(c) of the Bankruptcy Code.

Significantly, the Debtors propose to provide first priority liens on substantially all of the Debtors'

assets, including previously unencumbered property and "priming" liens on all of the Pre-Petition

Collateral except for the Excluded Assets.

65.     In the event that a debtor demonstrates that it is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court:

> [M]ay authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c); *see also In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing pursuant to section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

a.      the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

b.      the credit transaction is necessary to preserve the assets of the estate; and

c.      the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

66.     No party that Evercore contacted as part of the above-described marketing process was interested in providing, or willing to provide, postpetition financing to the Debtors on an unsecured basis.  *See* Banks Decl. ¶ 17.  Indeed, no constituency was willing to provide postpetition financing on anything other than a superpriority or priming basis with respect to all of the Debtors' assets.  *See id.*  Put simply, the DIP Lenders were not willing to provide the DIP Facility on any other terms, and no other existing stakeholder or third-party has presented a

proposal, let alone a proposal without such priming liens.  Further, the Debtors have not discovered sufficient unencumbered assets to secure sufficient debtor-in-possession financing to fund a non-consensual chapter 11 case.  Accordingly, the DIP Facility's structure is appropriate in light of the Debtors' financing needs and the lack of viable non-priming debtor-in-possession financing alternatives.

67.     Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  Accordingly, the Debtors may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either (a) the Pre-Petition RBL Secured Parties and the Pre-Petition Secured Noteholders have consented or (b) the Pre-Petition RBL Secured Parties' and the Pre-Petition Secured Noteholders interests in collateral are adequately protected.

68.     The Pre-Petition RBL Secured Parties and the Secured Noteholder Parties have consented to the priming liens securing the DIP Facility consistent with the terms of the Pre-Petition RBL Claim Documents.  Further, the Pre-Petition RBL Secured Parties and the Secured Noteholders will receive adequate protection of the Pre-Petition Collateral under the DIP Orders.  Specifically, the Pre-Petition RBL Secured Parties will receive adequate protection in the form of replacement liens and security interests in and upon the Collateral, superpriority administrative expense claims, and reimbursement of the fees and expenses of the Pre-Petition RBL Agent and the Pre-Petition RBL Secured Parties.  The Secured Noteholder Parties will receive adequate protection in the form of junior replacement liens and security interests in and upon the Collateral

and the reimbursement of fees and expenses of the Secured Noteholder Parties, including counsel and advisors to the Second Lien Ad Hoc Committee.

69.     Accordingly, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is both warranted and appropriate under the circumstances.

### D.     No Comparable Alternative to the DIP Facility Is Reasonably Available.

70.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988); *see also Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that the refusal of two national banks to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

71.     Here, the Debtors conducted a thorough debtor-in-possession marketing process that confirmed the only actionable option was the DIP Facility.  All parties contacted by Evercore declined to provide an offer for financing.  *See* Banks Decl. ¶ 17.  The DIP Facility is the product of good-faith negotiations with the DIP Lenders, is supported by the Second Lien Ad Hoc Committee, and represents the lowest cost alternative available to the Debtors.

### III.     The Debtors Should Be Authorized to Continue to Use the Cash Collateral.

72.     The Debtors' use of property of their estates, including the Cash Collateral, is governed by section 363 of the Bankruptcy Code,[10] which provides in relevant part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).  Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).

73.     Generally, what constitutes adequate protection is decided on a case-by-case basis. *See In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *In re Cont'l Airlines Inc.*, 154 B.R. 176, 180–81 (Bankr. D. Del. 1993); *In re Columbia Gas Sys., Inc.*, No. 91-803, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re Realty Sw. Assocs.*, 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection

---

[10]     Section 363(a) of the Bankruptcy Code defines "cash collateral" as follows:

> Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

74.    The Pre-Petition RBL Secured Parties and the Pre-Petition Secured Noteholders will inherently benefit from the Debtors' proposed use of the Cash Collateral, which will prevent avoidable diminution in value of the Cash Collateral and enhance the likelihood of preserving the Debtors' overall going concern value as the Debtors continue to negotiate with all of their key stakeholders.  Preservation of the Debtors' business as a going concern in and of itself serves to provide such parties "adequate protection" for Bankruptcy Code purposes.  *See 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (noting that, in determining whether protection is "adequate," courts consider "whether the value of the debtor's property will increase as a result of the" use of collateral or provision of financing); *Sky Valley, Inc.*, 100 B.R. at 114 ("[A]n increase in the value of the collateral . . . resulting from superpriority financing could result in adequate protection.").

75.    The Debtors believe that the proposed adequate protection in the proposed Interim DIP Order is necessary and sufficient for the Debtors to continue to use Cash Collateral.  Accordingly, the adequate protection is (a) fair and reasonable, (b) necessary to satisfy the requirements of sections 363(c)(2) and 363(e) of the Bankruptcy Code, and (c) in the best interests of the Debtors and their estates.

## IV.    The Debtors Should Be Authorized to Pay the Interest and Fees Required by the DIP Agent and the DIP Lenders under the DIP Facility Documents.

76.    Under the DIP Facility Documents, the Debtors have agreed, subject to Court approval, to pay certain interest and fees to the DIP Agent and the DIP Lenders.  In particular, the Debtors have agreed to pay $2.1 million in aggregate upfront, arranger, and agency fees in addition to:

    a.     ***Interest Rate***.  DNR shall pay interest at a rate per annum equal to (i) the ABR or (ii) LIBOR plus the Applicable Margin, as set forth in the DIP Credit Agreement.

    b.     ***Letter of Credit Fees***.  DNR shall pay a fronting fee equal to 0.125% per annum of the aggregate amount of outstanding DIP letters of credit.  In addition, a per annum fee equal to the Applicable Margin then in effect for LIBOR borrowings will accrue on the aggregate face amount of outstanding DIP Letters of Credit.  Both fees are payable in arrears at the end of each quarter and upon the termination of the DIP Facility.

    c.     ***Commitment Fees***.  DNR shall pay a fee in an amount computed on a daily basis equal to the undrawn portion of the DIP loans multiplied by the applicable unused commitment fee percentage, as set forth in the DIP Credit Agreement, to accrue daily and be paid quarterly in arrears.

