<u>**Exhibit B**</u>

**Kvarda Declaration**

**Exhibit 2**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DENBURY RESOURCES INC., *et al.*,[1] | ) | Case No. 20-33801 (DRJ) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

**DECLARATION OF MATT KVARDA IN SUPPORT OF THE
DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN
POSTPETITION FINANCING SECURED BY SENIOR PRIMING LIENS
AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND PROVIDING
SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING
ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY,
(V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

I, Matt Kvarda, hereby declare under penalty of perjury as follows:

1. I am a Managing Director at Alvarez & Marsal North America, LLC (together with employees of its affiliates (all of which are wholly-owned by its parent company and employees), it wholly owned subsidiaries, and independent contractors, "A&M"), a restructuring advisory services firm with numerous offices throughout the world. A&M has been engaged as the restructuring advisor to the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") since early May 2020.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Denbury Resources Inc. (7835); Denbury Air, LLC (7621); Denbury Brookhaven Pipeline Partnership, LP (6322); Denbury Brookhaven Pipeline, LLC (6471); Denbury Gathering & Marketing, Inc. (6150); Denbury Green Pipeline-Montana, LLC (6443); Denbury Green Pipeline-North Dakota, LLC (7725); Denbury Green Pipeline-Riley Ridge, LLC (2859); Denbury Green Pipeline-Texas, LLC (2301); Denbury Gulf Coast Pipelines, LLC (0892); Denbury Holdings, Inc. (1216); Denbury Onshore, LLC (7798); Denbury Operating Company (7620); Denbury Pipeline Holdings, LLC (0190); Denbury Thompson Pipeline, LLC (0976); Encore Partners GP Holdings, LLC (N/A); Greencore Pipeline Company, LLC (9605); Plain Energy Holdings, LLC (0543). The location of Debtor Denbury Resources Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 5320 Legacy Drive, Plano, Texas 75024.

**Exhibit 2**

2. I am generally familiar with the Debtors' day-to-day operations, business, and financial affairs. I submit this declaration (this "Declaration") in support of the relief requested in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing Secured by Senior Priming Liens and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "DIP Motion")[2] which seeks approval the Debtors' senior secured superpriority revolving debtor-in-possession credit facility in an aggregate principal amount of $615 million (the "DIP Facility")[3] and the consensual use of cash collateral (the "Cash Collateral").

3. Except where specifically noted, the statements in this Declaration are based on: (a) my personal knowledge, belief, or opinion; (b) information I have received from the Debtors' employees or advisors and/or employees of A&M working directly with me or under my supervision, direction, or control; or (c) from the Debtors' books and records maintained in the ordinary course of their businesses. I am not being specifically compensated for this testimony other than through payments received by A&M as a professional retained by the Debtors. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

---

[2] Capitalized terms used but not defined herein have the meanings given to such terms in the DIP Motion or the proposed interim order attached thereto (the "Interim DIP Order").

[3] The material terms of the DIP Facility are set forth in detail in the DIP Motion. For the avoidance of doubt, any description of the DIP Facility herein or in the DIP Motion is qualified in its entirety by reference to the DIP Facility Documents.

**Exhibit 2**

**Background and Qualifications**

4.  I am a Managing Director at A&M, a restructuring advisory services firm specializing in interim management, crisis management, turnaround consulting, operational due diligence, creditor advisory services, and financial and operational restructuring. Since its inception in 1981, A&M has been a global provider of turnaround advisory services to companies in crisis or those in need of performance improvement in specific financial and operational areas. A&M's debtor advisory services have included a wide range of activities targeted at stabilizing and improving a company's financial position, including developing or validating forecasts, business plans and related assessments of a business's strategic position; monitoring and managing cash, cash flow and supplier relationships; assessing and recommending cost reduction strategies; and designing and negotiating financial restructuring packages.

