**Exhibit A**

**Banks Declaration**

**Exhibit 3**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DENBURY RESOURCES INC., *et al.*,[1] | ) | Case No. 20-33801 (DRJ) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

**DECLARATION OF BRENT BANKS IN SUPPORT OF THE
DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN
POSTPETITION FINANCING SECURED BY SENIOR PRIMING LIENS
AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND PROVIDING
SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING
ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY,
(V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

I, Brent Banks, hereby declare under penalty of perjury as follows:

1. I submit this declaration (this "Declaration") in support of the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing Secured by Senior Priming Liens and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Denbury Resources Inc. (7835); Denbury Air, LLC (7621); Denbury Brookhaven Pipeline Partnership, LP (6322); Denbury Brookhaven Pipeline, LLC (6471); Denbury Gathering & Marketing, Inc. (6150); Denbury Green Pipeline-Montana, LLC (6443); Denbury Green Pipeline-North Dakota, LLC (7725); Denbury Green Pipeline-Riley Ridge, LLC (2859); Denbury Green Pipeline-Texas, LLC (2301); Denbury Gulf Coast Pipelines, LLC (0892); Denbury Holdings, Inc. (1216); Denbury Onshore, LLC (7798); Denbury Operating Company (7620); Denbury Pipeline Holdings, LLC (0190); Denbury Thompson Pipeline, LLC (0976); Encore Partners GP Holdings, LLC (N/A); Greencore Pipeline Company, LLC (9605); Plain Energy Holdings, LLC (0543). The location of Debtor Denbury Resources Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 5320 Legacy Drive Plano, Texas 75024.

**Exhibit 3**

*(VII) Granting Related Relief* (the "DIP Motion"),[2] which seeks approval of the Debtors' senior secured superpriority revolving debtor-in-possession credit facility in an aggregate principal amount of $615 million (the "DIP Facility")[3] and the consensual use of cash collateral (the "Cash Collateral").

2. Except where specifically noted, the statements in this Declaration are based on: (a) my personal knowledge, belief, or opinion; (b) information I have learned from my review of relevant documents or received from the Debtors' employees or advisors and/or employees of Evercore Group L.L.C. ("Evercore") working directly with me or under my supervision, direction, or control; or (c) from the Debtors' books and records maintained in the ordinary course of their businesses.

3. I am not being compensated for this testimony other than through payments expected to be received by Evercore as a professional proposed to be retained by the Debtors; none of those payments are specifically payable on account of this testimony. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

**Professional Background and Qualifications**

4. I am a Managing Director at Evercore, a financial advisory and investment banking firm with offices around the world. Evercore has expertise in domestic and cross-border restructurings, mergers and acquisitions, raising debt and equity capital, and other financial

---

[2] Capitalized terms used but not defined herein have the meanings given to such terms in the DIP Motion or the proposed interim order attached thereto (the "Interim DIP Order").

[3] The material terms of the DIP Facility are set forth in detail in the DIP Motion. For the avoidance of doubt, any description of the DIP Facility herein or in the DIP Motion is qualified in its entirety by reference to the DIP Facility Documents.

2

**Exhibit 3**

advisory services. Evercore has served as an experienced bankruptcy and restructuring advisor to debtors and creditors in a variety of industries.

5. I have approximately twelve years of financial advisory experience, including ten years of experience advising debtors and creditors on a wide variety of recapitalization and restructuring transactions. My experience includes procuring, structuring, and negotiating debtor-in-possession financing facilities across a broad range of industries. I have been involved in numerous restructurings, including, among others, Alion Science & Technology, Boart Longyear, Bonavista Energy, California Resources, Catalina Marketing, Claire's, Evergreen Aviation, Frontier Communications, Jack Entertainment, Jupiter Resources, Keystone Automotive, McDermott International, Neuberger Berman, Serta Simmons Bedding, SunEdison, Targus, Ultra Petroleum, and W.R. Grace.

6. Prior to joining Evercore in 2017, I was a Vice President in Goldman Sachs' debt advisory and restructuring practice. Prior to joining Goldman Sachs in 2010, I was a Senior Associate in the financial services group at Ernst & Young LLP. I received a BS and MSA in accounting from Wake Forest University. I am also a Chartered Financial Analyst. I am principally responsible for overseeing Evercore's day-to-day activities in these chapter 11 cases.

