**IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | * | Case No. 20-33801 (DRJ) |
| | * | |
| DENBURY RESOURCES INC., et al. | * | Chapter 11 |
| | * | |
| Debtors. | * | (Jointly Administered) |

**WESTERNGECO LLC'S OBJECTION TO CONFIRMATION OF
THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF DENBURY
RESOURCES INC. AND ITS DEBTOR AFFILIATES
AND TO ASSUMPTION OR ASSUMPTION AND ASSIGNMENT
OF WESTERNGECO'S SEISMIC LICENSE AGREEMENTS**
[Related to ECF Nos. 16 & 185]

TO THE HONORABLE DAVID R. JONES, UNITED STATES BANKRUPTCY JUDGE:

WesternGeco LLC ("WesternGeco") submits this objection to confirmation of the Joint Chapter 11 Plan of Reorganization [ECF No. 16] (the "Plan"), filed herein by the debtors, Denbury Resources Inc., Denbury Air, LLC, Denbury Brookhaven Pipeline Partnership, LP, Denbury Brookhaven Pipeline, LLC, Denbury Gathering & Marketing, Inc., Denbury Green Pipeline-Montana, LLC, Denbury Green Pipeline-North Dakota, LLC, Denbury Green Pipeline-Riley Ridge, LLC, Denbury Green Pipeline-Texas, LLC, Denbury Gulf Coast Pipelines, LLC, Denbury Holdings, Inc., Denbury Onshore, LLC, Denbury Operating Company, Denbury Pipeline Holdings, LLC, Denbury Thompson Pipeline, LLC, Encore Partners GP Holdings, LLC, Greencore Pipeline Company, LLC, and Plain Energy Holdings, LLC (each, a "Debtor" and collectively, the "Debtors"), as well as the proposed assumption or assumption and assignment of the License Agreements between WesternGeco and one or more of the Debtors, and in support thereof, respectfully submits as follows:

# I.    <u>INTRODUCTION</u>

1.    The Court should deny confirmation of the Debtors' Plan because it contains material provisions that are contrary to the United States Bankruptcy Code (the "Bankruptcy Code") and applicable bankruptcy law, thus rendering the Plan non-confirmable under Bankruptcy Code § 1129(a)(1).

2.    Specifically, the provisions of the Plan that purport to nullify change of ownership or control provisions such as are contained in WesternGeco's License Agreements with one or more of the Debtors are contrary to law.

3.    The Plan further violates settled bankruptcy law to the extent it provides for a change of ownership and control of the Debtors in violation of the change of ownership or control provisions in WesternGeco's License Agreements, but purports to enable the Debtors to assume the License Agreements without requiring that the Debtors cure all defaults thereunder, including those under the change of ownership or control provisions, and without providing adequate assurance of future performance thereof.

4.    Moreover, the release and exculpatory provisions of the Debtors' Plan are overbroad, non-specific, and contrary to other provisions of the Debtors' Plan. Thus, they fail to meet the standards and requirements for such clauses that have been adopted in the United States Fifth Circuit Court of Appeals.

5.    In addition or, alternatively, WesternGeco objects to assumption or assumption and assignment of its License Agreements with the Debtors.

6.    WesternGeco's License Agreements contain valid change in ownership and control provisions which will be breached by the Debtors upon confirmation of the Debtors' Plan, and the

Debtors cannot assume or assume and assign those License Agreements without curing all defaults thereunder, including any defaults under the change in ownership or control provisions, and without providing WesternGeco with adequate assurance of future performance thereof, as required by law.

7.     In addition or, alternatively, WesternGeco's License Agreements are non-assumable and non-assignable under Bankruptcy Code § 365 (c)(1)(A) without the consent of WesternGeco, and WesternGeco does not consent, absent payment of a mutually agreed upon change of ownership or control fee or cure amount.

## II.     BACKGROUND

8.     WesternGeco is a geophysical services company in the business, *inter alia*, of licensing comprehensive worldwide reservoir imaging, monitoring, and development services, including but not limited to 2D, 3D and other types of seismic surveys and images, which are generally offered to clients for the purpose of providing accurate measurements of subsurface geology for potential oil and gas exploration and/or production and other uses.

9.     The Debtors are affiliated independent oil and natural gas companies with onshore production and development activities in the Gulf Coast and Rocky Mountain regions.[1]

10.     Denbury Resources, Inc. ("DRI") is the ultimate parent company of each of the other Debtors.[2]  It is a publicly traded holding company that directly or indirectly owns the majority

---

[1] Disclosure Statement for Joint Chapter 11 Plan of Reorganization of Denbury Resources Inc. and Its Debtor Affiliates [ECF No. 17] (the "Disclosure Statement") at p. 11 of 390.
[2] *Id.*

of the common stock of each of the other Debtors.[3] Denbury Onshore, LLC ("DOL") is the primary operating entity and holds the majority of the Debtors' assets and employees.[4]

11.     As of January 31, 2020, DRI had issued and outstanding 506,382,897 shares of common stock.[5] The owners of greater than five percent (5%) of DRI, at least as of the 2020 Annual Meeting, were as follows: Black Rock, Inc. (14.8%); Fidelity (13.9%); Vanguard Group (13.7%), State Street Corp. (5.2%).[6]

12.     DRI is managed by a Board of Directors that is currently comprised of eight (8) individuals.[7]  DRI's 10-K Report for the Fiscal Year ended December 31, 2019 filed with the SEC reflects that each holder of common stock is entitled to one (1) vote per share, and there are no cumulative voting rights, meaning that the holders of greater than fifty percent (50%) of the shares voting for election of directors can elect 100% of the directors.[8]

### III.   THE BANKRUPTCY CASE AND PLAN

13.     On July 30, 2020 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief pursuant to Chapter 11 of Title 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors-in-possession pursuant to Bankruptcy Code §§1107 and 1108(a).

