**IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | * | Case No. 20-33801 (DRJ) |
| | * | |
| DENBURY RESOURCES INC., et al. | * | Chapter 11 |
| | * | |
| Debtors. | * | (Jointly Administered) |

**FAIRFIELD INDUSTRIES INCORPORATED D/B/A FAIRFIELD
GEOTECHNOLOGIES' OBJECTION TO CONFIRMATION OF
THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF DENBURY
RESOURCES INC. AND ITS DEBTOR AFFILIATES
AND TO ASSUMPTION OR ASSUMPTION AND ASSIGNMENT
<u>OF FAIRFIELD'S SEISMIC LICENSE AGREEMENTS</u>**
[Related to ECF Nos. 16 & 185]

TO THE HONORABLE DAVID R. JONES, UNITED STATES BANKRUPTCY JUDGE:

Fairfield Industries Incorporated d/b/a Fairfield Geotechnologies f/k/a FairfieldNodal ("Fairfield") submits this objection to confirmation of the Joint Chapter 11 Plan of Reorganization [ECF No. 16] (the "Plan"), filed herein by the debtors, Denbury Resources Inc., Denbury Air, LLC, Denbury Brookhaven Pipeline Partnership, LP, Denbury Brookhaven Pipeline, LLC, Denbury Gathering & Marketing, Inc., Denbury Green Pipeline-Montana, LLC, Denbury Green Pipeline-North Dakota, LLC, Denbury Green Pipeline-Riley Ridge, LLC, Denbury Green Pipeline-Texas, LLC, Denbury Gulf Coast Pipelines, LLC, Denbury Holdings, Inc., Denbury Onshore, LLC, Denbury Operating Company, Denbury Pipeline Holdings, LLC, Denbury Thompson Pipeline, LLC, Encore Partners GP Holdings, LLC, Greencore Pipeline Company, LLC, and Plain Energy Holdings, LLC (each, a "Debtor" and collectively, the "Debtors"), as well as the proposed assumption or assumption and assignment of the License Agreements between Fairfield and one or more of the Debtors, and in support thereof, respectfully submits as follows:

## I.   <u>INTRODUCTION</u>

1.      The Court should deny confirmation of the Debtors' Plan because it contains material provisions that are contrary to the United States Bankruptcy Code (the "Bankruptcy Code") and applicable bankruptcy law, thus rendering the Plan non-confirmable under Bankruptcy Code § 1129(a)(1).

2.      Specifically, the provision of the Plan pursuant to which all executory contracts are to be deemed assumed, unless it: (1) is identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (2) was previously expired or terminated pursuant to its own terms; (3) has been previously assumed or rejected by the Debtors pursuant to a Final Order; (4) is the subject of a motion to reject pending on the Effective Date; or (5) has an ordered or requested effective date of rejection that is after the Effective Date, is contrary to law as it purports to authorize the Debtors to assume essentially all executory contracts, even those, like Fairfield's, that are non-assumable and non-assignable without Fairfield's consent.

3.      Moreover, the Plan contains a provision that to the effect that the assumption of an executory contract may also include the assignment of such a contract. Again, particularly as applied to executory contracts like Fairfield's that are non-assumable and non-assignable, that provision is contrary to law.

4.      Additionally, the release and exculpatory provisions of the Debtors' Plan are overbroad, non-specific, and contrary to other provisions of the Debtors' Plan. Thus, they fail to meet the standards and requirements for such clauses that have been adopted in the United States Fifth Circuit Court of Appeals.

5.      Finally, Fairfield objects to assumption or assumption and assignment of its License Agreements with the Debtors on the basis that Fairfield's License Agreements are non-assumable and non-assignable under Bankruptcy Code § 365 (c)(1)(A) without the consent of Fairfield, and Fairfield does not consent, absent payment of a mutually agreed upon transfer fee or cure amount.