77.     As set forth in the Banks Declaration, the Debtors believe that the interest and fees to be paid under the DIP Facility are consistent with the market and are reasonable and appropriate, particularly in light of the circumstances of these chapter 11 cases and the marketing process undertaken, and represent the most favorable terms available to the Debtors.  *See* Banks Decl. ¶ 21.  Importantly, the approximately $2.1 million in aggregate upfront, arrangement, and agency fees on the DIP Facility constitutes only approximately 0.34 percent of the $614 million commitments provided under the DIP Facility.  *See id.* ¶ 20.  Further, the Debtors anticipate saving approximately $2 million in the proposed seven-week case (roughly $1.2 million per month) by reducing negative carry through the roll up and repayment of prepetition amounts outstanding under the RBL Facility.  *See id.*  After the payment of these fees, the Debtors will be approximately cost-breakeven.  *See id.*

78.     These fees were the subject of arm's-length and good-faith negotiations between the Debtors and the DIP Lenders, are integral components of the overall terms of the DIP Facility, and were required by the DIP Agent and the DIP Lenders as consideration for the extension of postpetition financing and an exit facility and consensual use of Cash Collateral.  *See id.* ¶ 21.  Over the course of multiple months, the Debtors' and their advisors actively negotiated the terms

and provisions of the DIP Facility and Exit Facility on behalf of the Debtors. *See id.* Indeed, the Debtors were able to negotiate a reduction of the fees and coupon rate included in the DIP Agent's original proposal, as well as other concessions, including certain conditions precedent associated with the Exit Facility, certain covenants, and reporting requirements. *See id.* This process culminated in the DIP Facility and Exit Facility. The Debtors do not believe that a financing package is reasonably available to the Debtors with terms similar to those of the DIP Facility for lower fees. Accordingly, the Court should authorize the Debtors to pay the interest and fees provided under the DIP Facility Documents in connection with the DIP Facility.

**V.     The DIP Agent and the DIP Lenders Should Be Afforded Good-Faith Protection under Section 364(e).**

79.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

80.     The DIP Facility is the result of (i) the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain vital postpetition financing, and (ii) extensive arm's-length, good-faith negotiations between the Debtors and the DIP Secured Parties. The Debtors submit that the terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.

Further, the Debtors market-tested the terms of the DIP Facility before determining that the DIP Facility provided the best terms available. Accordingly, the Court should find that the obligations arising under the DIP Facility and other financial accommodations made to the Debtors have been extended by the DIP Agent and the DIP Lenders in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and therefore the DIP Secured Parties are entitled to all of the protections afforded thereby.

## VI. The Automatic Stay Should Be Modified on a Limited Basis.

81. The Interim DIP Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the DIP Orders. The proposed Interim DIP Order further provides that the automatic stay is modified to the extent necessary to implement and effectuate the terms of the Interim DIP Order.

82. Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.

## VII. Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.

83. Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the court is empowered to conduct an interim expedited hearing on the motion at which it may authorize a debtor to use cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. *See* Bankruptcy Rule 4001(b)(2). Section 363(c)(3) of the Bankruptcy Code authorizes the court to

conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3). Furthermore, the Complex Case Procedures provide that "on motion by the debtors, a hearing . . . will routinely be conducted within three business days to consider . . . cash collateral use[.]" Complex Case Procedures, § I, ¶ 20.

84. The Debtors require the continued use of the Cash Collateral. As of the Petition Date, the Debtors' total cash balance is approximately $167 million, all of which is encumbered by prepetition liens. *See* Banks Decl. ¶ 8. The Debtors' business is cash intensive, with significant daily costs required to fund extraction operations and satisfy obligations to vendors and employees. *See* Kvarda Decl. ¶ 10.

85. Prior to the Petition Date, Alvarez & Marsal North America, LLC ("A&M"), advised and assisted the Debtors in evaluating the amount of funding that the Debtors will require in these chapter 11 cases. *See id.* ¶ 8. The amount was derived from a cash-flow projection that A&M and the Debtors' management team developed from an analysis of the Debtors' receipts and disbursements during a 13-week projection period (the "DIP Budget," attached as Exhibit 2 to the Interim DIP Order). *See id.* The DIP Budget takes into account anticipated cash receipts and disbursements and considers a number of factors, including required costs to maintain safe operations, fees and interest expense associated with the DIP Facility, professional fees, and required operational payments. *See id.* The DIP Budget presents a reasonable estimate of the Debtors' cash sources and needs during these chapter 11 cases. *See id.*

86. The Debtors are seeking limited relief to, among other things, refinance the loans outstanding under the RBL Facility, satisfy payroll, pay suppliers, meet overhead, pay expenses and billings related to the Debtors' oil and gas properties, and make any other payments that are

essential for the continued management, operation, and preservation of the Debtors' business. *See id.* ¶ 10.  The ability to satisfy these expenses when due is essential to the Debtors' continued operation of their business during the pendency of these cases.  *See id.*

87.     Failure to obtain access to the DIP Facility and Cash Collateral may result in immediate and irreparable harm to the Debtors and their stakeholders and may diminish the value of the Debtors' estates.  *See id.* ¶ 14.  Without approval of the DIP Facility and use of Cash Collateral, the Debtors will be unable to continue to operate in the ordinary course or preserve and maximize the value of their assets for the benefit of all parties in interest.  *See id.*  Accordingly, pursuant to section 363(c)(3) of the Bankruptcy Code and Bankruptcy Rule 4001(b), the Debtors request that the Court conduct an expedited hearing on this Motion, and enter the proposed Interim DIP Order authorizing the Debtors to enter into the DIP Facility and use the Cash Collateral.

## Request for Final Hearing

88.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## Emergency Consideration

89.     Pursuant to Bankruptcy Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  The Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  The failure to receive the requested relief during the first 21 days of these chapter 11 cases could disrupt the Debtors' operations at this critical juncture and imperil

the Debtors' restructuring. The Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested herein on an emergency basis.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

90. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Reservation of Rights

91. Nothing contained herein or any actions taken by the Debtors pursuant to any order granting the relief requested by this Motion is intended or should be construed as: (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined herein or any order granting the relief requested by this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be

construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

### Notice

92.     Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Bankruptcy Local Rules, and is sufficient under the circumstances.   Without limiting the foregoing, due notice will be afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties-in-interest, including:  (a) the U.S. Trustee for the Southern District of Texas; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) JPMorgan Chase Bank, N.A., as administrative agent under the Debtors' revolving credit facility; (d) Vinson & Elkins LLP, as counsel to the administrative agent under the Debtors' revolving credit facility (e) Wilmington Trust, N.A., as indenture trustee under the Debtors' (i) 9.00% second lien secured notes due 2021, (ii) 9.250% second lien secured notes due 2022, (iii) 7.50% second lien secured notes due 2024, (iv) 7.750% second lien secured notes due 2024, and (v) 6.375% convertible notes due 2024; (f) Wilmington Trust, N.A., as successor indenture trustee under the Debtors' (i) 6.375% subordinated notes due 2021, (ii) 4.625% subordinated notes due 2023, and (iii) 5.50% subordinated notes due 2022; (g) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to the ad hoc committee of second lien bondholders; (h) Akin Gump Strauss Hauer & Feld LLP, as counsel to the ad hoc group of convertible bondholders; (i) the United States Attorney's Office for the Southern District of Texas; (j) the Internal Revenue Service; (k) the United States Securities and Exchange Commission; (l) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (m) the state attorneys general for states in which the Debtors conduct business;

and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter the DIP Orders, granting the relief requested in this Motion and such other and further relief as is appropriate under the circumstances.