5.  I have a Master of Business Administration from the University of California at Los Angeles (the UCLA Anderson School of Management). I am also a Certified Insolvency and Restructuring Advisor. I have more than 27 years of restructuring experience both as a principal and advisor helping clients with negotiation of capital market solutions, contingency planning, case management, management of liquidity, and the design of crisis communication and vendor management programs. I have also led and implemented a myriad of restructuring transactions—including 363 sales and recapitalization transactions. Some notable, publicly-disclosed restructuring assignments that I have been involved with include Penn Virginia Corporation, Breitburn Energy Partners, and Arcapita Bank B.S.C. I am principally responsible for overseeing the day-to-day activities of the A&M deal team.

6.  Since May 4, 2020, A&M has worked closely with the Debtors' management team and other professionals in assisting with the numerous requirements of these chapter 11 cases. As a result of A&M's active engagement, I, along with other members of the A&M team, have

**Exhibit 2**

developed significant relevant experience and expertise regarding the Debtors and the unique circumstances of this case.

### The Debtors' Liquidity Needs

7.   In advance of the Petition Date, the Debtors undertook an analysis of how much postpetition financing and liquidity would be required to operate the Debtors' business and pay administrative costs during these chapter 11 cases.  I understand that, as of the Petition Date, the Debtors' total cash balance is approximately $167 million, all of which is encumbered by pre-petition liens.  While this cash position may be sufficient (assuming the Pre-Petition RBL Secured Parties' consent to use their Cash Collateral) to operate the business and to fund these chapter 11 cases on the timeline proposed by the Debtors, the Debtors sought an efficient form of financing that would ensure the Debtors are able to (a) retain access to favorable capital commitments to minimize the costs of financing these chapter 11 cases and (b) obtain the greatest amount of capital at the lowest cost of capital reasonably available to fund the Debtors on a post-petition basis. Accordingly, without access to the DIP Facility and Cash Collateral, the Debtors would lack adequate liquidity to consummate a restructuring through chapter 11.

8.   Since A&M's appointment as the Debtors' restructuring advisor, I have worked closely with the Debtors' management team and other advisors to evaluate the Debtors' liquidity and cash needs, including preparation for a potential chapter 11 filing.  A&M advised and assisted the Debtors in evaluating the amount of funding that the Debtors will require in these chapter 11 cases.  The amount was derived from a cash-flow projection that A&M and the Debtors' management team developed from an analysis of the Debtors' receipts and disbursements during a 13-week projection period (the "DIP Budget," attached as Exhibit 2 to the Interim DIP Order). The DIP Budget takes into account anticipated cash receipts and disbursements and considers a number of factors, including required costs to maintain safe operations, fees and interest expense

**Exhibit 2**

associated with the DIP Facility, professional fees, and required operational payments. Based on my experience in prior bankruptcy cases, my familiarity with the Debtors, and extensive discussions with the Debtors' management team and advisors, including a team from A&M acting under my supervision, the DIP Budget presents a reasonable estimate of the Debtors' cash sources and needs during these chapter 11 cases.

9. Additionally, I have worked with the members of the Debtors' management team and the Debtors' advisors to assist in arm's-length negotiations regarding postpetition financing. Since A&M's retention, the Debtors have been engaged in nearly constant discussions on potential economic and structural financing terms.

10. The Debtors' business is cash intensive. Although the Debtors have paused new drilling, the Debtors still face significant costs related to maintaining extraction operations and running the corporate enterprise, including: satisfying obligations to employees, customers, suppliers, and vendors; paying expenses pursuant to joint operating agreements for properties operated by the Debtors; satisfying joint interest billings for properties where the Debtors are non-operating working interest owners; paying royalties; maintaining the safety of their pipeline and drilling operations; and making any other payments that are essential for the continued management, operation, and preservation of the Debtors' business and assets. The ability to satisfy these expenses when due is essential to the Debtors' continued operation of their business during the pendency of these cases.