### Evercore Retention

7. On March 26, 2020, the Debtors engaged Evercore to act as their investment banker and financial advisor in connection with the Debtors' restructuring initiatives. Since its engagement, Evercore has worked closely with the Debtors' management team, creditors, and other professionals and advisors in exploring various strategic and financial alternatives and otherwise assisting in the Debtors' restructuring efforts, including: (a) engaging with creditors across the Debtors' capital structure; (b) assisting the Debtors with numerous creditor presentations focused on the Debtors' business plan and key initiatives; (c) negotiating with and

3

**Exhibit 3**

evaluating multiple restructuring proposals from the Debtors' secured lenders; (d) assisting the Debtors with soliciting, negotiating, and documenting the DIP Facility; (e) performing a valuation analysis of the Debtors; (f) advising and assisting the Debtors in negotiating the terms of a restructuring framework embodied in the Debtors' restructuring support agreement (the "Restructuring Support Agreement"); and (g) most recently, preparing for the commencement of these chapter 11 cases. As a result of its active engagement in these processes, Evercore is now familiar with the Debtors' financial affairs, debt structure, business operations, capital structure, key stakeholders, financing documents, and related matters.

### The Debtors' Immediate Liquidity Needs

8. I understand that, as of the Petition Date, the Debtors' total cash balance is approximately $167 million, all of which is encumbered by pre-petition liens. While this cash position may be sufficient (assuming the Pre-Petition RBL Secured Parties' consent to use their Cash Collateral) to operate the business and to fund these chapter 11 cases on the timeline proposed by the Debtors, the Debtors sought an efficient form of financing that would ensure the Debtors are able to (i) retain access to favorable capital commitments to minimize the costs of financing these chapter 11 cases and (ii) obtain the greatest amount of capital at the lowest cost of capital reasonably available to fund the Debtors on a postpetition basis.

9. Evercore has assisted the Debtors over the past several months in evaluating potential financing alternatives. Among other things, Evercore has worked closely with the Debtors, their management, and their other advisors to evaluate the cash requirements necessary to continue operating the Debtors' business as a going concern. Based on this work, the Debtors determined, in consultation with Evercore, that procuring financing at the start of these chapter 11 cases is in the best interest of the Debtors, minimizing the cost of these chapter 11 cases and

**Exhibit 3**

ensuring that the reorganized Debtors will have access to the lowest-cost capital reasonably available to fund the go-forward business.

10. Evercore reviewed the 13-week cash flow forecast prepared by the Debtors and Alvarez & Marsal North America, LLC, the Debtors' proposed restructuring advisor, which takes into account anticipated cash receipts and disbursements during a 13-week projection period and considers a number of factors, including required costs to maintain safe operations, fees and interest expense associated with the DIP Facility, professional fees, and required operational payments. Based on these forecasts and discussions with the Debtors' management and other advisors, I believe that while it would be possible to administer the Debtors' chapter 11 estates, operate the Debtors' business in the ordinary course, and pay administrative costs during these chapter 11 cases solely through the use of Cash Collateral on the Debtors' proposed schedule, it would be prudent for the Debtors to secure access to additional capital commitments in excess of the Debtors' cash balance to insure against future events that could increase the Debtors' administrative expenses or reduce the Debtors' expected revenue, including a prolonged timeline for these chapter 11 cases or an unexpected downturn in commodity prices.

11. As a result, I believe that the DIP Facility is beneficial to the Debtors' ability to administer these chapter 11 cases and beneficial to the estate.

### The Debtors' Efforts to Secure DIP Financing

12. In light of the Debtors' overleveraged capital structure, beginning in late April 2020, the Debtors and their advisors commenced discussions with an ad hoc committee of holders of the Debtors' second lien notes (the "Second Lien Ad Hoc Committee") regarding the terms of a value-maximizing, comprehensive restructuring. Concurrently, the Debtors began negotiating the terms of a debtor-in-possession credit facility and exit financing with the Pre-Petition RBL Secured Parties. These discussions coalesced around a $615 million senior secured debtor-in-

**Exhibit 3**

possession revolving credit facility that will roll into a new, senior secured revolving exit credit facility with initial availability thereunder of up to $615 million, subject to a borrowing base to be set forth in the exit facility documents and on such other terms and conditions as set forth therein.