14.     On the Petition Date, the Debtors also filed their Plan [ECF No. 16] and Disclosure Statement [ECF No. 17]. By Order (I) Scheduling A Combined Disclosure Statement Approval And Plan Confirmation Hearing, (II) Conditionally Approving The Disclosure Statement, (III)

---

[3] *Id.*
[4] *Id.*
[5] Annual Report (10-K) of DRI for the Fiscal Year Ended December 31, 2019, Ex. 4r at pp. 114-15.
[6] Proxy Statement for DRI's 2020 Annual Meeting to be held on May 28, 2020, at p. 20.
[7] *Id.* at p. 4.
[8] Annual Report (10-K) of DRI for the Fiscal Year Ended December 31, 2019, Ex. 4r.

Establishing Plan And Disclosure Statement Objection And Related Procedures, (IV) Approving The Solicitation Procedures, (V) Approving The Combined Notice, And (VI) Conditionally Waiving The Requirements That The U.S. Trustee Convene A Meeting Of Creditors And The Debtors File Schedules And SOFAS [ECF No. 68] (the "Scheduling Order"), the Court, among other things, conditionally approved the Disclosure Statement, approved the Debtors' proposed solicitation materials, scheduled a combined hearing on final approval of the Disclosure Statement and on confirmation of the Debtors' Plan, and established various deadlines relating to same.

15. The Debtors' Plan is premised upon a de-leveraging of the Debtors' balance sheet and conversion of a substantial portion of its debt into equity.

16. Holders of Priority Claims, Other Secured Claims, "Pipeline Lease Claims" and "RBL and Hedge Claims" are to be paid either in cash in full, have their claims reinstated, or receive such other treatment as renders their claims unimpaired.[9] However, holders of the "Second Lien Note Claims", which aggregate about $1.59 billion, are to receive a pro rata share of approximately ninety-five percent (95%) of the "New DNR Equity" (subject to some possible dilution) and holders of "Convertible Note Claims" aggregating about $225.7 million, are to receive 5% of the New DNR Equity (again subject to some possible dilution).[10] Holders of "Subordinated Note Claims" are to receive warrants for purchasing new equity interests only if the class votes for the Plan, but if it does not, they do not receive anything under the Plan.[11] A similar

---

[9] Plan [ECF No. 16] at pp. 20-1 of 55.
[10] *Id*. at p. 22 of 55.
[11] *Id*. at pp. 22-3 of 55.

treatment is proposed for Existing Equity Interest holders.[12]   Unsecured Creditors, however, are proposed to be paid in full.[13]

17.     According to the Plan, each of the Debtors are to continue to exist after the Effective Date, unless otherwise provided in the Plan.[14]   Nevertheless, as of the Effective Date of the Plan, the terms of the current members of the Board of Directors of DRI are to expire, and all of the directors of the initial term of the "New Board" of DRI are to be appointed in accordance with the terms of a Governance Term Sheet.[15]   The Plan indicates that DRI's New Board is to initially consist of seven (7) members, the identities of which are to be disclosed either in the Plan Supplement or prior to the Confirmation Hearing.[16]   The Governance Term Sheet agreed to by the parties that executed the Restructuring Support Agreement, provides that the "New Board" is to initially consist of (a) the CEO; (b) two (2) directors selected by Fidelity Management and Research Company; (c) one (1) director selected by Golden Tree Asset Management LP; and (d) three (3) directors (or such other number to be determined by the "Required Consenting Second Lien Noteholders") to be selected by the "Second Lien Ad Hoc Committee."[17]

18.     As to executory contracts, the Plan generally provides that all executory contracts are to be deemed assumed, unless it: (1) is identified on the Rejected Executory Contracts and

---

[12] *Id.* at p. 24 of 55.

[13] *Id.* at p. 23 of 55.

[14] *Id.* at p. 27 of 55.

[15] *Id.* at p. 29 of 55.

[16] *Id.*

[17] Governance Term Sheet attached as Annex 4 to the Disclosure Statement [ECF No. 17] at p. 347 of 390.   The term "Required Consenting Second Lien Noteholders" is defined in the Plan as meaning (a) beneficial Holders of at least 50.01% of the aggregate outstanding principal amount of the Second Lien Notes subject to the Restructuring Support Agreement that are members of the Second Lien Ad Hoc Committee and (b) constituting at least two (2) members of the Second Lien Ad Hoc Committee. Plan [ECF No. 16], ¶ 118 at p. 14 of 55.   The term "Second Lien Ad Hoc Committee" is, in turn, defined as the ad hoc committee of Holders of Second Lien Notes represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP, PJT Partners LP, and any local or foreign advisors. *Id.*, ¶ 123 at p. 14 of 55.