## II.      BACKGROUND

6.      Fairfield is a geophysical service company that is in the business, *inter alia*, of licensing geoscientific data products and services to the oil and gas industry for the purpose of providing descriptions of subsurface geology for potential oil and gas exploration and/or production and other uses. These products include, but are not limited to, 2D, 3D and other types of seismic surveys and images, which are generally offered by Fairfield to licensees, for their sole and internal use only, for a limited term and on a "multi-client" basis.

7.      The Debtors are affiliated independent oil and natural gas companies with onshore production and development activities in the Gulf Coast and Rocky Mountain regions.[1]

8.      Denbury Resources, Inc. ("DRI") is the ultimate parent company of each of the other Debtors.[2] It is a publicly traded holding company that directly or indirectly owns the majority of the common stock of each of the other Debtors.[3] Denbury Onshore, LLC ("DOL") is the primary operating entity and holds the majority of the Debtors' assets and employees.[4]

## III.    THE BANKRUPTCY CASE AND PLAN

9.      On July 30, 2020 (the "Petition Date"), each of the Debtors filed voluntary petitions

---

[1] Disclosure Statement for Joint Chapter 11 Plan of Reorganization of Denbury Resources Inc. and Its Debtor Affiliates [ECF No. 17] (the "Disclosure Statement") at p. 11 of 390.
[2] *Id.*
[3] *Id*.
[4] *Id.*

for relief pursuant to Chapter 11 of Title 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors-in-possession pursuant to Bankruptcy Code §§1107 and 1108(a).

10.     On the Petition Date, the Debtors also filed their Plan [ECF No. 16] and Disclosure Statement [ECF No. 17]. By Order (I) Scheduling A Combined Disclosure Statement Approval And Plan Confirmation Hearing, (II) Conditionally Approving The Disclosure Statement, (III) Establishing Plan And Disclosure Statement Objection And Related Procedures, (IV) Approving The Solicitation Procedures, (V) Approving The Combined Notice, And (VI) Conditionally Waiving The Requirements That The U.S. Trustee Convene A Meeting Of Creditors And The Debtors File Schedules And SOFAS [ECF No. 68] (the "Scheduling Order"), the Court, among other things, conditionally approved the Disclosure Statement, approved the Debtors' proposed solicitation materials, scheduled a combined hearing on final approval of the Disclosure Statement and on confirmation of the Debtors' Plan, and established various deadlines relating to same.

11.     The Debtors' Plan is premised upon a de-leveraging of the Debtors' balance sheet and conversion of a substantial portion of its debt into equity.

12.     Holders of Priority Claims, Other Secured Claims, "Pipeline Lease Claims" and "RBL and Hedge Claims" are to be paid either in cash in full, have their claims reinstated, or receive such other treatment as renders their claims unimpaired.[5]  However, holders of the "Second Lien Note Claims", which aggregate about $1.59 billion, are to receive a pro rata share of approximately ninety-five percent (95%) of the "New DNR Equity" (subject to some possible dilution) and holders of "Convertible Note Claims" aggregating about $225.7 million, are to

---

[5]  Plan [ECF No. 16] at pp. 20-1 of 55.

4

receive 5% of the New DNR Equity (again subject to some possible dilution).[6]  Holders of "Subordinated Note Claims" are to receive warrants for purchasing new equity interests only if the class votes for the Plan, but if it does not, they do not receive anything under the Plan.[7] A similar treatment is proposed for Existing Equity Interest holders.[8]  Unsecured Creditors, however, are proposed to be paid in full.[9]