Houston, Texas
July 31, 2020

/s/ *Matthew D. Cavenaugh*

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Vienna F. Anaya (TX Bar No. 24091225)
Victoria Argeroplos (TX Bar No. 24105799)

1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:          mcavenaugh@jw.com
                vanaya@jw.com
                vargeroplos@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Christopher J. Marcus, P.C. (*pro hac vice* admission pending)
Rebecca Blake Chaikin (*pro hac vice* admission pending)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                christopher.marcus@kirkland.com
                rebecca.chaikin@kirkland.com

-and-

David L. Eaton (*pro hac vice* admission pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          david.eaton@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**<u>Certificate of Accuracy</u>**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Local Rule 9013-1(i).

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

**<u>Certificate of Service</u>**

I certify that on July 31, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

<u>**Exhibit A**</u>

**Banks Declaration**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DENBURY RESOURCES INC., *et al.*,[1] | ) | Case No. 20-33801 (DRJ) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

**DECLARATION OF BRENT BANKS IN SUPPORT OF THE
DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN
POSTPETITION FINANCING SECURED BY SENIOR PRIMING LIENS
AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND PROVIDING
SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING
ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY,
(V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

I, Brent Banks, hereby declare under penalty of perjury as follows:

1.      I submit this declaration (this "<u>Declaration</u>") in support of the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing Secured by Senior Priming Liens and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Denbury Resources Inc. (7835); Denbury Air, LLC (7621); Denbury Brookhaven Pipeline Partnership, LP (6322); Denbury Brookhaven Pipeline, LLC (6471); Denbury Gathering & Marketing, Inc. (6150); Denbury Green Pipeline-Montana, LLC (6443); Denbury Green Pipeline-North Dakota, LLC (7725); Denbury Green Pipeline-Riley Ridge, LLC (2859); Denbury Green Pipeline-Texas, LLC (2301); Denbury Gulf Coast Pipelines, LLC (0892); Denbury Holdings, Inc. (1216); Denbury Onshore, LLC (7798); Denbury Operating Company (7620); Denbury Pipeline Holdings, LLC (0190); Denbury Thompson Pipeline, LLC (0976); Encore Partners GP Holdings, LLC (N/A); Greencore Pipeline Company, LLC (9605); Plain Energy Holdings, LLC (0543).  The location of Debtor Denbury Resources Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 5320 Legacy Drive Plano, Texas 75024.

*(VII) Granting Related Relief* (the "DIP Motion"),[2] which seeks approval of the Debtors' senior secured superpriority revolving debtor-in-possession credit facility in an aggregate principal amount of $615 million (the "DIP Facility")[3] and the consensual use of cash collateral (the "Cash Collateral").

2.      Except where specifically noted, the statements in this Declaration are based on: (a) my personal knowledge, belief, or opinion; (b) information I have learned from my review of relevant documents or received from the Debtors' employees or advisors and/or employees of Evercore Group L.L.C. ("Evercore") working directly with me or under my supervision, direction, or control; or (c) from the Debtors' books and records maintained in the ordinary course of their businesses.

3.      I am not being compensated for this testimony other than through payments expected to be received by Evercore as a professional proposed to be retained by the Debtors; none of those payments are specifically payable on account of this testimony.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

## Professional Background and Qualifications

4.      I am a Managing Director at Evercore, a financial advisory and investment banking firm with offices around the world.  Evercore has expertise in domestic and cross-border restructurings, mergers and acquisitions, raising debt and equity capital, and other financial

---

[2]    Capitalized terms used but not defined herein have the meanings given to such terms in the DIP Motion or the proposed interim order attached thereto (the "Interim DIP Order").

[3]    The material terms of the DIP Facility are set forth in detail in the DIP Motion.  For the avoidance of doubt, any description of the DIP Facility herein or in the DIP Motion is qualified in its entirety by reference to the DIP Facility Documents.

advisory services.  Evercore has served as an experienced bankruptcy and restructuring advisor to debtors and creditors in a variety of industries.

5.     I have approximately twelve years of financial advisory experience, including ten years of experience advising debtors and creditors on a wide variety of recapitalization and restructuring transactions.  My experience includes procuring, structuring, and negotiating debtor-in-possession financing facilities across a broad range of industries.  I have been involved in numerous restructurings, including, among others,  Alion Science & Technology, Boart Longyear, Bonavista Energy, California Resources, Catalina Marketing, Claire's, Evergreen Aviation, Frontier Communications, Jack Entertainment, Jupiter Resources, Keystone Automotive, McDermott International, Neuberger Berman, Serta Simmons Bedding, SunEdison, Targus, Ultra Petroleum, and W.R. Grace.

6.     Prior to joining Evercore in 2017, I was a Vice President in Goldman Sachs' debt advisory and restructuring practice.  Prior to joining Goldman Sachs in 2010, I was a Senior Associate in the financial services group at Ernst & Young LLP.  I received a BS and MSA in accounting from Wake Forest University.  I am also a Chartered Financial Analyst. I am principally responsible for overseeing Evercore's day-to-day activities in these chapter 11 cases.

**Evercore Retention**

7.     On March 26, 2020, the Debtors engaged Evercore to act as their investment banker and financial advisor in connection with the Debtors' restructuring initiatives.  Since its engagement, Evercore has worked closely with the Debtors' management team, creditors, and other professionals and advisors in exploring various strategic and financial alternatives and otherwise assisting in the Debtors' restructuring efforts, including:  (a) engaging with creditors across the Debtors' capital structure; (b) assisting the Debtors with numerous creditor presentations focused on the Debtors' business plan and key initiatives; (c) negotiating with and

evaluating multiple restructuring proposals from the Debtors' secured lenders; (d) assisting the Debtors with soliciting, negotiating, and documenting the DIP Facility; (e) performing a valuation analysis of the Debtors; (f) advising and assisting the Debtors in negotiating the terms of a restructuring framework embodied in the Debtors' restructuring support agreement (the "Restructuring Support Agreement"); and (g) most recently, preparing for the commencement of these chapter 11 cases.  As a result of its active engagement in these processes, Evercore is now familiar with the Debtors' financial affairs, debt structure, business operations, capital structure, key stakeholders, financing documents, and related matters.

### The Debtors' Immediate Liquidity Needs

8. I understand that, as of the Petition Date, the Debtors' total cash balance is approximately $167 million, all of which is encumbered by pre-petition liens.  While this cash position may be sufficient (assuming the Pre-Petition RBL Secured Parties' consent to use their Cash Collateral) to operate the business and to fund these chapter 11 cases on the timeline proposed by the Debtors, the Debtors sought an efficient form of financing that would ensure the Debtors are able to (i) retain access to favorable capital commitments to minimize the costs of financing these chapter 11 cases and (ii) obtain the greatest amount of capital at the lowest cost of capital reasonably available to fund the Debtors on a postpetition basis.

9. Evercore has assisted the Debtors over the past several months in evaluating potential financing alternatives.  Among other things, Evercore has worked closely with the Debtors, their management, and their other advisors to evaluate the cash requirements necessary to continue operating the Debtors' business as a going concern.  Based on this work, the Debtors determined, in consultation with Evercore, that procuring financing at the start of these chapter 11 cases is in the best interest of the Debtors, minimizing the cost of these chapter 11 cases and

ensuring that the reorganized Debtors will have access to the lowest-cost capital reasonably available to fund the go-forward business.