11. Significant availability under the RBL Facility enabled the Debtors to defensively draw down the RBL Facility by an incremental amount of approximately $200 million prior to the Petition Date, resulting in an available cash balance of approximately $167 million as of the Petition Date. This draw likely provides the Debtors with sufficient liquidity to sustain operations and fund the expenses of these chapter 11 cases on the prepack timeline proposed by

**Exhibit 2**

the Debtors (which assumes an emergence from bankruptcy by mid-September 2020); however, the carrying costs associated with these prepetition borrowings are significant (approximately $2 million for the anticipated approximately 7-week length of the chapter 11 cases), and the Debtors do not immediately require the entire approximately $167 million of cash on hand to fund near-term operations.  As such, by entering into the DIP Facility, and initially "rolling" $185 million of RBL Facility loans into the DIP Facility while gaining access to $25 million of the new money commitments upon entry of the Interim DIP Order, the Debtors will have access to a functioning revolving credit facility during the interim period.  This will provide the necessary liquidity to fund the Debtors' operations and administration of the cases, while enabling the Debtors to obtain interest savings of approximately $2 million during the cases by immediately paying down a significant portion of the outstanding balance on the revolver.  As such, it would be prudent for the Debtors to secure access to additional capital commitments in excess of the Debtors' cash balance.

12. The Debtors negotiated a comprehensive package with certain of their prepetition lenders which consists of both the DIP Facility and a committed exit credit facility (the "Exit Facility").  The DIP Facility is the product of good-faith negotiations with the DIP Lenders and is an essential component of the Debtors' restructuring support agreement (the "Restructuring Support Agreement").  Absent the commitment of the Pre-Petition RBL Lenders to fund the Exit Facility, the Debtors may otherwise be unable to secure exit financing in light of uncertain market conditions caused by the COVID-19 pandemic, jeopardizing the Debtors' ability to have sufficient liquidity upon emergence to continue operations in the ordinary course and effectuate their go-forward business plan.  Based on the foregoing, the DIP Facility represents the best available source of postpetition financing for the Debtors.

6

**Exhibit 2**

13. The use of Cash Collateral is critical to the Debtors' ability to administer these chapter 11 cases and provide the Debtors with sufficient liquidity to continue operations in the ordinary course and pursue the restructuring contemplated by the Debtors' Restructuring Support Agreement and prepackaged chapter 11 plan. The Debtors do not have material unencumbered cash and, therefore, without access to the Cash Collateral, the Debtors would not have sufficient cash to fund the planned disbursements in the DIP Budget, likely quickly bringing operations to a halt.

14. Failure to obtain access to the DIP Facility and Cash Collateral may result in immediate and irreparable harm to the Debtors and their stakeholders and may diminish the value of the Debtors' estates. Without approval of the DIP Facility and the use of Cash Collateral, the Debtors will be unable to continue to operate in the ordinary course and preserve and maximize the value of their assets for the benefit of all parties in interest. Accordingly, I respectfully submit that the Court should approve immediate access to the DIP Facility and Cash Collateral.

## Need for Interim Relief

15. The Debtors' businesses are cash intensive, with significant daily costs required to continue operations and satisfy obligations to vendors and employees. As such, and given the Debtors' required incremental liquidity, the Debtors require immediate access to postpetition financing and the use of Cash Collateral to operate their businesses, preserve value, and to avoid irreparable harm pending a final hearing. Absent funds available from the DIP Facility, access to Cash Collateral, and the cooperation of key business partners at this critical early stage, the Debtors could face a value-destructive interruption to their businesses to the detriment of the Debtors, their estates, and their creditors.

Case 20-33801   Document 38-2   Filed in TXSB on 07/31/20   Page 78 of 85

**Exhibit 2**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: July 30, 2020

/s/ *Matt Kvarda*
Matt Kvarda
Managing Director
Alvarez & Marsal North America, LLC

*Proposed Restructuring Advisor to the Debtors*

**Exhibit 2**