13. The DIP Facility is the product of good-faith negotiations with the DIP Lenders and is an essential component of the Debtors' Restructuring Support Agreement, which was signed by the vast majority of the Debtors' prepetition lenders—documenting their support for the Debtors' proposed Plan and the restructuring transaction contemplated therein. I believe that the DIP Facility will provide comfort to the Debtors' vendors, suppliers, royalties and working interest holders, customers, and employees that the Debtors will be able to continue to meet their commitments during and after these chapter 11 cases and will enable the Debtors to pursue their restructuring goals in a manner that maximizes the value of the Debtors' estates. The DIP Facility allows the Debtors, among other things, to continue to enter into commodity hedges, which would not have been available to the Debtors using cash collateral to fund these cases. As a result of this flexibility, the Debtors remain able to manage commodity price risk through the pendency of the cases and also mitigate risk associated with entering into significant levels of mandatory, prescribed hedging that are becoming the market norm in RBL exit conditions. Finally, the DIP Facility provides the Debtors with committed financing for an exit facility, which is particularly important to secure now in light of uncertain and tumultuous market conditions caused by the COVID-19 pandemic. There is a substantial risk of an adverse change in the financial markets or the occurrence of other circumstances, which might create obstacles to the Debtors' emergence from chapter 11. Absent the commitment of the Pre-Petition RBL Lenders to fund the Exit Facility, the Debtors may otherwise be unable to secure the exit financing needed to ensure the

**Exhibit 3**

Debtors have sufficient liquidity upon emergence to continue operations in the ordinary course and effectuate their go-forward business plan.

14. It is my belief, based on my experience, current market conditions, the Debtors' circumstances, and my participation in the negotiations around the DIP Facility and the broader restructuring transaction, that the DIP Facility represents the best option reasonably available to address the Debtors' liquidity needs and that the terms and conditions of the DIP Facility are reasonable and appropriate, in the best interests of the Debtors' estates, and should be approved on the terms and conditions described in the DIP Motion. As detailed below, I believe that the economic terms of the proposed DIP Facility are within the range of comparable post-petition financing facilities in recent years.

## The DIP Facility Should Be Approved

A. *Alternative Sources of Financing Are Not Reasonably Available to the Debtors.*

15. The Debtors have pursued a prudent liability management strategy in recent years. In the face of adverse market conditions, the Debtors have taken substantial steps to streamline operations and implement cost-savings initiatives. In 2018 and 2019 alone, the Debtors completed eight significant deleveraging transactions. Despite the Debtors' remarkable prepetition efforts, it became evident after March 2020 that a substantial balance sheet deleveraging is necessary to allow the Debtors to withstand the current commodity price volatility and the impact of the COVID-19 pandemic.

16. Notably, unlike many other independent oil and gas companies, the Debtors came to the responsible decision to file for chapter 11 prior to fully utilizing their revolver or pursuing a costly financing to extend runway at the expense of other constituencies in the capital structure. Specifically, the Debtors had only drawn approximately $65 million on the RBL Facility (utilizing just over 10% of the facility) prior to drawing the maximum amount available under the RBL

7

**Exhibit 3**

Facility in late June. As a consequence, and given the high quality of the Debtors' assets and the willingness of the Debtors' junior creditors to fully equitize all outstanding bond debt, the Debtors were able to negotiate one of the more attractively priced and structured facilities I have seen in the market—no small feat given the current underwriting environment, where banks are becoming far more selective in their lending processes, particularly in industries such as oil and gas.

17. To ensure that the Debtors had access to the best financing option reasonably available, simultaneously with the negotiations with the Pre-Petition RBL Secured Parties, Evercore initiated a third-party marketing process for debtor-in-possession financing. As part of this process, Evercore reached out to ten sources of financing outside the Debtors' capital structure, including four commercial banks and six institutional lenders. All parties contacted by Evercore declined to provide an offer for financing. Ultimately, many of the parties reported that they were unwilling to extend financing to the Debtors due to a number of factors, including their unwillingness to provide unsecured financing or financing secured by junior liens, the prospect of a priming fight with the Debtors' Pre-Petition RBL Secured Parties, unwillingness to provide an RBL, and the volatile state of the oil and gas industry. I therefore do not believe that workable alternative sources of financing with terms better than those of the DIP Facility are presently available to the Debtors.