Unexpired Leases Schedule; (2) was previously expired or terminated pursuant to its own terms; (3) has been previously assumed or rejected by the Debtors pursuant to a Final Order; (4) is the subject of a motion to reject pending on the Effective Date; or (5) has an ordered or requested effective date of rejection that is after the Effective Date.[18] The Plan provides that the assumption of an executory contract may also include the assignment of such a contract.[19]

19.     Counterparties to executory contracts that are to be assumed and which have monetary defaults are supposed to receive a Cure Notice from the Debtors, and if the counterparty objects to the Cure Notice or assumption generally, it is required to file an objection by the date provided by in the Cure Notice.[20]

20.     Significantly, the Plan provides that assumption or assumption and assignment of an executory contract "shall result in the **full release** . . . of any Cure Amounts, Claims or defaults, monetary or nonmonetary, **including defaults of provisions restricting the change in control or ownership interest composition** or any bankruptcy-related defaults, arising at any time prior to the effective date of assumption" (emphasis added).[21]

21.     Similarly, another provision of the Plan provides that to the maximum extent provided by Law, "to the extent any provision in any Executory Contract . . . restricts or prevents . . . or is breached . . . by, the assumption or assumption and assignment . . . **(including any "change of control" provision), then such provision shall be deemed modified** such that the transactions contemplated by the Plan shall not entitle the non-Debtor . . . to terminate . . . or to

---

[18] *Id*. at p. 32 of 55.
[19] *Id.*
[20] *Id.* at p. 34 of 55.
[21] *Id.*

exercise any other default-related rights . . ." (emphasis added).[22]

22.     On August 21, 2020, the Debtors filed a Plan Supplement containing their Assumed Executory Contracts and Unexpired Leases Schedule (Exhibit C) and their Rejected Executory Contracts and Unexpired Leases Schedule (Exhibit F) [ECF No. 185]. None of WesternGeco's License Agreements with the Debtors is listed on either of those schedules.  According to the terms of the Debtors' Plan, that means that the Debtors propose that WesternGeco's License Agreements be assumed or assumed and assigned by the Debtors for a cure amount of $0.

## IV.   THE LICENSE AGREEMENTS BETWEEN WESTERNGECO AND THE DEBTORS

23.     Prior to the Petition Date, WesternGeco licensed seismic data and derivatives thereof to one or more of the Debtors herein pursuant to written license agreements as well as various supplements and/or related agreements (collectively, the "License Agreements").

24.     Specifically, by Master License Agreement For Multiclient Seismic Data effective August 2, 2001 (the "Master License"), WesternGeco agreed to license to DRI, on a non-exclusive basis and subject to certain confidentiality provisions and transfer restrictions, certain seismic data and derivatives thereof (the "Seismic Materials") as from time to time were ordered by DRI and its Related Entities (as defined in the Master License) pursuant to Supplemental Agreements issued in accordance with the terms and conditions of the Master License. DRI and its Related Entities, thereafter, periodically entered into various Supplemental Agreements and/or related agreements in accordance with the Master License for licensing of specific Seismic Materials from WesternGeco.

25.     The Master License between WesternGeco and DRI provides, among other things,

---

[22] *Id.* at p. 33 of 55.

that:

a)     The license is for a limited period of time and grants use of the Seismic Materials on a non-exclusive basis for DRI's internal use only;

b)     The Seismic Materials licensed to DRI shall at all times remain owned by WesternGeco and contain proprietary information and trade secrets of WesternGeco that are protected by international and United States trade secret and copyright laws;

c)     DRI may not assign, sublet or "Transfer" its rights or obligations under the License Agreements without the prior written consent of WesternGeco; and

d)     DRI may not Disclose or Transfer the Seismic Materials except as provided in the Master License.

26.     Moreover, the Master License provides that the License Agreements, and the licenses granted thereunder, shall terminate as follows:

a)     In the event DRI commits a material breach of any condition or provision of the Master License relating to confidentiality or restrictions on the use, Disclosure or Transfer of the Seismic Materials, the License Agreements shall automatically terminate;

b)     In the event a "Related Party", "Licensee's Consultants", or "Allowed Viewing Parties" breach any condition or provision of the Master License relating to confidentiality or restrictions on the use, Disclosure or Transfer of the Seismic Materials, the License Agreements shall automatically terminate; and

c)     **Any event "causing the Ownership or Control of Licensee to materially change, whether by virtue of acquisition, statutory merger, consolidation, buyout, or other transaction, shall be deemed an assignment hereunder, and this License Agreement and the rights hereunder shall automatically terminate** in such event unless WesternGeco has given prior written consent to assign or Transfer this License Agreement and the Data licensed hereunder to the successor in Ownership or Control pursuant to Section Two, Article 4 above" (emphasis added).

## V.  WESTERNGECO'S SPECIFIC OBJECTIONS TO THE DEBTORS' PLAN AND ASSUMPTION OR ASSUMPTION AND ASSIGNMENT OF ITS LICENSE AGREEMENTS WITH THE DEBTORS

A.      WesternGeco's License Agreements are Executory Contracts

27.      WesternGeco's License Agreements are executory contracts within the meaning of Bankruptcy Code § 365 as, among other things the Debtor, DRI, has continuing confidentiality obligations to WesternGeco under those agreements and restrictions upon use of the licensed Seismic Materials while, at the same time, WesternGeco has continuing obligations to allow DRI to use the materials and/or to defend legal proceedings arising out of the licensing thereof. *See, e.g., In re Aerobox Composite Structures*, LLC, 373 B.R. 135 (Bankr. D.N.M. 7/27/07) (patent and technology license agreement found executory based primarily on continuing obligations of both parties to maintain confidentiality); *In re Chapin Revenue Cycle Management, LLC*, 343 B.R. 728 (Bankr. M.D.Fla. 3/1/06) (computer software licensing agreement held to be executory contract where the licensor had obligation to allow continued use by debtor and debtor had obligation to maintain confidentiality of software).   *See also In re Sunterra Corporation*, 361 F. 3d 257 (4th Cir. 3/18/04) (computer software licensing agreement held executory due to confidentiality obligations); *In re Superior Toy & Mfg. Co.*, 78 F. 3d 1169 (7th Cir. 3/7/96) (trademark license found to be executory contract).