13.    According to the Plan, each of the Debtors are to continue to exist after the Effective Date, unless otherwise provided in the Plan.[10]  Nevertheless, as of the Effective Date of the Plan, the terms of the current members of the Board of Directors of DRI are to expire, and all of the directors of the initial term of the "New Board" of DRI are to be appointed in accordance with the terms of a Governance Term Sheet.[11] The Plan indicates that DRI's New Board is to initially consist of seven (7) members, the identities of which are to be disclosed either in the Plan Supplement or prior to the Confirmation Hearing.[12]   The Governance Term Sheet agreed to by the parties that executed the Restructuring Support Agreement, provides that the "New Board" is to initially consist of (a) the CEO; (b) two (2) directors selected by Fidelity Management and Research Company; (c) one (1) director selected by Golden Tree Asset Management LP; and (d) three (3) directors (or such other number to be determined by the "Required Consenting Second Lien Noteholders") to be selected by the "Second Lien Ad Hoc Committee."[13]

---

[6] *Id*. at p. 22 of 55.
[7] *Id*. at pp. 22-3 of 55.
[8] *Id*. at p. 24 of 55.
[9] *Id*. at p. 23 of 55.
[10] *Id*. at p. 27 of 55.
[11] *Id*. at p. 29 of 55.
[12] *Id*.
[13] Governance Term Sheet attached as Annex 4 to the Disclosure Statement [ECF No. 17] at p. 347 of 390.   The term "Required Consenting Second Lien Noteholders" is defined in the Plan as meaning (a) beneficial Holders of at least 50.01% of the aggregate outstanding principal amount of the Second Lien Notes subject to the Restructuring Support Agreement that are members of the Second Lien Ad Hoc Committee and (b) constituting at least two (2) members of

14.     As to executory contracts, the Plan generally provides that all executory contracts are to be deemed assumed, unless it: (1) is identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (2) was previously expired or terminated pursuant to its own terms; (3) has been previously assumed or rejected by the Debtors pursuant to a Final Order; (4) is the subject of a motion to reject pending on the Effective Date; or (5) has an ordered or requested effective date of rejection that is after the Effective Date.[14]

15.     Moreover, the Plan provides that the assumption of an executory contract may also include the assignment of such a contract.[15]

16.     Counterparties to executory contracts that are to be assumed and which have monetary defaults are supposed to receive a Cure Notice from the Debtors, and if the counterparty objects to the Cure Notice or assumption generally, it is required to file an objection by the date provided by in the Cure Notice.[16]

17.     On August 21, 2020, the Debtors filed a Plan Supplement containing their Assumed Executory Contracts and Unexpired Leases Schedule (Exhibit C) and their Rejected Executory Contracts and Unexpired Leases Schedule (Exhibit F) [ECF No. 185]. None of Fairfield's License Agreements with the Debtors is listed on either of those schedules.   According to the terms of the Debtors' Plan, that means that the Debtors propose that Fairfield's License Agreements be assumed or assumed and assigned by the Debtors for a cure amount of $0.

## IV.   THE LICENSE AGREEMENTS BETWEEN FAIRFIELD AND THE DEBTORS

---

the Second Lien Ad Hoc Committee. Plan [ECF No. 16], ¶ 118 at p. 14 of 55. The term "Second Lien Ad Hoc Committee" is, in turn, defined as the ad hoc committee of Holders of Second Lien Notes represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP, PJT Partners LP, and any local or foreign advisors. *Id.*, ¶ 123 at p. 14 of 55.
[14] *Id.* at p. 32 of 55.
[15] *Id.*
[16] *Id.* at p. 34 of 55.

18.    Prior to the Petition Date, Fairfield licensed seismic data and derivatives thereof to one or more of the Debtors herein pursuant to written license agreements as well as various supplements and/or related agreements (collectively, the "License Agreements").

19.    Specifically, by Master License Agreement dated July 30, 1998 (the "7/30/98 Master License") between Fairfield and Matrix Oil and Gas, Inc. ("Matrix"), which in 2001 merged with Danbury Resources, Inc. ("DRI"), Fairfield agreed to license to Matrix (and subsequently after the merger, DRI), on a non-exclusive basis and subject to certain confidentiality provisions and transfer restrictions, certain seismic data and derivatives thereof (the "Seismic Materials") as from time to time were ordered by Matrix and, thereafter, DRI pursuant to Supplements issued in accordance with the terms and conditions of the 7/30/98 Master License. Matrix and DRI, thereafter, periodically entered into various Supplements to the 7/30/98 Master Licenses, and upon the merger between Matrix and DRI, DRI specifically acknowledged and agreed that, as successor by merger to Matrix, it had become a party to the 7/30/98 Master License and subject to its terms.