10.     Evercore reviewed the 13-week cash flow forecast prepared by the Debtors and Alvarez & Marsal North America, LLC, the Debtors' proposed restructuring advisor, which takes into account anticipated cash receipts and disbursements during a 13-week projection period and considers a number of factors, including required costs to maintain safe operations, fees and interest expense associated with the DIP Facility, professional fees, and required operational payments.  Based on these forecasts and discussions with the Debtors' management and other advisors, I believe that while it would be possible to administer the Debtors' chapter 11 estates, operate the Debtors' business in the ordinary course, and pay administrative costs during these chapter 11 cases solely through the use of Cash Collateral on the Debtors' proposed schedule, it would be prudent for the Debtors to secure access to additional capital commitments in excess of the Debtors' cash balance to insure against future events that could increase the Debtors' administrative expenses or reduce the Debtors' expected revenue, including a prolonged timeline for these chapter 11 cases or an unexpected downturn in commodity prices.

11.     As a result, I believe that the DIP Facility is beneficial to the Debtors' ability to administer these chapter 11 cases and beneficial to the estate.

**The Debtors' Efforts to Secure DIP Financing**

12.     In light of the Debtors' overleveraged capital structure, beginning in late April 2020, the Debtors and their advisors commenced discussions with an ad hoc committee of holders of the Debtors' second lien notes (the "Second Lien Ad Hoc Committee") regarding the terms of a value-maximizing, comprehensive restructuring.  Concurrently, the Debtors began negotiating the terms of a debtor-in-possession credit facility and exit financing with the Pre-Petition RBL Secured Parties.  These discussions coalesced around a $615 million senior secured debtor-in-

possession revolving credit facility that will roll into a new, senior secured revolving exit credit facility with initial availability thereunder of up to $615 million, subject to a borrowing base to be set forth in the exit facility documents and on such other terms and conditions as set forth therein.

13.     The DIP Facility is the product of good-faith negotiations with the DIP Lenders and is an essential component of the Debtors' Restructuring Support Agreement, which was signed by the vast majority of the Debtors' prepetition lenders—documenting their support for the Debtors' proposed Plan and the restructuring transaction contemplated therein.   I believe that the DIP Facility will provide comfort to the Debtors' vendors, suppliers, royalties and working interest holders, customers, and employees that the Debtors will be able to continue to meet their commitments during and after these chapter 11 cases and will enable the Debtors to pursue their restructuring goals in a manner that maximizes the value of the Debtors' estates.   The DIP Facility allows the Debtors, among other things, to continue to enter into commodity hedges, which would not have been available to the Debtors using cash collateral to fund these cases.   As a result of this flexibility, the Debtors remain able to manage commodity price risk through the pendency of the cases and also mitigate risk associated with entering into significant levels of mandatory, prescribed hedging that are becoming the market norm in RBL exit conditions.   Finally, the DIP Facility provides the Debtors with committed financing for an exit facility, which is particularly important to secure now in light of uncertain and tumultuous market conditions caused by the COVID-19 pandemic.   There is a substantial risk of an adverse change in the financial markets or the occurrence of other circumstances, which might create obstacles to the Debtors' emergence from chapter 11.   Absent the commitment of the Pre-Petition RBL Lenders to fund the Exit Facility, the Debtors may otherwise be unable to secure the exit financing needed to ensure the

Debtors have sufficient liquidity upon emergence to continue operations in the ordinary course and effectuate their go-forward business plan.

14.     It is my belief, based on my experience, current market conditions, the Debtors' circumstances, and my participation in the negotiations around the DIP Facility and the broader restructuring transaction, that the DIP Facility represents the best option reasonably available to address the Debtors' liquidity needs and that the terms and conditions of the DIP Facility are reasonable and appropriate, in the best interests of the Debtors' estates, and should be approved on the terms and conditions described in the DIP Motion.  As detailed below, I believe that the economic terms of the proposed DIP Facility are within the range of comparable post-petition financing facilities in recent years.

## The DIP Facility Should Be Approved

A.     *Alternative Sources of Financing Are Not Reasonably Available to the Debtors.*

15.     The Debtors have pursued a prudent liability management strategy in recent years. In the face of adverse market conditions, the Debtors have taken substantial steps to streamline operations and implement cost-savings initiatives.  In 2018 and 2019 alone, the Debtors completed eight significant deleveraging transactions.  Despite the Debtors' remarkable prepetition efforts, it became evident after March 2020 that a substantial balance sheet deleveraging is necessary to allow the Debtors to withstand the current commodity price volatility and the impact of the COVID-19 pandemic.

16.     Notably, unlike many other independent oil and gas companies, the Debtors came to the responsible decision to file for chapter 11 prior to fully utilizing their revolver or pursuing a costly financing to extend runway at the expense of other constituencies in the capital structure. Specifically, the Debtors had only drawn approximately $65 million on the RBL Facility (utilizing just over 10% of the facility) prior to drawing the maximum amount available under the RBL

Facility in late June.  As a consequence, and given the high quality of the Debtors' assets and the willingness of the Debtors' junior creditors to fully equitize all outstanding bond debt, the Debtors were able to negotiate one of the more attractively priced and structured facilities I have seen in the market—no small feat given the current underwriting environment, where banks are becoming far more selective in their lending processes, particularly in industries such as oil and gas.

17.     To ensure that the Debtors had access to the best financing option reasonably available, simultaneously with the negotiations with the Pre-Petition RBL Secured Parties, Evercore initiated a third-party marketing process for debtor-in-possession financing.  As part of this process, Evercore reached out to ten sources of financing outside the Debtors' capital structure, including four commercial banks and six institutional lenders.  All parties contacted by Evercore declined to provide an offer for financing.  Ultimately, many of the parties reported that they were unwilling to extend financing to the Debtors due to a number of factors, including their unwillingness to provide unsecured financing or financing secured by junior liens, the prospect of a priming fight with the Debtors' Pre-Petition RBL Secured Parties, unwillingness to provide an RBL, and the volatile state of the oil and gas industry.  I therefore do not believe that workable alternative sources of financing with terms better than those of the DIP Facility are presently available to the Debtors.

18.     As further evidence that the Debtors have obtained the best financing arrangement reasonably available, the Second Lien Ad Hoc Committee, which will ultimately own a significant equity interest in the Reorganized Debtors, also reviewed and provided input to the negotiations of the terms of the DIP Facility and Exit Facility.

B.      *The Fees and Milestones Provided in Connection with the DIP Facility Are Reasonable.*

19.     I understand that the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Lenders pursuant to the DIP Facility Documents as consideration for the extension of postpetition financing.  Specifically, the Debtors have agreed to pay an arrangement fee and an agency fee to the DIP Agent plus an upfront fee and commitment fee to the DIP Lenders.