18. As further evidence that the Debtors have obtained the best financing arrangement reasonably available, the Second Lien Ad Hoc Committee, which will ultimately own a significant equity interest in the Reorganized Debtors, also reviewed and provided input to the negotiations of the terms of the DIP Facility and Exit Facility.

**Exhibit 3**

B.  *The Fees and Milestones Provided in Connection with the DIP Facility Are Reasonable.*

19. I understand that the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Lenders pursuant to the DIP Facility Documents as consideration for the extension of postpetition financing. Specifically, the Debtors have agreed to pay an arrangement fee and an agency fee to the DIP Agent plus an upfront fee and commitment fee to the DIP Lenders.

20. Importantly, the approximately $2.1 million in aggregate upfront, arrangement, and agency fees on the DIP Facility constitutes only approximately 0.34 percent of the $614 million commitments provided under the DIP Facility. Further, as discussed below, the Debtors anticipate interest savings of approximately $2 million in the proposed seven-week case (roughly $1.2 million per month) by reducing negative carry through the roll up and repayment of prepetition amounts outstanding under the RBL Facility. After the payment of these fees, the Debtors will be approximately cost-breakeven. Although it is not our current expectation, if the chapter 11 cases take longer than the proposed seven-week timeline, the $1.2 million of savings per month will continue to inure to the benefit of the estate (as an example, a nine-month case would yield $8 million of savings net of fees). It is my belief that the Debtors would be required to seek an exit facility to fund the operations of the business regardless of whether they used cash collateral or a DIP facility to fund these chapter 11 cases, and that the upfront fees and arrangement fees would be similar in either scenario.

21. These fees were the subject of arm's-length and good-faith negotiations between the Debtors and the DIP Lenders, are integral components of the overall terms of the DIP Facility, and were required by the DIP Agent and the DIP Lenders as consideration for the extension of postpetition financing and an Exit Facility and consensual use of Cash Collateral. Over the course of multiple months, my team and I, along with the Debtors' other advisors, actively negotiated the

9

**Exhibit 3**

terms and provisions of the DIP Facility and Exit Facility on behalf of the Debtors. Indeed, the Debtors were able to negotiate a reduction of the fees and coupon rate included in the DIP Agent's original proposal, as well as other concessions, including certain conditions precedent associated with the Exit Facility, certain covenants, and reporting requirements. This process culminated in the DIP Facility and Exit Facility. I do not believe that a financing package is reasonably available to the Debtors with terms similar to those of the DIP Facility for lower fees. Accordingly, I believe that paying these fees is reasonable and necessary under the circumstances of these chapter 11 cases.

22. The DIP Facility Documents also contain certain milestones that the Debtors must meet throughout their chapter 11 cases. Specifically, these milestones include:

   a. on the Petition Date, filing of a motion seeking approval of the DIP Facility;

   b. entry of the Interim DIP Order within three (3) business days of the Petition Date;

   c. entry of the Confirmation Order no later than September 6, 2020;

   d. entry of the Final DIP Order within thirty-five (35) calendar days of the Petition Date; and

   e. no later than fourteen (14) calendar days after entry of the Confirmation Order, the occurrence of the effective date of the Plan and the discharge of the DIP Obligations.

23. Failure to meet such milestones would constitute an event of default under the DIP Credit Agreement. These milestones were negotiated at arm's-length and are an integral component of both the DIP Facility and the broader set of transactions contemplated by the Restructuring Support Agreement. I have reviewed these milestones, and I believe that they are appropriate under the circumstances, reasonably achievable, and will permit sufficient time to effectuate the restructuring contemplated by the terms of the Restructuring Support Agreement.