B.      The Change in Ownership or Control Provision in WesternGeco's Master License is Valid and Enforceable, and the Plan Provision Purporting to Invalidate it is Contrary to Bankruptcy and Non-Bankruptcy Law. In addition or, alternatively, the Debtors Cannot Assume WesternGeco's License Agreements Without Curing All Defaults Thereunder, Including Under the Change of Ownership or Control Provision.

28.      In order to assume an executory contract, a debtor is generally required to (a) cure any existing default under the contract or provide "adequate assurance" of a prompt cure; (b) compensate or provide adequate assurance that the debtor will compensate the other party to the contract for any actual pecuniary loss arising from the debtor's default thereunder; and (c) provide

"adequate assurance of future performance" under the contract to the other party.   Bankruptcy Code § 365(b)(1).   These requirements apply to defaults that occur under executory contracts either before or after commencement of the case.   *In re Luce Industries, Inc*., 8 B.R. 100, 104 (Bankr. S.D.N.Y. 1980), *rev'd on other grds*., 14 B.R. 529 (S.D.N.Y. 1981).

29.     Moreover, it is well-settled that an executory contract must generally be assumed in its entirety or not at all.   One cannot reject the burdens of an executory contract and accept only the benefits.   *In re E-Z Serve Convenience Stores, Inc*., 289 B.R. 45, 49 (Bankr. M.D.N.C. 2003); *In re Rovine Corp.*, 6 B.R. 661, 666 (Bankr. W.D.Tenn. 1980).

30.     As noted above, WesternGeco's Master License with DRI contains a change of ownership or control provision that terminates the License Agreements in the event of a change of ownership or control of DRI without the prior written consent of WesternGeco.

31.     The change in ownership or control provision contained in the Master License provides, in pertinent part:

> "Any event causing the Ownership or Control of Licensee to materially change, whether by virtue of acquisition, statutory merger, consolidation, buyout, or other transaction, shall be deemed an assignment hereunder, and this License Agreement and the rights hereunder shall automatically terminate in such event unless WesternGeco has given prior written consent to assign or Transfer this License Agreement and the Data licensed hereunder to the successor in Ownership or Control pursuant to Section Two, Article 4 above."[23]

---

[23] *See* Master License, Section Two, ¶ 8.B. The term "Ownership" is defined in the Master License as meaning "in the case of a corporation or other entity which issues voting securities, at least 50% (or such lesser percentage which results in *de facto* Control) of the outstanding common stock or other voting securities and, in the case of a partnership, trust or other entity, at least 50% (or such lesser percentage which results in *de facto* Control) of the interest in the profits thereof." *Id.* at Section Two, ¶ 1.I. The term "Control" means "the ability to direct, manage and/or dictate the actions of and/or determine the management of the entity in question whether by the election of members of the Board of Directors or other governing body of such entity, or by having a majority number of members of such governing body, or by other means." *Id.* at Section Two, ¶ 1.C.

32.     Change in ownership or control provisions of the type contained in the Master License have been held to be valid and enforceable against a debtor.   *See, e.g.*, *In re Washington Capital Aviation & Leasing*, 156 B.R. 167, 174 (Bankr. E.D.Va. 1993).

33.     Although 11 U.S.C. § 365(e) and (f) generally provide that *ipso facto* and anti-assignment clauses in executory contracts can be stricken as contrary to the Bankruptcy Code, it has been held that 11 U.S.C. § 365(e) and (f) do not operate to invalidate clauses that permit termination of a contract upon a change in control of the debtor party.   *In re Washington Capital Aviation & Leasing*, 156 B.R. at 174 (noting that the change in control provision at issue was neither an *ipso facto* clause nor a non-assignment clause).

34.     In any event, courts recognize that executory contracts should be evaluated on a case by case basis to determine the effect of enforcement of these types of provisions on both the debtor party and the non-debtor party, specifically including the extent of the economic detriment suffered by the non-debtor party. *See In re E-Z Serve*, 289 B.R. at 50 (noting that a bankruptcy court's "authority to excise a bargained for element of a contract is questionable" and that "modification of a nondebtor contracting party's rights is not to be taken lightly").

35.     Here, the change in ownership or control restrictions in the Master License are critical to WesternGeco's business model as WesternGeco makes a substantial investment in creating its own seismic data and earns revenue by granting non-exclusive access to this data to multiple customers under restrictive license agreements.   If the change in ownership or control restrictions are not enforced, the value of those licenses will be severely diminished.   For this reason, the change in ownership or control provision in WesternGeco's Master License is an essential, bargained-for element of WesternGeco's agreements with DRI that should be enforced.