20.    By License Agreement no. 05-0097-3D dated February 18, 2005 between Fairfield, Seismic Exchange, Inc. ("Seismic Exchange") and DRI (the "2/18/05 License"), Fairfield and Seismic Exchange agreed to license to DRI, on a non-exclusive basis and subject to certain confidentiality provisions and transfer restrictions, certain Seismic Materials identified on an attachment thereto.

21.    In addition, by License Agreement no. 05-0047-3D dated January 18, 2005 between Fairfield, Seismic Exchange and DRI, Fairfield and Seismic Exchange agreed to license to DRI, on a non-exclusive basis and subject to certain confidentiality provisions and transfer restrictions,

certain Seismic Materials identified on an attachment thereto.

22.     The License Agreements between Fairfield and DRI provide, among other things, that:

<table>
<tr><td>a)</td><td>The licenses are for a limited period of time and grants use of the Seismic Materials on a non-exclusive basis for DRI's internal use only;</td></tr>
<tr><td>b)</td><td>The Seismic Materials licensed to DRI shall at all times remain owned by the licensor and contain valuable information and trade secrets of the licensor;</td></tr>
<tr><td>c)</td><td>DRI many only use, disclose and show the licensed Seismic Materials as expressly permitted in the License Agreements;</td></tr>
<tr><td>d)</td><td>DRI may not transfer, assign or grant a security interest in any of its rights or obligations under the License Agreements without the prior written consent of Fairfield; and</td></tr>
<tr><td>e)</td><td>Except as provided in the License Agreements, DRI may not sell, sublicense, transfer, assign, encumber or otherwise dispose of or exploit the Seismic Materials.</td></tr>
</table>

### V.   FAIRFIELD'S SPECIFIC OBJECTIONS TO THE DEBTORS' PLAN AND ASSUMPTION OR ASSUMPTION AND ASSIGNMENT OF ITS LICENSE AGREEMENTS WITH THE DEBTORS

A.     Fairfield's License Agreements are Executory Contracts

23.     Fairfield's License Agreements are executory contracts within the meaning of Bankruptcy Code § 365 as, among other things the Debtor, DRI, has continuing confidentiality obligations to Fairfield under those agreements and restrictions upon use of the licensed Seismic Materials while, at the same time, Fairfield has continuing obligations to allow DRI to use the materials and/or to defend legal proceedings arising out of the licensing thereof. *See, e.g., In re Aerobox Composite Structures*, LLC, 373 B.R. 135 (Bankr. D.N.M. 7/27/07) (patent and technology license agreement found executory based primarily on continuing obligations of both

parties to maintain confidentiality); *In re Chapin Revenue Cycle Management, LLC*, 343 B.R. 728 (Bankr. M.D.Fla. 3/1/06) (computer software licensing agreement held to be executory contract where the licensor had obligation to allow continued use by debtor and debtor had obligation to maintain confidentiality of software). *See also In re Sunterra Corporation*, 361 F. 3d 257 (4th Cir. 3/18/04) (computer software licensing agreement held executory due to confidentiality obligations); *In re Superior Toy & Mfg. Co.*, 78 F. 3d 1169 (7th Cir. 3/7/96) (trademark license found to be executory contract).

B.      The Provisions of the Plan Authorizing the Debtors to Assume All Executory Contracts Not Listed on the Debtors' Schedule of Rejected Executory Contracts and Unexpired Leases or Not Otherwise Rejected, and Permitting the Debtors to Assign All Executory Contracts that Have been Assumed Violate Bankruptcy Law. In addition or, alternatively, the Debtors Cannot Assume or Assume and Assign Fairfield's License Agreements As they are Non-Assumable and Non-assignable Without the Consent of Fairfield.