20.     Importantly, the approximately $2.1 million in aggregate upfront, arrangement, and agency fees on the DIP Facility constitutes only approximately 0.34 percent of the $614 million commitments provided under the DIP Facility.  Further, as discussed below, the Debtors anticipate interest savings of approximately $2 million in the proposed seven-week case (roughly $1.2 million per month) by reducing negative carry through the roll up and repayment of prepetition amounts outstanding under the RBL Facility.  After the payment of these fees, the Debtors will be approximately cost-breakeven.  Although it is not our current expectation, if the chapter 11 cases take longer than the proposed seven-week timeline, the $1.2 million of savings per month will continue to inure to the benefit of the estate (as an example, a nine-month case would yield $8 million of savings net of fees).  It is my belief that the Debtors would be required to seek an exit facility to fund the operations of the business regardless of whether they used cash collateral or a DIP facility to fund these chapter 11 cases, and that the upfront fees and arrangement fees would be similar in either scenario.

21.     These fees were the subject of arm's-length and good-faith negotiations between the Debtors and the DIP Lenders, are integral components of the overall terms of the DIP Facility, and were required by the DIP Agent and the DIP Lenders as consideration for the extension of postpetition financing and an Exit Facility and consensual use of Cash Collateral.  Over the course of multiple months, my team and I, along with the Debtors' other advisors, actively negotiated the

9

terms and provisions of the DIP Facility and Exit Facility on behalf of the Debtors.  Indeed, the

Debtors were able to negotiate a reduction of the fees and coupon rate included in the DIP Agent's

original proposal, as well as other concessions, including certain conditions precedent associated

with the Exit Facility, certain covenants, and reporting requirements.  This process culminated in

the DIP Facility and Exit Facility.  I do not believe that a financing package is reasonably available

to the Debtors with terms similar to those of the DIP Facility for lower fees.  Accordingly, I believe

that paying these fees is reasonable and necessary under the circumstances of these chapter 11

cases.

22.     The DIP Facility Documents also contain certain milestones that the Debtors must

meet throughout their chapter 11 cases.  Specifically, these milestones include:

   a.     on the Petition Date, filing of a motion seeking approval of the DIP Facility;

   b.     entry of the Interim DIP Order within three (3) business days of the Petition
          Date;

   c.     entry of the Confirmation Order no later than September 6, 2020;

   d.     entry of the Final DIP Order within thirty-five (35) calendar days of the
          Petition Date; and

   e.     no later than fourteen (14) calendar days after entry of the Confirmation
          Order, the occurrence of the effective date of the Plan and the discharge of
          the DIP Obligations.

23.     Failure to meet such milestones would constitute an event of default under the DIP

Credit Agreement.   These milestones were negotiated at arm's-length and are an integral

component of both the DIP Facility and the broader set of transactions contemplated by

the Restructuring Support Agreement.  I have reviewed these milestones, and I believe that they

are appropriate under the circumstances, reasonably achievable, and will permit sufficient time to

effectuate the restructuring contemplated by the terms of the Restructuring Support Agreement.

24.     I believe that the fees and milestones associated with the DIP Facility are the result of extensive good-faith and arm's-length negotiations between the Debtors and the DIP Lenders and are an integral component of the DIP Facility and consensual use of Cash Collateral.  Any failure to receive approval thereof may cause a termination of the DIP Facility, thereby jeopardizing the potential for the Debtors to successfully restructure.

C.     *The Refinancing of the Obligations Under the RBL Facility Is Appropriate.*

25.     The DIP Facility contemplates a "roll-up" of all outstanding prepetition letters of credit issued by any Pre-Petition RBL Lender and all loans outstanding under the RBL Facility (other than $1 million) held by any Pre-Petition RBL Lender with $185 million of the principal amount of the outstanding loans rolled into the DIP Facility upon entry of the Interim DIP Order. I believe the proposed roll-up is justified under the circumstances.

26.     Prior to the Petition Date, the Debtors defensively drew down on the RBL Facility as a preventive measure to hedge against the possibility that the Debtors would not be able to obtain DIP financing or an exit facility in light of current market conditions.  Prior to making the $200 million defensive draw, the Debtors had drawn approximately $65 million under the RBL Facility.  With a DIP-to-exit facility in hand, the Debtors can confidently use up to $147 million of that Cash Collateral to pay down the RBL Facility and roll that amount into the DIP-to-Exit Facility.  Repaying up to $147 million of the approximately $230 million drawn under the RBL Facility upon entry of the Interim DIP Order will allow the Debtors to eliminate a substantial amount of negative carry on interest.  The Debtors will only be required to pay a fee of 0.34% to secure the DIP Facility with significant availability and the flexibility to repay the drawn portion of the RBL with excess cash on hand.  Following paydown, the Debtors will be required to pay an undrawn commitment fee of 0.50% as compared to the all-in rate of approximately 7.50% if $230 million remains drawn under the prepetition RBL Facility.  Accordingly, the roll-up will

offset fees associated with the DIP, or if timing slips for unforeseen reasons, will result in significant savings for the Debtors' estates.

27.     Further, the Pre-Petition RBL Secured Parties are oversecured.  The overwhelming majority of that value is derived from the Debtors' crude developed and producing reserves, which constitute collateral under the RBL Facility.  The DIP Facility's proposed repayment feature therefore affects the timing, but not the amount, of the Pre-Petition RBL Secured Parties' recovery of principal amounts owed while also minimizing interest costs for the Debtors.

28.     I understand that roll-ups and repayments of prepetition debt have been approved in a variety of cases.  The roll-up is an essential feature of the DIP Facility that actually benefits the Debtors' estates given the associated cost-savings.  Based on the foregoing, it is my belief that the DIP Facility represents the best option reasonably available to address the Debtors' liquidity needs and that the terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances.

## **Need for Interim Relief**

29.     The Debtors require cash to fund these chapter 11 cases, continue operations in the ordinary course, and satisfy obligations to vendors and employees.  As such, entering into the DIP Facility is critical to ensuring the Debtors are able to retain access to favorable capital commitments, avoid a Cash Collateral dispute, and minimize the costs of financing these chapter 11 cases.  Absent interim approval of the DIP Facility and the associated roll-up, the Debtors could potentially incur costs on amounts currently borrowed under the RBL Facility in excess of the fees contemplated under the DIP Facility, would have less certainty as to the availability of excess funding above the current cash balance to withstand an unexpectedly longer process, and could put the Exit Facility at risk.

### Conclusion

30.    I believe that, given the inability to find third-party debtor-in-possession financing and the extensive good faith and arm's length negotiations in respect of the DIP Facility, the terms of the DIP Facility are reasonable and appropriate.   The DIP Facility is an integral part of the Restructuring Support Agreement and the Plan, which will eliminate all of the Debtors' $2.1 billion of bond debt from the Debtors' balance sheet.   I also believe that, based on the Debtors' projections, the proposed DIP Facility will provide the Debtors with the necessary liquidity to effectively run their chapter 11 process and avoid a potential liquidation.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  July 30, 2020

/s/ *Brent Banks*
Brent Banks
Managing Director
Evercore Group L.L.C.