**Exhibit 3**

24. I believe that the fees and milestones associated with the DIP Facility are the result of extensive good-faith and arm's-length negotiations between the Debtors and the DIP Lenders and are an integral component of the DIP Facility and consensual use of Cash Collateral. Any failure to receive approval thereof may cause a termination of the DIP Facility, thereby jeopardizing the potential for the Debtors to successfully restructure.

C. *The Refinancing of the Obligations Under the RBL Facility Is Appropriate.*

25. The DIP Facility contemplates a "roll-up" of all outstanding prepetition letters of credit issued by any Pre-Petition RBL Lender and all loans outstanding under the RBL Facility (other than $1 million) held by any Pre-Petition RBL Lender with $185 million of the principal amount of the outstanding loans rolled into the DIP Facility upon entry of the Interim DIP Order. I believe the proposed roll-up is justified under the circumstances.

26. Prior to the Petition Date, the Debtors defensively drew down on the RBL Facility as a preventive measure to hedge against the possibility that the Debtors would not be able to obtain DIP financing or an exit facility in light of current market conditions. Prior to making the $200 million defensive draw, the Debtors had drawn approximately $65 million under the RBL Facility. With a DIP-to-exit facility in hand, the Debtors can confidently use up to $147 million of that Cash Collateral to pay down the RBL Facility and roll that amount into the DIP-to-Exit Facility. Repaying up to $147 million of the approximately $230 million drawn under the RBL Facility upon entry of the Interim DIP Order will allow the Debtors to eliminate a substantial amount of negative carry on interest. The Debtors will only be required to pay a fee of 0.34% to secure the DIP Facility with significant availability and the flexibility to repay the drawn portion of the RBL with excess cash on hand. Following paydown, the Debtors will be required to pay an undrawn commitment fee of 0.50% as compared to the all-in rate of approximately 7.50% if $230 million remains drawn under the prepetition RBL Facility. Accordingly, the roll-up will

11

**Exhibit 3**

offset fees associated with the DIP, or if timing slips for unforeseen reasons, will result in significant savings for the Debtors' estates.

27. Further, the Pre-Petition RBL Secured Parties are oversecured. The overwhelming majority of that value is derived from the Debtors' crude developed and producing reserves, which constitute collateral under the RBL Facility. The DIP Facility's proposed repayment feature therefore affects the timing, but not the amount, of the Pre-Petition RBL Secured Parties' recovery of principal amounts owed while also minimizing interest costs for the Debtors.

28. I understand that roll-ups and repayments of prepetition debt have been approved in a variety of cases. The roll-up is an essential feature of the DIP Facility that actually benefits the Debtors' estates given the associated cost-savings. Based on the foregoing, it is my belief that the DIP Facility represents the best option reasonably available to address the Debtors' liquidity needs and that the terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances.

**Need for Interim Relief**

29. The Debtors require cash to fund these chapter 11 cases, continue operations in the ordinary course, and satisfy obligations to vendors and employees. As such, entering into the DIP Facility is critical to ensuring the Debtors are able to retain access to favorable capital commitments, avoid a Cash Collateral dispute, and minimize the costs of financing these chapter 11 cases. Absent interim approval of the DIP Facility and the associated roll-up, the Debtors could potentially incur costs on amounts currently borrowed under the RBL Facility in excess of the fees contemplated under the DIP Facility, would have less certainty as to the availability of excess funding above the current cash balance to withstand an unexpectedly longer process, and could put the Exit Facility at risk.

**Exhibit 3**

## Conclusion

30. I believe that, given the inability to find third-party debtor-in-possession financing and the extensive good faith and arm's length negotiations in respect of the DIP Facility, the terms of the DIP Facility are reasonable and appropriate. The DIP Facility is an integral part of the Restructuring Support Agreement and the Plan, which will eliminate all of the Debtors' $2.1 billion of bond debt from the Debtors' balance sheet. I also believe that, based on the Debtors' projections, the proposed DIP Facility will provide the Debtors with the necessary liquidity to effectively run their chapter 11 process and avoid a potential liquidation.

**Exhibit 3**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: July 30, 2020

/s/ *Brent Banks*
Brent Banks
Managing Director
Evercore Group L.L.C.

*Proposed Investment Banker and Financial Advisor to the Debtors*

**Exhibit 3**