36. Accordingly, the provision in the Debtors' Plan that purports to nullify change of ownership or control provisions such as are contained in WesternGeco's License Agreements is contrary to Bankruptcy law and non-Bankruptcy law. Moreover, to the extent the Plan provides for a change of ownership or control of the Debtors in violation of the change of ownership or control provisions of WesternGeco's Master License and/or the Plan otherwise authorizes or enables the Debtors to assume (or assume and assign to third parties) WesternGeco's License Agreements without properly curing all defaults thereunder, including the Debtors' default under the change of ownership or control provisions contained therein, the Plan further violates settled Bankruptcy law.

37. Regardless of whether or not the Court confirms the Debtors' Plan, WesternGeco further objects to assumption or assumption and assignment of the License Agreements by the Debtors because, as is shown above, the Debtors' Plan is premised upon a substantial change of ownership and control as those terms are defined in the Master License, and under settled bankruptcy law, the Debtors are prohibited from assuming or assuming and assigning the License Agreements without curing all defaults thereunder, including non-monetary defaults such as under the change of ownership and control provision thereof.

38. Specifically, prior to the Petition Date, there were 506,382,897 shares of DRI common stock issued and outstanding, with Black Rock, Inc. owning 14.8%, Fidelity owning 13.9%, Vanguard Group owning 13.7% and State Street Corp. owning 5.2%. Upon the Effective Date of the Plan, however, the holders of the Second Lien Note Claims that will receive 95% of the new equity of Reorganized DRI. As ownership of at least 50% of the outstanding common stock of DRI will change, a material change in ownership under WesternGeco's Master License

13

will occur.

39.     The same is true regarding control of DRI. As is shown above, prior to the Petition Date, no stockholder of DRI owned more than 14.8% of DRI's common stock. Since each common share was entitled to one vote for director, DRI did not have cumulative voting, and WesternGeco has found no evidence of any shareholder's agreement between the major stockholders governing voting for directors, no stockholder or group of stockholders controlled who would be elected to DRI's Board of Directors.

40.     After the Effective Date, however, assuming the Plan is confirmed, control over DRI will pass to Fidelity Management and Research Company, Golden Tree Asset Management LP, and the Second Lien Ad Hoc Committee. That is because, under the Governance Term Sheet, the "New Board" of DRI is to initially consist of (a) the CEO; (b) two (2) directors selected by Fidelity Management and Research Company; (c) one (1) director selected by Golden Tree Asset Management LP; and (d) three (3) directors (or such other number to be determined by the "Required Consenting Second Lien Noteholders") to be selected by the Second Lien Ad Hoc Committee. And after the terms of the initial directors have expired, it will be the holders of the Second Lien Note Claims that will control DRI, as under the Plan, they are to receive 95% of the new equity of Reorganized DRI.[24]

C.     In addition or, Alternatively, the License Agreements are Non-Assumable and Non-Assignable under Bankruptcy Code § 365 (c)(1)(A).

---

[24] Neither the identities of the Second Lien Ad Hoc Committee nor of the holders of the Second Lien Note Claims are disclosed in the Plan or Disclosure Statement. However, a Verified Statement of the Second Lien Ad Hoc Committee filed on August 4, 2020 reflects that the Second Lien Ad Hoc Committee consists of Fidelity Investments, Inc., Capital Research and Management, Golden Tree Asset Management, LP, Cyrus Capital Partners, LP, Keyframe Capital Partners, Aristeia Capital, Nomura Corporate Research and Asset Management, Inc., FS/EIG Advisor, LLC, JP Morgan Investment Management Inc., and AllianceBernstein, LP. *See* Verified Statement of the Second Lien Ad Hoc Committee [ECF No. 123] at pp. 6-7 of 7.

41.     Although Bankruptcy Code § 365(a) gives a debtor or trustee, with court approval, the right to assume (or reject) executory contracts, and Bankruptcy Code § 365(f) generally gives the debtor or trustee the power to assign executory contracts, Bankruptcy Code § 365(c)(1)(A) contains an exception to both of those grants of authority.   Bankruptcy Code § 365(c)(1)(A) provides that a trustee may <u>not</u> assume or assign an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if:

> (a) "applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession . . .," and (b) "such party does not consent to such assumption or assignment . . .".

i.     *Trade Secret Law is "Applicable Law" Preventing Assumption or Assumption and Assignment as Proposed by the Debtors in their Plan under § 365(c)(1)(A)*

42.     It has been held that the phrase "applicable law" as used in Bankruptcy Code § 365(c)(1)(A) means "any law applicable to a contract, other than bankruptcy law".   *See In re XMH Corp.*, 647 F.3d 690, 695 (7th Cir. 2011).   WesternGeco asserts that Texas and U.S. trade secrets laws constitute "applicable law" under Bankruptcy Code § 365(c)(1)(A) and excuse WesternGeco from accepting performance from or rendering performance to an entity other than DRI, thus precluding assumption or assumption and assignment of WesternGeco's License Agreements without WesternGeco's consent.[25]

43.     The Texas Supreme Court has defined a trade secret as "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *In re Bass*, 113 S.W.3d 735,

---

[25] The Master License stipulates that Texas law is to be the law governing the agreement.

739 (Tex. 2003). It is axiomatic that the secrecy of a trade secret is of paramount importance for the information to maintain its value: trade secrets must necessarily remain secret to be useful to the owner. *See generally Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 552 (Tex.App.-Dallas 1993, no writ) ("[A] trade secret can exist in a combination of characteristics and components[,] each of which, by itself, is in the public domain, but the unified process, [the] design and operation of which in unique combination[ ] affords a competitive advantage, is a protected trade secret.")