24.      Although Bankruptcy Code § 365(a) gives a debtor or trustee, with court approval, the right to assume (or reject) executory contracts, and Bankruptcy Code § 365(f) generally gives the debtor or trustee the power to assign executory contracts, Bankruptcy Code § 365(c)(1)(A) contains an exception to both of those grants of authority.  Bankruptcy Code § 365(c)(1)(A) provides that a trustee may <u>not</u> assume or assume and assign an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if:

> (a) "applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession . . .," and (b) "such party does not consent to such assumption or assignment . . .".

25.      It has been held that the phrase "applicable law" as used in Bankruptcy Code § 365(c)(1)(A) means "any law applicable to a contract, other than bankruptcy law".  *See In re XMH*

*Corp.*, 647 F.3d 690, 695 (7th Cir. 2011).   Fairfield asserts that Texas and U.S. trade secrets laws constitute "applicable law" under Bankruptcy Code § 365(c)(1)(A) and excuse Fairfield from accepting performance from or rendering performance to an entity other than DRI, thus precluding assumption or assumption and assignment of Fairfield's License Agreements without Fairfield's consent.[17]

26.     The Texas Supreme Court has defined a trade secret as "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003). It is axiomatic that the secrecy of a trade secret is of paramount importance for the information to maintain its value: trade secrets must necessarily remain secret to be useful to the owner. *See generally Rugen v. Interactive Bus. Sys., Inc*., 864 S.W.2d 548, 552 (Tex.App.-Dallas 1993, no writ) ("[A] trade secret can exist in a combination of characteristics and components[,] each of which, by itself, is in the public domain, but the unified process, [the] design and operation of which in unique combination[ ] affords a competitive advantage, is a protected trade secret.")

27.     It has been uniformly held that seismic data is a protected trade secret under Texas law.  *See, e.g., In re Bass*, 113 S.W.3d 735, 742 (Tex. 2003).  *See also Musser David Land Co. v. Union Pac. Res*., 201 F.3d 561, 569 (5th Cir. 2000).  In determining that seismic data is considered a trade secret, the Texas Supreme Court has recognized that seismic data and other methods for obtaining subsurface geological information are widely considered trade secrets both within the oil and gas industry and at law. *See In re Bass*, 113 S.W.3d at 742. Further, the United

---

[17] The License Agreements provide that Texas law is to be the law governing the agreements.

10

States Bankruptcy Court for the Western District of Texas has also found subsurface data, including both seismic and microseismic data and well logs, to be entitled to trade secret protection under Texas law. *In re TXCO Res., Inc.*, 475 B.R. 781 (Bankr. W.D. Tex. 2012). This Court should follow the Texas Supreme Court, the Fifth Circuit and the Western District of Texas by finding that the Seismic Materials licensed to DRI by Fairfield are likewise trade secrets.

28.     Under the Texas version of the Uniform Trade Secrets Act, an actionable misappropriation is considered to exist and may be enjoined when a disclosure or use of a trade secret occurs without the express or implied consent of the owner.[18]   Tex. Civ. Prac. & Rem. Code § 134A.002(3). Further, a person who, without the owner's consent, knowingly communicates or transmits a trade secret, is guilty of committing a felony.  *See* Tex. Penal Code § 31.05.

29.     Similarly, the Defend Trade Secrets Act of 2016 creates a federal cause of action for trade secret misappropriation that in large part mirrors the Uniform Trade Secrets Act.  The definition of the term "trade secret" in the Defend Trade Secrets Act ("DTSA") is similar to the definition found in the Uniform Trade Secrets Act, and the remedies set forth in the DTSA are in large part, similar to the state version.[19] *See* 18 U.S.C. § 1836 *et seq*.  Further, while the DTSA creates federal jurisdiction over trade secret theft, it does not preempt state trade secret law and allows trade secret owners to pursue federal civil remedies as an alternative to or in addition to existing state remedies. 18 U.S.C. § 1838.