*Proposed Investment Banker and Financial Advisor to the Debtors*

## Exhibit B

**Kvarda Declaration**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| DENBURY RESOURCES INC., *et al.*,[1] | ) | Case No. 20-33801 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) | (Emergency Hearing Requested) |

### DECLARATION OF MATT KVARDA IN SUPPORT OF THE DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING SECURED BY SENIOR PRIMING LIENS AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

I, Matt Kvarda, hereby declare under penalty of perjury as follows:

1.      I am a Managing Director at Alvarez & Marsal North America, LLC (together with employees of its affiliates (all of which are wholly-owned by its parent company and employees), it wholly owned subsidiaries, and independent contractors, "A&M"), a restructuring advisory services firm with numerous offices throughout the world.  A&M has been engaged as the restructuring advisor to the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") since early May 2020.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Denbury Resources Inc. (7835); Denbury Air, LLC (7621); Denbury Brookhaven Pipeline Partnership, LP (6322); Denbury Brookhaven Pipeline, LLC (6471); Denbury Gathering & Marketing, Inc. (6150); Denbury Green Pipeline-Montana, LLC (6443); Denbury Green Pipeline-North Dakota, LLC (7725); Denbury Green Pipeline-Riley Ridge, LLC (2859); Denbury Green Pipeline-Texas, LLC (2301); Denbury Gulf Coast Pipelines, LLC (0892); Denbury Holdings, Inc. (1216); Denbury Onshore, LLC (7798); Denbury Operating Company (7620); Denbury Pipeline Holdings, LLC (0190); Denbury Thompson Pipeline, LLC (0976); Encore Partners GP Holdings, LLC (N/A); Greencore Pipeline Company, LLC (9605); Plain Energy Holdings, LLC (0543).  The location of Debtor Denbury Resources Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 5320 Legacy Drive, Plano, Texas 75024.

2.      I am generally familiar with the Debtors' day-to-day operations, business, and financial affairs.  I submit this declaration (this "Declaration") in support of the relief requested in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing Secured by Senior Priming Liens and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "DIP Motion")[2] which seeks approval the Debtors' senior secured superpriority revolving debtor-in-possession credit facility in an aggregate principal amount of $615 million (the "DIP Facility") [3] and the consensual use of cash collateral (the "Cash Collateral").

3.      Except where specifically noted, the statements in this Declaration are based on: (a) my personal knowledge, belief, or opinion; (b) information I have received from the Debtors' employees or advisors and/or employees of A&M working directly with me or under my supervision, direction, or control; or (c) from the Debtors' books and records maintained in the ordinary course of their businesses.  I am not being specifically compensated for this testimony other than through payments received by A&M as a professional retained by the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

---

[2]     Capitalized terms used but not defined herein have the meanings given to such terms in the DIP Motion or the proposed interim order attached thereto (the "Interim DIP Order").

[3]     The material terms of the DIP Facility are set forth in detail in the DIP Motion.  For the avoidance of doubt, any description of the DIP Facility herein or in the DIP Motion is qualified in its entirety by reference to the DIP Facility Documents.

### Background and Qualifications

4.      I am a Managing Director at A&M, a restructuring advisory services firm specializing in interim management, crisis management, turnaround consulting, operational due diligence, creditor advisory services, and financial and operational restructuring.  Since its inception in 1981, A&M has been a global provider of turnaround advisory services to companies in crisis or those in need of performance improvement in specific financial and operational areas. A&M's debtor advisory services have included a wide range of activities targeted at stabilizing and improving a company's financial position, including developing or validating forecasts, business plans and related assessments of a business's strategic position; monitoring and managing cash, cash flow and supplier relationships; assessing and recommending cost reduction strategies; and designing and negotiating financial restructuring packages.

5.      I have a Master of Business Administration from the University of California at Los Angeles (the UCLA Anderson School of Management).  I am also a Certified Insolvency and Restructuring Advisor.  I have more than 27 years of restructuring experience both as a principal and advisor helping clients with negotiation of capital market solutions, contingency planning, case management, management of liquidity, and the design of crisis communication and vendor management programs.  I have also led and implemented a myriad of restructuring transactions— including 363 sales and recapitalization transactions.   Some notable, publicly-disclosed restructuring assignments that I have been involved with include Penn Virginia Corporation, Breitburn Energy Partners, and Arcapita Bank B.S.C.  I am principally responsible for overseeing the day-to-day activities of the A&M deal team.

6.      Since May 4, 2020, A&M has worked closely with the Debtors' management team and other professionals in assisting with the numerous requirements of these chapter 11 cases.  As a result of A&M's active engagement, I, along with other members of the A&M team, have

developed significant relevant experience and expertise regarding the Debtors and the unique circumstances of this case.

**The Debtors' Liquidity Needs**

7.      In advance of the Petition Date, the Debtors undertook an analysis of how much postpetition financing and liquidity would be required to operate the Debtors' business and pay administrative costs during these chapter 11 cases.  I understand that, as of the Petition Date, the Debtors' total cash balance is approximately $167 million, all of which is encumbered by pre-petition liens.  While this cash position may be sufficient (assuming the Pre-Petition RBL Secured Parties' consent to use their Cash Collateral) to operate the business and to fund these chapter 11 cases on the timeline proposed by the Debtors, the Debtors sought an efficient form of financing that would ensure the Debtors are able to (a) retain access to favorable capital commitments to minimize the costs of financing these chapter 11 cases and (b) obtain the greatest amount of capital at the lowest cost of capital reasonably available to fund the Debtors on a post-petition basis. Accordingly, without access to the DIP Facility and Cash Collateral, the Debtors would lack adequate liquidity to consummate a restructuring through chapter 11.

8.      Since A&M's appointment as the Debtors' restructuring advisor, I have worked closely with the Debtors' management team and other advisors to evaluate the Debtors' liquidity and cash needs, including preparation for a potential chapter 11 filing.  A&M advised and assisted the Debtors in evaluating the amount of funding that the Debtors will require in these chapter 11 cases.   The amount was derived from a cash-flow projection that A&M and the Debtors' management team developed from an analysis of the Debtors' receipts and disbursements during a 13-week projection period (the "DIP Budget," attached as Exhibit 2 to the Interim DIP Order). The DIP Budget takes into account anticipated cash receipts and disbursements and considers a number of factors, including required costs to maintain safe operations, fees and interest expense

4

associated with the DIP Facility, professional fees, and required operational payments.  Based on my experience in prior bankruptcy cases, my familiarity with the Debtors, and extensive discussions with the Debtors' management team and advisors, including a team from A&M acting under my supervision, the DIP Budget presents a reasonable estimate of the Debtors' cash sources and needs during these chapter 11 cases.

9.      Additionally, I have worked with the members of the Debtors' management team and the Debtors' advisors to assist in arm's-length negotiations regarding postpetition financing. Since A&M's retention, the Debtors have been engaged in nearly constant discussions on potential economic and structural financing terms.

10.     The Debtors' business is cash intensive.  Although the Debtors have paused new drilling, the Debtors still face significant costs related to maintaining extraction operations and running the corporate enterprise, including: satisfying obligations to employees, customers, suppliers, and vendors; paying expenses pursuant to joint operating agreements for properties operated by the Debtors; satisfying joint interest billings for properties where the Debtors are non-operating working interest owners; paying royalties; maintaining the safety of their pipeline and drilling operations; and making any other payments that are essential for the continued management, operation, and preservation of the Debtors' business and assets.  The ability to satisfy these expenses when due is essential to the Debtors' continued operation of their business during the pendency of these cases.