44.     It has been uniformly held that seismic data is a protected trade secret under Texas law.  *See, e.g., In re Bass*, 113 S.W.3d 735, 742 (Tex. 2003).  *See also Musser David Land Co. v. Union Pac. Res.*, 201 F.3d 561, 569 (5th Cir. 2000).  In determining that seismic data is considered a trade secret, the Texas Supreme Court has recognized that seismic data and other methods for obtaining subsurface geological information are widely considered trade secrets both within the oil and gas industry and at law. *See In re Bass*, 113 S.W.3d at 742. Further, the United States Bankruptcy Court for the Western District of Texas has also found subsurface data, including both seismic and microseismic data and well logs, to be entitled to trade secret protection under Texas law.  *In re TXCO Res., Inc.*, 475 B.R. 781 (Bankr. W.D. Tex. 2012).  This Court should follow the Texas Supreme Court, the Fifth Circuit and the Western District of Texas by finding that the Seismic Materials licensed to DRI by WesternGeco are likewise trade secrets.

45.     Under the Texas version of the Uniform Trade Secrets Act, an actionable misappropriation is considered to exist and may be enjoined when a disclosure or use of a trade secret occurs without the express or implied consent of the owner.[26]   Tex. Civ. Prac. & Rem. Code

---

[26] A trade secret is defined as information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (i) derives independent economic value, actual or potential, from not being generally

§ 134A.002(3). Further, a person who, without the owner's consent, knowingly communicates or transmits a trade secret, is guilty of committing a felony.  *See* Tex. Penal Code § 31.05.

46.     Similarly, the Defend Trade Secrets Act of 2016 creates a federal cause of action for trade secret misappropriation that in large part mirrors the Uniform Trade Secrets Act.   The definition of the term "trade secret" in the Defend Trade Secrets Act ("DTSA") is similar to the definition found in the Uniform Trade Secrets Act, and the remedies set forth in the DTSA are in large part, similar to the state version.[27]  *See* 18 U.S.C. § 1836 *et seq*.   Further, while the DTSA creates federal jurisdiction over trade secret theft, it does not preempt state trade secret law and allows trade secret owners to pursue federal civil remedies as an alternative to or in addition to existing state remedies. 18 U.S.C. § 1838.

47.     Although there is no case law specifically discussing whether trade secret law is "applicable law" under § 365(c)(1)(A), the trade secrets laws serve similar purposes to other laws considered "applicable law" under § 365(c)(1)(A), such as federal trademark, patent and copyright law, which prohibit nonconsensual assignments in order to provide protection to owners of information or materials that derive their value from being difficult to develop, unique and/or not publicly available by limiting who can use the information or materials without the owner's consent.[28]  Moreover, under both the Texas Uniform Trade Secrets Act and the Defend Trade

---

known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Uniform Trade Secrets Act, § 1(4).

[27] On the other hand, the DTSA provides an ex parte seizure procedure for use where the party against whom the seizure is ordered "would destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to such person…." 18 U.S.C. § 1836(b)(2).

[28] *See e.g. In re Trump Entm't Resorts, Inc*., 526 B.R. 116, 124 (Bankr. D. Del. 2015)("federal trademark law generally bans assignment of trademark licenses absent the licensor's consent because, in order to ensure that all products bearing its trademark are of uniform quality, the identity of the licensee is crucially important to the licensor"); *In re CFLC, Inc.*, 89 F.3d 673, 679 (9th Cir. 1996)(The fundamental policy of the patent system is to "encourag[e] the creation and disclosure of new, useful, and non-obvious advances in technology and design" by granting the inventor the reward

Secrets Act of 2016, any transfer or use of a trade secret requires the express or implied consent of the owner thereof.   Thus, the Texas Uniform Trade Secrets Act and the Defend Trade Secrets Act of 2016 should be found to constitute "applicable law" under Bankruptcy Code § 365(c)(1)(A) that excuses WesternGeco from accepting performance from or rendering performance under its License Agreements to entities other than DRI.

     ii.     *Copyright Law is also "Applicable Law" Preventing Assumption or Assumption and Assignment under § 365(c)(1)(A)*

     48.     The U.S. Copyright Act further constitutes "applicable law" under Bankruptcy Code § 365(c)(1)(A) and excuses WesternGeco from accepting performance from or rendering performance to an entity other than DRI, thus precluding assumption or assumption and assignment of the License Agreements under Bankruptcy Code § 365(c)(1)(A), notwithstanding the terms of the Debtors' Plan.

     49.     The Copyright Act, 17 U.S.C. §102, *et. seq.*, provides protection to the authors of "original works of authorship" fixed in "any tangible medium of expression . . . from which they can be perceived, reproduced, or otherwise communicated," including but not limited to both published and non-published literary, pictorial, graphic, artistic, audiovisual, sound recording, architectural, and certain other intellectual works. It also applies to and protects compilations and derivative works.