---

[18] A trade secret is defined as information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Uniform Trade Secrets Act, § 1(4).

[19] On the other hand, the DTSA provides an ex parte seizure procedure for use where the party against whom the seizure is ordered "would destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to such person…." 18 U.S.C. § 1836(b)(2).

30.     Although Fairfield has not been able to find any case law specifically discussing whether trade secret law is "applicable law" under § 365(c)(1)(A), the trade secrets laws serve similar purposes to other laws considered "applicable law" under § 365(c)(1)(A), such as federal trademark, patent and copyright law, which prohibit nonconsensual assignments in order to provide protection to owners of information or materials that derive their value from being difficult to develop, unique and/or not publicly available by limiting who can use the information or materials without the owner's consent.[20]   Moreover, under both the Texas Uniform Trade Secrets Act and the Defend Trade Secrets Act of 2016, any transfer or use of a trade secret requires the express or implied consent of the owner thereof.   Thus, the Texas Uniform Trade Secrets Act and the Defend Trade Secrets Act of 2016 should be found to constitute "applicable law" under Bankruptcy Code § 365(c)(1)(A) that excuses Fairfield from accepting performance from or rendering performance under its License Agreements to entities other than DRI.

31.     For the foregoing reasons, Fairfield objects to any attempt by the Debtors to assume or assume and assign Fairfield's License Agreements. As shown above, the License Agreements are non-assumable and non-assignable under Bankruptcy Code § 365 (c)(1)(A) without Fairfield's

---

[20] *See e.g. In re Trump Entm't Resorts, Inc*., 526 B.R. 116, 124 (Bankr. D. Del. 2015)("federal trademark law generally bans assignment of trademark licenses absent the licensor's consent because, in order to ensure that all products bearing its trademark are of uniform quality, the identity of the licensee is crucially important to the licensor"); *In re CFLC, Inc.*, 89 F.3d 673, 679 (9th Cir. 1996)(The fundamental policy of the patent system is to "encourag[e] the creation and disclosure of new, useful, and non-obvious advances in technology and design" by granting the inventor the reward of "the exclusive right to practice the invention for a period of years"… free assignability—of nonexclusive patent licenses would undermine the reward that encourages invention because a party seeking to use the patented invention could either seek a license from the patent holder or seek an assignment of an existing patent license from a licensee. In essence, every licensee would become a potential competitor with the licensor-patent holder in the market for licenses under the patents."); *In re Patient Educ. Media, Inc*., 210 B.R. 237, 242 (Bankr. S.D.N.Y. 1997)("The federal policy designed to protect the limited monopoly of copyright owners and restrict unauthorized use constitutes applicable nonbankruptcy law. It prevents the trustee from assigning the nonexclusive license absent the owner's consent.")

consent. Fairfield does not consent, absent payment of a mutually agreed upon transfer fee or cure amount.

32.     Furthermore, to the extent the executory contract provisions of the Debtors' Plan purport to authorize the Debtors to assume or assume and assign non-assumable and non-assignable contracts like Fairfield's License Agreements, those provisions are contrary to law.

C.      <u>The Release and Exculpation Provisions in the Debtors' Plan are Overbroad and Contrary to Law</u>.

33.     The Debtors' Plan contains broad release and exculpation provisions that release the Debtors, the Reorganized Debtors and numerous third parties from a broad array of both pre and post-Petition claims, obligations, actions, and omissions.[21]

34.     Among other things, the release provision in the Plan releases the Debtor, its estate, and the Reorganized Debtors, from:

> "all Claims . . . based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), . . . the Debtors' restructuring efforts, . . . the Chapter 11 Cases, . . . the Restructuring Support Agreement, the DIP Facility, the Disclosure Statement, the Plan, the Exit Facility, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document . . . created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the Disclosure Statement, the Plan, the Exit Facility, the Plan Supplement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan. . . , or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. . .".[22]