11.     Significant availability under the RBL Facility enabled the Debtors to defensively draw down the RBL Facility by an incremental amount of approximately $200 million prior to the Petition Date, resulting in an available cash balance of approximately $167 million as of the Petition Date.  This draw likely provides the Debtors with sufficient liquidity to sustain operations and fund the expenses of these chapter 11 cases on the prepack timeline proposed by

the Debtors (which assumes an emergence from bankruptcy by mid-September 2020); however, the carrying costs associated with these prepetition borrowings are significant (approximately $2 million for the anticipated approximately 7-week length of the chapter 11 cases), and the Debtors do not immediately require the entire approximately $167 million of cash on hand to fund near-term operations.  As such, by entering into the DIP Facility, and initially "rolling" $185 million of RBL Facility loans into the DIP Facility while gaining access to $25 million of the new money commitments upon entry of the Interim DIP Order, the Debtors will have access to a functioning revolving credit facility during the interim period.  This will provide the necessary liquidity to fund the Debtors' operations and administration of the cases, while enabling the Debtors to obtain interest savings of approximately $2 million during the cases by immediately paying down a significant portion of the outstanding balance on the revolver.  As such, it would be prudent for the Debtors to secure access to additional capital commitments in excess of the Debtors' cash balance.

12.     The Debtors negotiated a comprehensive package with certain of their prepetition lenders which consists of both the DIP Facility and a committed exit credit facility (the "Exit Facility").  The DIP Facility is the product of good-faith negotiations with the DIP Lenders and is an essential component of the Debtors' restructuring support agreement (the "Restructuring Support Agreement").  Absent the commitment of the Pre-Petition RBL Lenders to fund the Exit Facility, the Debtors may otherwise be unable to secure exit financing in light of uncertain market conditions caused by the COVID-19 pandemic, jeopardizing the Debtors' ability to have sufficient liquidity upon emergence to continue operations in the ordinary course and effectuate their go-forward business plan.  Based on the foregoing, the DIP Facility represents the best available source of postpetition financing for the Debtors.

13.     The use of Cash Collateral is critical to the Debtors' ability to administer these chapter 11 cases and provide the Debtors with sufficient liquidity to continue operations in the ordinary course and pursue the restructuring contemplated by the Debtors' Restructuring Support Agreement and prepackaged chapter 11 plan.  The Debtors do not have material unencumbered cash and, therefore, without access to the Cash Collateral, the Debtors would not have sufficient cash to fund the planned disbursements in the DIP Budget, likely quickly bringing operations to a halt.

14.     Failure to obtain access to the DIP Facility and Cash Collateral may result in immediate and irreparable harm to the Debtors and their stakeholders and may diminish the value of the Debtors' estates.  Without approval of the DIP Facility and the use of Cash Collateral, the Debtors will be unable to continue to operate in the ordinary course and preserve and maximize the value of their assets for the benefit of all parties in interest.  Accordingly, I respectfully submit that the Court should approve immediate access to the DIP Facility and Cash Collateral.

### Need for Interim Relief

15.     The Debtors' businesses are cash intensive, with significant daily costs required to continue operations and satisfy obligations to vendors and employees.  As such, and given the Debtors' required incremental liquidity, the Debtors require immediate access to postpetition financing and the use of Cash Collateral to operate their businesses, preserve value, and to avoid irreparable harm pending a final hearing.  Absent funds available from the DIP Facility, access to Cash Collateral, and the cooperation of key business partners at this critical early stage, the Debtors could face a value-destructive interruption to their businesses to the detriment of the Debtors, their estates, and their creditors.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  July 30, 2020

/s/ *Matt Kvarda*
Matt Kvarda
Managing Director
Alvarez & Marsal North America, LLC

*Proposed Restructuring Advisor to the Debtors*

# **Exhibit C**

**Attorney Checklist Concerning Motion and Order Pertaining to Use of Cash Collateral**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| DENBURY RESOURCES INC., *et al.*,[1] | ) | Case No. 20-33801 (DRJ) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

**ATTORNEY CHECKLIST CONCERNING MOTIONS
AND ORDERS PERTAINING TO USE OF CASH COLLATERAL AND
POST-PETITION FINANCING (WHICH ARE IN EXCESS OF TEN (10) PAGES)**

Motions and orders pertaining to cash collateral and post-petition financing matters tend to be lengthy and complicated. Although the Court intends to read such motions and orders carefully, it will assist the Court if counsel will complete and file this checklist. All references are to the Bankruptcy Code (§) or Rules (R).

**PLEASE NOTE:**

"*"     Means generally not favored by Bankruptcy Courts in this District.

"**"    Means generally not favored by Bankruptcy Courts in this District without a reason and a time period for objections.

If your motion or order makes provision for any of the following, so indicate in the space provided:

**CERTIFICATE BY COUNSEL**

This is to certify that the following checklist fully responds to the Court's inquiry concerning material terms of the motion and/or proposed order:

Yes, at Page/Exhibit
Y means yes; N means no

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Denbury Resources Inc. (7835); Denbury Air, LLC (7621); Denbury Brookhaven Pipeline Partnership, LP (6322); Denbury Brookhaven Pipeline, LLC (6471); Denbury Gathering & Marketing, Inc. (6150); Denbury Green Pipeline-Montana, LLC (6443); Denbury Green Pipeline-North Dakota, LLC (7725); Denbury Green Pipeline-Riley Ridge, LLC (2859); Denbury Green Pipeline-Texas, LLC (2301); Denbury Gulf Coast Pipelines, LLC (0892); Denbury Holdings, Inc. (1216); Denbury Onshore, LLC (7798); Denbury Operating Company (7620); Denbury Pipeline Holdings, LLC (0190); Denbury Thompson Pipeline, LLC (0976); Encore Partners GP Holdings, LLC (N/A); Greencore Pipeline Company, LLC (9605); Plain Energy Holdings, LLC (0543). The location of Debtor Denbury Resources Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 5320 Legacy Drive, Plano, Texas 75024.