---

of "the exclusive right to practice the invention for a period of years"… free assignability—of nonexclusive patent licenses would undermine the reward that encourages invention because a party seeking to use the patented invention could either seek a license from the patent holder or seek an assignment of an existing patent license from a licensee. In essence, every licensee would become a potential competitor with the licensor-patent holder in the market for licenses under the patents."); *In re Patient Educ. Media, Inc*., 210 B.R. 237, 242 (Bankr. S.D.N.Y. 1997)("The federal policy designed to protect the limited monopoly of copyright owners and restrict unauthorized use constitutes applicable nonbankruptcy law. It prevents the trustee from assigning the nonexclusive license absent the owner's consent.")

50.     Although materials may be registered in the Copyright Office, registration is not required in order to obtain the protections of the Copyright Act, which arise when the work is "created." *See* 17 U.S.C. §§ 302, 408.

51.     For a work to be sufficiently original for copyrightability, it needs only have been independently created (as opposed to copied from other works) and possess "at least some minimal degree of creativity." *Mason v. Montgomery Data, Inc.,* 967 F.2d 135, 141 (5th Cir. 1992). In other words, the work must have a "creative spark." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 345, 111 S.Ct. 1282, 1290 (1991). But not much more than a spark. The Supreme Court has held that the level of creativity required under the Copyright Act "is extremely low; even a slight amount will suffice." *Feist*, 111 S.Ct. at 1287. Indeed, copyright protects works that possess just something "more than a de minimis quantum of creativity." *Id*. at 1297. In fact, "a work may be protected by copyright even though it is based on . . . something already in the public domain if the author, through his skill and effort, has contributed a distinguishable variation from the older works." *Donald v. Zack Meyer's T.V. Sales & Serv.*, 426 F.2d 1027, 1029 (5th Cir.1970), *cert. denied*, 400 U.S. 992, 91 S.Ct. 459 (1971).

52.     For example, photographs have long been held to be copyrightable, notwithstanding the objections of 19th century artists who argued that photographs were merely mechanical reproductions of the physical features or outlines of an object. *See SHL Imaging, Inc. v. Artisan House, Inc.,* 117 F. Supp. 2d 301, 308-311 (S.D.N.Y. 2000). Courts now widely recognize that, in taking a photograph, the photographer makes a series of creative choices intended to evoke the desired expression before any image is captured, such as the posing of the subject, the lighting, the angle and perspective of the shot, and the selection of the type of film and

camera. *See Biggs v. Cabela's, Inc.,* No. 4:03-CV-0205-A, 2004 WL 530167, * 4 (N.D. Tex. Feb. 23, 2004); *SHL Imaging, Inc.,* 117 F. Supp. 2d at 308-311.

53.     Similarly, maps have been held to be copyrightable, even though a map at its core is designed to accurately reflect the location, size and other relevant information of land parcels. The author of a map utilizes his originality and creativity in the designing the map, including choices regarding the placement, size and dimensions of individual tracts of land, geographic conditions and other features and in coordinating, arranging or even drawing the geographic information differently than as might be seen in other maps. *See Mason,* 967 F.2d at 139-141; *City of New York v. Geodata Plus, LLC*, 537 F. Supp. 2d 443, 450-52 (E.D.N.Y. 2007); *Newton v. Voris*, 364 F. Supp. 562, 563-64 (D. Or. 1973) ("The fact that the source of the material for the map is in the public domain does not void the copyright, but [the material] is subject to the requirement of originality and creativity.") (internal citations omitted).

54.     The Seismic Materials licensed to DRI under WesternGeco's License Agreements, much like photographs and maps, are "original works of authorship" of WesternGeco fixed in a tangible medium of expression from which they can be perceived, reproduced or otherwise communicated.  The Seismic Materials are the pictorial and graphic result of sound recordings obtained by geophones or hydrophones that are manipulated, using sophisticated state of the art and proprietary software, to obtain a one of a kind interpretation and analysis of the recording. Further, the Seismic Materials are in large part formed by collecting and assembling data using WesternGeco's judgment in such a way that the resulting work as a whole constitutes an original

work. Indeed, in the Master License, DRI stipulated that the Seismic Materials licensed thereunder were subject to and protected by copyright law.[29]

55.     It has been held that under U.S. copyright law, nonexclusive licenses such as was granted to DRI by WesternGeco under the Master License are personal to the licensee, and the licensee cannot assign them to a third party without the consent of the copyright owner. *See, e.g., In re Patient Education Media, Inc*., 210 B.R. 237, 241 (Bankr. S.D.N.Y. 1997); *In re Buildnet, Inc*., 01-82293, 2002 WL 31103235, at *5 (Bankr. M.D.N.C. Sept. 20, 2002).   This is primarily because, under 17 U.S.C. §204(a), a transfer of copyright ownership, other than by operation of law (such as succession law), is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed.   For that reason, it has been held that U.S. copyright law constitutes "applicable law" under Bankruptcy Code § 365 (c)(1)(A) that "excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession . . .".  *See, e.g., In re Sunterra Corporation*, 361 F.3d 257, 262 (4th Cir. 2004); *In re Golden Books Family Entertainment, Inc.*, 269 B.R. 300, 309-310 (Bankr. D.Del. 2001); *In re Patient Education Media, Inc.*, 210 B.R. 237, 243 (Bankr. S.D.N.Y. 1997).

56.     Because WesternGeco's License Agreements are protected under trade secret and copyright laws, Bankruptcy Code § 365 (c)(1)(A) prohibits their assumption or assumption and assignment by the Debtors without WesternGeco's consent.   As such, the provision of the Plan purporting to authorize the Debtors to assume WesternGeco's License Agreements if not identified

---

[29] *See* Master License, Section Two, at ¶ 2.

on the Debtors' Schedule of Rejected Executory Contracts, and purporting to authorize the Debtors

to assume and assign those licenses to third parties, violates Bankruptcy law.