35.     The exculpation provision of the Plan, among other things, exculpates the Debtor and Reorganized Debtor from, "any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation,

---

[21] *See* Plan [ECF No. 16] at pp. 44-5 of 55.
[22] *Id*. at p. 44 of 55.

dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the DIP Facility, the Disclosure Statement, the Plan, the Exit Facility, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document . . . created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the Disclosure Statement, the Plan, the Exit Facility, the Plan Supplement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, . . . , or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date . . .".[23]

36.     The Fifth Circuit takes a "very restrictive" approach to releases in bankruptcy cases. To that end, it has recognized that § 524(e) of the Bankruptcy Code generally prohibits non-consensual, non-debtor releases, and the Court has indicated that a plan containing such a release is non-confirmable. *See In re Vitro S.A. B. de CV*, 701 F.3d 1031, 1069 (5th Cir. 2012), *cert. dismissed*, 569 U.S. 944 (2013), *citing In re Pac. Lumber Co.*, 584 F3d 229, 252 (5th Cir. 2009). Moreover, it has been held that a release provision will be found to be prohibited, thus rendering the plan non-confirmable, if the language of the release is vague, over broad or does not specifically set out who is affected by the release and the specific claims that are being released. *See, e.g., Hernandez v. Larry Miller Roofing, Incorporated*, 628 Fed. Appx. 281, 286-288 (5th Cir. 1/6/16); *In re Patriot Place, Ltd.*, 486 B.R. 773, 821-821 (Bankr. W.D.Tex. 2013).

37.     The releases and exculpation provision contained in the Plan are vague, non-specific, and over broad in violation of Fifth Circuit requirements.  Nowhere does the release

---

[23] *Id.* at p. 45 of 55.

identify any specific claims intended to be released, or the identity of the specific parties who are to be releasing those claims.   Yet, to be effective, the Fifth Circuit has made it clear that a release must be specific in what it releases and may not contain generic boilerplate language as does the release proposed in the Debtors' Plan.   *Hernandez*, 628 Fed. Appx. at 287-288.

38.     Moreover, the release and exculpation provisions are so over broad that they could be construed as barring Fairfield and other similarly situated licensors of Seismic Materials, intellectual property, trade secrets, and copyrighted or patented materials, whose licenses are non-assumable and non-assignable under Bankruptcy Code § 365 (c)(1)(A) from being able to assert rights, benefits and remedies contained in their licenses or under applicable law against the Reorganized Debtors. That would run contrary to the very purpose and intent of Bankruptcy Code § 365 (c)(1)(A).

## VI.    <u>RESERVATION OF RIGHTS</u>

39.     Fairfield reserves the right to raise other objections it may have to confirmation of the Debtors' proposed Plan and/or assumption or assumption and assignment of its License Agreements, as well as all other rights including, without limitation, the right to file any such further and additional objections to any filings in this proceeding that it deems appropriate.

## VII.    <u>CONCLUSION</u>

For the foregoing reasons, Fairfield prays that the Court deny confirmation of the Debtors' Plan, as written, reject the Debtors' proposed assumption or assumption and assignment of Fairfield's License Agreements without Fairfield's consent, and provide any other and further relief as is just and equitable.

15

Respectfully submitted,

*/s/ Andrew A. Braun*
ANDREW A. BRAUN
Texas State Bar No. 24061558
GIEGER, LABORDE & LAPEROUSE, L.L.C.
Suite 4800, 701 Poydras Street
New Orleans, Louisiana   70139-4800
Telephone:   (504) 561-0400
Facsimile: (504) 561-0100
Email: abraun@glllaw.com

*Counsel for Fairfield Industries Incorporated d/b/a Fairfield Geotechnologies*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing pleading was served via electronic mail on the 28th day of August, 2020, upon all parties in interest listed on the ECF service list.

*/s/ Andrew A. Braun*

16