N/A means not applicable
(Page Listing Optional)

1. Identification of Proceedings:

   (a) Preliminary or final motion/order (circle one)............................................... N/A

   (b) Continuing use of cash collateral (§ 363) ..................................................... Y

   (c) New financing (§ 364) .................................................................................. Y

   (d) Combination of §§ 363 and 364 financing .................................................... Y

   (e) Emergency hearing (immediate and irreparable harm) ................................. Y

2. Stipulations:

   (a) Brief history of debtor's businesses and status of debtor's prior
       relationships with lender.................................................................................. Y

   (b) Brief statement of purpose and necessity of financing. ................................. Y

   (c) Brief statement of type of financing (i.e., accounts receivable, inventory)... Y

   (d) Are lender's pre-petition security interest(s) and liens deemed valid, fully
       perfected and non-avoidable............................................................................ Y

       (i) Are there provisions to allow for objections to above? ........................... Y

   (e) Is there a post-petition financing agreement between lender and
       debtor? ............................................................................................................. Y

       (i) If so, is agreement attached?.................................................................... Y

   (f) Is there an agreement that lender's post-petition security interests and
       liens deemed valid, fully perfected and non-avoidable? ............................... Y

   (g) Is lender undersecured or oversecured (circle one) ..................................... N/A

   (h) Has lender's non-cash collateral been appraised? ........................................ Y

       (i) Insert date of latest appraisal ................................................................. 12/31/2019

   (i) Is debtor's proposed budget attached?.......................................................... Y

   (j) Are all pre-petition loan documents identified? ........................................... Y

   (k) Are pre-petition liens on single or multiple assets? (circle one) .................. Y

   (l) Are there pre-petition guaranties of debt? ................................................... Y

       (i) Limited or unlimited? (circle one)............................................................ Y

3. Grant of Liens:

   (a) Do post-petition liens secure pre-petition debts?......................................... Y

   (b) Is there cross-collaterization? ...................................................................... N

   (c) Is the priority of post-petition liens equal to or higher than existing liens? .. Y

   (d) Do post-petition liens have retroactive effect? ............................................. N

   (e) Are there restrictions on granting further liens or liens of equal or higher
       priority?............................................................................................................. Y

     (f)    Is lender given liens on claims under §§ 506(c), 544-50 and §§ 522? ......... Y

        *(i)*  Are lender's attorneys fees to be paid? .................................................. Y

        *(ii)* Are debtor's attorneys fees excepted from § 506(c)? ............................ N

     (g)   Is lender given liens upon proceeds of causes of action under §§ 544, 547 and 548? ................................................................................................... Y

4.     **Administrative Priority Claims:**

     (a)   Is lender given an administrative priority? .................................... Y

     (b)   Is administrative priority higher than § 507(a)? ............................ Y

     (c)   Is there a conversion of pre-petition secured claim to post-petition administrative claim by virtue of use of existing collateral? ........................ Y

5.     **Adequate Protection (§361):**

     (a)   Is there post-petition debt service? ................................................ N

     (b)   Is there a replacement/addition 361(/) lien? (circle one or both) ................. Y

     (c)   Is the lender's claim given super-priority? (§ 364(c) or (d)) [designate] ........................................................ Y - Both

     (d)   Are there guaranties? ........................................................................ Y

     (e)   Is there adequate Insurance coverage? ....................................... Y

     (f)   Other? ................................................................................................ Y

         **Debtors' comment**:  Adequate protection includes payment of all reasonable and documented out-of-pocket professional fees and expenses payable to the advisors to the Pre-Petition RBL Secured Agent and Pre-Petition Secured Noteholder.

6.     **Waiver/Release Claims v. Lender:**

     (a)   Debtor waives or release claims against lender, including, but not limited to, claims under §§ 506(c), 544-550, 552, and 553 of the Code? ................. Y

     (b)   Does the debtor waive defenses to claim or liens of lender? ........................ Y

7.     **Source of Post-Petition Financing (§ 364 Financing):**

     (a)   Is the proposed lender also the pre-petition lender? ..................................... Y

     (b)   New post-petition lender? ..................................................................... N

     (c)   Is the lender an insider? .......................................................................... N

         **Debtors' comment**:  [_____]

8.    Modification of Stay:

    (a)   Is any modified lift of stay allowed? ............................................... Y

    (b)   Will the automatic stay be lifted to permit lender to exercise self-help upon default without further order? ...................................................... N

    (c)   Are there any other remedies exercisable without further order of court? .... Y

    (d)   Is there a provision that any future modification of order shall not affect status of debtor's post-petition obligations to lender? ................................. Y

9.    Creditors' Committee:

    (a)   Has creditors' committee been appointed? .................................... N

    (b)   Does creditors' committee approve of proposed financing? ........................ N/A

10.   Restrictions on Parties in Interest:

    (a)   Is a plan proponent restricted in any manner, concerning modification of lender's rights, liens and/or causes? .............................................. Y

    (b)   Is the debtor prohibited from seeking to enjoin the lender in pursuit of rights? ................................................................................. Y

    (c)   Is any party in interest prohibited from seeking to modify this order? ......... Y

    (d)   Is the entry of any order conditioned upon payment of debt to lender? ........ N

    (e)   Is the order binding on subsequent trustee on conversion? .......................... Y

11.   Nunc Pro Tunc:

    (a)   Does any provision have retroactive effect? ................................................. N

12.   Notice and Other Procedures:

    (a)   Is shortened notice requested? ....................................................... Y

    (b)   Is notice requested to shortened list? ............................................. N

    (c)   Is time to respond to be shortened? ............................................... N

    (d)   If final order sought, have 15 days elapsed since service of motion pursuant to Rule 4001(b)(2)? ................................................ N/A

    (e)   If preliminary order sought, is cash collateral necessary to avoid immediate and irreparable harm to the estate pending a final hearing? ........ Y

    (f)   Is a Certificate of Conference included? ...................................... N

    (g)   Is a Certificate of Service included? ............................................. Y

    (h)   Is there verification of transmittal to U.S. Trustee included pursuant to Rule 9034? .................................................................. N

    (i)   Has an agreement been reached subsequent to filing motion? ..................... N/A

        *(i)*  If so, has notice of the agreement been served pursuant to Rule 4001(d)(4)? ............................................................... N/A

*(ii)* Is the agreement in settlement of motion pursuant to Rule 4001(d)(4)? . <u>N/A</u>

*(iii)* Does the motion afford reasonable notice of material provisions of agreement pursuant to Rule 4001(d)(4)? ................................................ <u>N/A</u>

*(iv)* Does the motion provide for opportunity for hearing pursuant to Rule 9014? ...................................................................................................... <u>N/A</u>

Houston, Texas
July 30, 2020

/s/ Matthew D. Cavenaugh

| | |
|---|---|
| **JACKSON WALKER L.L.P.** | **KIRKLAND & ELLIS LLP** |
| Matthew D. Cavenaugh (TX Bar No. 24062656) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Vienna F. Anaya (TX Bar No. 24091225) | Joshua A. Sussberg, P.C. (*pro hac vice* admission pending) |
| Victoria Argeroplos (TX Bar No. 24105799) | Christopher J. Marcus, P.C. (*pro hac vice* admission pending) |

JACKSON WALKER L.L.P.
Matthew D. Cavenaugh (TX Bar No. 24062656)
Vienna F. Anaya (TX Bar No. 24091225)
Victoria Argeroplos (TX Bar No. 24105799)

1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:          mcavenaugh@jw.com
                vanaya@jw.com
                vargeroplos@jw.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Christopher J. Marcus, P.C. (*pro hac vice* admission pending)
Rebecca Blake Chaikin (*pro hac vice* admission pending)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                christopher.marcus@kirkland.com
                rebecca.chaikin@kirkland.com

-and-

David L. Eaton (*pro hac vice* admission pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          david.eaton@kirkland.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*