D.      The Release and Exculpation Provisions in the Debtors' Plan are Overbroad and Contrary
        to Law.

57.     The Debtors' Plan contains broad release and exculpation provisions that release

the Debtors, the Reorganized Debtors and numerous third parties from a broad array of both pre

and post-Petition claims, obligations, actions, and omissions.[30]

58.     Among other things, the release provision in the Plan releases the Debtor, its estate,

and the Reorganized Debtors, from:

> "all Claims . . . based on or relating to, or in any manner arising from, in whole or
> in part, the Debtors (including the management, ownership or operation thereof), .
> . . the Debtors' restructuring efforts, . . . the Chapter 11 Cases, . . . the Restructuring
> Support Agreement, the DIP Facility, the Disclosure Statement, the Plan, the Exit
> Facility, the Plan Supplement, or any Restructuring Transaction, contract,
> instrument, release, or other agreement or document . . . created or entered into in
> connection with the Restructuring Support Agreement, the DIP Facility, the
> Disclosure Statement, the Plan, the Exit Facility, the Plan Supplement, the Chapter
> 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit
> of Consummation, the administration and implementation of the Plan. . . , or upon
> any other related act or omission, transaction, agreement, event, or other occurrence
> taking place on or before the Effective Date. . .".[31]

59.     The exculpation provision of the Plan, among other things, exculpates the Debtor

and Reorganized Debtor from, "any Cause of Action for any claim related to any act or omission

in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation,

dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and

related prepetition transactions, the DIP Facility, the Disclosure Statement, the Plan, the Exit

Facility, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or

---

[30] *See* Plan [ECF No. 16] at pp. 44-5 of 55.
[31] *Id*. at p. 44 of 55.

other agreement or document . . . created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the Disclosure Statement, the Plan, the Exit Facility, the Plan Supplement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, . . . , or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date . . .".[32]

60.     The Fifth Circuit takes a "very restrictive" approach to releases in bankruptcy cases. To that end, it has recognized that § 524(e) of the Bankruptcy Code generally prohibits non-consensual, non-debtor releases, and the Court has indicated that a plan containing such a release is non-confirmable. *See In re Vitro S.A. B. de CV*, 701 F.3d 1031, 1069 (5th Cir. 2012), *cert. dismissed*, 569 U.S. 944 (2013), *citing In re Pac. Lumber Co.*, 584 F3d 229, 252 (5th Cir. 2009). Moreover, it has been held that a release provision will be found to be prohibited, thus rendering the plan non-confirmable, if the language of the release is vague, over broad or does not specifically set out who is affected by the release and the specific claims that are being released. *See, e.g., Hernandez v. Larry Miller Roofing, Incorporated*, 628 Fed. Appx. 281, 286-288 (5th Cir. 1/6/16); *In re Patriot Place, Ltd*., 486 B.R. 773, 821-821 (Bankr. W.D.Tex. 2013).

61.     The releases and exculpation provision contained in the Plan are vague, non-specific, and over broad in violation of Fifth Circuit requirements.  Nowhere does the release identify any specific claims intended to be released, or the identity of the specific parties who are to be releasing those claims.   Yet, to be effective, the Fifth Circuit has made it clear that a release

---

[32] *Id*. at p. 45 of 55.

must be specific in what it releases and may not contain generic boilerplate language as does the release proposed in the Debtors' Plan. *Hernandez*, 628 Fed. Appx. at 287-288.

62.     Moreover, the release and exculpation provisions are so over broad that they could be construed as barring WesternGeco and other similarly situated licensors of Seismic Materials, intellectual property, trade secrets, and copyrighted or patented materials, whose licenses are non-assumable and non-assignable under Bankruptcy Code § 365 (c)(1)(A) from being able to assert rights, benefits and remedies contained in their licenses or under applicable law against the Reorganized Debtors.   That would run contrary to the very purpose and intent of Bankruptcy Code § 365 (c)(1)(A).

## VI.     <u>RESERVATION OF RIGHTS</u>

63.     WesternGeco reserves the right to raise other objections it may have to confirmation of the Debtors' proposed Plan and/or assumption or assumption and assignment of its License Agreements, as well as all other rights including, without limitation, the right to file any such further and additional objections to any filings in this proceeding that it deems appropriate.

## VII.     <u>CONCLUSION</u>

For the foregoing reasons, WesternGeco prays that the Court deny confirmation of the Debtors' Plan, as written, reject the Debtors' proposed assumption or assumption and assignment of WesternGeco's License Agreements without WesternGeco's consent, and provide any other and further relief as is just and equitable.

Respectfully submitted,

*/s/ Andrew A. Braun*

ANDREW A. BRAUN
Texas State Bar No. 24061558
GIEGER, LABORDE & LAPEROUSE, L.L.C.
Suite 4800, 701 Poydras Street
New Orleans, Louisiana   70139-4800
Telephone:   (504) 561-0400
Facsimile: (504) 561-0100
Email: abraun@glllaw.com

*Counsel for WesternGeco LLC*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing pleading was served via electronic mail on the 28th day of August, 2020, upon all parties in interest listed on the ECF service list.

*/s/ Andrew A. Braun*

ANDREW A. BRAUN

25